Vincent P. Slusher, State Bar No. 00785480
vince.slusher@dlapiper.com
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano, NY Bar No. 2286144
thomas.califano@dlapiper.com
George B. South, NY Bar No. 2446771
george.south@dlapiper.com
Jeremy R. Johnson, NY Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

J. Mark Chevallier, State Bar No. 04189170
mchevallier@mcslaw.com
James G. Rea, State Bar No. 24051234
jrea@mcslaw.com
McGUIRE, CRADDOCK & STROTHER, P.C.
3550 Lincoln Plaza
500 N. Akard St.
Dallas, Texas 75201
Telephone: (214) 954-6800
Facsimile: (214) 954-6850

Martin T. Fletcher, MD Bar No. 07608
mfletcher@wtplaw.com
Stephen F. Fruin, MD Bar No. 08456
sfruin@wtplaw.com
Thomas J. Francella, Jr., DE Bar No 3835
tfrancella@wtplaw.com
WHITEFORD, TAYLOR AND PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
Telephone: (410) 347-8700
Facsimile: (410) 752-7092

Proposed Attorneys for Hingham Campus, LLC,
Debtor and Debtor in Possession

Proposed Attorneys for Linden Ponds, Inc.,
Debtor and Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case Nos. 11-33913 and 11-33912** |
| | § | |
| **LINDEN PONDS, INC. and** | § | **Chapter 11** |
| **HINGHAM CAMPUS, LLC,** | § | |
| | § | **Joint Administration Pending** |
| **Debtors.** | § | |

## AFFIDAVIT OF PAUL RUNDELL IN SUPPORT OF FIRST DAY MOTIONS OF
## LINDEN PONDS, INC AND HINGHAM CAMPUS, LLC

State of New York      )
                        ) ss.:
County of New York    )

1.      I am the Plan Administrator for Senior Living Retirement Communities LLC, formerly known as Erickson Retirement Communities, LLC ("Senior Living"), which is the sole member of Hingham Campus, LLC ("Hingham") one of the debtors and debtors in possession in the above-captioned cases. In addition, I provide analysis and advice to Linden Ponds, Inc.

("Linden Ponds" and together with Hingham, the "Debtors"), another of the debtors and debtors in possession in the above-captioned cases, pursuant to that certain Management and Marketing Agreement dated November 26, 2003, by and between Linden Ponds and Senior Living (as amended, the "Management Agreement"), and am familiar with its operations.

2.     I am a Managing Director of Alvarez & Marsal in its Healthcare Industry Group in New York, New York.  I have more than thirteen (13) years of experience, specializing in interim management, with a focus on cash management and financial analysis.  I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis and operational improvement services to clients, and I have advised unsecured and secured creditors and debtors both in and out of court.

3.     I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Affidavit on behalf of the Debtors.

4.     On June 14, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

5.     The Debtors remain in possession of their assets and continue to manage their business as a debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.     No trustee, examiner, or committee has been appointed in these cases.

7.     The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

    (a)     Debtors' Joint First Day Motions

        i.     Motion of the Debtors For Order (I) Extending Time For

2

Debtors To File Their Schedules and Statements and (II) Permanently Waiving Same Upon Confirmation of Debtors' Plan (the "Schedules Motion");

ii.  Emergency Motion For Conditional Approval of Disclosure Statement and Authorization To Solicit Acceptances Of Plan (the "Combined Hearing Motion");

iii. Motion of the Debtors For Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection To Secured Lenders and (III) Scheduling A Final Hearing (the "Cash Collateral Motion");

iv.  Motion of the Debtors To Approve Interim and Final Orders to Approve Debtor in Possession Financing (the "DIP Motion");

v.   Motion of the Debtors For an Order Authorizing the Debtors' Assumption of the Restructuring, Lockup, Plan Support and Forbearance Agreement (the "Lockup Assumption Motion");

(b)  Linden Ponds' First Day Motions

i.   Motion of Linden Ponds, Inc. for Authorization to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Employee Medical and Similar Benefits and (III) Other Miscellaneous Employee Expenses and Benefits (the "Wage Motion");

ii.  Motion of Linden Ponds, Inc. for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service to the Debtor, (II) Deeming the Utility Companies Adequately Assured of Future Performance by the Debtor and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion");

iii. Motion of Linden Ponds, Inc. For Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms and (IV) Maintenance of Existing Investment Practices (the "Linden Ponds Cash Management Motion");

iv.  Motion of Linden Ponds, Inc. for an Order Authorizing Debtors to Escrow Initial Entrance Deposits (the "IED

3

<u>Motion</u>");

    (c)    Hingham's First Day Motions

        i.    Motion of Hingham Campus, LLC For Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms and (IV) Maintenance of Existing Investment Practices (the "<u>Hingham Cash Management Motion</u>");

8.    I am submitting this Affidavit in support of the Debtors' First Day Motions. Capitalized terms not defined in this Affidavit shall have the meanings ascribed to the term in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtors. If I were called upon to testify, I would testify consistently with the facts set forth in this Affidavit.

9.    This Affidavit provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases. <u>Section I</u> provides an overview of the Debtors' operations. <u>Section II</u> recounts the events preceding the bankruptcy filing. <u>Section III</u> affirms and incorporates facts that support the First Day Motions. A detailed chart depicting the Debtors' capital structure is attached hereto as <u>Exhibit A</u>.

## I.    <u>Overview of the Debtors' Business</u>

### A.    **Description of the Continuing Care Retirement Community.**

10.    The Linden Ponds campus, which opened in October 2004, is a 108-acre continuing care retirement community (a "<u>CCRC</u>") that offer seniors a full lifecycle of services during their retirement years from independent living to skilled nursing care on the same campus. The CCRC provides affordable living accommodations and related healthcare and

4

support services to a target market of middle-income seniors aged sixty-two (62) years and older. The CCRC enables seniors to remain in the same place as they age and their needs change by providing various levels of support and care at the same facility. In addition, the CCRC provides the residents with multiple entertainment outlets and other social benefits for all stages of their retirement living. The CCRC includes space to cover all aspects of everyday life from dinner to exercise, music to game rooms, theatre and television studios, planters, gardens, dining rooms, a pub, a convenience store, a bank, a beauty salon/barbershop, an aquatic center, classrooms, a library, a woodwork and hobby shop, a pharmacy, a computer lab, a non-denominational chapel, walking paths and a fitness center.

11.     As of March 31, 2011, the CCRC had (a) 988 completed independent living units, 5 of which are units utilized for guest rooms and services, 869 of which are occupied units, resulting in an 87.9% occupancy rate of independent living units; and (b) 132 skilled nursing beds, of which 90 are occupied by residents, resulting in a 68% occupancy rate. Upon completion of construction of the CCRC, including Residential Building 2.5 and Neighborhood 3, it is anticipated that the CCRC's facilities will include up to 1,705 independent living units and 228 assisted living and skilled nursing beds.

**B.      Development of the CCRC.**

12.     The CCRC has been developed as follows: (i) Hingham, the landowner, purchased the land; (ii) the construction and development of the new CCRC began; then (iii) when the CCRC was ready for occupancy by residents, Linden Ponds, an independent not-for-profit operator, began to operate the CCRC. It was anticipated that, when the construction of the CCRC is complete, the land and CCRC would be sold to Linden Ponds.

i.      <u>First Phase: Land Acquisition, Construction, and Development.</u>

13.     During the first phase of the CCRC, Hingham was formed to purchase the land.

Hingham has ownership of both the real property and all improvements as they are constructed on the land, until the CCRC is sold to Linden Ponds. In general, the land acquisition was financed through cash, equity provided by Hingham's parent company, construction loans, and/or subordinated debt. Once the land was acquired, Hingham began the construction and development of the CCRC.

ii.     Second Phase: Occupancy by Residents.

14.     At the beginning of the marketing of the CCRC, Linden Ponds was created to operate the campus on a day-to-day basis. Linden Ponds and Hingham entered into a master lease agreement (the "Master Lease"), pursuant to which Linden Ponds leased the land and the improvements from Hingham. The Master Lease is a twenty-year, triple net lease, requiring Linden Ponds to pay all ongoing maintenance expenses (e.g. utilities, taxes, and insurance), with three ten-year renewal options.

15.     Hingham also entered into a community loan agreement with Linden Ponds (the "Community Loan"), pursuant to which Linden Ponds lent Hingham all initial entrance deposits ("IEDs") collected from the CCRC's residents prior to their occupancy of a unit after such IEDs have passed through the indenture for the 2007 Bonds described below. The proceeds of the Community Loan were generally sufficient to pay all construction and development costs of the CCRC. Debt service on the Community Loan paid by Hingham to Linden Ponds was fully offset by the rental payments made by Linden Ponds to Hingham under the Master Lease. Hingham's obligations were secured by a mortgage on the property in favor of Linden Ponds. Currently, Hingham owes Linden Ponds approximately $177,170,023 under the Community Loan.

16.     To fund working capital deficits of Linden Ponds, Hingham provided a working capital loan (the "Working Capital Loan") to Linden Ponds. To secure its obligations under the Working Capital Loan, Linden Ponds granted Hingham a security interest in all assets of Linden

Ponds, including the Residence and Care Agreements and the IEDs. Currently, Linden Ponds does not owe Hingham anything under the Working Capital Loan.

17. When the first phase of the CCRC was near completion, Linden Ponds secured permanent financing through a municipal bond offering (tax-exempt and taxable bonds) issued by the Massachusetts Development Finance Agency with the total principal amount of $156,365,000 (the "2007 Bonds"). The obligor on the 2007 Bonds is Linden Ponds, not Hingham. Hingham is also indirectly liable to the holders of the 2007 Bonds (the "Bondholders") by virtue of its obligations under the Fee and Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of July 1, 2007, by and between Linden Ponds, Hingham and Wells Fargo Bank, National Association, as successor indenture trustee ("Bond Trustee") with respect to the 2007 Bonds. The 2007 Bonds have a fixed rate component that is typically long-term and a variable rate component that is paid down at stabilization.

18. The issuance of the 2007 Bonds was comprised of Series 2007 A Bonds (Tax-Exempt), Series 2007 B Bonds (Tax-Exempt) and of Series 2007 C Bonds (Taxable). The Series A Bonds consist of $101,365,000 of tax-exempt fixed rate term bonds with a final maturity date in 2042 and the interest on the Series 2007 A Bonds is payable semiannually on May 15 and November 15 of each year. The Series 2007 B Bonds consist of $45,000,000 of tax-exempt variable rate demand bonds with a final maturity date in 2042 and the interest on the Series B Bonds is payable monthly. The Series 2007 C Bonds consist of $10,000,000 in taxable variable rate demand Bonds with a final maturity date in 2042 and the interest on the Series 2007 C Bonds is payable monthly.

19. An irrevocable transferable direct-pay letter of credit was issued by Sovereign

Bank (the "Bank") in the maximum initial stated amount of $55,768,494 (the "Letter of Credit") which provides liquidity support for the principal of and interest the Series 2007 B Bonds and Series 2007 C Bonds. The Letter of Credit expires on July 31, 2012.

20.    Upon the issuance of the 2007 Bonds, Linden Ponds entered into a purchase option agreement (the "Purchase Option Agreement") with Hingham, whereby a significant portion of the proceeds of the 2007 Bonds were used by Linden Ponds to pay Hingham a purchase option deposit (the "Purchase Option Deposit") to ensure the sale of the CCRC to Linden Ponds. Pursuant to the Purchase Option Agreement, the holders of the 2007 Bonds received a first priority mortgage on the property and the CCRC.

iii.    Residential Building 2.5 and Neighborhood 3.

21.    Zoning and site plan approval has been received for construction of Residential Building 2.5 and Neighborhood Three of the CCRC.  As currently designed, Residential Building 2.5 will contain 120  independent living units in a seven-story steel framed building. Neighborhood Three is currently designed to include 642 independent living units in five residential buildings, and one community building containing 49,356 square feet of community space, including a restaurant, classrooms, administrative offices, and meeting space.  However, the Manager (defined below) and Linden Ponds will review market trends and community requirements prior to finalizing the designs for Residential Building 2.5 and Neighborhood Three, and thus the final approved designs may deviate from the current designs.  Planning and design on Residential Building 2.5 are expected to occur prior to Neighborhood Three and are anticipated to commence once occupancy rates for Neighborhood One and Neighborhood Two indicate the need for additional units.  Construction of Residential Building 2.5 is currently anticipated to begin within nine (9) months after  occupancy of the independent living units of the existing CCRC has averaged at least 93%  for three (3) consecutive months.  Should

8

absorption of available units be delayed or slower than currently projected, this will cause a delay in reaching 93% occupancy of the independent living units of the existing CCRC and the corresponding commencement of construction on Residential Building 2.5. A delay in construction of Residential Building 2.5 may result in the resizing of the 2011 Bonds as further set forth in the definition of "Resizing Event." It is projected that the amount of IEDs received from the settlement of Residential Building 2.5 will be greater than the construction costs required to build Residential Building 2.5, thus generating positive cash flows to the CCRC through the collection of IEDs. In addition, the ongoing operations of Residential Building 2.5 are projected to add incremental cash flow to the CCRC that it will not otherwise have should Residential Building 2.5 not be built. Should the construction of Residential Building 2.5 be delayed or not completed, this will negatively impact the cash flows of the CCRC and lower the amount of cash available to pay debt service.

C. **Management of the CCRC.**

22. Senior Living provided (a) development and construction services to Hingham, pursuant to an Amended and Restated Development Agreement dated as of August 21, 2006 by and between Hingham and Senior Living (as amended, the "Development Agreement"), and (b) management services to Linden Ponds pursuant to the Management Agreement. Upon the consummation of Senior Living's chapter 11 plan of reorganization (as discussed below), Senior Living delegated and assigned its rights under the Management Agreement to Erickson Living Management, LLC (formerly known as Redwood-ERC Management, LLC), a Maryland limited liability company ("Erickson" or the "Manager"), for a transitional period pursuant to that certain Transitional Subcontract Agreement effective April 30, 2010 among Senior Living, the Manager, Linden Ponds and the 2007 Bond Trustee (as amended, the "Transitional Subcontract").

23. The Management Agreement may be terminated due to a party's uncured material

breach, the failure of a party to maintain necessary licenses or permits, the bankruptcy or insolvency of the Manager, or certain legal changes that would adversely affect Linden Ponds' tax-exempt status. Unless terminated earlier, the existing Management Agreement is expected to be replaced on or prior to the Effective Date by a new management agreement (the "New Management Agreement") to be entered into by and between the Manager and reorganized Linden Ponds.

### D. Residents of the CCRC.

#### iv. Residence and Care Agreements.

24. Prior to a resident's occupancy of an independent living unit in the CCRC, Linden Ponds enters into a residence and care agreement (the "Residence and Care Agreement") with the resident. Under the terms of the Residence and Care Agreement, each resident agrees to pay to Linden Ponds an entrance deposit (an "ED") or IED and monthly service fees, which average about $2,300 per unit. In return, the resident is permitted to occupy a unit in the CCRC for his lifetime, subject to certain conditions. Pursuant to the Residence and Care Agreement, the resident receives a full refund of his ED or IED upon his death or departure from the community, subject to a successful resale of the unit. The resident can terminate the Residence and Care Agreement without cause on thirty-days' notice, and the Residence and Care Agreement can be assigned to a new manager/operator of the community if the manager/operator is certified as a continuing care provider.

#### v. EDs and IEDs.

25. The EDs and IEDs paid by the residents prior to their occupancy of a unit range from $149,000 to $600,000. When a resident moves out or dies, if the unit's new entrance deposit is the same or greater than the ED or IED price paid by the departing resident, then the departing resident's ED or IED will be 100% refunded and Linden Ponds will keep the

10

difference between the new entrance deposit and the departing resident's ED or IED from the sale of the unit. If the new entrance deposit is less than the departing resident's ED or IED, then the departing resident will generally receive the lesser amount. In this scenario, Linden Ponds is not required to participate in the downside risk in this transaction, unless it elects to do so.

vi.      State Regulations.

26.      The CCRC industry is heavily regulated by state authorities. Linden Ponds, as operator of the CCRC, is required to satisfy the regulations of the state where its facilities are located, in this case the Commonwealth of Massachusetts.

27.      Massachusetts regulates the marketing and sale of living units and services in CCRCs pursuant to Massachusetts General Laws Chapter 93, Section 76 (the "CCRC Act"). The CCRC Act imposes three fundamental duties on providers of CCRCs after the effective date of the CCRC Act, March 15, 1983.

28.      First, at or before the earlier of execution of a contract to provide continuing care, or the time any money or other property is transferred to a CCRC provider by or on behalf of a prospective resident, the provider is required to deliver a detailed disclosure statement to the prospective resident. Among other disclosures, such statement must include certified financial statements of the provider and statements of anticipated sources and applications of funds used and to be used in the purchase and construction of the CCRC facility.

29.      Second, the CCRC Act specifies certain minimum requirements for all continuing care contracts including, in particular, the right to a refund of the entrance deposit, if the prospective resident rescinds the contract prior to occupancy or dies prior to occupancy, or if the living unit is not available for occupancy by the agreed-on date, unless extended in writing by the provider and the prospective resident. Such entrance deposit refund is subject to certain limited adjustments up or down depending on the particular circumstances. This portion of the

11

CCRC Act also requires continuing care contracts to describe the services provided to and recurring fees required from residents, and requires that entrance fees, minus no more than one percent for each month of occupancy, be refunded to the resident when the resident leaves the facility or dies.

30.     Third, any provider intending to market or develop a CCRC that requires prepayment for any services or to market or develop additional living units at a CCRC is required to file with the Massachusetts Executive Office of Elder Affairs ("MA Elder Affairs") copies of such disclosure statement, such contracts, and any available advertising or promotional material to be used in connection with such marketing effort.  Such a provider is also required by the CCRC Act to file with MA Elder Affairs copies of any changes in such materials within 30 days after the provider utilizes the changed materials, and a copy of the building permit for the CCRC facility within 30 days after its issuance.  The CCRC Act does not give MA Elder Affairs any right of pre-approval of such disclosure statement, continuing care contract or promotional materials.

31.     The CCRC Act provides two key, private enforcement mechanisms.  Any continuing care contract drawn in violation of the minimum contract requirements of Section 76(c) of the CCRC Act may be rescinded by the resident and the resident shall be entitled to a full refund of the entrance fee.  Section 76(e) of the CCRC Act further provides that in addition to the Section 76(c) contract rescission remedy, any violation of any portion of the CCRC Act shall also constitute an unfair and deceptive trade practice under the provisions of Massachusetts General Laws Chapter 93A.  In turn, Chapter 93A provides up to treble damages and attorneys fees as a remedy for unfair or deceptive trade practices.

**E.      Corporate Governance.**

32.     National Senior Campuses, Inc. ("NSC"), a Maryland non-stock corporation, is

the sole member of Linden Ponds.  Under the Ninth Amended and Restated Bylaws of Linden Ponds, as amended (the "Bylaws"), the Board of Directors of Linden Ponds (the "Board of Directors") has all of the powers of governance of Linden Ponds except for certain powers of NSC as the sole member of Linden Ponds (the "Member Powers").  NSC's mission is to provide support to its affiliated continuing care retirement communities.  The Member Powers include the appointment and removal of Directors and any other rights of a member under the statutes or charter.

33.    Under the Bylaws, there are two classes of directors:  one NSC Director who is also a member of the NSC's board of directors (the "NSC Director") and the other Directors (the "Directors").  Members of the Board of Directors are elected as follows:  The Board of Directors are appointed by the Member, any of whom may be a member of the Member's board of directors.  The remaining Directors may include one (1) individual who is a "Resident Director" (*i.e.*, a resident of Linden Ponds' continuing care retirement community) who may be appointed by the Member if and when the Member shall deem appropriate.  An employee of or owner of an equity interest in any entity providing comprehensive management services for Linden Ponds' retirement community or of any of such entity's affiliates, or a member of the employee's or owner's "family" (which means a person's spouse, ancestors, children, grandchildren, great grandchildren, and the spouses of those children, grandchildren and great grandchildren) may not serve as a Director. The NSC Director serves for a one-year term and may be reappointed to subsequent one-year terms.  The initial term of each Director is one year.  Under the Bylaws, upon reappointment after the initial one-year term, a Director then serves for subsequent terms of up to three-years each.  The terms of the members of the Board of Directors are staggered.

## II.    Events Leading to Chapter 11

13

### A. The Decline in the Market.

34.     During the past few years, senior living facilities, including the CCRC, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital and declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the financial market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities.  As a result of these challenging market conditions, Linden Ponds has suffered a substantial loss of revenue and lower than anticipated absorption rates.

### B. Senior Living Cases.

35.     Substantial losses of revenue at certain senior living facilities in turn forced Senior Living, previously known as Erickson Retirement Communities, the prior manager and developer of Linden Ponds and Hingham's direct parent company, and certain other of its related entities to seek chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 09-37010) (the "Senior Living Cases") on October 19, 2009.  Senior Living's Fourth Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on April 16, 2010.  The Senior Living Cases are still pending before this Court.

### C. Illinois Cases.

36.     Subsequently, two of Senior Living's other direct subsidiaries, Lincolnshire Campus, LLC and Naperville Campus, LLC, along with the not-for-profit operators of their respective Sedgebrook and Monarch Landing campuses, Sedgebrook, Inc. and Monarch Landing, Inc. (collectively, the "Illinois Debtors"), also sought chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 10-34176) (the "Illinois Cases").  The Illinois Debtors'

14

Third Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on November 16, 2010. The Illinois Cases are still pending before this Court.

### D. The Debtors' Prepetition Restructuring Attempts.

37. The Bond Trustee has indicated that events of default under the 2007 Bonds have occurred including (i) the failure of Linden Ponds to make the principal and interest payments due to the Bond Trustee on March 15, 2011, (ii) failure to reimburse the Bank under the letter of credit agreement for the principal component of a draw made on March 1, 2011 and (iii) the failure of Linden Ponds to deposit IEDs with the 2007 Bond Trustee, commencing December 2010, when Linden Ponds began escrowing such IEDs to provide further assurance to prospective residents. Prior to these defaults, the Debtors entered into negotiations with the Bond Trustee, the Bank and certain holders of the outstanding 2007 Bonds (the "Consenting Holders").

38. On April 5, 2011, the Debtors, the Bond Trustee, the Bank and the Consenting Holders executed that certain Restructuring Term Sheet (the "Restructuring Term Sheet"). The Restructuring Term Sheet was a non-binding agreement among the signatories to, among other things, (i) conduct an out-of-court exchange offer whereby the 2007 Bonds would be exchanged for new bonds to be issued by the Massachusetts Development Finance Agency and/or amended 2007 Bonds (the "2011 Bonds") and (ii) simultaneously solicit votes for a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code on substantially the same terms as the exchange offer and provide all of the Debtors' other creditors with payment in full. The Restructuring Term Sheet conditioned consummation of the exchange offer on the tender of 98% of the 2007 Bonds and contemplated that a prepackaged plan of reorganization would be filed if a lesser amount of 2007 Bonds were tendered. The Bank and the Consenting Holders collectively held or had voting authority with respect to approximately 75% of the outstanding

15

2007 Bonds. After several months of extensive negotiations and the drafting of substantially all of the documents required to commence solicitation related to the exchange offer and the prepackaged plan of reorganization, the Bank demanded a term in the deal that neither the Debtors nor the Consenting Holders could accept. As a result, on or about May 26, 2011, the Bank indicated that it no longer wished to participate in the exchange offer or a prepackaged plan on the terms outlined in the Restructuring Term Sheet as further negotiated between the parties.

39. In light of the 98% consent threshold required to effectuate the out-of-court exchange and the fact that the Debtors could no longer afford to continue negotiating terms with the Bank without any certainty of the outcome, the Debtors were left with no feasible alternative other than to commence these chapter 11 cases in order to effectuate the restructuring.

40. Consequently, on June 8, 2011, the Debtors and the Consenting Holders entered into the Restructuring, Lockup, Plan Support and Forbearance Agreement (the "Lockup Agreement"). Pursuant to the Lockup Agreement, the Consenting Holders agreed to, among other things, support the Debtors to use of cash collateral and its efforts to obtain debtor-in-possession financing in connection with these chapter 11 cases. Additionally, the Consenting Holders, which entities hold approximately 62% of the Series 2007 A Bonds and approximately 40% of all of the 2007 Bonds, have agreed to support and vote in favor of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"), filed contemporaneously herewith.

## III.    Facts in Support of First Day Motions

41. Subsequent to the filing of its chapter 11 petition, the Debtors have filed the First Day Motions. The Debtors request that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in these

chapter 11 cases.

## IV.     Debtors' Joint First Day Motions

### A.     Schedules Motion

42.     By the Schedules Motion, the Debtors request that the Court enter an order (a) extending the time by which the Debtors must file their Schedules and Statements until the earlier of the 120th day after the filing of the Schedules Motion and the third business day after the first date set for the hearing on confirmation of the Debtors' contemporaneously filed Plan (the "Schedules and Statements Filing Deadline") and (b) permanently waiving the requirement to file all Schedules and Statements if the Debtors' Plan is confirmed during the extension period, without prejudice to the Debtors' ability to request additional time should it become necessary.

43.     Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, and the limited resources available to compile the Schedules and Statements, I believe that "cause" exists to extend the current deadline until the Schedules and Statements Filing Deadline.

44.     I believe that the request for a final waiver of the requirement to file Schedules and Statements is appropriate in a pre-arranged case where the vast majority of the parties entitled to vote on a plan of reorganization were deeply involved in the negotiation thereof and all general unsecured creditors will be paid in full.  In general, a debtor is required to file the Schedules and Statements in order to permit parties-in-interest to understand and assess the debtor's assets and liabilities and thereafter negotiate and confirm a plan of reorganization.  In these chapter 11 cases, the Debtors have already negotiated a plan of reorganization and, out of the three impaired classes under the Plan, 62% of the aggregate amount of claims in Class 2 and 100% of the claims in Class 7 have indicated that they will accept the Plan. And, with respect to

17

the third impaired class of Claims, the Bank, having the ultimate beneficial interest in and authority to vote the Class 3 Claims, was intimately involved in the negotiation of the Plan. Accordingly, one of the primary justifications for requiring the filing of Schedules and Statements does not exist in these cases.

45.        In addition, much of the information that would be contained in the Schedules and Statements is already available in the Disclosure Statement. To require the Debtors to file the Schedules and Statements would be duplicative and unnecessarily burdensome to the Debtors' estates.

**B.        Combined Hearing Motion**

46.        By the Combined Hearing Motion the Debtors request the conditional approval of the Disclosure Statement solely to permit the Debtors to distribute and solicit acceptances for their Plan, with final approval combined with the confirmation hearing as contemplated by Bankruptcy Code section 105(d)(2)(B)(vi). The Debtors propose the following dates:

> June 16 or 17, 2011 – Hearing on the Combined Hearing Motion
>
> Two business days prior to the commencement of the Plan Solicitation  – Record Date
>
> July 8, 2011 – Solicitation Deadline
>
> July 28, 2011 – Deadline to File Plan Supplement
>
> August 12, 2011 – Voting and Objection Deadline
>
> August 22, 2011 – Deadline to file Ballot Report, Reply to Objections and supporting memoranda and affidavits
>
> September 15 and 16, 2011 – Combined Hearing on approval of Disclosure Statement and confirmation of the Plan

47.        The Debtors propose that the Court adopt the following procedures:

a.        The Disclosure Statement, the Plan and the Combined Hearing Motion will be served on all creditors and parties in interest, including the Office of the United States Trustee, the Bank, the

18

Bond Trustee, the Consenting Holders and the Manager. If any of the served parties have objections to conditional approval of the Disclosure Statement, they must file and serve same on the Debtors prior to the hearing on the Combined Hearing Motion.

b.     At the expedited hearing on the Combined Hearing Motion, the Debtors will ask the Court to consider conditionally determining that the Disclosure Statement contains adequate information to enable creditors to make an informed decision regarding their acceptance or rejection of the Plan.

c.     If the Court conditionally determines that the information contained in the Disclosure Statement is adequate, the Debtors will ask the Court to combine the hearing to consider final approval of the Disclosure Statement with the hearing on confirmation of the Plan, as well as approve solicitation procedures. The rights of any party to object to the adequacy of the information in the Disclosure Statement is expressly reserved until the Combined Hearing.

d.     Prior to the Combined Hearing, the Debtors will comply with any reasonable request for information made formally or informally, by any creditor seeking further information relevant to its decision to vote for or against the Plan.

e.     At the Combined Hearing, objections to the adequacy of the Disclosure Statement will be considered in addition to any objections to confirmation. Objections to adequacy of the Disclosure Statement will be sustained only if a defect or omission in the Disclosure Statement is of such a nature that the correction of such defect of omission might, in the Court's judgment, cause a creditor to change its vote on the Plan.

48.     The proposed process is designed to permit expedited solicitation of the Plan, while ensuring that creditors and parties in interest will have sufficient time to review the Plan and Disclosure Statement and file objections thereto in advance of the Combined Hearing. The parties that are likely to object to the adequacy of the Disclosure Statement or confirmation of the Plan have been involved in negotiations with the Debtors regarding an out-of-court exchange offer and potential prepackaged plan on terms substantially similar to those found in the Plan. Additionally, those parties, including the Bank, the Bond Trustee and the Consenting

EAST\43933963.6

Holders have had access to a wide range of financial and other proprietary information of the Debtors and have engaged professionals to review such information.

49.     Conditional approval of the Disclosure Statement on an expedited basis allows the Debtors to circulate the Disclosure Statement without running afoul of the requirements of Bankruptcy Code section 1125 while providing creditors and parties in interest with a reasonable opportunity to object to the Disclosure Statement even after solicitation begins.  I believe the proposed solicitation process promotes judicial efficiency and economy.

### C.     Cash Collateral Motion

50.     By the Cash Collateral Motion, Linden Ponds seeks entry of interim and final orders, pursuant to sections 105(a), 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code, (i) authorizing the Debtors to use Cash Collateral, (ii) approving the form of adequate protection provided to the holders of the 2007 Bonds, and (iii) scheduling a final hearing.  The Cash Collateral Motion and related order were fully negotiated with and consented to by the Bond Trustee.

51.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize. All of the Debtors' deposit accounts, cash and cash proceeds are encumbered by security interests in favor of the Bond Trustee and, as such, constitute "cash collateral" of the Bond Trustee (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").

52.     The Debtors have an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations and fund their working capital needs.  Absent the use of Cash Collateral (in addition to the proposed debtor-in-possession financing facility), the Debtors will be forced to cease operations of their business, thereby

jeopardizing their ability to maximize the value of their estates. Such an abrupt cessation of the business would have devastating effects on the residents of the communities, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRC in a complete state of disarray.

53. I believe that the proposed adequate protection is sufficient to protect any diminution in the value of the Bond Trustee's interests and is fair and reasonable, and the Bond Trustee has agreed to the Debtors' use of the Cash Collateral on such basis. The Bond Trustee for the benefit of the Bondholders will be adequately protected and, as a result, will not be prejudiced in any way by the Debtors' use of Cash Collateral. Given these circumstances, the Court should authorize the use of Cash Collateral on the terms and conditions set forth herein.

54. The Debtors have an immediate and urgent need to use Cash Collateral in addition to the DIP facility, and absent the use of Cash Collateral, they cannot continue their business operations, and their ability to maximize the value of their estates is in jeopardy. If the Debtors are forced to abruptly cease business operations, residents will suffer significant harm that will put their lives and health at risk, and there will be no recovery for unsecured creditors.

55. Linden Ponds has submitted with the Cash Collateral Motion a proposed interim order granting the relief requested (the "Interim Order"). Attached to the Interim Order is a detailed operating budget (the "Budget"). Certain of the terms of the Interim Order are summarized below:

| Term | Brief Summary |
|---|---|
| **Use of Cash Collateral** | The Debtors are authorized to use Cash Collateral upon the terms and conditions set forth in the Interim Order and in accordance with the Budget from the Petition Date through and including the date of |

| | |
|---|---|
| | conclusion of the final hearing on the Cash Collateral Motion. |
| **Adequate Protection** | The Bond Trustee is entitled to adequate protection of their interest in the Cash Collateral. The following adequate protection (collectively, the "Adequate Protection") shall be provided:<br><br>(a) the Bond Trustee shall have a valid, perfected and enforceable continuing replacement lien and security interest (the "Rollover Lien") to the extent of any diminution in all assets of Linden Ponds and Hingham existing on or after the Petition Date of the same type as the assets serving as collateral for the 2007 Bonds prepetition ("Pre-Petition Bond Collateral"), together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of the Bond Trustee as of the Petition Date. The Rollover Lien shall be subject only to (i) valid, perfected and unavoidable liens, if any, that were existing as of the Petition Date, and senior in priority to the liens and security interest of the Bond Trustee; (ii) the Carve Out (as defined below) and (iii) liens granted to the DIP Lender pursuant an order regarding the DIP Facility that has been entered by this Court (the "DIP Order").<br><br>(b) The Bond Trustee shall have a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") to the extent of any diminution in the Pre-Petition Bond Collateral in all of the property of Linden Ponds and Hingham, or their respective estates, of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof (together with the property secured by the Rollover Lien, the "Collateral" or "Post-Petition Bond Collateral"). Subject to and upon entry of an order on the Debtors use of Cash Collateral on a final basis, Collateral shall also include any causes of action or proceeds thereof under Sections 544 through 550 and 724(e) of the Bankruptcy Code. The Supplemental Lien shall be subject only to (i) valid, perfected and unavoidable liens, if any, that were existing as of the Petition Date, and senior in priority to the liens and security interest of the Bond Trustee; (ii) the Carve Out and (iii) liens granted to the DIP Lender pursuant to the DIP Order.<br><br>(c) The Rollover Lien and Supplemental Lien shall be in addition to all other rights of the Bond Trustee, including its liens and security interests in the Pre-Petition Bond Collateral. With the exception of the Carve Out and liens granted to the DIP Lender pursuant to the DIP Order, the Rollover Lien and the Supplemental Lien shall not be subject or subordinate to or made pari passu with (i) any lien or security interest that is avoided and preserved for the benefit of Linden or Hingham and their estates under Section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of |

| | |
|---|---|
| | Linden and Hingham, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in Bankruptcy Code Section 507(a)(8), (iii) any intercompany or affiliate liens of the Debtors, or (iv) any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise.<br><br>(d)    Subject to the Carve-Out for certain professional fees and administrative expenses, the Bond Trustee will receive, for the benefit of the Bondholders, a superpriority claim as provided in Bankruptcy Code section 507(b) (the "<u>Superpriority Claim</u>") to the extent of any diminution in the value of the Bond Trustee's interest in the Cash Collateral <u>provided</u>, <u>however</u>, the Superpriority Claim and all other claims and interests of the Bond Trustee shall be subject to and junior to the Carve Out and superpriority claim granted to the DIP Lender in connection with the DIP Facility, but shall otherwise be senior to any other superpriority claims granted in these cases.<br><br>Furthermore, the Debtors shall continue to operate their business, and in doing so, shall preserve the value of the Debtors' estates. |
| **Carve-Out** | In partial consideration of the provisions contained in the Interim Order, the Bond Trustee consents to the carve out for certain expenses and professional fees incurred during the pendency of the Bankruptcy Cases relating to Linden and Hingham described in the DIP Facility and DIP Order, without duplication, which shall be superior in all instances to the liens and claims of the Bond Trustee and all other parties (the "<u>Carve Out</u>").  The Carve Out means carve outs for (i) the Debtors' professional fees incurred in these chapter 11 cases in the amount not to exceed those fees and expenses incurred through the date of the default under the DIP Facility plus $250,000, (ii) other professional fees and expenses incurred in the Chapter 11 Cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the Facility was received plus $150,000, (iii) the payment of fees pursuant to 28 U.S.C. § 1930 and (iv) costs and administrative expenses permitted to be incurred by any chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $100,000.  Nothing in any order allowing the use of Cash Collateral or in the DIP Order shall constitute a waiver of any right of the Bond Trustee or other parties to object to fees and expenses of any professionals or to challenge any assertion that any amount of such fees and expenses remain unpaid. Subject to the rights of any creditors' committee or residents' committee appointed in these cases to the extent preserved in the DIP Order, the entry of a Final Order shall be a conclusive and binding determination on all parties that except for the Carve Out, no costs or expenses of administration shall be imposed against the Bond Trustee or the Pre-Petition Bond Collateral or the Post-Petition Bond Collateral under Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |

EAST\43933963.6

56.     I believe that the relief requested in the Cash Collateral Motion is in the best interests of Linden Ponds, its estate and its creditors, and absent such relief, Linden Ponds will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

**D.     DIP Motion**

57.     By the DIP Motion, the Debtors request the entry of the Interim Order and Final Order (i) authorizing Linden Ponds to obtain the DIP Facility from the DIP Lender on a senior secured superpriority basis, pursuant to Bankruptcy Code sections 105, 361, 362, 363, and 364; (ii) granting adequate protection to the Secured Lenders pursuant to Bankruptcy Code sections 361, 363 and 364; and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c).  Certain of the terms of the DIP Facility are summarized below:

| | |
|---|---|
| **Borrowers:** | Linden Ponds and Hingham as debtors and debtors in possession under the Bankruptcy Code. |
| **Lender:** | Redwood Capital Investments, LLC or its designee (the "DIP Lender") or its designee. |
| **DIP Facility:** | A revolving credit facility made available to the Linden Ponds in a principal amount of up to $6,000,000 (the "DIP Facility") of which up to $1,000,000 (the "Interim DIP Amount") shall be available during the period from the Closing Date (as defined below) through the entry of the final order approved on a final basis (the "Final Order", with the interim order being referred to herein as the "Interim Order" and the Final Order and the Interim Order being referred to herein collectively as the "DIP Orders") by this Court approving the Facility. The DIP Facility amount in excess of the Interim DIP Amount shall not be available unless and until the Final Order is in full force and effect, final, non-appealable and not subject to a stay.  All loans outstanding under the Facility (the "Loans"), and unless provided otherwise in the loan documentation, other obligations under the Facility, shall become due and payable on the Maturity Date (as defined below).  On a business day and on two (2) business days written notice, and not more frequently than twice per calendar week, Linden Ponds shall be permitted to request a borrowing under the DIP Facility. |
| **Maturity Date:** | The maturity date ("Maturity Date") shall be the earlier to occur of (i) November 8, 2011; or (ii) the effective date of a plan of reorganization under chapter 11 of the Bankruptcy Code in these chapter 11 cases, |

unless converted to a new post-bankruptcy exit facility at the request of the Borrowers, in the sole and absolute discretion of the DIP Lender and with consent of at least 40% of the principal amount of the 2007 Bonds outstanding; or (iii) the occurrence of an event of default under the DIP Loan Agreement (including, without limitation, failure to meet a Milestone (defined below) within the time required).

Any conversion, dismissal or confirmation order entered in these Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrowers to the DIP Lender under the DIP Facility and any loan documents, other than after the payment in full and in cash on or before the effective date of a plan of reorganization.

| | |
|---|---|
| **Purpose/Use of Proceeds:** | Proceeds of the Loans under the DIP Facility will be used solely in accordance with the cash flow projections of Linden Ponds showing anticipated cash receipts and disbursements on a weekly basis for the periods as required under the loan documentation and in form and substance satisfactory to the DIP Lender (the "Budget"), which will consist of the following payments: (i) to pay interest, fees and expenses in respect of the DIP Facility to the DIP Lender in accordance with the DIP Facility loan documentation; (ii) to fund the postpetition operating expenses of Linden Ponds incurred in the ordinary course of business; and (iii) to pay certain other costs and expenses of administration of these chapter 11 cases including, without limitation, adequate protection payments, if any, required by any cash collateral order entered in these cases. A copy of the initial Budget is attached to the DIP Motion. |
| **Rate:** | The Loans will bear interest at the Applicable Margin plus the LIBOR Rate, payable at the end of the relevant interest period. |
| | "LIBOR Rate" means the greater of (i) 2.5%; or (ii) the then current LIBOR Rate for interest periods of one month. |
| | "Applicable Margin" means 2.5% per annum. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year. |
| **Default Rate:** | Effective immediately upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), Loans will bear interest at an additional 3% per annum. |
| **Unused Line Fee:** | From and after the Closing Date, a non-refundable unused commitment fee of .5% per annum will accrue as a percentage of the daily average unused portion of the DIP Facility (whether or not then available), payable monthly in arrears and on the Maturity Date. |
| **Upfront Commitment** | On the Closing Date, Linden Ponds shall pay a fee of $50,000. |

**Fee:**

**Optional Commitment Reductions:**  Linden Ponds may permanently and irrevocably reduce the commitments under the DIP Facility upon at least five business days' notice; provided that each such reduction shall be in an amount of $250,000 or multiples of $250,000 in excess thereof and any mandatory prepayment resulting from such reduction shall have been made.

**Mandatory Repayments:**  Mandatory repayments of the Loans under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales (including, without limitation, a sale of all or substantially all of the Borrowers' assets), (ii) 100% of extraordinary receipt proceeds, (iii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business and (iv) 100% of insurance and condemnation proceeds, in each case received by the Borrowers.  Mandatory repayments shall result in a permanent reduction of the DIP Facility and in no event shall such mandatory repayments exceed the obligations owing under the DIP Facility.

**Voluntary Prepayments:**  Upon three (3) business days written notice and not more frequently than once per calendar week, permitted in whole or in part, with prior written notice but without premium or penalty, subject to limitations as to minimum amounts of prepayments and customary indemnification. Such repayments shall only be in increments of $250,000.

**Repayment at Maturity**  The DIP Facility will be repaid in full at the Maturity Date.

**Priority:**  Subject to the Carve Out (as defined below), all amounts owing by the Borrowers under the DIP Facility shall be joint and several as to each Borrower and (a) will be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing the 2007 Bonds and all other existing secured credit facilities, bonds and other indebtedness of the Borrowers (the "Existing Facility") pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Borrowers, whether consisting of real, personal, tangible or intangible property (including, without limitation, property held by others, all of the outstanding shares of capital stock of the Borrowers' subsidiaries, all Initial Entrance Deposits and all other entrance deposits (whether existing or new) (collectively, the "IEDs"), and all other accounts of the Borrowers (which for avoidance of doubt shall

26

not include any account held or controlled by the Bond Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account), and all proceeds and products of all of the foregoing (collectively, the "Collateral," described more fully below). The relative priority of all amounts owed under the DIP Facility will be subject only to a carve-out for (i) the Borrowers' professional fees incurred in these chapter 11 cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the DIP Facility was received plus $250,000, (ii) other professional fees and expenses incurred in the Chapter 11 Cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the Facility was received plus $150,000, (iii) the payment of fees pursuant to 28 U.S.C. § 1930 and (iv) costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $100,000 (collectively, the "Carve-Out"). Nothing in the DIP Loan Agreement shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in these chapter 11 cases.

No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of the DIP Lender's liens or in any way that is materially adverse to the DIP Lender's rights under the DIP Facility.

All of the liens described herein shall be effective and perfected as of the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Separate Cash Accounts:**

The proceeds of the DIP Facility and all other cash from operation of the Borrowers during the period in which the Facility is in place shall be maintained in one or more segregated accounts over which the DIP Lender shall have a Lien as described above.

The IEDs currently held in a separate account (the "Segregated IED Account") at JPMorgan Chase Bank, N.A., which IEDs are expected to be transferred into a separate escrow account following the commencement of these chapter 11 cases and approval by this Court (the "IED Escrow Account") shall continue to be maintained in one of such accounts. The DIP Lender shall maintain a security interest and first priority lien in the proceeds of the Segregated IED Account or the IED Escrow Account, as applicable, subject only to the Carve-Out and rights of the residents pursuant to any agreement or order requiring the Borrowers to escrow or segregate such IEDs for the benefit of the

27

residents.

The Borrowers shall also enter into an account control agreement immediately with respect to any account as and when directed by the DIP Lender.

**Collateral:** All amounts owing by the Borrowers under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, subject only to the Carve-Out and all other prepetition perfected and unavoidable security interests. The DIP Lender shall have a first priority lien as described in the "Priority" section above on all Collateral. For avoidance of doubt Collateral shall not include any account held or controlled by the Bond Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account.

Collateral shall not include avoidance actions first arising on the Petition Date, but shall include avoidance actions to the extent such avoidance actions could be commenced pursuant to Section 549 of the Bankruptcy Code or a similar claim relating to property that had been Collateral or proceeds or product of Collateral at any time during these chapter 11 cases.

The DIP Facility shall be joint and several obligations of each Borrower and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. The Borrowers shall waive and the DIP Order shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory. In the event of foreclosure, all lenders will be subrogated to the rights of the DIP Lender.

In the event the Debtors have ceased to prosecute the confirmation of the Plan (substantially in the form attached to the Lockup Agreement or as filed in the first day pleadings), in good faith, the DIP Lender shall reserve the right, in consultation with the Borrowers, to retain expert consultants and financial advisors at the expense of the Borrowers, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Borrowers and the value of the Collateral.

**Adequate Protection:** The Consenting Holders have consented to the DIP Facility pursuant to the Lockup Agreement subject to entry of that certain Cash Collateral Order attached thereto granting the Bond Trustee on behalf

of the holders of the 2007 Bonds adequate protection in respect of the DIP Facility and for the use of cash collateral (the "Cash Collateral Order").

**Cross-collateralization Protections**

The Interim Order and Final Order will contain provisions allowing for joint and several liability between the Borrowers and the ability to seek collection from any and all Collateral.

**Conditions Precedent to the Closing:**

The DIP Loan Agreement contains conditions to the closing of the DIP Facility customarily found in loan agreements for similar debtor in possession financings, including, without limitation, the following conditions:

- All fees and expenses (including reasonable fees and expenses of counsel) required to be paid to the DIP Lender on or before the Closing Date shall have been paid and the Borrowers shall fund a $150,000 deposit to cover such fees and expenses as described in the Section entitled "Expenses" below.

- All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the DIP Lender.

- The DIP Lender shall have received and approved the Budget, which shall include the items set forth in "Use of Proceeds" and any changes or amendments to the Budget.

- Linden Ponds shall have entered into an amendment of that certain Management Agreement and Marketing Agreement dated January 31, 2009 by and between Linden Ponds and Erickson Retirement Communities, LLC ("ERC") as previously amended (the "Existing Management Agreement") and/or the Transitional Subcontract effective April 30, 2010 among ERC, Erickson Living Management, LLC ("Erickson"), Linden Ponds and the Trustee, as previously amended (the "Transitional Subcontract") as applicable that: (a) provides that such amendment will be effective only in the event the Borrowers commence the Chapter 11 Cases, enter into the Facility and obtain approval from this Court to do so on a final basis; (b) provides for an amendment of the term of the Existing Management Agreement from month-to-month to a term coterminous with the Facility, and (c) provides for a termination fee not to exceed $900,000 (the "Termination Fee") as liquidated damages and not as a penalty, if (i) Linden Ponds executes an agreement with any entity other than Erickson, under which such entity is engaged by Linden Ponds to provide management services to Linden Ponds; or (ii) the Existing Management

29

Agreement terminates for any reason and, at the effective time of such termination, a replacement management agreement in substantially the form of the Management and Marketing Agreement attached to the Lockup Agreement (the "New Management Agreement") has not been fully executed. Notwithstanding the foregoing, the Termination Fee shall not be paid to Erickson if: (A) at the time the Termination Fee would otherwise be payable pursuant to the preceding sentence, Erickson has materially breached any provision of (x) the Transitional Subcontract or the Existing Management Agreement, or (y) any agreement related to the DIP Facility, and has in either case received written notice from Linden Ponds specifying such material breach, *provided, however*, that Linden Ponds shall subsequently pay any Termination Fee to Erickson that would otherwise have been due but for this subsection (A) if Erickson cures such breach in accordance with any applicable cure provisions in the Transitional Subcontract, the Existing Management Agreement or the applicable document relating to the DIP Facility (as the case may be); or (B) at the time the Termination Fee would otherwise be payable pursuant to clause (ii) of the preceding sentence, Linden Ponds has executed, but Erickson refuses to execute the New Management Agreement.

- On or prior to entry of a Final Order, Linden Ponds shall have obtained an order from the Bankruptcy Court approving Linden Ponds' assumption of the Existing Management Agreement, as amended.

**Conditions Precedent to Each Loan:**  On the Closing Date and the funding date of each Loan, the following conditions precedent shall have been satisfied:

- Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to the DIP Lender in its sole and absolute discretion;

- The Interim Order or Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed for a period of five business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender;

- The Borrowers use of the proceeds is consistent with the Budget;

- There shall exist no default under the DIP Loan Agreement; and

30

- The representations and warranties of the Borrowers shall be true and correct immediately prior to, and after giving effect to, funding.

**Representations and Warranties:** The DIP Loan Agreement contains representations and warranties customarily found in loan agreements for similar debtor in possession financings, including, without limitation, with respect to: valid existence, requisite power, due authorization, no conflict with agreements or applicable law, enforceability of loan documentation, accuracy of financial statements and all other information provided, compliance with law, absence of material adverse change, no default under the loan documentation (except as specified), absence of material litigation, absence of liens on assets (except as specified), ownership of properties and necessary rights to intellectual property, no burdensome restrictions, inapplicability of Investment Company Act, compliance and continued effectiveness of the applicable Order.

**Affirmative, Negative and Financial Covenants:** The DIP Loan Agreement contains affirmative, negative and financial covenants appropriate to the transaction, including, without limitation, the following:

- The DIP Orders shall prohibit and the Borrowers shall waive the claims arising under Bankruptcy Code section 506(c) against the DIP Lender or the DIP Facility or the commencement of other actions adverse to the DIP Lender or its rights and remedies under the DIP Facility.

- Compliance with total net cash flow of the Budget, reported weekly and tested every second week on a rolling four week basis (subject to certain variances).

- Certain additional financial covenants.

- Delivery to DIP Lender each month of the Borrower's rolling 13-week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior monthly period) in form and substance reasonably satisfactory to the DIP Lender.

- Unless superseded by the New Management Agreement, Borrowers shall not be in default under, or, except for the amendments described above, seek to reject or terminate, or seek to renegotiate materially or otherwise repudiate (i) the Existing Management Agreement, or (ii) the Transitional Subcontract Agreement.

- The Borrowers shall not take any action which is inconsistent with consummation of the Plan.

Certain Affirmative Covenants – The Borrowers shall:

- Deliver weekly updates of the cash flow forecast and weekly variance reports;

- Deliver monthly updates by the Borrowers with respect to asset sales, cost savings, construction progress, and other matters reasonably requested by the DIP Lender;

- Deliver to the DIP Lender as soon as practicable the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Lender), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

- Obtain, prior to entry of the Final Order, Bankruptcy Court approval of Linden Ponds' assumption of the Existing Management Agreement (as amended as described above);

- Comply with Milestones set forth below with respect to these chapter 11 cases;

- Comply with additional reporting requirements reasonably requested by the DIP Lender; and

- Provide access to the DIP Lender for information (including historical information) and personnel, including, without limitation, regularly scheduled meetings with the Borrowers and their advisors.

Certain Negative Covenants – the Borrowers shall be barred from:

- Creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date and liens described in the Cash Collateral Order) and other liens described in "Priority" above;

- Creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lender under the DIP Facility, except for the Carve-Out and liens of the DIP Lender;

- Disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363 or otherwise) out of the ordinary course of business or

32

in excess of $250,000;

- Modifying or altering (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code;

- Asserting any right of subrogation or contribution against any of the Borrowers until all borrowings under the DIP Facility are paid in full and the commitments thereunder are terminated;

- Paying amounts not within the Budget (subject to the variances allowed) without the DIP Lender's consent;

- Making any material investment in excess of $50,000 (subject to the variances allowed above) not approved in the Budget without the DIP Lender's consent; and

- Revise or otherwise amend the Plan (unless such Plan amendment is permitted under the Lockup Agreement) without the DIP Lender's consent, or pursue a plan of reorganization materially different than the Plan (unless such plan is permitted under the Lockup Agreement).

**Milestones:**   Within one business day of the Petition Date, the Borrowers shall have filed the Plan (or a plan modified as permitted under the Lockup Agreement) and accompanying Disclosure Statement (each of which shall have been approved by the DIP Lender provided that the form of Plan and Disclosure Statement attached to the Lockup Agreement shall be deemed approved by the DIP Lender);

An Interim Order acceptable to the DIP Lender must have been entered by Bankruptcy Court within ten days of the Petition Date, or such later date as may be agreed upon;

A Final Order acceptable to the DIP Lender must have been entered by the Bankruptcy Court and not stayed pending appeal, within thirty days of the Petition Date, and such order shall become a final order no longer subject to any appeal that may have a material adverse impact on the rights or interests of the DIP Lender, within forty-five days of the Petition Date;

The joint hearing on the Disclosure Statement and Confirmation shall have been set within one hundred twenty (120) days of the Petition Date; and

The Borrowers shall otherwise comply with the provisions of the Lockup Agreement and within the time prescribed in the Lockup Agreement.

EAST\43933963.6

**Events of Default:** The DIP Loan Agreement contains events of default customarily found in loan agreements for similar debtor in possession financings, including, without limitation, failure to make payments when due; termination of, or any act to assign, sell or terminate, the Borrowers' management contracts, unless for the purpose of implementing a New Management Agreement with Erickson or except for actions necessary to implement the amendments described above; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; impairment of loan documentation or security; change of ownership or control; dismissal of either of these chapter 11 cases or conversion of either case to a chapter 7 case; appointment of a chapter 11 trustee; judgment against the Borrowers or an affiliate in an amount to be determined by the DIP Lender; appointment of a responsible officer or examiner with enlarged powers beyond those set forth in Section 1106(3) and (4) of the Bankruptcy Code; granting of relief from the automatic stay to permit foreclosure on assets of the Borrowers (other than "<u>friendly foreclosures</u>" agreed to by the Borrowers and the applicable lender, as agreed to by the DIP Lender) or that would otherwise have a material adverse affect on the Borrowers or their businesses; entry of an order granting any super-priority claim which is senior or pari passu with the DIP Lender's claims under the DIP Facility; entry of an order without the prior consent of the DIP Lender, or the Borrowers otherwise agreeing to incur indebtedness, other than trade debt in the ordinary course of the Borrowers' businesses or under the DIP Facility; entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying either of the DIP Orders; reversal, vacation or stay of the effectiveness of either of the DIP Orders; non-entry of the Final Order within 30 days of commencement of these chapter 11 cases; any plan is confirmed without repayment of the DIP Facility in full in cash without consent of the DIP Lender; reversing, amending, supplementing, vacating, appealing or otherwise modifying any of the DIP Orders without consent of the DIP Lender; the Borrowers or an affiliate shall take any action in support of any person who contests the DIP Order or the Borrowers fail to contest in good faith the foregoing; the filing of any motion, pleading or proceeding by any of the Borrowers that could reasonably be expected to result in a material impairment of the rights or interest of the DIP Lender; cross-default of any material indebtedness or material commitment of the Borrowers; payment of or granting adequate protection with respect to pre-petition debt (other than as set forth above, as provided in the Cash Collateral Order, or as provided in the Budget or the DIP Order); cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

34

| | |
|---|---|
| **Taxes** | The DIP Loan Agreement includes customary provisions, as to the DIP Facility, to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever. |
| **Assignments and Participations** | The DIP Lender may assign all or any part of the DIP Facility to one or more affiliates, banks, financial institutions or other entities. Upon such assignment, such affiliate, bank, financial institution or entity will become a DIP Lender for all purposes under the Loan Documents. |
| **Indemnification** | Pursuant to the DIP Loan Agreement, the Borrowers provide certain joint and several indemnifications for the DIP Lender and its representatives. |
| **Expenses** | The Borrowers are required to pay all customary and reasonable costs and expenses of the DIP Lender and shall fund a deposit of $150,000 (the "Deposit") to cover actual costs and expenses to be paid as follows: |

- After providing five (5) days notice to the Prepetition Lenders and the DIP Lenders to commence drafting and negotiation of definitive documentation, the Borrowers shall pay the DIP Lender $75,000; provided such payment shall be (i) credited against the Deposit, if made, and (ii) refundable in the event the DIP Lender doesn't provide the DIP Facility and to the extent the DIP Lender does not utilize such amounts to pay its fees and expenses in connection with the DIP Facility (whether or not the DIP Lender actually provides the DIP Facility); and

- The unpaid portion of the Deposit shall be paid upon entry of the Interim Order.

58.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize. Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to cease operations of their business, thereby jeopardizing their ability to maximize the value of their estates.  Such an abrupt cessation of the business would have

EAST\43933963.6

devastating effects on the residents of the communities, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRC in a complete state of disarray. Due to the nature of the Debtors' business and the impact that prolonged chapter 11 cases would have on the Debtors' residents, it is imperative that the Debtors have the necessary cash on hand to successfully reorganize as quickly as possible.

59.     I believe that the relief requested in the DIP Motion is in the best interests of the Linden Ponds, its estate and its creditors, and absent such relief, Linden Ponds will experience immediate and irreparable harm and its reorganization efforts will be jeopardized.

**E.     Lockup Assumption Motion**

60.     By the Lockup Assumption Motion, the Debtors seek, pursuant to Bankruptcy Code section 365(a) and Bankruptcy Rule 6006, to assume the Lockup Agreement.  As is set forth more fully below, the Debtors believe that assuming the Lockup Agreement is in the best interest of their estates so as to ensure that they continue to have the affirmative vote of the Consenting Holders on the Plan.  The Debtors also seek this relief since, to the extent that this Court has not entered an order approving the Lockup Agreement within 30 days of the Petition Date, the Consenting Holders can terminate the Lockup Agreement and withdraw their votes on the Plan (unless the Debtors are continuing to diligently pursue entry of such an order following the expiration of such 30 day period).

61.     The Debtors and the Consenting Holders entered into the Lockup Agreement in order to effectuate the above referenced restructuring.  Pursuant to the Lockup Agreement, as more particularly set forth therein, the Consenting Holders, which entities hold approximately 62% of the Series 2007 A Bonds and approximately 40% of all of the 2007 Bonds, have agreed to, among other things, (i) vote all of their 2007 Bonds and related claims in favor of the Plan, (ii) take no action or otherwise pursue any right or remedy under the Trust Indenture, related

36

loan agreement or any other bond documents, (ii) consent to Debtor's request for debtor in possession financing to be provided on a basis senior to the 2007 Bonds and (iv) consent to the use by the Debtors of the cash collateral of the Bond Trustee.

62.     Pursuant to the Lockup Agreement and as more particularly set forth therein, the Debtors agreed that, subject to the exercise of their fiduciary duties, the Debtors would take all steps as may be commercially reasonable to (i) coordinate with the Consenting Holders concerning the restructuring, (ii) obtain any necessary approval for the restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances, (iii) obtain any and all requisite regulatory or third party approvals necessary to consummate the restructuring, (iv) file these chapter 11 cases, contemporaneously with the Plan and (v) obtain an Order from this Court confirming the Plan by October 12, 2011 (120 days after the Petition Date).  The Debtors also agreed under the Lockup Agreement that, subject to the exercise of their fiduciary duties, the Debtors will not solicit the potential sale of the Debtors or a restructuring of the Debtors that is different from the restructuring contemplated under the Plan in a manner that is material adverse to the Consenting Holders without the requisite consent of the Consenting Holders.

63.     Pursuant to the Lockup Agreement, the holders of a majority amount of senior debt held by the Consenting Holders may terminate the Lockup Agreement if, among other things and as more particularly set forth in the Lockup Agreement, (i) any of the 2011 Bond Documents or Bankruptcy Documents (as defined in the Lockup Agreement) is withdrawn, modified or amended in any manner that changes any specified provision or in a manner that adversely affects the holders of such senior debt, (ii) Class 2, under the Plan, has not voted to accept the Plan by the deadline established by this Court, (iii) the Debtors fail to file the

37

Bankruptcy Documents on the Petition Date, (iv) the Debtors fail to support confirmation of the Plan, (v) the Debtors file a motion, complaint, application or other request seeking to subordinate the claims of the Consenting Holders, (vi) this Court has (a) not approved the Disclosure Statement and entered an order confirming the Plan by October 12, 2011 (120 days after the Petition Date), (b) entered an order denying confirmation of the Plan, (c) appointed a trustee or an examiner with expanded powers, (d) entered an order terminating the Debtors' exclusive right to file a chapter 11 plan, (e) entered an order dismissing either of these chapter 11 cases or (f) not entered an order granting the Lockup Assumption Motion by July 14, 2011 (30 days after the Petition Date) unless the Debtors are continuing to diligently pursue entry of such an order following the expiration of such 30 day period, (vii) a Termination Event has occurred under the cash collateral order, or (viii) the effective date of the Plan has not occurred by the earlier of 150 days after the Petition Date or November 8, 2011, or such later date agreed to by a requisite lender consent.

64.     The Lockup Agreement is integral to the Debtors' efforts to consummate the restructuring contemplated under the Plan.  Because of the Lockup Agreement, the Debtors are assured that they will have votes needed to confirm the Plan so long as no Agreement Termination Event (as defined in the Lockup Agreement) occurs.  Absent the benefit of the Lockup Agreement, the Consenting Holders could withdraw their support for the Plan and could also decide to object to the Debtors' use of their cash collateral and to the Debtors' debtor-in-possession financing.  At that point, all the Debtors' restructuring efforts would be at risk which could result in the closing of the CCRC, leaving hundreds of residents without a home and their initial entrance deposits at risk.  Accordingly, the Debtors, in their business

judgment, believe that the assumption of the Lockup Agreement is in the best interests of their estates and that this Court should authorize the Debtors to assume the Lockup Agreement.

## V. Linden Ponds' First Day Motions

### A. Wage Motion

65.     By the Wage Motion, Linden Ponds requests authorization to pay certain prepetition claims, honor obligations and continue programs, in the ordinary course of business related to employee compensation, payroll administration, wage deductions, government withholdings and payroll taxes, reimbursable expenses, and employee benefit programs. In addition, Linden Ponds is requesting an order authorizing and directing banks and other financial institutions to honor all related checks and electronic payment requests.

66.     Linden Ponds has 723 full and part time employees (collectively, the "Employees"). None of the Employees are subject to a collective bargaining agreement. Linden Ponds estimates that in total, approximately $354,305.36 in unpaid salary, wages and other compensation is owing to its Employees as of the Petition Date.

67.     I believe that any delay in paying prepetition employee obligations will adversely impact Linden Ponds' relationship with its Employees and will irreparably impair the Employees' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in the case, Linden Ponds simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' morale and cooperation attributable to Linden Ponds' failure to pay wages, salary, benefits and other similar items.

### B. Utilities Motion

68.     By the Utilities Motion, Linden Ponds is requesting interim and final orders to (i) prohibit utilities from altering, refusing, or discontinuing service to Linden Ponds, (ii) deeming the utility companies adequately assured of future performance by Linden Ponds and

39

(iii) establishing procedures for determining requests to Linden Ponds for additional adequate assurance.

69.     In the ordinary course of business, Linden Ponds obtains gas, water, sewer, electric, data, telephone, cable, and other similar utility services from various utility providers. Approximately seven (7) utility providers (as such term is used in Section 366 of the Bankruptcy Code) provide these services to Linden Ponds.  On average, Linden Ponds spends approximately $229,364 each month for utility services.

70.     At all relevant times, Linden Ponds has attempted to remain current with regard to its utility bills.  Furthermore, to the best of my knowledge, Linden Ponds is current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of this chapter 11 proceeding.

71.     I believe that uninterrupted utility services are essential to the ongoing operations of Linden Ponds, and therefore, to the successful resolution of this case.  Any interruption of utility services, even for a brief period of time, would negatively affect Linden Ponds' operations, customer relationships, revenues and profits, seriously jeopardizing Linden Ponds' efforts and, ultimately, the value of recoveries for its creditors.  It is, therefore, critical that utility services continue uninterrupted during this chapter 11 proceeding.

72.     Linden Ponds proposes to put an amount equal to two weeks worth of payments to each Utility Company ($115,000) into a separate account (the "Utility Deposit Account") to be held for the exclusive purpose of paying the Utilities Companies.  Linden Ponds submits that the establishment of the Utility Deposit Account, in conjunction with Linden Ponds' ability to pay for future Utility Services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Companies.

EAST\43933963.6

73.     Linden Ponds expects to have access to Cash Collateral and/or debtor in possession financing, which means that it will have liquidity sufficient to keep its utility obligations current.

74.     Finally, Linden Ponds proposes to protect the Utility Providers by establishing the Procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to Linden Ponds that would merit greater protection.

75.     Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### C.     Linden Ponds Cash Management Motion

76.     By the Linden Ponds Cash Management Motion, Linden Ponds seeks entry of an order granting the following relief:

(a)     Authorizing Linden Ponds to continue to use the LP Cash Management System (defined below), subject to any modification or other relief granted by order of this Court relating thereto, including the following:

(i)     the continued use of the existing LP Bank Accounts (defined below) with the same names and account numbers as such LP Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining the LP Cash Management System by closing or consolidating LP Bank Accounts);

(ii)     the ability of Linden Ponds to deposit funds into and withdraw funds from any of the LP Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

(iii)     the ability of Linden Ponds to otherwise treat the LP Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

(iv)    the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments;

(v)    authorizing and directing the LP Banks (defined below) to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable LP Bank and Linden Ponds relating to such accounts;

(vi)    authorizing the LP Banks to charge and collect, and authorizing but not directing Linden Ponds to pay, the prepetition and postpetition service charges and other fees and expenses to which the LP Banks are entitled under the terms of their account agreements and/or other service documentation with Linden Ponds;

(b)    Authorizing Linden Ponds to continue to use its existing business forms without alteration or change; and,

(c)    Authorizing Linden Ponds to maintain its existing investment practices and waiving the requirements of Section 345(b) of the Bankruptcy Code as to the LP Cash Management System.

77.    I believe that by using the existing LP Bank Accounts and investment practices, Linden Ponds will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of Linden Ponds, delay the administration of Linden Ponds' estate, and increase the costs to the estate.

78.    Prior to the Petition Date and in the ordinary course of business, Linden Ponds maintained a centralized cash management system through which funds are collected into an operating account and disbursed to various other accounts to pay operating expenses, with excess funds being invested (the "LP Cash Management System").

79.    The LP Cash Management System employs a series of integrated financial accounts, including a centralized operating account maintained at PNC Bank which receives cash from various sources.  The cash maintained in the operating account is used to fund Linden

42

Ponds' day-to-day operations, including payroll, employee benefits, payments to vendors and other accounts payable. Any funds remaining in the operating account are automatically transferred on a daily basis to an interest-bearing sweep account.

80. As of the Petition Date, the LP Cash Management System utilized a total of twenty-one (21) bank accounts (collectively, the "LP Bank Accounts") with the following financial institutions: (i) PNC Bank; (ii) Bank of America; (iii) JPMorgan Chase; and (iv) Hingham Institution for Savings (collectively with any other institutions with which Linden Ponds maintains or establishes deposit accounts or investment accounts, the "LP Banks"). The LP Bank Accounts are described in detail below:

**(a) LP Operating Account:**

The focal point of the LP Cash Management System is the LP Operating Account at PNC Bank (Account No. XXXXXX7434), which serves as the collection point for all funds moved into and through the LP Cash Management System. The LP Operating Account pools and holds cash, and supplies cash to all other accounts as necessary.

The LP Operating Account receives cash receipts due to Linden Ponds, which are deposited from three primary sources: (i) monthly fees from residents, (ii) entry deposits from campus residents, and (iii) releases from the LP Supplemental Account.

The cash in the LP Operating Account is used to fund the operations of the Linden Ponds campus, including payments to vendors, debt service, payroll, and for other general payables. Cash from the LP Operating Account is also transferred, automatically or manually, to certain accounts discussed below.

Manual transfers are made to a Controlled Disbursement Account, which is the central disbursement account for all the Not-For-Profits and is located under Erickson Living Management's Tax ID in order to pay checks issued by Linden Ponds.

**(b) LP Onsite Operating Account:**

The LP Onsite Operating Account is held at Hingham Savings (Account No. XXXX7763). The LP Onsite Operating Account is used for small onsite deposits and any emergency manual checks that may need to be written.

43

**(c) LP Special Initial Entrance Fee Reserve Account:**

The LP Special Initial Entrance Fee Reserve Account is held at Bank of America (Account No. XX1949). Historically, this account was funded through manual transfers from the LP Escrow Account and/or LP Operating Accounts on a monthly basis. The LP Special Initial Entrance Fee Reserve Account is used to hold special initial entrance fee reserves related to the facility.

**(d) LP Construction Account:**

The LP Construction Account is held at Wells Fargo (Account No. XXXX4000). Historically, this account was funded through manual transfers from the LP Escrow Account and/or LP Operating Accounts on a monthly basis. The LP Construction Account is used to hold construction reserves related to construction projects at the facility. These reserves are required either by local authorities and/or the terms of Linden Ponds' bond agreement.

**(e) LP A&B Debt Service Reserve (DSR) Accounts:**

The LP A&B DSR Account is held at Wells Fargo (Account No. XXXX4011). Historically, this account was funded through manual transfers from the LP Escrow Account and/or LP Operating Accounts on a monthly basis. The LP DSR Account is used to hold debt service reserves for facility debt obligations.

**(f) LP Interest Accounts:**

The LP Interest Accounts A, B & C are held at Wells Fargo (Account Nos. XXXX4002, XXXX4003 & XXXX4004). Historically, this account was funded through manual transfers from the LP Escrow Account and/or LP Operating Accounts on a monthly basis. The LP Interest Accounts are used to fund interest payments for facility debt obligations. Payments out of this account are automatically made by the Bond Trustee twice a year.

**(g) LP Principal Accounts:**

The LP Principal Accounts A, B & C are held at Wells Fargo (Account Nos. XXXX4005, XXXX4006 & XXXX4007). Historically, this account was funded through manual transfers from the LP Escrow Account and/or LP Operating Accounts on a monthly basis. The LP Principal Accounts are used to fund principal payments for facility debt obligations. Payments out of this account are automatically made by the Bond Trustee twice a year.

EAST\43933963.6

**(h)  LP Escrow Account:**

The LP Escrow Account is held at Bank of America (Account No. XX1949) and is used to hold resident entrance deposits for a statutory period after they move into Linden Ponds.  Funds were transferred from this account twice a month to various other Linden Ponds accounts.

**(i)  LP Restricted Funds Account:**

The LP Restricted Funds Account is held at Hingham Savings (Account No. XXXX2163).  The LP Restricted Funds Account is used to hold restricted cash required at the facility.

**(j)  LP 2007 Development Fee Account:**

The LP 2007 Development Fee Account is held at Wells Fargo (Account No. XXXX4015).  The LP 2007 Development Fee Account is used to hold development fees payable to Erickson based on sales of living units on campus.  Funds are released to Erickson from this account when Linden Ponds' building hit certain occupancy hurdles.

**(k)  LP Pre-Petition Escrow Account:**

The LP Pre-Petition Escrow Account is held at JPMorgan Chase (Account No. XXXXX0576) and is used to reserve pre-petition Initial Entrance Deposits.

**(l)  LP Supplemental Account:**

The LP Supplemental Account is held at Wells Fargo (Account No. XXXX4022) and funded through transfers from the LP Escrow Account.  The LP Supplemental Account was put in place to hold initial entrance deposits after they were available for release from the LP escrow account.

**(m) LP LOC Account:**

The LP LOC Account is held at Wells Fargo (Account No. XXXX4013) and is used to pay bondholders their monthly bond payment.  Funds are then reimbursed into the account by the Letter Of Credit bank (Sovereign).

**(n) LP C Purchase Account:**

The LP C Purchase Account is held at Wells Fargo (Account No. XXXX4010).  The C Purchase account would be used as a custody account for the Series 2007 C Bonds in the event that the bonds are tendered.

### (o) LP COI Account

The LP COI Account is held at Wells Fargo (Account No. XXXX4001). The LP 2007 COI Account was funded at bond issuance to pay for any remaining fees related to the issuance of the bonds.

### (p) LP Operating Reserve Account:

The LP Operating Reserve Account is held at Wells Fargo (Account No. XXXX4014) and is used to hold reserve funds to be used by the community for operations as governed in the bond indenture.

81. Linden Ponds manages its cash receipts, transfers and disbursements through the LP Bank Accounts. In doing so, Linden Ponds routinely deposits, withdraws and otherwise transfers funds to, from and between the LP Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, Linden Ponds processes large numbers of transactions via the LP Cash Management System. Linden Ponds maintains current and accurate records of all transactions processed through the LP Cash Management System.

82. The LP Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Among other benefits, the LP Cash Management System permits Linden Ponds to accurately monitor cash availability at all times. The LP Cash Management System also permits Linden Ponds to centrally manage and track the collection and transfer of funds, including intercompany transfers, which reduces administrative burden and expense and maximizes interest income.

83. In addition to the LP Cash Management System and LP Bank Accounts, Linden Ponds uses in the ordinary course of its business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices). Linden

46

Ponds has a supply of these forms on hand. It would be expensive and wasteful, and disruptive to the Linden Ponds' business to destroy all of these forms and order new ones.

84.     Contemporaneously with the filing of the LP Cash Management Motion, Linden Ponds has filed other motions seeking authority to pay certain prepetition obligations, including obligations to employees and other entities. With respect to certain of these prepetition obligations, Linden Ponds already has issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system. In other instances, Linden Ponds will issue checks or other debits postpetition on account of the prepetition obligations once the Court has entered an appropriate order permitting Linden Ponds to do so. Linden Ponds intends to inform the LP Banks which prepetition checks and other debits should be honored pursuant to orders of the Court authorizing such payment.

85.     I believe that the relief requested in the LP Cash Management Motion will help to ensure Linden Ponds' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert Linden Ponds' attention from more pressing matters during the initial days of these chapter 11 cases.

86.     Given the size and complexity of Linden Ponds' business operations, any disruption of its accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact Linden Ponds' efforts to reorganize. At this critical juncture, Linden Ponds must be able to conduct "business as usual" to the extent possible. To this end, it is essential that Linden Ponds be permitted to continue using its existing LP Cash Management System and LP Bank Accounts.

87.     Historically, all excess funds of Linden Ponds have been maintained in interest-bearing domestic bank accounts insured by the United States (through the FDIC) or

invested through low risk investment accounts. The investment of Linden Ponds' excess funds is managed exclusively through the LP Cash Management System. Although Linden Ponds' investment practices may not strictly comply in all respects with the guidelines identified in section 345 of the Bankruptcy Code, Linden Ponds' investments are nevertheless safe, prudent and designed to yield the maximum reasonable return on the funds invested, taking into account the safety of such deposits and investments. Accordingly, Linden Ponds requests authority to maintain its existing investment practices and a waiver of the requirements of section 345(b) of the Bankruptcy Code.

88.     Linden Ponds has a complex LP Cash Management System that provides the Linden Ponds with the ability to transfer funds rapidly to ensure their safety and to maximize their investment value. Linden Ponds and its estate will receive significant benefit from the continued investment of excess funds. In light of these factors, I believe that Linden Ponds should be permitted to maintain its investment practices.

**D.      IED Motion**

89.     By the IED Motion, Linden Ponds seeks authority to escrow all IEDs collected postpetition as well as move all IEDs escrowed as of the Petition Date in to such new escrow account, in order to provide assurance to existing and new residents that Linden Ponds' bankruptcy case will not affect the residents' rights to a refund. Linden Ponds proposes to escrow the IEDs pending confirmation of a plan of reorganization in this case or sale of substantially all of the Linden Ponds' assets or such other order of this Court.

90.     A resident's willingness to pay the IED to Linden Ponds is necessarily dependent upon such resident's conviction that Linden Ponds' bankruptcy will not negatively affect the refundability of the IED. Any negative publicity suggesting that a community is in bankruptcy

will necessarily deter prospective residents from entering into the new Residence and Care Agreements, which are the precursors to the Linden Ponds' receipt of future IEDs.

91.     The relief requested with respect to the IEDs should be granted because the IEDs required under the Residence and Care Agreements and loaned to Linden Ponds are the lifeblood of Linden Ponds' operations. The IEDs account for a significant portion of Linden Ponds' annual operating budget and the collection of such amounts is critical to Linden Ponds' ability to reorganize.  Providing the relief requested in the IED Motion maintains the status quo pending a resolution of this case.

92.     Prior to confirmation of a plan, Linden Ponds will refund IEDs to residents as provided in the Residence and Care Agreements. Upon confirmation of a plan, the IEDs will be transferred to reorganized Linden Ponds or such other party as directed by this Court.  I believe it will have a devastating effect on Linden Ponds' operations if it can not guarantee potential purchasers that their IEDs will be escrowed.  Accordingly, Linden Ponds seeks authorization to escrow all IEDs received postpetition (as well as move IEDs currently escrowed  to the new escrow account) and protect the residents' interest with respect thereto.

VI.     **Hingham's First Day Motions**

A.     **Hingham Cash Management Motion**

93.     By the Cash Management Motion, Hingham seeks entry of an order granting the following relief:

> (a)     the continued use of the existing Hingham Bank Accounts with the same names and account numbers as such Hingham Bank Accounts existed immediately prior to the Petition Date (with the option to Hingham and the Hingham Banks of streamlining Hingham Cash Management System by closing or consolidating Hingham Bank Accounts in accordance with the terms and conditions of the existing account and service agreements);
>
> (b)     the ability of Hingham to deposit funds into and withdraw funds

from any of the Hingham Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

(c)     the ability of Hingham to continue to make intercompany transfers among the Hingham Bank Accounts in the ordinary course of its business through the Hingham Cash Management System;

(d)     the ability of Hingham to otherwise treat the Hingham Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

(e)     the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; provided, however, that accounts pledged or serving as collateral for prepetition obligations shall be maintained as such; and

(f)     authorizing and directing the Hingham Banks to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Hingham Bank and Hingham relating to such accounts; and

(g)     authorizing the Hingham Banks to charge and collect, and authorizing and directing Hingham to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with Hingham.

94.     I believe that by using the existing Hingham Bank Accounts, Hingham will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of Hingham, delay the administration of the its estate, and increase the costs to its estate.

95.     Prior to the Petition Date and in the ordinary course of business, Hingham maintained a cash management system (the "Hingham Cash Management System").   The Hingham Cash Management System allows for funds to be collected into one operating account and thereafter those funds are disbursed to various other accounts to pay operating expenses.

EAST\43933963.6

Flow charts depicting the Hingham Cash Management System is attached to the Hingham Cash Management Motion as <u>Exhibit A</u>.

96.     The Hingham Cash Management System employs a series of integrated financial accounts, including centralized operating accounts, which are generally maintained at PNC Bank and which receive cash from various sources.  The cash maintained in the operating accounts is used to fund day-to-day operations, including payments to construction vendors, marketing vendors, debt service, and other accounts payable.

97.     As of the Petition Date, the Hingham Cash Management System employed four (4) bank accounts (collectively, the "<u>Hingham Bank Accounts</u>") with the following financial institutions (collectively with any other institutions with which Hingham maintains or established deposit accounts or investment accounts, the "<u>Hingham Banks</u>"):  (a) PNC Bank; and (b) Sovereign Bank.

98.     The table attached to the Hingham Cash Management Motion as <u>Exhibit B</u> sets forth for each of the Hingham Bank Accounts Hingham maintains, the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account.  Hingham manages its cash receipts, transfers and disbursements through the Hingham Bank Accounts.  In doing so, Hingham routinely deposits, withdraws and otherwise transfers funds to, from and between the Hingham Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, Hingham processes a number of transactions through the Hingham Cash Management System.  Hingham maintains current and accurate records of all transactions processed through the Hingham Cash Management System.

99.     I believe that the relief requested in the Hingham Cash Management Motion will

help to ensure Hingham's orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert Hingham's attention from more pressing matters during the initial days of these chapter 11 cases.

100.     Given the size and complexity of Hingham's business operations, any disruption of their accounting and cash management procedures would be burdensome and disruptive, and could adversely impact Hingham's efforts to reorganize.  At this critical juncture, Hingham must be able to conduct "business as usual" to the extent possible.  To this end, it is essential that Hingham be permitted to continue to use the Hingham Cash Management System and Hingham Bank Accounts.

## CONCLUSION

101.     For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.  I reserve the right to supplement this affidavit with testimony and exhibits.

102.     I declare under penalty of perjury that the foregoing is true and current.


/s/ Paul Rundell          
Paul Rundell


Subscribed and sworn to before me
this 14th day of June, 2011

/s/ Jason Michael Karaffa
Notary Public, State of New York
No. 02KA6168851
Qualified in New York County
Commission Expires June 18, 2011

EAST\43933963.6