**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A CONDITIONAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case Nos. 11-33913 and 11-33912** |
| | § | |
| **LINDEN PONDS, INC. and** | § | **Chapter 11** |
| **HINGHAM CAMPUS, LLC** | § | |
| | § | **Joint Administration Pending** |
| **Debtors.** | § | |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Vincent P. Slusher, State Bar No. 00785480
vince.slusher@dlapiper.com
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

and

Thomas R. Califano, NY Bar No. 2286144
thomas.califano@dlapiper.com
George B. South III, NY Bar No. 2446771
george.south@dlapiper.com
Jeremy R. Johnson, NY Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501


J. Mark Chevallier, State Bar No. 04189170
mchevallier@mcslaw.com
James G. Rea, State Bar No. 24051234
jrea@mcslaw.com
McGUIRE, CRADDOCK & STROTHER, P.C.
3550 Lincoln Plaza
500 N. Akard St.
Dallas, Texas 75201
Telephone: (214) 954-6800
Facsimile: (214) 954-6850

and

Martin T. Fletcher, MD Bar No. 07608
mfletcher@wtplaw.com
Stephen F. Fruin, MD Bar No. 08456
sfruin@wtplaw.com
Thomas J. Francella, Jr., DE Bar No 3835
tfrancella@wtplaw.com
WHITEFORD, TAYLOR AND PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
Telephone: (410) 347-8700
Facsimile: (410) 752-7092

Dated: June 14, 2011

# EXHIBITS

| | |
|---|---|
| Exhibit 1 | Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 14, 2011 |
| Exhibit 2 | Liquidation Analysis |
| Exhibit 3 | 2011 Bond Documents |
| | Amended and Restated Trust Indenture |
| | Amended and Restated Loan Agreement |
| | Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing |
| Exhibit 4 | Directors and Management |
| Exhibit 5 | Projections |
| Exhibit 6 | Form of Investor Letter |
| Exhibit 7 | Form of Continuing Disclosure Agreement |
| Exhibit 8 | Bond Amortization Schedules |
| Exhibit 9 | Unaudited Financial Statements for Linden Ponds for the Years Ended December 31, 2010 and 2009 |
| Exhibit 10 | Unaudited Financial Statements for Linden Ponds for the Years Ended December 31, 2009 and 2008 |
| Exhibit 11 | New Management Agreement |

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS**

ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTORS' STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTORS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## I.      INTRODUCTION

### A.      General.

The following introduction is qualified by the Joint Plan of Reorganization of Linden Ponds, Inc. ("***Linden Ponds***") and Hingham Campus, LLC ("***Hingham***") as debtors and debtors-in-possession (the "***Debtors***"), dated June 14, 2011 (the "***Plan***"),[1] which is attached hereto as **Exhibit 1**, and the more detailed information and financial statements contained elsewhere in this document.  The Debtors believe that confirmation and implementation of the Plan is in the best interest of creditors and that the Plan provides the best available alternative to creditors.

This disclosure statement ("***Disclosure Statement***") and the other documents described herein are being furnished by the Debtors to holders of Claims in the Debtors' Chapter 11 Cases pending before the United States Bankruptcy Court for the Northern District of Texas (the "***Court***").

Under the Bankruptcy Code, only holders of Claims and interests that are "impaired" are entitled to vote to accept or reject the Plan.  The Bankruptcy Code further provides that a Class that is left unimpaired under the Plan is deemed to have accepted the Plan and a Class that receives no distribution under the Plan is deemed to have rejected the Plan.  To become effective, the Plan must be accepted by certain Classes of Claims and confirmed by the Court.

### B.      Classification and Treatment of Claims Under the Plan.

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan.  The Debtors are seeking votes to accept the Plan from holders of Claims in these Classes.  For a description of the Classes of Claims and their treatment under the Plan, see Section 3 of the Plan – Classification and Treatment of Claims and Interests.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtors and their Professionals of Claims filed in the Debtors' Chapter 11 Cases. There can be no assurance that these estimates are correct.  The following treatments are possible only if the Plan is approved and the Debtors' estimate of the Claims is determined to be valid by the Court.  The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Claims, Priority Tax Claims, Trustee Fees and DIP Claims are placed in the following Classes and will receive the following treatment under the Plan:

---

1  All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

## Summary of Classification
## and Treatment of Claims Under the Plan

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 1 - Other Priority Claims | $0 | No | Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Claim in this Class, each Allowed Claim under Bankruptcy Code section 507(a), which has not been satisfied as of the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim, will receive (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim or (ii) payment in Cash in full on the later of: (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; and (b) the date on which there is a Final Order allowing such Claim. |
| Class 2 - Series 2007 A Bond Claims | $98,285,000 | Yes | Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007 A Bond Claim:<br><br>• Each holder of an outstanding Series 2007 A Bond will receive:<br><br>  o a Series 2011 A-1 Bond in a principal amount equal to the Series 2011 A-1 Percentage of the principal amount of the Series 2007 A Bond so tendered bearing interest at a rate of 5.5%, with the principal amount of such bond being reduced by multiplying the Series 2011 A-1 Percentage by the 2007 A Series Factor corresponding to such Series 2007 A Bond below and the interest rate being increased to 6.25% per annum (in each case, prior to issuance) so that the cumulative debt service for such bond will be the same as if the par amount thereof accrued interest at 5.5% per annum at the higher principal amount;<br><br>  o a Series 2011 A-2 Bond in a principal amount equal to the Series 2011 A-2 Percentage of the principal amount of the Series 2007 A Bond held; and<br><br>  o a Series 2011 B Bond in a principal amount equal to the Series 2011 B Percentage of the principal amount of the Series 2007 A Bond held.<br><br>• Each holder of an outstanding Series 2007 A Bond will receive in Cash accrued and unpaid interest on |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | such Series 2007 A Bond as of the Effective Date. |
| | | | • The 2007 Bond Trustee will receive payment of all of its unpaid reasonable fees and expenses due under the 2007 Bond Indenture in Cash, less any such fees and expenses paid to the 2007 Bond Trustee as part of the distributions under the Plan on account of Class 3 Claims. |
| Class 3 - Series 2007 B/C Bond Claims | $53,945,000 | Yes | Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007 B/C Bond Claim:<br><br>• Each holder of the outstanding Original Series 2007 B Bonds or Series 2007 C Bonds will receive:<br><br>  o Amended Series 2007 B Bonds in an aggregate principal amount equal to the Amended Series 2007 B Percentage of the principal amount of the Original Series 2007 B Bond and/or Series 2007 C Bond; provided that, the Amended Series 2007 B Bonds will be issued, in accordance with the terms and conditions of the 2011 Bond Documents, either in fixed rate mode bearing interest at 5.5% per annum to maturity or variable rate mode at the election of the Bank by the Bank delivering written notice of such election to the Debtors and the 2011 Bond Trustee, and filing such notice with the Bankruptcy Court, within five (5) Business Days following the Confirmation Date; provided, further that, if such notice is not timely delivered and filed or if the Bank elects to receive such bonds in variable rate mode but fails to deliver the applicable letter of credit on or prior to the Effective Date, the Amended Series 2007 B Bonds will be issued to the Bank in fixed rate mode;<br><br>  o Series 2011 A-2 Bonds in a principal amount equal to the Series 2011 A-2 Percentage of the principal amount of the Original Series 2007 B Bond and/or Series 2007 C Bond; and<br><br>  o Series 2011 B Bonds in an aggregate principal amount equal to the Series 2011 B Percentage of the principal amount of the Series 2007 B Bond |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | and/or Series 2007 C Bond. |
| | | | • Each holder of an outstanding Original Series 2007 B Bond or Series 2007 C Bond will receive accrued and unpaid interest to the Effective Date on such Original Series 2007 B Bond or Series 2007 C Bond. |
| | | | • The Bank will receive Series 2011 A-2 Bonds in a principal amount equal to the Allowed Other Senior Debt Claims other than the L/C Draw Claims, provided that notwithstanding any provision of the Plan, the Disclosure Statement or any provision of the Confirmation Order to the contrary, no Other Senior Debt Claims for late payment fees under the 2007 Letter of Credit Agreement or any related letter of credit documents, whether denominated as a "late charge" under section 5.3 of the 2007 Letter of Credit Agreement or otherwise, shall be an Allowed Claim, and no distribution shall be made under the Plan on account of such Claims, if any. |
| | | | • The Bank will receive payment in Cash for any Allowed L/C Draw Claims. |
| | | | • The 2007 Bond Trustee will receive payment in Cash of all of its unpaid reasonable fees and expenses due under the 2007 Bond Indenture, less any such fees and expenses paid to the 2007 Bond Trustee as part of the distributions under the Plan on account of Class 2 Claims. |
| | | | • Notwithstanding anything contained in the Plan, the rights of the beneficial holders of the Original Series 2007 B Bonds and the Series 2007 C Bonds against the Bank under the 2007 Letter of Credit Agreement or any related letter of credit documents shall remain unaffected by the Plan. |
| Class 4 - Other Secured Claims | $0 | No | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, at the sole option of the Reorganized Debtor(s), each Allowed Other Secured Claim shall have its Other Secured Claim reinstated and otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled in accordance with section 1124 of the Bankruptcy Code. |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 5 - Linden Ponds General Unsecured Claims | $5,000,000 | No | Except to the extent that a holder of an Allowed Linden Ponds General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Linden Ponds General Unsecured Claim, each holder of an Allowed Linden Ponds General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed Linden Ponds General Unsecured Claim on the latest of (1) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Disbursing Agent, (2) the date such Allowed Linden Ponds General Unsecured Claim becomes due and payable in the ordinary course of business and (3) as otherwise agreed to by the Debtors and the holder of such Claim, and the Plan shall otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled; provided, however, that the Debtors may seek authority from the Court to pay certain Linden Ponds General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any Linden Ponds General Unsecured Claim, whether or not objected to prior to the Effective Date. |
| Class 6 – Hingham General Unsecured Claims | $0 | Yes | Holders of Allowed Hingham General Unsecured Claims shall not receive any distribution in respect of any Hingham General Unsecured Claims. The Debtors estimate that the Allowed Class 6 Claims will be approximately $0 on the Effective Date. |
| Class 7 - Manager Claims | $8,000,000 | Yes | In full and final satisfaction and discharge of and in exchange for the Manager Claims, (i) Linden Ponds will enter into the New Management Agreement with the Manager on or prior to the Effective Date and (ii) the Manager will receive payment in full in Cash of the unpaid portion of the Claims arising pursuant to the Transitional Subcontract Agreement or the Current Management Agreement on the latest of (1) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Disbursing Agent, (2) the date such Claim becomes due and payable in the ordinary course of business and (3) as otherwise agreed to by the Debtors and the Manager. No distribution shall be made in respect of any other Manager Claims. |
| Class 8 - Interests in Linden Ponds | N/A | No | Interests in Linden Ponds shall be reinstated on the Effective Date. |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 9 - Interests in Hingham | N/A | Yes | On the Effective Date and in accordance with Section 4.7 of the Plan, at the discretion of the Debtors, (i) all of the assets of Hingham shall be transferred to Reorganized Linden Ponds, the agreements between Hingham and Linden Ponds shall be terminated, Hingham shall cease operations and, as soon as practical thereafter, all Interests in Hingham shall be extinguished and Hingham shall be dissolved or (ii) all of the Interests in Reorganized Hingham shall be transferred to Reorganized Linden Ponds. |

### C. Summary of Exchange of 2007 Bonds for 2011 Bonds Pursuant to the Plan.

| Original Series Designation | Original Maturities | Exchange Series Designation | Exchange Maturity | Exchange Percentage* | Aggregate Principal Amount | Interest Rate |
|---|---|---|---|---|---|---|
| Series 2007 A | Serial bonds maturing on November 15, 2011-12, 2015-18<br><br>Term bonds Maturing on November 15 in each of 2014, 2022, 2027, 2035 and 2042 | Series 2011 A-1 | Term Bonds maturing November 15, 2013-2014, 2017-2021, 2026, 2031, 2039 and 2046 | 77.51429% multiplied by the 2007 A Series Factor Below | $69,712,722 | 6.25% |
| | | Subseries I of Series 2011 A-2 | November 15, 2046, subject to prepayment from Excess Liquidity | 3.76404% | $3,699,488 | 5.5% |
| | | Series 2011 B | November 15, 2056, subject to prepayment from Excess Cash | 18.72167% | $18,400,594 | None |

| Original CUSIP (2007 A Bonds) | Original Maturity (2007 A Bonds) | Maturity (2011 A-1 Bonds) | 2007 A Series Factor |
|---|---|---|---|
| 57583RPL3 | 11/15/2011 | 11/15/2013 | 0.9818664753 |
| 57583RPM1 | 11/15/2012 | 11/15/2014 | 0.9673413268 |
| 57583RPP4 | 11/15/2014 | 11/15/2017 | 0.9442425124 |
| 57583RPQ2 | 11/15/2015 | 11/15/2018 | 0.9306268897 |
| 57583RPR0 | 11/15/2016 | 11/15/2019 | 0.9254893529 |
| 57583RPS8 | 11/15/2017 | 11/15/2020 | 0.9213127500 |
| 57583RPT6 | 11/15/2018 | 11/15/2021 | 0.9179318442 |
| 57583RPU3 | 11/15/2022 | 11/15/2026 | 0.9109989513 |
| 57583RPV1 | 11/15/2027 | 11/15/2031 | 0.9084096035 |
| 57583RPW9 | 11/15/2035 | 11/15/2039 | 0.9097238063 |
| 57583RPX7 | 11/15/2042 | 11/15/2046 | 0.9147238610 |

| Original Series Designation | Original Maturities | Exchange Series Designation | Maturity Date | Exchange Percentage* | Aggregate Principal Amount | Interest Rate |
|---|---|---|---|---|---|---|
| Series 2007 B **or** Series 2007 C | November 1, 2042 | Amended Series 2007 B | November 1, 2046 | 77.51429% | $41,815,083 | 5.5% Variable |
| | | Subseries II of Series 2011 A-2 | November 15, 2046, subject to prepayment from Excess Liquidity | 3.76404% | $2,030,512 | 5.5% |
| | | Series 2011 B | November 15, 2056, subject to prepayment from Excess Cash | 18.72167% | $10,099,406 | None |

* Represents the percentage of a tendering holder's outstanding principal amount of 2007 Bonds which will be exchanged for 2011 Bonds of the subseries or series specified.

**The following chart sets forth the approximate distributions (stated as the face amount of principal received for every $10,000 in face amount of 2007 Bonds) that a holder can expect to receive (rounded to the nearest $10.00 denomination) of each series of Series 2011 A-1 Bonds, Amended Series 2007 B Bonds, Series 2011 A-2 Bonds and Series 2011 B Bonds.**

| Original CUSIP | Original Maturity Date | | |
|---|---|---|---|
| **57583RPL3** | **11/15/2011** | | |
| | 2011 A-1 (2013 Term) Bond Distribution | | $7,610.00 |
| | 2011 A-2 Bond Distribution | | $380.00 |
| | 2011 B Bond Distribution | | $1,870.00 |
| **57583RPM1** | **11/15/2012** | | |
| | 2011 A-1 (2014 Term) Bond Distribution | | $7,500.00 |
| | 2011 A-2 Bond Distribution | | $380.00 |
| | 2011 B Bond Distribution | | $1,870.00 |
| **57583RPP4** | **11/15/2014** | | |
| | 2011 A-1 (2017 Term) Bond Distribution | | $7,320.00 |
| | 2011 A-2 Bond Distribution | | $380.00 |
| | 2011 B Bond Distribution | | $1,870.00 |
| **57583RPQ2** | **11/15/2015** | | |
| | 2011 A-1 (2018 Term) Bond Distribution | | $7,210.00 |
| | 2011 A-2 Bond Distribution | | $380.00 |
| | 2011 B Bond Distribution | | $1,870.00 |

| 57583RPR0 | 11/15/2016 | |
|---|---|---:|
| | 2011 A-1 (2019 Term) Bond Distribution | $7,170.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPS8 | 11/15/2017 | |
|---|---|---:|
| | 2011 A-1 (2020 Term) Bond Distribution | $7,140.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPT6 | 11/15/2018 | |
|---|---|---:|
| | 2011 A-1 (2021 Term) Bond Distribution | $7,120.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPU3 | 11/15/2022 | |
|---|---|---:|
| | 2011 A-1 (2026 Term) Bond Distribution | $7,060.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPV1 | 11/15/2027 | |
|---|---|---:|
| | 2011 A-1 (2031 Term) Bond Distribution | $7,040.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPW9 | 11/15/2035 | |
|---|---|---:|
| | 2011 A-1 (2039 Term) Bond Distribution | $7,050.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPX7 | 11/15/2042 | |
|---|---|---:|
| | 2011 A-1 (2046 Term) Bond Distribution | $7,090.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPY5 | 11/1/2042 | |
|---|---|---:|
| | Amended 2007 B (2046 Term) Distribution | $7,750.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

| 57583RPZ2 | 11/1/2042 | |
|---|---|---:|
| | Amended 2007 B (2046 Term) Distribution | $7,750.00 |
| | 2011 A-2 Bond Distribution | $380.00 |
| | 2011 B Bond Distribution | $1,870.00 |

Which subseries of Series 2011 A Bonds that a holder of Series 2007 A Bonds will receive will depend upon which subseries of Series 2007 A Bonds are held. For example,

holders of Series 2007 A Bonds that currently have the earliest maturity date will receive Series 2011 A Bonds having the earliest maturity as compared to the maturity dates of all other 2011 Bonds being issued, as reflected in the below table:

| Series 2007 A Bonds Maturing (November 15) | Exchanged For: Series 2011 A-1 Bonds Maturing (November 15) |
| --- | --- |
| 2011 | 2013 |
| 2012 | 2014 |
| 2014 | 2017 |
| 2015 | 2018 |
| 2016 | 2019 |
| 2017 | 2020 |
| 2018 | 2021 |
| 2022 | 2026 |
| 2027 | 2031 |
| 2035 | 2039 |
| 2042 | 2046 |

**D.     Plan Overview.**

The following is a brief overview of the Plan and it is qualified by reference to the Plan itself. For a more detailed description of the terms and provisions of the Plan, see Article V - The Plan of Reorganization.

The Plan is the result of negotiations by and among the Debtors and certain significant creditor constituencies, including the 2007 Bond Trustee and the Consenting Holders.

The Plan provides for the payment and/or full satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Trustee Fees, Allowed DIP Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed Linden Ponds General Unsecured Claims and Allowed Interests in Linden Ponds. The Plan also provides that the holders of Allowed Series 2007 A Bond Claims and Allowed Series 2007 B/C Bond Claims, in full and final satisfaction and discharge of and in exchange for such Allowed Claims will receive 2011 Bonds, plus interest of such bonds accruing up to the Effective Date payable in Cash. The Plan provides that holders of Hingham General Unsecured Claims will receive no distribution.

The potential recoveries are only estimates and the actual recovery will either increase or decrease depending upon the occurrence or non-occurrence of numerous factors, including, but not limited to the risk factors discussed in Article VIII of this Disclosure Statement.

### E.     Summary of Confirmation Requirements.

Under the Bankruptcy Code, only classes of claims that are "impaired" are entitled to vote to accept or reject the Plan.  The Bankruptcy Code requires, as a condition to confirmation of a consensual plan of reorganization, that each impaired class of claims accepts the Plan.  A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount, and more than one-half in number, of those creditors that actually cast ballots, vote to accept such plan.

Liabilities incurred in the ordinary course of business by the Debtors since the Petition Date that are described in the Plan as Allowed Administrative Claims will be paid on the later of: (1) the third Business Day after the Effective Date; (2) the date on which such Person becomes the holder of an Allowed Administrative Claim; or (3) the date or dates on which that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Holders of Administrative Claims will not be entitled to vote on the Plan.

Any Claims arising from the rejection of executory contracts and unexpired leases are treated under the Bankruptcy Code as if they arose before the filing of the Chapter 11 petition.

Any Claim in an impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing the Claim for the purpose of voting on the Plan.

### F.     Voting Instructions and Deadline.

The Debtors have prepared this Disclosure Statement as required by Bankruptcy Code section 1125 and Bankruptcy Rule 3016(c).  It is being distributed to holders of Claims against the Debtors to assist such holders in evaluating the feasibility of the Plan, the manner in which their Claims are treated and in determining that the Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129.  A copy of the Plan is attached hereto as **Exhibit 1**.  The purpose of this Disclosure Statement is to assist those entitled to vote on the Plan to make an informed judgment in voting to accept or reject the Plan.

This Disclosure Statement is subject to the Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.  The Debtors are seeking to combine, at the same hearing, approval of this Disclosure Statement and confirmation of the Plan.

**THE COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

This Disclosure Statement describes the background of the Debtors and the significant events leading up to and following the filing of the Chapter 11 Cases on the Petition

Date.  It summarizes the major events that have taken place during the Debtors' Chapter 11 Cases and describes the Plan, which divides creditor Claims into Classes and provides for the treatment of Allowed Claims.

1.    <u>General Information</u>.    Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan and the vote of these Classes will not be solicited.

2.    <u>Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote</u>.    If a Creditor holds a Claim included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited.  Classes 1, 4, 5 and 8 are unimpaired under the Plan.

3.    <u>Certain Classes Are Deemed to Reject the Plan and Do Not Vote</u>.    Under Bankruptcy Code section 1126(g), Classes 6 and 9, will receive no distributions on account of such claims.  Thus, Classes 6 and 9 are deemed to have rejected the Plan and the vote of holders of such Claims in these Classes will not be solicited.

4.    <u>Claims Which Are Not Allowed</u>.    The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Court rules on the objection and allows the Claim.  If the Court has not ruled on the objection or status of such a Claim, but the holder of a Claim wishes to vote, the holder of the Claim may petition the Court to estimate its claim for voting purposes under Bankruptcy Rule 3018(a).  Consequently, although holders of such Claims may receive ballots, their votes will not be counted unless the Court, prior to the Voting Deadline, rules on the objection and allows the Claim or, on proper request under Bankruptcy Rule 3018(a) prior to the hearing on Confirmation, temporarily allows the Claim in an amount that the Court deems proper for the purpose of voting on the Plan.

5.     <u>Voting and Record Date</u>.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time.  The record date for determining which creditors may vote on the Plan is June [__], 2011.  The Voting Deadline is August 22, 2011 at 5:00 p.m. (prevailing Central Time).

a.     <u>How to Vote</u>.  IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED (I) TO THE RESPECTIVE NOMINEES IN SUFFICIENT TIME TO ENABLE THE RESPECTIVE NOMINEES TO COMPLETE THE MASTER BALLOT AND DELIVER IT TO THE VOTING AGENT BY THE VOTING DEADLINE OR (II) TO THE VOTING AGENT BY THE VOTING DEADLINE, AS EACH IS APPLICABLE.

b.     <u>Ballots</u>.  Creditors must use only the ballot or ballots sent to them with this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

**IF A CREDITOR IS A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF SUCH BALLOT IS DAMAGED OR LOST, OR IF A CREDITOR HAS ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT:**

EPIQ BANKRUPTCY SOLUTIONS, LLC
757 Third Avenue
3rd Floor
New York, NY  10017
Tel. No.: 646-282-2400
Attn.:  Linden Ponds

**G.     The Confirmation Hearing.**

The Debtors have requested that the Court schedule a hearing to consider approval of this Disclosure Statement and confirmation of the Plan on **September 15 and 16, 2011 at _:__ _.m. (prevailing Central Time)**, before the Honorable Stacey G. Jernigan, at the United States Bankruptcy Court, Northern District of Texas, Earle Cabell Building, U.S. Courthouse, 1100 Commerce Street - Room 1254, Dallas, Texas 75242-1496.  The Court has ordered that objections, if any, to confirmation of the Plan be filed and served within the time and in the manner described in the Confirmation Notice and Order that accompany this Disclosure Statement.  The date of the Confirmation Hearing may be continued at such later time(s) as the Court may announce during the Confirmation Hearing or any continued hearing without further notice.

If the Plan is confirmed by the Court, it will be binding on all Claim holders regardless of whether an individual Claim holder has supported or opposed the Plan.

**H.    Definitions.**

1.    <u>Defined Terms</u>.  As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.

2.    <u>Interpretation of Terms</u>.  Each definition in this Disclosure Statement and in the Plan includes both the singular and the plural, and references in this Disclosure Statement include the masculine and feminine where appropriate.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

## II.    BACKGROUND INFORMATION

**I.    Description of the Continuing Care Retirement Community.**

The Linden Ponds campus, which opened in October 2004, is a 108-acre continuing care retirement community (a "***CCRC***") that offer seniors a full lifecycle of services during their retirement years from independent living to skilled nursing care on the same campus.  The CCRC provides affordable living accommodations and related healthcare and support services to a target market of middle-income seniors aged sixty-two (62) years and older.  The CCRC enables seniors to remain in the same place as they age and their needs change by providing various levels of support and care at the same facility.  In addition, the CCRC provides the residents with multiple entertainment outlets and other social benefits for all stages of their retirement living.  The CCRC includes space to cover all aspects of everyday life from dinner to exercise, music to game rooms, theatre and television studios, planters, gardens, dining rooms, a pub, a convenience store, a bank, a beauty salon/barbershop, an aquatic center, classrooms, a library, a woodwork and hobby shop, a pharmacy, a computer lab, a non-denominational chapel, walking paths and a fitness center.

As of March 31, 2011, the CCRC had (a) 988 completed independent living units, 5 of which are units utilized for guest rooms and services, 869 of which are occupied units, resulting in an 87.9% occupancy rate of independent living units; and (b) 132 skilled nursing beds, of which 90 are occupied by residents, resulting in a 68% occupancy rate.  Upon completion of construction of the CCRC, including Residential Building 2.5 and Neighborhood 3, it is anticipated that the CCRC's facilities will include up to 1,705 independent living units and 228 assisted living and skilled nursing beds.

**J.    Development of the CCRC.**

The CCRC has been developed as follows: (i) Hingham, the landowner, purchased the land; (ii) the construction and development of the new CCRC began; then (iii) when the CCRC was ready for occupancy by residents, Linden Ponds, an independent not-for-profit operator, began to operate the CCRC.  It was anticipated that, when the construction of the CCRC is complete, the land and CCRC would be sold to Linden Ponds.

1.    First Phase: Land Acquisition, Construction, and Development.

During the first phase of the CCRC, Hingham was formed to purchase the land. Hingham has ownership of both the real property and all improvements as they are constructed on the land, until the CCRC is sold to Linden Ponds. In general, the land acquisition was financed through cash, equity provided by Hingham's parent company, construction loans, and/or subordinated debt. Once the land was acquired, Hingham began the construction and development of the CCRC.

2.    Second Phase: Occupancy by Residents.

At the beginning of the marketing of the CCRC, Linden Ponds was created to operate the campus on a day-to-day basis. Linden Ponds and Hingham entered into a master lease agreement (the "***Master Lease***"), pursuant to which Linden Ponds leased the land and the improvements from Hingham. The Master Lease is a twenty-year, triple net lease, requiring Linden Ponds to pay all ongoing maintenance expenses (e.g. utilities, taxes, and insurance), with three ten-year renewal options.

Hingham also entered into a community loan agreement with Linden Ponds (the "***Community Loan***"), pursuant to which Linden Ponds lent Hingham all excess initial entrance deposits ("***IEDs***") collected from the CCRC's residents prior to their occupancy of a unit. The proceeds of the Community Loan were generally sufficient to pay all construction and development costs of the CCRC. Debt service on the Community Loan paid by Hingham to Linden Ponds was fully offset by the rental payments made by Linden Ponds to Hingham under the Master Lease. Hingham's obligations were secured by a mortgage on the property in favor of Linden Ponds. Currently, Hingham owes Linden Ponds approximately $177,170,023 under the Community Loan.

To fund working capital deficits of Linden Ponds, Hingham provided a working capital loan (the "***Working Capital Loan***") to Linden Ponds. To secure its obligations under the Working Capital Loan, Linden Ponds granted Hingham a security interest in all assets of Linden Ponds, including the Residence and Care Agreements and the IEDs. Currently, Linden Ponds does not owe Hingham anything under the Working Capital Loan.

When the first phase of the CCRC was near completion, Linden Ponds secured permanent financing through a municipal bond offering (tax-exempt and taxable bonds) issued by the Massachusetts Development Finance Agency with the total principal amount of $156,365,000 (the "***2007 Bonds***"). The obligor on the 2007 Bonds is Linden Ponds, not Hingham. The 2007 Bonds have a fixed rate component that is typically long-term and a variable rate component that is paid down at stabilization.

The issuance of the 2007 Bonds was comprised of Series 2007 A Bonds (Tax-Exempt), Series 2007 B Bonds (Tax-Exempt) and of Series 2007 C Bonds (Taxable). The Series A Bonds consist of $101,365,000 of tax-exempt fixed rate term bonds with a final maturity date in 2042 and the interest on the Series 2007 A Bonds is payable semiannually on May 15 and November 15 of each year. The Series 2007 B Bonds consist of $45,000,000 of tax-exempt variable rate demand bonds with a final maturity date in 2042 and the interest on the Series B Bonds is payable monthly. The Series 2007 C Bonds consist of $10,000,000 in taxable

variable rate demand Bonds with a final maturity date in 2042 and the interest on the Series 2007 C Bonds is payable monthly.

An irrevocable transferable direct-pay letter of credit was issued by Sovereign Bank (the "***Bank***") in the initial stated amount of $55,768,494 (the "***Letter of Credit***").  Of this amount, $55,000,000 supports the face value of the Series 2007 B Bonds and Series 2007 C Bonds.  The Letter of Credit expires on July 31, 2012.

Upon the issuance of the 2007 Bonds, Linden Ponds entered into a purchase option agreement (the "***Purchase Option Agreement***") with Hingham, whereby a significant portion of the proceeds of the 2007 Bonds were used by Linden Ponds to pay Hingham a purchase option deposit (the "***Purchase Option Deposit***") to ensure the sale of the CCRC to Linden Ponds.  Pursuant to the Purchase Option Agreement, the holders of the 2007 Bonds received a first priority mortgage on the property and the CCRC.

3.    Residential Building 2.5 and Neighborhood 3.

Zoning and site plan approval has been received for construction of Residential Building 2.5 and Neighborhood Three of the CCRC.  As currently designed, Residential Building 2.5 will contain 120  independent living units in a seven-story steel framed building. Neighborhood Three is currently designed to include 642 independent living units in five residential buildings, and one community building containing 49,356 square feet of community space, including a restaurant, classrooms, administrative offices, and meeting space.  However, the Manager and Linden Ponds will review market trends and community requirements prior to finalizing the designs for Residential Building 2.5 and Neighborhood Three, and thus the final approved designs may deviate from the current designs.  Planning and design on Residential Building 2.5 are expected to occur prior to Neighborhood Three and are anticipated to commence once occupancy rates for Neighborhood One and Neighborhood Two indicate the need for additional units.  Construction of Residential Building 2.5 is currently anticipated to begin within nine (9) months after  occupancy of the independent living units of the existing CCRC has averaged at least 93% for three (3) consecutive months.  Should absorption of available units be delayed or slower than currently projected, this will cause a delay in reaching 93% occupancy of the independent living units of the existing CCRC and the corresponding commencement of construction on Residential Building 2.5.  A delay in construction of Residential Building 2.5 may result in the resizing of the 2011 Bonds as further set forth in the definition of "Resizing Event."  It is projected that the amount of IEDs received from the settlement of Residential Building 2.5 will be greater than the construction costs required to build Residential Building 2.5, thus generating positive cash flows to the CCRC through the collection of IEDs.  In addition, the ongoing operations of Residential Building 2.5 are projected to add incremental cash flow to the CCRC that it will not otherwise have should Residential Building 2.5 not be built.  Should the construction of Residential Building 2.5 be delayed or not completed, this will negatively impact the cash flows of the CCRC and lower the amount of cash available to pay debt service.

K.    **Management of the CCRC.**

Senior Living Retirement Communities LLC, formerly known as Erickson Retirement Communities, LLC ("***Senior Living***") provided (a) development and construction

services to Hingham, pursuant to an Amended and Restated Development Agreement dated as of August 21, 2006 by and between Hingham and Senior Living (as amended, the "***Development Agreement***"), and (b) management services to Linden Ponds pursuant to the Management and Marketing Agreement dated January 31, 2009, by and between Linden Ponds and Senior Living (as amended, the "***Management Agreement***").  Upon the consummation of Senior Living's chapter 11 plan of reorganization (as discussed below), Senior Living delegated and assigned its rights under the Management Agreement to Erickson Living Management, LLC   (formerly known as Redwood-ERC Management, LLC), a Maryland limited liability company ("***Erickson***" or the "***Manager***"), for a transitional period pursuant to that certain Transitional Subcontract Agreement effective April 30, 2010 among Senior Living, the Manager, Linden Ponds and the 2007 Bond Trustee (as amended, the "***Transitional Subcontract***").

The Management Agreement may be terminated due to a party's uncured material breach, the failure of a party to maintain necessary licenses or permits, the bankruptcy or insolvency of the Manager, or certain legal changes that would adversely affect Linden Ponds' tax-exempt status.  Unless terminated earlier, the existing Management Agreement is expected to be replaced on or prior to the Effective Date by the New Management Agreement to be entered into by and between the Manager and Reorganized Linden Ponds.

**L.    Residents of the CCRC.**

1.    Residence and Care Agreements.

Prior to a resident's occupancy of an independent living unit in the CCRC, Linden Ponds enters into a residence and care agreement (the "***Residence and Care Agreement***") with the resident.  Under the terms of the Residence and Care Agreement, each resident agrees to pay to Linden Ponds an entrance deposit (an "***ED***") or IED and monthly service fees, which average about $2,300 per unit.  In return, the resident is permitted to occupy a unit in the CCRC for his lifetime, subject to certain conditions.  Pursuant to the Residence and Care Agreement, the resident receives a full refund of his ED or IED upon his death or departure from the community, subject to a successful resale of the unit.  The resident can terminate the Residence and Care Agreement without cause on thirty-days' notice, and the Residence and Care Agreement can be assigned to a new manager/operator of the community if the manager/operator is certified as a continuing care provider.

2.    EDs and IEDs.

The EDs and IEDs paid by the residents prior to their occupancy of a unit range from $149,000 to $600,000.  When a resident moves out or dies, if the unit's new entrance deposit is the same or greater than the ED or IED price paid by the departing resident, then the departing resident's ED or IED will be 100% refunded and Linden Ponds will keep the difference between the new entrance deposit and the departing resident's ED or IED from the sale of the unit.  If the new entrance deposit is less than the departing resident's ED or IED, then the departing resident will generally receive the lesser amount.  In this scenario, Linden Ponds is not required to participate in the downside risk in this transaction, unless it elects to do so.

3.      State Regulations.

The CCRC industry is heavily regulated by state authorities. Linden Ponds, as operator of the CCRC, is required to satisfy the regulations of the state where its facilities are located, in this case the Commonwealth of Massachusetts.

Massachusetts regulates the marketing and sale of living units and services in CCRCs pursuant to Massachusetts General Laws Chapter 93, Section 76 (the "***CCRC Act***"). The CCRC Act imposes three fundamental duties on providers of CCRCs after the effective date of the CCRC Act, March 15, 1983.

First, at or before the earlier of execution of a contract to provide continuing care, or the time any money or other property is transferred to a CCRC provider by or on behalf of a prospective resident, the provider is required to deliver a detailed disclosure statement to the prospective resident. Among other disclosures, such statement must include certified financial statements of the provider and statements of anticipated sources and applications of funds used and to be used in the purchase and construction of the CCRC facility.

Second, the CCRC Act specifies certain minimum requirements for all continuing care contracts including, in particular, the right to a refund of the entrance deposit, if the prospective resident rescinds the contract prior to occupancy or dies prior to occupancy, or if the living unit is not available for occupancy by the agreed-on date, unless extended in writing by the provider and the prospective resident. Such entrance deposit refund is subject to certain limited adjustments up or down depending on the particular circumstances. This portion of the CCRC Act also requires continuing care contracts to describe the services provided to and recurring fees required from residents, and requires that entrance fees, minus no more than one percent for each month of occupancy, be refunded to the resident when the resident leaves the facility or dies.

Third, any provider intending to market or develop a CCRC that requires prepayment for any services or to market or develop additional living units at a CCRC is required to file with the Massachusetts Executive Office of Elder Affairs ("***MA Elder Affairs***") copies of such disclosure statement, such contracts, and any available advertising or promotional material to be used in connection with such marketing effort. Such a provider is also required by the CCRC Act to file with MA Elder Affairs copies of any changes in such materials within 30 days after the provider utilizes the changed materials, and a copy of the building permit for the CCRC facility within 30 days after its issuance. The CCRC Act does not give MA Elder Affairs any right of pre-approval of such disclosure statement, continuing care contract or promotional materials.

The CCRC Act provides two key, private enforcement mechanisms. Any continuing care contract drawn in violation of the minimum contract requirements of Section 76(c) of the CCRC Act may be rescinded by the resident and the resident shall be entitled to a full refund of the entrance fee. Section 76(e) of the CCRC Act further provides that in addition to the Section 76(c) contract rescission remedy, any violation of any portion of the CCRC Act shall also constitute an unfair and deceptive trade practice under the provisions of Massachusetts General Laws Chapter 93A. In turn, Chapter 93A provides up to treble damages and attorneys fees as a remedy for unfair or deceptive trade practices.

**M.     Corporate Governance.**

National Senior Campuses, Inc. ("***NSC***"), a Maryland non-stock corporation, is the sole member of Linden Ponds.  Under the Ninth Amended and Restated Bylaws of Linden Ponds, as amended (the "***Bylaws***"), the Board of Directors of Linden Ponds (the "***Board of Directors***") has all of the powers of governance of Linden Ponds except for certain powers of NSC as the sole member of Linden Ponds (the "***Member Powers***").  NSC's mission is to provide support to its affiliated continuing care retirement communities.  The Member Powers include the appointment and removal of Directors and any other rights of a member under the statutes or charter.

Under the Bylaws, there are two classes of directors:  one NSC Director who is also a member of the NSC's board of directors (the "***NSC Director***") and the other Directors (the "***Directors***").  Members of the Board of Directors are elected as follows:  The Board of Directors are appointed by the Member, any of whom may be a member of the Member's board of directors.  The remaining Directors may include one (1) individual who is a "Resident Director" (*i.e.*, a resident of Linden Ponds' continuing care retirement community) who may be appointed by the Member if and when the Member shall deem appropriate.  An employee of or owner of an equity interest in any entity providing comprehensive management services for Linden Ponds' retirement community or of any of such entity's affiliates, or a member of the employee's or owner's "family" (which means a person's spouse, ancestors, children, grandchildren, great grandchildren, and the spouses of those children, grandchildren and great grandchildren) may not serve as a Director. The NSC Director serves for a one-year term and may be reappointed to subsequent one-year terms.  The initial term of each Director is one year.  Under the Bylaws, upon reappointment after the initial one-year term, a Director then serves for subsequent terms of up to three-years each.  The terms of the members of the Board of Directors are staggered.

**N.     Legal Proceedings.**

Certain claims, suits and complaints (including those involving environmental matters) which arise in the ordinary course of Linden Ponds' business have been filed or are pending against it.  Linden Ponds believes, based upon the currently available information, that all the results of such proceedings, individually, or in the aggregate, would not have a material adverse effect on its consolidated financial condition or results of operations.

**O.     Environmental Matters.**

Linden Ponds' operations are subject to a number of federal, state and local environmental laws and regulations including those governing air emissions, wastewater discharges, the use, generation, storage, management and disposal of, or exposure to hazardous or toxic substances and wastes, the investigation and remediation of contaminated soil, air, and groundwater and occupational health and safety.  While these laws and regulations could impose capital and operating costs on Linden Ponds' business and there are significant penalties for violations, these costs currently are not material.

III.    EVENTS LEADING TO BANKRUPTCY

      A.    The Decline in the Market.

          During the past few years, senior living facilities, including the CCRC, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital and declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the financial market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities.  As a result of these challenging market conditions, Linden Ponds has suffered a substantial loss of revenue and lower than anticipated absorption rates.

      B.    Senior Living Cases.

          Substantial losses of revenue at certain senior living facilities in turn forced Senior Living, previously known as Erickson Retirement Communities, the prior manager and developer of Linden Ponds and Hingham's direct parent company, and certain other of its related entities to seek chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 09-37010) (the "*Senior Living Cases*") on October 19, 2009.  Senior Living's Fourth Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on April 16, 2010.  The Senior Living Cases are still pending before this Court.

      C.    Illinois Cases.

          Subsequently, two of Senior Living's other direct subsidiaries, Lincolnshire Campus, LLC and Naperville Campus, LLC, along with the not-for-profit operators of their respective Sedgebrook and Monarch Landing campuses, Sedgebrook, Inc. and Monarch Landing, Inc. (collectively, the "*Illinois Debtors*"), also sought chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 10-34176) (the "*Illinois Cases*").  The Illinois Debtors' Third Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on November 16, 2010.  The Illinois Cases are still pending before this Court.

      D.    The Debtors' Prepetition Restructuring Attempts.

          The Bond Trustee has indicated that events of default under the 2007 Bonds have occurred including (i) the failure of Linden Ponds to make the principal and interest payments due to the Bond Trustee on March 15, 2011, (ii) failure to reimburse the Bank under the letter of credit agreement for the principal component of a draw made on March 1, 2011 and (iii) the failure of Linden Ponds to deposit IEDs with the 2007 Bond Trustee, commencing December 2010, when Linden Ponds began escrowing such IEDs to provide further assurance to prospective residents.  Prior to these defaults, the Debtors entered into negotiations with the Bond Trustee, the Bank and certain holders of the outstanding 2007 Bonds (the "*Consenting Holders*").

          On April 5, 2011, the Debtors, the Bond Trustee, the Bank and the Consenting Holders executed that certain Restructuring Term Sheet (the "*Restructuring Term Sheet*").  The

Restructuring Term Sheet was a non-binding agreement among the signatories to, among other things, (i) conduct an out-of-court exchange offer whereby the 2007 Bonds would be exchanged for new bonds to be issued by the Massachusetts Development Finance Agency and/or amended 2007 Bonds (the "*2011 Bonds*") and (ii) simultaneously solicit votes for a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code on substantially the same terms as the exchange offer and provide all of the Debtors' other creditors with payment in full. The Restructuring Term Sheet conditioned consummation of the exchange offer on the tender of 98% of the 2007 Bonds and contemplated that a prepackaged plan of reorganization would be filed if a lesser amount of 2007 Bonds were tendered. The Bank and the Consenting Holders collectively held or had voting authority with respect to approximately 75% of the outstanding 2007 Bonds. After several months of extensive negotiations and the drafting of substantially all of the documents required to commence solicitation related to the exchange offer and the prepackaged plan of reorganization, the Bank demanded a term in the deal that neither the Debtors nor the Consenting Holders could accept. As a result, on or about May 26, 2011, the Bank indicated that it no longer wished to participate in the exchange offer or a prepackaged plan on the terms outlined in the Restructuring Term Sheet as further negotiated between the parties.

In light of the 98% consent threshold required to effectuate the out-of-court exchange and the fact that the Debtors could no longer afford to continue negotiating terms with the Bank without any certainty of the outcome, the Debtors were left with no feasible alternative other than to commences these chapter 11 cases in order to effectuate the restructuring.

Consequently, on June 8, 2011, the Debtors and the Consenting Holders entered into the Restructuring, Lockup, Plan Support and Forbearance Agreement (the "*Lockup Agreement*"). Pursuant to the Lockup Agreement, the Consenting Holders agreed to, among other things, support the Debtors to use of cash collateral and its efforts to obtain debtor-in-possession financing in connection with these chapter 11 cases. Additionally, the Consenting Holders, which entities hold approximately 62% of the Series 2007 A Bonds and approximately, 40% of all of the 2007 Bonds, have agreed to support and vote in favor of the Plan.

## IV. EVENTS EXPECTED TO OCCUR DURING DEBTORS' CHAPTER 11 CASES

### A. Anticipated Events During the Chapter 11 Cases.

The Debtors do not expect the Chapter 11 Cases to be protracted. To expedite their emergence from chapter 11, the Debtors on the Petition Date, in addition to filing this Disclosure Statement and the Plan, have filed motions seeking the relief detailed below, among other relief, from the Court. Such relief, if granted, will facilitate the administration of the Chapter 11 Cases; there can be no assurance, however, that the Court will grant the relief sought.

### B. Motion To Approve Combined Disclosure Statement And Confirmation Hearing.

The Debtors are seeking an order scheduling a combined hearing on this Disclosure Statement and confirmation of the Plan (the "*Confirmation Hearing*") for a date approximately 90 days following the Petition Date. At the Confirmation Hearing, the Debtors will seek approval of the confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. At that time, the Debtors will also request that the Court approve this

Disclosure Statement. There can be no assurance that the Court will approve the request to schedule the Confirmation Hearing approximately 90 days from the Petition Date.

### C. Motion For Authority To Pay Prepetition Employee Wages and Associated Benefits.

Linden Ponds' employees are an integral part of its business, and their continued dedication is crucial to its success. Linden Ponds believes that they have a valuable asset in its work force and that any delay in paying prepetition compensation or benefits to their employees would destroy its relationships with employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. Linden Ponds is grateful to their employees for their help, without which a restructuring would not be possible. Accordingly, Linden Ponds is seeking authority to pay compensation and benefits in the Chapter 11 Cases which were accrued but unpaid as of the Petition Date and to continue its employee programs during the pendency of the Chapter 11 Cases.

### D. Motions To Continue Using Existing Cash Management Systems.

Because the Debtors expect the Chapter 11 Cases to be pending for about three (3) months, and because of the administrative hardship that any operating changes would impose, the Debtors are seeking authority to continue using their existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines. Absent the Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be impaired to the detriment of the Debtors' Estate and creditors.

Continued use of their existing cash management system will facilitate the Debtors' smooth and orderly transition into the Chapter 11 Cases, minimize the disruption of their businesses while in chapter 11, and expedite their emergence from chapter 11. As a result of set-up time and expenses, requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases. For the same reasons, requiring the Debtors to close their existing bank accounts and establish new accounts or requiring them to create new business forms would only frustrate their efforts to reorganize expeditiously.

### E. Motion to Escrow IEDs for Protection of Residents.

In order to fully protect the Debtors' residents, the Debtors has filed a motion for an order authorizing the Debtors to escrow certain IEDs received postpetition from residents of the CCRCs to ensure that the refunds of the residents' deposits will be secure during the Debtors' Chapter 11 Cases. Commencing on or about December 1, 2010, Linden Ponds has not transferred IEDs to the 2007 Bond Trustee, but has instead transferred such IEDs to a depository account pursuant to a certain Depository Agreement, dated as of December 14, 2010 by and between Linden Ponds and JPMorgan Chase Bank, N.A. As of April 1, 2011, approximately $4.3 million was held in the depository account.

### F. Motion To Approve Debtor-In-Possession Financing.

The Debtors need access to funds in order to operate their businesses during the Chapter 11 Cases. As a consequence, the Debtors are seeking prompt Court approval of debtor-in-possession financing to enable the Debtors to address their funding and other commitments and to otherwise maintain normal operations and strong relationships with their vendors, customers and suppliers during the Chapter 11 Cases. The debtor-in-possession financing will be provided by a Manager-affiliated entity and is expected to be senior in priority and right of payment to the 2007 Bonds. The Debtors estimate that up to approximately $6,000,000 in debtor-in-possession financing may be necessary to support the Debtors during their Chapter 11 Cases and consummate the Plan.

### G. Motion To Approve the Use of Cash Collateral.

In addition to the debtor-in-possession financing referred to above, the Debtors need access to the cash collateral of the 2007 Bond Trustee in order to operate their businesses during the Chapter 11 Cases. As a consequence, the Debtors are seeking prompt Court approval of the use of cash collateral to enable the Debtors to address their funding and other commitments and to otherwise maintain normal operations and strong relationships with their vendors, customers and suppliers during the Chapter 11 Cases.

### H. Motion To Waive Filing of Schedules and Statement of Financial Affairs.

Bankruptcy Code section 521 and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, a debtor must prepare and file certain schedules of claims, executory contracts and unexpired leases and related information (the "*Schedules*") and a statement of financial affairs (the "*Statement*") within fifteen (15) days of the commencement of a Chapter 11 case. The purpose of this requirement is to provide a debtor's creditors, equity security holders and other interested parties with sufficient information to make informed decisions with respect to the debtor's reorganization. In appropriate circumstances, however, a bankruptcy court may modify or dispense with the filing of the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code. The Debtors believe that such circumstances would exist in the Chapter 11 Cases, and that they should not be required to file the Schedules and the Statement. The Debtors are requesting that the Court waive the necessity of filing the Schedules and the Statement if the Plan is consummated and if the Plan is not consummated extend the time for the Debtors to file the Schedules and the Statement until after the Confirmation Hearing.

### I. Motion to Assume the Lockup Agreement.

Because the Lockup Agreement is integral to the Consenting Holders' support of the restructuring, the Debtors have agreed to seek to assume the Lockup Agreement pursuant to Bankruptcy Code section 365(a). Because of the Lockup Agreement, the Debtors are assured that they will have a significant number of the votes needed to confirm the Plan so long as no Agreement Termination Event (as defined in the Lockup Agreement) occurs. Absent the benefit of the Lockup Agreement, the Consenting Holders could withdraw their support for the Plan and could also decide to object to the Debtors' use of their cash collateral and to the Debtors' proposed debtor-in-possession financing. At that point, all the Debtors' restructuring efforts

would be at risk which could result in the closing of the CCRC, leaving hundreds of residents without a home and their initial entrance deposits at risk. Accordingly, the Debtors, in their business judgment, believe that the assumption of the Lockup Agreement is in the best interests of their estates.

### J. Applications For Retention of the Debtors' Professionals.

The Debtors intend to seek retention of certain professionals to represent and assist them in connection with the Chapter 11 Cases. These professionals were intimately involved with the negotiation and development of the restructuring transactions and the Plan. These professionals include, among others, DLA Piper LLP (US), as counsel for Hingham; Whiteford, Taylor & Preston L.L.P., and McGuire, Craddock & Strother, P.C. as counsel for Linden Ponds; Alvarez & Marsal Healthcare Industry LLC, to provide a chief restructuring officer for Hingham; and Houlihan Lokey, as financial advisor and investment banker for the Debtors.

### K. Timetable for Chapter 11 Cases.

Assuming that the Court approves this Disclosure Statement and confirms the Plan on the schedule requested by the Debtors, the Debtors would seek to emerge from chapter 11 approximately three (3) months following the Petition Date. There can be no assurance, however, that the Court's orders will permit the Chapter 11 Cases to proceed as expeditiously as anticipated.

## V. PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

### A. Classification and Treatment of Claims Under the Plan.

The Claims against the Debtors are divided into Classes according to their seniority and other criteria. The Classes of Claims in the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTORS' ASSETS.**

### B. Treatment of Administrative Claims, Tax Claims and Trustee Fees.

Certain Claims need not be classified under a plan pursuant to the Bankruptcy Code, including Administrative Claims and Priority Tax Claims.

1. <u>Administrative Claims</u>

The Plan defines Administrative Claims as any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for Accrued Professional Compensation; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

Holders of Allowed Administrative Claims will receive Cash equal to the unpaid portion of such Allowed Administrative Claim which has come due for payment under any applicable order or law, as soon as practicable after the later of: (a) the third Business Day after the Effective Date; (b) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (c) the date or dates when that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Allowed Administrative Claims shall only be made in accordance with any Final Order of the Court. The Debtors estimate that there will be approximately $6,600,000 in Allowed Administrative Claims.

2. <u>Professional Compensation.</u>

Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors, the Reorganized Debtor(s) and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 60 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtor(s), the Office of the U.S. Trustee and the requesting party no later than 90 days after the Effective Date.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor(s) may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Court.

3. <u>Priority Tax Claims.</u>

The Plan defines Priority Tax Claims as any Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8). Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtor(s) in its or their sole discretion and in full satisfaction of such Claim: (a) payment in Cash in full on the later of the Effective Date or the date such Claim becomes an Allowed Claim; or (b) Cash over a period not exceeding five (5) years after the Petition Date, with interest at a rate equal to four percent (4%) per year, payable monthly, in periodic payments, having the value of such Claim as of the Effective Date. All real

estate taxes that are accrued and unpaid, as of the Effective Date, will be paid in Cash in full on the Effective Date. The Debtors estimate that there will be $1,700,000 in Priority Tax Claims.

### 4. Trustee Fees.

Trustee Fees include all fees and charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code. All Trustee Fees will be paid in full by the Reorganized Debtor(s) as they become due and owing.

### 5. DIP Claims.

Except to the extent that a holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed DIP Claim, each such Allowed DIP Claim shall, in the discretion of the Debtors, (i) be paid in full in Cash on the Effective Date or as soon as practicable thereafter or (ii) with the consent of the holder of such DIP Claim and at least 40% of the principal amount of the Series 2007 Bonds outstanding, be converted into the Exit Facility.

### C. Treatment of Classified Claims.

The Plan provides for certain Claims by Class, as provided in Bankruptcy Code sections 1122 and 1123(a)(1). The Classes established by the Plan and the treatment of each Class are set forth below. The Plan provides for certain general treatment provisions that, in addition to other generally applicable provisions (including distribution provisions described herein), apply to the treatment of all Claims under the Plan.

The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties. Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim, the payment of which has been assumed by a third party.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2007 A Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2007 B/C Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | Linden Ponds General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Hingham General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | Manager Claims | Impaired | Entitled to Vote |
| 8 | Interests in Linden Ponds | Unimpaired | Deemed to Accept |
| 9 | Interests in Hingham | Impaired | Deemed to Reject |

### 1. Class 1 — Other Priority Claims.

This Class consists of all Allowed Other Priority Claims that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims still exist as of the Effective Date. Each Allowed Claim in this Class shall be in a separate subclass. Unless

otherwise agreed by the holder of any Claim in this Class, each Allowed Claim under Bankruptcy Code section 507(a), which has not been satisfied as of the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim, will receive (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim or (ii) payment in Cash in full on the later of: (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; and (b) the date on which there is a Final Order allowing such Claim. The Debtors estimate that the Allowed Class 1 Claims will be $0 on the Effective Date.

Class 1 is unimpaired by the Plan. Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

2. Class 2 — Series 2007 A Bond Claims.

This Class consists of all Series 2007 A Bond Claims and includes all Claims of the holders of the Series 2007 A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of (i) $98,285,000 plus (ii) unpaid reasonable fees and expenses of the 2007 Bond Trustee as of the Effective Date (less any amounts paid to the 2007 Bond Trustee as part of the distribution to Class 3 Claims) plus (iii) accrued and unpaid interest on the Series 2007 A Bonds as of the Effective Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007 A Bond Claim:

- Each holder of an outstanding Series 2007 A Bond will receive:

  o a Series 2011 A-1 Bond in a principal amount equal to the Series 2011 A-1 Percentage of the principal amount of the Series 2007 A Bond so tendered bearing interest at a rate of 5.5%, with the principal amount of such bond being reduced by multiplying the Series 2011 A-1 Percentage by the 2007 A Series Factor corresponding to such Series 2007 A Bond below and the interest rate being increased to 6.25% per annum (in each case, prior to issuance) so that the cumulative debt service for such bond will be the same as if the par amount thereof accrued interest at 5.5% per annum at the higher principal amount;

| Original CUSIP (2007 A Bonds) | Original Maturity (2007 A Bonds) | Maturity (2011 A-1 Bonds) | 2007 A Series Factor |
|---|---|---|---|
| 57583RPL3 | 11/15/2011 | 11/15/2013 | 0.9818664753 |
| 57583RPM1 | 11/15/2012 | 11/15/2014 | 0.9673413268 |
| 57583RPP4 | 11/15/2014 | 11/15/2017 | 0.9442425124 |
| 57583RPQ2 | 11/15/2015 | 11/15/2018 | 0.9306268897 |
| 57583RPR0 | 11/15/2016 | 11/15/2019 | 0.9254893529 |
| 57583RPS8 | 11/15/2017 | 11/15/2020 | 0.9213127500 |
| 57583RPT6 | 11/15/2018 | 11/15/2021 | 0.9179318442 |

| Original CUSIP (2007 A Bonds) | Original Maturity (2007 A Bonds) | Maturity (2011 A-1 Bonds) | 2007 A Series Factor |
|---|---|---|---|
| 57583RPU3 | 11/15/2022 | 11/15/2026 | 0.9109989513 |
| 57583RPV1 | 11/15/2027 | 11/15/2031 | 0.9084096035 |
| 57583RPW9 | 11/15/2035 | 11/15/2039 | 0.9097238063 |
| 57583RPX7 | 11/15/2042 | 11/15/2046 | 0.9147238610 |

- o a Subseries I of Series 2011 A-2 Bond in a principal amount equal to the Series 2011 A-2 Percentage of the principal amount of the Series 2007 A Bond held; and

- o a Series 2011 B Bond in a principal amount equal to the Series 2011 B Percentage of the principal amount of the Series 2007 A Bond held.

- Each holder of an outstanding Series 2007 A Bond will receive in Cash accrued and unpaid interest on such Series 2007 A Bond as of the Effective Date.

- The 2007 Bond Trustee will receive payment of all of its unpaid reasonable fees and expenses due under the 2007 Bond Indenture in Cash, less any such fees and expenses paid to the 2007 Bond Trustee as part of the distributions under the Plan on account of Class 3 Claims.

Class 2 is impaired by the Plan. Each holder of a Series 2007 A Bond Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 — Series 2007 B/C Bond Claims.

This Class consists of all Series 2007 B/C Bond Claims and includes (a) all Claims of the holders of the (i) Original Series 2007 B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $43,945,000, (ii) Series 2007 C Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $10,000,000 plus (iii) unpaid reasonable fees and expenses of the 2007 Bond Trustee as of the Effective Date (less any amounts paid to the 2007 Bond Trustee under the Plan as part of the distribution to Class 2 Claims) plus (iv) accrued and unpaid interest on the Series 2007 B Bonds and the Series 2007 C Bonds as of the Effective Date; and (b) all Other Senior Debt Claims. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007 B/C Bond Claim:

- Each holder of the outstanding Original Series 2007 B Bonds or Series 2007 C Bonds will receive:

- o Amended Series 2007 B Bonds in an aggregate principal amount equal to the Amended Series 2007 B Percentage of the principal amount of the Original Series 2007 B Bond and/or Series 2007 C Bond; provided that, the Amended Series 2007 B Bonds will be issued, in accordance with the

terms and conditions of the 2011 Bond Documents, either in fixed rate mode bearing interest at 5.5% per annum to maturity or variable rate mode at the election of the Bank by the Bank delivering written notice of such election to the Debtors and the 2011 Bond Trustee, and filing such notice with the Bankruptcy Court, within five (5) Business Days following the Confirmation Date; provided, further that, if such notice is not timely delivered and filed or if the Bank elects to receive such bonds in variable rate mode but fails to deliver the applicable letter of credit on or prior to the Effective Date, the Amended Series 2007 B Bonds will be issued to the Bank in fixed rate mode;

- o Subseries II of Series 2011 A-2 Bonds in an aggregate principal amount equal to the Series 2011 A-2 Percentage of the principal amount of the Original Series 2007 B Bond and/or Series 2007 C Bond; and

- o Series 2011 B Bonds in an aggregate principal amount equal to the Series 2011 B Percentage of the principal amount of the Series 2007 B Bond and/or Series 2007 C Bond.

- Each holder of an outstanding Original Series 2007 B Bond or Series 2007 C Bond will receive accrued and unpaid interest to the Effective Date on such Original Series 2007 B Bond or Series 2007 C Bond.

- The Bank will receive Subseries II of Series 2011 A-2 Bonds in an aggregate principal amount equal to the Allowed Other Senior Debt Claims other than the L/C Draw Claims, provided that notwithstanding any provision of the Plan, the Disclosure Statement or any provision of the Confirmation Order to the contrary, no Other Senior Debt Claims for late payment fees under the 2007 Letter of Credit Agreement or any related letter of credit documents, whether denominated as a "late charge" under section 5.3 of the 2007 Letter of Credit Agreement or otherwise, shall be an Allowed Claim, and no distribution shall be made under the Plan on account of such Claims, if any.

- The Bank will receive payment in Cash for any Allowed L/C Draw Claims.

- The 2007 Bond Trustee will receive payment in Cash of all of its unpaid reasonable fees and expenses due under the 2007 Bond Indenture, less any such fees and expenses paid to the 2007 Bond Trustee as part of the distributions under the Plan on account of Class 2 Claims.

- Notwithstanding anything contained in the Plan, the rights of the beneficial holders of the Original Series 2007 B Bonds and the Series 2007 C Bonds against the Bank under the 2007 Letter of Credit Agreement or any related letter of credit documents shall remain unaffected by the Plan.

Class 3 is impaired by the Plan. Each holder of a Series 2007 B/C Bond Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 — Other Secured Claims.

This Class consists of all Secured Claims other than Series 2007 A Bond Claims, Series 2007 B/C Bond Claims and Other Senior Debt Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, at the sole option of the Reorganized Debtor(s), each Allowed Other Secured Claim shall have its Other Secured Claim reinstated and otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled in accordance with section 1124 of the Bankruptcy Code.  The Debtors estimate that the Allowed Class 4 Claims will be $0 on the Effective Date.

Class 4 is unimpaired by the Plan.  Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.    Class 5 — Linden Ponds General Unsecured Claims.

This Class consists of all Linden Ponds General Unsecured Claims.  Except to the extent that a holder of an Allowed Linden Ponds General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Linden Ponds General Unsecured Claim, each holder of an Allowed Linden Ponds General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed Linden Ponds General Unsecured Claim on the latest of (1) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Disbursing Agent, (2) the date such Allowed Linden Ponds General Unsecured Claim becomes due and payable in the ordinary course of business and (3) as otherwise agreed to by the Debtors and the holder of such Claim, and the Plan shall otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled; provided, however, that the Debtors may seek authority from the Court to pay certain Linden Ponds General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtors reserve their rights, however, to dispute the validity of any Linden Ponds General Unsecured Claim, whether or not objected to prior to the Effective Date.  The Debtors estimate that the Allowed Class 5 Claims will be approximately $5,000,000 on the Effective Date.  Notwithstanding the foregoing, no distributions shall be made in respect of any intercompany Claims against Hingham or Linden Ponds by Linden Ponds or Hingham, respectively, or any successor or assignee thereof.

Class 5 is unimpaired by the Plan.  Each holder of a Linden Ponds General Unsecured Claim is deemed to accept the Plan and is not entitled to vote to accept or reject the Plan.

6.    Class 6 — Hingham General Unsecured Claims

This Class consists of all Hingham General Unsecured Claims.  Holders of Allowed Hingham General Unsecured Claims shall not receive any distribution in respect of any Hingham General Unsecured Claims.  The Debtors estimate that the Allowed Class 6 Claims will be approximately $0 on the Effective Date.

Class 6 is impaired by the Plan. The holders of the Hingham General Unsecured Claims are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

7.     Class 7 — Manager Claims.

This Class consists of all Manager Claims. In full and final satisfaction and discharge of and in exchange for the Manager Claims, (i) Linden Ponds will enter into the New Management Agreement with the Manager on or prior to the Effective Date and (ii) the Manager will receive payment in full in Cash of the unpaid portion of the Claims arising pursuant to the Transitional Subcontract Agreement or the Current Management Agreement on the latest of (1) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Disbursing Agent, (2) the date such Claim becomes due and payable in the ordinary course of business and (3) as otherwise agreed to by the Debtors and the Manager. No distribution shall be made in respect of any other Manager Claims.

Class 7 is impaired by the Plan. The holder of the Manager Claims is entitled to vote to accept or reject the Plan.

8.     Class 8 — Interests in Linden Ponds.

This Class consists of all ownership interests in Linden Ponds. Interests in Linden Ponds shall be reinstated on the Effective Date.

Class 8 is unimpaired by the Plan. The holder of the Interests in Linden Ponds is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

9.     Class 9 – Interests in Hingham.

This Class consists of all ownership interests in Hingham. On the Effective Date and in accordance with Section 4.7 of the Plan, at the discretion of the Debtors, (i) all of the assets of Hingham shall be transferred to Reorganized Linden Ponds, the agreements between Hingham and Linden Ponds shall be terminated, Hingham shall cease operations and, as soon as practical thereafter, all Interests in Hingham shall be extinguished and Hingham shall be dissolved or (ii) all of the Interests in Reorganized Hingham shall be transferred to Reorganized Linden Ponds.

Class 9 is impaired by the Plan. The holder of the Interests in Hingham is presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

D.     Acceptance Requirements.

1.     Acceptance or Rejection of the Plan.

Classes 2, 3 and 7 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount, and more than one-half in number, of those creditors that actually cast ballots, vote to accept such plan. Classes 1, 4, 5 and 8 are unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code. Classes 6 and 9 are not entitled to receive or retain any property under the Plan and are, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Notwithstanding the foregoing, the holder of the Interests in Class 9 has consented to the treatment provided for under the Plan in respect of such Interests.

2.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to rejecting Classes of Claims and Interests. The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**E.      Means for Implementation of the Plan.**

1.      Sources of Consideration.

All Cash consideration necessary for the Reorganized Debtor(s) to make payments or distributions pursuant hereto shall be obtained from the Cash on hand of the Reorganized Debtor(s), including Cash derived from business operations, and to the extent necessary from the Exit Facility, to the extent such facility is permitted under Section 2.5 of the Plan.

2.      Cancellation of 2007 Bonds.

Subject to the receipt of the consideration provided for in Sections 3.2.2 and 3.2.3 of the Plan, the 2007 Bonds will be cancelled on the Effective Date.

3.      Issuance of 2011 Bonds and Execution of 2011 Bond Documents.

On the Effective Date, the Issuer will issue, in accordance with the terms of the Plan and pursuant to the 2011 Bond Indenture, 2011 Bonds in the aggregate principal amount of $145,757,805 plus the Allowed amount of certain Other Senior Debt Claims as described in Section 3 of the Plan. In connection with the foregoing matters described in Section 4.3 of the Plan, on the Effective Date, the Issuer and the 2011 Bond Trustee will enter into the 2011 Bond Indenture, substantially in the form attached hereto as **Exhibit 3**, and Reorganized Linden Ponds, the Issuer, the 2011 Bond Trustee and the Bank, as applicable, will enter into the 2011 Loan Agreement, the 2011 Mortgage and the other 2011 Bond Documents, each substantially in the forms attached hereto as **Exhibit 3**, or as otherwise included in the Plan Supplement. The 2007 Bond Trustee shall transfer all funds and accounts created and/or maintained under or pursuant to the 2007 Bond Indenture in accordance with the 2011 Bond Documents.

4.      Investor Representations and Transfer Restrictions.

Prior to Reorganized Linden Ponds obtaining a Rating Confirmation for a particular subseries of the 2011 Bonds, the beneficial holder of a 2011 Bond of such subseries shall not be permitted to transfer or sell such bond other than as follows:

- A transfer or sale to a person who is an "accredited investor" as defined in Section 2(15) of the 1933 Act upon the execution and delivery to the 2011 Bond Trustee of an Investor Letter in the form set out in **Exhibit 6** hereto; or

- A transfer or sale to a person who is a "qualified institutional buyer," within the meaning of Section 144 of the 1933 Act.

5.      Exit Facility.

On the Effective Date, with the consent of the DIP Lender and at least 40% of the principal amount of the Series 2007 Bonds outstanding, the Debtors may (but shall not be required to) convert the DIP Facility into an Exit Facility.

6.      New Management Agreement.

To the extent not entered into prior thereto, on the Effective Date, Linden Ponds and the Manager will enter into the New Management Agreement in the form of Exhibit 11 hereto in accordance with Section 3.2.6 of the Plan.

7.      Transfer of Hingham's Assets or Interests in Reorganized Hingham.

On the Effective Date or as soon as reasonably practicable thereafter, at the sole election of the Debtors either (i) all of the material assets of Hingham will be transferred to Reorganized Linden Ponds, including without limitation the Facility and the Facility Site, the agreements between Hingham and Linden Ponds will be terminated, Hingham will cease operations, all Interests in Hingham be extinguished and Hingham be dissolved or (ii) in accordance with Section 4.11 of the Plan all of the assets of Hingham will vest in Reorganized Hingham and all of the Interests in Reorganized Hingham shall be distributed to Reorganized Linden Ponds in accordance with Section 3.2.9 of the Plan.  Consistent with Sections 4.7(i) and (ii) of the Plan, Hingham shall have full authority to take any action necessary to wind-up its affairs, liquidate, transfer or abandon assets, and dissolve and terminate the existence of Hingham in a manner and in accordance with the best means to maximize assets and minimize expenses or costs associated with such liquidation under applicable state laws and in accordance with the rights, powers and responsibilities conferred by the Bankruptcy Code, the Plan and any order of the Court.

8.      Corporate Existence.

Except as otherwise provided herein, in the Corporate Governance Documents or elsewhere in the Plan Supplement, Reorganized Linden Ponds shall continue to exist after the Effective Date as a separate non-stock corporate entity with all the powers of a non-stock corporation, pursuant to the applicable law in the jurisdiction in which Reorganized Linden Ponds is incorporated or formed.  To the extent the Debtors elect to transfer the Interests in Reorganized Hingham to Reorganized Linden Ponds in accordance with Sections 3.2.9 and 4.7 of the Plan and except as otherwise provided herein, in the Corporate Governance Documents or elsewhere in the Plan Supplement, Reorganized Hingham shall continue to exist after the Effective Date as a corporate entity with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which Reorganized Hingham is incorporated or formed.

9.    Reorganized Linden Ponds' Board of Directors.

The existing members of the Linden Ponds Board of Directors as of the date of the Disclosure Statement as provided in **Exhibit 4** shall continue to be members of the Board of Directors of Reorganized Linden Ponds.

10.    Reorganized Hingham's Board of Directors.

If the Debtors elect to transfer the Interests in Reorganized Hingham to Reorganized Linden Ponds in accordance with Section 4.7 of the Plan, the members of Reorganized Hingham's Board of Directors shall be identified in the Plan Supplement.

11.    Officers of Reorganized Linden Ponds.

The existing officers of Linden Ponds as of the date of the Disclosure Statement as provided in **Exhibit 4** shall continue to be officers of the Reorganized Linden Ponds. Such officers shall serve in accordance with applicable non-bankruptcy law.

12.    Officers of Reorganized Hingham.

If the Debtors elect to transfer the Interests in Reorganized Hingham to Reorganized Linden Ponds in accordance with Section 4.7 of the Plan, the existing officers of Hingham shall continue to be officers of Reorganized Hingham. Such officers shall serve in accordance with applicable non-bankruptcy law.

13.    Employee Benefits.

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtor(s) may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or the Reorganized Debtor(s)' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtor(s)' or the Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

14.    Vesting of Assets in the Reorganized Debtor(s).

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Estate of Linden Ponds and all Causes of Action of Linden Ponds (except those released pursuant to the Releases by the Debtors) shall vest in Reorganized Linden Ponds, free

and clear of all Liens, Claims, charges or other encumbrances (except for Liens securing the 2011 Bonds or the Exit Facility) and, at the discretion of the Debtors and in accordance with Section 4.7 of the Plan either (i) all property of the Estate of Hingham and all Causes of Action of Hingham (except those released pursuant to the Releases by the Debtors) shall vest in Reorganized Linden Ponds, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens securing the 2011 Bonds or the Exit Facility) or (ii) all Interests in Reorganized Hingham shall be transferred to Reorganized Linden Ponds. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor(s) may operate its business or their businesses, as the case may be, and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

15.     Tender of Series 2007 B and C Bonds and Timing of Distributions.

To the extent that the (i) the Bank declares a mandatory tender or (ii) the then existing beneficial holders of the Original Series 2007 B Bonds and the Series 2007 C Bonds other than the Bank (the "***Non-Bank Holders***") cause an optional tender, in either case, so as to cause the Bank to become the sole holder of the Original Series 2007 B Bonds and the Series 2007 C Bonds on or prior to the Effective Date, the Bank shall receive the treatment otherwise provided to the Non-Bank Holders pursuant to Section 3.2.3 of the Plan. Notwithstanding anything contained in the Plan to the contrary, if the Bank does not become the sole holder of all of the Original Series 2007 B Bonds and the Series 2007 C Bonds on or prior to the Effective Date, the distributions to be made to the Non-Bank Holders as of the Distribution Record Date pursuant to Section 3.2.3 of the Plan shall not be made on the Effective Date but rather will be made as follows: (i) in the event that the Bank satisfies all of its obligations to the Non-Bank Holders following an optional or mandatory tender of all of the Original Series 2007 B Bonds and the Series 2007 C Bonds in accordance with the 2007 Letter of Credit Agreement and related letter of credit documents, then the relevant 2011 Bonds shall be issued by the Issuer to the Bank upon receipt by the Disbursing Agent of evidence reasonably satisfactory to it that all such Bank obligations have been satisfied; or (ii) in the event that the Bank fails to satisfy all of its obligations to the Non-Bank Holders following an optional or mandatory tender of all of the Original Series 2007 B Bonds and the Series 2007 C Bonds in accordance with the 2007 Letter of Credit Agreement and related letter of credit documents, then the relevant 2011 Bonds shall be issued by the Issuer to the Non-Bank Holders upon receipt by the Disbursing Agent of evidence reasonably satisfactory to it in the event that such failure has occurred; provided that the Bank and the Non-Bank Holders as of the applicable Subsequent Distribution Record Date (defined below) will be given by the Disbursing Agent at least seven (7) business days prior written notice (a "***Distribution Notice***") of any such distribution of 2011 Bonds and if there is an objection by any party as to the proposed distribution release such party shall be required to seek relief from the Bankruptcy Court prior to the end of such seven (7) business day period and the Disbursing Agent shall not make such distribution until the dispute is determined by the Bankruptcy Court by Final Order.

16.     Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtor(s) may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan,

including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

17.     Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including all actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtor(s), and any corporate action required by the Debtors or the Reorganized Debtor(s) in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtor(s).

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtor(s), as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtor(s), as the case may be, and any and all other agreements, documents, securities and instruments relating to the foregoing.

18.     Section 1146 Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan, including the transfer of the Facility and the Facility Site from Hingham to Reorganized Linden Ponds or the transfer of the Interests in Reorganized Hingham to Reorganized Linden Ponds (as applicable), shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by of the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

19.     Preservation of Causes of Action of the Debtors.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided in the Plan), the Reorganized Debtor(s) shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor(s)' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor(s) may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor(s).  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtor(s), as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtor(s) have released any Person or Person on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtor(s), as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, the Reorganized Debtor(s) expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.  Notwithstanding the foregoing, the Debtors shall be deemed to have released any claims, causes of action or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

20.     Single Satisfaction of Claims.

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

**F.      Treatment of Executory Contracts and Unexpired Leases.**

1.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of Linden Ponds and Hingham shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (1) was assumed or rejected previously by the applicable Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date.

**Notwithstanding anything contained in the Plan to the contrary, (i) each Residence and Care Agreement, and all obligations arising thereunder, including the repayment of IEDs and all other entrance deposits, will be assumed by Reorganized Linden Ponds, as of the Effective Date, pursuant to the Plan and (ii) the Master Lease, the Working Capital Loan and the Community Loan will be mutually terminated, as of the Effective Date, with no amounts or other damages owing to or due from either Linden Ponds or Hingham; provided however that to the extent that the Interests in Reorganized Hingham are transferred to Reorganized Linden Ponds and the Interests in Hingham are not extinguished, in the sole discretion of Reorganized Linden Ponds and pursuant to Sections 3.2.9 and 4.7 of the Plan, then the Master Lease will either be amended and restated or a new lease for the Facility will be entered into between Reorganized Hingham and Reorganized Linden Ponds, in each case on terms subject to the prior reasonable approval of the 2011 Bond Trustee.**

Entry of the Confirmation Order shall constitute a Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor(s) in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtor(s), as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtor(s) shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Court.

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within 30 days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection; provided, that any such Rejection Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by Bankruptcy Code section 502(b)(6). Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtor(s), the Estates or their property without the need for any objection by the Reorganized Debtor(s) or further notice to, or action, order or approval of the Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with the Plan.

3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the

Bankruptcy Code, by Cure.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtor(s) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

4.      Insurance Policies.

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtor(s) if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

5.      Modifications, Amendments, Supplements, Restatements or Other Agreements.

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors or either of them.

6.      Reservation of Rights.

Nothing contained in the Plan or Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor(s) has or have, as the case may be, any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtor(s), as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

7. <u>Contracts and Leases Entered Into After the Petition Date.</u>

Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or the Reorganized Debtor(s) liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## G. Provisions Governing Distributions.

1. <u>Timing and Calculation of Amounts to Be Distributed.</u>

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2. <u>Disbursing Agent.</u>

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtor(s) as Disbursing Agent or such other Person designated by the Reorganized Debtor(s) as a Disbursing Agent on the Effective Date. With respect to any distribution constituting 2011 Bonds, such bonds shall be issued by the Issuer and exchanged through DTC, to the holders of 2007 Bonds of record as of the Distribution Record Date.

3. <u>Rights and Powers of Disbursing Agent.</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

4. <u>Payments and Distributions on Disputed Claims.</u>

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

5. <u>Special Rules for Distributions to Holders of Disputed Claims.</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtor(s), on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6. <u>Delivery of Distributions in General.</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records except that, in the case of holders of 2007 Bonds, distributions will be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable; provided that distributions of Cash made pursuant to Sections 3.2.2 and 3.2.3 of the Plan to the 2007 Bond Trustee and the Bank shall be made as designated by the 2007 Bond Trustee and the Bank, as applicable. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the Debtors, the Reorganized Debtor(s) and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

7. <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor(s) (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

8.      <u>Withholding and Reporting Requirements.</u>

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

9.      <u>Setoffs.</u>

Except as set forth herein, the Debtors and the Reorganized Debtor(s) may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtor(s) may hold against the holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtor(s) may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtor(s) may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtor(s) of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtor(s) may possess against any such holder, except as specifically provided herein. Notwithstanding anything in the Plan, the distributions made to holders of Series 2007 A Bond Claims and Series 2007 B/C Bond Claims shall not be subject to setoff.

10.      <u>Insurance Claims.</u>

No distributions under the Plan shall be made on account of Allowed Claims until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Court.

11.      <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

12.     Allocation of Distributions Between Principal and Unpaid Interest.

With the exception of distributions on account of the Series 2007 A Bonds, the Original Series 2007 B Bonds and the Series 2007 C Bonds which shall be treated as provided in Classes 2 and 3, respectively, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

## H.     Procedures for Resolving Contingent, Unliquidated and Disputed Claims.

### 1.     Prosecution of Objections to Claims.

The Debtors (before the Effective Date) or the Reorganized Debtor(s) (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Debtors and the Reorganized Debtor(s) may settle or compromise any Disputed Claim without approval of the Court.  The Debtors reserve all rights to resolve any Disputed Claim outside the Court under applicable governing law.

### 2.     Allowance of Claims.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtor(s) after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.  All claims of any Person against any Debtor shall be disallowed unless and until such Person pays, in full, the amount it owes each such Debtor.

### 3.     Distributions After Allowance.

On the Distribution Date following the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### 4.     Estimation of Claims.

The Debtors (before the Effective Date) or the Reorganized Debtor(s) (on or after the Effective Date) may, at any time, and from time to time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Court with respect to such Claim, or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Court.  If

the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtor(s) (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Court.

## I. Conditions Precedent to Confirmation of the Plan and the Effective Date.

### 1. Conditions Precedent to Confirmation.

It shall be a condition to Confirmation of the Plan that each of the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

(a)     The Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance reasonably acceptable to the Debtors and the 2007 Bond Trustee approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law.

(b)     The Confirmation Order (a) shall be, in form and substance, reasonably acceptable to the Debtors and the 2007 Bond Trustee, (b) shall include a finding by the Court that the 2011 Bonds to be issued on the Effective Date will be authorized and (c) shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(c)     (c)     The Confirmation Order shall provide that, in the event that the Bank timely elects, pursuant to section 3.2.3 of the Plan, to receive the Amended Series 2007 B Bonds in variable rate mode, the Bank shall be required to deliver an applicable letter of credit to the 2011 Bond Trustee in accordance with the 2011 Bond Documents on or prior to the Effective Date.

(d)     The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, reasonably acceptable to the Debtors and the 2007 Bond Trustee.

### 2. Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date that each of the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

(a)     The Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated herein in

form and substance reasonably acceptable to the Debtors and the 2007 Bond Trustee.

(b)     The Confirmation Order, in form and substance, reasonably acceptable to the Debtors and the 2007 Bond Trustee shall have been entered by the Court and shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(c)     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors and the 2007 Bond Trustee.

(d)     All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

3.     Waiver of Conditions.

The conditions to confirmation and consummation of the Plan set forth herein may be waived at any time by the Debtors; provided, however, that the Debtors may not waive entry of the Order approving the Disclosure Statement and confirming the Plan.

4.     Effect of Failure of Conditions.

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Person in any respect.

**J.     Modification, Revocation or Withdrawal of the Plan.**

1.     Modification and Amendments.

Except as otherwise specifically provided herein, the Debtors reserve the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan.

2.       <u>Effect of Confirmation on Modifications.</u>

      Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.       <u>Revocation or Withdrawal of the Plan.</u>

      The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Person.

**K.     Retention of Jurisdiction.**

      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor(s) amending, modifying or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases the list of Executory Contracts and Unexpired Leases to

be assumed or rejected; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide or resolve any and all matters related to any Cause of Action;

(g)     adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)     enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(i)     resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

(j)     resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

(k)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

(l)     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(m)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(n)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

(o)     adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)     consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Court order, including the Confirmation Order;

(q)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(r)      hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(s)      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(t)      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

(u)      enforce all orders previously entered by the Court;

(v)      hear any other matter not inconsistent with the Bankruptcy Code; and

(w)      enter an order concluding or closing the Chapter 11 Cases.

**L.      Miscellaneous Provisions.**

1.      <u>Immediate Binding Effect.</u>

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtor(s) and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

2.      <u>Additional Documents.</u>

On or before the Effective Date, the Debtors may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtor(s), as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.      <u>Dissolution of Any Committees.</u>

On the Effective Date, Committees, if any, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

4.     Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

5.     Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

6.     Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the 2011 Bonds offered under the Plan.

7.     Closing of Chapter 11 Cases.

The Debtors or the Reorganized Debtor(s) shall, promptly after the full administration of the Chapter 11 Cases, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

## VI.     DESCRIPTION OF 2011 BONDS

### A.     General.

The 2011 Bonds will be registered as to principal and interest in the name of Cede & Co., as nominee for DTC, or otherwise as hereinafter described.  Purchases of beneficial ownership interests in the 2011 Bonds will be made only in book-entry form and purchasers will not receive certificates representing their interests in the 2011 Bonds so purchased.  If the book-entry system is discontinued, bond certificates will be delivered as described in the 2011 Bond Indenture, and beneficial owners will become the registered owners.

Capitalized terms not defined herein or in the Plan shall have the meanings given to them in the 2011 Bond Documents.

**THE 2011 BONDS WILL NOT CONSTITUTE A GENERAL OBLIGATION OF THE ISSUER OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OR ANY POLITICAL SUBDIVISION THEREOF. THE PRINCIPAL, PURCHASE PRICE, REDEMPTION PRICE OF AND INTEREST AND PREMIUM, IF ANY, ON THE 2011 BONDS WILL BE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT UNDER THE 2011 BOND INDENTURE AND THE 2011 LOAN AGREEMENT. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.**

The Debtors anticipate that prior to the Effective Date either (i) the Bank will declare a mandatory tender so as to become the sole holder of the Original Series 2007 B Bonds and the Series 2007 C Bonds or (ii) the existing beneficial holders of the Original Series 2007 B Bonds and the Series 2007 C Bonds will cause an optional tender of such bonds to achieve the same result.

**B.      Series 2011 A-1 Bonds; Series 2011 A-2 Bonds; Series 2011 B Bonds.**

The Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds will be dated as of, and will bear interest from, the date of issuance thereof, if authenticated prior to November 15, 2011, or otherwise from the November 15 or May 15 that is, or that immediately precedes, the date on which any such Series 2011 A-1 Bond and Series 2011 A-2 Bond is authenticated, unless payment of interest is in default, in which case such Series 2011 A-1 Bond and Series 2011 A-2 Bond shall bear interest from the date to which interest has been paid. The Series 2011 A-1 Bonds will mature on November 15 in each of the years and in amounts as follows:

<u>Series 2011 A-1 Bonds</u>

<u>TERM BONDS</u>

| Due<br>(November 15) | Principal<br>Amount | Interest<br>Rate |
|---|---|---|
| 2013 | $      860,029 | 6.25% |
| 2014 | 892,295 | 6.25% |
| 2017 | 1,877,383 | 6.25% |
| 2018 | 995,489 | 6.25% |
| 2019 | 1,040,210 | 6.25% |
| 2020 | 1,089,078 | 6.25% |
| 2021 | 1,142,003 | 6.25% |
| 2026 | 5,179,642 | 6.25% |
| 2031 | 8,224,441 | 6.25% |
| 2039 | 18,926,654 | 6.25% |
| 2046 | 29,485,498 | 6.25% |

The Series 2011 A-2 Bonds and will mature on November 15, 2046.

The Series 2011 B Bonds will be dated the date of issuance thereof. The Series 2011 B Bonds shall not bear interest and will mature on November 15, 2056.

The Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds and the Series 2011 B Bonds will be issued as fully registered bonds in authorized denominations of $100,000 or any integral multiple of $1 in excess of $100,000, provided that if such Series 2011 A-1 Bonds, Series 2011 A-2 Bonds and Series 2011 B Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, such Series 2011 A-1 Bonds, Series 2011 A-2 Bonds and Series 2011 B Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and provided further that any 2011 Bonds issued in exchange for 2007 Bonds, including the exchange of 2011 Bonds for 2007 Bonds to Owners holding a beneficial interest of such 2007 Bonds, and any transfer of such 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an authorized denomination. The Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds will bear interest at the rate or rates of interest per year (calculated on the basis of a 360-day year consisting of twelve 30-day months and payable semiannually on May 15 and November 15 in each year, commencing on November 15, 2011).

**Prior to the Rating Confirmation, transfer of the Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds and the Series 2011 B Bonds is subject to certain restrictions as described in this Disclosure Statement.**

1.      Resizing of Series 2011 A-1 Bonds and Series 2011 A-2 Bonds.

The Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds are subject to mandatory tender and exchange, unless Linden Ponds' right to require a Resizing Event is terminated as provided in the 2011 Loan Agreement or the Independent Resizing Consultant determines upon a Resizing Event that no resizing of the Series 2011 A Bonds is necessary (in each such case, there shall be no Resizing Tender Date), on the date which is 45 days after the later of (a) the date on which the Resizing Event (defined below) occurs and (b) the date on which Linden Ponds has delivered the Certificate and certain related financial information to the 2011 Bond Trustee pursuant to the 2011 Loan Agreement (the "*Resizing Tender Date*").

As defined in the 2011 Bond Indenture, *"Resizing Event"* means the occurrence of any one of the following:

(1)      if Linden Ponds does not satisfy the Commencement Test on or before February 29, 2016, the date of delivery of Linden Ponds' audited financial statements for Fiscal Year 2015; "*Commencement Test*" means, under the 2011 Loan Agreement, Linden Ponds agrees to begin construction of Residential Building 2.5 within nine (9) months after occupancy of the then-existing Residential Units has averaged at least 93% for three consecutive months;

(2)      if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements (defined below) for the earlier of: (i) the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and (ii) Fiscal Year 2017;

(3)      if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the

Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended, then the Resizing Event under this clause (3) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2020, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended, then the Resizing Event under this clause (3) will be the date of delivery of the Resizing Financial Statements for the earlier of: (A) the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and (B) the Fiscal Year in which the Construction Loan is repaid;

(4)     subject to the 2011 Loan Agreement, if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and Linden Ponds is not in default of its obligation to proceed with construction of Residential Building 2.5 pursuant to the 2011 Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of: (A) the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and (B) Fiscal Year 2016; and

(5)     if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under the 2011 Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends.

(6)     Notwithstanding paragraphs (1) through (5) above, any pending Resizing Event may be extended due to a Good Cause Delay, as provided in the Loan Agreement, resulting from the inability of Linden Ponds to complete the rebuild or replacement of facilities following a calamity.

As defined in the 2011 Bond Indenture, "***Resizing Financial Statements***" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if Linden Ponds' audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the August 31 immediately following such Fiscal Year and the holders of the Amended Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use Linden Ponds' unaudited financial statements from such Fiscal Year reviewed by Linden Ponds' auditor under an agreed upon procedures letter or some other arrangement approved by the holders of a majority in aggregate principal amount of the Senior Parity Debt.

At least 35 days prior to the Resizing Tender Date, the 2011 Bond Trustee shall mail a notice to the holders of the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds. Such notice shall state: (1) that a Resizing Event has occurred, the date that is the Resizing Tender Date and the percentage of the resize; (2) that the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the holders do not have a right to waive the mandatory tender of the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2011 A-1 Bonds and Series 2011 A-2 Bonds are in Book-Entry Form, by book-entry delivery thereof to the

account of the Resizing Tender Agent (as defined in the 2011 Bond Indenture) maintained with the Depository or (B) if physical bond certificates have been delivered to the holders of such Series 2011 A-1 Bonds and Series 2011 A-2 Bonds pursuant to the 2011 Bond Indenture, delivery thereof to the 2011 Bond Trustee at its delivery office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2011 A-1 Bonds and Series 2011 A-2 Bonds so tendered will be exchanged for new Series 2011 A-1 Bonds and Series 2011 A-2 Bonds on the Resizing Tender Date; (4) that as of the Resizing Tender Date, the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the 2011 Bond Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2011 A-1 Bonds and Series 2011 A-2 Bonds are tendered to the 2011 Bond Trustee on such date, and that the holders thereof shall have no rights with respect thereto or under the 2011 Bond Indenture, except to receive new Series 2011 A-1 Bonds and Series 2011 A-2 Bonds in exchange therefor as provided in the 2011 Bond Indenture.

Any Series 2011 A-1 Bond or Series 2011 A-2 Bond to be exchanged on a Resizing Tender Date that is not delivered by the holder thereof to the 2011 Bond Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the holder thereof for exchange and to have been exchanged for new Series 2011 A-1 Bonds or Series 2011 A-2 Bonds in accordance with the 2011 Bond Indenture. Thereafter, (A) the Issuer shall execute and the 2011 Bond Trustee shall authenticate and deliver a new Series 2011 A-1 Bond or Bonds or new Series 2011 A-2 Bond or Bonds in the aggregate principal amount set forth in this Section to the holder of the Series 2011 A-1 Bonds or Series 2011 A-2 Bonds deemed to have been tendered and exchanged; (B) such Series 2011 A-1 Bonds or Series 2011 A-2 Bonds deemed to have been tendered and exchanged shall no longer be Outstanding under the 2011 Bond Indenture; (C) interest on such Series 2011 A-1 Bond or Series 2011 A-2 Bond deemed to have been tendered and exchanged shall cease to accrue to the holder thereof as of the Resizing Tender Date; (D) such Series 2011 A-1 Bond or Series 2011 A-2 Bond shall cease to be entitled to the benefits and security of the 2011 Bond Indenture as of the date on which such Series 2011 A-1 Bond or Series 2011 A-2 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the 2011 Bond Trustee will not recognize, any further transfers of such Series 2011 A-1 Bond or Series 2011 A-2 Bond by the holder thereof.

On the Resizing Tender Date, the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds tendered or deemed tendered shall be exchanged for Series 2011 A-1 Bonds and Series 2011 A-2 Bonds of the same subseries resized in principal amount determined by the Independent Consultant in accordance with the 2011 Bond Indenture and as described in **"Independent Resizing Consultant"** below. Any accrued and unpaid interest on the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds as of the Resizing Tender Date shall be due and payable as set forth in the 2011 Bond Indenture and as described in **"Independent Resizing Consultant"** below.

### C. Amended Series 2007 B Bonds.

#### 1. General.

The Amended Series 2007 B Bonds will be dated, and will bear interest from, the date of issuance thereof, will be due November 1, 2046 and will be issued as fully registered

bonds in authorized denominations of (i) $100,000 or any integral multiple of $5,000 in excess of $100,000 during any period during which such Amended Series 2007 B Bonds bear interest at the Variable Rate, and (ii) $100,000 or any integral multiple of $1 in excess of $100,000 during any Fixed Rate Period with respect to such Amended Series 2007 B Bonds, provided that during any Fixed Rate Period, if such Amended Series 2007 B Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, such Amended Series 2007 B Bonds shall be issuable in denominations of $5,000 and integral multiples thereof.

Prior to the Rating Confirmation, transfer of the Amended Series 2007 B Bonds is subject to certain restrictions.

Linden Ponds expects that the Bank will exercise its rights under the 2007 Bond Documents to declare a mandatory tender of the Series 2007 B Bonds and the Series 2007 C Bonds prior to the issuance of the 2011 Bonds. Therefore, the Bank will be the holder of all of the Series 2007 B Bonds and the Series 2007 C Bonds as of the exchange of such Series 2007 B Bonds and Series 2007 C Bonds for the Amended Series 2007 B Bonds and the Series 2011 B Bonds.

The Amended Series 2007 B Bonds may bear interest at a Fixed Rate or at a Variable Rate. If the Bank elects that the Amended Series 2007 B Bonds will bear interest at a Variable Rate and the Letter of Credit Provider delivers its Letter of Credit to secure such Amended Series 2007 B Bonds, then after the exchange, all of the Amended Series 2007 B Bonds will be delivered to a remarketing agent and remarketed to holders who may or may not hold the Series 2007 B Bonds and the Series 2007 C Bonds on the date of this Solicitation and will satisfy all other requirements for the remarketing of the Amended Series 2007 B Bonds in a variable rate mode as set forth in the 2011 Bond Indenture. Prior to the time the Amended Series 2007 B Bonds are so remarketed, the Bank will be the registered holder of such Bonds, including immediately after the exchange.

Interest on the Amended Series 2007 B Bonds shall be payable on each of the following dates (each, an "***Interest Payment Date***"): (a) during any period in which such Amended Series 2007 B Bonds bear interest at the Variable Rate, (1) the first Business Day of each month commencing on the first Business Day of the month after the Amended Series 2007 B Bonds are reissued, (2) each Mandatory Tender Date and (3) the maturity date of such Amended Series 2007 B Bonds, (b) for any Fixed Rate Period of six months or fewer, the calendar day after the last day of such Fixed Rate Period, (c) for any Fixed Rate Period of more than six months, (1) the first calendar day of the month that is the sixth month after the month in which the Fixed Rate Date occurs, (2) each sixth month anniversary of such first calendar day, and (3) the calendar day following the last calendar day of such Fixed Rate Period, (d) for any Fixed Rate Period that extends to the maturity of such Amended Series 2007 B Bonds, each May 15 and November 15 of each year, and (e) for any Pledged Bonds, any date on which interest on such Pledged Bonds is payable in accordance with the Letter of Credit Agreement and any date on which Pledged Bonds are remarketed in accordance with the 2011 Bond Indenture. Each Amended Series 2007 B Bond shall bear interest from the Interest Payment Date immediately preceding the date on which such Amended Series 2007 B Bond is authenticated; provided, however, (a) if any Amended Series 2007 B Bond is authenticated on an Interest Payment Date, such Amended Series 2007 B Bond shall bear interest from such Interest Payment

Date, and (b) if any Amended Series 2007 B is authenticated prior to the first Interest Payment Date, such Amended Series 2007 B Bond shall bear interest from the date of issuance of the Amended Series 2007 B Bonds, and (c) if at the time of authentication of any Amended Series 2007 B Bond, the Issuer is in default with respect to the payment of interest on such Amended Series 2007 B Bond, such Amended Series 2007 B Bond shall bear interest from the date to which interest shall have been paid. (The certificate of authentication on each Amended Series 2007 B Bond shall be dated the date on which such Amended Series 2007 B Bond is authenticated by the 2011 Bond Trustee.)

2.     Interest Provisions.

In the event the Bank timely files notice with the Bankruptcy Court of its election, pursuant to Section 3.2.2 of the Plan, to receive the Amended Series 2007 B Bonds in a Variable Rate and delivers its Letter of Credit to secure such Amended Series 2007 B Bonds, then the Amended Series 2007 B Bonds will initially bear interest at the applicable Variable Rate. In that case, from and including the date of initial authentication and delivery of the Amended Series 2007 B Bonds to, and including, the first Adjustment Date, the Amended Series 2007 B Bonds shall bear interest at the initial Variable Rate set forth in the 2011 Bond Indenture. In the event that the Bank either does not file notice with the Bankruptcy Court of its election, pursuant to Section 3.2.2 of the Plan, to receive the Amended Series 2007 B Bonds in a Variable Rate or does not deliver its Letter of Credit to secure such Amended Series 2007 B Bonds, then the Amended Series 2007 B Bonds shall bear interest at the Fixed Rate of 5.5% per annum to maturity. In the event the Amended Series 2007 B Bonds do not initially bear interest at a Variable Rate, but instead initially bear interest at a Fixed Rate, then all other provisions in the 2011 Bond Indenture (and as described in this Disclosure Statement) regarding the Amended Series 2007 B Bonds while bearing interest at a Variable Rate, including the Bank Tender Date and the Bank Conversion Date provisions, shall have no force and effect.

Thereafter, the Variable Rate for the Amended Series 2007 B Bonds shall be determined by the Remarketing Agent on each Adjustment Date and shall be equal to the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Amended Series 2007 B Bonds on the Adjustment Date at a price equal to the principal amount thereof, plus accrued interest, if any, thereon; provided, however, that the Variable Rate shall not exceed the Maximum Rate, as described below. The Variable Rate determined by the Remarketing Agent on each Adjustment Date shall be and remain in effect from and including the day immediately following such Adjustment Date through the earlier of (i) the immediately succeeding Adjustment Date and (ii) the immediately succeeding Mandatory Tender Date. During any period in which the Amended Series 2007 B Bonds bear interest at the Variable Rate, interest on such Amended Series 2007 B Bonds will be computed on the basis of a year of 365 days (366 days in leap years) for the actual number of days elapsed and shall be payable on each applicable Interest Payment Date.

With respect to the Amended Series 2007 B Bonds while bearing interest at the Variable Rate, *"Adjustment Date"* means each of (i) the first Wednesday after the reissuance of the Amended Series 2007 B Bonds, as set forth in the 2011 Bond Indenture, (ii) the Wednesday of each week thereafter or if any such Wednesday is not a Business Day, the immediately succeeding Business Day, during any period in which the Amended Series 2007 B Bonds bear

interest at the Variable Rate, and (iii) the Business Day immediately preceding each Mandatory Tender Date after which such Amended Series 2007 B Bonds will bear interest at the Variable Rate.

3.    Conversion of Interest Rate and Establishment of Fixed Rate Periods.

Subject to the terms of the Letter of Credit Agreement and except as provided in the last paragraph of this "**Conversion of Interest Rate and Establishment of Fixed Rate Periods**" section, Linden Ponds, on behalf of the Issuer, may from time to time, with respect to each Series of the Amended Series 2007 B Bonds:

(1)    establish one or more consecutive Fixed Rate Periods, or

(2)    at the expiration of any Fixed Rate Period

(x)  change the interest rate on such Amended Series 2007 B Bonds from the Fixed Rate then in effect to the Variable Rate, or

(y)  establish one or more additional consecutive Fixed Rate Periods,

in any case by delivering to the 2011 Bond Trustee, (iii) at least 45 but not more than 90 days before the proposed Conversion Date (or such fewer number of days as is acceptable to the 2011 Bond Trustee), a written notice that specifies the proposed change, the Conversion Date and, if one or more Fixed Rate Periods will be established, the Computation Date for each such Fixed Rate Period and the last day of each such Fixed Rate Period and (iv) on or before the proposed Conversion Date, the following:

(1)    an opinion of Bond Counsel to the effect that such change is permitted by the 2011 Bond Indenture and will not adversely affect

(x)    the exclusion of the interest payable on the Amended Series 2007 B Bonds from the gross income of the holders thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and

(y)    the exemption of the Amended Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth;

(2)    if there is then a Letter of Credit in effect that will remain in effect following the establishment of one or more Fixed Rate Periods,

(x)  evidence satisfactory to the 2011 Bond Trustee, including an amendment to the existing Letter of Credit if necessary, that the amount which can be realized under the Letter of Credit for the payment of interest on such Amended Series 2007 B Bonds is equal to at least 204 days' interest on such Amended Series 2007 B Bonds (or, if the Fixed Rate Period to be established will consist of less than 6 months, the number of days' interest on such Amended Series 2007 B Bonds obtained by adding 20 days to the number of days in such Fixed Rate Period) calculated at the Maximum Rate (or, if the Fixed Rate Period extends to the maturity date of such Amended Series 2007 B Bonds, the actual Fixed Rate on such Amended Series 2007 B Bonds) and on the basis of a 360-day year of twelve 30-day months, and

(y) written evidence from each of the Rating Agencies, if any, maintaining a rating on such Amended Series 2007 B Bonds that the ratings, if any, borne by such Amended Series 2007 B Bonds will not be reduced or withdrawn as a result of the establishment of the Fixed Rate Period;

(3) either

(x) evidence satisfactory to the 2011 Bond Trustee that the principal of, any premium on, and interest (at the Fixed Rate applicable to such Fixed Rate Period) on, such Amended Series 2007 B Bonds during such Fixed Rate Period can be realized in full under the Letter of Credit then in effect, or

(y) an opinion of Independent Counsel to the effect that the exemption of such Amended Series 2007 B Bonds and any Letter of Credit then in effect from the registration requirements of the Securities Act of 1933, as amended, and the exemption of the 2011 Bond Indenture from qualification under the Trust Indenture Act of 1939, as amended, will not be impaired as a result of the establishment of such Fixed Rate Period;

(4) if such Fixed Rate Period does not extend to the maturity of such Amended Series 2007 B Bonds, a new Letter of Credit or amendment to the existing Letter of Credit (if such Letter of Credit will remain in effect following such Conversion Date), which new Letter of Credit and the issuer thereof or amendment shall be satisfactory to the 2011 Bond Trustee; and

(5) in connection with the establishment of a Fixed Rate Period of more than one year following a period in which such Amended Series 2007 B Bonds accrue interest at the Variable Rate or a Fixed Rate Period of one year or less, at the request of, and in form and content satisfactory to, the Remarketing Agent, additional disclosure on Linden Ponds, all facilities owned or operated from time to time by Linden Ponds and any other matter deemed appropriate by the Remarketing Agent for inclusion in an offering document for such Amended Series 2007 B Bonds.

During any Fixed Rate Period after the Bank Tender Date, Linden Ponds shall be required either (a) to provide a Letter of Credit for such Amended Series 2007 B Bonds, or (b) to pay to the 2011 Bond Trustee for deposit into the Tax-Exempt Senior Debt Service Reserve Fund cash or a Debt Service Reserve Fund Credit Facility (as defined in the 2011 Bond Indenture) in an amount necessary, if any, to bring the amount on deposit in the Tax-Exempt Senior Debt Service Reserve Fund equal to the Senior Debt Service Reserve Fund Requirement as described in **"SECURITY FOR THE 2011 BONDS—Senior Debt Service Reserve Fund."**

Fixed Rate Periods established in accordance with the 2011 Bond Indenture may be of the same or different periods, but each such Fixed Rate Period shall commence on the first calendar day of a month or, if the Variable Rate is then in effect, the first Thursday of a month, or if such Thursday is not a Business Day, the immediately succeeding Business Day, and shall end on the last calendar day of a month or, if such Amended Series 2007 B Bonds may bear interest at the Variable Rate following the expiration of any Fixed Rate Period, the day immediately preceding the first Thursday of a month, or if such Thursday is not a Business Day,

the day immediately preceding the Business Day that immediately succeeds such Thursday. Any Fixed Rate Period (a) shall be for a period of at least 2 months in duration and (b) may extend to the maturity of such Amended Series 2007 B Bonds.

At least 35 days before each Conversion Date with respect to the Amended Series 2007 B Bonds, the 2011 Bond Trustee shall mail a Mandatory Tender Notice to each holder of the Amended Series 2007 B Bonds.

Notwithstanding any other provision in this "**Conversion of Interest Rate and Establishment of Fixed Rate Periods**" section, prior to the Bank Tender Date, Linden Ponds may convert the Amended Series 2007 B Bonds bearing interest at a Variable Rate to a Fixed Rate following a Bank Conversion Date in accordance with the 2011 Bond Indenture. The last day of any Fixed Rate Period occurring prior to the Bank Tender Date shall be the Bank Tender Date.

4.    Rescission of Election.

Subject to the terms of the Letter of Credit Agreement, at any time prior to the Fixed Rate Date for any Fixed Rate Period, Linden Ponds, on behalf of the Issuer, may rescind its election to establish such Fixed Rate Period by written notice to the 2011 Bond Trustee; provided, however, that if any such Fixed Rate Period shall be the second or any subsequent Fixed Rate Period in a succession of Fixed Rate Periods, there shall first be delivered to the 2011 Bond Trustee an opinion of Bond Counsel to the effect that such rescission will not adversely affect (i) the exclusion of the interest payable on the Amended Series 2007 B Bonds from the gross income of the holders thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and (ii) the excludability of interest on the Amended Series 2007 B Bonds from gross income for purposes of state, county and municipal taxation in the Commonwealth. If Linden Ponds rescinds its election to establish a Fixed Rate Period with respect to the Amended Series 2007 B Bonds, as provided in this paragraph, or if a Fixed Rate has not been established as required by the 2011 Bond Indenture, such Amended Series 2007 B Bonds shall bear interest at the Variable Rate then in effect, as if such election had not been made or, if a Fixed Rate Period is then in effect, a new Fixed Rate Period shall be established as provided below; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

Subject to the terms of the Letter of Credit Agreement, at any time prior to any Conversion Date on which the interest rate on the Amended Series 2007 B Bonds is to be converted from a Fixed Rate to the Variable Rate, Linden Ponds, on behalf of the Issuer, may rescind its election to convert the interest rate on such Amended Series 2007 B Bonds from a Fixed Rate to the Variable Rate by written notice to the 2011 Bond Trustee, in which event a new Fixed Rate Period shall be established as provided below; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

5.    Automatic Establishment of Fixed Rate Periods.

If, 45 days before the last day of any Fixed Rate Period for which a succeeding Fixed Rate Period has not been established as described above, Linden Ponds, on behalf of the

Issuer, shall not have elected to change the interest rate on the Amended Series 2007 B Bonds to the Variable Rate or to establish a new Fixed Rate Period by delivery of the notice and opinion and evidence with respect to the coverage of the Letter of Credit required by the 2011 Bond Indenture, or if Linden Ponds rescinds any election to establish a new Fixed Rate Period at the end of any Fixed Rate Period or rescinds any election to convert the interest rate on the Amended Series 2007 B Bonds from a Fixed Rate to the Variable Rate at the end of any Fixed Rate Period as provided in the 2011 Bond Indenture, a new Fixed Rate Period shall be deemed to have been established having (i) if the Fixed Rate Period then ending consisted of twelve months or fewer than twelve months, the same number of days as the Fixed Rate Period then ending, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, such Amended Series 2007 B Bonds may bear interest at the Variable Rate (provided, however, that such new Fixed Rate Period shall not exceed one year in length), (ii) if the Fixed Rate Period then ending consisted of more than twelve months, the same number of days as a Fixed Rate Period of twelve months, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, such Amended Series 2007 B Bonds may bear interest at the Variable Rate, or (iii) such fewer number of days as shall remain until the maturity date of such Amended Series 2007 B Bonds, and a new Fixed Rate shall be determined as provided in the 2011 Bond Indenture, as if Linden Ponds had elected, on behalf of the Issuer, to establish a new Fixed Rate Period, except that neither the notice nor the opinion of Bond Counsel referred to above need be provided.

6. Fixed Rate Determination.

During any Fixed Rate Period other than any Fixed Rate Period occurring prior to the Bank Tender Date, such Amended Series 2007 B Bonds shall bear interest at the interest rate determined by the Remarketing Agent on the Computation Date to be the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Amended Series 2007 B Bonds on the Fixed Rate Date at a price equal to the principal amount thereof plus accrued interest, if any, thereon. The Remarketing Agent shall determine the Fixed Rate for each Fixed Rate Period on the applicable Computation Date, and the Fixed Rate determined by the Remarketing Agent on each Computation Date shall constitute the Fixed Rate applicable to all Amended Series 2007 B Bonds. During any Fixed Rate Period occurring prior to the Bank Tender Date, the Amended Series 2007 B Bonds converted to the Fixed Rate shall bear interest at 5.5% per annum.

Each Fixed Rate determined by the Remarketing Agent for any Fixed Rate Period shall be and remain in effect from and including the Fixed Rate Date on which such Fixed Rate Period commences to and including the last day of such Fixed Rate Period. During any Fixed Rate Period, the interest payable on the Amended Series 2007 B Bonds will be computed on the basis of a 360-day year of twelve 30-day months.

7.      Interest Rate on Pledged Bonds.

Anything in the 2011 Bond Indenture to the contrary notwithstanding, all Variable Rate Bonds that are purchased with proceeds of a drawing under the Letter of Credit in respect of which the Letter of Credit has not been reinstated (*"Pledged Bonds"*) shall bear interest at a fluctuating rate per annum determined as provided in the Letter of Credit Agreement (the *"Bank Rate"*) until remarketed or repaid.  Prior to the Bank Tender Date, Pledged Bonds shall bear interest at the rate of 5.5% per annum.

8.      Maximum Rate.

Notwithstanding the foregoing, so long as a Letter of Credit is in effect, the interest rate payable on the Amended Series 2007 B Bonds (other than Pledged Bonds) may not exceed the Maximum Rate.  The Issuer may from time to time, upon the written request of Linden Ponds, increase the Maximum Rate as provided in the 2011 Bond Indenture.  The initial Maximum Rate is 10%. Notwithstanding the foregoing, in the event the Trustee receives a written notice from the Corporation that the interest expense plus the remarketing fees and letter of credit fees on the Amended Series 2007 B Bonds bearing interest at a Variable Rate, including any increased costs imposed by lawful request, law, regulation or directive under the Letter of Credit Agreement, equals or exceeds 5.5% or a notice from the Letter of Credit Provider that it is electing to convert the Bonds to the Fixed Rate, the Amended Series 2007 B Bonds will be converted on the Bank Conversion Date to a Fixed Rate and will be held by the Letter of Credit Provider after the Bank Conversion Date.

9.      Default Rate; Alternate Rates.

Notwithstanding the foregoing, (i) if any payment of the principal of or premium (if any) or interest on, or the Purchase Price of, any Amended Series 2007 B Bond shall not be made when due, such Amended Series 2007 B Bond shall continue to bear interest at the last interest rate borne by such Amended Series 2007 B Bond prior to the due date for such payment until such payment is made or provided for in accordance with the 2011 Bond Indenture, except that interest on any Pledged Bonds shall continue to accrue interest at the Bank Rate and (ii) if the Remarketing Agent does not determine the Variable Rate on any Adjustment Date or the Fixed Rate on any Computation Date, or a court of competent jurisdiction holds that the rate so determined is invalid or unenforceable, (A) the Variable Rate for such Adjustment Date shall be equal to 85% of the per annum bond equivalent yield applicable to 13-week United States Treasury securities, and (B) the Fixed Rate for such Computation Date shall be equal to the same Fixed Rate in effect for the immediately preceding Fixed Rate Period.

10.     Notice of Interest Rates; Interest Rates Conclusive and Binding.

With respect to the Amended Series 2007 B Bonds, the Remarketing Agent shall: (i) on each Adjustment Date give the 2011 Bond Trustee, Linden Ponds, the Letter of Credit Provider, the Registrar and the Paying Agent notice by telecopy of the Variable Rate determined on such Adjustment Date; and (ii) on each Computation Date give the 2011 Bond Trustee, Linden Ponds, the Letter of Credit Provider, the Registrar and the Paying Agent notice by telecopy of the Fixed Rate so determined.

The determination by the Remarketing Agent of the Variable Rate and the Fixed Rate as provided in the 2011 Bond Indenture and the Remarketing Agreement shall be conclusive and binding upon the Issuer, the 2011 Bond Trustee, Linden Ponds, the Paying Agent, the Registrar, the Remarketing Agent, the Letter of Credit Provider, the holders of the Amended Series 2007 B Bonds and all other Persons.

11. Optional and Mandatory Tender.

*Purchase of Amended Series 2007 B Bonds on Optional Tender Dates.* During any period in which the Amended Series 2007 B Bonds bear interest at the Variable Rate, the Issuer will cause to be purchased (but solely from proceeds of the remarketing of such Amended Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or, if one is in effect, the Confirming Letter of Credit) any Amended Series 2007 B Bond (or portion thereof in a denomination of $5,000 or integral multiple thereof provided such tender does not result in a Variable Rate Bond of such Series in a denomination of less than $100,000, except with respect to Pledged Bonds) at the Purchase Price, payable by check or wire transfer in immediately available funds, upon:

(A) delivery to the 2011 Bond Trustee and the Remarketing Agent of a telephonic notice (the "*Optional Tender Notice*") not later than 4:00 p.m., prevailing Baltimore, Maryland time, on a Business Day not less than seven calendar days prior to the Optional Tender Date as defined below (such notice to be irrevocable and effective upon receipt) that states (1) the principal amount of Variable Rate Bonds of such Series that are to be purchased (which amount shall be $5,000 or a multiple thereof) and the portion retained, if any (which must be $100,000 or any integral multiple of $5,000 in excess of $100,000), (2) the date on which such Amended Series 2007 B Bonds are to be purchased (an "*Optional Tender Date*"), which date shall be a Business Day not less than seven calendar days after the delivery of the Optional Tender Notice to the 2011 Bond Trustee and the Remarketing Agent, and (3) if fewer than all of the holder's Amended Series 2007 B Bonds are to be purchased, the CUSIP numbers and bond numbers of the Amended Series 2007 B Bonds to be purchased; and

(B) (1) if the Amended Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Amended Series 2007 B Bonds to be purchased to the account of the Remarketing Agent maintained with the Depository, or

(2) if physical bond certificates have been delivered to the holders of the Amended Series 2007 B Bonds, delivery of the Amended Series 2007 B Bonds to be purchased to the 2011 Bond Trustee or the Remarketing Agent (which shall promptly deliver the same to the 2011 Bond Trustee), at its delivery office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank; and

(3) in either case, at or prior to 10:00 a.m., prevailing Baltimore, Maryland time, on the date designated for purchase in the Optional Tender Notice.

Notwithstanding anything to the contrary contained herein, no optional tender of Amended Series 2007 B Bonds made as described above shall result in a Variable Rate Bond in a denomination of less than $100,000.

Accrued interest payable on any Amended Series 2007 B Bond Tendered or Deemed Tendered for Purchase on any Interest Payment Date as described above shall be paid to the holder as of the Record Date immediately preceding such Interest Payment Date in the same manner as if such Amended Series 2007 B Bond had not been purchased or deemed to have been purchased as described above.

*Mandatory Tender of Amended Series 2007 B Bonds on a Conversion Date or Bank Conversion Date.*  The Amended Series 2007 B Bonds are subject to mandatory tender and purchase on (i) each Fixed Rate Date and each date on which the Variable Rate takes effect following a Fixed Rate Period (each, a **"Conversion Date"**) and (ii) the third (3rd) Business Day after receipt by the 2011 Bond Trustee of (A) a written notice from Linden Ponds to the 2011 Bond Trustee stating that the interest expense plus the remarketing fees and letter of credit fees on the Amended Series 2007 B Bonds bearing interest at a Variable Rate, including any increased costs imposed by lawful request, law, regulation or directive under the Letter of Credit Agreement,  equals or exceeds 5.5% and as a result all such Amended Series 2007 B Bonds bearing interest at a Variable Rate will be held by the Letter of Credit Provider after such date (each, a "**Bank Conversion Date**"); provided, in the event the Bank either does not file notice with the Bankruptcy Court of its election, pursuant to Section 3.2.2 of the Plan, to receive the Amended Series 2007 B Bonds in a Variable Rate or does not deliver its Letter of Credit to secure such Amended Series 2007 B Bonds, prior to the Effective Date, then the Amended Series 2007 B Bonds will bear interest at a Fixed Rate of 5.5% to maturity and any references to Bank Conversion Date shall have no force and effect.

*Mandatory Tender of Amended Series 2007 B Bonds on a Termination Date*.  The Amended Series 2007 B Bonds are subject to mandatory tender and purchase on the earliest of the fifth Business Day before the expiration date of the Letter of Credit then in effect, the fifth Business Day before the expiration date of the Confirming Letter of Credit then in effect, if one is in effect and the effective date of any Substitute Letter of Credit (each, a **"Termination Date"**).

*Mandatory Tender of Amended Series 2007 B Bonds on Letter of Credit Mandatory Tender Event Date*.  The Amended Series 2007 B Bonds are subject to mandatory tender and purchase on the second Business Day after the 2011 Bond Trustee receives a written notice from the Letter of Credit Provider stating that an Event of Default has occurred and is continuing under the Letter of Credit Agreement or that the Letter of Credit or the Confirming Letter of Credit will not be reinstated (the **"Letter of Credit Mandatory Tender Event Date"**).

*Purchase of Amended Series 2007 B Bonds on Mandatory Tender Dates.*  The Amended Series 2007 B Bonds (other than any Pledged Bonds) are subject to mandatory tender and purchase, and the Issuer will cause to be purchased (but solely from proceeds of the remarketing of the Amended Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or the Confirming Letter of Credit) the Amended Series 2007 B Bonds (other than any Pledged Bonds), on each Mandatory Tender Date at the Purchase Price, payable by check or wire transfer in immediately available funds.

At least 35 days prior to each Mandatory Tender Date that is a Conversion Date or a Termination Date, the 2011 Bond Trustee shall mail a Mandatory Tender Notice to the holders of the Amended Series 2007 B Bonds.  Within one Business Day of receipt by the 2011

Bond Trustee of a Letter of Credit Mandatory Tender Event Notice, the 2011 Bond Trustee shall mail a Mandatory Tender Notice to holders of the Amended Series 2007 B Bonds. The provisions for the Mandatory Tender Date that is a Resizing Tender Date are set forth in **"Mandatory Tender on Resizing Tender Date"** below, and the provisions for the Mandatory Tender Date that is a Bank Conversion Date are set forth in **"Mandatory Tender on Bank Conversion Date"** below.

During any time prior to the Bank Tender Date, Linden Ponds may set a Bank Conversion Date for the conversion of Amended Series 2007 B Bonds from a Variable Rate to a Fixed Rate by delivering to the 2011 Bond Trustee the Bank Conversion Date Notice at least 3 Business Days prior to the Bank Conversion Date, which Bank Conversion Date Notice shall state: (1) that all of the Outstanding Amended Series 2007 B Bonds shall be purchased, (2) the Bank Conversion Date, (3) the interest rate applicable to such Amended Series 2007 B Bonds subject to mandatory tender on the Bank Conversion Date, in accordance with the 2011 Bond Indenture and (4) the delivery instructions for such Amended Series 2007 B Bonds subject to mandatory tender on the Bank Conversion Date, in accordance with the 2011 Bond Indenture.

*Remarketing of Amended Series 2007 B Bonds by Remarketing Agent; Prohibition on Remarketing of Amended Series 2007 B Bonds; Certain Notices.* The 2011 Bond Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent, Linden Ponds and the Letter of Credit Provider of any Optional Tender Notice given by a holder of Amended Series 2007 B Bonds to the 2011 Bond Trustee pursuant to the 2011 Bond Indenture, which notice shall specify the principal amount of the Amended Series 2007 B Bonds to be purchased and the Optional Tender Date.

The 2011 Bond Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent and Linden Ponds that the 2011 Bond Trustee has received a Letter of Credit Mandatory Tender Event Notice. Upon receipt of such notice, the Remarketing Agent shall suspend any remarketing of Amended Series 2007 B Bonds then in progress, and there shall be no further remarketing of the Amended Series 2007 B Bonds.

The 2011 Bond Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent and Linden Ponds that the 2011 Bond Trustee has received a Bank Conversion Date Notice, and the principal amount of Amended Series 2007 B Bonds subject to such Bank Conversion. Upon receipt of a notice that Amended Series 2007 B Bonds are being converted to a Fixed Rate, the Remarketing Agent shall suspend any remarketing of the Amended Series 2007 B Bonds subject to such Bank Conversion and there shall be no further remarketing thereof. Upon receipt of a Bank Conversion Date Notice that the Amended Series 2007 B Bonds are being converted to a Variable Rate, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall use its best efforts to solicit purchasers for and sell the principal amount of the Amended Series 2007 B Bonds specified in such Bank Conversion Date Notice, any such sale to be made on the Bank Conversion Date on which such Amended Series 2007 B Bonds are to be purchased, at a price equal to the Purchase Price thereof.

Upon receipt of notice from the 2011 Bond Trustee that the 2011 Bond Trustee has received an Optional Tender Notice meeting the requirements of the 2011 Bond Indenture, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement,

shall use its best efforts to solicit purchasers for and sell the principal amount of Amended Series 2007 B Bonds specified in such Optional Tender Notice, any such sale to be made on the Optional Tender Date on which such Amended Series 2007 B Bonds are to be purchased, at the Purchase Price.

At least 40 days before each Mandatory Tender Date that is a Conversion Date, a Termination Date or a Resizing Tender Date, the 2011 Bond Trustee shall give written notice to the Issuer, the Letter of Credit Provider, Linden Ponds, the Registrar, the Paying Agent and the Remarketing Agent of such Mandatory Tender Date and the aggregate principal amount of Amended Series 2007 B Bonds to be remarketed on such Mandatory Tender Date, which amount shall be equal to the aggregate principal amount of the Amended Series 2007 B Bonds Outstanding on such Mandatory Tender Date less the aggregate principal amount of Amended Series 2007 B Bonds to be redeemed in accordance with the 2011 Bond Indenture on such Mandatory Tender Date or, with respect to a Resizing Tender Date, the aggregate principal amount of Amended Series 2007 B Bonds to be cancelled as a result of the resizing. Upon receipt of such notice, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall use its best efforts to solicit purchasers for and sell the principal amount of Amended Series 2007 B Bonds specified in such notice, any such sale to be made on the Mandatory Tender Date on which such Amended Series 2007 B Bonds are to be purchased at the Purchase Price.

In no event will the Remarketing Agent remarket any Amended Series 2007 B Bonds Tendered or Deemed Tendered for Purchase (as described below) on any Tender Date at a price less than 100% of the principal amount thereof, plus accrued interest (if any) thereon to the applicable Tender Date.

Not later than 10:00 a.m., prevailing Baltimore, Maryland time, on the Business Day prior to any Tender Date on which Amended Series 2007 B Bonds are to be purchased pursuant to the 2011 Bond Indenture, the Remarketing Agent shall (1) give telephonic notice (promptly confirmed in writing) to the 2011 Bond Trustee, Linden Ponds, the Paying Agent and the Letter of Credit Provider of the principal amount of Amended Series 2007 B Bonds that it has been unable to remarket and (2) if physical bond certificates have been delivered to the holders of the Amended Series 2007 B Bonds, deliver to the 2011 Bond Trustee the name, address and tax identification number of each prospective purchaser to whom the Remarketing Agent has remarketed and sold Amended Series 2007 B Bonds.

*Sources of Moneys for Purchase of Amended Series 2007 B Bonds on Tender Dates.* On each Tender Date on which Amended Series 2007 B Bonds are to be purchased, such Amended Series 2007 B Bonds shall be purchased with immediately available funds from the holders thereof at a Purchase Price equal to 100% of the principal amount thereof, plus accrued interest (if any) thereon to the Tender Date. Moneys for the payment of such Purchase Price shall be derived solely from the following sources in the order of priority indicated, none of the Issuer, the 2011 Bond Trustee, the Paying Agent or the Remarketing Agent having any obligation to use moneys from any other source:

(A)     proceeds of the remarketing and sale of such Amended Series 2007 B Bonds which are on deposit in the Purchase Account;

(B)     moneys received from a drawing under the Letter of Credit or the Confirming Letter of Credit; and

(C)     any moneys paid by Linden Ponds for purchase of the Amended Series 2007 B Bonds pursuant to the 2011 Loan Agreement.

*Amended Series 2007 B Bonds Deemed Tendered and Purchased on Tender Dates.* Any Optional Tender Notice given by a holder shall be irrevocable. Any Amended Series 2007 B Bond described in an Optional Tender Notice as a Amended Series 2007 B Bond to be purchased on an Optional Tender Date which is not tendered by the holder thereof to the 2011 Bond Trustee on such Optional Tender Date, and any Amended Series 2007 B Bond to be purchased on a Mandatory Tender Date which is not delivered by the holder thereof to the 2011 Bond Trustee on such Mandatory Tender Date shall nonetheless be deemed to have been tendered by the holder thereof for purchase and to have been purchased from moneys described above, if moneys for such purchase have been deposited with the 2011 Bond Trustee on or before any such Tender Date in accordance with the 2011 Bond Indenture. Thereafter (A) unless such Amended Series 2007 B Bond deemed to have been tendered and purchased is required to be canceled by the 2011 Bond Trustee as set forth in the 2011 Bond Indenture, the Issuer shall execute and the 2011 Bond Trustee shall authenticate and deliver a new Amended Series 2007 B Bond or Amended Series 2007 B Bonds in the same aggregate principal denomination as the Amended Series 2007 B Bond deemed to have been tendered and purchased to the person to whom the Amended Series 2007 B Bond deemed to have been tendered and purchased would have been delivered as set forth in the 2011 Bond Indenture, and the 2011 Bond Trustee shall register such new Amended Series 2007 B Bond in the manner provided in the 2011 Bond Indenture; (B) such Amended Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under the 2011 Bond Indenture; (C) interest on such Amended Series 2007 B Bond deemed to have been tendered and purchased shall cease to accrue to the former holder thereof as of the Tender Date on which such Amended Series 2007 B Bond is deemed to have been tendered and purchased; (D) the former holder of such Amended Series 2007 B Bond shall cease to be entitled to the benefits and security of the 2011 Bond Indenture as of the date on which such Amended Series 2007 B Bond is deemed to have been tendered and purchased, except to receive the moneys representing the Purchase Price of such Amended Series 2007 B Bond against delivery thereof at the Designated Office of the 2011 Bond Trustee; and (E) the Registrar will not register, and the 2011 Bond Trustee will not recognize, any further transfers of such Amended Series 2007 B Bond by the former holder thereof.

The 2011 Bond Trustee shall promptly mail notice by first-class mail to the holder of any Amended Series 2007 B Bond which is deemed to have been purchased, which notice shall state that interest on such Amended Series 2007 B Bond ceased to accrue to the former holder thereof as of the Tender Date on which such Amended Series 2007 B Bond is deemed to have been tendered and purchased, that the Registrar will not register, and the 2011 Bond Trustee will not recognize, any further transfer of such Amended Series 2007 B Bond by the former holder thereof, and that the former holder of such Amended Series 2007 B Bond ceased to be entitled to the benefits and security of the 2011 Bond Indenture as of the Tender Date on which such Amended Series 2007 B Bond is deemed to have been tendered and purchased, except to receive the moneys representing the Purchase Price of such Amended Series 2007 B

Bond against delivery thereof at the Designated Office of the 2011 Bond Trustee. Moneys to be used for the purchase of any Amended Series 2007 B Bond deemed to have been tendered and purchased shall be deposited with the 2011 Bond Trustee and held in trust by the 2011 Bond Trustee segregated from all other moneys held by the 2011 Bond Trustee under the 2011 Bond Indenture, without liability for interest thereon, and shall be paid to the former holder of such Amended Series 2007 B Bond upon presentation thereof. Except as provided in the following paragraph, the former holder of such Amended Series 2007 B Bond shall thereafter be restricted exclusively to such moneys for the satisfaction of any claim of whatever nature on its part under the 2011 Bond Indenture or with respect to such Amended Series 2007 B Bond.

Any moneys which the 2011 Bond Trustee holds in trust for the payment of the principal amount of or interest on any Amended Series 2007 B Bond deemed to have been tendered and purchased pursuant to the 2011 Bond Indenture and which remain unclaimed for a period of one year after the Tender Date on which such Amended Series 2007 B Bond is deemed to have been tendered and purchased, upon Linden Ponds' written request to the 2011 Bond Trustee, shall be paid to Linden Ponds, with notice to the Letter of Credit Provider of such payment, but only to the extent permitted by law; provided, however, that:

(1) before the 2011 Bond Trustee makes any such payment to Linden Ponds, the 2011 Bond Trustee, at Linden Ponds' expense, shall cause notice to be given once by first-class mail to the former holder of such Amended Series 2007 B Bond at the last address for such holder reflected on the registration books of the 2011 Bond Trustee, to the effect that such moneys remain unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notice by mail, any unclaimed balance of such moneys then remaining will be paid to Linden Ponds; and

(2) no such payment shall be made to Linden Ponds if the 2011 Bond Trustee has notice (within the meaning of the 2011 Bond Indenture) that an Event of Default shall have occurred and be continuing under the 2011 Bond Indenture, or the 2011 Bond Trustee has written notice from the Letter of Credit Provider that the Letter of Credit Provider is owed any moneys under any of the documents executed in connection with the Letter of Credit.

After the payment of such unclaimed moneys to Linden Ponds, the holder of such Amended Series 2007 B Bond shall thereafter look only to Linden Ponds for the payment thereof, and all liability of the Issuer, the 2011 Bond Trustee, the Paying Agent and the Letter of Credit Provider with respect to such moneys shall thereupon cease.

*Mandatory Tender on Resizing Tender Date*. The Amended Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit are subject to mandatory tender and purchase on the Resizing Tender Date, and the Amended Series 2007 B Bonds bearing interest at a Fixed Rate and the Amended Series 2007 B Bonds constituting Pledged Bonds are subject to mandatory tender and exchange on the Resizing Tender Date. At least 35 days prior to the Resizing Tender Date, the 2011 Bond Trustee shall mail a notice to the holders of the Amended Series 2007 B Bonds. Such notice shall state: (1) that a Resizing Event has occurred and the date that is the Resizing Tender Date; (2) that the Amended Series 2007 B Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the holders do not have a right to waive the mandatory tender of the Amended Series 2007 B Bonds and that all

of such Bonds must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Amended Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Remarketing Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the holders of such Amended Series 2007 B Bonds pursuant to the 2011 Bond Indenture, delivery thereof to the 2011 Bond Trustee at its delivery office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that, in the case of Amended Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit, such Amended Series 2007 B Bonds so tendered will be purchased on the Resizing Tender Date at the Purchase Price; (4) that as of the Resizing Tender Date, the Amended Series 2007 B Bonds will be deemed, subject to the delivery of a new Amended Series 2007 B Bond, to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the 2011 Bond Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Amended Series 2007 B Bonds are tendered to the 2011 Bond Trustee on such date, and that the holders thereof shall have no rights with respect thereto or under the 2011 Bond Indenture, except, in the case of Amended Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit, to receive the moneys representing the Purchase Price of such Amended Series 2007 B Bonds against delivery thereof at the Designated Office of the 2011 Bond Trustee or, in the case of Amended Series 2007 B Bonds bearing interest at a Fixed Rate or Amended Series 2007 B Bonds constituting Pledged Bonds, to receive new Amended Series 2007 B Bonds in exchange therefor as provided in this Indenture; and (5) to the extent not described above, the matters set forth in the definition of Mandatory Tender Notice.

Any Amended Series 2007 B Bond to be purchased or exchanged, as the case may be, on a Resizing Tender Date that is not delivered by the holder thereof to the 2011 Bond Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the holder thereof for purchase or exchange, and to have been purchased from money described under "**Sources of Moneys for Purchase of Amended Series 2007 B Bonds on Tender Dates**" herein or exchanged as described below. Thereafter, (A) the Issuer shall execute and the 2011 Bond Trustee shall authenticate and deliver a new Amended Series 2007 B Bond or Bonds in the aggregate principal amount determined by the Independent Consultant in accordance with the 2011 Bond Indenture to the person to whom the Amended Series 2007 B Bond deemed to have been tendered and purchased subject to the delivery of a new Amended Series 2007 B Bond would have been delivered as set forth in the 2011 Bond Indenture; (B) such Amended Series 2007 B Bond deemed to have been tendered and purchased or exchanged, as the case may be, shall no longer be Outstanding under the 2011 Bond Indenture; (C) interest on such Amended Series 2007 B Bond deemed to have been tendered shall cease to accrue to the holder thereof as of the Resizing Tender Date; (D) such Amended Series 2007 B Bond shall cease to be entitled to the benefits and security of the 2011 Bond Indenture as of the date on which such Amended Series 2007 B Bond is deemed to have been tendered; and (E) the Registrar will not register, and the 2011 Bond Trustee will not recognize, any further transfers of such Amended Series 2007 B Bond by the holder thereof.

On the Resizing Tender Date, the Amended Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit shall have been tendered or deemed tendered to the Letter of Credit Provider and the Letter of Credit Provider shall exchange such Amended Series 2007 B Bonds for Amended Series 2007 B Bonds resized in principal amount determined

by the Independent Consultant in accordance with the 2011 Bond Indenture and as described in "**Independent Resizing Consultant**" below. Any accrued and unpaid interest on the Amended Series 2007 B Bonds as of the Resizing Tender Date shall be due and payable as set forth in the 2011 Bond Indenture and as described in "**Independent Resizing Consultant**" below.

The Amended Series 2007 B Bonds Outstanding following the Resizing Tender Date will be remarketed in accordance with the provisions listed above under "**Remarketing of Amended Series 2007 B Bonds by Remarketing Agent; Prohibition on Remarketing of Amended Series 2007 B Bonds; Certain Notices.**"

*Mandatory Tender on Bank Conversion Date.* During any time prior to the Bank Tender Date, Linden Ponds may set a Bank Conversion Date for the conversion of Amended Series 2007 B Bonds from a Variable Rate to a Fixed Rate by delivering to the 2011 Bond Trustee the Bank Conversion Date Notice at least three business days prior to the Bank Conversion Date, which Bank Conversion Date Notice shall state: (1) that all of the Outstanding Amended Series 2007 B Bonds shall be purchased, (2) the Bank Conversion Date, (3) the interest rate applicable to such Amended Series 2007 B Bonds subject to mandatory tender on the Bank Conversion Date, in accordance with the 2011 Bond Indenture and (4) the delivery instructions for such Amended Series 2007 B Bonds subject to mandatory tender on the Bank Conversion Date, in accordance with the 2011 Bond Indenture. All the Amended Series 2007 B Bonds bearing interest at a Variable Rate are subject to mandatory tender on the Bank Conversion Date. At least one day prior to the Bank Conversion Date, the 2011 Bond Trustee shall mail a notice to the holders of the Amended Series 2007 B Bonds to be converted to a Fixed Rate as directed by Linden Ponds in accordance with "**Purchase of Series 2007 B Bonds on Mandatory Tender Dates**" above and as selected by the 2011 Bond Trustee by lot or in such other manner as the 2011 Bond Trustee, in its discretion, may deem proper. Such notice shall state: (1) the date that is the Bank Conversion Date; (2) that all of the Amended Series 2007 B Bonds will be subject to mandatory tender on the Bank Conversion Date, (3) that the holders do not have a right to waive the mandatory tender of the Amended Series 2007 B Bonds and that all of such Bonds selected for mandatory tender must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Bank Conversion Date (A) if such Amended Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the 2011 Bond Trustee maintained with the Depository or (B) if physical bond certificates have been delivered to the holders of such Amended Series 2007 B Bonds, delivery thereof to the 2011 Bond Trustee at its delivery office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Amended Series 2007 B Bonds so tendered will be delivered to or at the direction of the Letter of Credit Provider in accordance with the 2011 Bond Indenture; and (4) that, as of the Bank Conversion Date, the Amended Series 2007 B Bonds selected for mandatory tender will be deemed to have been tendered on such Bank Conversion Date, shall be deemed to be no longer Outstanding under the 2011 Bond Indenture, and shall cease to bear interest as of such Bank Conversion Date, whether or not such Amended Series 2007 B Bonds are tendered to the 2011 Bond Trustee on such date, and that the holders thereof shall have no rights with respect thereto or under the 2011 Bond Indenture, except to receive the moneys representing the Purchase Price of such Amended Series 2007 B Bonds against delivery thereof at the Designated Office of the 2011 Bond Trustee.

Any Amended Series 2007 B Bond to be purchased on a Bank Conversion Date that is not delivered by the holder thereof to the 2011 Bond Trustee on such Bank Conversion Date shall nonetheless be deemed to have been tendered by the holder thereof for purchase and to have been purchased from moneys as described in "**Sources of Moneys for Purchase of Amended Series 2007 B Bonds on Tender Dates**" above. Thereafter, (A) the Issuer shall execute and the 2011 Bond Trustee shall authenticate and deliver a new Amended Series 2007 B Bond or Bonds in the aggregate principal amount of the Amended Series 2007 B Bond deemed to have been tendered and purchased to the person who would have received the Amended Series 2007 B Bond as set forth in the 2011 Bond Indenture; (B) such Amended Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under the 2011 Bond Indenture; (C) interest on such Amended Series 2007 B Bond deemed to have been tendered and purchased shall cease to accrue to the holder thereof as of the Bank Conversion Date; (D) such Amended Series 2007 B Bond shall cease to be entitled to the benefits and security of the 2011 Bond Indenture as of the date on which such Amended Series 2007 B Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the 2011 Bond Trustee will not recognize, any further transfers of such Amended Series 2007 B Bond by the holder thereof.

The Bank Conversion Date Notice shall provide that the Amended Series 2007 B Bonds bearing interest at a Variable Rate tendered or deemed tendered on the Bank Conversion Date shall be registered in the name of the Letter of Credit Provider as Pledged Bonds or shall be registered in the name of the Letter of Credit Provider or of the holder designated by the Letter of Credit Provider as Amended Series 2007 B Bonds bearing interest at a Fixed Rate of 5.5% per annum and containing such other terms as shall be set forth in the Form of Amended Series 2007 B Bond, and shall be accompanied by an opinion of Bond Counsel to the effect that such change is permitted by the 2011 Bond Indenture and will not adversely affect the exclusion of the interest payable on the Amended Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of the Amended Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth.

*Mandatory Tenders in Accordance with Procedures of Depository*. Notwithstanding any provisions contained in the 2011 Bond Indenture, during any period in which Amended Series 2007 B Bonds are maintained pursuant to a book-entry system, mandatory tenders and purchases of Amended Series 2007 B Bonds shall occur in accordance with the Depository's standard procedures for mandatory tenders and purchases of obligations such as the Amended Series 2007 B Bonds.

12.     Letter of Credit; Substitute Letter of Credit.

The Amended Series 2007 B Bonds may not be remarketed in a variable rate mode without the delivery to the 2011 Bond Trustee of a qualifying Letter of Credit. Linden Ponds expects that the Bank will deliver a Letter of Credit to facilitate the remarketing of the Amended Series 2007 B Bonds. See **"SECURITY FOR THE 2011 BONDS—LETTER OF CREDIT"** herein.

The 2011 Bond Trustee shall draw upon the Letter of Credit in accordance with its terms to the extent necessary to pay the principal of and any premium (if covered by the

Letter of Credit) and/or interest on the Amended Series 2007 B Bonds, when due whether upon any Interest Payment Date or upon redemption, at maturity, upon acceleration of maturity or otherwise. The 2011 Bond Trustee, in determining the amount of any draw on the Letter of Credit in accordance with the immediately preceding sentence, shall take into consideration the amount on deposit of any immediately available Refunding Proceeds described in the 2011 Bond Indenture. In the event that there are not on deposit in the Purchase Account sufficient immediately available remarketing proceeds pursuant to the 2011 Bond Indenture to pay the Purchase Price of Amended Series 2007 B Bonds Tendered or Deemed Tendered for Purchase on any Tender Date, the 2011 Bond Trustee shall, not later than 10:00 a.m., prevailing Baltimore, Maryland time on such Tender Date, make a drawing under the Letter of Credit to the extent necessary to pay the Purchase Price of Bonds Tendered or Deemed Tendered for Purchase on such Tender Date in excess of the amount of the Purchase Price of Amended Series 2007 B Bonds to be paid from the proceeds of the remarketing and sale of Amended Series 2007 B Bonds which have been deposited in the Purchase Account and constitute immediately available funds.

If at any time there shall have been delivered to the 2011 Bond Trustee (A) a proposed Substitute Letter of Credit and (B) each of the items described in the 2011 Bond Indenture as requirements for the provision of a Substitute Letter of Credit, then the 2011 Bond Trustee shall accept such proposed Substitute Letter of Credit and, promptly following the Mandatory Tender Date resulting from the delivery of the Substitute Letter of Credit, surrender the Letter of Credit then in effect to the Letter of Credit Provider which issued such Letter of Credit for cancellation in accordance with its terms. The 2011 Bond Trustee shall not accept a Substitute Letter of Credit in substitution for an existing Letter of Credit, unless (A) the Letter of Credit then in effect is expiring, or (B) it has received the written consent of the Letter of Credit Provider which issued the Letter of Credit then in effect to the substitution by Linden Ponds of a Substitute Letter of Credit for the Letter of Credit then in effect.

13. Remarketing Agent for Amended Series 2007 B Bonds.

Linden Ponds expects that B. C. Ziegler and Company will serve as Remarketing Agent for the Amended Series 2007 B Bonds (the *"Remarketing Agent"*).

**D.** **Independent Resizing Consultant.**

Upon the occurrence of a Resizing Event, Linden Ponds shall employ an Independent Consultant, who shall determine the principal amounts of the Series 2011 A-1 Bonds, the Amended Series 2007 B Bonds and the Series 2011 A-2 Bonds to be exchanged for such Bonds tendered or deemed tendered in accordance with the 2011 Bond Indenture, the percentage of the resize, the amortization schedule of the Series 2011 A Bonds Outstanding after the resizing, and the Senior Debt Service Reserve Fund Requirement after the resizing.

The Independent Consultant shall calculate the principal amount of Series 2011 A Bonds to be exchanged for the Series 2011 A Bonds tendered or deemed tendered in accordance with the 2011 Bond Indenture by calculating the aggregate principal amount of Series 2011 A Bonds that, assuming amortization on a level debt service basis over the remaining Series 2011 A Bond term and a 5.5% or 6.25% interest rate, as applicable, would result in a Debt Service Coverage Ratio of 1.25, based on the Resizing Financial Statements delivered to the 2011 Bond

Trustee pursuant to the 2011 Loan Agreement for the applicable Fiscal Year. For purposes of this calculation, there shall be excluded from Annual Debt Service on all Outstanding Long-Term Indebtedness any interest and principal on the Construction Loan and any principal on the Series 2011 A-2 Bonds. IEDs shall be excluded from Funds Available for Debt Service, but net turnover Entrance Fees shall be included. If, as a result of the resizing, a surplus from the Senior Debt Service Reserve Fund is to be applied and taken into account in the resizing in accordance with the 2011 Bond Indenture, any such surplus shall be applied to the payment of the principal amount of Series 2011 A Bonds, otherwise to be reduced as a result of the calculation described herein. As an example of the application of the preceding sentence, if the Independent Consultant determines the total of Series 2011 A Bonds to be reduced as a result of the resizing equals $20,000,000 and the surplus to be applied in the resizing is $2,000,000, then the net resizing amount of Series 2011 A Bonds shall be $18,000,000 and the $2,000,000 shall be applied to the payment of the principal of Series 2011 A Bonds immediately prior to the resizing.

If the Independent Consultant determines a resizing is not necessary at such time, no Resizing Tender Date shall occur and Linden Ponds' right to resize the Series 2011 A Bonds shall be terminated.

If on the Resizing Tender Date, there is any accrued and unpaid principal or Purchase Price of or interest on the Series 2011 A Bonds, then (i) to the extent such principal or Purchase Price or interest was not paid pursuant to a Special Senior Parity Debt Standstill, a Calamity Standstill or a Good Cause Standstill, as each is defined in Section 7.01 of the 2011 Bond Indenture, then such principal or Purchase Price or interest shall be taken into account by the Independent Consultant in calculating the principal amount of the Series 2011 A Bonds to be exchanged as described above, and if such deferred amounts could be included in the accreted value on the outstanding principal amount of the Series 2011 A Bonds and the resulting sum would not cause the Debt Service Coverage Ratio to exceed 1.25, such deferred amounts will be amortized over the remaining term of the Series 2011 A Bonds, and paid in monthly installments after payment of debt service on any Special Senior Parity Debt, and otherwise, such principal or Purchase Price or interest shall be treated on parity with the Series 2011 A Bonds as Additional Subordinated Parity Obligations under the 2011 Loan Agreement and the 2011 Bond Indenture in principal amount equal to the amount of such principal or Purchase Price or interest and payable on the same terms as the Series 2011 B Bonds and (ii) to the extent such principal or Purchase Price or interest was not paid for any other reason, such principal or Purchase Price or interest would remain fully due and payable. A copy of the Independent Consultant's report shall be delivered to the 2011 Bond Trustee and Significant Holders prior to the Resizing Tender Date and will not be taken into account in the resizing.

### E. Redemption and Tender Provisions.

#### 1. Mandatory Redemption.

The Series 2011 A-1 Bonds maturing on November 15, 2013, November 15, 2014, November 15, 2017, November 15, 2018, November 15, 2019, November 15, 2020, November 15, 2021, November 15, 2026, November 15, 2031, November 15, 2039 and November 15, 2046 are subject to redemption prior to maturity on the dates and in the amounts set forth below, at a price of 100% of the principal amount of the Series 2011 A-1 Bonds plus accrued interest to the redemption date:

**Series 2011 A-1 Bonds Maturing November 15, 2013**

| November 15 | Amount |
|---|---|
| 2012 | $593,065 |
| 2013* | 266,964 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2014**

| November 15 | Amount |
|---|---|
| 2013 | $363,167 |
| 2014* | 529,128 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2017**

| November 15 | Amount |
|---|---|
| 2014 | $140,387 |
| 2015 | 711,359 |
| 2016 | 755,819 |
| 2017* | 269,818 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2018**

| November 15 | Amount |
|---|---|
| 2017 | $533,240 |
| 2018* | 462,249 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2019**

| November 15 | Amount |
|---|---|
| 2018 | $390,999 |
| 2019* | 649,211 |

_____

*Maturity date; payable on November 15

### Series 2011 A-1 Bonds Maturing November 15, 2020

| November 15 | Amount |
|---|---|
| 2019 | $257,366 |
| 2020* | 831,712 |

_____

*Maturity date; payable on November 15

### Series 2011 A-1 Bonds Maturing November 15, 2021

| November 15 | Amount |
|---|---|
| 2020 | $131,526 |
| 2021* | 1,010,477 |

_____

*Maturity date; payable on November 15

### Series 2011 A-1 Bonds Maturing November 15, 2026

| November 15 | Amount |
|---|---|
| 2021 | $12,963 |
| 2022 | 1,087,405 |
| 2023 | 1,155,368 |
| 2024 | 1,227,578 |
| 2025 | 1,304,302 |
| 2026* | 392,026 |

_____

*Maturity date; payable on November 15

### Series 2011 A-1 Bonds Maturing November 15, 2031

| November 15 | Amount |
|---|---|
| 2026 | $993,795 |
| 2027 | 1,472,435 |
| 2028 | 1,564,462 |
| 2029 | 1,662,241 |
| 2030 | 1,766,131 |
| 2031* | 765,377 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2039**

| November 15 | Amount |
|---|---|
| 2031 | $1,111,137 |
| 2032 | 1,993,796 |
| 2033 | 2,118,408 |
| 2034 | 2,250,809 |
| 2035 | 2,391,484 |
| 2036 | 2,540,952 |
| 2037 | 2,699,762 |
| 2038 | 2,868,497 |
| 2039* | 951,809 |

_____

*Maturity date; payable on November 15

**Series 2011 A-1 Bonds Maturing November 15, 2046**

| November 15 | Amount |
|---|---|
| 2039 | $2,095,969 |
| 2040 | 3,238,264 |
| 2041 | 3,440,655 |
| 2042 | 3,655,696 |
| 2043 | 3,884,177 |
| 2044 | 4,126,938 |
| 2045 | 4,384,872 |
| 2046* | 4,658,927 |

_____

*Maturity date; payable on November 15

The Amended Series 2007 B Bonds are subject to redemption prior to maturity on the dates and in the amounts set forth below, at a price of 100% of the principal amount of the Amended Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date:

**Amended Series 2007 B Bonds**

| November 1 | Amount | November 1 | Amount |
|---|---|---|---|
| 2012 | $417,102 | 2030 | $1,093,420 |
| 2013 | 440,043 | 2031 | 1,153,558 |
| 2014 | 464,245 | 2032 | 1,217,004 |
| 2015 | 489,779 | 2033 | 1,283,939 |
| 2016 | 516,717 | 2034 | 1,354,555 |
| 2017 | 545,136 | 2035 | 1,429,056 |
| 2018 | 575,119 | 2036 | 1,507,654 |
| 2019 | 606,750 | 2037 | 1,590,575 |
| 2020 | 640,121 | 2038 | 1,678,057 |
| 2021 | 675,328 | 2039 | 1,770,350 |

| | | | |
|---|---|---|---|
| 2022 | 712,471 | 2040 | 1,867,719 |
| 2023 | 751,657 | 2041 | 1,970,444 |
| 2024 | 792,998 | 2042 | 2,078,818 |
| 2025 | 836,613 | 2043 | 2,193,153 |
| 2026 | 882,627 | 2044 | 2,313,776 |
| 2027 | 931,171 | 2045 | 2,441,034 |
| 2028 | 982,386 | 2046* | 2,575,291 |
| 2029 | 1,036,417 | | |

_____

* Maturity date; payable on November 1

The Series 2011 A-2 Bonds are subject to mandatory redemption in Authorized Denominations on any date occurring at least 45 days after the first to occur of (i) the Construction Commencement Date or (ii) the Resizing Tender Date, from Linden Ponds' Excess Liquidity as of the immediately preceding December 31, March 31, June 30 and September 30, respectively (as certified to the 2011 Bond Trustee by Linden Ponds in writing at least 40 days prior to the applicable redemption date from moneys deposited in the Redemption Fund from the Construction Account in accordance with the 2011 Bond Indenture and from any other moneys deposited by Linden Ponds in the Redemption Fund with instructions to use such moneys to redeem Series 2011 A-2 Bonds), at a price of 100% of the principal amount of the Series 2011 A-2 Bonds to be redeemed plus interest accrued to the redemption date.

As defined in the 2011 Bond Indenture, "***Excess Liquidity***" means as of each March 31, June 30, September 30 and December 31 and on the Resizing Review Date (in each case based on total operating expenses for the most recent preceding rolling four quarters ending on such date), Linden Ponds' Unrestricted Cash and Investments (including all funds held by the 2011 Bond Trustee under the 2011 Bond Indenture, other than the Debt Service Fund, Senior Debt Service Reserve Fund), exceeding (i) 60 Days' Cash on Hand, with respect to mandatory redemption payments on the Series 2011 A-2 Bonds pursuant to the 2011 Bond Indenture prior to the Construction Commencement Date, and (ii) 45 Days' Cash on Hand with respect to mandatory redemption payments on the Series 2011 A-2 Bonds pursuant to the 2011 Bond Indenture on and after the Construction Commencement Date.

On and after the Resizing Tender Date, the Series 2011 B Bonds are subject to mandatory redemption in Authorized Denominations on any date, in an amount equal to Linden Ponds' Excess Cash as certified to the 2011 Bond Trustee by Linden Ponds in writing at least 40 days prior to the applicable redemption date and as deposited into the Redemption Fund pursuant to the 2011 Bond Indenture, at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.

As defined in the 2011 Bond Indenture, "***Excess Cash***" means at the end of each fiscal year following the Resizing Tender Date,

(i)  if Linden Ponds has at least 90 Days' Cash on Hand up to and including 120 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, thirty percent (30%) of the Net Cash Flow generated over the course of the fiscal year,

(ii)  if Linden Ponds has at least 120 Days' Cash on Hand up to 180 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, forty percent (40%) of the Net Cash Flow generated over the course of the fiscal year, or

(iii)  if Linden Ponds has at least 180 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, fifty percent (50%) of the Net Cash Flow generated over the course of the fiscal year.

Linden Ponds' calculation of Excess Cash for the immediately preceding fiscal year shall be calculated by Linden Ponds based upon Linden Ponds' management prepared financial statements and delivered to the 2011 Bond Trustee no later than March 1 of each year.

The Series 2011 B Bonds are also subject to mandatory redemption in Authorized Denominations on the date which is 45 days after the date on which funds are transferred to the Redemption Fund in accordance with the 2011 Bond Indenture, in an amount equal to the surplus funds so transferred from the Senior Debt Service Reserve Fund, at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.

Notwithstanding the foregoing, any holder of Series 2011 B Bonds may elect, by written notice delivered to the 2011 Bond Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds applied to the redemption of the Series 2011 A-1 Bonds or Amended Series 2007 B Bonds owned by such holder.

2.      Optional Redemption.

Series 2011 A-1 Bonds will be subject to redemption prior to maturity beginning on December 31, 2018 upon the written direction of Linden Ponds on behalf of the Issuer, in whole at any time or in part at any time, at a redemption price equal to a percentage of the principal amount of the Series 2011 A-1 Bonds to be redeemed, plus accrued interest thereon to the redemption date:

| Redemption Period (both dates inclusive) | Redemption Price |
| --- | --- |
| December 31, 2018 to June 30, 2019 | 105% |
| July 1, 2019 to December 31, 2019 | 104 |
| January 1, 2020 to June 30, 2020 | 103 |
| July 1, 2020 to December 31, 2020 | 102 |
| January 1, 2021 to June 30, 2021 | 101 |
| July 1, 2021 and thereafter | 100 |

The Series 2011 A-2 Bonds are subject to optional redemption prior to their maturity by the Issuer on the written direction of Linden Ponds, with respect to the Series 2011 A-2 Bones, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest thereon to the redemption date.

The Series 2011 B Bonds are subject to redemption prior to maturity by the Issuer upon the written direction of Linden Ponds, as a whole or in part on any date, at a redemption

price equal to 100% of the principal amount thereof to be redeemed. Notwithstanding the foregoing, any holder of Series 2011 B Bonds may elect, by written notice delivered to the 2011 Bond Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds applied to the redemption of the Series 2011 A-1 Bonds or the Amended Series 2007 B Bonds owned by such holder.

3.      <u>Extraordinary Redemption.</u>

The Bonds are subject to redemption prior to maturity in whole at any time or in part on any Interest Payment Date, at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date from, and to the extent of, funds deposited in the Redemption Fund from (i) proceeds received by Linden Ponds from title insurance with respect to the Property; (ii) proceeds received by Linden Ponds from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by Linden Ponds from insurance and related payments in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property. Notwithstanding the foregoing, the Amended Series 2007 B Bonds shall be redeemed solely from Available Moneys and proceeds allocable to the Amended Series 2007 B Bonds will be used to reimburse the Letter of Credit Provider for any draw on the Letter of Credit in connection with such redemption. Any extraordinary redemption of less than all of the Bonds shall be in such manner as Linden Ponds shall provide in writing to the 2011 Bond Trustee, provided that such redemption shall be applied first to Special Senior Bonds, second after all Special Senior Bonds are paid in full, to Senior Bonds, and third after all Senior Bonds are paid in full, to Subordinated Bonds.

4.      <u>Optional Redemption and Tender of Amended Series 2007 B Bonds.</u>

*Optional Redemption During Variable Rate Period.* During any period in which any Amended Series 2007 B Bonds bears interest at the Variable Rate, the Amended Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of Linden Ponds to the 2011 Bond Trustee with the written consent of the Letter of Credit Provider, upon notice to the holders as set forth in the 2011 Bond Indenture, in whole or in part, on any Interest Payment Date, at a redemption price equal to the principal amount of the Amended Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date.

*Optional Redemption on Mandatory Tender Dates.* The Amended Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of Linden Ponds to the 2011 Bond Trustee, upon notice to the holders as set forth in the 2011 Bond Indenture, in whole or in part, on any Mandatory Tender Date, at a redemption price equal to the principal amount of the Amended Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date.

*Optional Redemption During Fixed Rate Period.* Any Amended Series 2007 B Bonds bearing interest at the Fixed Rate shall be subject to optional redemption at the written direction of the Issuer (as directed by Linden Ponds) to the 2011 Bond Trustee, during any Fixed Rate Period that (A) extends to the maturity of the Amended Series 2007 B Bonds, and (B) is six years or longer, on or after the Interest Payment Date immediately succeeding the date that is the

later of (1) the sixth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (2) the earlier of (x) the tenth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (y) the anniversary of such Fixed Rate Date that approximates more closely than any other anniversary of the Fixed Rate Period, the date which occurs at the midpoint of such Fixed Rate Period, in whole at any time or in part on any Interest Payment Date, upon notice to the holders as set forth in the 2011 Bond Indenture, at a redemption price equal to the principal amount thereof, plus a premium (expressed as a percentage of the principal amount of the Amended Series 2007 B Bonds redeemed) that for the first permissible redemption date is equal to the lesser of (I) three percent of the principal amount of the Amended Series 2007 B Bonds to be redeemed and (II) one-half of one percent times the number of years between the calendar year of such first redemption date and the calendar year during which such Fixed Rate Period ends (including, for purposes of computation, the calendar year of such first redemption date but excluding the calendar year during which such Fixed Rate Period ends), and declining by one-half of one percent annually thereafter, such premium calculation to be made by the 2011 Bond Trustee, upon consultation with the Remarketing Agent, prior to such redemption date, plus accrued interest to the redemption date.

*Optional Tender During Fixed Rate Period.* On the Bank Tender Date, the Issuer will cause to be purchased (but solely from amounts provided by Linden Ponds pursuant to the 2011 Loan Agreement) any Amended Series 2007 B Bond which was originally bearing interest at a Variable Rate on the Closing Date but which was converted to the Fixed Rate in accordance with the 2011 Bond Indenture, at a purchase price equal to the principal amount thereof, plus accrued interest to the Bank Tender Date, payable by check or wire transfer in immediately available funds. On the Bank Tender Date, the holder shall deliver the Amended Series 2007 B Bonds to be purchased as follows: (1) if the Amended Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Amended Series 2007 B Bonds to be purchased to the account of the Tender Agent maintained with the Depository, or (2) if physical bond certificates have been delivered to the holders of the Amended Series 2007 B Bonds pursuant to the 2011 Bond Indenture, delivery of the Amended Series 2007 B Bonds to be purchased to the 2011 Bond Trustee, at its delivery office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank. On or before November 15, 2020, or if the Bank Tender Date has been extended past July 1, 2021, 220 days prior to the extended Bank Tender Date, Linden Ponds may request the Letter of Credit Provider to extend the Bank Tender Date by delivering to the Letter of Credit Provider a copy of Linden Ponds' interim financial statements and such other information as shall be reasonably requested by the Letter of Credit Provider. The Letter of Credit Provider shall provide written notice by 180 days prior to the Bank Tender Date (as may be extended) whether it has determined to extend the Bank Tender Date. The Letter of Credit Provider's decision to extend such Bank Tender Date shall be made in its sole discretion and no course of dealing or other circumstance shall be deemed to require the Letter of Credit Provider to extend the Bank Tender Date. The failure of the Letter of Credit Provider to deliver its notice to extend the Bank Tender Date shall be treated for all purposes hereunder as an election by the Letter of Credit Provider to not extend the Bank Tender Date. This paragraph shall have no force and effect if the Letter of Credit Provider **either** does not notify the Bankruptcy Court of its election, pursuant to the Plan, to receive Amended Series 2007 B Bonds in a Variable Rate or does not deliver a Letter of Credit to secure the Amended Series 2007 B Bonds.

If the owners of the Amended Series 2007 B Bonds determine not to extend the Bank Tender Date, and on the Bank Tender Date Linden Ponds does not refinance the Amended Series 2007 B Bonds, Linden Ponds will be required to pay in full such Amended Series 2007 B Bonds. Such payment may affect the ability of Linden Ponds to make payments on the Series 2011 A-1 Bonds and Series 2011 A-2 Bonds. Moreover, if Linden Ponds fails to pay such amounts when due, the owners of the Amended Series 2007 B Bonds can direct the 2011 Bond Trustee to accelerate all of the 2011 Bonds and pursue remedies. In such event, under the 2011 Bond Indenture, the holders of not less than 50% of the outstanding Senior Parity Debt can direct the 2011 Bond Trustee not to so accelerate or pursue remedies.

5.      Manner of Redemption.

During the period that DTC or the DTC nominee is the registered holder of the 2011 Bonds, the 2011 Bond Trustee will not be responsible for mailing notices of redemption to the beneficial holders of the 2011 Bonds. If fewer than all of a Series of the 2011 Bonds shall be called for redemption, they shall be redeemed from such maturities as shall be selected by Linden Ponds. If fewer than all of the 2011 Bonds of such maturities shall be called for redemption, the 2011 Bond Trustee shall select the particular 2011 Bonds or portions thereof for redemption within such maturities by lot or in such other manner as the 2011 Bond Trustee, in its discretion, may deem proper; provided, however, that the portion of any Series 2011 Bond to be redeemed shall be in Authorized Denominations (except in the case of Amended Series 2007 B Bonds, the portion of any Amended Series 2007 B Bond remaining outstanding after any redemption shall be deemed to be an Authorized Denomination after the redemption date) and provided further, if fewer than all of the Series 2011 A-1 Bonds shall be called for optional redemption, the 2011 Bond Trustee shall apply the funds for such optional redemption ratably between the Series 2011 A-1 Bonds and the Amended Series 2007 B Bonds. Any redemption of Series 2011 B Bonds shall be subject to the option of the holder of such Series 2011 B Bonds, by written notice to the 2011 Bond Trustee at least 10 days prior to the redemption date, to direct that moneys available to redeem Series 2011 B Bonds held by such holder shall instead be applied to the redemption of Series 2011 A-1 Bonds or Amended Series 2007 B Bonds held by such holder. Under no circumstances shall moneys be applied to the optional redemption of Series 2007 A Bonds while 2011 Bonds remain Outstanding. The selection of 2011 Bonds to be redeemed shall be irrevocable, and provided further that in the case of the Amended Series 2007 B Bonds, Pledged Bonds shall be selected before any other Amended Series 2007 B Bonds.

The 2011 Bond Trustee shall mail notice of the call for any redemption at least 30 days (15 days in the case of the Amended Series 2007 B Bonds bearing interest at a Variable Rate) before the redemption date to the registered owners of the 2011 Bonds to be redeemed. The failure to mail any such notice to any registered owner of 2011 Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other 2011 Bonds. If for any reason it is impossible or impractical to mail such notice of redemption, then the 2011 Bond Trustee shall give notice of the call for any redemption by publication at least once in an Authorized New York Newspaper, which notice shall be published at least 30 days (15 days in the case of the Amended Series 2007 B Bonds bearing interest at a Variable Rate) before the redemption date. In the event notice is published as provided above, the mailing of notice to the registered owners of 2011 Bonds to be redeemed shall not be a condition

precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of 2011 Bonds.

**F.     Acceleration Upon Default; Standstill; Other Remedies.**

All principal and accrued interest on the Parity Debt may become immediately due and payable, without premium, upon an Event of Default under the 2011 Bond Indenture if the 2011 Bond Trustee (1) exercises its option to accelerate the maturity of the Bonds, or (2) is requested to accelerate by the owners of not less than 25% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt), unless the owners of not less than 50% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) direct the 2011 Bond Trustee not to accelerate the maturity of the Bonds.

In the event Special Senior Parity Debt is issued, the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default hereunder during the period commencing on the date such payment was due and ending on the date that is six months after all amounts due under the Special Senior Parity Debt are paid in full (the "***Standstill Period***"). All amounts that become due and payable and are not paid during the Standstill Period shall accrue interest at the per annum rate of 6.25% on amounts not paid on Series 2011 A-1 Bonds and at the per annum rate of 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Special Senior Parity Debt and the Senior Parity Debt due on such payment dates has been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date. On the Resizing Review Date any accrued and unpaid debt service during the Standstill Period will not be subject to resizing but instead shall be satisfied in accordance with the 2011 Bond Indenture.

Notwithstanding the foregoing, in the event of a Calamity Standstill (as defined in the 2011 Loan Agreement), the failure to pay the principal or Redemption Price of or interest on any Special Senior Parity Debt, or Senior Parity Debt or Subordinated Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default under the 2011 Bond Indenture at any time during the Calamity Standstill Period, provided during the Calamity Standstill Period, Linden Ponds shall pay scheduled debt service due on any Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt to the extent Linden Ponds maintains 30 Days' Cash on Hand. All amounts that become due and payable and are not paid during the Calamity Standstill shall accrue interest at the per annum rate equal to (i) the interest rate on the Special Senior Parity Debt on the amounts not paid on the Special Senior Parity Debt, (ii) 6.25% on amounts not paid on Series 2011 A-1 Bonds and (iii) 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Special Senior Parity Debt, if any, and the Series 2011 A Bonds and the Amended Series 2007 B Bonds due on such payment dates has been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date.  Any amounts accrued and unpaid as of the Resizing Review Date will not be subject to resizing but instead will be satisfied in accordance with the 2011 Bond Indenture.

Notwithstanding the foregoing, in the event of a Good Cause Standstill (as defined in the 2011 Loan Agreement), the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default under the 2011 Bond Indenture at any time during the Good Cause Standstill Period (as defined in the 2011 Loan Agreement), provided during the Good Cause Standstill Period, Linden Ponds shall pay scheduled debt service due on any Senior Parity Debt to the extent Linden Ponds maintains 30 Days' Cash on Hand.  All amounts that become due and payable and are not paid during the Good Cause Standstill Period shall accrue interest at the per annum rate equal to (i) 6.25% on amounts not paid on Series 2011 A-1 Bonds and (ii) 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Series 2011 A Bonds, the Amended Series 2007 B Bonds due on such payment dates has been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date.  Any amounts accrued and unpaid as of the Resizing Review Date will not be subject to resizing but instead will be satisfied in accordance with the 2011 Bond Indenture.

So long as the Letter of Credit is outstanding, the Bank will be treated as the holder of the Amended Series 2007 B Bonds.  If an Event of Default occurs under the Letter of Credit Agreement, the Bank has the right to cause acceleration of the maturity of the Bonds, with the written approval of the owners of not less than 25% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Bonds), provided that the owners of a not less than 50% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) (treating the Bank as the holder of all of the Amended Series 2007 B Bonds) may direct the 2011 Bond Trustee, in writing, not to accelerate the maturity of the Bonds.

## G.    Book-Entry Only System.

The information provided under this caption, **"DESCRIPTION OF 2011 BONDS—Book-Entry Only System"** has been provided by the DTC.   No representation is made by the Issuer, Linden Ponds, Hingham or the 2011 Bond Trustee as to the accuracy or adequacy of such information provided by DTC or as to the absence of material adverse changes in such information subsequent to the date hereof.

The DTC, New York, New York, will act as securities depository for the 2011 Bonds. The 2011 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC.  One fully-registered 2011 Bond will be issued for each maturity of each series and subseries of the 2011 Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17 A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity

issues, corporate and municipal debt issues and money market instruments (from over 100 countries) that DTC's participants ("***Direct Participants***") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("***DTCC***"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("***Indirect Participants***"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Issues of 2011 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2011 Bonds on DTC's records. The ownership interest of each actual holder of each 2011 Bond ("***Beneficial Owner***") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2011 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 2011 Bonds, except in the event that use of the book-entry system for the 2011 Bonds is discontinued.

To facilitate subsequent transfers, all 2011 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of 2011 Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2011 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2011 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of 2011 Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the 2011 Bonds, such as redemptions, tenders, defaults, and

proposed amendments to the 2011 Bond Documents. For example, Beneficial Owners of 2011 Bonds may wish to ascertain that the nominee holding the 2011 Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the 2011 Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to 2011 Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts 2011 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, premium and interest payments on the 2011 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from Linden Ponds or the 2011 Bond Trustee, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Direct and Indirect Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Direct and Indirect Participant and not of DTC, Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premium and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Trustee. Disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the 2011 Bonds at any time by giving reasonable notice to the Issuer and Linden Ponds. Under such circumstances, in the event that a successor depository is not required under the 2011 Bond Indenture or obtained, 2011 Bond certificates are required to be printed and delivered in accordance with the 2011 Bond Indenture.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, 2011 Bond certificates will be printed and delivered to DTC in accordance with the 2011 Bond Indenture.

## VII. SECURITY FOR THE 2011 BONDS

### A. General.

THE 2011 BONDS WILL NOT BE A GENERAL OBLIGATION OF THE ISSUER AND SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR LIABILITY

OF THE COMMONWEALTH OR ANY POLITICAL SUBDIVISION THEREOF, OR A PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER OR THE COMMONWEALTH OR ANY SUCH POLITICAL SUBDIVISION, BUT SHALL BE PAYABLE SOLELY FROM AND TO THE EXTENT OF THE PAYMENTS MADE BY LINDEN PONDS PURSUANT TO THE 2011 LOAN AGREEMENT AND ANY OTHER FUNDS HELD UNDER THE 2011 BOND INDENTURE FOR SUCH PURPOSE INCLUDING THE PROCEEDS OF ANY DRAW UNDER THE LETTER OF CREDIT. NEITHER THE FAITH AND CREDIT OF THE ISSUER OR THE COMMONWEALTH NOR THE TAXING POWER OF THE COMMONWEALTH OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON OR PREMIUM, IF ANY, ON THE 2011 BONDS. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.**

      **B.**      **Pledge of Revenues.**

Pursuant to the 2011 Bond Indenture, the Issuer will pledge and assign to the 2011 Bond Trustee, for the benefit of the owners of the 2011 Bonds and the holders of Parity Debt (which includes the Letter of Credit Provider) (as security for the payment of all amounts due to the Letter of Credit Provider under the Letter of Credit Agreement in respect of payments made on the Amended Series 2007 B Bonds from moneys realized under the Letter of Credit) (i) all right, title and interest of the Issuer in and to, and remedies under, the 2011 Loan Agreement and the 2011 Mortgage, together with all moneys due and to become due to the Issuer thereunder, (ii) all right, title and interest of the Issuer in and to the proceeds of the 2011 Bonds, and (iii) all right, title and interest of the Issuer in and to the Revenues and the Receipts, moneys and securities from time to time on deposit in the Revenue Fund, the Debt Service Funds, the Interest Accounts, the Principal Accounts, the Sinking Fund Accounts, the Purchase Account, the Senior Debt Service Reserve Fund, the Insurance and Condemnation Award Fund, the Redemption Fund, the Construction Fund, the Construction Account, the Operating Reserve Fund, the Supplemental Reserve Fund, the Supplemental Reserve Account, the Letter of Credit Fund and any and all accounts and subaccounts in any of the foregoing and any and all other real and personal property of every name and nature from time to time by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or transferred, as and for additional security under the 2011 Bond Indenture by the Issuer or by anyone on its behalf, or with its written consent, to the 2011 Bond Trustee (collectively, the *"Trust Estate"*), first, for the equal and ratable benefit, security and protection of all present and future holders of Special Senior Parity Debt, without privilege, priority or distinction as to the lien or otherwise of any Special Senior Parity Debt over any other Special Senior Parity Debt, except as otherwise provided in the 2011 Bond Indenture and in any Supplemental Indenture authorizing the issuance of or certifying any Special Senior Parity Debt; second, for the equal and ratable benefit, security and protection of all present and future holders of Senior Parity Debt, without privilege, priority or distinction as to the lien or otherwise of any Senior Parity Debt over any other Senior Parity Debt, except as otherwise expressly provided in the 2011 Bond Indenture and in any Supplemental Indenture authorizing the issuance of or certifying any Senior Parity Debt; and third, for the equal and ratable benefit, security and protection of all present and future holders of the Subordinated Parity Debt without privilege, priority or distinction as to the lien or otherwise of any Subordinated Parity Debt over any other Subordinated Parity Debt, except as otherwise expressly provided in the 2011 Bond Indenture and in any Supplemental Indenture authorizing the issuance of Additional Subordinated Parity Debt, provided, however, that there are excluded from the

Trust Estate the Reserved Rights of the Issuer and the Rebate Fund and any and all accounts and subaccounts therein. The Revenues consist of (i) all payments to the 2011 Bond Trustee for the account of the Issuer or the Letter of Credit Provider pursuant to the 2011 Loan Agreement, the Letter of Credit Agreement and the 2011 Mortgage, including (without limitation) payments from the Receipts, and (ii) all other receipts of the Issuer or the 2011 Bond Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site and any Additional Facilities and Residential Building 2.5 with the proceeds of Bonds; *provided, however*, that the term "Revenues" does not include the Reserved Rights of the Issuer. At the present time, it is contemplated that such "other receipts" would consist only of earnings from the investment of moneys held by the 2011 Bond Trustee under the 2011 Bond Indenture, certain proceeds of insurance and condemnation awards with respect to the Facility and the Facility Site, and certain proceeds of sales of property, if any.

If the 2011 Bond Trustee should take possession of the Facility upon the occurrence of an Event of Default under the 2011 Loan Agreement or the 2011 Mortgage, Revenues would include any rentals, fees or other charges in which the 2011 Bond Trustee then had an interest generated by reason of the 2011 Bond Trustee's ownership, leasing or operation of any portion of the Facility and the Facility Site. In such event, the Revenues would be paid to the 2011 Bond Trustee in order to meet the operating expenses of the Facility and, thereafter, would be deposited by the 2011 Bond Trustee in the funds and accounts established by the 2011 Bond Indenture for the payment of debt service on the 2011 Bonds and any Additional Bonds and Parity Obligations.

### C.     2011 Loan Agreement.

#### 1.     General.

The 2011 Loan Agreement will be an unconditional general obligation of Linden Ponds and will remain in full force and effect until all of the 2011 Bonds and any Additional Bonds, Parity Obligations and Subordinated Indebtedness and the interest thereon have been paid or provision for the payment thereof has been made in accordance with the 2011 Bond Indenture. The 2011 Loan Agreement will require Linden Ponds to make payments in such amounts as shall be sufficient to provide for the payment of the principal of and the redemption premium, if any, and interest on the 2011 Bonds, and any Additional Bonds and Parity Obligations when due, to pay any Administrative Expenditures, to maintain the Senior Debt Service Reserve Fund at the Senior Debt Service Reserve Fund Requirement. Pursuant to the 2011 Bond Indenture, the payments required by the 2011 Loan Agreement with respect to any Bonds will be assigned by the Issuer to the 2011 Bond Trustee.

#### 2.     Security Interest in Receipts and Other Property.

Under the 2011 Loan Agreement, as security for all of its obligations under the 2011 Loan Agreement and the 2011 Mortgage, including, without limitation, its obligation to make payments due under the 2011 Loan Agreement, Linden Ponds will grant to the Issuer a security interest, subject to the Permitted Encumbrances, in (a) the Receipts and (b) all of Linden Ponds' inventory, accounts, contract rights, general intangibles, chattel paper, equipment, fixtures, furniture, licenses, Residence and Care Agreements and cash and deposits, both now

owned and hereafter acquired, and all proceeds, cash and non-cash thereof. ***"Receipts"*** means all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third-party payments), condemnation awards and other moneys received by or on behalf of Linden Ponds, including (without limitation) revenues derived from (a) ownership, operation or leasing of any portion of the Facility and the Facility Site (including, without limitation, Fees and any other fees payable by or on behalf of residents of the Property) and all rights to receive the same (other than the right to receive Medicaid and Medicare payments), whether in the form of accounts, general intangibles or other rights, and the proceeds of such accounts, general intangibles and other rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (b) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet any of the obligations of Linden Ponds incurred in the financing, operation, maintenance or repair of any portion of the Property; provided, however, that there shall be excluded from Receipts any moneys received by Linden Ponds from prospective residents or commercial tenants in order to pay for customized improvements to those Residential Units or other areas of the Facility to be occupied by such residents or leased to such tenants.

The 2011 Loan Agreement will provide that, upon written request of the 2011 Bond Trustee following the occurrence of any Event of Default under the 2011 Loan Agreement, and only for so long as such Event of Default continues, any Receipts that are then held by Linden Ponds shall immediately, and any Receipts thereafter received shall upon their receipt, be transferred to the 2011 Bond Trustee, deposited in the Revenue Fund and applied pursuant to the 2011 Bond Indenture. Pursuant to the 2011 Bond Indenture, the Issuer will assign to the 2011 Bond Trustee all of its right, title and interest in and to, and remedies under, the 2011 Loan Agreement, except for the Reserved Rights of the Issuer.

Simultaneously with the issuance of the 2011 Bonds, appropriate financing statements will be filed among the appropriate financing statement records of the Maryland State Department of Assessments and Taxation and any other filing offices in which such financing statements may be required to be filed in order to perfect the security interest in the Receipts and the other property described above to the extent possible by such filing.

The Issuer's security interest in the Receipts and such other property, as assigned to the 2011 Bond Trustee, may be limited by the following:

(i)     statutory liens or rights arising in favor of the Issuer and the 2011 Bond Trustee by virtue of the operation of the Act;

(ii)    other statutory liens;

(iii)   rights arising in favor of the United States of America or any agency thereof;

(iv)    prohibitions against assignment contained in state or federal statutes, including those governing Medicare and Medicaid;

(v)      constructive trusts, equitable liens or other rights impressed or conferred by any state or federal court in the exercise of its equitable jurisdiction;

(vi)    state and federal insolvency or bankruptcy laws affecting Receipts or other property in which Linden Ponds acquires an interest and upon which the lien of

the 2011 Loan Agreement and the 2011 Mortgage attaches within the statutorily prescribed preference period prior to any effectual institution of bankruptcy proceedings by or against Linden Ponds and thereafter;

(vii) rights of third parties in any Receipts or other property, including Receipts or other property converted to cash, not in the possession of the 2011 Bond Trustee; and

(viii) the requirement that appropriate continuation statements be filed in accordance with the Uniform Commercial Code as in effect from time to time.

### D.    Mortgage.

Under the 2011 Mortgage, as security for its obligations under the 2011 Loan Agreement and the Letter of Credit Agreement, Linden Ponds will grant to the 2011 Bond Trustee a first lien on Linden Ponds' fee interest in the Facility Site, both now owned and hereafter acquired, together with any and all improvements now or hereafter located thereon, including the Facility.  The lien of the 2011 Mortgage will be subject to the Permitted Encumbrances and the right of Linden Ponds, under certain conditions, to dispose of certain of its assets.

The 2011 Mortgage also constitutes a security agreement under the Massachusetts Uniform Commercial Code pursuant to which Linden Ponds will (i) grant to the 2011 Bond Trustee a security interest in the tangible personal property which is a part of the Facility, and (ii) assign all of its right, title and interest in and to, but not its obligations under, the Residence and Care Agreements to the 2011 Bond Trustee.

### E.    Letter of Credit.

#### 1.    General.

The Confirmation Order shall provide that, in the event that the Letter of Credit Provider timely elects, pursuant to Section 3.2.3 of the Plan, to receive the Amended Series 2007 B Bonds bearing interest at a Variable Rate, the Letter of Credit Provider shall be required to deliver the Letter of Credit to the 2011 Bond Trustee in accordance with the 2011 Bond Documents on or prior to the Effective Date.

If the Letter of Credit Provider either does not elect to receive the Amended Series 2007 B Bonds bearing interest at a Variable Rate, or if the Letter of Credit Provider fails to deliver the Letter of Credit on or prior to the Effective Date, then in either case the Amended Series 2007 B Bonds will be issued to the Letter of Credit Provider bearing interest at a Fixed Rate of 5.5% per annum to maturity, and the provisions of the 2011 Bond Indenture permitting the Owner of such Amended Series 2007 B Bonds to tender such bonds for purchase on the Bank Tender Date shall have no force and effect.

If the Letter of Credit Provider elects to receive the Amended Series 2007 B Bonds bearing interest at a Variable Rate and delivers the Letter of Credit, then the timely payment of the principal of, and interest on, the Amended Series 2007 B Bonds and the purchase price of the Amended Series 2007 B Bonds tendered or deemed tendered under the 2011 Bond Indenture and not remarketed will be secured by the Letter of Credit.  The Letter of Credit will

be issued pursuant to the Amended and Restated Letter of Credit Agreement between Linden Ponds and the Letter of Credit Provider (the "***Letter of Credit Agreement***").  The Letter of Credit will expire on July 1, 2021 (the "***Termination Date***") unless earlier terminated or extended as described below. The following summarizes certain provisions of the Letter of Credit.

The Series 2011 A Bonds and the Amended Series 2007 B Bonds bearing interest at a Fixed Rate will not be secured by the Letter of Credit.

Under the Letter of Credit Agreement, the Letter of Credit Provider agrees that in the event of a Bank Conversion Date resulting from notice from Linden Ponds that the interest expense plus the remarketing fees and letter of credit fees on the Amended Series 2007 B Bonds equals or exceeds 5.5%, the Amended Series 2007 B Bonds shall be subject to mandatory tender for purchase on the Bank Conversion Date and as a result such Series 2007 B Bonds will be converted to a Fixed Rate bearing interest at 5.5% per annum and will be held by the Letter of Credit Provider.

2.      Expiration.

The Letter of Credit will expire upon the Letter of Credit Provider's close of business on the earliest to occur of:  (i) July 1, 2021, or if such date is extended pursuant to the terms of the Letter of Credit, to the date as so extended (or in the event such date is not a Business Day, the next succeeding Business Day), (ii) the date on which the principal amount of and interest on the Amended Series 2007 B Bonds shall have been paid in full, (iii) the close of business on the second Business Day following conversion of the interest rate on the Amended Series 2007 B Bonds to a Fixed Rate, (iv) the date on which the Letter of Credit Provider honors the draft drawn on the Letter of Credit pursuant to the Indenture following the occurrence of an Event of Default and an acceleration, (v) the date on which the Letter of Credit Provider honors the draft drawn on the Letter of Credit to purchase the Amended Series 2007 B Bonds following receipt by the Trustee of a Letter of Credit Mandatory Tender Event Notice from the Letter of Credit Provider that an Event of Default under the Letter of Credit Agreement has occurred and is continuing and directing the Trustee to cause a mandatory tender of the Amended Series 2007 B Bonds pursuant to the Indenture, (vi) the date the Letter of Credit is surrendered to the Letter of Credit Provider by the Trustee for cancellation following acceptance by the Trustee of a Substitute Letter of Credit (as defined in the Indenture), and (vii) the date the Letter of Credit Provider honors the final drawing available under the Letter of Credit.

Under the 2011 Bond Indenture, the Termination Date shall constitute a Bank Tender Date, provided the Letter of Credit Provider may, in accordance with the Letter of Credit Agreement, extend the Termination Date and thereby extend the Bank Tender Date. On or before November 15, 2020, or if the Termination Date has been extended past July 1, 2021, 220 days prior to the extended Termination Date, Linden Ponds may request the Letter of Credit Provider to extend the Termination Date by delivering to the Letter of Credit Provider a copy of Linden Ponds' interim financial statements and such other information as shall be reasonably requested by the Letter of Credit Provider. The Letter of Credit Provider shall provide written notice by 180 days prior to the Termination Date (as may be extended) whether it has determined to extend the Termination Date. The failure of the Letter of Credit Provider to deliver its notice to extend the Termination Date shall be treated for all purposes as an election by the Letter of Credit Provider to not extend the Termination Date.

If the Termination Date is not extended and all of the Amended Series 2007 B Bonds are tendered for purchase on the Bank Tender Date and a Substitute Letter of Credit is not delivered or the Amended Series 2007 B Bonds are not refinanced, then the Amended Series 2007 B Bonds will be registered in the name of the Letter of Credit Provider as Pledged Bonds, but the Letter of Credit Provider shall not be entitled to receive any default or penalty interest after the Bank Tender Date.

3.      Letter of Credit Agreement.

The Letter of Credit Agreement will incorporate the same covenants of Linden Ponds (including financial covenants) and certain restrictions and liabilities applicable to Linden Ponds and to the assets and operations of Linden Ponds as those contained in the Loan Agreement.  The Letter of Credit Agreement will provide for certain remedies of the Letter of Credit Provider upon the occurrence of an Event of Default under the Letter of Credit Agreement, including (without limitation) the right of the Letter of Credit Provider to direct the Trustee to cause the mandatory tender of the Amended Series 2007 B Bonds and, under certain circumstances, with the written approval of the owners of not less than 25% of the Outstanding principal amount of the Senior Parity Debt, to cause the Trustee to accelerate the maturity of all of the Senior Parity Debt, unless the owners of not less than 50% of the Outstanding principal amount of the Senior Parity Debt direct the Trustee, in writing, not to accelerate the maturity of the Senior Parity Debt.

**F.      Creditworthiness of Bank.**

The ability of the Bank or any future Letter of Credit Provider to make payments required under the Letter of Credit or any Substitute Letter of Credit will depend upon the creditworthiness of the Bank or any future Letter of Credit Provider.  There can be no assurance that the Bank or any future Letter of Credit Provider will maintain its financial condition and will be able to honor future drawings under the Letter of Credit or any Substitute Letter of Credit.

**G.      Subordination.**

Pursuant to the Fee Subordination Agreement among the Manager, Linden Ponds and the 2011 Bond Trustee, 50% of the management fees payable by Linden Ponds to the Manager pursuant to the Management Agreement will be subordinated to the payment and performance by Linden Ponds of its obligations under the 2011 Loan Agreement and certain purchased services shall be paid on a deferred basis as set forth in the Management Agreement.

**H.      Additional Security.**

As additional security for the performance of its obligations under the 2011 Loan Agreement, pursuant to the Collateral Assignment (the *"Collateral Assignment"*) to be executed by Linden Ponds in favor of the 2011 Bond Trustee, Linden Ponds will assign to the 2011 Bond Trustee all of Linden Ponds' right, title and interest in and to, but not its obligations under, the Transitional Subcontract or the New Management Agreement, as the case may be, the Residence and Care Agreements and certain other agreements, contracts, approvals, certificates, licenses and permits relating to the operation of the Facility (to the extent the same may be lawfully assigned).  In the event of a default under the 2011 Loan Agreement, the 2011 Bond Trustee may

exercise its rights under such assigned documents, including the right to require payment of all amounts and performance of all obligations due under such assigned documents.

## I.     Senior Debt Service Reserve Fund.

The 2011 Bond Indenture establishes a Senior Debt Service Reserve Fund (the ***"Senior Debt Service Reserve Fund"***).

The 2011 Indenture provides that, upon the delivery of the 2011 Bonds, the 2011 Bond Trustee will deposit in the Senior Debt Service Reserve Fund, moneys from the debt service reserve fund and other accounts held under the 2007 Indenture for the benefit of the 2007 Bonds and not otherwise applied to pay interest and other costs associated with the 2007 Bonds, in an amount equal to the difference between (a) $4,670,000 and (b) the excess of the amount of unpaid interest on the Series 2007 A Bonds, the Original Series 2007 B Bonds and the Series 2007 C Bonds and unpaid letter of credit fees related thereto over $2,600,000. In the event amounts transferred from the 2007 Indenture into the Senior Debt Service Reserve Fund as of the delivery of the 2011 Bonds are less than the Senior Debt Service Reserve Fund Requirement, the 2011 Bond Indenture provides that Initial Entrance Fees deposited with the Trustee shall be applied first to cure any such deficiency. Thereafter, the 2011 Bond Indenture provides that a portion of the Initial Entrance Fees deposited with the Indenture after the commencement of construction of Residential Building 2.5 and after certain other financial conditions are satisfied shall be deposited into the Senior Debt Service Reserve Fund to the extent the amount held in such Senior Debt Service Reserve Fund is less than the Senior Debt Service Reserve Fund Requirement. "***Senior Debt Service Reserve Fund Requirement***" means the amount equal to (a) Maximum Annual Debt Service on the Series 2011 A-1 Bonds and the Amended Series 2007 B Bonds, (b) on and after the Resizing Tender Date, Maximum Annual Debt Service after taking into account any resizing of the Series 2011 A-1 Bonds and the Amended Series 2007 B Bonds and (c) on and after the date on which (i) redemption payments on the Series 2011 B Bonds commence under the 2011 Bond Indenture, and (ii) Linden Ponds achieves 90 Days' Cash on Hand, 50% of the Maximum Annual Debt Service on the Series 2011 A Bonds and the Amended Series 2007 B Bonds Outstanding on such date and secured by such Senior Debt Service Reserve Fund. With respect to the Senior Debt Service Reserve Fund requirement for any other Series of Bonds or the debt service reserve fund, if any, maintained for such Bonds, such amount as shall be established in the Supplemental Indenture authorizing the issuance of such Bonds. Any surplus amounts released from the Senior Debt Service Reserve Fund resulting from the operation of clause (1)(b) or (1)(c) shall be applied in accordance with the provisions of the 2011 Bond Indenture.

If, as a result of any withdrawal from the Senior Debt Service Reserve Fund to pay debt service on the Series 2011 Bonds, Linden Ponds is required under the 2011 Loan Agreement promptly to pay to the 2011 Bond Trustee for deposit into the Revenue Fund the amount of any such withdrawal. The 2011 Bond Indenture and the 2011 Loan Agreement also contain provisions which require Linden Ponds to deposit moneys into the Senior Debt Service Reserve Fund in the event that the amount on deposit in the Debt Service Reserve Fund is less than the Senior Debt Service Reserve Fund Requirement after all of the Series 2011 A-2 Bonds have been paid in full and Linden Ponds' Days' Cash on Hand exceeds 90 after such deposit.

Linden Ponds may deliver to the 2011 Bond Trustee a Debt Service Reserve Fund Credit Facility in substitution for amounts initially deposited in a Debt Service Reserve Fund.

**J.    Initial Entrance Deposits.**

1.    General.

All IEDs received by Linden Ponds shall be delivered to the 2011 Bond Trustee upon the receipt thereof and shall be deposited by the 2011 Bond Trustee in the Construction Account. Upon making such deposit, Linden Ponds shall deliver a certificate to the 2011 Bond Trustee which shall (i) identify such amounts as IEDs, (ii) designate the building or buildings to which such IEDs relate as required in the 2011 Loan Agreement, (iii) identify the amount, if any, of deficiency in Linden Ponds' operating account below $3,000,000 and (iv) calculate Linden Ponds' Days' Cash on Hand. Moneys in the Construction Account shall be disbursed FIRST, to the Senior Debt Service Reserve Fund to the extent that the amount on deposit therein is less than the Senior Debt Service Reserve Fund Requirement, SECOND, to Linden Ponds, an amount, if any, to replenish Linden Ponds' operating account to a balance of $3,000,000 in accordance with a certificate of Linden Ponds delivered to the 2011 Bond Trustee when making a deposit of IEDs described above, THIRD, to fund the Operating Reserve Fund so that, together with the amount held in Linden Ponds' operating account after any deposit described in SECOND, Linden Ponds has 45 Days' Cash on Hand, FOURTH, commencing on the earlier of the Construction Commencement Date and the Resizing Tender Date, on the first day of each February, May, August and November, promptly following receipt by the 2011 Bond Trustee from Linden Ponds of a certificate identifying its Days' Cash on Hand, and the amount, if any, of money that constitutes Excess Liquidity as of the immediately preceding calendar quarter, to the Redemption Fund, the amount, if any, which constitutes Excess Liquidity in accordance with such certificate, to be applied to redeem the Series 2011 A-2 Bonds, FIFTH, if the Construction Commencement Date has occurred, to the Senior Debt Service Reserve Fund as necessary to bring the amount on deposit therein to the Senior Debt Service Reserve Fund Requirement, SIXTH, to the Operating Reserve Fund, as necessary to bring the amount on deposit therein equal to the Operating Reserve Fund Requirement, SEVENTH, to Linden Ponds the remaining amount of such IEDs to be applied in accordance with the 2011 Loan Agreement.

2.    Operating Reserve Fund.

The amount of the Operating Reserve Fund Requirement for any Fiscal Year shall be established by a certificate of an Authorized Officer of Linden Ponds delivered to the 2011 Bond Trustee prior to the commencement of such Fiscal Year, together with a copy of Linden Ponds' Budget for such Fiscal Year. The term "***Operating Reserve Fund Requirement***" means, as of the Closing Date, the amount that, when added to the $3,000,000 to be maintained in Linden Ponds' operating account, will result in 30 Days' Cash on Hand of Linden Ponds, and as of any date thereafter, an amount equal to 10% of the amount included by Linden Ponds in Linden Ponds' Budget for payment of Total Operating Expenses for the current Fiscal Year, excluding depreciation.

Moneys in the Operating Reserve Fund shall be disbursed by the 2011 Bond Trustee to or for the account of Linden Ponds within seven days of receipt by the 2011 Bond Trustee of the written direction of an Authorized Officer of Linden Ponds to be applied to the

payment of (a) subject to the provisions of the 2011 Loan Agreement, Debt Service on the Senior Parity Debt and the Special Senior Parity Debt, (b) operating expenses and the costs of needed repairs to the Facility, (c) the costs of capital improvements to the Facility required by law or regulation, (d) restructuring costs, (e) judgments against Linden Ponds, (f) amounts due on any Indebtedness of Linden Ponds, or (g) the Purchase Price of tendered Variable Rate Bonds, provided that (1) in the case of clause (a) regarding the payment of Debt Service on the Senior Parity Debt, upon written certification by an Authorized Officer of Linden Ponds to the 2011 Bond Trustee that no moneys from IEDs (excluding Residential Building 2.5 IEDs) are available to pay such expenses and money available to Linden Ponds in Linden Ponds' operating account for the payment of such expenses have fallen below $3,000,000, (2) in the case of debt service on the Special Senior Parity Debt, upon written certification by an Authorized Officer of Linden Ponds to the 2011 Bond Trustee that no moneys from Residential Building 2.5 Initial Entrance Fees are available to pay such expenses, and moneys available to Linden Ponds in Linden Ponds' operating account for the payment of such expenses have fallen below $3,000,000, and (3) in all other cases, upon written certification that no other moneys are available to Linden Ponds to pay such costs. Linden Ponds' written direction for the application of amounts in the Operating Reserve Fund shall certify that no other moneys are available to Linden Ponds for the payment of such expenses, costs or amounts from any other source. Moneys on deposit in the Operating Reserve Fund shall come from IEDs as described above and from other moneys deposited with the 2011 Bond Trustee and directed to be deposited into the Operating Reserve Fund, provided that Linden Ponds shall not be obligated to fund or replenish the Operating Reserve Fund. On the later of the date the Series 2011 A Bonds are resized as provided in the 2011 Bond Indenture, and the Operating Reserve Fund Requirement is met, all amounts then on deposit in the Operating Reserve Fund shall be paid directly to Linden Ponds.

3.    <u>Supplemental Reserve Fund.</u>

Moneys in the Supplemental Reserve Fund shall be disbursed by the 2011 Bond Trustee to or for the account of Linden Ponds to pay operating expenses of the Facility, to the extent permitted, at the time and in the manner as moneys in the Operating Reserve Fund are disbursed under clause (a), (c) and (d) of the preceding paragraph, provided that no funds may be disbursed to pay such expenses unless Linden Ponds has certified that in the case of clause (a), moneys available to Linden Ponds in Linden Ponds' operating account for the payment of such expenses have fallen below $3,000,000 and in all other cases, no moneys are available in the Operating Reserve Fund or for the payment of such expenses. Moneys on deposit in the Supplemental Reserve Fund shall not be included in the calculation for purposes of determining whether there are sufficient moneys on deposit in the Operating Reserve Fund to meet the Operating Reserve Fund Requirement. On the date amounts on deposit in the Operating Reserve Fund are released to Linden Ponds in accordance with the preceding paragraph, (i) all amounts then on deposit in the Supplemental Reserve Fund shall be paid directly to Linden Ponds, and (ii) all amounts then on deposit in the Supplemental Reserve Account shall be transferred to the Series 2011 Redemption Fund and applied to redeem Series 2011 A Bonds.

**K.    Enforceability.**

The Issuer's security interest in the Receipts (including Entrance Fees), as assigned to the 2011 Bond Trustee, the 2011 Bond Trustee's interest in the moneys, securities and funds held or set aside under the 2011 Bond Indenture and the remedies available to the

2011 Bond Trustee or the Issuer under the 2011 Bond Indenture, the 2011 Loan Agreement and the 2011 Mortgage may be limited by the CCRC Act (hereinafter defined).

Enforceability of the 2011 Bond Indenture, the 2011 Loan Agreement, the 2011 Mortgage, the Collateral Assignment and the 2011 Bonds is subject to bankruptcy, insolvency, moratorium, reorganization and other state and federal laws affecting the enforcement of creditors' rights, to fraudulent conveyance laws and to general principles of equity.  A claim for payment of the principal of or interest on the 2011 Bonds could be made subject to any statutes that may be constitutionally enacted by the United States Congress or the Massachusetts General Court affecting the time and manner of payment or imposing other constraints upon enforcement.

The enforceability of the Letter of Credit or the Confirming Letter of Credit may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws or equitable principles affecting the enforcement of creditors' rights generally in the event of any bankruptcy, reorganization or insolvency of the Bank or any moratorium applicable to the Bank.

The Bankruptcy Code permits a bankruptcy court to modify the rights of a secured creditor.  In the event of a bankruptcy proceeding involving Linden Ponds, the Issuer or the 2011 Bond Trustee could be treated under the Bankruptcy Code as one holding a secured claim, to the extent provided in the 2011 Loan Agreement, the 2011 Mortgage and the Collateral Assignment.  The potential effects of the bankruptcy of Linden Ponds could be to delay substantially enforcement of remedies otherwise available to the Issuer or the 2011 Bond Trustee and to allow the Court, under certain circumstances (i) to substitute other assets of Linden Ponds for collateral under the 2011 Loan Agreement, the 2011 Mortgage, and the Collateral Assignment, (ii) to sell all or part of the collateral under the 2011 Loan Agreement or the 2011 Mortgage without application of the proceeds to the payment of Parity Debt, including, without limitation, the 2011 Bonds, (iii) to subordinate the 2011 Loan Agreement, the 2011 Mortgage and the Collateral Assignment to liens securing borrowings approved by the Court, (iv) to permit Linden Ponds to cure defaults and reinstate the 2011 Loan Agreement, the 2011 Mortgage and the Collateral Assignment, (v) to compel release of the 2011 Mortgage or termination of the 2011 Loan Agreement by payment of an amount determined by the Court to be the value of the collateral pledged by Linden Ponds thereunder (even though less than the total amount of Parity Debt outstanding) or (vi) to modify the terms of or payments due under the 2011 Mortgage, the 2011 Loan Agreement and the Collateral Assignment.  For additional detail, reference is made to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.*

1.    Covenant to Commence Construction of Residential Building 2.5.

Linden Ponds has agreed to begin construction of Residential Building 2.5 within nine (9) months after occupancy of the independent living units of the existing CCRC has averaged at least 93% for three consecutive months (the "***Commencement Test***").  Linden Ponds acknowledges that the failure to commence construction within such nine-month period, except for Good Cause (as defined below), and except as described below, will result in Linden Ponds' forfeiture of its right to resize the Series 2011 A Bonds.

Notwithstanding the foregoing, if the holders of the 2011 Bonds and any Letter of Credit Providers with respect thereto (or any subset thereof) do not provide financing to pay the costs of constructing Residential Building 2.5 (including all hard and soft costs incurred after the

commencement of construction, but excluding marketing costs and the development fee, plus soft costs incurred by Linden Ponds prior to the commencement of construction but after the Closing Date, plus capitalized interest during the scheduled construction period and ending six months after Scheduled Completion, plus, at the election of the holders of the 2011 Bonds and the Letter of Credit Providers providing such financing, a debt service reserve fund securing such financing) on terms at least as favorable to Linden Ponds as the terms and conditions set forth in the 2011 Loan Agreement, Linden Ponds shall have no obligation to begin construction of Residential Building 2.5, and the failure of Linden Ponds to begin construction shall not constitute an Event of Default under the 2011 Loan Agreement. In the event the holders of the 2011 Bonds and the Letter of Credit Providers (or any subset thereof) fail to provide such financing, Linden Ponds shall deliver to the 2011 Bond Trustee a Certificate of an Authorized Officer to such effect and requesting that the resizing of the Series 2011 A Bonds occur as soon as possible in accordance with the 2011 Loan Agreement.

Notwithstanding the foregoing, if Linden Ponds designs Residential Building 2.5 other than as permitted by the 2011 Loan Agreement or fails to competitively bid the construction contract for such building, the failure of the holders of the 2011 Bonds and any Letter of Credit Providers with respect thereto (or any subset thereof) to finance the costs of Residential Building 2.5 shall not constitute a Resizing Event and Linden Ponds will have no right to resize by reason of the Construction Loan not being funded.

Notwithstanding the foregoing, if Good Cause (as defined herein) exists, then Linden Ponds shall have no obligation to begin construction of Residential Building 2.5 and the failure of Linden Ponds to begin construction shall not constitute an Event of Default under the 2011 Loan Agreement. "*Good Cause*" means (1) the failure of Linden Ponds to obtain any governmental approval necessary for the construction of Residential Building 2.5 despite the exercise of commercially reasonable diligent efforts to obtain such approval, (2) the inability of Linden Ponds to begin construction without violating any court order prohibiting the same despite the exercise of commercially reasonable diligent efforts to have such court order modified or set aside, or (3) the inability of Linden Ponds to begin construction as a result of a Force Majeure Event despite the exercise of commercially reasonable diligent efforts to overcome the impact of such Force Majeure Event; <u>provided</u> Good Cause described in any of clauses (1) through (3) above shall not constitute a Resizing Event unless Linden Ponds has, for a period commencing on the date the Commencement Test is satisfied and ending on February 29, 2016 (which may be extended as described below) (the "*Good Cause Period*"), exercised commercially reasonable diligent efforts to cure or overcome the impediment to the commencement of construction as described in clauses (1) through (3) above. If, on February 1, 2016, construction of Residential Building 2.5 has not commenced, then Linden Ponds shall deliver a certificate of an Authorized Officer to the 2011 Bond Trustee to such effect and directing the 2011 Bond Trustee to provide a notice to the holders of the Outstanding Senior Parity Debt and the Series 2011 B Bonds, to the effect that (a) Good Cause has impeded Linden Ponds' ability to commence construction of Residential Building 2.5 and (b) unless Good Cause has ceased to be in effect, a Resizing Event will occur on the date of delivery of the Resizing Financial Statements for the Fiscal Year ending December 31, 2015 unless within the later of (x) 28 days after the delivery of such notice to the 2011 Bond Trustee and (y) February 29, 2016, the holders of at least a Majority in principal amount of all Outstanding Senior Parity Debt, and the holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds,

consent to a Good Cause Standstill for the Good Cause Standstill Period (as each are hereinafter defined). "***Good Cause Standstill***" means the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt or Subordinated Parity Debt when the same shall become due and payable, by reason of the Minimum Liquidity Condition shall not, in and of itself, constitute an Event of Default under the 2011 Loan Agreement during the Good Cause Standstill Period. "***Good Cause Standstill Period***" shall mean the 12-month period ending on February 29, 2017. During the Good Cause Standstill Period, Linden Ponds shall pay scheduled debt service due on the Senior Parity Debt to the extent that immediately after such payment, Linden Ponds would have at least 30 Days' Cash on Hand (the "***Minimum Liquidity Condition***"). All amounts that become due and payable with respect to the principal of or interest on the Senior Parity Debt that are not paid during the Good Cause Standstill Period shall accrue interest at the rate on the applicable Senior Parity Debt and shall be payable as described in the 2011 Bond Indenture and shall not be subject to resizing pursuant to the 2011 Bond Indenture. If the holders consent to a Good Cause Standstill Period as provided above, the end of the Good Cause Standstill Period (and thereby any resizing of the Series 2011 A Bonds) will be extended to February 29, 2017.

Upon the occurrence of a Resizing Event, Linden Ponds shall deliver to the 2011 Bond Trustee a Certificate of an Authorized Officer, which Certificate shall include (i) the Resizing Financial Statements, a calculation of Linden Ponds' Days' Cash On Hand and such other information required under the definition of Resizing Event, (ii) any certifications required under the 2011 Loan Agreement, (iii) a copy of the report of the Independent Consultant delivered to Linden Ponds pursuant to the 2011 Bond Indenture, and (iv) a request that the resizing of the Series 2011 A Bonds occur as soon as possible.

a.  Additional Indebtedness.

Under the 2011 Loan Agreement, Linden Ponds may not incur, or permit to exist, any Additional Indebtedness, except as follows:

(a)  Refunding Indebtedness for either a current or advance refunding (including Cross-over Refunding Indebtedness), provided that Linden Ponds has delivered a certificate to the Trustee certifying that the refunding will result in debt savings in each Fiscal Year, provided further that no such certification shall be required with respect to refunding after the Resizing Review Date of the Amended Series 2007 B Bonds. With respect to any variable rate indebtedness, debt savings will be determined by assuming such variable rate indebtedness is accruing interest at the Maximum Rate then in effect. For the avoidance of doubt, Linden Ponds may refinance the Series 2007 B Bonds at any time on or prior to the Bank Tender Date provided such refinancing is consummated after the Resizing Review Date;

(b)  Current liabilities of Linden Ponds, arising in the ordinary course of business, other than for borrowed money or installment sales or similar contracts, without limit;

(c)  Long Term Indebtedness to finance the construction of Residential Building 2.5;

(d)  No Additional Indebtedness shall be deemed to arise when variable rate Indebtedness converts to fixed rate Indebtedness;

(e) Subordinated Parity Obligations, only as permitted in the 2011 Loan Agreement, and Subordinated Indebtedness, without limit, but only after the Resizing Review Date provided (i) on the Resizing Review Date, the Outstanding principal amount of the Series 2011 A Bonds is not reduced and (ii) Linden Ponds' Days' Cash on Hand equals or exceeds 180 after any payment on such Subordinated Indebtedness and (iii) the terms of such Subordinated Indebtedness state expressly that the repayment of such Subordinated Indebtedness (A) occurs not more frequently than annually, (B) is subordinate to the Series 2011 B Bonds and (C) cannot be accelerated;

(f) Capital lease financings incurred in the ordinary course of Linden Ponds' operations of the Facility;

(g) The Neighborhood Three Loan and the Neighborhood Three Loan Mortgage and any debt refinancing the Neighborhood Three Loan, but only with the consent of the holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds; and

(h) The Renaissance Gardens Two Loan and any debt refinancing the Renaissance Garden Two Loan, but only with the consent of the holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds.

b. Debt Service Coverage Ratio Covenant.

Linden Ponds will covenant and agree in the 2011 Loan Agreement that an Authorized Officer of Linden Ponds will calculate the Debt Service Coverage Ratio of Linden Ponds for each fiscal quarter of the prior 12-month period, commencing with the fourth fiscal quarter which occurs in the Fiscal Year ending December 31, 2011, and to deliver a copy of such calculation to the 2011 Bond Trustee, each nationally recognized rating agency maintaining a rating on the Series 2011 A Bonds, EMMA, and each Significant Holder within 45 days following the end of each such fiscal quarter (the **"*Quarterly Evaluation Date*"**). If the Debt Service Coverage Ratio of Linden Ponds for any two consecutive Fiscal Years is greater than 1.50:1, then thereafter Linden Ponds will calculate the Debt Service Coverage Ratio as part of its annual financial statements as of the end of each Fiscal Year for the prior 12-month period, commencing with the Fiscal Year after the second consecutive Fiscal Year in which Linden Ponds' Debt Service Coverage Ratio exceeded 1.50:1, and deliver a copy of such calculation to the 2011 Bond Trustee, each nationally recognized rating agency maintaining a rating on the Series 2011 A Bonds, EMMA, and each Significant Holder within 120 days following the end of each such Fiscal Year (the **"*Annual Evaluation Date*"** and together with the Quarterly Evaluation Date, as the case may be, the **"*Evaluation Date*"**).

Linden Ponds will covenant and agree in the 2011 Loan Agreement to maintain a Debt Service Coverage Ratio of not less than 1.10:1 (the "***Debt Service Coverage Ratio Covenant***") for the 12-month period ending on each Evaluation Date, commencing with the earlier to occur of (i) the Evaluation Date following the date on which the Series 2011 A Bonds are resized as described above under **"DESCRIPTION OF 2011 BONDS—Series 2011 A-1 Bonds; Series 2011 A-2 Bonds; Series 2011 B Bonds – Resizing of Series 2011 A-1 Bonds; Series 2011 A-2 Bonds"** and (ii) December 31, 2018.

If, at any time after the commencement of the Debt Service Coverage Ratio Covenant while reports are required to be delivered on Quarterly Evaluation Dates, the Debt Service Coverage Ratio of Linden Ponds, is less than the Debt Service Coverage Ratio Covenant, Linden Ponds will retain a Management Consultant within 60 days after receipt of financial statements disclosing the deficiency to prepare a Consultant's Report (as defined below).

If, at any time after the commencement of the Debt Service Coverage Ratio Covenant while reports are required to be delivered on Annual Evaluation Dates, the Debt Service Coverage Ratio of Linden Ponds, is less than the Debt Service Coverage Ratio Covenant, Linden Ponds will submit an Authorized Officer's Certificate to the 2011 Bond Trustee within 45 days of the applicable Annual Evaluation Date setting forth in detail the reasons therefor and the plan to increase the Debt Service Coverage Ratio to at least the required level in future periods including the 12-month period immediately following the Fiscal Year in which the deficiency occurred. If the Debt Service Coverage Ratio of Linden Ponds for any two consecutive Fiscal Years after the commencement of the Debt Service Coverage Ratio Covenant is less than the Debt Service Coverage Ratio Covenant, Linden Ponds will retain a Management Consultant within 45 days following the second such applicable Annual Evaluation Date to prepare a Consultant's Report.

"*Consultant's Report*" means a report making recommendations with respect to the rates, fees and charges of Linden Ponds, Linden Ponds' methods of operation and other factors affecting its financial condition in order to increase such Debt Service Coverage Ratio to meet the Debt Service Coverage Ratio Covenant.

A copy of the Consultant's Report and recommendations, if any, shall be filed with Linden Ponds and the 2011 Bond Trustee within 75 days of the applicable Evaluation Date. Linden Ponds shall follow each recommendation of the Management Consultant applicable to it; provided such actions need not be taken if they are not permitted by law or have been determined by the Governing Body of Linden Ponds by resolution to be unreasonable, impractical or not feasible or otherwise in accordance with the 2011 Loan Agreement. This provision of the 2011 Loan Agreement shall not be construed to prohibit Linden Ponds from serving indigent residents to the extent required for Linden Ponds to continue its qualification as a tax-exempt organization or from serving any other class or classes of residents without charge or at reduced rates so long as such service does not prevent Linden Ponds from satisfying the other requirements of this provision of the 2011 Loan Agreement.

The foregoing provisions notwithstanding, if the Debt Service Coverage Ratio of Linden Ponds for any Fiscal Quarter or for any two consecutive Fiscal Years is less than the Debt Service Coverage Ratio Covenant, Linden Ponds will not be obligated to retain a Management Consultant to make such recommendations and deliver a Consultant's Report if: (i) there is filed with the 2011 Bond Trustee a written report addressed to it of a Management Consultant (which Management Consultant and report, including without limitation the scope, form, substance and other aspects of such report, are acceptable to the 2011 Bond Trustee) which contains an opinion of such Management Consultant that applicable laws or regulations have prevented Linden Ponds from generating Net Income Available for Debt Service during such 12-month periods sufficient to meet the requirements of this provision of the 2011 Loan Agreement, and, if requested by the 2011 Bond Trustee, such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including without limitation the scope,

form, substance and other aspects thereof, are acceptable to the 2011 Bond Trustee) as to any conclusions of law supporting the opinion of such Management Consultant; and (ii) the report of such Management Consultant indicates that the rates charged by Linden Ponds and the expenses incurred in connection therewith are such that, in the opinion of the Management Consultant, Linden Ponds has generated the maximum amount of Revenues reasonably practicable given such laws or regulations.

Linden Ponds will not be required to cause the Consultant's Report referred to above to be prepared more frequently than once each Fiscal Year (with respect to the Quarterly Evaluation Dates) or once each two Fiscal Years (with respect the Annual Evaluation Dates) if at the end of the fiscal quarter (with respect to the Quarterly Evaluation Dates) or the end of the first of such two Fiscal Years (with respect the Annual Evaluation Dates) Linden Ponds provides to the 2011 Bond Trustee an opinion of Independent Counsel (which Counsel and opinion, including without limitation the scope, form, substance and other aspects thereof, are acceptable to the 2011 Bond Trustee) to the effect that the applicable laws and regulations underlying the Management Consultant's report delivered in respect of the previous 12-month period have not changed in any material way.

Notwithstanding any other provisions of the 2011 Loan Agreement, if Linden Ponds takes all action necessary to comply with the procedures set forth above for preparing a report and adopting a plan and follows each recommendation contained in such report to the extent required above:

(i) Linden Ponds' failure to achieve a Debt Service Coverage Ratio of at least 1.00:1 for the most recent 12-month period shall not constitute an Event of Default under the 2011 Loan Agreement;

(ii) Linden Ponds' failure to achieve a Debt Service Coverage Ratio of at least 1.00:1 for two consecutive 12-month periods shall not constitute an Event of Default under the 2011 Loan Agreement provided, as of the end of the second such 12-month period, Days' Cash on Hand is greater than 150; and

(iii) Linden Ponds' failure to achieve a Debt Service Coverage Ratio, of at least 1.00:1 for three consecutive 12-month periods, regardless of Linden Ponds' Days' Cash on Hand as of the end of such third 12-month period, shall constitute an Event of Default under the 2011 Loan Agreement.

c.   Covenant to Obtain Rating.

Linden Ponds, not later than 180 days following the first full fiscal year after the Resizing Review Date and not later than 180 days following the end of each fiscal year thereafter until the 2011 Bonds have received a rating of not less than "Ba" by Moody's, "BB-" by S&P or "BB-" by Fitch, shall review Linden Pond's credit, taking into account rating medians published by Fitch, S&P and Moody's and discussions with representatives of one or more of such rating agencies.  In the event that such review and discussions indicate a likelihood the 2011 Bonds would receive such a rating by any of such rating agencies, Linden Ponds shall, at its sole expense, solicit and make a good faith effort to obtain such rating.  If Linden Ponds receives such rating, the foregoing requirements shall be of no further force and effect with respect to such series of the 2011 Bonds so long as such rating is neither reduced below "Ba" by Moody's,

"BB-" by S&P or "BB-" by Fitch nor withdrawn.

## VIII.  RISK FACTORS IN CONNECTION WITH THE PLAN.

### A.  If Linden Ponds and Hingham receive the requisite votes to accept the Plan, there can be no assurance that the Court will confirm the Plan.

Although the requisite votes to accept the Plan may be obtained, there can be no assurance that one or more parties will not seek to oppose confirmation of the Plan or that the Court may otherwise decline to confirm the Plan.

### B.  If the Plan is confirmed, there can be no assurance that the effective date of the Plan will occur.

Although Linden Ponds and Hingham believe that the Effective Date will occur reasonably soon after the Plan is approved by the Court, there can be no assurance as to such timing or as to whether it will occur.

### C.  There can be no assurance that the Court will approve the classification scheme in the Plan.

The Court, which sits as a court of equity, may exercise substantial discretion in connection with the Plan.  Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, Linden Ponds and Hingham.  The Bankruptcy Code also provides that the Plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  Linden Ponds and Hingham believe that all claims and interests have been appropriately classified in the Plan. There can be no assurance, however, that the Court will conclude that such claims and interests are properly classified in the Plan.

### D.  Linden Ponds' and Hingham's actual financial results may vary significantly from the projections filed with the Court.

**The financial projections attached hereto reflect numerous assumptions, including the consummation of the Plan.  The financial projections should be viewed in conjunction with a review of these assumptions including the qualifications and footnotes as set forth therein.  The financial projections were prepared by management of Linden Ponds in good faith based upon assumptions believed to be reasonable at the time of preparation.  While presented with numerical specificity, the financial projections are based upon a variety of estimates and assumptions subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of Linden Ponds.  Actual results may vary materially from those presented.  The financial projections have not been prepared to comply with the guidelines established with respect to projections by the SEC or the *AICPA*, have not been audited and are not presented in accordance with *GAAP*.**

**This Disclosure Statement contains projected financial information that demonstrates the feasibility of the Plan and the ability of Linden Ponds to continue**

operations upon emergence from proceedings under the Bankruptcy Code. Such information was prepared for the limited purpose of furnishing holders of all 2007 Bond Claims with adequate information to make an informed judgment regarding acceptance of the Plan. None of the projections should be regarded for the purpose of this Disclosure Statement as representations or warranties by Linden Ponds, Hingham, the Issuer or any other person as to the accuracy of such information or that any such projections will be realized. The achievement of certain results or other expectations contained in these projections involve known and unknown risks, uncertainties and other factors which may cause actual results, performances or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Linden Ponds and Hingham do not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or events, conditions or circumstances on which these statements are based, occur.

E. **Even if the Plan is confirmed, the extent of Linden Ponds' remaining indebtedness may impair its financial condition and Linden Ponds' ability to grow and compete.**

As of the date hereof, Linden Ponds' total secured debt is $152,230,000. Although Linden Ponds anticipates that the Plan will significantly increase its liquidity, it still will have a significant level of debt upon consummation of the Plan. Linden Ponds' debt has important consequences for its financial condition, including:

- making Linden Ponds vulnerable to general adverse economic, competitive and industry conditions;

- limiting Linden Ponds' ability to obtain additional financing to support its operations and complete construction and maintenance of its Facility;

- limiting Linden Ponds' ability to execute key strategies;

- limiting Linden Ponds' ability to attract and retain key personnel;

- requiring a substantial portion of Linden Ponds' cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital, capital expenditures, execution of its business strategy, acquisitions, operations and general corporate requirements;

- limiting Linden Ponds' ability to retain and attract residents;

- limiting Linden Ponds' flexibility in planning for, or reacting to, changes in its business and the industry in which it operates; and

- limiting Linden Ponds' ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less-leveraged competitors.

F. **Servicing Linden Ponds' debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

Linden Ponds' ability to make payments on and refinance its debt, fund planned capital expenditures and execute its business strategy depends on its ability to generate cash flow

in the future. To some extent, this is subject to general economic, financial, competitive and other factors that are beyond Linden Ponds' control. Even if the Plan is consummated, there can be no assurance that Linden Ponds' business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs, including with respect to the repayment of the 2011 Bonds or any construction loan for Residential Building 2.5, including any cash payments due upon the maturity of such indebtedness. If Linden Ponds is unable to service its debt or experiences a significant reduction in its liquidity, Linden Ponds could be forced to reduce or delay planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt or seek additional equity capital, and Linden Ponds may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all. Further, any of these actions may not be sufficient to allow Linden Ponds to service its debt obligations or may have a materially adverse effect on its results of operations and financial condition. Linden Ponds' failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition. If Linden Ponds cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and Linden Ponds' existing and future lenders could, under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

G.    **Series 2011 A Bonds may be resized upon certain events.**

As described below under "**DESCRIPTION OF 2011 BONDS —Series 2011 A-1 Bonds; Series 2011 A-2 Bonds; Series 2011 B Bonds – *Resizing of Series 2011 A-1 Bonds and Series 2011 A-2 Bonds***," the Series 2011 A Bonds may be resized upon the occurrence of certain events. Such resizing would impact the value of a holder's Series 2011 A Bonds.

H.    **All 2011 Bonds will be subject to any senior financing obtained by Linden Ponds in connection with the construction of Residential Building 2.5.**

Linden Ponds expects to obtain new financing for the construction of Residential Building 2.5. The 2011 Bonds will be subordinated to such construction financing. In addition, the security interest in Linden Ponds' assets granted in respect of the 2011 Bonds will be junior in priority to the liens granted in respect of such construction financing. See "**SECURITY FOR THE 2011 BONDS.**"

I.    **The collateral securing the 2011 Bonds is subject to casualty risks.**

Linden Ponds will be obligated to maintain insurance pursuant to the terms of the 2011 Indenture. However, there are certain losses that may be either uninsurable or not economically insurable, in whole or in part, or against which Linden Ponds may not obtain adequate insurance. As a result, it is possible that insurance proceeds will not compensate Linden Ponds fully for its losses. If there is a total or partial loss of any of the collateral, Linden Ponds cannot assure you that any insurance proceeds received by Linden Ponds will be sufficient to satisfy all of its secured obligations, including the 2011 Bonds.

**J.     An active trading market for the 2011 Bonds may not develop.**

If any of the 2011 Bonds are traded after their issuance, they may trade at a discount from their principal amount.  The liquidity of any market for the 2011 Bonds will depend upon various factors, including:

- the possible future resizing of Series 2011 A Bonds;

- the number of holders of the 2011 Bonds of any given series or subseries;

- the overall market for similar securities;

- prevailing interest rates;

- Linden Ponds' financial condition, performance or prospects;

- restrictions on transfers of the 2011 Bonds;

- the prospects for Linden Ponds' industry generally; and

- general economic conditions.

Accordingly, Linden Ponds cannot assure you that a trading market or liquidity will develop for the 2011 Bonds.  Any decline in trading prices, regardless of the cause, may adversely affect the trading markets, if any, and liquidity for the 2011 Bonds.

**K.     The 2011 Bonds will be subject to certain restrictions on transfer.**

Because the 2011 Bonds involve a significant degree of risk, upon consummation of the Plan and prior to Linden Ponds obtaining a Rating Confirmation for a particular subseries of the 2011 Bonds, the beneficial holder of a 2011 Bond of such subseries shall not be permitted to transfer or sell such bond other than as follows:

- A transfer or sale to a person who is an "accredited investor" as defined in Section 2(15) of the Securities Act of 1933 (the "***1933 Act***") upon the execution and delivery to the Trustee of an Investor Letter in the form set out in **Exhibit 6** hereto; or

- A transfer or sale to a person who is a "qualified institutional buyer," within the meaning of Section 144 of the 1933 Act;

in each case, in addition to compliance with applicable state law.

Linden Ponds is not obligated to obtain any Rating Confirmation.  However, beginning not later than 180 days following the first full fiscal year after the Resizing Review Date and not later than 180 days following the end of each fiscal year thereafter until the 2011 Bonds have received a Rating Confirmation, Linden Ponds shall review its credit, taking into account rating medians published by Fitch, S&P and Moody's and discussions with representatives of one or more of such rating agencies.  In the event that such review and discussions indicate a likelihood the 2011 Bonds would receive a Rating Confirmation, Linden

Ponds shall, at its sole expense, solicit and make a good faith effort to obtain such Rating Confirmation. If Linden Ponds receives a Rating Confirmation, the foregoing requirements will be of no further force and effect with respect to such series of the 2011 Bonds so long as such rating is neither reduced below "Ba" by Moody's, "BB-" by S&P or "BB-" by Fitch nor withdrawn. In view of the significant level of risk involved with the Facility, there is no assurance that any Rating Confirmation will be obtained. As a result, these transfer restrictions may adversely affect a beneficial holder's ability to transfer his 2011 Bond or the price which may be realized upon such sale.

**L.**     **Owners of the Amended Series 2007 B Bonds may cause such Amended Series 2007 B Bonds to be purchased at par on a Bank Tender Date.**

As described under **"DESCRIPTION OF 2011 BONDS—Amended Series 2007 B Bonds,"** the owners of the Amended Series 2007 B Bonds may cause such Amended Series 2007 B Bonds to be purchased at par on a Bank Tender Date. **"Bank Tender Date"** is defined in the Indenture to mean July 1, 2021, as such date may be extended by the Letter of Credit Provider. If the Letter of Credit Provider determines not to extend the Bank Tender Date, and on the Bank Tender Date Linden Ponds does not refinance the Amended Series 2007 B Bonds, Linden Ponds will be required to pay in full such Amended Series 2007 B Bonds. Such payment may affect the ability of Linden Ponds to make payments on the Series 2011 A-1 Bonds and Series 2011 A-2 Bonds. Moreover, if Linden Ponds fails to pay such amounts when due, the owners of the Amended Series 2007 B Bonds can direct the Trustee to accelerate all of the 2011 Bonds and pursue remedies. In such event, under the Indenture, the holders of not less than 50% of the outstanding senior parity debt can direct the Trustee not to so accelerate or pursue remedies.

**M.**     **Financing obtained by Linden Ponds and Hingham in connection with a bankruptcy filing would likely be senior to the 2011 Bonds.**

The Debtors need access to funds in order to operate their businesses during the Chapter 11 Cases. As a consequence, prompt Court approval of debtor-in-possession financing is necessary to enable the Debtors to address their funding and other commitments and to otherwise maintain normal operations and strong relationships with their vendors, customers and suppliers during the Chapter 11 Cases. Any debtor-in-possession financing that may be required is anticipated to be provided by a Manager-affiliated entity and is expected to be senior in priority and right of payment to the 2011 Bonds. Linden Ponds and Hingham estimate that up to approximately $6 million in debtor-in-possession financing may be necessary to support Linden Ponds and Hingham during the Chapter 11 Cases and prior to consummation of the Plan. Moreover, to the extent that such debtor-in-possession financing cannot not be repaid upon exit from bankruptcy, with the lender's consent, such financing may remain in place post-bankruptcy and, consequently, would be senior in priority and right of payment to the 2011 Bonds.

**N.**     **Costs associated with the Management Agreement may increase.**

The Manager, as a subcontractor of Senior Living, currently provides management services pursuant to the Transitional Subcontract. Upon consummation of the Plan, it is anticipated that the Manager and Linden Ponds will enter into the New Management Agreement. Additionally, in the event that the Transitional Subcontract with the Manager

terminates (which will occur on July 31, 2011, unless such agreement is extended by mutual consent of the parties, if the Management Agreement has not been executed by that date), Linden Ponds may need to replace the Manager as the manager and the costs associated with the management of the CCRC may increase.

**O.    Linden Ponds may fail to maintain turnover or occupancy.**

The economic feasibility of the Facility depends upon the ability of the Facility to attract sufficient residents and to maintain substantial occupancy of the Facility throughout the term of the 2011 Bonds.

If the levels of occupancy for the Facility assumed by Linden Ponds do not occur, the revenues anticipated by the Facility from monthly fees and IEDs and other charges could be adversely affected.    If a substantial number of residents live beyond the life expectancies anticipated by Linden Ponds, new residents will be admitted at a slower rate and the receipt of additional, potentially higher entrance fees will be curtailed with a consequent impairment of the Facility's cash flow.    Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by Linden Ponds.    Additionally, Linden Ponds' financial projections are based on the availability of certain IEDs currently held in escrow and the prompt payment of promissory notes issued by residents to finance their IEDs.    The Chapter 11 Cases will likely result in a delay of the payments on the promissory notes and, if residents decide to leave the Facility, these IEDs would no longer be available to Linden Ponds.

**P.    Linden Ponds may be faced with competition from other similar facilities.**

Linden Ponds faces competition from similar facilities operating and under construction in or near its market area, from other residential facilities for older adults and from existing facilities offering custodial, intermediate and skilled nursing care.    Linden Ponds may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by the Facility as well as in the areas surrounding the area served by the Facility.

**Q.    The Plan and the related transactions, which contemplate transactions that will modify Linden Ponds' capital structure, are based in large part upon assumptions and analyses developed by it.    If these assumptions and analyses prove to be incorrect, Linden Ponds' plan may be unsuccessful in its execution of the restructuring and it may be unable to continue as a going concern.**

The Plan and the transactions related thereto, which contemplate transactions that will affect Linden Ponds' capital structure, are based upon assumptions and analyses based on Linden Ponds' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that it considers appropriate under the circumstances.    Whether actual future results and developments will be consistent with Linden Ponds' expectations and assumptions depend on a number of factors, including but not limited to (i) its ability to obtain adequate liquidity and financing sources and establish an appropriate level of debt, including its ability to consummate the proposed transactions; (ii) its ability to restore

residents' confidence in its viability as a continuing entity and to attract and retain sufficient residents; (iii) its ability to retain key personnel; (iv) its ability to finance and construct Residential Building 2.5; and (v) the overall strength and stability of general economic conditions, both in the United States and in global markets.  The failure of any of these factors could materially adversely affect the successful execution of the restructuring of its business.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.  Linden Ponds' actual financial condition and results of operations may differ, perhaps materially, from what it anticipated.  Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on Linden Ponds' business or operations.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

**R.      Uncertainties related to Linden Ponds' business may result in the loss of or decreased business with residents.**

Linden Ponds' success depends on its ability to consistently, accurately and effectively provide affordable living accommodations and related healthcare and support services to middle-income seniors aged sixty-two (62) and older.  Should seniors perceive that the uncertainties related to Linden Ponds' business have adversely affected its services, there will a decrease in new residents attracted to its CCRC.

**S.      Uncertainties related to Linden Ponds' business may create a distraction for or cause a loss of personnel and may otherwise materially adversely affect its ability to attract new personnel.**

The market for qualified personnel is competitive and Linden Ponds' future success will depend upon, among other factors, its ability to attract and retain key personnel.  In addition, uncertainties about the future prospects and viability of its business is impacting and is likely to continue to impact Linden Ponds' ability to attract and retain key personnel, and is a distraction for existing personnel.  If Linden Ponds loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it or if personnel continue to be distracted due to the uncertainties about the future prospects and viability of its business, Linden Ponds may not be able to effectively implement its business strategy and its business could suffer.  The loss of the services of any of Linden Ponds' other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and financial condition due to disruptions in its leadership and the continuity of its business relationships.

**T.      Costs to provide healthcare and other benefits to Linden Ponds' employees may increase.**

Linden Ponds provides healthcare and other benefits to its employees.  In recent years, costs for healthcare have increased more rapidly than general inflation in the U.S.

economy. In addition, there can be no assurance that recent changes in healthcare regulation will not result in material increases in Linden Ponds' healthcare-related costs. If this trend in healthcare costs continues, Linden Ponds' cost to provide such benefits could increase, which may have a material adverse effect on its profitability.

U.    **Linden Ponds may incur costs or liabilities under environmental laws and regulations.**

Linden Ponds is subject to a wide range of general environmental, health and safety laws and regulations as well as industry-specific regulations relating to CCRCs. Violation of these laws and regulations can lead to substantial fines and penalties, other civil or criminal sanctions and closure of the Facility. Linden Ponds incurs costs and capital expenditures to comply with these laws and regulations, and to obtain and maintain all necessary permits.

V.    **Linden Ponds may fail to complete the construction of Residential Building 2.5.**

Certain of Linden Ponds' projections contemplate the completion of Residential Building 2.5, an additional building anticipated to be constructed as part of the CCRC. However, sufficient demand for senior housing at Linden Ponds may not develop to justify the construction of Residential Building 2.5. In addition, Linden Ponds may fail to secure financing for construction of Residential Building 2.5, because there is no assurance that the holders of the 2011 Bonds or any other entity will finance the construction or will finance the construction at a cost that makes Residential Building 2.5 commercially feasible. Additionally, Linden Ponds may fail to complete the construction of Residential Building 2.5 for a variety of other reasons outside its control. If the holders of the 2011 Bonds and any Letter of Credit providers do not provide financing to pay the costs of constructing Residential Building 2.5 on terms at least as favorable to Linden Ponds as the terms and conditions set forth in the Loan Agreement, Linden Ponds shall have no obligation to begin construction of Residential Building 2.5.

Construction of Residential Building 2.5 is currently anticipated to begin within nine (9) months after occupancy of the independent living units of the existing CCRC has averaged at least 93% for three (3) consecutive months. Should absorption of available units be delayed or slower than currently projected, this will cause a delay in reaching 93% occupancy of the independent living units of the existing CCRC and the corresponding commencement of construction on Residential Building 2.5. It is projected that the amount of IEDs received from the settlement of Residential Building 2.5 will be greater than the construction costs required to build Residential Building 2.5, thus generating positive cash flows to the CCRC through the collection of IEDs. In addition, the ongoing operations of Residential Building 2.5 are projected to add incremental cash flow to the CCRC that it will not otherwise have should Residential Building 2.5 not be built. Should the construction of Residential Building 2.5 be delayed or not completed, this will negatively impact the cash flow of the CCRC and lower the amount of cash available to pay debt service on the 2011 Bonds following consummation of the Plan.

W.    **Labor Union Activity**

Health care facilities in Massachusetts are being subjected to increasing union organizational efforts. At this time, no employees of Linden Ponds are represented by a

collective bargaining agreement, although service unions have generally targeted the senior living industry as an area for potential membership growth. Future unionization of Linden Ponds' employees could have an adverse effect on Linden Ponds' financial condition.

### X.     Staffing

Linden Ponds currently has what it considers appropriate staff. In recent years, the health care industry has suffered from a shortage of skilled nursing personnel, which has forced up nursing wage scales. Linden Ponds' management believes it will continue to be able to retain or hire all required staff, but the presence of other residential health care providers, and the low unemployment rates generally and in the Plymouth County area in particular, may adversely affect Linden Ponds' ability to attract additional skilled personnel to the service area.

### Y.     The global market and economic conditions, as well as the effects of these conditions on Linden Ponds' residents and potential residents, have adversely affected Linden Ponds and those effects could continue.

CCRCs, which provide seniors with the ability to remain within the same community for the remainder of their years and the peace of mind that comes along with such stability, have become increasingly popular over the past few decades. In exchange for the ability to remain within the same community, seniors typically must pay a sizable IED along with monthly fees that vary in size depending on the services provided by each CCRC. The influx of IEDs is the lifeblood of a CCRC and CCRCs need new IEDs to pay down their debt or fund operations. Over the past several years, as housing prices have fallen, seniors have lost the ability to sell their homes and pay the sizeable IEDs. This, in turn, resulted in financial difficulties for CCRCs, including Linden Ponds. These adverse affects based upon the global market and economic conditions could continue.

### Z.     Federal and state regulations may adversely impact Linden Ponds.

Linden Ponds is subject to regulatory actions by a number of federal, State and local agencies. These bodies may promulgate new regulatory provisions from time to time, and it is not possible to predict the effect of any such future promulgations on Linden Ponds. Future actions by the federal, State or local government increasing the required services to be provided to residents of the Facility or otherwise changing existing regulations or their interpretation could increase the cost of operation of the Facility and adversely affect the revenues of Linden Ponds.

The United States Congress and the Massachusetts General Court have considered a number of proposals, some of which involve comprehensive health care reform, in recent years. The provisions that may be included in future federal or State legislation or regulations and their impact upon Linden Ponds cannot be determined at this time. No assurance can be given that any future health care legislation that is enacted or implemented will not materially adversely affect Linden Ponds.

Failure by Linden Ponds or the Facility to comply with applicable federal and State laws and regulations could have a material adverse effect on Linden Ponds' financial condition and its ability to pay and perform its obligations regarding the 2011 Bonds.

The enactment of further State or federal legislation restricting operation of care facilities, creating additional residents' rights or requiring certain financial reserves could adversely affect the financial condition of Linden Ponds. In addition, the ability of the Trustee to enforce remedies and rights under the financing documents may be adversely affected by litigation on behalf of residents. Although under the current Residence and Care Agreement residents will have no special lien or claim against any property of Linden Ponds (other than the right to occupy their respective units), there can be no certainty that residents could not successfully claim or otherwise restrict the use of Linden Ponds' property in bankruptcy proceedings or other disputes. Linden Ponds expects to continue to use the continuing care concept of contracting with residents, but is under no obligation to do so.

### AA.    Third party reimbursement may be reduced or eliminated.

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicaid and Medicare reimbursement programs, and other federal, State and local governmental agencies. As a result, Linden Ponds is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs. Congress has in the past enacted a number of provisions which affect health care providers, and additional legislative changes can be expected. Previous legislative actions have included limitation of payments to nursing homes under the Medicare and Medicaid programs.

Future legislation, regulation or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services. At present, no determination can be made concerning whether, or in what form, such legislation would be introduced and enacted into law. Similarly, the impact of future cost control programs and future regulations upon Linden Ponds' financial performance cannot be determined at this time.

Linden Ponds may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations. Most of these programs make payments at rates which are less than actual charges. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

### BB.    Linden Ponds may change the level of services provided to its residents.

Linden Ponds may, from time to time, be subject to pressure from organized groups of residents seeking, among other things, to raise the level of services or to maintain the level of monthly fees with respect to the Facility or other charges without increase. Moreover, Linden Ponds may be subject to conflicting pressures from different groups of residents, some of whom may seek an increase in the level of services while others wish to hold down monthly fees and other charges. No assurance can be given that Linden Ponds will be able satisfactorily to meet the needs of both groups.

**CC.    The income of the elderly may diminish.**

A large percentage of the monthly income of the residents of the Facility is fixed income derived from pensions and social security or income from investments.  If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in operating costs, wages, benefits and other expenses, residents may have difficulty paying such monthly fees.  Furthermore, investment income of the residents may be adversely affected by declines in market interest rates, also resulting in payment difficulties.

**DD.    Other Possible Risk Factors.**

The occurrence of any of the following events, or other unanticipated events, could adversely affect the financial condition or results of operations of Linden Ponds:

(1)    Reinstatement of or establishment of mandatory governmental wage, rent or price controls.

(2)    Adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of Linden Ponds.

(3)    Events adversely affecting the operation of the Facility, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare, Medicaid or comparable regulations or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities.

(4)    A decline in the population, a change in the age composition of the population or a decline in the economic conditions of Linden Ponds' market area.

(5)    Developments or events affecting the federal or State exemption of Linden Ponds' income from taxation or Linden Ponds' status as an exclusively charitable organization.

(6)    Suspension or revocation of or failure to renew any license, certificate or approval to operate the Facility, or any portion thereof, or any restriction on new admissions to licensed beds.

(7)    Changes in key management personnel.

(8)    Reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved occupational health and safety, development and utilization of medical and scientific research and technological advances and other developments.

(9)    Changes in reimbursement procedures or in contracts under public or private insurance programs.

(10)    Increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals.

(11) Increased costs resulting from employee strikes, or the unionization of the employees of Linden Ponds or the utilization by a non-union employee of Linden Ponds of proceedings available under the National Labor Relations Act.

(12) Increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, the attraction and retention of nurses and other personnel, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues.

(13) Inability of Linden Ponds to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges and the quality and scope of care or any limitation on the availability of tax-exempt or other financing for future projects.

(14) The occurrence of natural disasters, including floods, hurricanes, tornadoes and earthquakes, could damage the facilities of Linden Ponds, interrupt utility service or otherwise impair the operations of Linden Ponds and the generation of revenues from the Facility. The Facility is required to be covered by general property insurance in amounts which management of Linden Ponds considers to be sufficient to provide for the replacement of such Facility in the event of a natural disaster.

## IX.     ANNUAL DEBT SERVICE REQUIREMENTS

The tables attached as **Exhibit 8** set forth, for each twelve-month period ending on November 15, the amounts payable by Linden Ponds for the payment of principal of (whether at maturity or by mandatory sinking fund redemption) and interest on each Series of 2011 Bonds assuming 100% of the 2007 Bonds tender in the Exchange Offer. *Note, debt service payments for the Amended Series 2007 B Bonds are for each twelve-month period ending November 1.*

## X.     FINANCIAL PROJECTIONS

Attached hereto as **Exhibit 5** are Linden Ponds' financial projections. Exhibit 5A contains the pro-forma balance sheet assuming a restructuring transaction date of September 1, 2011. Exhibit 5B contains the projected income statement, balance sheet, cash flow statement and major underlying operating assumptions.

**The projected financial information set forth in this Disclosure Statement contains certain significant assumptions, including the following:**

1) **Linden Ponds will have $6.5 million in cash in its operating account, Operating Reserve Fund and Supplemental Reserve Fund upon consummation of the Plan;**

2) **Linden Ponds will experience an increase in occupancy rates at the CCRC from 86% in March 2011 to 94% by the end of 2015;**

3) the existing residential buildings will be fully settled by 2013, with a significant amount of those settlements concentrated in the second half of 2011 and 2012;

4) Linden Ponds is able to retain the residents that have placed their IEDs in escrow;

5) at the CCRC, annual increases in the amount of entrance deposits per unit of 1% in 2012, 2% in 2013 and 3% in 2014 will occur;

6) Linden Ponds will receive a meaningful level of IEDs from third party residents associated with the Renaissance Gardens assisted care facility through 2017;

7) Linden Ponds will receive payments on promissory notes issued by residents to finance their IEDs when the same become due and payable;

8) construction of Residential Building 2.5 will begin in 2015 and will take one year to complete;

9) Residential Building 2.5 will be fully settled by 2018;

10) the inflation levels associated with operating expenses will be 3% per year through 2018;

11) Linden Ponds will be able to maintain stable working capital requirements; and

12) the amount of repair and replacement capital expenditures per unit will be consistent with management's budget for 2011, increase to approximately $1,600 per unit in 2012 and grow at the rate of 3% per year following 2012.

These assumptions may or may not prove to be accurate. Holders of 2007 Bonds are urged to consider these assumptions with their independent investment advisors, and each holder of 2007 Bonds and his, her or its advisors should make an independent judgment on the reasonableness of such assumptions. There can be no assurances that these assumptions will prove to be correct, and holders of 2007 Bonds are cautioned against attributing any certainty to the projections. None of Linden Ponds, Hingham, the Trustee, the Issuer, the Financial Advisor or the Voting Agent or any other person or entity makes any representation or warranty that the projected results will be realized, as projections are, by their nature, based on future events that cannot be predicted with certainty.

## XI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

The Plan must be approved by the Court after a confirmation hearing.

### A. Elements of Confirmation.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Court determine that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have

included information concerning all payments made or promised in connection with the Plan and this Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtors will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### B. Best Interests of Creditors.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under Chapter 7, the Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if their Chapter 11 Cases were converted to Chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both Chapter 7 cases and Chapter 11 Cases. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the 2011 Bond Trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain Tax and Other Priority Claims (collectively, "*Priority Claims*") that otherwise would be due in the ordinary course of business. Those Priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay General Unsecured Claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of most, if not all, of the Debtors' executory contracts and unexpired leases, thereby creating a significant increase in General Unsecured Claims.

The Debtors believe that the Plan meets the "*best interests of creditors*" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of Impaired Classes 2 and 3 will receive more under the Plan than they would receive in a liquidation. The Liquidation Analysis for a potential Chapter 7 liquidation scenario is attached hereto as **Exhibit 2**.

Although the Debtors believe that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Court will determine that the Plan meets this test.

**C.      Feasibility of the Plan.**

The Bankruptcy Code requires that the Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  For purposes of showing that the Plan meets this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtor(s) to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

Linden Ponds believes that it will be able to support the financial projections set forth in **Exhibit 5** to this Disclosure Statement (the "***Projections***").  Based on the terms of the Plan, at emergence (the Effective Date is assumed to occur on or about 100 days following the Petition Date) the Reorganized Debtor(s) will have access to funds in the amount of $5,000,000 after making distributions pursuant to the Plan.

Holders of Claims against and Interests in the Debtors are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.

In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, including environmental legislation or, regulations, that will have an unexpected effect on the operations of the Reorganized Debtor(s), (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtor(s), and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtor(s).  To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor(s).

Accordingly, the Projections are only estimates that are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized, and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this

Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions. Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including:

- the high degree of competition in Linden Ponds' business;
- the susceptibility of Linden Ponds' business to general economic conditions;
- discovery of unknown contingent liabilities;
- the interest rate environment;
- the ability to attract new residents;
- the effect of tightened liquidity markets on Linden Ponds and prospective residents; and
- future capital requirements.

### D. Confirmation of the Plan if One or More Classes Do Not Accept.

Bankruptcy Code section 1129(b) provides that a plan of reorganization can be confirmed even if the such plan of reorganization is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan of reorganization at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan of reorganization.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

### E. Hearing on Confirmation of the Plan.

At the time and place given in the notice served with this Disclosure Statement, the Court will hold a hearing to determine if the Plan has been accepted by a requisite number of Claims and whether the other requirements for Confirmation of the Plan have been satisfied.

CREDITORS ARE NOT REQUIRED TO ATTEND THE HEARING ON CONFIRMATION UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE HEARING ON CONFIRMATION.

## XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This Disclosure Statement does not discuss any federal income tax consequences of the Plan to Creditors. Accordingly, Creditors should consult their own tax advisors regarding their ability to recognize a loss for tax purposes and any other tax consequences to them of the Plan.

DUE TO A LACK OF DEFINITIVE JUDICIAL OR ADMINISTRATIVE AUTHORITY AND INTERPRETATION, SUBSTANTIAL UNCERTAINTIES EXIST WITH RESPECT TO VARIOUS TAX CONSEQUENCES OF THE PLAN. FOR THE FOREGOING REASONS CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO SPECIFIC TAX CONSEQUENCES (FEDERAL, STATE AND LOCAL) OF THE PLAN.

## XIII. EFFECTS OF PLAN CONFIRMATION

A confirmed plan leaves the holders of Claims with new rights as set forth in the confirmed plan. Therefore, in the event of a default after Confirmation, a holder of a Claim may pursue its remedies under the Plan. Some rights may remain with holders of Claims after the provisions of the confirmed Plan have been carried out. The automatic stay of Bankruptcy Code section 362(a) as to actions against the Debtors and the Debtors' assets remains in effect until the Chapter 11 Cases are closed. Thereafter, all parties in interest will be enjoined from taking any action inconsistent with the Plan.

### A. Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Court, after the Effective Date, the Reorganized Debtor(s) may compromise and settle Claims against them and Causes of Action against other Persons.

### B. Releases by the Debtors.

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration,

including the service of (i) the Debtors and their member or members, (ii) the Reorganized Debtor(s) and their member or members, (iii) the Manager in any capacity, (iv) Consenting Holders in any capacity, (v) the Issuer, (vi) the 2007 Bond Trustee in any capacity, (vii) the 2011 Bond Trustee in any capacity, (viii) the DIP Lender and (ix) the current and former officers, members, directors, managers, employees, attorneys and advisors, each in their respective capacities as such, of each of the foregoing (the "***Released Parties***") to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtor(s) and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtor(s), the Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the 2007 Bonds, the Debtors' Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtor(s) or the Issuer, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Debtors' Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "***Debtor Released Claims***"), other than Debtor Released Claims against a Released Party arising out of or relating to any act or omission of that party constituting willful misconduct or gross negligence.

### C.     Releases by Holders of Claims.

As of the Effective Date and except as set forth in the Plan or the Plan Supplement, each holder of a Claim or Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtor(s) and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the 2007 Bonds, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtor(s), the Issuer, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, "***Released Claims***"), other than Released Claims against a Debtor, the Reorganized Debtor(s) or a Released Party arising out of or relating to any act or omission of that party constituting willful misconduct or gross negligence; provided, however that the Plan shall not release the Debtors, the Reorganized Debtor(s) and the Released

Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act of 1933 (as now in effect or hereafter amended), or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.

### D. Exculpation.

Except as otherwise specifically provided in the Plan or Plan Supplement, no the (i) the Debtors and their member or members, (ii) the Reorganized Debtor(s) and their member or members, (iii) the Manager in any capacity, (iv) Consenting Holders in any capacity, (v) the Issuer, (vi) the 2007 Bond Trustee in any capacity, (vii) the 2011 Bond Trustee in any capacity, (viii) the DIP Lender and (ix) the current and former officers, directors, members, managers, employees, attorneys and advisors, each in their respective capacities as such, of each of the foregoing (the "***Exculpated Parties***") shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (to the extent such duty is imposed by applicable non-bankruptcy law), but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtor(s) (and each of their respective affiliates, agents, directors, members, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law with regard to the solicitation and distribution of securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### E. Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant

to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

        **F.**     **Injunction.**

        FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

        FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

        EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATE OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

        THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS,

PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN AND IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTOR(S), EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## G. Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## H. Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including Governmental Units, shall not discriminate against the Reorganized Debtor(s) or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor(s) or another Person with whom the Reorganized Debtor(s) has or have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## I. Release of Liens.

Except as otherwise provided in the Plan, including, but not limited to Classes 2 and 3 of the Plan, the 2011 Bond Documents, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim,

satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor(s) and its or their successors and assigns. For the avoidance of doubt, except as otherwise provided the Plan, including Sections 3.2.2 and 3.2.3 of the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A. Liquidation Under Chapter 7.

If no Chapter 11 Plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors. The Debtors believe that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation.

The Debtors, with the assistance of its professionals, have prepared a Liquidation Analysis, attached hereto as **Exhibit 2**. The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case. The Debtors have taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to the liens and security interests.

The likely form of any liquidation would be the sale of the Debtors' individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable under the Plan. Among other things, a chapter 7 liquidation would prevent the Debtors from closing on the Asset Sale and any alternative sale of such assets would likely be on less favorable terms than are now contemplated under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as do the Plan.

### B. Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. During the course of negotiation of the Plan, the Debtors explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of creditors, residents and other parties in interest. The Debtors have not changed their conclusions.

## XV. CONCLUSION AND RECOMMENDATIONS

The Debtors urge all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly completed ballots to the appropriate voting agent as set forth on the ballots within the time stated in the notice served with this Disclosure Statement.

Dated: June 14, 2011                    Respectfully submitted,

**Linden Ponds, Inc.**

By:  /s/ Mary Helen Lorenz
      Name: Mary Helen Lorenz
      Title: Chairman

**Hingham Campus, LLC**

By:  /s/ Paul Rundell
      Name: Paul Rundell
      Title: Chief Restructuring Officer