# **Exhibit 3**

2011 Bond Documents

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY**

and

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Trustee**

_____

**AMENDED AND RESTATED**

**TRUST INDENTURE**

_____

**$_____**

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY**
**REVENUE BONDS**
**(LINDEN PONDS, INC. FACILITY)**

| | |
|---|---|
| $_____ | $_____ |
| SERIES 2011 A-1 | SERIES 2007 B |
| [Fixed Rate] | |
| | [Variable Rate] |

| | |
|---|---|
| $_____ | $_____ |
| SERIES 2011 A-2 | SERIES 2011 B |
| [Fixed Rate] | [Zero Coupon] |

Subseries I:  $_____
Subseries II:  $_____

_____

Dated as of _____ 1, 2011

_____

**Table of Contents**

Page

ARTICLE I        DEFINITIONS AND CONSTRUCTION ...........................................4

  Section 1.01.    Definitions ...........................................................................4

  Section 1.02.    Rules of Construction ...........................................................41

  Section 1.03.    Accounting Terms ................................................................42

ARTICLE II      AUTHORIZATION OF THE REFINANCING OF THE
                FACILITY; AUTHORIZATION AND DETAILS OF THE
                SERIES 2007 BONDS AND THE SERIES 2011 BONDS;
                ADDITIONAL BONDS.................................................................42

  Section 2.01.    Refinancing Authorized.........................................................42

  Section 2.02.    Bonds Authorized; Designations ............................................42

  Section 2.03.    [Reserved]............................................................................45

  Section 2.04.    Details of the Series 2011 A-1 Bonds ...................................45

  Section 2.05.    Details of the Series 2007 B Bonds .......................................47

  Section 2.06.    Details of the Series 2011 A-2 Bonds ...................................63

  Section 2.07.    Details of the Series 2011 B Bonds .......................................65

  Section 2.08.    Letter of Credit; Substitute Letter of Credit .........................66

  Section 2.09.    Bonds Generally ..................................................................67

  Section 2.10.    Sinking Fund Installments for the Series 2011 A Bonds .......67

  Section 2.11.    Conditions Precedent to Delivery of Series 2011 Bonds .......70

  Section 2.12.    Refunding Bonds ..................................................................72

  Section 2.13.    Authorization of Additional Senior Bonds; Conditions
                   Precedent to Delivery of Additional Senior Bonds ...............72

  Section 2.14.    Authorization of Special Senior Bonds; Conditions
                   Precedent to Delivery of Special Senior Bonds....................77

  Section 2.15.    Execution and Authentication ...............................................78

  Section 2.16.    Registration and Exchange of Bonds.....................................79

  Section 2.17.    Bonds Mutilated, Destroyed, Lost or Stolen .........................80

  Section 2.18.    Cancellation and Disposition of Bonds .................................81

  Section 2.19.    Subordinated Bonds..............................................................81

  Section 2.20.    Subordinated Indebtedness Authorized.................................81

  Section 2.21.    Book-Entry Registration of Bonds .........................................82

  Section 2.22.    Independent Resizing Consultant; Rules for Resizing ..........84

ARTICLE III      REDEMPTION OF BONDS .............................................................85

    Section 3.01.    Selection of Bonds to Be Redeemed ....................................85

    Section 3.02.    Notice of Redemption................................................................86

    Section 3.03.    Redemption of Portion of Bond ............................................88

    Section 3.04.    Effect of Call for Redemption .................................................88

    Section 3.05.    No Partial Redemption After Default.....................................88

    Section 3.06.    Redemption of Parity Obligations .........................................89

    Section 3.07.    Redemption in Accordance with Procedures of Depository ...............................................................................89

    Section 3.08.    RESERVED ................................................................................89

    Section 3.09.    Mandatory Redemption ...........................................................89

    Section 3.10.    Extraordinary Redemption ......................................................90

    Section 3.11.    Optional Redemption and Tender..........................................90

    Section 3.12.    Notice of Redeemed Bonds ....................................................92

ARTICLE IV      REVENUES AND FUNDS ................................................................92

    Section 4.01.    Creation of Funds to Be Held for All Parity Debt................92

    Section 4.02.    Creation of Funds to Be Held for Bonds; Rebate Fund..........93

    Section 4.03.    Application of Moneys in Funds and Accounts Created Under the Original Indenture....................................94

    Section 4.04.    Construction Fund; Conditions Precedent to Application of Moneys; Application of Moneys...................95

    Section 4.05.    Disbursements from Funds.......................................................96

    Section 4.06.    Deposit of Revenues; Flow of Funds ....................................96

    Section 4.07.    Series 2011 Debt Service Fund; Application of Moneys .......99

    Section 4.08.    Senior Debt Service Reserve Fund: Application of Moneys; Deficiencies and Surpluses...................102

    Section 4.09.    Redemption Fund: Application of Moneys .........................104

    Section 4.10.    Insurance and Condemnation Award Fund: Application of Moneys.......................................................105

    Section 4.11.    Operating Reserve Fund; Supplemental Reserve Fund........105

    Section 4.12.    [Reserved]................................................................................107

    Section 4.13.    Investment of Moneys; Application of Earnings.................107

**Table of Contents**
(continued)

**Page**


Section 4.14. Application of Moneys in Certain Funds for Retirement of Parity Debt ....... 110

Section 4.15. Rebate Fund; Rebate Amount ....... 110

Section 4.16. Letter of Credit Fund ....... 111

Section 4.17. Payments on Variable Rate Bonds ....... 111

ARTICLE V PARTICULAR COVENANTS ....... 111

Section 5.01. Covenant as to Payment; Faith and Credit of Commonwealth Not Pledged ....... 111

Section 5.02. Due Organization and Authorization of the Bonds ....... 112

Section 5.03. Rights and Duties of the Issuer ....... 112

Section 5.04. Rights Under Loan Agreement ....... 114

Section 5.05. Arbitrage and Tax Covenants ....... 114

Section 5.06. Parity Obligations ....... 114

Section 5.07. Issuer Entitled to Indemnity ....... 115

Section 5.08. Issuer Not Responsible for Insurance, Taxes, Execution of Indenture, or Application of Moneys ....... 115

ARTICLE VI CONCERNING THE TRUSTEE AND THE REMARKETING AGENT ....... 116

Section 6.01. Appointment of Trustee, Registrar and Paying Agent; Acceptance of Appointment ....... 116

Section 6.02. Trustee Entitled to Indemnity ....... 116

Section 6.03. Responsibilities of Trustee ....... 116

Section 6.04. Property Held in Trust ....... 117

Section 6.05. Trustee and Issuer Protected in Relying on Certain Documents ....... 117

Section 6.06. Action by Trustee ....... 118

Section 6.07. Standard of Care ....... 118

Section 6.08. Co-Trustees ....... 119

Section 6.09. Compensation ....... 120

Section 6.10. Permitted Acts ....... 120

Section 6.11. Resignation of the Trustee ....... 120

Section 6.12. Removal of Trustee ....... 121

| | | |
|---|---|---|
| Section 6.13. | Successor Trustee | 121 |
| Section 6.14. | Transfer of Rights and Property to Successor Trustee | 122 |
| Section 6.15. | Merger, Conversion or Consolidation of Trustee | 122 |
| Section 6.16. | Trustee to File Continuation Statements | 122 |
| Section 6.17. | Notice of Events of Default | 123 |
| Section 6.18. | Construction of Indenture | 123 |
| Section 6.19. | Employment by Trustee of Management Consultant | 123 |
| Section 6.20. | Procurement of Insurance for Corporation; Other Advances | 123 |
| Section 6.21. | Remarketing Agent | 124 |
| Section 6.22. | Information Provided to Others | 124 |
| ARTICLE VII | EVENTS OF DEFAULT AND REMEDIES | 124 |
| Section 7.01. | Events of Default | 124 |
| Section 7.02. | Acceleration of Maturity | 126 |
| Section 7.03. | Enforcement | 127 |
| Section 7.04. | Priority of Payments following Default | 127 |
| Section 7.05. | Discontinuance of Proceedings | 131 |
| Section 7.06. | Holders May Control Proceedings | 131 |
| Section 7.07. | Restrictions upon Action by Individual Holders | 131 |
| Section 7.08. | Actions by Trustee | 132 |
| Section 7.09. | No Remedy Exclusive | 132 |
| Section 7.10. | No Delay or Omission Construed as a Waiver; Waiver of Default | 132 |
| Section 7.11. | Notice of Default | 133 |
| ARTICLE VIII | MODIFICATION OR AMENDMENT OF INDENTURE, LOAN AGREEMENT AND MORTGAGE | 133 |
| Section 8.01. | Modification or Amendment Without Consent | 133 |
| Section 8.02. | Supplemental Indentures Requiring Consent of Holders of Parity Debt | 135 |
| Section 8.03. | Notation on Bonds | 136 |
| Section 8.04. | Amendment of Loan Agreement and Mortgage | 137 |

ARTICLE IX      DEFEASANCE ................................................................................138

    Section 9.01.      Defeasance...............................................................................138

ARTICLE X      MISCELLANEOUS .......................................................................140

    Section 10.01.      [Reserved]................................................................................140

    Section 10.02.      Consent of Holders; Evidence of Signatures of Holders
        and Ownership of Parity Debt; Letter of Credit Provider ....140

    Section 10.03.      Preservation by Trustee and Inspection of Documents ........141

    Section 10.04.      Moneys and Funds Held for Particular Parity Debt or
        Subordinated Indebtedness....................................................141

    Section 10.05.      No Recourse on Parity Debt or Subordinated
        Indebtedness .........................................................................142

    Section 10.06.      Issuer Protected in Acting in Good Faith .............................142

    Section 10.07.      Reserved ................................................................................143

    Section 10.08.      Actions to be Taken by Trustee.............................................143

    Section 10.09.      Severability of Invalid Provision...........................................143

    Section 10.10.      Notices...................................................................................143

    Section 10.11.      [Reserved]...............................................................................145

    Section 10.12.      Business Days.........................................................................145

    Section 10.13.      Execution in Several Counterparts .......................................145

    Section 10.14.      Governing Law.......................................................................145

    Section 10.15.      Intention as to Contract ........................................................145

    Section 10.16.      Effective Date ........................................................................145

    Section 10.17.      Certain Notices to Rating Agencies......................................145

    Section 10.18.      Certain References Ineffective Except During a Credit
        Facility Period ......................................................................145

AMENDED AND RESTATED TRUST INDENTURE

THIS AMENDED AND RESTATED TRUST INDENTURE (this "Indenture") is dated as of _____ 1, 2011 and is made and entered into by and between MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), and WELLS FARGO BANK, NATIONAL ASSOCIATION a national banking association, as successor Trustee (the "Trustee") and amends and restates a Trust Indenture dated as of July 1, 2007 (the "Original Indenture") between the Issuer and the Trustee.

The Issuer is empowered pursuant to Chapters 23G and 40D of the General Laws of The Commonwealth of Massachusetts (the "Act"), to issue its bonds and loan the proceeds therefrom for the purpose of financing and refinancing qualifying facilities under the Act.

At the request of Linden Ponds, Inc., a not-for-profit, nonstock corporation, duly existing and incorporated under the laws of the State of Maryland (the "Corporation"), the Issuer issued its (A) Revenue Bonds (Linden Ponds, Inc. Facility), Series 2007 A (Tax-Exempt) in the original aggregate principal amount of $101,365,000 (the "Series 2007 A Bonds"), (B) Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand Series 2007 B (Tax-Exempt) in the original aggregate principal amount of $45,000,000 (the "Original Series 2007 B Bonds") and (C) Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand Series 2007 C (Taxable) in the original aggregate principal amount of $10,000,000 (the "Series 2007 C Bonds" and together with the Series 2007 A Bonds and the Original Series 2007 B Bonds, the "Series 2007 Bonds") pursuant to the terms of the Original Indenture.

The Issuer loaned the proceeds of the Series 2007 Bonds to the Corporation pursuant to the terms of a Loan Agreement dated as of July 1, 2007 (the "Original Loan Agreement") between the Issuer and the Corporation to finance a deposit applied toward the purchase price of the Facility (hereinafter defined).

On June __, 2011, the Corporation filed a voluntary bankruptcy action under Chapter 11 of Title 11 of the United States Code, and pursuant to such action and the plan of reorganization (the "Plan") confirmed by the bankruptcy court (the "Confirmation Order"), the amendment and restatement of the Original Indenture and the Original Loan Agreement has been approved.

By resolution adopted by the Issuer on _____, 2011, the Issuer will (a) issue its (i) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt) (the "Series 2011 A-1 Bonds"), (ii) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt) (the "Series 2011 A-2 Bonds"),   and (iii) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt) (the "Series 2011 B Bonds") and (b) amend, restate and reissue a portion of the Original Series 2007 B Bonds (as so amended and restated, the "Series 2007 B Bonds" and together with the Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds and the Series 2011 B Bonds, the "Series 2011 Bonds"), tendered for exchange in accordance with the terms of this Indenture.

The Confirmation Order provides that, in the event the Letter of Credit Provider timely elects, pursuant to Section 3.2.3 of the Plan, to receive Series 2007 B Bonds bearing interest at a Variable Rate, the Bank is required to deliver an applicable letter of credit to the Trustee in accordance with this Indenture on or prior to the Closing Date. If the Letter of Credit Provider elected to receive the Series 2007 B Bonds bearing interest at a Variable Rate and deliver the Letter of Credit then, as security for the timely payment of the principal of and interest on, and the purchase price of, the Series 2007 B Bonds, the Letter of Credit Provider (as defined herein), pursuant to the Letter of Credit Agreement (as defined herein), will issue to the Trustee the Letter of Credit (as defined herein) in an initial stated amount equal to the aggregate principal amount of the Series 2007 B Bonds plus the Required Interest Amount (as defined herein) and with an expiration date of July 1, 2021. The initial Letter of Credit may be replaced by a Substitute Letter of Credit (as defined herein).

As provided by Article IV hereof, this Indenture shall constitute a trust agreement securing Parity Debt (hereinafter defined) to the extent and as provided herein.

The Trustee has the power to enter into this Indenture and to execute the trusts hereby created and has accepted the trusts so created and in evidence thereof has joined in the execution hereof.

All things necessary to make the Bonds, when authenticated by the Trustee and issued as provided in this Indenture, the valid, binding and legal limited obligations of the Issuer according to the terms thereof, and to constitute this Indenture a valid assignment and pledge of the Revenues for the payment of the principal and Redemption Price (hereinafter defined) of and interest on Parity Debt, and the creation, execution and delivery of this Indenture, and the creation, execution and issuance of the Bonds, subject to the terms hereof, have in all respects been duly authorized.

## GRANTING CLAUSES

The Issuer, in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Parity Debt by the holders thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in order to secure (i) the payment of the principal or Redemption Price (as defined herein) of, or Purchase Price (as defined herein) of and interest on the Series 2011 Bonds according to their tenor and effect, (ii) to the extent provided herein and in any Supplemental Indenture, the payment of the principal or redemption price of or interest on any other Parity Debt, and (iii) the performance and observance by the Issuer of all the covenants expressed or implied herein and in any documents executed or delivered in connection with Parity Debt, subject only to the provisions of this Indenture permitting the application thereof on the terms and conditions set forth in this Indenture, does hereby grant, bargain, sell, convey, assign and pledge to the Trustee and unto its successors in trust and assigns forever and grants to the Trustee and unto its successors in trust and assigns forever a security interest in the following, subject however to the Trustee's right to receive payments pursuant to Section 6.09 (the "Trust Estate") (provided, however, that any financial obligation of the Issuer hereunder shall not be a general obligation of the Issuer nor a debt or pledge of the faith and credit of The Commonwealth of Massachusetts, but shall be payable solely from the Trust Estate):

## GRANTING CLAUSE FIRST

Subject to the Reserved Rights of the Issuer, all right, title and interest of the Issuer in and to, and remedies under, the Loan Agreement, together with all moneys due and to become due to the Issuer thereunder, and the Issuer hereby appoints the Trustee as the Issuer's agent for the purpose of receiving and disbursing the moneys due and to become due under the Loan Agreement.

## GRANTING CLAUSE SECOND

All of the right, title and interest of the Issuer in and to the proceeds of the Bonds.

## GRANTING CLAUSE THIRD

All of the right, title and interest of the Issuer in and to the Revenues and the Receipts, moneys and securities from time to time on deposit in the Revenue Fund, the Debt Service Funds, the Interest Accounts, the Principal Accounts, the Sinking Fund Accounts, the Purchase Account, the Senior Debt Service Reserve Fund, the Insurance and Condemnation Award Fund, the Redemption Fund, the Construction Fund, the Construction Account, the Operating Reserve Fund, the Supplemental Reserve Fund, the Supplemental Reserve Account, the Letter of Credit Fund and any and all accounts and subaccounts in any of the foregoing and any and all other real or personal property of every name and nature from time to time by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or transferred, as and for additional security hereunder by the Issuer or by anyone on its behalf, or with its written consent, to the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms of this Indenture.

SAVING AND EXCEPTING, HOWEVER, the Rebate Fund and any and all accounts and subaccounts in the Rebate Fund.

TO HAVE AND TO HOLD all and singular the Trust Estate, whether now owned or hereafter acquired, unto the Trustee and its successors in trust and assigns forever upon the terms and trusts herein set forth, first, for the equal and ratable benefit, security and protection of all present and future holders of Special Senior Parity Debt, without privilege, priority or distinction as to the lien or otherwise of any Special Senior Parity Debt over any other Special Senior Parity Debt, except as otherwise expressly provided herein and in any Supplemental Indenture authorizing the issuance of or certifying any Special Senior Parity Debt; second, for the equal and ratable benefit, security and protection of all present and future holders of Senior Parity Debt, without privilege, priority or distinction as to the lien or otherwise of any Senior Parity Debt over any other Senior Parity Debt, except as otherwise expressly provided herein and in any Supplemental Indenture authorizing the issuance of or certifying any Senior Parity Debt; and third, for the equal and ratable benefit, security and protection of all present and future holders of the Subordinated Parity Debt without privilege, priority or distinction as to the lien or otherwise of any Subordinated Parity Debt over any other Subordinated Parity Debt, except as otherwise expressly provided herein and in any Supplemental Indenture authorizing the issuance of any Subordinated Parity Debt.

PROVIDED, HOWEVER, if the Issuer shall well and truly cause to be paid, the principal, Purchase Price or Redemption Price of and interest on all Parity Debt according to the true intent and meaning thereof and shall cause to be paid, all amounts due under each other Parity Obligation, if any, or shall provide for the payment thereof as provided by Article IX hereof, and shall perform and observe all the covenants and conditions of this Indenture to be kept, performed and observed by it, and shall pay, or cause to be paid, to the Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then, upon compliance with Article IX hereof, the lien of this Indenture shall be discharged and satisfied and shall be null and void; otherwise, this Indenture is to be and remain in full force and effect.

AND IT IS EXPRESSLY DECLARED that all Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt issued and secured hereunder is to be issued, authenticated and delivered and all such property, rights and interests, including (without limitation) the amounts hereby assigned and pledged, are to be dealt with and disposed of under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes as expressed herein, and the Issuer has agreed and covenanted, and does hereby agree and covenant with the Trustee and the respective holders of the Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt as follows (subject, however, to the provisions of Sections 5.01 and 10.05 hereof):

## ARTICLE I
### DEFINITIONS AND CONSTRUCTION

Section 1.01. <u>Definitions</u>. Terms used in this Indenture and the Loan Agreement shall have the meaning set forth below, unless a different meaning clearly appears from the context.

"Acquisition" or "acquire" means, when used in regard to the Facility and Additional Facilities, and shall include, where applicable, and without limitation, the acquisition, construction, rehabilitation, remodeling, extension, equipping and permanent improvement of the Facility and Additional Facilities, and paying the necessary costs of preparing, printing and selling the Bonds and the tender and exchange of the Bonds as set forth in Section 2.02(c), and such other costs as may be permitted by the Act and the Code.

"Act" shall have the meaning assigned to it in the recitals, including all future acts supplemental thereto or amendatory thereof.

"Act of Bankruptcy" means the filing of a petition in bankruptcy under the Bankruptcy Code, or the commencement of a proceeding under any other applicable law concerning insolvency, reorganization or bankruptcy, by or against the Corporation.

"Actual Annual Debt Service" means actual Debt Service on all Outstanding Long-Term Indebtedness with respect to which the term is used as computed for the applicable time period or periods (including, as applicable, any Fiscal Year including less than twelve calendar months).

"Additional Bonds" means, collectively, any Additional Senior Bonds, Additional Subordinated Bonds and Special Senior Bonds.

"Additional Facilities" means any project undertaken by the Corporation that is financed or refinanced (a) pursuant to the Act and this Indenture by the Issuer by the issuance of Additional Bonds or (b) pursuant to the Loan Agreement by the Corporation by the issuance of Parity Obligations, including (without limitation) land, easements, rights-of-way, leaseholds and other interests in real property and any improvement, addition or betterment to, or any construction, replacement, remodeling or equipping of, the Property. Additional Facilities includes Residential Building 2.5, Neighborhood Three and Renaissance Gardens Two.

"Additional Indebtedness" means any Indebtedness incurred or assumed by the Corporation subsequent to the date of issuance of the Series 2011 Bonds secured hereby.

"Additional Senior Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.13 of this Indenture.

"Additional Subordinated Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.19 of this Indenture.

"Adjustment Date" means, with respect to Variable Rate Bonds, each of (i) the Wednesday of each week or if any such Wednesday is not a Business Day, the immediately succeeding Business Day, during any period in which such Variable Rate Bonds bear interest at the Variable Rate, and (ii) the Business Day immediately preceding each Mandatory Tender Date after which such Variable Rate Bonds will bear interest at the Variable Rate.

"Administrative Expenditures" means any fees and expenses of the Trustee (whether as Trustee, Paying Agent or Registrar for the Bonds), fees and expenses of the Issuer, fees and expenses of the issuer of any Letter of Credit securing any Parity Debt not otherwise paid or provided for by the Corporation, and all expenditures incurred by the Issuer by reason of its issuance of any Bonds and any Subordinated Indebtedness, including (without limitation) the Issuer's Annual Administrative Fee, legal, accounting, consulting, financing and administrative expenses and expenses incurred by the Issuer or the Trustee to compel full and punctual performance of the provisions of the Loan Agreement, the Mortgage, this Indenture and the Collateral Documents in accordance with the terms thereof.

"Affiliate" means an organization: (a) more than 10% of the members of the Governing Body of which are (i) subject to election or appointment by the Corporation or another Affiliate of the Corporation, or (ii) subject to election or appointment by a Person which has the power to elect or appoint more than 10% of the members of the Governing Body of the Corporation; (b) that has the power to elect or appoint more than 10% of the members of the Governing Body of the Corporation; (c) the sole member of the Governing Body of which is the Corporation; or (d) that is expressly designated as an Affiliate in a certificate of the Authorized Officer of the Corporation, provided that such designation must be expressly approved by such organization designated to be an Affiliate.

"Agency Obligations" means any bond, debenture, note, participation certificate or other similar obligation issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) which is

either (i) rated in the highest rating category by any Rating Agency, or (ii) backed by the full faith and credit of the United States of America.

"Architect" means, with respect to any of the Additional Facilities, any architect or architectural firm having a good reputation in its field and retained by the Corporation.

"Authorized Denomination" means (a) with respect to the Series 2011 Bonds other than Series 2011 Bonds which are Variable Rate Bonds, $100,000 or any integral multiple of $1 in excess of $100,000, provided that if such Series 2011 Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Series 2011 Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and provided further that any Series 2011 Bond issued in exchange for Series 2007 Bonds, including the exchange of Series 2011 Bonds for Series 2007 Bonds to Owners holding a beneficial interest of such Series 2007 Bonds on the Closing Date, and any transfer of such Series 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an Authorized Denomination, and (b) with respect to any Series of Variable Rate Bonds, (i) during any period in which such Series of Variable Rate Bonds bears interest at the Variable Rate, $100,000 or any integral multiple of $5,000 in excess of $100,000 and (ii) during any Fixed Rate Period with respect to such Series of Variable Rate Bonds, $100,000 or any integral multiple of $1 in excess of $100,000, provided that if such Series of Variable Rate Bonds during any Fixed Rate Period are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, such series of Variable Rate Bonds during any Fixed Rate Period shall be issuable in denominations of $5,000 and integral multiples thereof. In connection with (1) any partial redemption of any Variable Rate Bonds during any period in which such Variable Rate Bonds bear interest at the Variable Rate or (2) any Optional Tender of a portion of a Variable Rate Bond, the term "Authorized Denomination" shall also mean any integral multiple of $5,000 to the extent that following such redemption or tender no such Variable Rate Bond Outstanding shall be of a denomination of less than $100,000.

"Authorized New York Newspaper" means a daily newspaper printed in the English language and having a general circulation in the Borough of Manhattan, City and State of New York, or a financial journal printed in the English language and having a general circulation in the Borough of Manhattan, City and State of New York.

"Authorized Officer" means (a) when used with reference to the Issuer, the person designated to act on behalf of the Issuer by resolution adopted by the Issuer or any person at the time designated to act on behalf of the Issuer by a certificate signed by any such person, (b) when used with reference to the Corporation, the President, any Vice President or Executive Vice President, Secretary, Treasurer or Assistant Treasurer of the Corporation, and (c) when used with reference to any act or document, also means any other person authorized by resolution of the Board of Directors of the Corporation to perform such act or execute such document.

"Available Moneys" means:

(a)     moneys that have been on deposit with the Trustee for at least 91 days during and prior to which no Act of Bankruptcy has occurred with respect to the Corporation;

(b)     proceeds of any Bonds that refund any other Series of Bonds, but only to the extent that (i) such refunding proceeds are paid directly to the Trustee for the benefit of the Holders and shall not have come into the possession or control of the Issuer, the Corporation or any Affiliate thereof, and (ii) with respect to the refunding of the Variable Rate Bonds, the Trustee shall have received an opinion of Independent Counsel acceptable to the Trustee and any of the Rating Agencies then maintaining a rating on such Series of Variable Rate Bonds, to the effect that distributions of payments of principal of and premium (if any) and interest on such Series of Variable Rate Bonds made to the Holders from such refunding proceeds will not constitute preferential payments pursuant to the provisions of (A) Section 547(b) of the Bankruptcy Code in a bankruptcy proceeding by or against the Paying Agent, the Issuer, the Corporation or any Affiliate thereof, or (B) Chapter 9 of the Bankruptcy Code, if the Issuer should become a debtor under Chapter 9 of the Bankruptcy Code; and

(c)     moneys received from a drawing under the Letter of Credit or any Confirming Letter of Credit.

For the purposes of this definition, moneys shall be deemed to be on deposit with the Trustee only when cash or its equivalent is so deposited or, in the case of checks or drafts, when final payment thereof has been made to the Trustee by the payor bank.

"Bank Conversion Date" means the third (3rd) Business Day after receipt by the Trustee of a Bank Conversion Date Notice.

"Bank Conversion Date Notice" means a written notice from the Corporation to the Trustee that the interest expense plus the remarketing fees and letter of credit fees on the Series 2007 B Bonds bearing interest at a Variable Rate, including any increased costs imposed by lawful request, law, regulation or directive under Section 5.4 of the Letter of Credit Agreement, equals or exceeds 5.5% and as a result all such Series 2007 B Bonds bearing interest at a Variable Rate will be held by the Letter of Credit Provider after the Bank Conversion Date, provided, in the event the Letter of Credit Provider either does not elect to receive Series 2007 B Bonds bearing interest at a Variable Rate or does not deliver a Letter of Credit on the Closing Date, then any references to Bank Conversion Date and Bank Conversion Date Notice shall have no force and effect.

"Bank Rate" means the fluctuating rate per annum determined as provided in the Letter of Credit Agreement.

"Bank Tender Date" means July 1, 2021, as such date may be extended by the Letter of Credit Provider, being the (i) optional tender date of the Series 2007 B Bonds bearing interest at the Fixed Rate pursuant to Section 3.11(c)(iv) herein, which date shall be a Business Day not less than 180 days after the delivery of written notice to the Trustee and the Corporation in accordance with Section 3.11(c)(iv), and provided in no event shall the Bank Tender Date occur prior to the Resizing Tender Date and (ii) termination date of the Letter of Credit securing the Series 2007 B Bonds, provided, in the event the Letter of Credit Provider either does not elect to receive Series 2007 B Bonds bearing interest at a Variable Rate or does not deliver a Letter of Credit on the Closing Date, then any references herein to Bank Tender Date shall have no force and effect.

"Bond" or "Bonds" means the Series 2011 Bonds and any Additional Bonds, collectively.

"Bond Counsel" means Ropes & Gray LLP or any law firm approved by the Issuer having a national reputation in the field of municipal finance law, whose legal opinions are generally accepted by purchasers of municipal bonds.

"Bond Documents" means and includes without limitation the Bonds, this Indenture, the Loan Agreement, the Mortgage and, with respect to each Series of Variable Rate Bonds, the Letter of Credit, and any and all other documents that the Issuer, the Corporation, or any other party or parties or their representatives have executed and delivered, or may hereafter execute and deliver, to evidence or secure the Series 2011 Bonds, together with any and all Supplements thereto.

"Bond Year" means the period from the Closing Date to and including _____, 2012 and, thereafter, a period of 12 consecutive months beginning on _____ in any calendar year in which Bonds are Outstanding and ending on _____ of the next calendar year.

"Bondholder" means the registered owner of any Bond.

"Bonds Tendered or Deemed Tendered for Purchase" means Variable Rate Bonds tendered, or deemed to have been tendered, to the Trustee for purchase on an Optional Tender Date, as provided in Section 2.05(k) or on a Mandatory Tender Date, as provided in Section 2.05(l) of this Indenture.

"Book-Entry Form" or "Book-Entry System" means a form or system, as applicable, under which (a) the ownership of beneficial interests in any Series of the Bonds may be transferred only through a book-entry and (b) physical bond certificates in fully registered form are registered only in the name of a Depository or its nominee as holder, with the physical bond certificates "immobilized" in the custody of the Depository.

"Book Value" when used with respect to any property or interest therein, means, at the option of the Authorized Officer of the Corporation, either (a) the value of such property or interest, net of accumulated depreciation, as it is carried on the books of the Corporation in conformity with generally accepted accounting principles, or (b) the current market value of such property as of the time a ratio is to be calculated or value determined, in either case evidenced by a certificate of such Authorized Officer. In preparation of such certificate pursuant to (a) above, Book Value shall be the value set forth in the most recent financial statements of the Corporation. In preparation of such certificate pursuant to (b) above, current market value shall be assigned to property or any portion thereof only on the basis of an appraisal completed within three years of the date of such certificate by an independent party qualified by reputation and experience or, with respect to property other than real property and fixed assets, on the basis of a certificate of an Authorized Officer of the Corporation if such certificate is accompanied by appropriate documentation indicating the basis of such valuation.

"Budget" means the annual budget required to be prepared by the Corporation pursuant to Section 8.13 of the Loan Agreement, as amended from time to time in accordance with such Section.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the Commonwealth observed as such or observed by the Designated Office of the Trustee or the office of the Letter of Credit Provider.

"Capital Improvements" means any Additional Facilities or any capital project undertaken by the Corporation.

"Calamity Standstill" shall have the meaning assigned to such term in Section 6.04 of the Loan Agreement.

"Calamity Standstill Period" shall have the meaning assigned to such term in Section 6.04 of the Loan Agreement.

"Closing Date" means the date of initial issuance and delivery of fully executed and authenticated Series 2011 Bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor federal income tax statute or code, and the applicable regulations thereunder.

"Collateral" shall have the meaning assigned such term in Section 3.05(b) of the Loan Agreement.

"Collateral Assignment" means the Collateral Assignment dated the date hereof by the Corporation to the Trustee.

"Collateral Documents" means those documents, instruments and items, a continuing security interest in which have been assigned, transferred and conveyed to the Trustee pursuant to the Collateral Assignment, including, but not limited to, the Management Agreement, each Residence and Care Agreement, and certain agreements, contracts, approvals, certificates, licenses and permits relating to the operations of the Facility (to the extent the same may be lawfully assigned).

"Commencement Test" shall have the meaning assigned to such term in Section 4.05(a) of the Loan Agreement.

"Commonwealth" means The Commonwealth of Massachusetts.

"Completion Certificate" means the completion certificate described in Section 4.08 of the Loan Agreement.

"Computation Date" means, with respect to any Series of Variable Rate Bonds, the date designated by the Corporation as the date on which a Fixed Rate for such Series of Variable Rate Bonds is to be determined by the Remarketing Agent in accordance with Section 2.05 of this Indenture, which date shall be at least 7 but not more than 15 days before the Fixed Rate Date for such Series of Variable Rate Bonds; provided, however, that if the Corporation directs the Issuer to rescind its election to establish a Fixed Rate Period pursuant to Section 2.05 (d) of this Indenture, and a Fixed Rate Period is then in effect with respect to such Series of Variable Rate

- 9 -

Bonds, the term "Computation Date" means the Fixed Rate Date for the new Fixed Rate Period to be established in accordance with Sections 2.05(d) and (e) of this Indenture.

"Confirming Letter of Credit" means each Credit Facility issued from time to time to confirm a Letter of Credit.

"Construction Commencement Date" means the date on which construction of Residential Building 2.5 commences, as evidenced by the issuance of the notice to proceed by the Corporation to the Construction Contractor.

"Construction Contractor" means any general contractor with whom the Corporation contracts to construct any phase of the Facility.

"Construction Loan Term Sheet" means the Term Sheet for Construction Financing attached to the Loan Agreement as Exhibit A.

"Construction Loan" means the Indebtedness of the Corporation for the purpose of financing the construction of Residential Building 2.5.

"Conversion Date" means, with respect to any Series of Variable Rate Bonds, each Fixed Rate Date and each date on which the Variable Rate takes effect following a Fixed Rate Period.

"Corporation" means the nonstock corporation, duly organized and existing under the laws of the State of Maryland and qualified to do business in the Commonwealth, having its principal facilities in Hingham, Plymouth County, Massachusetts, the corporate name of which is Linden Ponds, Inc., and its successors and assigns.

"Corporation's Bond Obligations" means the obligations of the Corporation under the Bond Documents to (a) pay the principal of, premium (if any) and interest on the Loan as required by Section 3.02 of the Loan Agreement, when and as the same become due and payable (whether at the stated maturity thereof, or by acceleration of maturity or after notice of redemption or prepayment or otherwise), (b) pay all other payments required by the Bond Documents to be paid by the Corporation to the Issuer, to the Trustee or to others, when and as the same shall become due and payable, and (c) timely perform, observe and comply with all of the terms, covenants, conditions, stipulations, and agreements, express or implied, which the Corporation is required by any of the Bond Documents to perform or observe.

"Corporation's Letter of Credit Obligations" means the obligations of the Corporation under the Letter of Credit Documents to pay all payments required by the Letter of Credit Documents, when and as the same become due and payable, and timely perform, observe and comply with all of the terms, covenants, conditions, stipulations and agreements, express or implied, which the Corporation is required by the Letter of Credit Documents to observe or perform, including, without limitation, the Corporation's obligation thereunder to reimburse the Letter of Credit Provider, with interest, for all amounts drawn under the Letter of Credit and to pay certain fees to the Letter of Credit Provider.

"Corporation's Obligations" means, collectively, the Corporation's Bond Obligations and the Corporation's Letter of Credit Obligations.

"Costs" means the costs of construction and acquisition of all lands, structures, property (real or personal), rights, rights-of-way, franchises, easements and interests acquired by the Corporation or Hingham for the Facility or any Additional Facilities; the cost of demolishing or removing any buildings or structures on land so acquired; the cost of all labor, materials, machinery and equipment, financing charges, interest prior to and during construction and for such a limited period after completion of such construction as the Corporation deems advisable, reserves for principal and interest and for extensions, enlargements, additions and improvements; the cost of architectural, engineering, financial and legal services, plans, specifications, studies, surveys, estimates of costs and of revenues, and administrative expenses necessary or incidental to determining the feasibility or practicability of constructing the Facility or any Additional Facilities; and such other expenses as may be necessary or incidental to the construction and acquisition of the Facility or any Additional Facilities, the financing or refinancing of such construction and acquisition and the placing of the Facility or any Additional Facilities in operation.

"Credit Facility" means any letter of credit, bond insurance policy, bond purchase agreement, guaranty, line of credit, surety bond or similar credit or liquidity facility. The term "Credit Facility" includes without limitation, the Letter of Credit, any Substitute Letter of Credit and any Confirming Letter of Credit.

"Cross-over Date" means, with respect to Cross-over Refunding Indebtedness, the date on which the principal portion of the Cross-over Refunded Indebtedness is paid or redeemed, or on which it is anticipated that such principal portion will be paid or redeemed, from the proceeds of such Cross-over Refunding Indebtedness.

"Cross-over Refunded Indebtedness" means Indebtedness of a Person refunded by Cross-over Refunding Indebtedness.

"Cross-over Refunding Indebtedness" means Indebtedness of a Person issued for the purpose of refunding other Indebtedness of such Person if the proceeds of such Cross-over Refunding Indebtedness are irrevocably deposited in escrow to secure the payment on the applicable Cross-over Date of the Cross-over Refunded Indebtedness and earnings on such escrow deposit are required to be applied to pay interest on either or both of such Cross-over Refunding Indebtedness or such Cross-over Refunded Indebtedness until the Cross-over Date.

"Days' Cash on Hand" means, as of the date of calculation, (a) Unrestricted Cash and Investments of the Corporation divided by (b) the quotient obtained by dividing the Total Operating Expenses of the Corporation for the period in question (excluding depreciation, amortization expense and Other Non-Cash Expenses) by the number of days in the period.

"Debt Service" means the aggregate principal (whether at maturity or pursuant to mandatory scheduled redemption requirements), interest payments (and with respect to any Variable Rate Bonds, letter of credit fees and remarketing fees) and other payments of the Corporation on Outstanding Long-Term Indebtedness during the period in question; provided, however, that for purposes of calculating such amount:

(a)     The amount of such payments for any future period shall be calculated in accordance with the assumptions contained below and in Section 8.10 of the Loan Agreement;

(b)     Principal and interest shall be excluded from the determination of Debt Service to the extent that such principal or interest is payable from amounts deposited in trust, escrowed or otherwise set aside for the payment thereof with the Trustee or another Person approved by the Trustee;

(c)     Except in the case of the calculation of Actual Annual Debt Service, the various calculations of the amount of Indebtedness of a Person, the amortization schedule of that Indebtedness and the Debt Service payable with respect to that Indebtedness for future periods required under certain provisions of this Indenture and the Loan Agreement shall be made in a manner consistent with that adopted in Section 8.10 of the Loan Agreement and as set forth below. The Projected Rate and other assumptions utilized with respect to Indebtedness at the time compliance with the provisions of Section 8.10 of the Loan Agreement was first calculated shall continue to be utilized for the calculation of Debt Service payable with respect to that Indebtedness for future periods unless that Indebtedness is reclassified as provided below;

(d)     In determining the amount of Debt Service payable on Indebtedness in the course of the various calculations required under certain provisions of this Indenture, except as otherwise provided in Section 8.10 of the Loan Agreement with respect to interest rate assumptions or term, if the terms of the Indebtedness being considered are such that interest thereon for any future period of time is expressed to be calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then for the purpose of making such determination of Debt Service, interest on such Indebtedness for such period (the "Determination Period") shall be computed by assuming that the rate of interest applicable to the Determination Period is equal to the average annual rate of interest (calculated in the manner in which the rate of interest for the Determination Period is expressed to be calculated) that was or would have been in effect for the 12-month period immediately preceding the date on which such calculation is made; provided, however, that if such average annual rate of interest cannot be calculated for such entire 12-month period but can be calculated for a shorter period, then the assumed interest rate for the Determination Period shall be the average annual rate of interest that was or would have been in effect for such shorter period; and provided further, that if such average annual rate of interest cannot be calculated for any preceding period of time, then the assumed interest rate for the Determination Period shall be a Projected Rate;

(e)     100% of the annual principal and interest payments scheduled to become due on Long-Term Indebtedness arising from any Guaranty issued by the Corporation shall be included in the determination of Debt Service;

(f)     Bonds issued to secure Indebtedness permitted to be incurred under Section 8.10 of the Loan Agreement shall not be treated as Additional Indebtedness; and

(g)     If the Corporation shall be party to a Hedge Agreement requiring the Corporation to pay a fixed interest rate on a notional amount, or requiring the Corporation to pay a variable interest rate on a notional amount, and the Corporation has made a determination that such Hedge Agreement was entered into for the purpose of providing substitute interest payments (or

- 12 -

portion thereof) for Indebtedness of a particular maturity or maturities in a principal amount equal to the notional amount of the Hedge Agreement, then during the term of the Hedge Agreement and so long as the counterparty under such Hedge Agreement is not in default under such Hedge Agreement, then, for purposes of any calculation of Debt Service, the interest rate (or portion thereof) on the Indebtedness of such maturity or maturities shall be determined as if such Indebtedness bore interest at the fixed interest rate or the variable interest rate, as the case may be, payable by the Corporation after giving effect to such Hedge Agreement; provided, however, if a Hedge Agreement does not constitute Derivative Indebtedness, then it is assumed that the principal of such Indebtedness is equal to the lesser of (x) the maximum amount payable by the Corporation in the event such Hedge Agreement is terminated by any party thereto and (y) the greater of the current market valuation of such Hedge Agreement or the amount designated in the Hedge Agreement as the principal amount thereof, and it is further assumed that the amount of principal and interest assigned as debt service to any Fiscal Year shall be based on a level debt service schedule calculated at the Projected Rate for a period equal to the longer of (x) 10 years and (y) the period from the dated date of the Hedge Agreement to its termination or maturity date.

"Debt Service Coverage Ratio" or "Coverage Ratio" means, with respect to any one year period, the ratio of Net Income Available for Debt Service for the year in question to the Actual Annual Debt Service on all Outstanding Long-Term Indebtedness other than the Series 2011 B Bonds during such year. There shall be excluded from the calculation of the Debt Service Coverage Ratio the Debt Service on any Additional Indebtedness, together with all Receipts and Total Expenses of any revenue producing facility, the acquisition, construction, renovation or replacement of which was financed in whole or in part with the Additional Indebtedness, until the first full Fiscal Year (the "Countable Year") following the later of: (i) the Fiscal Year in which completion of the acquisition, construction, renovation or replacement occurs (provided that such completion occurs no later than six months following the date(s) specified in the Management Consultant's report or Management Report, as the case may be, issued in connection with the issuance of such Additional Indebtedness), or (ii) the Fiscal Year in which Stable Occupancy for the particular facility occurs (provided that Stable Occupancy occurs no later than during the fourth full Fiscal Year following the incurrence of such Additional Indebtedness); provided that as a condition of excluding from the calculation of the Debt Service Coverage Ratio the Debt Service on any Additional Indebtedness:

(a)     The Corporation shall have delivered to the Trustee a report of a Management Consultant to the effect that the Debt Service Coverage Ratio of the Corporation for the Countable Year and the next succeeding Fiscal Year will not be less than 1.20 after giving effect to the incurrence of such Additional Indebtedness and the application of the proceeds thereof; provided, however, in the event the Management Consultant (or in the case that a Management Report is permitted above, the Corporation) delivers a report stating that state or federal laws do not permit the Corporation to maintain the 1.20 ratio, then such ratio shall be reduced to that permitted by law, but in no event shall such ratio be less than 1.00. In the event a Management Consultant's report is not required or utilized to incur Additional Indebtedness, a Management Report, certified by a designated officer of the Corporation, may be used in lieu of the Management Consultant's report for purposes of this section;

(b)     the interest on such Additional Indebtedness and any projected start-up losses during such period is funded from the proceeds thereof, or other funds specifically so designated by the Corporation at the time such Additional Indebtedness was incurred, and such proceeds or funds continue to be available for such purposes throughout such period; and

(c)     no principal of such Additional Indebtedness shall be payable during such period, excluding any Additional Indebtedness that becomes due as the result of the collection of Initial Entrance Fees during such period.

"Debt Service Fund" means the Series 2011 Debt Service Fund.

"Debt Service Reserve Fund Requirement" means the Senior Debt Service Reserve Fund Requirement.

"Debt Service Revenue" means for any period, (a) in the case of health care or residential and health care related services, the sum of (i) gross service revenues less contractual allowances and provisions for uncollectible accounts, discounted care and free care, plus (ii) other operating revenues other than earned Entrance Fees, plus (iii) non-operating revenues, all as determined in accordance with generally accepted accounting principles consistently applied, plus (iv) Entrance Fees, other than Initial Entrance Fees, actually received net of refunds; and (b) gross revenues less sale discounts and sale returns and allowances, as determined in accordance with generally accepted accounting principles consistently applied; provided, however, that no determination thereof shall take into account (u) unrealized gains or losses on investments (including any unrealized gains and losses on Hedge Agreements and Derivative Indebtedness), (v) income derived from the investment of the proceeds of Cross-over Refunding Indebtedness prior to the Cross-over Date, (w) any gain or loss resulting from the early extinguishment of Indebtedness or the sale, exchange or other disposition of Property not in the ordinary course of business, (x) realized gains and losses on Hedge Agreements or Derivative Indebtedness, (y) gifts, grants, bequests or donations restricted as to use for a purpose inconsistent with the payment of Debt Service or operating expenses, and (z) insurance (other than business interruption) and condemnation proceeds.  For purposes of any calculation hereunder that is made with reference to both Debt Service Revenue and Total Expenses, any deduction from gross patient service revenues otherwise required by the preceding provisions of this definition shall not be made if and to the extent that the amount of such deduction is included in Total Expenses.

"Defeasance Obligations" means:

(a)     noncallable Government Obligations; and

(b)     noncallable obligations of state or local government municipal bond issuers that are rated in the highest rating category established by two of the Rating Agencies, without regard to any refinement or gradation of such rating category by numerical modifier or otherwise, provision for the payment of the principal of and interest on which shall have been made by deposit with a trustee or escrow agent of (i) Government Obligations and/or (ii) Government Participations, the maturing principal of and interest on such Government Obligations and/or Government Participations, when due and payable, shall provide sufficient money to pay the

principal of, premium, if any, and interest on such obligations of state or local government municipal bond issuers.

"Depository" means any securities depository that is a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, operating and maintaining, with its participants or otherwise, a Book-Entry System to record ownership of beneficial interests in municipal bonds, and to effect transfers of municipal bonds, in Book-Entry Form, and includes and means initially The Depository Trust Company, New York, New York.

"Derivative Indebtedness" means all or any portion of Indebtedness meeting the requirements set forth in clauses (1) and (2) below:

(1)     a Person has issued or entered into a Hedge Agreement in respect to all or such portion of such Indebtedness, and

(2)     (A) if such Indebtedness constitutes Variable Rate Indebtedness, such Hedge Agreement provides that, during the Hedge Period, such Person will pay a fixed rate or a variable rate and in either case the provider of the Hedge Agreement will pay a variable rate approximately equal to the variable rate borne by such Indebtedness or portion thereof subject to the Hedge Agreement on a notional amount equal to the outstanding principal amount of such Indebtedness or portion thereof subject to the Hedge Agreement, or (B) if such Indebtedness or portion thereof subject to the Hedge Agreement does not constitute Variable Rate Indebtedness, such Hedge Agreement provides that, during the Hedge Period, such Person will pay a variable rate and the provider of the Hedge Agreement will pay a fixed rate approximately equal to the fixed rate borne by such Indebtedness or portion thereof subject to the Hedge Agreement on a notional amount equal to the outstanding principal amount of such Indebtedness or portion thereof subject to the Hedge Agreement.

"Designated Office" means the office of the Trustee at the address designated in Section 10.10 or such other office that may be designated as such, from time to time, by the Trustee in writing to the Issuer, the Corporation, the Paying Agent, the Registrar, the Remarketing Agent, the Letter of Credit Provider and the Owners of the Bonds.

"Development Plan" means Exhibit C of the Linden Ponds Amended and Restated Development Agreement dated as of August 21, 2006, by and between Hingham and Erickson Retirement Communities, as amended from time to time.

"Eligible Account" means an account that is either (a) maintained with a federal or state-chartered depository institution or trust company that has a Standard & Poor's short-term debt rating of at least 'A-2' (or, if no short-term debt rating, a long-term debt rating of 'BBB+'); or (b) maintained with the corporate trust department of a federal depository institution or state-chartered depository institution subject to regulations regarding fiduciary funds on deposit, which, in either case, has corporate trust powers and is acting in its fiduciary capacity.

"Entrance Fees" means the fees, other than Monthly Fees, paid to the Corporation by residents of the Facility for the purpose of obtaining the right to reside in the Facility, including any refundable resident deposits described in any Residence and Care Agreements or similar

lease agreements with respect to the Facility, but shall not include any such amounts that are escrowed or otherwise set aside pursuant to the requirements of any such agreement or in accordance with the laws of the Commonwealth prior to the occupancy of the unit covered by such agreement (which amounts shall be included if and when such occupancy occurs).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default," when used in this Indenture, means any Event of Default specified in Section 7.01 of this Indenture, when used in or with respect to the Loan Agreement, means any Event of Default specified in Section 9.01 of the Loan Agreement and when used in or with respect to the Mortgage, means any event of default specified in Section 4.01 of the Mortgage.

"Excess Cash" means at the end of each fiscal year following the Resizing Tender Date,

(i)      if the Corporation has at least 90 Days' Cash on Hand up to 120 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, thirty percent (30%) of the Net Cash Flow generated over the course of the fiscal year,

(ii)      if the Corporation has at least 120 Days' Cash on Hand up to 180 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, forty percent (40%) of the Net Cash Flow generated over the course of the fiscal year, or

(iii)      if the Corporation has at least 180 Days' Cash on Hand at the end of the immediately preceding fiscal year prior to the calculation of Excess Cash, fifty percent (50%) of the Net Cash Flow generated over the course of the fiscal year.

The Corporation's calculation of Excess Cash for the immediately preceding fiscal year shall be calculated by the Corporation based upon the Corporation's management-prepared financial statements delivered to the Trustee by no later than March 1 of each year.

"Excess Liquidity" means as of each March 31, June 30, September 30 and December 31 and on the Resizing Review Date (in each case based on total operating expenses for the most recent preceding rolling four quarters ending on such date), the Corporation's Unrestricted Cash and Investments on such date (including all funds held by the Trustee under the Indenture, other than the Debt Service Funds or Senior Debt Service Reserve Funds), exceeding (i) 60 Days' Cash on Hand, with respect to mandatory redemption payments on the Series 2011 A-2 Bonds pursuant to Section 3.09(b) of this Indenture prior to the Construction Commencement Date, and (ii) 45 Days' Cash on Hand with respect to mandatory redemption payments on the Series 2011 A-2 Bonds pursuant to Section 3.09(b) of this Indenture on and after the Construction Commencement Date.

"Existing Facility Site" means that portion of the Land on which Neighborhood One and Neighborhood Two and any other Facilities in existence on the Closing Date, are located.

"Expansion" means any addition to or expansion of the Facility to occur on a site contiguous to, or part of, the Facility Site.

- 16 -

"Facility" means (a) approximately 988 Residential Units, (b) two community buildings, (c) a skilled nursing facility with approximately 132 private nursing care beds ("Nursing Care Beds"), and (d) dining rooms, convenience stores, banks, beauty salons/barber shops, game rooms, an aquatic center, a music room, classrooms, a woodwork and hobby shop, a computer lab, a library, an in-house cable television station, a non-denominational chapel, walking paths and a health club, which may be expanded to include Neighborhood Three, together with any amendments to the scope of the Facility or additions to or Expansions or replacements of the Facility made by the Corporation pursuant to the Loan Agreement, including any Additional Facilities.

"Facility Site" or "Land" means the parcel of land containing approximately 108 acres located in Plymouth County, Massachusetts, consisting of the Existing Facility Site and Parcel Three, and more particularly described in Exhibit A to the Mortgage.

"Fees" means all fees charged to each and every resident of the Facility pursuant to a Residence and Care Agreement, including, without limitation, all fees paid on a daily basis, all Monthly Fees and all Entrance Fees.

"Fiscal Quarter" means any one of the four three-consecutive month periods during a Fiscal Year.

"Fiscal Year" means the period of 12 consecutive months beginning on January 1 in any calendar year and ending on December 31 of the same calendar year, or such other fiscal year as the Corporation, with prior written notice to the Trustee, shall establish as the fiscal year of the Corporation.

"Fitch" means Fitch Ratings or its successor in the business of providing investment rating services, provided that if neither Fitch nor any such successor is then in the business, the references to Fitch and ratings thereof shall no longer be required by the terms and provisions of the documents.

"Fixed Rate" means the fixed rate or rates of interest borne by any Series of Variable Rate Bonds during each Fixed Rate Period for such Series of Variable Rate Bonds.

"Fixed Rate Date" means the first day of each Fixed Rate Period.

"Fixed Rate Period" means a period established for a Series of Variable Rate Bonds in accordance with Section 2.05 of this Indenture during which the rate of interest borne by such Series of Variable Rate Bonds is a Fixed Rate.

"Force Majeure Event" shall have the meaning assigned to such term in Section 9.01 of the Loan Agreement.

"Futures List" means the list of prospective residents who want a priority position when they are ready to move to the Standby List or the Reservation List.

"Good Cause" shall have the meaning assigned such term in Section 4.05 of the Loan Agreement.

"Good Cause Period" shall have the meaning assigned to such term in Section 4.05 of the Loan Agreement.

"Good Cause Standstill" shall have the meaning assigned to such term in Section 4.05 of the Loan Agreement.

"Good Cause Standstill Period" shall have the meaning assigned to such term in Section 4.05 of the Loan Agreement.

"Governing Body" means, when used with respect to the Corporation and its Affiliates, its board of directors, board of trustees, or other board or group of individuals in which the powers of the Corporation or such Affiliates are vested.

"Government Obligations" means (i) direct obligations of, or obligations the timely payment of the principal of and the interest on which is guaranteed by, the United States of America; and (ii) evidences of ownership of proportionate interest in direct obligations of, or obligations the timely payment of the principal of and the interest on which are unconditionally and fully guaranteed by, the United States of America, which obligations are held by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of custodian.

"Government Participations" mean participations in Government Obligations.

"Guaranty" means, as applied to any Indebtedness for borrowed money, (a) a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such Indebtedness or (b) an agreement, direct or indirect, contingent or otherwise, providing assurance of the payment or performance (or payment of damages in the event of non-performance) of any part or all of such Indebtedness, including, without limiting the foregoing, the payment of amounts drawn down by letters of credit. Notwithstanding anything herein to the contrary, a guarantee shall not include any agreement solely because such agreement creates a lien on the assets of any Person or any agreement providing for indemnification. The amount of a guarantee shall be deemed to be the maximum principal amount of the Indebtedness guaranteed for which the guarantor could be held liable under such guarantee.

"Hedge Agreement" means an interest rate swap, cap, collar, floor, forward, option, put, call or other agreement, arrangement or security, however denominated, entered into in order to hedge interest rate fluctuations, which may be with respect to all or a portion of any Indebtedness, or to change the payments to be made by the issuer with respect to any Indebtedness from fixed to variable or from variable to fixed or variable to variable with the goal of achieving lower or less volatile interest costs.

"Hedge Period" means the period during which a Hedge Agreement is in effect.

"Holder" or "holder" or "Owner" or "owner" or any similar term means (a) when used with reference to a Bond, a Bondholder and (b) when used with reference to the Corporation's Letter of Credit Obligations or any other Parity Obligation or Subordinated Indebtedness, the Letter of Credit Provider or the owner of such other Parity Obligation or Subordinated

Indebtedness, determined in accordance with this Indenture or the Supplemental Indenture authorizing or approving the issuance thereof.

"Indebtedness" means any indebtedness or liability for borrowed money, any installment sale obligation or any obligation under any lease that is capitalized under generally accepted accounting principles and any Guaranty of any of the foregoing.

"Indenture" means this Amended and Restated Trust Indenture, as amended, modified or supplemented from time to time by Supplemental Indentures.

"Independent Appraiser" means an Independent Person who is a member of the appraisal institute (MAI) having a favorable reputation for skill and experience in appraising life care and continuing care retirement communities.

"Independent Architect" means an Independent Person (a) authorized to engage in the practice of architecture by the laws of the Commonwealth and (b) employed by the Corporation from time to time to pass upon those matters required by this Indenture, the Loan Agreement or the Mortgage to be passed upon by an Independent Architect, provided that the Corporation will mail a statement to the Trustee naming the Independent Architect.

"Independent Consultant" means an Independent Person who is one of the top three feasibility consultants for publicly offered continuing care retirement community bonds for the two full calendar years immediately preceding the Resizing Tender Date, as measured by the aggregate principal amount of publicly offered continuing care retirement community bonds for which such Independent Person prepared the feasibility study or such other Independent Person selected by the Corporation and approved by a Majority of the Holders of the Senior Parity Debt.

"Independent Counsel" means any attorney duly admitted to practice law before the highest court of any state who has regularly engaged in the practice of law as a primary occupation and who is not an officer or full-time employee of the Issuer, the Corporation or the Trustee. Bond Counsel to the Issuer and outside counsel to the Corporation may be deemed Independent Counsel.

"Independent Engineer" means an Independent Person (a) authorized to engage in the profession of engineering by the Commonwealth and (b) employed by the Corporation from time to time to pass upon those matters required by this Indenture, the Loan Agreement or the Mortgage to be passed upon by an Independent Engineer, provided that the Corporation will mail a statement to the Trustee naming any Independent Engineer.

"Independent Insurance Consultant" means an Independent Person that is a registered professional actuary (a) having a favorable reputation for skill and experience in actuarial work relating to life care and continuing care retirement communities, and (b) employed by the Corporation from time to time pursuant to Section 6.01 of the Loan Agreement, provided that the Corporation will mail a statement to the Trustee naming the Independent Insurance Consultant.

"Independent Person" means a Person designated by the Corporation and not an employee, director or officer of the Corporation.

"Independent Public Accountant" means an Independent Person engaged in the accounting profession, either entitled to practice, or having members or officers entitled to practice, as a certified public accountant under the laws of the Commonwealth, employed by the Corporation from time to time to pass upon those matters required by this Indenture and the Loan Agreement to be passed upon by an Independent Public Accountant. The firm of PricewaterhouseCoopers LLP is recognized as constituting Independent Public Accountants, subject to further action by the Corporation, provided that the Corporation will mail a statement to the Trustee naming any substitute Independent Public Accountant.

"Initial Entrance Fees" means Entrance Fees received upon initial occupancy of any living unit in the Facility not previously occupied.

"Initial Manager" means Erickson Living Management, LLC.

"Initial Senior Debt Service Reserve Fund Requirement" means $4,670,000 less the Initial Taxable Senior Debt Service Reserve Fund Requirement.

"Initial Taxable Senior Debt Service Reserve Fund Requirement" means $4,670,000 multiplied by the Taxable Ratio.

"Intercreditor Agreement" means an intercreditor agreement among the Corporation, the Trustee and the holder(s) of Special Senior Parity Obligations concerning the matters set forth in Section 5.06 and Article VII hereof.

"Interest Accounts" means the Series 2011 A-1 Interest Account, the Series 2007 B Interest Account and the Series 2011 A-2 Bonds Interest Account within the Series 2011 Debt Service Fund.

"Interest Payment Date" means, (a) with respect to the Series 2011 A-1 Bonds and Series 2011 A-2 Bonds, each May 15 and November 15 commencing on November 15, 2011, (b) with respect to the Series 2011 A Bonds, the Resizing Tender Date and (c) with respect to the Series 2007 B Bonds, (i) during any period in which such Series 2007 B Bonds bear interest at the Variable Rate, (1) the first Business Day of each month, commencing _____, 2011, (2) each Mandatory Tender Date and (3) the maturity date of such Series of Variable Rate Bonds, (ii) for any Fixed Rate Period of six months or fewer, the calendar day after the last day of such Fixed Rate Period, (iii) for any Fixed Rate Period of more than six months, (1) the first calendar day of the month that is the sixth month after the month in which the Fixed Rate Date occurs, (2) each sixth month anniversary of such first calendar day, and (3) the calendar day following the last calendar day of such Fixed Rate Period, (iv) for any Fixed Rate Period that extends to the maturity of such Series 2007 B Bonds, each May 15 and November 15 of each year, and (v) for any Pledged Bonds, any date on which interest on such Pledged Bonds is payable in accordance with the Letter of Credit Agreement and any date on which Pledged Bonds are remarketed in accordance with this Indenture.

"Interest Portion" or "Interest Component" shall have the meaning assigned to such term in the Letter of Credit.

"Investment Obligations" means dollar denominated investments in any of the following:

(a)     Government Obligations;

(b)     debt obligations which are (i) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency;

(c)     Agency Obligations;

(d)     U.S. denominated deposit accounts, certificates of deposit and banker's acceptances of any bank, trust company, or savings and loan association, including the Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which mature not more than 360 days after the date of purchase;

(e)     commercial paper which is rated at the time of purchase in one of the two highest categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency, and which matures not more than 270 days after the date of purchase;

(f)     bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by any Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(g)     Investment agreements with banks that at the time such agreement is executed are rated by any Rating Agency in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any Rating Agency or investment agreements with non-bank financial institutions provided that (i) all of the unsecured, direct long-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any Rating Agency at the time such agreement is executed in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) for obligations of that nature; or (ii) if such non-bank financial institutions and any related guarantor have no outstanding long-term debt that is rated, all of the short-term debt of either the non-bank financial institution or the related guarantor of such non-bank financial institution is rated by any Rating Agency in one of the two highest rating categories (without regard to any refinement or gradation of the rating category by numerical modifier or otherwise) assigned to short term indebtedness by any Rating Agency.  If such non-bank financial institution and any guarantor do not have any short-term or long-term debt, but do have a rating in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise), then investment agreements with the non-bank financial institution will be permitted;

\29695489.18

(h)     repurchase agreements with respect to and secured by Government Obligations or by obligations described in clause (b) and (c) above, which agreements may be entered into with a bank (including without limitation the Trustee or its affiliates), a trust company, a financial services firm or a broker dealer which is a member of the Securities Investors Protection Corporation, provided that (i) the Trustee or a custodial agent of the Trustee has possession of the collateral and the collateral is free and clear of third party claims, (ii) a master repurchase agreement or specific written repurchase agreement governs the transaction, (iii) the collateral securities are valued no less frequently than monthly, (iv) the fair market value of the collateral securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least 103%, and (v) such obligations must be held in the custody of the Trustee or the Trustee's agent;

(i)     investments in a money market fund including funds of the Trustee or its affiliates, rated (at the time of purchase) in the highest rating category for this type of investment by any Rating Agency; and

(j)     Shares in any investment company, money market mutual fund, fixed income mutual fund, exchange-traded fund or other collective investment fund registered under the federal Investment Company Act of 1940, whose shares are registered under the Securities Act of 1933, and whose investments consist solely of Investment Obligations as defined in paragraphs (a) through (i) above, including money market mutual funds from which the Trustee or its affiliates derive a fee for investment advisory or other services to the fund.

"Issuer" means Massachusetts Development Finance Agency, a body politic and corporate and a governmental instrumentality of the Commonwealth, and any successor thereto.

"Letter of Credit" means, with respect to the Series 2007 B Bonds, the direct pay letter of credit issued on the Closing Date securing the Series 2007 B Bonds and expiring on July 1, 2021 and, upon its effective date, any Substitute Letter of Credit.

"Letter of Credit Agreement" means, with respect to the Series 2007 B Bonds initially, the Amended and Restated Letter of Credit Agreement dated as of the date hereof, between the Corporation and the Letter of Credit Provider pursuant to which the Letter of Credit securing such Series 2007 B Bonds is issued, together with any and all Supplements thereto, and if the Letter of Credit has been replaced by a Substitute Letter of Credit, any similar reimbursement agreement relating to such Substitute Letter of Credit.

"Letter of Credit Documents" means the Letter of Credit, any Confirming Letter of Credit, the Letter of Credit Agreement and any and all other documents which the Corporation or any other party or parties or their representatives have executed and delivered, or may hereafter execute and deliver, to evidence or secure the Corporation's Letter of Credit Obligations, or any part thereof, or in connection therewith, together with any and all Supplements thereto.

"Letter of Credit Fund" means the Letter of Credit Fund created under Article IV.

"Letter of Credit Mandatory Tender Event Date" means, with respect to any Variable Rate Bonds, the second Business Day after receipt by the Trustee of a Letter of Credit Mandatory Tender Event Notice.

"Letter of Credit Mandatory Tender Event Notice" means a written notice from the Letter of Credit Provider to the Trustee stating that (i) an Event of Default has occurred and is continuing under the Letter of Credit Agreement or (ii) that the Letter of Credit or the Confirming Letter of Credit will not be reinstated.

"Letter of Credit Provider" means the issuer of any Letter of Credit then in effect and, alternatively, during any period when there is an unreimbursed draw under a Confirming Letter of Credit, the issuer of such Confirming Letter of Credit. The initial Letter of Credit Provider for the Series 2007 B Bonds is _____ , as issuer of the initial Letter of Credit securing the Series 2007 B Bonds.

"Licenses" shall have the meaning assigned such term in Section 3.05(b)(vii) of the Loan Agreement.

"Loan Agreement" means the Amended and Restated Loan Agreement dated as of the date hereof, between the Issuer and the Corporation, together with any and all Supplements thereto.

"Loans" means the Series 2011 Loan and any other loans made by the Issuer to the Corporation of the proceeds of sale of any Additional Bonds, Parity Obligations or Subordinated Indebtedness.

"Long-Term," when used in connection with Indebtedness, means Indebtedness having an original maturity greater than one year or renewable or extendable at the option of the Corporation for a period greater than one year from the date of original issuance thereof.

"Long-Term Indebtedness" means all Parity Debt, together with all of the following Indebtedness incurred or assumed by the Corporation:

(a)     any obligation for the payment of principal and interest with respect to money borrowed for an original term, or renewable or extendable at the option of the Corporation for a period from the date originally incurred, longer than one year;

(b)     any obligation for the payment of money under leases that are required to be capitalized under generally accepted accounting principles;

(c)     any obligation for the payment of money under installment purchase contracts having an original term in excess of one year;

(d)     any obligation that would constitute Short-Term Indebtedness if a Credit Facility were not in effect with respect thereto; and

(e)     any Guaranty of any Indebtedness that would be described in item (a), (b), (c) or (d) above if such Indebtedness were incurred directly by the Corporation.

"Majority" or "majority" shall have the meaning assigned such term in Section 7.06 of this Indenture.

"Management Agreement" means (a) the Management and Marketing Agreement dated as of _____, 2011, between the Corporation and the Manager, together with any Supplements thereto and (b) any other management agreement entered into with a Manager.

"Management Consultant" means a Person, including a professional consulting, accounting or investment banking firm, who is independent (and not engaged to manage any Facility for the Corporation or the Manager) and who is appointed by the Corporation and satisfactory to the Trustee and the Letter of Credit Provider, having the skill and experience necessary to render the particular report required and having a favorable reputation for skill and experience in such affairs.

"Management Report" means a written report prepared by or on behalf of the Corporation other than a report of a Management Consultant.

"Manager" means the Initial Manager and thereafter any successor manager engaged by the Corporation to manage the Facility.

"Mandatory Tender Date" means, with respect to any Series of Variable Rate Bonds, (i) any Conversion Date, (ii) any Termination Date, (iii) any Letter of Credit Mandatory Tender Event Date and (iv) with respect to the Series 2007 B Bonds constituting Variable Rate Bonds, each Bank Conversion Date and the Resizing Tender Date.

"Mandatory Tender Notice" means, with respect to any Series of Variable Rate Bonds, a notice of a Mandatory Tender Date given by the Trustee in accordance with Section 2.05(l) or (r) of this Indenture, which notice shall state:

(a)     if the Mandatory Tender Date is a Conversion Date or a Bank Conversion Date, (i) that the interest rate on such Series of Variable Rate Bonds will be converted from the Fixed Rate to the Variable Rate or that one or more consecutive Fixed Rate Periods of specified length are to be established on such Conversion Date or if the Conversion Date is a Bank Conversion Date, that all or a portion of the Series 2007 B Bonds will be held by the Letter of Credit Provider; (ii) if one or more Fixed Rate Periods will be established, that under certain circumstances the Corporation may direct the Issuer to rescind its election to establish a Fixed Rate Period at any time prior to the Fixed Rate Date for the new Fixed Rate Period, in which event such Series of Variable Rate Bonds will bear interest at the Variable Rate then in effect with respect to such Series of Variable Rate Bonds (if interest thereon is then payable at the Variable Rate) or, if a Fixed Rate Period is then in effect with respect to such Series of Variable Rate Bonds, a new Fixed Rate Period will be established as set forth in this Indenture, provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission; (iii) if the interest rate on such Series of Variable Rate Bonds will be converted from the Fixed Rate to the Variable Rate, that under certain circumstances the Corporation may direct the Issuer to rescind its election to convert the interest rate on such Series of Variable Rate Bonds from the Fixed Rate to the Variable Rate at any time prior to the Conversion Date, in which event a new Fixed Rate Period will be established as set forth in this Indenture, provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission; and (iv) the date that is the Mandatory Tender Date; or

- 24 -

(b)    if the Mandatory Tender Date is a Termination Date, that the Letter of Credit or the Confirming Letter of Credit then in effect will expire and the date on which it will expire; or

(c)    if the Mandatory Tender Date is a Letter of Credit Mandatory Tender Event Date, that an Event of Default has occurred and is continuing under the Letter of Credit Agreement, and the date that is the Letter of Credit Mandatory Tender Event Date; or

(d)    if the Mandatory Tender Date is a Resizing Tender Date, that the Series 2007 B Bonds will be resized on the Resizing Tender Date; and

(e)    that the Owners do not have a right to waive any mandatory purchase of such Series of Variable Rate Bonds and that all of such Bonds must be tendered for purchase at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Mandatory Tender Date (1) if such Variable Rate Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Remarketing Agent maintained with the Depository or (2) if physical bond certificates have been delivered to the Owners of such Variable Rate Bonds pursuant to Section 2.21, delivery thereof to the Trustee or the Remarketing Agent (which shall promptly deliver the same to the Trustee) at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Variable Rate Bonds so tendered will be purchased on the Mandatory Tender Date at the Purchase Price; and

(f)    that if there shall be on deposit with the Trustee an amount sufficient to pay the Purchase Price of the Variable Rate Bonds to be purchased on such Mandatory Tender Date, such Series of Variable Rate Bonds will be deemed to have been tendered and purchased on such Mandatory Tender Date, shall be deemed to be no longer Outstanding under this Indenture, and shall cease to bear interest as of such Mandatory Tender Date, whether or not such Variable Rate Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under this Indenture, except to receive the Purchase Price of such Variable Rate Bonds.

"Market Value" means, (a) with respect to Net Plant, Property and Equipment:  (i) the aggregate fair market value of such Net Plant, Property and Equipment as reflected in the most recent written report delivered to the Trustee, which report shall be that of an Independent Appraiser delivered to the Trustee (which report shall be dated not more than three years prior to the date as of which Market Value is to be calculated); plus (ii) the Book Value of any Net Plant, Property and Equipment acquired since the last such report; minus (iii) the greater of the Book Value or the fair market value (as reflected in such most recent appraiser's report) of any Net Plant, Property and Equipment disposed of since the last such report, and (b) with respect to any other Property, the fair market value of such Property, which fair market value shall be evidenced in a manner satisfactory to the Trustee.

"Maximum Annual Debt Service" means, when used with reference to any Bond or any Series of Bonds, as of any particular date of computation, the greatest amount required in the then-current or any future Bond Year or Fiscal Year to pay the principal of, the Sinking Fund Installments for and the interest on the Bonds or Series of Bonds becoming due during the period from the second day of such Bond Year or Fiscal Year through the first day of the immediately succeeding Bond Year or Fiscal Year; provided, however, that Maximum Annual Debt Service

- 25 -

for the Series 2011 Bonds constituting Variable Rate Bonds shall be calculated using an assumed rate of 5.50%.

"Maximum Rate" means, with respect to the Variable Rate Bonds, 10% per annum or such higher rate per annum to which the Maximum Rate may be increased in accordance with Section 2.05(h) of this Indenture or any Supplemental Indenture.

"Monthly Fee" means the monthly service charge required to be paid pursuant to a Residence and Care Agreement.

"Moody's" means Moody's Investors Service, Inc. or its successor in the business of providing investment rating services, provided that if neither Moody's nor any such successor is then in the business, the references to Moody's and ratings thereof shall no longer be required by the terms and provisions of the documents.

"Mortgage" means the Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of the date hereof, by the Corporation to the Trustee and its successors and assigns, as it may be further amended and supplemented.

"Neighborhood One" means that group of Residential Buildings identified as R.B. 1.1, R.B. 1.2, R.B. 1.3, R.B. 1.4 and R.B. 1.5, and community building 1.0 (each as described in the Development Plan), which has been constructed as part of the Facility.

"Neighborhood Three" means that group of Residential Buildings identified as R.B. 3.1, R.B. 3.2, R.B. 3.3, R.B. 3.4 and R.B. 3.5, and community building 3.0 (each as described in the Development Plan), which are intended to be constructed as part of the Facility.

"Neighborhood Three Loan" means the construction loan(s) to the Corporation in connection with the construction of Neighborhood Three and any refinancing(s) thereof.

"Neighborhood Three Loan Mortgage" means any mortgage, security agreement or other agreement encumbering assets of the Corporation located on or derived from Parcel Three for the benefit of any construction lender entered into to secure the Neighborhood Three Loan.

"Neighborhood Two" means that group of Residential Buildings identified as R.B. 2.1, R.B. 2.2, R.B. 2.3, R.B. 2.4 and R.B. 2.5, and community building 2.0 (each as described in the Development Plan), which has been or are intended to be constructed as part of the Facility.

"Net Cash Flow" means as of any period of time, Net Income Available for Debt Service less (i) ordinary maintenance and replacement expenditures of the Corporation, and (ii) debt service on all Indebtedness other than on the Series 2011 B Bonds and Subordinated Indebtedness.

"Net Income Available for Debt Service" means, as to any period of time, all Debt Service Revenue of the Corporation minus Total Expenses of the Corporation other than depreciation, amortization, Other Non-Cash Expenses (except that any provision for bad debt expenses shall not be subtracted from Total Expenses) and interest (including any component of

a rental payment treated as a payment of interest), all as determined on a pro forma basis for the Corporation in accordance with generally accepted accounting principles (unless otherwise specifically required herein).

"Net Plant, Property and Equipment" means, with respect to the Corporation, the entire complex of tangible long-lived assets used by the Corporation as shown on the balance sheet of the Corporation, determined in accordance with generally accepted accounting principles.

"Nursing Care Beds" has the meaning given to that term in the definition of Facility.

"Operating Assets" means any land, building, machinery, equipment, hardware, inventory or other property or any interest therein (except cash, investment securities and other property held for investment purposes) used by the Corporation in its trade or business.

"Operating Reserve Fund Requirement" means, as of the Closing Date, the amount that, when added to the $3,000,000 to be maintained in the Corporation's operating account, will result in 30 Day's Cash on Hand of the Corporation, and as of any date thereafter, an amount equal to 10% of the amount included by the Corporation in the Corporation's Budget for payment of Total Operating Expenses for the current Fiscal Year, excluding depreciation. The amount of the Operating Reserve Fund Requirement for any Fiscal Year shall be established by a certificate of an Authorized Officer of the Corporation delivered to the Trustee prior to the commencement of such Fiscal Year, together with a copy of the Corporation's Budget for such Fiscal Year. After the Closing Date, moneys to replenish the Operating Reserve Fund shall come from Initial Entrance Fees as described in this Indenture and from other moneys deposited with the Trustee and directed to be deposited into the Operating Reserve Fund and from any other source, provided that the Corporation shall not be in default hereunder if such moneys are insufficient to meet the Operating Reserve Fund Requirement.

"Operating Revenues" means the sum of gross resident and patient service revenues less contractual allowances and provisions for uncollectible accounts, free care and discounted care, plus other operating revenues and non-operating revenues.

"Optional Tender Date" means, with respect to the Variable Rate Bonds, the date on which an Owner tenders its Variable Rate Bonds for purchase pursuant to Section 2.05(k) of this Indenture or any Supplemental Indenture.

"Optional Tender Notice" means, with respect to the Variable Rate Bonds, an irrevocable written notice given to the Trustee by the Owner of any Variable Rate Bond in accordance with Section 2.05(k)(i)(A) of this Indenture or any Supplemental Indenture of such Owner's election to tender such Variable Rate Bond or a portion thereof in an Authorized Denomination for purchase.

"Optional Tender Indebtedness" means any Indebtedness that is subject to optional or mandatory tender by the holder thereof (including, without limitation, any mandatory tender in connection with the expiration of any Credit Facility securing such Indebtedness) for purchase or redemption prior to the stated maturity date thereof if the purchase or redemption price of such Indebtedness is under any circumstances payable by the Corporation (including, without

limitation, reimbursement by the Corporation of draws against any Credit Facility securing such Indebtedness).

"Original Closing Date" means July 31, 2007, the date of initial issuance and delivery of fully executed and authenticated Series 2007 Bonds.

"Original Indenture" means the Trust Indenture dated as of July 1, 2007 by and between the Issuer and Manufacturers and Traders Trust Company, as Trustee.

"Original Loan Agreement" means the Loan Agreement dated as of July 1, 2007 by and between the Issuer and the Corporation.

"Original Series 2007 B Bonds" means the Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2007 B, authorized by the Original Indenture.

"Other Non-Cash Expenses" means bad debt expense and all other items properly reportable under generally accepted accounting principles for a period as an expense, other than depreciation or amortization, but for which no corresponding outlay of cash or property is required in any period.

"Outstanding" means, as of any particular date, (a) when used with reference to Bonds, all Bonds authenticated and delivered under this Indenture except (i) any Bond cancelled by the Trustee (or delivered to the Trustee for cancellation) at or before such date, (ii) any Bond for the payment of the principal or Redemption Price of and interest on which provision shall have been made as provided in Section 9.01 of this Indenture, and (iii) any Bond in lieu of or in substitution for which a new Bond shall have been authenticated and delivered pursuant to Article II or Section 8.03 of this Indenture; and (b) when used with reference to any other Indebtedness, except as otherwise provided in any Supplemental Indenture authorizing or approving the issuance of any Parity Obligation or Subordinated Indebtedness, all Indebtedness theretofore issued or incurred other than any such Indebtedness that is deemed to have been paid and discharged under generally accepted accounting principles.

"Parcel Three" means that portion of the Land on which Neighborhood Three, if constructed, is to be located.

"Parity Debt" means all Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt, collectively.

"Parity Obligation" means any bond, note or other Indebtedness issued by or on behalf of the Corporation as permitted by Section 8.11 or Section 8.22 of the Loan Agreement and with respect to which the Trustee, pursuant to Section 5.06 of this Indenture, has notified the Corporation in writing that all items that are conditions precedent to the issuance of Parity Obligations have been received.

"Paying Agent" means the Trustee, or any successor paying agent appointed under this Indenture.

"Permitted Encumbrance" means:

(a)     any lien arising by reason of any good faith deposit with the Corporation in connection with any lease of real estate, bid or contract (other than any contract for the payment of money), any deposit by the Corporation to secure any public or statutory obligation, or to secure, or in lieu of, any surety, stay or appeal bond, and any deposit as security for the payment of taxes or assessments or other similar charges;

(b)     any lien arising by reason of any deposit with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license or to enable the Corporation to maintain self-insurance or to participate in any funds established to cover any insurance risk or in connection with workers' compensation, unemployment insurance, any pension or profit-sharing plan or other social security, or to share in the privileges or benefits required for the participation of the Corporation in such arrangements;

(c)     any judgment lien against the Corporation, so long as such judgment is being contested in good faith and is fully bonded, fully covered by a letter of credit or other surety, or covered by insurance;

(d)     any right reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law affecting any property of the Corporation; any lien on any property of the Corporation for taxes, assessments, levies, fees, water and sewer rents or charges and other governmental and similar charges and any lien of any mechanic, materialman, laborer, supplier or vendor for work or services performed or materials furnished in connection with such property that is not due and payable or that is not delinquent or the amount or validity of which is being contested and execution thereon stayed;

(e)     this Indenture, the Loan Agreement, the Letter of Credit Agreement, the Collateral Agreement and the Mortgage; and any lien or encumbrance disclosed in the title insurance policy delivered in connection with the issuance of the Series 2007 Bonds or the bring down endorsement to such policy delivered in connection with the issuance of the Series 2011 Bonds, provided that such lien or encumbrance is not extended, renewed or modified to apply to any property of the Corporation not subject to such lien or encumbrance on the date such policy is delivered, unless the lien or encumbrance, as so extended, renewed or modified, otherwise qualifies as a Permitted Encumbrance without reference to this clause;

(f)     any lien or encumbrance on the Property or the Receipts securing any Indebtedness permitted by Section 8.10(c) of the Loan Agreement, to finance or refinance Residential Building 2.5 which shall be senior to the lien arising hereunder and under the Mortgage to secure the Senior Bonds and the Subordinated Bonds;

(g)     any lien with respect to moneys deposited by residents or others with the Corporation as security for, or as prepayment of, the cost of resident or other client care and any

lien arising under law or by contract with respect to any deposit made by a prospective resident under a Residence and Care Agreement prior to occupancy;

(h)     any lien on property received by the Corporation through any gift, grant or bequest constituting a restriction imposed by the donor, grantor or testator on such gift, grant or bequest or the income therefrom;

(i)     any lien (other than a lien on the Property) of any third-party payor for recoupment of amounts paid to the Corporation for resident care;

(j)     any lien on property acquired with the proceeds of Indebtedness permitted by Section 8.10(f) of the Loan Agreement;

(k)     [RESERVED];

(l)     any lien granted for the benefit of all holders of Parity Debt in accordance with this Indenture and the Loan Agreement;

(m)     any lease whereunder the Corporation is lessor which relates to property that is of a type that is customarily the subject of such leases, including without limitation, the lease of individual living units, office space for physicians and educational institutions, food service facilities, parking facilities, barber shops, beauty shops, flower shops, gift shops, radiology, pathology or other specialty services and pharmacy and similar departments, and leases of or licenses to use buildings or portions thereof located on the Facility Site, which leases or licenses do not impair the operations being conducted in connection with the Facility (or, if no operations are being conducted therein, the operations for which the Facility was designed or last modified);

(n)     any lien placed upon any real or personal property being acquired by the Corporation to secure all or a portion of the purchase price thereof and any landlord's lien under any lease permitted under the Loan Agreement;

(o)     any lien or encumbrance on any property existing on the date on which such property was acquired by the Corporation, including (without limitation) any acquisition as a result of a merger or consolidation permitted by Section 8.09 of the Loan Agreement, involving the owner of such property, provided that such lien is not extended or modified to apply to other property, no Additional Indebtedness is incurred which is secured by such lien, and such lien is not extended, renewed or replaced with another lien or mortgage, unless the lien, as so extended, renewed or modified, otherwise qualifies as a Permitted Encumbrance without reference to this clause;

(p)     with respect to property acquired after the effective date of this Indenture, liens securing the purchase price of such property, or existing liens, provided that Indebtedness secured by liens under this subsection (p) (i) is not incurred prior to the Resizing Tender Date, and (ii) does not exceed 10% of Book Value or Market Value, at the option of the Corporation, of Net Plant, Property and Equipment of the Corporation, provided, any property that is encumbered by a lien other than the Mortgage securing this Indenture shall be excluded from the determination of Book Value or Market Value of Net Plant, Property and Equipment;

(q)     such easements, rights-of-way, servitudes, restrictions and other defects, liens and encumbrances which shall not materially impair the use of the Property for its intended purposes or the value of the Property;

(r)     such easements, servitudes, restrictions, licenses, restrictive covenants and rights-of-way (including the dedication of public highways or public or private utility easements) as may be required by governmental authorities or utility providers in connection with the construction of, or the furnishing of utilities to, the Facility;

(s)     with the consent of the Holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt, and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds, with respect to Parcel Three only, the Neighborhood Three Loan, the Neighborhood Three Loan Mortgage and any other documents or instruments entered into with respect to the Neighborhood Three Loan; and

(t)     any banker's lien arising in connection with the establishment and maintenance of depository bank accounts in the ordinary course of business.

"Person" or "person" means any natural person, firm, association, corporation, company, trust, partnership, public body or other entity.

"Plans and Specifications" means the plans and specifications in accordance with which any Additional Facilities are to be constructed by a Construction Contractor.

"Pledged Bonds" means Variable Rate Bonds that have been purchased with proceeds of a drawing under the Letter of Credit in respect of which the Letter of Credit has not been reinstated.

"Prime Rate" means, with respect to the Series 2011 Bonds, the prime rate of interest established and declared from time to time by the Trustee as a commercial lending institution or, if the Trustee is not a commercial lending institution, by a commercial lending affiliate of the Trustee, and with respect to the Variable Rate Bonds, the "Prime Rate" as such term is defined in any Letter of Credit Agreement.

"Principal Accounts" means the Series 2011 A-1 Principal Account, the Series 2007 B Principal Account, the Series 2011 A-2 Bonds Principal Account and the Series 2011 B Principal Account within the Series 2011 Debt Service Fund created pursuant to this Indenture.

"Principal Portion" or "Principal Component" has the meaning given to that term in the Letter of Credit.

"Project" means the Facility.

"Projected Rate" means the projected yield at par of an obligation, as set forth in the report of a Management Consultant which report shall state that in determining the Projected Rate such Management Consultant reviewed the yield evaluations at par of not less than five obligations selected by such Management Consultant, the interest on which is excludable from gross income for federal income tax purposes (or, if it is not expected that it will be possible to

issue such tax-exempt obligations to refinance the Indebtedness with respect to which debt service is being estimated, obligations the interest on which is subject to federal income tax) which obligations such Management Consultant states in its opinion are reasonable comparisons to be utilized in developing such Projected Rate and which obligations: (a) were Outstanding on a date selected by the Management Consultant which date so selected occurred during the 45-day period preceding the date of the calculation utilizing the Projected Rate in question, (b) to the extent practicable, are obligations of persons engaged in operations similar to those of the Corporation and having a credit rating similar to that of the Corporation, (c) are not entitled to the benefits of any credit enhancement including without limitation any letter of credit or insurance policy (except in a case where the Corporation has a commitment for comparable credit enhancement), and (d) to the extent practicable, have a remaining term and amortization schedule substantially the same as the obligation with respect to which such Projected Rate is being determined.

"Property" means the real property and all buildings, structures and improvements thereon described in the granting clauses of the Mortgage, including, without limitation, the Facility and the Land, as more fully described in Exhibit A attached to the Mortgage and all other items of property described in the Granting Clauses of the Mortgage and included in the term "Property" as used and defined in the Mortgage.

"Purchase Account" means the Series 2007 B Purchase Account within the Series 2011 Debt Service Fund created pursuant to this Indenture.

"Purchase Price" means, with respect to any Variable Rate Bond, the price at which any such Bond shall be purchased on any Mandatory Tender Date or Optional Tender Date, which shall be an amount equal to 100% of the Outstanding principal amount thereof plus accrued interest (if any) to the date of purchase.

"Rating Agencies" means Moody's, S&P and Fitch.

"Rebate Amount" shall have the meaning given to that term in the Tax Certificate.

"Rebate Expert" means any of the following chosen by the Corporation: (a) Bond Counsel, (b) any nationally recognized firm of certified public accountants, (c) any reputable firm which offers to the tax-exempt bond industry rebate calculation services and holds itself out as having expertise in that area, or (d) such other person as is approved by Bond Counsel.

"Receipts" means all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third-party payments), condemnation awards and other moneys received by or on behalf of the Corporation, including (without limitation) revenues derived from (a) ownership, operation or leasing of any portion of the Facility and the Facility Site (including, without limitation, Fees and any other fees payable by or on behalf of residents of the Property) and all rights to receive the same (other than the right to receive Medicaid and Medicare payments), whether in the form of accounts, general intangibles or other rights, and the proceeds of such accounts, general intangibles and other rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (b) gifts, grants, bequests, donations and contributions heretofore or hereafter made

that are legally available to meet any of the obligations of the Corporation incurred in the financing, operation, maintenance or repair of any portion of the Property; provided, however, that there shall be excluded from Receipts any moneys received by the Corporation from prospective residents or commercial tenants in order to pay for customized improvements to those Residential Units or other areas of the Facility to be occupied by such residents or leased to such tenants.

"Record Date" means, with respect to, the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds, the 1st day of the month of the applicable Interest Payment Date and, with respect to any Series of Variable Rate Bonds, (a) during any period in which such Series of Variable Rate Bonds bear interest at the Variable Rate, the last day before each Interest Payment Date, (b) during any Fixed Rate Period, the first day of the calendar month of each Interest Payment Date, and (c) in the case of the payment of any defaulted interest, the fifth day before such payment; provided, however, that if any such day is not a Business Day, the Record Date will be the Business Day immediately preceding such day.

"Redemption Price" means, when used with respect to any Bond or Parity Obligation or portion thereof, the principal amount of such Bond or such Parity Obligation or such portion thereof plus the applicable premium, if any, payable upon redemption thereof pursuant to this Indenture.

"Refunding Indebtedness" means any Additional Indebtedness including any Cross-over Refunding Indebtedness issued for the purpose of refunding any Outstanding Long-Term Indebtedness and financing the funding of related reserve funds, costs of issuance and other costs related to such refunding.

"Registrar" or "Bond Registrar" means the Trustee in its capacity as bond registrar under this Indenture.

"Reimbursement Rate" means the fluctuating rate of interest that is at all times equal to the Prime Rate plus one percent (1.0%) per annum.

"Remarketing Agent" means, with respect to the Variable Rate Bonds, B.C. Ziegler and Company and any successor appointed by the Corporation to serve as Remarketing Agent for the Variable Rate Bonds.

"Remarketing Agreement" means (a) the Remarketing Agreement dated the date hereof, between the Remarketing Agent and the Corporation relating to the Variable Rate Bonds, together with any and all Supplements thereto, and (b) any other remarketing agreement or similar agreement among the Remarketing Agent, and the Corporation, pursuant to which the Remarketing Agent agrees to use its best efforts to remarket and sell Bonds Tendered or Deemed Tendered for Purchase, together with any and all Supplements thereto.

"Renaissance Gardens Two Loan" shall have the meaning assigned such term in Section 8.14 of the Loan Agreement.

"Replacement Bonds" means Bonds that are issued upon the discontinuance of the maintenance of the Bonds in Book-Entry Form or the appointment of a replacement Depository in accordance with Section 2.17 hereof.

"Reserved Rights of the Issuer" means (a) all rights of the Issuer as set forth in Sections 5.07, 6.02, 8.01, 8.04, 8.06, 8.08, 9.07, 11.04, 11.07 and 11.15 of the Loan Agreement, (b) the right of the Issuer to receive notices, reports or other information hereunder and under the Loan Agreement, (c) all rights of the Issuer to enforce (other than the declaration of a default under the Loan Agreement) the representations, warranties, covenants and agreements of the Corporation pertaining in any manner or way, directly or indirectly, to the tax-exempt status of interest on any Tax-Exempt Bonds set forth in the Loan Agreement or in the Tax Certificate or in any other certificate or agreement executed by the Corporation, (d) all rights of the Issuer in connection with any amendment to or modification of this Indenture and the Loan Agreement and (e) all enforcement remedies with respect to the foregoing.

"Residence and Care Agreement" means each and every Residence and Care Agreement, as amended from time to time, between the Corporation and a resident of the Facility giving the resident certain rights of occupancy in the Facility, including, without limitation, the Residential Units and the Nursing Care Beds, and providing for certain services to such resident, which contract shall be in one of the forms previously delivered to the Department of Elder Affairs of the Commonwealth and the Letter of Credit Provider, as such forms may from time to time be amended, modified or supplemented in accordance with Section 5.08 of the Loan Agreement.

"Residential Building" means a building located within the Facility that contains Residential Units.

"Residential Building 2.5" means the Residential Building identified as such in the Development Plan which is intended to be constructed as part of the Facility.

"Residential Building 2.5 Initial Entrance Fees" means Initial Entrance Fees payable to the Corporation by residents of Residential Building 2.5.

"Residential Units" means an Independent Living Unit (as defined in the Residence and Care Agreements) within the Facility, and, for the avoidance of doubt, does not include Nursing Beds.

"Resizing Event" means the occurrence of any one of the following:

(a)      if the Corporation never satisfies the Commencement Test on or before February 29, 2016, the date of delivery of the Corporation's audited financial statements for Fiscal Year 2015;

(b)      if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and

(2)     Fiscal Year 2017;

(c)     if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2020, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and

(2)     the Fiscal Year in which the Construction Loan is repaid;

(d)     subject to Sections 4.05 and 4.06 of the Loan Agreement, if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and the Corporation is not in default of its obligation to proceed with construction of Residential Building 2.5 under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and

(2)     Fiscal Year 2016; and

(e)     if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends; and

(f)     Notwithstanding subsections (a) through (e) above, any pending Resizing Event may be extended due to a Good Cause Delay, as provided in Section 6.04 of the Loan Agreement.

"Resizing Factor" means the percentage derived by dividing the principal amount of Senior Parity Debt Outstanding immediately after the resizing of such Senior Parity Debt on the Resizing Tender Date by the principal amount of Senior Parity Debt Outstanding immediately before such resizing.

"Resizing Financial Statements" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if the Corporation's audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the

August 31 immediately following such Fiscal Year and the Holders of the Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use the Corporation's unaudited financial statements from such Fiscal Year reviewed by the Corporation's auditor under an agreed upon procedures letter or some other arrangement approved by the Holders of a majority in aggregate principal amount of the Senior Parity Debt.

"Resizing Review Date" means the earliest of (i) the Resizing Tender Date, (ii) the date on which, upon a Resizing Event, that an Independent Resizing Consultant determines, pursuant to Section 2.22 of this Indenture, that no resizing of the Series 2011 A Bonds is necessary and (iii) the date the Corporation's right to require a Resizing Event is terminated as provided in Section 4.05 of the Loan Agreement.

"Resizing Tender Agent" means B.C. Ziegler and Company and any successor appointed by the Corporation to serve as Resizing Tender Agent for the Series 2011 Bonds.

"Resizing Tender Date" means unless the Corporation's right to require a Resizing Event is terminated as provided in Section 4.05 of the Loan Agreement or the Independent Resizing Consultant determines upon a Resizing Event pursuant to Section 2.22 of the Indenture that no resizing of the Series 2011 A Bonds is necessary (in each such case, there shall be no Resizing Tender Date), the date which is 45 days after the later of (a) the date on which the Resizing Event occurs and (b) the date on which the Corporation has delivered the Certificate to the Trustee pursuant to Section 4.10 of the Loan Agreement, at which time the Series 2011 A-1 Bonds and Series 2011 A-2 Bonds shall be subject to mandatory tender and exchange in accordance with Sections 2.04 and 2.06 of this Indenture and the Series 2007 B Bonds shall be subject to mandatory tender and purchase in accordance with Section 2.05 of this Indenture.

"Revenues" means (a) all payments to the Trustee for the account of the Issuer or the Letter of Credit Provider pursuant to the Loan Agreement, the Letter of Credit Agreement and the Mortgage, including without limitation payments from the Receipts, and (b) all other receipts of the Issuer or the Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 with the proceeds of Bonds; provided, however, that the term "Revenues" does not include the Reserved Rights of the Issuer.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, or its successors in the business of providing investment rating services, provided that if neither S&P nor any such successor is then in the business, the references to S&P and ratings thereof shall no longer be required by the terms and provisions of the documents.

"Senior Bonds" means the Series 2011 A Bonds (including the Series 2007 B Bonds) and any Additional Senior Bonds.

"Senior Debt Service Reserve Fund" means the Senior Debt Service Reserve Fund created pursuant to Section 4.02 of this Indenture.

\29695489.18

"Senior Debt Service Reserve Fund Credit Facility" means any Credit Facility held to the credit of the Senior Debt Service Reserve Fund.

"Senior Debt Service Reserve Fund Requirement" means, as of any particular date of computation, with respect to the Senior Debt Service Reserve Fund, an amount equal to (1) with respect to the Series 2011 A Bonds secured by the Senior Debt Service Reserve Fund maintained for the Series 2011 A Bonds, (i) initially an amount equal to Maximum Annual Debt Service on the Series 2011 A-1 Bonds and the Series 2007 B Bonds and (ii) on and after the date on which (a) redemption payments on the Series 2011 B Bonds commence under Section 3.09(c) of this Indenture, and (b) the Corporation achieves 90 Days' Cash on Hand, fifty percent (50% ) of the Maximum Annual Debt Service on the Series 2011 A-1 Bonds and the Series 2007 B Bonds Outstanding on such date and secured thereby, and (2) with respect to any other Series of Bonds or the debt service reserve fund, if any, maintained for such Bonds, such amount as shall be established in the Supplemental Indenture authorizing the issuance of such Bonds.  Any surplus amounts released from the Senior Debt Service Reserve Fund resulting after the Resizing Tender Date or from the operation of clause (1)(ii) shall be applied in accordance with the provisions of Section 4.08 of this Indenture.

"Senior Parity Debt" means the Senior Bonds and the Senior Parity Obligations.

"Senior Parity Obligations" means any Parity Obligation which is designated as a Senior Parity Obligation in accordance with Section 5.06 of this Indenture and in compliance with Section 8.11 of the Loan Agreement.

"Series" or "series" means any series or subseries of Bonds authorized by this Indenture.

"Series 2007 Bonds" has the meaning given such term in the Recitals.

"Series 2007 B Bonds" means the Original Series 2007 B Bonds, as amended and restated in accordance with this Indenture.

"Series 2011 A Bonds" means, collectively, the Series 2007 B Bonds, the Series 2011 A-1 Bonds and the Series 2011 A-2 Bonds.

"Series 2011 A-1 Bonds" means Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt) authorized to be issued by Section 2.02(b)(i) of this Indenture.

"Series 2011 A-2 Bonds" means the Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt) authorized to be issued by Section 2.02(b)(ii) of this Indenture, and includes, collectively, the Subseries I of Series 2011 A-2 Bonds and the Subseries II of Series 2011 A-2 Bonds.

"Series 2011 B Bonds" means the Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt), authorized to be issued by Section 2.02(b)(iii) of this Indenture.

"Series 2011 Bonds" means, collectively, the Series 2011 A Bonds and the Series 2011 B Bonds.

"Series 2011 Loan" means the loan deemed to have been made by the Issuer to the Corporation by virtue of the issuance of the Series 2011 Bonds in exchange for the Series 2007 Bonds tendered for exchange pursuant to this Indenture.

"Short-Term Indebtedness" means any Indebtedness (a) incurred or assumed by the Corporation for a term not exceeding 365 days, except any such Indebtedness with respect to which a Credit Facility is then in effect, and (b) any Guaranty of any Indebtedness that would be described in clause (a) above if such Indebtedness were incurred directly by the Corporation. Optional Tender Indebtedness shall not be deemed to constitute Short-Term Indebtedness for the purposes of the Loan Agreement solely by reason of the option of the holder thereof to require the redemption or purchase thereof or any required redemption or purchase thereof in connection with the termination of a Credit Facility securing such Optional Tender Indebtedness prior to the stated maturity thereof.

"Significant Holder" means the Letter of Credit Provider and any holder of at least $1,000,000 in aggregate principal amount of Outstanding Parity Debt, which holder has notified the Trustee and the Corporation in writing of such holder's address for the delivery of information under the provisions of the Bond Documents.

"Sinking Fund Account" means the Series 2011 Sinking Fund Account within the Series 2011 Debt Service Fund created pursuant to this Indenture.

"Sinking Fund Installment" means the amount of money provided in this Indenture, and in each Supplemental Indenture authorizing any Series of Additional Bonds, to redeem prior to maturity and pay at maturity Bonds at the times and in the amounts provided in Section 2.10 of this Indenture or such Supplemental Indenture (as the case may be), less the amount of any credit against such amount arising from the purchase of Bonds in any prior Bond Year as provided in Section 4.07 of this Indenture.

"Special Senior Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.14 of this Indenture.

"Special Senior Parity Debt" means the Special Senior Bonds or the Special Senior Parity Obligations, as applicable, issued to evidence the Construction Loan.

"Special Senior Parity Obligation" means any Parity Obligation which is designated as a Special Senior Parity Obligation in accordance with Section 5.06 of this Indenture and in compliance with Section 8.11 of the Loan Agreement.

"Stable Occupancy" means, as assumed in a Management Report or report of a Management Consultant required pursuant to the terms of this Indenture or the Loan Agreement, the maximum functional occupancy or utilization percentage for a revenue producing facility the acquisition, construction, renovation or replacement of which was financed in whole or in part with Additional Indebtedness.

"Standby List" means the list of prospective residents of the Facility who have indicated that they are ready to move into a specific type of Residential Unit when it becomes available.

"Subordinated Bonds" means the Series 2011 B Bonds and any Additional Subordinated Bonds.

"Subordinated Indebtedness" means Indebtedness the terms of the documents providing for the issuance of which expressly provide that all payments on such Subordinated Indebtedness shall be subordinated to the timely payment of all Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt, whether currently Outstanding or subsequently issued.

"Subordinated Parity Debt" means the Subordinated Bonds and the Subordinated Parity Obligations.

"Subordinated Parity Obligation" means any Parity Obligation which is designated as a Subordinated Parity Obligation in accordance with Section 5.06 of this Indenture and in compliance with Section 8.22 of the Loan Agreement.

"Subseries I of Series 2011 A-2 Bonds" means the $_____ principal amount of Series 2011 A-2 Bonds designated as "Subseries I" in accordance with Section 2.06 of this Indenture.

"Subseries II of Series 2011 A-2 Bonds" means the $_____ principal amount of Series 2011 A-2 Bonds designated as "Subseries II" in accordance with Section 2.06 of this Indenture.

"Substitute Letter of Credit" means, with respect to the Variable Rate Bonds, any letter of credit, bond insurance policy, bond purchase agreement, guaranty, line of credit, surety bond or similar credit or liquidity facility meeting the requirements of and delivered to the Trustee in accordance with Section 2.06 of this Indenture, together with all Supplements thereto, the administrative provisions of which are reasonably satisfactory to the Trustee.

The requirements for the provision of a Substitute Letter of Credit include the following items:

(i)     an opinion of Bond Counsel addressed to the Issuer and the Trustee to the effect that the delivery of the proposed Substitute Letter of Credit to the Trustee is permitted under this Indenture and the Loan Agreement and complies with their terms and that such delivery and any such change(s) will not adversely affect (A) if any Series of Variable Rate Bonds are Tax-Exempt Bonds, the excludability of the interest payable on such Series of Variable Rate Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code and (B) the excludability of interest on the Variable Rate Bonds from gross income for purposes of state, county and municipal taxation in the Commonwealth,

(ii)    an opinion of Independent Counsel addressed to the Issuer and the Trustee to the effect that the Substitute Letter of Credit is exempt from the registration requirements of the Securities Act of 1933, as amended,

(iii)    an opinion of Independent Counsel addressed to the Issuer and the Trustee to the effect that the Substitute Letter of Credit constitutes the valid and legally binding obligation of the Letter of Credit Provider issuing the Substitute Letter of Credit, and

(iv)    the written consent of the Remarketing Agent to the substitution of the proposed Substitute Letter of Credit for the Letter of Credit then in effect, which consent shall not be unreasonably withheld.

"Supplement" or "Supplements" means any and all extensions, renewals, modifications, amendments, supplements and substitutions.

"Supplemental Indenture" means any indenture of the Issuer amending, modifying or supplementing this Indenture, any Supplemental Indenture, the Loan Agreement or any Bond, adopted and becoming effective in accordance with the terms of this Indenture.

"Tax Certificate" means the Tax Certificate and Covenants executed and delivered by the Corporation upon the issuance and delivery of the Series 2011 Bonds and any other similar certificates executed and delivered by the Corporation upon the issuance and sale of any other Series of Tax-Exempt Bonds.

"Tax-Exempt Bonds" means the Series 2011 Bonds and any other Bonds with respect to which there shall have been delivered to the Issuer an opinion of Bond Counsel to the effect that the interest on such Bonds is excludable from gross income for federal income tax purposes.

"Tax Exemption" means the exclusion of the interest on the Bonds from the gross income of an Owner for federal income tax purposes, subject to the limitations and qualifications described in the opinion of Bond Counsel on the date of issue of the Bonds.

"Taxes" means all taxes, water rents, sewer rents, assessments and other governmental or municipal or public or private dues, charges and levies and any prior liens (including federal tax liens) for the Taxes which are or may be levied, imposed or assessed upon the Property or any part thereof, or any leases pertaining thereto, or upon the rents, issues, income or profits thereof, whether any or all of the aforementioned be levied directly or indirectly or as excise taxes or as income taxes.

"Tender Agent" means B.C. Ziegler and Company and any successor appointed by the Corporation to serve as Tender Agent for the Series 2011 Bonds.

"Tender Date" means, with respect to any Series of Variable Rate Bonds, (a) an Optional Tender Date or (b) a Mandatory Tender Date.

"Termination Date" means, with respect to any Series of Variable Rate Bonds, the earliest of (a) the fifth Business Day before the expiration date of the Letter of Credit then in effect subject to Section 9.01(e) of this Indenture, (b) the fifth Business Day before the expiration date of the Confirming Letter of Credit then in effect, if one is in effect, and (c) the effective date of any Substitute Letter of Credit (including a substitute Confirming Letter of Credit) that replaces any Letter of Credit or Confirming Letter of Credit, if any, then in effect. The expiration date of the Letter of Credit delivered on the Closing Date is July 1, 2021.

"Total Expenses" means total operating and non-operating expenses of the Corporation determined in accordance with generally accepted accounting principles consistently applied; provided, however, that no determination thereof shall take into account (a) any loss resulting from the early extinguishment of Indebtedness or the sale, exchange or other disposition of investments or capital assets not in the ordinary course of business or (b) any unrealized loss from investments (including any unrealized losses on Hedge Agreements and Derivative Indebtedness), or (c) realized losses on Hedge Agreements or Derivative Indebtedness.

"Total Operating Expenses" means, for any period, the sum of all expenses of the Corporation for such period, exclusive of items that did not require the expenditure of cash (including, without limitation, depreciation and amortization), but specifically including debt service (including Debt Service on the Bonds) and management fees, determined in accordance with generally accepted accounting principles consistently applied.

"Trust Estate" has the meaning given to that term in the Granting Clauses hereof.

"Trustee" means the bank, trust company or national banking association appointed pursuant to Section 6.01 of this Indenture as trustee for the Bonds and any other corporation that may at any time be substituted in its place pursuant to this Indenture, and their successors.

"Unrestricted Cash and Investments" means, as of the date of determination, any cash, cash equivalents and marketable securities, including Commonwealth-mandated reserve funds, and board designated or trustee held funds (specifically including amounts in the Operating Reserve Fund, the Supplemental Reserve Fund and the Supplemental Reserve Account but specifically excluding amounts in any fund or account held by the Trustee as a "bond," debt service or similar fund or account, including the Senior Debt Service Reserve Fund, the Revenue Fund, the Insurance and Condemnation Award Fund, each Debt Service Fund, the Construction Fund, the Construction Account, the Redemption Fund and the Letter of Credit Fund, pursuant to this Indenture), all to the extent available for the payment of operating expenses and Debt Service and as evidenced by the most recent financial statements of the Corporation, less all Indebtedness not properly classified on such statements as Long-Term Indebtedness (except Short-Term Indebtedness resulting from delays in payments owed by third-party payors and scheduled payments of Long-Term Indebtedness), and less trade payables in excess of 30 days not attributable to delays in payments from third-party payors.

"Variable Rate" means, with respect to any Series of Variable Rate Bonds, the rate of interest borne by such Series of Variable Rate Bonds during any period other than a Fixed Rate Period.

"Variable Rate Bonds" means, collectively, the Series 2007 B Bonds and any Additional Bonds initially bearing interest at a Variable Rate.

"Variable Rate Indebtedness" means, as of any particular date, Long-Term Indebtedness the interest rate on which is not established at a fixed rate or rates for the remaining term thereof.

Section 1.02. <u>Rules of Construction</u>.  Unless the context clearly indicates to the contrary, the following rules shall apply to the construction of this Indenture:

\29695489.18

(a)     Words importing the singular number include the plural number and words importing the plural number include the singular number.

(b)     Words of the masculine gender include correlative words of the feminine and neuter genders.

(c)     The headings and the table of contents set forth in this Indenture are solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect.

(d)     Words importing persons include any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or agency or political subdivision thereof.

(e)     Any reference to a particular Article or Section shall be to such Article or Section of this Indenture unless the context shall otherwise require.

(f)     Any reference to a person or entity shall include and mean such person or entity and his or its successors and permitted assigns.

(g)     Any reference to a document, instrument, certificate or agreement in writing shall include and mean such document, instrument, certificate or agreement in writing as replaced, supplemented or amended in accordance with its terms.

Section 1.03.   Accounting Terms.  Unless specifically provided otherwise, all accounting terms used herein shall have the definitions given them in accordance with generally accepted accounting principles as applied to the Corporation on a consistent basis by its accountants in the preparation of its previous annual financial statements.

ARTICLE II
AUTHORIZATION OF THE REFINANCING OF THE FACILITY; AUTHORIZATION AND DETAILS OF THE SERIES 2007 BONDS AND THE SERIES 2011 BONDS; ADDITIONAL BONDS

Section 2.01.   Refinancing Authorized.   The application of the proceeds of the Series 2011 Bonds to refinance the costs of the Facility by exchanging the Series 2007 Bonds for the Series 2011 Bonds as provided herein is hereby authorized.

Section 2.02.   Bonds Authorized; Designations. (a)No Bonds may be issued under the provisions of this Indenture except in accordance with this Article.  The total principal amount that may be issued and outstanding hereunder is expressly limited to $____.  The Series 2007 Bonds were initially issued pursuant to and in accordance with the Original Indenture in order to obtain moneys for the Issuer to loan to the Corporation.  On the Closing Date, (i) the Series 2011 Bonds will be issued as provided in subsection (b) below, and (ii) a portion of the Series 2007 Bonds will be exchanged for Series 2011 Bonds as provided in subsection (c) below.

(b)     There is hereby authorized the issuance of $_____ aggregate principal amount of bonds, which shall be designated as follows and issued as hereinafter provided, for

the purposes described in the recitals. Each Series of the Series 2011 Bonds shall be individually designated as follows:

(i)     The Series 2011 A-1 Bonds shall be designated "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)."

(ii)    The Series 2011 A-2 Bonds shall be designated "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt)."

(iii)   The Series 2011 B Bonds shall be designated "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)."

On the Closing Date, all Outstanding Series 2007 A Bonds shall be exchanged in accordance with (c)(i) below and the Letter of Credit Provider, as the Owner of any Original Series 2007 B Bonds or Series 2007 C Bonds tendered for purchase on or prior to such Closing Date, shall be exchanged in accordance with (c)(ii) below. On each date after the Closing Date that Original Series 2007 B Bonds and/or Series 2007 C Bonds are (1) tendered and purchased with a draw on the letter of credit securing the Original Series 2007 B Bonds and Series 2007 C Bonds (the "2007 Letter of Credit"), the Issuer shall issue and the Trustee shall authenticate and deliver such Series 2011 Bonds in the principal amounts determined in accordance with (c)(ii) below to the Letter of Credit Provider, or (2) tendered but not purchased with a draw on the 2007 Letter of Credit (each, a "2011 Issue Date"), the Issuer shall issue and the Trustee shall authenticate and deliver Series 2011 Bonds in the principal amount determined in accordance with (c)(ii) below to the Owner of such Original Series 2007 B Bonds and Series 2007 C Bonds, but only upon receipt by the Trustee of:

(A)     Borrower's Tax Certificate;

(B)     Issuer's Non-Arbitrage Certificate;

(C)     Bond Counsel Opinion;

(D)     Special Tax Counsel Opinion

(E)     Form 8038.

(c)     The Series 2007 Bonds shall be exchanged for Series 2011 Bonds, as follows:

(i)     Owners tendering Series 2007 A Bonds shall receive Series 2011 Bonds, (A) subject to clause (iii) below, ___% of which shall be a ratable share of Series 2011 A-1 Bonds maturing as set forth below, (B) ___% of which shall be a ratable share of Series 2011 A-2 Bonds, and (C) ___% of which shall be a ratable share of Series 2011 B Bonds, each by taking into account the total principal amount of Series 2007 A Bonds tendered:

- 43 -

|                                              | Exchanged For:                                 |
| Series 2007 A Bonds Maturing<br>(November 15) | Series 2011 A-1 Bonds Maturing<br>(November 15) |
| :---: | :---: |
| 2011 | 2013 |
| 2012 | 2014 |
| 2014 | 2017 |
| 2015 | 2018 |
| 2016 | 2019 |
| 2017 | 2020 |
| 2018 | 2021 |
| 2022 | 2026 |
| 2027 | 2031 |
| 2035 | 2039 |
| 2042 | 2046 |

(ii)     Owners tendering Original Series 2007 B Bonds and Series 2007 C Bonds shall receive Series 2007 B Bonds, Series 2011 A-2 Bonds and Series 2011 B Bonds, (A) ___% of which shall be a ratable share of Series 2007 B Bonds, (B) ___% of which shall be a ratable share of Series 2011 A-2 Bonds and (C) ___% of which shall be a ratable share of Series 2011 B Bonds, each by taking into account the total principal amount of Original Series 2007 B Bonds and Series 2007 C Bonds tendered.

(iii)     Notwithstanding the foregoing, the principal amount of each Series 2011 A-1 Bonds to be exchanged for Series 2007 A Bonds tendered shall be reduced by multiplying the ratable share calculated as set forth above by the 2007 A Series Factor (see chart below).  Such factor computed so that the total debt service on each Series 2011 A-1 Bonds is the same as such total debt service if the Series 2011 A-1 Bonds bore interest at 5.5%.

| Original<br>CUSIP | Original Maturity<br>(2007 A Bonds) | 2007 A Series<br>Factor |
| :---: | :---: | :---: |
| 57583RPL3 | 11/15/2011 | 0.9818664753 |
| 57583RPM1 | 11/15/2012 | 0.9673413268 |
| 57583RPP4 | 11/15/2014 | 0.9442425124 |
| 57583RPQ2 | 11/15/2015 | 0.9306268897 |
| 57583RPR0 | 11/15/2016 | 0.9254893529 |
| 57583RPS8 | 11/15/2017 | 0.9213127500 |
| 57583RPT6 | 11/15/2018 | 0.9179318442 |
| 57583RPU3 | 11/15/2022 | 0.9109989513 |
| 57583RPV1 | 11/15/2027 | 0.9084096035 |
| 57583RPW9 | 11/15/2035 | 0.9097238063 |
| 57583RPX7 | 11/15/2042 | 0.9147238610 |

(d)     All Series 2007 A Bonds and Series 2007 C Bonds exchanged on the Closing Date will no longer be Outstanding under this Indenture and a portion of the Original

Series 2007 B Bonds will be amended and restated and the Series 2007 B Bonds will be reissued under this Indenture.

(e)     Owners of Series 2007 Bonds who tender such Series 2007 Bonds for exchange in accordance with this Indenture will be deemed to have (i) waived any and all rights with respect to the Series 2007 Bonds so tendered (including without limitation, any existing or past defaults by the Issuer, the Corporation, the Trustee or any party acting on the Issuer's behalf or at its instruction and their consequences in respect of such Series 2007 Bonds), and (ii) released and discharged the Issuer, the Corporation, the Trustee and their respective affiliates, current and former officers, directors, managers, members, employees, attorneys and advisors, each in their respective capacities as such, any party acting on the Corporation's behalf or at the Corporation's instruction from any and all claims such Owner may have, now or in the future, arising out of or related to the Series 2007 Bonds so tendered, including, without limitation, any and all claims that such Owner may be entitled to receive additional principal or interest payments with respect to the Series 2007 Bonds so tendered, including any accrued and unpaid interest (other than as provided in this Indenture) or to participate in any redemption of the Series 2007 Bond so tendered.

Section 2.03.   [Reserved].

Section 2.04.   Details of the Series 2011 A-1 Bonds.  (i) The Series 2011 A-1 Bonds shall be issued in the original aggregate principal amount of $ _____.   The Series A-1 Bonds shall be issued in Authorized Denominations as fully registered bonds without coupons in the forms attached hereto as Appendix B, shall be dated the Closing Date, for purposes of reference, shall be numbered from RA-1 - 1 upward, and shall bear interest (a) from the Closing Date, if authenticated prior to November 15, 2011, or (b) otherwise from May 15 or November 15, that is, or that immediately precedes, the date on which any such Series 2011 A-1 Bond is authenticated (unless payment of interest is in default, in which case such Series 2011 A-1 Bonds shall bear interest from the date to which interest has been paid).  The Series 2011 A-1 Bonds shall bear interest at the rate or rates of interest per year (calculated on the basis of a 360-day year consisting of twelve 30-day months and payable on November 15, 2011, and semiannually thereafter on May 15 and November 15 in each year) set forth below and shall mature on November 15 of each of the years and in amounts as follows:

Series 2011 A-1 Bonds

TERM BONDS

| Due (November 15) | Principal Amount | Interest Rate |
|---|---|---|
| 2013 | $[860,029] | 6.25% |
| 2014 | [892,295] | 6.25% |
| 2017 | [1,877,383] | 6.25% |
| 2018 | [995,489] | 6.25% |
| 2019 | [1,040,210] | 6.25% |
| 2020 | [1,089,078] | 6.25% |
| 2021 | [1,142,003] | 6.25% |

| 2026 | [5,179,642] | 6.25% |
| 2031 | [8,224,441] | 6.25% |
| 2039 | [18,926,654] | 6.25% |
| 2046 | [29,485,498] | 6.25% |

(a)     The Series 2011 A-1 Bonds shall be subject to mandatory, extraordinary and optional redemption prior to maturity and shall have the terms, tenor, denominations, details and specifications as set forth in the form of the Series 2011 A-1 Bonds attached hereto as Appendix B.

The principal of, premium, if any, and interest on the Series 2011 A-1 Bonds shall be payable in lawful money of the United States of America.  Principal of and premium, if any, on the Series 2011 A-1 Bonds shall be payable upon presentation and surrender of the Series 2011 A-1 Bonds as they become due at the Designated Office of the Trustee.  Interest on the Series 2011 A-1 Bonds shall be payable to the Owners of Series 2011 A-1 Bonds by (a) check or draft mailed to such Owners at their addresses as they appear on registration books kept by the Trustee as Bond Registrar on the first day of the month in which interest is to be paid, or (b) by bank wire transfer for registered Owners of $500,000 or more of Series 2011 A-1 Bonds who have provided the Trustee with written instructions on or before the 1st day of the month in which interest is to be paid.

If any principal of or interest on any Series 2011 A-1 Bond is not paid when due (whether at maturity, by acceleration or call for redemption or otherwise), then the overdue installments of principal and, to the extent permitted by law, interest shall bear interest until paid at the same rate set forth in such Series 2011 A-1 Bond.

(b)     The Series 2011 A-1 Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Series 2011 A-1 Bonds.  Such notice shall state:  (1) that a Resizing Event has occurred, the date that  is the Resizing Tender Date and the percentage of the resize; (2) that the Series 2011 A-1 Bonds will be subject to mandatory tender on the Resizing Tender Date, (3) that the Owners do not have a right to waive the mandatory tender of the Series 2011 A-1 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2011 A-1 Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Resizing Tender Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2011 A-1 Bonds pursuant to Section 2.21, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2011 A-1 Bonds so tendered will be exchanged for new Series 2011 A-1 Bonds on the Resizing Tender Date; and (4) that, as of the Resizing Tender Date, the Series 2011 A-1 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under this Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2011 A-1 Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under this Indenture, except to receive new Series 2011 A-1 Bonds in exchange therefor as provided in this Indenture.

Any Series 2011 A-1 Bond to be exchanged on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for exchange and to have been exchanged for new Series 2011 A-1 Bonds in accordance with this Indenture. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2011 A-1 Bond or Bonds in the aggregate principal amount set forth in this Section to the Owner of the Series 2011 A-1 Bond deemed to have been tendered and exchanged; (B) such Series 2011 A-1 Bond deemed to have been tendered and purchased shall no longer be Outstanding under this Indenture; (C) interest on such Series 2011 A-1 Bond deemed to have been tendered and purchased shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Series 2011 A-1 Bond shall cease to be entitled to the benefits and security of this Indenture as of the date on which such Series 2011 A-1 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2011 A-1 Bond by the Owner thereof.

On the Resizing Tender Date, the Series 2011 A-1 Bonds tendered or deemed tendered shall be exchanged for Series 2011 A-1 Bonds resized in principal amount determined by the Independent Consultant in accordance with Section 2.22 of this Indenture. Any accrued and unpaid interest on the Series 2011 A-1 Bonds as of the Resizing Tender Date shall be due and payable as set forth in Section 2.22.

Section 2.05. <u>Details of the Series 2007 B Bonds</u>. The Original Series 2007 B Bonds were initially issued under the Original Indenture in the original aggregate principal amount of $45,000,000. Upon the tender of the Original Series 2007 B Bonds from time to time as described in Section 2.02(b) above, the Original Series 2007 B Bonds will be amended, restated and reissued as Series 2007 B Bonds from time to time on each 2011 Issue Date in the amount established on each 2011 Issue Date provided the maximum aggregate principal amount of Series 2007 B Bonds shall not exceed $_____. The Series 2007 B Bonds shall be issued in Authorized Denominations as fully registered bonds without coupons in the form attached hereto as <u>Appendix C</u>, the Series 2007 B Bonds issued on the Closing Date shall be dated the Closing Date and Series 2007 B Bonds issued on each 2011 Issue Date shall be dated the respective 2011 Issue Date, for purposes of reference, shall be numbered from RB - 1 upward, shall bear interest from the Closing Date or the respective 2011 Issue Date, as the case may be, and shall mature on November 1, 2046. Each Series 2007 B Bond shall bear interest from the Interest Payment Date immediately preceding the date on which such Series 2007 B Bond is authenticated; provided, however, (a) if any Series 2007 B Bond is authenticated on an Interest Payment Date, such Series 2007 B Bond shall bear interest from such Interest Payment Date, and (b) if any Series 2007 B Bond is authenticated prior to the first Interest Payment Date, such Series 2007 B Bond shall bear interest from the date of issuance of the Series 2007 B Bonds, and (c) if at the time of authentication of any Series 2007 B Bond, the Issuer is in default with respect to the payment of interest on such Series 2007 B Bond, such Series 2007 B Bond shall bear interest from the date to which interest shall have been paid. (The certificate of authentication on each Series 2007 B Bond shall be dated the date on which such Series 2007 B Bond is authenticated by the Trustee.) The Series 2007 B Bonds shall be subject to mandatory, extraordinary and optional redemption prior to maturity, and shall have the terms, tenor, denomination, details and specifications as set forth in the form of Series 2007 B Bonds attached hereto as <u>Appendix C</u>. Notwithstanding any other provision of this Section 2.05, any Pledged Bonds shall bear interest at the Bank Rate until

remarkted or repaid.  The provisions of this Section 2.05 shall apply independently to each Series of Series 2007 B Bonds.

(a)  <u>Initial Rate</u>.  In the event the Letter of Credit Provider elects, prior to the Closing Date, to deliver the Letter of Credit, then the Series 2007 B Bonds shall initially bear interest at the Variable Rate.  The initial Variable Rate shall be ____%.  The Series 2007 B Bonds shall bear interest at the initial Variable Rate from and including the date of their initial authentication and delivery to and including the first Adjustment Date.  In the event the Letter of Credit Provider does not elect, prior to the Closing Date, to deliver the Letter of Credit, then the Series 2007 B Bonds shall bear interest at the Fixed Rate of 5.5% per annum to maturity, and all other provisions in this Indenture regarding the Series 2007 B Bonds while bearing interest at a Variable Rate, including the Bank Tender Date and the Bank Conversion Date provisions, shall have no force and effect.

(b)  <u>Determination of Variable Rate</u>.  After the initial Variable Rate has been set, the Variable Rate for the Series 2007 B Bonds shall be determined by the Remarketing Agent on each Adjustment Date and, subject to the provisions of subsection (h) of this Section 2.05, shall be equal to the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Series 2007 B Bonds on the Adjustment Date at a price equal to the principal amount thereof, plus accrued interest, if any, thereon.  The Variable Rate determined by the Remarketing Agent on each Adjustment Date shall be and remain in effect from and including the day immediately following such Adjustment Date through the earlier of (i) the immediately succeeding Adjustment Date and (ii) the immediately succeeding Mandatory Tender Date.  During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, interest on the Series 2007 B Bonds shall be computed on the basis of a year of 365 days (366 days in leap years) for the actual number of days elapsed and shall be payable on each applicable Interest Payment Date commencing _____, 2011.

(c)  <u>Conversion of Interest Rate and Establishment of Fixed Rate Periods</u>. Subject to the terms of the Letter of Credit Agreement and except as provided in the last paragraph of this subsection (c), the Corporation may, on behalf of the Issuer, from time to time, with respect to the Series 2007 B Bonds

(i)  establish one or more consecutive Fixed Rate Periods, or

(ii)  at the expiration of any Fixed Rate Period

(A)  change the interest rate on the Series 2007 B Bonds from the Fixed Rate then in effect to the Variable Rate, or

(B)  establish one or more additional consecutive Fixed Rate Periods,

in any case by delivering to the Trustee, (iii) at least 45 but not more than 90 days before the proposed Conversion Date (or such fewer number of days as is acceptable to the Trustee), a written notice that specifies the proposed change, the Conversion Date and, if one or more Fixed Rate Periods will be established, the Computation Date for each such Fixed Rate Period and the

last day of each such Fixed Rate Period and (iv) on or before the proposed Conversion Date, the following:

(1)     an opinion of Bond Counsel to the effect that such change is permitted by this Indenture and will not adversely affect the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of the Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth;

(2)     if there is then a Letter of Credit in effect that will remain in effect following the establishment of one or more Fixed Rate Periods,

(x)     evidence satisfactory to the Trustee, including an amendment to the existing Letter of Credit if necessary, that the amount which can be realized under the Letter of Credit for the payment of interest on the Series 2007 B Bonds is equal to at least 204 days' interest on the Series 2007 B Bonds (or, if the Fixed Rate Period to be established will consist of less than 6 months, the number of days' interest on the Series 2007 B Bonds obtained by adding 20 days to the number of days in such Fixed Rate Period) calculated at the Maximum Rate (or, if the Fixed Rate Period extends to the maturity date of the Series 2007 B Bonds, the actual Fixed Rate on the Series 2007 B Bonds) and on the basis of a 360-day year of twelve 30-day months, and

(y)     written evidence from each of the Rating Agencies, if any, maintaining a rating on the Series 2007 B Bonds that the ratings, if any, borne by the Series 2007 B Bonds will not be reduced or withdrawn as a result of the establishment of the Fixed Rate Period;

(3)     either

(x)     evidence satisfactory to the Trustee that the principal of, any premium on, and interest (at the Fixed Rate applicable to such Fixed Rate Period) on, the Series 2007 B Bonds during such Fixed Rate Period can be realized in full under the Letter of Credit then in effect, or

(y)     an opinion of Independent Counsel to the effect that the exemption of the Series 2007 B Bonds and any Letter of Credit then in effect from the registration requirements of the Securities Act of 1933, as amended, and the exemption of this Indenture from qualification under the Trust Indenture Act of 1939, as amended, will not be impaired as a result of the establishment of such Fixed Rate Period;

(4)     if such Fixed Rate Period does not extend to the maturity of the Series 2007 B Bonds, a new Letter of Credit or amendment to the existing Letter of Credit (if such Letter of Credit will remain in effect following

- 49 -

such Conversion Date), which new Letter of Credit and the issuer thereof or amendment shall be satisfactory to the Trustee; and

(5)     in connection with the establishment of a Fixed Rate Period of more than one year following a period in which the Series 2007 B Bonds accrue interest at the Variable Rate or a Fixed Rate Period of one year or less, at the request of, and in form and content satisfactory to, the Remarketing Agent, additional disclosure on the Corporation, all facilities owned or operated from time to time by the Corporation, and any other matter deemed appropriate by the Remarketing Agent for inclusion in an offering document for the Series 2007 B Bonds.

During any Fixed Rate Period after the Bank Tender Date, the Corporation shall be required either (a) to provide a Letter of Credit for the Series 2007 B Bonds, or (b) to pay to the Trustee for deposit into the Tax-Exempt Senior Debt Service Reserve Fund, cash or a Debt Service Reserve Fund Credit Facility in an amount necessary, if any, to bring the amount on deposit in the Tax-Exempt Senior Debt Service Reserve Fund equal to the Senior Debt Service Reserve Fund Requirement.

The Trustee shall promptly deliver copies of the notice described in clause (iii) above upon receipt to the Bond Registrar, the Paying Agent, the Remarketing Agent and the Letter of Credit Provider.

Fixed Rate Periods established in accordance with this paragraph may be of the same or different periods, but each such Fixed Rate Period shall commence on the first calendar day of a month or, if the Variable Rate is then in effect, the first Thursday of a month, or if such Thursday is not a Business Day, the immediately succeeding Business Day, and shall end on the last calendar day of a month or, if the Series 2007 B Bonds may bear interest at the Variable Rate following the expiration of any Fixed Rate Period, the day immediately preceding the first Thursday of a month, or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday.  Any Fixed Rate Period (a) shall be for a period of at least 2 months in duration and (b) may extend to the maturity of the Series 2007 B Bonds.

At least 35 days before each Conversion Date, the Trustee shall mail a Mandatory Tender Notice to each Owner of Series 2007 B Bonds.

Notwithstanding any other provision in this subsection (c), prior to the Bank Tender Date, the Corporation may convert all of the Series 2007 B Bonds bearing interest at a Variable Rate to a Fixed Rate following a Bank Conversion Date in accordance with subsection (l) herein. The last day of any Fixed Rate Period occurring prior to the Bank Tender Date shall be the Bank Tender Date.

(d)     <u>Rescission of Election to Establish Fixed Rate Periods or to Convert Interest Rate to Variable Rate</u>.  Subject to the terms of the Letter of Credit Agreement, at any time prior to the Fixed Rate Date for any Fixed Rate Period, the Corporation, on behalf of the Issuer, may rescind its election to establish such Fixed Rate Period by written notice to the

- 50 -

Trustee; provided, however, that if any such Fixed Rate Period shall be the second or any subsequent Fixed Rate Period in a succession of Fixed Rate Periods, there shall first be delivered to the Trustee an opinion of Bond Counsel to the effect that such rescission will not adversely affect (i) the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and (ii) the excludability of interest on the Series 2007 B Bonds from gross income for purposes of state, county and municipal taxation in the Commonwealth. If the Corporation rescinds its election to establish a Fixed Rate Period, as provided in this paragraph, or if a Fixed Rate has not been established as required by subsection (c) of this Section 2.05, the Series 2007 B Bonds will bear interest at the Variable Rate then in effect, as if such election had not been made or, if a Fixed Rate Period is then in effect, a new Fixed Rate Period shall be established as provided in subsection (e) of this Section 2.05; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

Subject to the terms of the Letter of Credit Agreement, at any time prior to any Conversion Date on which the interest rate on the Series 2007 B Bonds is to be converted from a Fixed Rate to the Variable Rate, the Corporation, on behalf of the Issuer, may rescind its election to convert the interest rate thereon from a Fixed Rate to the Variable Rate by written notice to the Trustee, in which event a new Fixed Rate Period shall be established as provided in subsection (e) of this Section 2.05; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

Upon receipt of the items required by this subsection (d), the Trustee shall promptly give notice of any such rescission to the Remarketing Agent, the Paying Agent, the Registrar, the Letter of Credit Provider and the Owners of the Series 2007 B Bonds and shall deliver copies of the opinion of Bond Counsel, if any, to the Remarketing Agent, the Paying Agent, the Registrar and the Letter of Credit Provider.

(e) <u>Automatic Establishment of Fixed Rate Periods</u>. If, 45 days before the last day of any Fixed Rate Period for which a succeeding Fixed Rate Period has not been established in accordance with subsection (c) of this Section 2.05 (or such fewer number of days as is acceptable to the Trustee), the Corporation, on behalf of the Issuer, shall not have elected to change the interest rate on the Series 2007 B Bonds to the Variable Rate or to establish a new Fixed Rate Period by delivery of the notice and opinion and evidence with respect to the coverage of the Letter of Credit required by subsection (c) of this Section 2.05, or if the Corporation rescinds any election to establish a new Fixed Rate Period at the end of any Fixed Rate Period or rescinds any election to convert the interest rate on the Series 2007 B Bonds from a Fixed Rate to the Variable Rate at the end of any Fixed Rate Period as provided in subsection (d) of this Section 2.05, a new Fixed Rate Period shall be deemed to have been established having (i) if the Fixed Rate Period then ending consisted of twelve months or fewer than twelve months, the same number of days as the Fixed Rate Period then ending, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, the Series 2007 B Bonds may bear interest at the Variable Rate (provided, however, that such new Fixed Rate Period shall not exceed one year in length), (ii) if

\29695489.18

the Fixed Rate Period then ending consisted of more than twelve months, the same number of days as a Fixed Rate Period of twelve months, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, the Series 2007 B Bonds may bear interest at the Variable Rate, or (iii) such fewer number of days as shall remain until the maturity date thereof, and a new Fixed Rate shall be determined as provided in subsection (f) of this Section 2.05, as if the Corporation had elected, on behalf of the Issuer, to establish a new Fixed Rate Period, except that neither the notice nor the opinion of Bond Counsel referred to in subsection (c) of this Section 2.05 shall be provided.

(f)     Fixed Rate Determination. During any Fixed Rate Period other than any Fixed Rate Period occurring prior to the Bank Tender Date, the Series 2007 B Bonds shall bear interest at the interest rate determined by the Remarketing Agent on the Computation Date to be the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Series 2007 B Bonds of the applicable Series on the Fixed Rate Date at a price equal to the principal amount thereof plus accrued interest, if any, thereon. The Remarketing Agent shall determine the Fixed Rate for each Fixed Rate Period on the applicable Computation Date, and the Fixed Rate determined by the Remarketing Agent on each Computation Date shall constitute the Fixed Rate applicable to all Series 2007 B Bonds of the applicable Series. During any Fixed Rate Period occurring prior to the Bank Tender Date, the Series 2007 B Bonds converted to the Fixed Rate shall bear interest at 5.5% per annum.

Each Fixed Rate determined by the Remarketing Agent for any Fixed Rate Period shall be and remain in effect from and including the Fixed Rate Date on which such Fixed Rate Period commences to and including the last day of such Fixed Rate Period. During any Fixed Rate Period, the interest payable on the Series 2007 B Bonds will be computed on the basis of a 360-day year of twelve 30-day months.

(g)     Notice of Interest Rates. The Remarketing Agent shall: (i) on each Adjustment Date give the Trustee, the Corporation, the Letter of Credit Provider, the Bond Registrar and the Paying Agent notice by telecopy of the Variable Rate determined on such Adjustment Date; and (ii) on each Computation Date give the Trustee, the Corporation, the Letter of Credit Provider, the Bond Registrar and the Paying Agent notice by telecopy of the Fixed Rate so determined.

(h)     Maximum Rate. Notwithstanding the foregoing provisions of this Section 2.05, so long as a Letter of Credit is in effect, the interest rate payable on the Series 2007 B Bonds (other than Pledged Bonds) may not exceed the Maximum Rate. The Issuer may from time to time, upon the written request of the Corporation, increase the Maximum Rate by delivering to the Trustee (i) evidence of the approval of the Issuer authorizing such increase in the Maximum Rate, certified by an Authorized Officer of the Issuer, (ii) an opinion of Bond Counsel to the effect that such increase in the Maximum Rate has been duly and properly approved by the Issuer and that the approval of the Issuer is valid and binding and that such increase in the Maximum Rate will not adversely affect (A) the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal

income taxation pursuant to Section 103 of the Code, and (B) the excludability of interest on the Variable Rate Bonds from gross income for purposes of state, county and municipal taxation in the Commonwealth, and (iii) an amendment to the Letter of Credit providing that, or other evidence satisfactory to the Trustee that, the amount that can be realized thereunder for the payment of interest on the Series 2007 B Bonds is equal to 51 days' interest thereon (or such greater number of days of interest as may then be drawn under the Letter of Credit), calculated at the Maximum Rate after giving effect to such increase. The Trustee shall give written notice to the Bond Registrar, the Paying Agent and the Remarketing Agent of any increase in the Maximum Rate, promptly upon its receipt of the items referred to in this subsection (h). The Trustee shall give each of the Rating Agencies then maintaining a rating on the Series 2007 B Bonds written notice of any such increase in the Maximum Rate.

(i)     Default Rate; Alternate Rates. Notwithstanding the foregoing provisions of this Section 2.05, (i) if any payment of the principal of or premium (if any) or interest on, or the Purchase Price of, any Series 2007 B Bond shall not be made when due, the Series 2007 B Bonds shall continue to bear interest at the last interest rate borne by the Series 2007 B Bonds prior to the due date for such payment until such payment is made or provided for in accordance with this Indenture, except that interest on any Pledged Bonds shall continue to accrue interest at the Bank Rate, and (ii) if the Remarketing Agent does not determine the Variable Rate on any Adjustment Date or the Fixed Rate on any Computation Date, or a court of competent jurisdiction holds that the rate so determined is invalid or unenforceable, (A) the Variable Rate for such Adjustment Date shall be equal to 85% of the per annum bond equivalent yield applicable to 13-week United States Treasury securities on such Adjustment Date and (B) the Fixed Rate for such Computation Date shall be equal to the same Fixed Rate in effect for the immediately preceding Fixed Rate Period. The Trustee shall not incur any liability for any errors in the computation of the rates required to be determined in accordance with this subsection (i).

(j)     Interest Rates Conclusive and Binding. The determination by the Remarketing Agent of the Variable Rate and the Fixed Rate as provided in this Section 2.05 shall be conclusive and binding upon the Issuer, the Trustee, the Corporation, the Paying Agent, the Registrar, the Remarketing Agent, the Letter of Credit Provider, the Owners of the Series 2007 B Bonds, and all other Persons.

(k)     Purchase of Series 2007 B Bonds on Optional Tender Dates.

(i)     During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, the Issuer will cause to be purchased (but solely from proceeds of the remarketing of such Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or, if one is in effect, the Confirming Letter of Credit) any Series 2007 B Bond (or portion thereof in a denomination of $5,000 or integral multiple thereof provided such tender does not result in a Series 2007 B Bond in a denomination of less than $100,000, except with respect to Pledged Bonds) at the Purchase Price, payable by check or wire transfer in immediately available funds, upon:

(A)     delivery to the Trustee and the Remarketing Agent of a telephonic notice (the "Optional Tender Notice") not later than 4:00 p.m. prevailing

Baltimore, Maryland time, on a Business Day not less than seven calendar days prior to the Optional Tender Date as defined below (such notice to be irrevocable and effective upon receipt) that states (1) the principal amount of Series 2007 B Bonds that are to be purchased (which amount shall be $5,000 or a multiple thereof) and the portion retained, if any (which must be $100,000 or any integral multiple of $5,000 in excess of $100,000), (2) the date on which such Series 2007 B Bonds are to be purchased (an "Optional Tender Date"), which date shall be a Business Day not less than seven calendar days after the delivery of the Optional Tender Notice to the Trustee and the Remarketing Agent, and (3) if fewer than all of the Owner's Series 2007 B Bonds are to be purchased, the CUSIP numbers and bond numbers of the Series 2007 B Bonds to be purchased; and

(B)    (1)    if the Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Series 2007 B Bonds to be purchased to the account of the Remarketing Agent maintained with the Depository, or

(2)    if physical bond certificates have been delivered to the Owners of the Series 2007 B Bonds pursuant to Section 2.21, delivery of the Series 2007 B Bonds to be purchased to the Trustee or the Remarketing Agent (which shall promptly deliver the same to the Trustee), at its Designated Office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank; and

(3)    in either case, at or prior to 10:00 a.m. prevailing Baltimore, Maryland time on the date designated for purchase in the Optional Tender Notice.

(ii)    Notwithstanding anything to the contrary contained herein, no optional tender of Series 2007 B Bonds made pursuant to this subsection (k) shall result in a Series 2007 B Bond in a denomination of less than $100,000.

(iii)    Accrued interest payable on any Bond Tendered or Deemed Tendered for Purchase on any Interest Payment Date as provided in this subsection (k) shall be paid to the Owner as of the Record Date immediately preceding such Interest Payment Date in the same manner as if such Bond had not been purchased or deemed to have been purchased pursuant to this subsection (k).

(l)    Purchase of Series 2007 B Bonds on Mandatory Tender Dates.    The Series 2007 B Bonds (other than any Pledged Bonds) are subject to mandatory tender and purchase, and the Issuer will cause to be purchased (but solely from the proceeds of the remarketing of the Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or any Confirming Letter of Credit) the Series 2007 B Bonds (other than any Pledged Bonds), on each Mandatory Tender Date at the Purchase Price, payable by check or wire transfer in immediately available funds.

At least 35 days prior to each Mandatory Tender Date that is a Conversion Date or a Termination Date, the Trustee shall mail a Mandatory Tender Notice to the Owners of the Series 2007 B Bonds.  Within one (1) Business Day of receipt by the Trustee of a Letter of Credit

Mandatory Tender Event Notice, the Trustee shall mail a Mandatory Tender Notice to the Owners of the Series 2007 B Bonds. The provisions for the Mandatory Tender Date that is a Resizing Tender Date are set forth in subsection (r) herein and the provisions for the Mandatory Tender Date that is a Bank Conversion Date are set forth in subsection (s) herein.

During any time prior to the Bank Tender Date, the Corporation may set a Bank Conversion Date for the conversion of Series 2007 B Bonds from a Variable Rate to a Fixed Rate by delivering to the Trustee the Bank Conversion Date Notice at least 3 Business Days prior to the Bank Conversion Date, which Bank Conversion Date Notice shall state: (1) that all of the Outstanding Series 2007 B Bonds shall be purchased, (2) the Bank Conversion Date, (3) the interest rate applicable to such Series 2007 B Bonds subject to Mandatory Tender on the Bank Conversion Date, in accordance with subsection (s) herein and (4) the delivery instructions for such Series 2007 B Bonds subject to Mandatory Tender on the Bank Conversion Date, in accordance with subsection (o) herein.

(m)    Remarketing of Series 2007 B Bonds by Remarketing Agent; Prohibition on Remarketing of Series 2007 B Bonds; Certain Notices.

(i)    (A)    The Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent, the Corporation, and the Letter of Credit Provider of any Optional Tender Notice given by an Owner to the Trustee pursuant to subsection (k) above, which notice shall specify the principal amount of the Series 2007 B Bonds to be purchased and the Optional Tender Date.

(B)    The Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent and the Corporation that the Trustee has received a Letter of Credit Mandatory Tender Event Notice.  Upon receipt of such notice, the Remarketing Agent shall suspend any remarketing of Series 2007 B Bonds then in progress, and there shall be no further remarketing thereof.

(C)    The Trustee shall promptly notify by telephone (promptly confirmed in writing) the Remarketing Agent and the Corporation that the Trustee has received a Bank Conversion Date Notice, and the principal amount of Series 2007 B Bonds subject to such Bank Conversion. Upon receipt of a notice that Series 2007 B Bonds are being converted to a Fixed Rate, the Remarketing Agent shall suspend any remarketing of the Series 2007 B Bonds subject to such Bank Conversion and there shall be no further remarketing thereof.  Upon receipt of a Bank Conversion Date Notice that Series 2007 B Bonds are being converted to a Variable Rate, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall use its best efforts to solicit purchasers for and sell the principal amount of Series 2007 B Bonds specified in such Bank Conversion Date Notice, any such sale to be made on the Bank Conversion Date on which such Series 2007 B Bonds are to be purchased, at a price equal to the Purchase Price thereof.

(ii)    Upon receipt of notice from the Trustee of the receipt by the Trustee of any Optional Tender Notice meeting the requirements of this Indenture, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall

use its best efforts to solicit purchasers for and sell the principal amount of Series 2007 B Bonds specified in such Optional Tender Notice, any such sale to be made on the Optional Tender Date on which such Series 2007 B Bonds are to be purchased, at a price equal to the Purchase Price thereof.

(iii)     At least 40 days before each Mandatory Tender Date that is a Conversion Date, a Termination Date or a Resizing Tender Date, the Trustee shall give written notice to the Issuer, the Letter of Credit Provider, the Corporation, the Bond Registrar, the Paying Agent and the Remarketing Agent of such Mandatory Tender Date and the aggregate principal amount of Series 2007 B Bonds to be remarketed on such Mandatory Tender Date, which amount shall be equal to the aggregate principal amount of Series 2007 B Bonds Outstanding on such Mandatory Tender Date less the aggregate principal amount of Series 2007 B Bonds to be redeemed in accordance with paragraph 8(a)(iii) of the Series 2007 B Bonds on such Mandatory Tender Date or with respect to a Resizing Tender Date, the aggregate principal amount of Series 2007 B Bonds to be cancelled as a result of the resizing.  The Trustee shall give such notice to each of the Rating Agencies then maintaining a rating on the Series 2007 B Bonds.

(iv)     Upon receipt of the notice referred to in (iii) above, the Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall use its best efforts to solicit purchasers for and sell the principal amount of Series 2007 B Bonds specified in such notice, any such sale to be made on the Mandatory Tender Date on which such Series 2007 B Bonds are to be purchased at the Purchase Price.

(v)     In no event will the Remarketing Agent remarket any Series 2007 B Bonds Tendered or Deemed Tendered for Purchase on any Tender Date at a price less than 100% of the principal amount thereof, plus accrued interest (if any) thereon to the applicable Tender Date.

(vi)     Not later than 10:00 a.m. prevailing Baltimore, Maryland time on the Business Day prior to any Tender Date on which Series 2007 B Bonds are to be purchased pursuant to subsection (k) or (l) above, the Remarketing Agent shall (1) give telephonic notice (promptly confirmed in writing) to the Trustee, the Corporation, the Paying Agent and the Letter of Credit Provider of the principal amount of Series 2007 B Bonds that it has been unable to remarket and (2) if physical bond certificates have been delivered to the Owners thereof, deliver to the Trustee the name, address and tax identification number of each prospective purchaser to whom the Remarketing Agent has remarketed and sold Series 2007 B Bonds.

(vii)     The Remarketing Agent, pursuant to and subject to the terms of the Remarketing Agreement, shall use its best efforts to solicit purchasers for and sell any Pledged Bonds.

(viii)     Anything in this Indenture to the contrary notwithstanding, there shall be no remarketing of Series 2007 B Bonds pursuant to this Section, (i) if a Mandatory Tender Date is a Termination Date or a Letter of Credit Mandatory Tender Event Date and the Corporation has not provided a Substitute Letter of Credit, unless the Trustee, the Registrar, the Paying Agent, the Remarketing Agent and the Issuer have received an opinion of Bond Counsel to the effect that the remarketing of the Series 2007 B Bonds on such Mandatory Tender Date

will not adversely affect (A) the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code and (B) the excludability of interest on the Series 2007 B Bonds from gross income for purposes of state, county and municipal taxation in the Commonwealth or (ii) if a Mandatory Tender Date is a Bank Conversion Date, or (iii) if the Series 2007 B Bonds shall have been declared to be immediately due and payable hereunder.

(ix) The Remarketing Agent shall hold the proceeds of the sale of any Series 2007 B Bonds that have been remarketed by the Remarketing Agent pursuant hereto in trust for the persons who tendered, or are deemed to have tendered, such Series 2007 B Bonds for purchase and shall deliver the proceeds of such sale to the Trustee no later than 9:30 a.m., prevailing Baltimore, Maryland time on the applicable Tender Date, and the Trustee shall deposit such proceeds in the Series 2007 B Purchase Account of the Series 2011 Debt Service Fund. The proceeds of any sale of Pledged Bonds by the Remarketing Agent shall be paid by the Remarketing Agent directly to the Letter of Credit Provider for the account of the Corporation.

(x) Notwithstanding anything herein to the contrary, the Remarketing Agent shall not solicit the Issuer or the Corporation as potential purchasers of Bonds Tendered or Deemed Tendered for Purchase on any Optional Tender Date or Mandatory Tender Date or sell such Bonds to the Issuer or the Corporation, except that the Remarketing Agent may solicit the Corporation as a potential purchaser of any Pledged Bonds.

(n) Sources of Moneys for Purchase of Series 2007 B Bonds on Tender Dates.

(i) On each Tender Date on which Series 2007 B Bonds are to be purchased pursuant to subsection (k) or (l) above, such Series 2007 B Bonds shall be purchased with immediately available funds from the Owners thereof at a Purchase Price equal to 100% of the principal amount thereof, plus accrued interest (if any) thereon to the Tender Date. Moneys for the payment of such Purchase Price shall be derived solely from the following sources in the order of priority indicated, and none of the Issuer, nor the Trustee, the Paying Agent or the Remarketing Agent shall have any obligation to use moneys from any other source:

(A) proceeds of the remarketing and sale of such Series 2007 B Bonds pursuant to subsection (m) above, which are on deposit in the Purchase Account;

(B) moneys received from a drawing under the Letter of Credit or, if one is in effect, the Confirming Letter of Credit;

(C) any moneys paid by the Corporation for purchase of the Series 2007 B Bonds pursuant to the Loan Agreement.

(ii) The Trustee shall purchase Series 2007 B Bonds pursuant to subsection (k) and (l) above solely from the sources described in this subsection (n), and neither the Trustee nor the Remarketing Agent shall be responsible for the failure of any other person to furnish moneys for the Purchase Price of such Series 2007 B Bonds. In purchasing Series 2007

- 57 -

B Bonds hereunder, the Trustee shall be acting as a conduit and shall not be deemed to be purchasing Series 2007 B Bonds for its own account.

(iii)     If on any Tender Date, the Trustee draws on the Letter of Credit for the purpose of paying the Purchase Price of Series 2007 B Bonds on such Tender Date, and subsequent thereto, the Trustee receives from the Remarketing Agent proceeds of the remarketing and sale of such Series 2007 B Bonds, the Trustee, on such Tender Date, shall transfer to the Letter of Credit Provider (in immediately available funds by wire transfer or, upon direction by the Letter of Credit Provider, by deposit into the Letter of Credit Provider's correspondent account with the Trustee; provided, however, that the Trustee shall not be required to transfer such moneys in immediately available funds to the extent that the moneys on deposit in the Purchase Account are not immediately available) such remarketing proceeds in an amount not exceeding an amount equal to such drawing, and such amount shall be credited against the Corporation's reimbursement obligation to the Letter of Credit Provider under the Letter of Credit Agreement.

(o)     <u>Delivery of Series 2007 B Bonds Purchased on Tender Dates</u>.

All Series 2007 B Bonds tendered for purchase on a Tender Date, and any new Series 2007 B Bonds executed and authenticated in lieu of any Series 2007 B Bonds deemed to have been tendered for purchase, shall be delivered as follows:

(i)     Series 2007 B Bonds remarketed and sold by the Remarketing Agent shall be exchanged for other Series 2007 B Bonds, as necessary to correspond to the denominations in which such Series 2007 B Bonds have been sold by the Remarketing Agent, and such Series 2007 B Bonds (or new Series 2007 B Bonds executed and authenticated in lieu thereof) shall be re-registered and delivered in accordance with the directions of the purchasers thereof.

(ii)     Series 2007 B Bonds, the Purchase Price of which shall have been paid by the Trustee from amounts realized from a drawing under the Letter of Credit or, if one is in effect, the Confirming Letter of Credit (or new Series 2007 B Bonds executed and authenticated in lieu thereof), shall be registered in the name of the Letter of Credit Provider or otherwise upon the Letter of Credit Provider's written direction, and delivered to the Trustee to hold as agent for the Letter of Credit Provider under the Letter of Credit Agreement, or to the Letter of Credit Provider upon the written order of the Letter of Credit Provider; provided that, if Pledged Bonds are held in Book-Entry Form with a Depository, then the Letter of Credit Provider's ownership interest therein shall be recorded in the registration books maintained by the Trustee and in the records of ownership maintained by the securities depository and/or the participant through which such Pledged Bonds are held.

(iii)     Series 2007 B Bonds that are either (A) purchased with the proceeds of a drawing under the Letter of Credit, for which drawing the Letter of Credit Provider is immediately reimbursed with moneys furnished by the Corporation, as confirmed by the Letter of Credit Provider to the Trustee in writing, or (B) purchased with moneys furnished by the Corporation, as confirmed by the Letter of Credit Provider to the Trustee in writing, shall at the option of the Corporation, either be registered in the name of the Corporation, and shall not

thereafter be transferred to another person except in accordance with a remarketing thereof pursuant to this Indenture, or be deemed to have been redeemed and delivered to the Trustee for cancellation.

(iv)    Series 2007 B Bonds tendered on a Bank Conversion Date for conversion to a Fixed Rate, the Purchase Price of which shall have been paid by the Trustee from amounts realized from a drawing under the Letter of Credit, shall be registered in the name of the Letter of Credit Provider or otherwise upon the Letter of Credit Provider's written direction, and either (A) shall be delivered to the Trustee to hold as agent for the Letter of Credit Provider under the Letter of Credit Agreement, or to the Letter of Credit Provider upon the written order of the Letter of Credit Provider as Pledged Bonds; provided that, if Pledged Bonds are held in Book-Entry Form with a Depository, then the Letter of Credit Provider's ownership interest therein shall be recorded in the registration books maintained by the Trustee and in the records of ownership maintained by the securities depository and/or the participant through which such Pledged Bonds are held, or (B) shall be registered in the name of the Holder of the Series 2007 B Bond bearing interest at the Fixed Rate in accordance with subsection (s) herein.

(p)    Series 2007 B Bonds Deemed Tendered and Purchased on Tender Dates.

(i)    Any Optional Tender Notice given by an Owner shall be irrevocable.  Any Series 2007 B Bond described in an Optional Tender Notice as a Series 2007 B Bond to be purchased on an Optional Tender Date that is not tendered by the Owner thereof to the Trustee on such Optional Tender Date, and any Series 2007 B Bond to be purchased on a Mandatory Tender Date that is not delivered by the Owner thereof to the Trustee on such Mandatory Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for purchase and to have been purchased from moneys described in subsection (n) above, if moneys for such purchase have been deposited with the Trustee on or before any such Tender Date in accordance with this Indenture.  Thereafter (A) unless such Series 2007 B Bonds are required to be cancelled pursuant to subsection (o) above, the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2007 B Bond or Bonds in the same aggregate principal denomination as the Series 2007 B Bond deemed to have been tendered and purchased to the person to whom the Series 2007 B Bond deemed to have been tendered and purchased would have been delivered as set forth in subsection (o) above, and the Trustee shall register such new Series 2007 B Bond in the manner provided in subsection (o) above; (B) such Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under this Indenture; (C) interest on such Series 2007 B Bond deemed to have been tendered and purchased shall cease to accrue to the former Owner thereof as of the Tender Date on which such Series 2007 B Bond is deemed to have been tendered and purchased; (D) the former Owner of such Series 2007 B Bond shall cease to be entitled to the benefits and security of this Indenture as of the date on which such Series 2007 B Bond is deemed to have been tendered and purchased, except to receive the moneys representing the Purchase Price of such Series 2007 B Bond against delivery thereof at the Designated Office of the Trustee; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2007 B Bond by the former Owner thereof.  Any Series 2007 B Bond executed and authenticated in lieu of a Series 2007 B Bond deemed to have been tendered and purchased shall be delivered as provided in subsection (o) hereof.

(ii)    The Trustee shall promptly mail notice by first-class mail to the Owner of any Series 2007 B Bond that is deemed to have been purchased pursuant to this Section, which notice shall state that interest on such Series 2007 B Bond ceased to accrue to the former Owner thereof as of the Tender Date on which such Series 2007 B Bond is deemed to have been tendered and purchased, that the Registrar will not register, and the Trustee will not recognize, any further transfer of such Series 2007 B Bond by the former Owner thereof, and that the former Owner of such Series 2007 B Bond ceased to be entitled to the benefits and security of this Indenture as of the Tender Date on which such Series 2007 B Bond is deemed to have been tendered and purchased, except to receive the moneys representing the Purchase Price of such Series 2007 B Bond against delivery thereof at the Designated Office of the Trustee. Moneys to be used for the purchase of any Series 2007 B Bond deemed to have been tendered and purchased pursuant to this subsection (p) shall be deposited with the Trustee and held in trust by the Trustee segregated from all other moneys held by the Trustee under this Indenture, without liability for interest thereon, and shall be paid to the former Owner of such Series 2007 B Bond upon presentation thereof. Except as provided in the following paragraph, the former Owner of such Series 2007 B Bond shall thereafter be restricted exclusively to such moneys for the satisfaction of any claim of whatever nature on its part under this Indenture or with respect to such Series 2007 B Bond.

Any moneys that the Trustee holds in trust for the payment of the principal amount of or interest on any Series 2007 B Bond deemed to have been tendered and purchased pursuant to this subsection (p) and that remain unclaimed for a period of one year after the Tender Date on which such Series 2007 B Bond is deemed to have been tendered and purchased, upon the written request of the Corporation to the Trustee, shall be paid to the Corporation with notice to the Letter of Credit Provider of such payment, but only to the extent permitted by law, provided, however, that:

(A)    before the Trustee makes any such payment to the Corporation, the Trustee, at the Corporation's expense, shall cause notice to be given once by first-class mail to the former Owner of such Bond at the last address for such Owner reflected on the registration books of the Registrar, to the effect that such moneys remain unclaimed and that, after a date specified therein which shall not be less than 30 days from the date of such notice by mail, any unclaimed balance of such moneys then remaining will be paid to the Corporation; and

(B)    no such payment shall be made to the Corporation if the Trustee has notice, within the meaning of Section 6.17 hereof, that an Event of Default shall have occurred and be continuing under this Indenture, or the Trustee has written notice from the Letter of Credit Provider that the Letter of Credit Provider is owed any moneys under any of the documents executed and delivered in connection with the Letter of Credit.

After the payment of such unclaimed moneys to the Corporation, the Owner of such Series 2007 B Bond shall thereafter look only to the Corporation for the payment thereof, and all liability of the Issuer, the Trustee, the Paying Agent and the Letter of Credit Provider with respect to such moneys shall thereupon cease.

\29695489.18

(q)     Series 2007 B Bonds Purchased not Discharged.  Except for (i) Series 2007 B Bonds cancelled by the Trustee pursuant to subsection (o) above and (ii) Series 2007 B Bonds deemed to have been tendered and purchased and in lieu of which new Series 2007 B Bonds have been executed and delivered as provided in subsection (p) above, no purchase of Series 2007 B Bonds on a Tender Date shall be deemed a payment or redemption of such Series 2007 B Bonds and no such purchase will operate to extinguish or discharge the indebtedness evidenced by such Series 2007 B Bonds.

(r)     Mandatory Tender on Resizing Tender Date. The Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit are subject to mandatory tender and purchase on the Resizing Tender Date, and the Series 2007 B Bonds bearing interest at a Fixed Rate and the Series 2007 B Bonds constituting Pledged Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Series 2007 B Bonds. Such notice shall state: (1) that a Resizing Event has occurred, and the date that is the Resizing Tender Date; (2) that the Series 2007 B Bonds will be subject to mandatory tender on the Resizing Tender Date, (3) that the Owners do not have a right to waive the mandatory tender of the Series 2007 B Bonds and that all of such Bonds must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Remarketing Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2007 B Bonds pursuant to Section 2.21, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that, in the case of Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit, such Series 2007 B Bonds so tendered will be purchased on the Resizing Tender Date at the Purchase Price; (4) that, as of the Resizing Tender Date, the Series 2007 B Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed, subject to the delivery of a new Series 2007 B Bond as described below, to be no longer Outstanding under this Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2007 B Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under this Indenture, except, in the case of Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit, to receive the moneys representing the Purchase Price of such Series 2007 B Bonds against delivery thereof at the Designated Office of the Trustee or, in the case of Series 2007 B Bonds bearing interest at a Fixed Rate or Series 2007 B Bonds constituting Pledged Bonds, to receive new Series 2007 B Bonds in exchange therefor as provided in this Indenture and (5) to the extent not described above, the matters set forth in the definition of Mandatory Tender Notice.

Any Series 2007 B Bond to be purchased or exchanged, as the case may be, on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for purchase or exchange, and to have been purchased from moneys in accordance with subsection (n) above or exchanged as described below.  Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2007 B Bond or Bonds in the aggregate principal amount determined by the Independent Consultant in accordance with Section 2.22 of this Indenture to the person to whom the Series 2007 B Bond deemed to have been tendered and

purchased subject to the delivery of a new Series 2007 B Bond as described below, would have been delivered as set forth in subsection (o) above; (B) such Series 2007 B Bond deemed to have been tendered and purchased or exchanged, as the case may be, shall no longer be Outstanding under this Indenture; (C) interest on such Series 2007 B Bond deemed to have been tendered shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Series 2007 B Bond shall cease to be entitled to the benefits and security of this Indenture as of the date on which such Series 2007 B Bond is deemed to have been tendered; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2007 B Bond by the Owner thereof.

On the Resizing Tender Date, the Series 2007 B Bonds bearing interest at a Variable Rate and secured by a Letter of Credit shall have been tendered or deemed tendered to the Letter of Credit Provider, and the Letter of Credit Provider shall exchange such Series 2007 B Bonds, for Series 2007 B Bonds resized in principal amount determined by the Independent Consultant in accordance with Section 2.22 of this Indenture. Any accrued and unpaid interest on the Series 2007 B Bonds as of the Resizing Tender Date shall be due and payable as set forth in Section 2.22.

The Series 2007 B Bonds Outstanding following the Resizing Tender Date will be remarketed in accordance with subsection (m) above.

(s) _Mandatory Tender on Bank Conversion Date_. All of the Series 2007 B Bonds bearing interest at a Variable Rate are subject to mandatory tender on the Bank Conversion Date. At least one (1) day prior to the Bank Conversion Date, the Trustee shall mail a notice to the Owners of the Series 2007 B Bonds to be converted to a Fixed Rate as directed by the Corporation in accordance with subsection (l) above and as selected by the Trustee by lot or in such other manner as the Trustee, in its discretion, may deem proper. Such notice shall state: (1) the date that is the Bank Conversion Date; (2) that all of the Series 2007 B Bonds will be subject to mandatory tender on the Bank Conversion Date, (3) that the Owners do not have a right to waive the mandatory tender of the Series 2007 B Bonds and that all of such Bonds selected for mandatory tender must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Bank Conversion Date (A) if such Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Trustee maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2007 B Bonds pursuant to Section 2.21, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2007 B Bonds so tendered will be delivered to or at the direction of the Letter of Credit Provider in accordance with subsection (o) above; and (4) that, as of the Bank Conversion Date, the Series 2007 B Bonds selected for mandatory tender will be deemed to have been tendered on such Bank Conversion Date, shall be deemed to be no longer Outstanding under this Indenture, and shall cease to bear interest as of such Bank Conversion Date, whether or not such Series 2007 B Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under this Indenture, except to receive the moneys representing the Purchase Price of such Series 2007 B Bonds against delivery thereof at the Designated Office of the Trustee.

Any Series 2007 B Bond to be purchased on a Bank Conversion Date that is not delivered by the Owner thereof to the Trustee on such Bank Conversion Date shall nonetheless be deemed to have been tendered by the Owner thereof for purchase and to have been purchased from moneys as described in subsection (n) above. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2007 B Bond or Bonds in the aggregate principal amount of the Series 2007 B Bond deemed to have been tendered and purchased to the person whom would have received the Series 2007 B Bond as set forth in subsection (o) above; (B) such Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under this Indenture; (C) interest on such Series 2007 B Bond deemed to have been tendered and purchased shall cease to accrue to the Owner thereof as of the Bank Conversion Date; (D) such Series 2007 B Bond shall cease to be entitled to the benefits and security of this Indenture as of the date on which such Series 2007 B Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2007 B Bond by the Owner thereof.

The Bank Conversion Date Notice shall provide that the Series 2007 B Bonds bearing interest at a Variable Rate tendered or deemed tendered on the Bank Conversion Date shall be registered in the name of the Letter of Credit Provider as Pledged Bonds or shall be registered in the name of the Letter of Credit Provider or of the Holder designated by the Letter of Credit Provider as Series 2007 B Bonds bearing interest at a Fixed Rate of 5.5% per annum and containing such other terms as shall be set forth in the provisions of the Form of Series 2007 B Bond in Appendix C attached hereto, and shall be accompanied by an opinion of Bond Counsel to the effect that such change is permitted by this Indenture and will not adversely affect the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of the Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth.

(t)      Mandatory Tenders in Accordance with Procedures of Depository. Notwithstanding any provisions contained herein, during any period in which Series 2007 B Bonds are maintained pursuant to a Book-Entry System, mandatory tenders, purchases and exchanges of Series 2007 B Bonds shall occur in accordance with the Depository's standard procedures for mandatory tenders, purchases and exchanges of obligations such as the Series 2007 B Bonds.

Section 2.06.  Details of the Series 2011 A-2 Bonds. (a)  The Series 2011 A-2 Bonds shall be issued in the original aggregate principal amount of $_____. The Series 2011 A-2 Bonds shall be issued in Authorized Denominations as fully registered bonds without coupons in the form attached hereto as Appendix D-1 (for Subseries I of Series 2011 A-2 Bonds) and Appendix D-2 (for Subseries II of Series 2011 A-2 Bonds), shall be dated the Closing Date, for purposes of reference, shall be numbered from RA-2I-1 and RA-2II-1 upward, respectively, and shall bear interest (a) from the Closing Date, if authenticated prior to November 15, 2011, or (b) otherwise from May 15 or November 15, that is, or that immediately precedes, the date on which any such Series 2011 A-2 Bond is authenticated (unless payment of interest is in default, in which case such Series 2011 A-2 Bonds shall bear interest from the date on which interest has been paid). The Series 2011 A-2 Bonds shall bear interest at the rate or rates of interest per year (calculated on the basis of a 360-day year consisting of twelve 30-day months and payable on

November 15, 2011, and semiannually thereafter on May 15 and November 15 in each year) set forth below and shall mature on November 15, 2046.

<div align="center">Series 2011 A-2 Bonds</div>

<div align="center">TERM BONDS</div>

| Due (November 15) | Principal Amount | Interest Rate |
|---|---|---|
| 2046 | $_____ | 5.5% |

(b)     The Series 2011 A-2  Bonds shall be subject to mandatory, extraordinary and optional redemption prior to maturity and shall have the terms, tenor, denominations, details and specifications as set forth in the form of the Series 2011 A-2 Bonds attached hereto as Appendix D.

The principal of, premium, if any, and interest on the Series 2011 A-2 Bonds shall be payable in lawful money of the United States of America.  Principal of and premium, if any, on the Series 2011 A-2 Bonds shall be payable upon presentation and surrender of the Series 2011 A-2 Bonds as they become due at the Designated Office of the Trustee.  Interest on the Series 2011 A-2 Bonds shall be payable to the Owners of Series 2011 A-2 Bonds by (a) check or draft mailed to such Owners at their addresses as they appear on registration books kept by the Trustee as Bond Registrar on the 1st day of the month in which interest is to be paid, or (b) by bank wire transfer for registered Owners of $500,000 or more of Series 2011 A-2 Bonds who have provided the Trustee with written instructions on or before the 1st day of the month in which interest is to be paid.

If any principal of or interest on any Series 2011 A-2 Bond is not paid when due (whether at maturity, by acceleration or call for redemption or otherwise), then the overdue installments of principal and, to the extent permitted by law, interest shall bear interest until paid at the same rate set forth in such Series 2011 A-2 Bond.

(c)     The Series 2011 A-2 Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Series 2011 A-2 Bonds.  Such notice shall state:  (1) that a Resizing Event has occurred, the date that is the Resizing Tender Date and the percentage of the resize; (2) that the Series 2011 A-2 Bonds will be subject to mandatory tender on the Resizing Tender Date, (3) that the Owners do not have a right to waive the mandatory tender of the Series 2011 A-2 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2011 A-2 Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Resizing Tender Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2011 A-2 Bonds pursuant to Section 2.21, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2011 A-2 Bonds so tendered will be exchanged for new Series 2011 A-2 Bonds on the

Resizing Tender Date; and (4) that, as of the Resizing Tender Date, the Series 2011 A-2 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under this Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2011 A-2 Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under this Indenture, except to receive new Series 2011 A-2 Bonds in exchange therefor as provided in this Indenture.

Any Series 2011 A-2 Bond to be exchanged on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for exchange and to have been exchanged for new Series 2011 A-2 Bonds in accordance with this Indenture. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2011 A-2 Bond or Bonds in the aggregate principal amount set forth in this Section to the Owner of the Series 2011 A-2 Bond deemed to have been tendered and exchanged; (B) such Series 2011 A-2 Bond deemed to have been tendered and purchased shall no longer be Outstanding under this Indenture; (C) interest on such Series 2011 A-2 Bond deemed to have been tendered and exchanged shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Series 2011 A-2 Bond shall cease to be entitled to the benefits and security of this Indenture as of the date on which such Series 2011 A-2 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2011 A-2 Bond by the Owner thereof.

On the Resizing Tender Date, the Series 2011 A-2 Bonds tendered or deemed tendered shall be exchanged for Series 2011 A-2 Bonds resized in principal amount determined by the Independent Consultant in accordance with Section 2.22 of this Indenture. Any accrued and unpaid interest on the Series 2011 A-2 Bonds as of the Resizing Tender Date shall be due and payable as set forth in Section 2.22.

Section 2.07. <u>Details of the Series 2011 B Bonds</u>. The Series 2011 B Bonds shall be issued in the original aggregate principal amount of $_____. The Series 2011 B Bonds shall be issued in Authorized Denominations as fully registered bonds without coupons in the form attached hereto as <u>Appendix E</u>, shall be dated the Closing Date, for purposes of reference, shall be numbered from RB - 1 upward, and shall mature on November 15, 2056. The Series 2011 B Bonds shall not bear interest.

The Series 2011 B Bonds shall be subject to mandatory and optional redemption prior to maturity and shall have the terms, tenor, denominations, details and specifications as set forth in the form of the Series 2011 B Bonds attached hereto as <u>Appendix E</u>.

The principal of the Series 2011 B Bonds shall be payable in lawful money of the United States of America. Principal of the Series 2011 B Bonds shall be payable upon presentation and surrender of the Series 2011 B Bonds as they become due at the Designated Office of the Trustee.

The Series 2011 B Bonds constitute Subordinated Bonds hereunder, such that payment of the principal of the Series 2011 B Bonds shall be subordinate to the payment of the principal of,

premium if any, and interest on any Special Senior Parity Debt and Senior Parity Debt issued or certified in accordance with this Indenture, including without limitation, the Series 2011 A Bonds, and no principal payments shall be made with respect to the Series 2011 B Bonds (whether at maturity, upon redemption or acceleration of maturity or otherwise), until all current payments of principal of, premium, if any, and interest on all Special Senior Parity Debt and Senior Parity Debt, including the Series 2011 A Bonds have been paid in full. The Series 2011 B Bonds shall be payable from Excess Cash.

Section 2.08.  Letter of Credit; Substitute Letter of Credit.

(a)  The Trustee shall draw upon the Letter of Credit in accordance with its terms to the extent necessary to pay the principal of and any premium (if covered by the Letter of Credit) and/or interest on the Variable Rate Bonds, when due whether upon any Interest Payment Date or upon redemption, at maturity, at purchase, upon acceleration of maturity or otherwise. The Trustee, in determining the amount of any draw on the Letter of Credit in accordance with the immediately preceding sentence, shall take into consideration the amount on deposit of any immediately available Refunding Proceeds described in clause (g) of Section 4.17 hereof. In the event that there are not on deposit in the Purchase Account sufficient immediately available remarketing proceeds pursuant to Section 2.05(n)(i)(A) to pay the Purchase Price of Bonds Tendered or Deemed Tendered for Purchase on any Tender Date, the Trustee shall, not later than 10:00 a.m., prevailing Baltimore, Maryland time on such Tender Date, make a drawing under the Letter of Credit to the extent necessary to pay the Purchase Price of Bonds Tendered or Deemed Tendered for Purchase on such Tender Date in excess of the amount of the Purchase Price of Variable Rate Bonds to be paid from the proceeds of the remarketing and sale of such Variable Rate Bonds that have been deposited in the Purchase Account and constitute immediately available funds.  All amounts drawn by the Trustee under the Letter of Credit pursuant hereto shall be deposited in the Letter of Credit Fund.  The Trustee will also provide the Letter of Credit Provider with any advance notice of a drawing thereunder as may be required by the terms of the Letter of Credit.  The Trustee shall not draw upon the Letter of Credit or the Confirming Letter of Credit to pay the principal or the Purchase Price of any Pledged Bonds.  If the Letter of Credit Provider has failed to honor a proper drawing on the Letter of Credit or the Substitute Letter of Credit, as the case may be, or the Letter of Credit or Substitute Letter of Credit that would have been drawn upon has been repudiated, and a Confirming Letter of Credit has been issued, then the Trustee, without further authorization or direction, promptly shall draw upon such Confirming Letter of Credit in the amount required by the first sentence of this Subsection (a).

(b)  If at any time there shall have been delivered to the Trustee (i) a proposed Substitute Letter of Credit and (ii) each of the items described in the definition of "Substitute Letter of Credit" as requirements for the provision of a Substitute Letter of Credit, then the Trustee shall accept such proposed Substitute Letter of Credit and, promptly following the Mandatory Tender Date resulting from the delivery of the Substitute Letter of Credit, surrender the Letter of Credit then in effect to the Letter of Credit Provider which issued such Letter of Credit for cancellation in accordance with its terms.  The Trustee shall not accept a Substitute Letter of Credit in substitution for an existing Letter of Credit, unless (A) the Letter of Credit then in effect is expiring, or (B) it has received the written consent of the Letter of Credit

Provider that issued the Letter of Credit then in effect to the substitution by the Corporation of a Substitute Letter of Credit for the Letter of Credit then in effect.

(c)     Each Substitute Letter of Credit or substitute Confirming Letter of Credit shall be delivered and become effective on the Mandatory Tender Date resulting from the proposed delivery of such Substitute Letter of Credit or substitute Confirming Letter of Credit, which Mandatory Tender Date shall not be earlier than 40 days from the date of the delivery to the Trustee of a commitment for the issuance of the Substitute Letter of Credit or substitute Confirming Letter of Credit.

(d)     The stated expiration date of any Substitute Letter of Credit and the Confirming Letter of Credit and any extension thereof must be on or after the 15th day of a calendar month.

(e)     If at any time there shall cease to be any Variable Rate Bonds Outstanding hereunder, the Trustee shall promptly surrender the Letter of Credit and the Confirming Letter of Credit then in effect to the issuer thereof in accordance with the terms thereof for cancellation.

(f)     The Trustee shall not sell, assign or otherwise transfer the Letter of Credit, the Confirming Letter of Credit or any interest in the Revenues except to a successor Trustee hereunder and in accordance with the terms of the Letter of Credit.

(g)     The provisions of this Section 2.08 shall apply independently to each Letter of Credit securing a Series of Variable Rate Bonds.

Section 2.09.  Bonds Generally.  The Bonds may contain, or have endorsed thereon, any notations, legends or endorsements not inconsistent with the provisions of this Indenture or of any Supplemental Indenture authorizing the same as may be necessary or desirable and as may be determined by an Authorized Officer of the Issuer prior to the authentication and delivery of such Bonds.  The execution and delivery of any Bond by the Issuer in accordance with this Indenture shall be conclusive evidence of the approval of the form of such Bond by the Issuer, including any insertions, omissions, variations, notations, legends or endorsements authorized by this Indenture.

Before authenticating and delivering any Bond, the Registrar shall complete the form of such Bond to show the registered owner, principal amount, interest rate, maturity date, number and authentication date of such Bond.

The Bonds of a Series may have printed thereon or attached thereto the opinion of Bond Counsel for such Series of Bonds.  The printing of CUSIP numbers on the Bonds shall have no legal effect and shall not affect the enforceability of any Bond.

Section 2.10.  Sinking Fund Installments for the Series 2011 A Bonds.  (a) The Trustee shall deposit into the Series 2011 Sinking Fund Account from the Revenues, in accordance with Section 4.06 hereof, an amount sufficient to pay Sinking Fund Installments for the Series 2011 A-1 Bonds, and the Trustee shall purchase or redeem Series 2011 A-1 Bonds from the Series 2011 Sinking Fund Account at a redemption price equal to the principal amount of the Series

2011 A-1 Bonds maturing on November 15, 2013, November 15, 2014, November 15, 2017, November 15, 2018, November 15, 2019, November 15, 2020, November 15, 2021, November 15, 2026, November 15, 2031, November 15, 2039 and November 15, 2046, to be redeemed, plus accrued interest to the redemption date in the manner herein provided on each November 15 as follows:

### SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2013

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2012 | $[593,065] | 2013* | $[266,964] |

*Final Maturity

### SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2014

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2013 | $[363,167] | 2014* | $[529,128] |

*Final Maturity

### SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2017

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2014 | $[140,387] | 2016 | $[755,819] |
| 2015 | [711,359] | 2017* | [269,818] |

*Final Maturity

### SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2018

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2017 | $[533,240] | 2018* | $[462,249] |

*Final Maturity

### SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2019

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2018 | $[390,999] | 2019* | $[649,211] |

*Final Maturity

\29695489.18

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2020

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2019 | $[257,366] | 2020* | $[831,712] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2021

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2020 | $[131,526] | 2021* | $[1,010,477] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2026

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2021 | $12,963 | 2024 | $1,227,578 |
| 2022 | 1,087,405 | 2025 | [1,304,302] |
| 2023 | [1,155,368] | 2026* | [392,026] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2031

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2026 | $[993,795] | 2029 | $[1,662,241] |
| 2027 | [1,472,435] | 2030 | [1,766,131] |
| 2028 | [1,564,462] | 2031* | [765,377] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2039

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2031 | $[1,111,137] | 2036 | $[2,540,952] |
| 2032 | [1,993,796] | 2037 | [2,699,762] |
| 2033 | [2,118,408] | 2038 | [2,868,497] |
| 2034 | [2,250,809] | 2039* | [951,809] |
| 2035 | [2,391,484] | | |

_____
*Final Maturity

\29695489.18

SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2046

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2039 | $[2,095,969] | 2043 | $[3,884,177] |
| 2040 | [3,238,264] | 2044 | [4,126,938] |
| 2041 | [3,440,655] | 2045 | [4,384,872] |
| 2042 | [3,655,696] | 2046* | [4,658,927] |

_____
*Final Maturity

(b)     The Trustee shall deposit into the Series 2011 Sinking Fund Account from the Revenues, in accordance with Section 4.06 hereof, an amount sufficient to pay Sinking Fund Installments for the Series 2007 B Bonds, and the Trustee shall purchase or redeem Series 2007 B Bonds from the Series 2011 Sinking Fund Account at a redemption price equal to the principal amount of the Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date in the manner herein provided on each November 1 as follows:

SERIES 2007 B BONDS

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2012 | $[417,102] | 2030 | $[1,093,420] |
| 2013 | [440,043] | 2031 | [1,153,558] |
| 2014 | [464,245] | 2032 | [1,217,004] |
| 2015 | [489,779] | 2033 | [1,283,939] |
| 2016 | [516,717] | 2034 | [1,354,555] |
| 2017 | [545,136] | 2035 | [1,429,056] |
| 2018 | [575,119] | 2036 | [1,507,654] |
| 2019 | [606,750] | 2037 | [1,590,575] |
| 2020 | [640,121] | 2038 | [1,678,057] |
| 2021 | [675,328] | 2039 | [1,770,350] |
| 2022 | [712,471] | 2040 | [1,867,719] |
| 2023 | [751,657] | 2041 | [1,970,444] |
| 2024 | [792,998] | 2042 | [2,078,818] |
| 2025 | [836,613] | 2043 | [2,193,153] |
| 2026 | [882,627] | 2044 | [2,313,776] |
| 2027 | [931,171] | 2045 | [2,441,034] |
| 2028 | [982,386] | 2046* | [2,575,291] |
| 2029 | [1,036,417] | | |

_____
*Final Maturity

Section 2.11.  <u>Conditions Precedent to Delivery of Series 2011 Bonds</u>.  The Series 2011 Bonds shall be executed by the Issuer and delivered to the Trustee, whereupon the Trustee shall authenticate the Series 2011 Bonds and exchange the Series 2011 Bonds for Series 2007 Bonds as provided in Section 2.02(c) above, but only upon delivery to the Trustee of:

(a)     a copy of the resolution certified by an Authorized Officer of the Issuer authorizing the issuance of the Series 2011 Bonds;

(b)     the written order of the Issuer directing the authentication and delivery of the Series 2011 Bonds, signed by an Authorized Officer of the Issuer;

(c)     opinions of Bond Counsel and/or Independent Counsel to the effect that (i) this Indenture and the Loan Agreement have been duly and lawfully executed and delivered by the Issuer and constitute valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their respective terms, (ii) this Indenture creates the valid pledge of and the valid lien upon the Revenues that it purports to create, subject only to the provisions of this Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for or to the purposes and on the terms and conditions set forth in this Indenture, (iii) the Series 2011 Bonds have been duly and validly authorized and issued by the Issuer and constitute valid and binding limited obligations of the Issuer enforceable against the Issuer in accordance with their terms, and (iv) (based upon assumptions stated therein) the interest payable on the Series 2011 Bonds is excludable from the gross income of the Holders thereof for purposes of federal income taxation pursuant to Section 103 of the Code.  The opinions of Bond Counsel and Independent Counsel may be qualified as to such matters as are acceptable to the Trustee and the Issuer, including, without limitation, customary exceptions as to bankruptcy, insolvency and other laws affecting creditors' rights generally, and customary exceptions as to principles of equity;

(d)     fully executed counterparts of the Bond Documents;

(e)     completed financing statements;

(f)     a bring-down or endorsement of the title insurance policy or such other documentation delivered in conjunction with the issuance of the Series 2007 Bonds, to evidence that the Corporation has obtained, and there is then in effect, a policy of insurance with respect to all real property conveyed by the Mortgage insuring against title losses in an amount equal to the aggregate principal amount of the Bonds, less the Debt Service Reserve Fund Requirement as calculated on the date of delivery of the Series 2011 Bonds, issued by a company licensed to conduct a title insurance business in the Commonwealth;

(g)     a current as-built survey of all real property conveyed by the Mortgage, prepared by a registered surveyor and sufficient to enable a title insurance company to deliver the bring-down or endorsement referred to in paragraph (f) above without any survey exceptions;

(h)     evidence of the perfection of a security interest in favor of the Issuer as secured party and the Trustee as assignee in the Receipts, the Collateral and the goods and chattels of the Corporation located in or on any part of the Property, in form and substance satisfactory to the Trustee;

(i)     policies of insurance or certificates of insurance and a certificate of an Independent Insurance Consultant to evidence that the Corporation has obtained, and there is then in effect, insurance of the types and in the amounts required by the Loan Agreement;

\29695489.18

(j)        an opinion or opinions of Independent Counsel to the effect that the Bond Documents have been duly executed and delivered by the parties thereto and constitute valid and binding obligations of such parties, enforceable against such parties in accordance with their respective terms (subject to customary exceptions as to bankruptcy, insolvency or other laws affecting creditors' rights generally, and customary exceptions as to principles of equity);

(k)        a written statement of _____, to the Trustee, setting forth a determination, assuming the delivery of the Series 2011 Bonds and the exchange of Series 2007 Bonds, of the Debt Service Reserve Fund Requirement for each Series of Bonds secured by the Senior Debt Service Reserve Fund as of the Closing Date;

(l)        fully executed counterparts of the Collateral Documents;

(m)       execution and delivery of the Collateral Assignment;

(n)        a certificate of the Corporation confirming the release of escrowed Initial Entrance Fees;

(o)        a copy of the deed transferring ownership of the Facility and the Facility Site to the Corporation; and

(p)        the executed original of the initial Letter of Credit, together with an opinion of Independent Counsel to the effect that the initial Letter of Credit has been duly authorized, executed and delivered by the issuer of such Letter of Credit and constitutes the valid and binding obligation of the issuer of such Letter of Credit.

Section 2.12.  Refunding Bonds.  The Issuer may issue refunding bonds (which may be Additional Senior Bonds or Additional Subordinated Bonds issued under this Indenture) to refund any Outstanding Bonds or Parity Debt.  Refunding bonds shall be issued pursuant to and in accordance with the provisions of this Indenture or any other indenture of the Issuer authorizing such refunding bonds, which may provide (without limitation) for the refunding of Outstanding Bonds in advance of the earliest redemption date for such Outstanding Bonds.

Section 2.13.  Authorization of Additional Senior Bonds; Conditions Precedent to Delivery of Additional Senior Bonds.  In addition to the Series 2011 A Bonds, the Issuer may issue from time to time Additional Senior Bonds under and secured by this Indenture, subject to the conditions hereinafter provided in this Section, solely for the following purposes:  (a) to refund or advance refund any Outstanding Senior Bonds, provided such refunding or advance refunding results in debt service savings in each year or refunds the Series 2007 B Bonds or Subseries II of the Series 2011 A-2 Bonds and (b) any other purpose permitted hereunder and under the Loan Agreement.  The costs to be incurred by the Corporation in connection with the issuance and sale of any such Additional Senior Bonds and the establishment of necessary reserves shall be included within each of the foregoing authorized purposes.  The issuance of Additional Senior Bonds shall be authorized by a Supplemental Indenture of the Issuer, which shall specify all matters required to be provided in this Section.

Each Series of Additional Senior Bonds shall be on a parity with, and shall be entitled to the same benefit and security of this Indenture, including (without limitation) the pledge of the

Revenues made hereby, as the Series 2011 A Bonds and any other Series of Additional Senior Bonds that may be issued from time to time as provided in this Section.

The Supplemental Indenture authorizing the issuance of any Series of Additional Senior Bonds shall specify the maturities and redemption provisions of such Additional Senior Bonds, the form, denominations, registration provisions and provisions for the exchange of such Additional Senior Bonds and other details of such Additional Senior Bonds. Any Supplemental Indenture authorizing the issuance of Additional Senior Bonds shall also state the amount (if any) of the proceeds of such Additional Senior Bonds or other moneys required to be deposited in the Senior Debt Service Reserve Fund for such Additional Senior Bonds to make the amount on deposit therein equal the Debt Service Reserve Fund Requirement upon the issuance of such Additional Senior Bonds. Any Supplemental Indenture authorizing the issuance of Additional Senior Bonds may provide for the creation of a separate Debt Service Fund, Construction Fund, Senior Debt Service Reserve Fund, Operating Reserve Fund and Redemption Fund for each Series of Additional Senior Bonds. If a separate Senior Debt Service Reserve Fund is created for any Series of Bonds, the Debt Service Reserve Fund Requirement and amounts payable under the Loan Agreement with respect to the Debt Service Reserve Fund Requirement shall be calculated separately for each Series of Bonds for which a separate Senior Debt Service Reserve Fund is maintained.

All Additional Senior Bonds shall mature on November 15 and redemptions of Additional Senior Bonds from the Series 2011 Sinking Fund Account shall be made on November 15 of the year in which such redemptions are to be made, and the interest on all Additional Senior Bonds shall be payable on May 15 and November 15 of each year, unless (a) the Issuer and the Corporation enter into a supplemental Loan Agreement that provides that the Corporation shall make equal monthly payments (as nearly as practicable) thereunder in an amount sufficient to pay the principal of and interest on, and the Sinking Fund Installment for, all of the Bonds becoming due in each Bond Year and (b) the Supplemental Indenture authorizing such Additional Senior Bonds provides for the creation of a separate Debt Service Fund and a separate Senior Debt Service Reserve Fund for each Series of Bonds.

The Supplemental Indenture authorizing the issuance of any Series of Additional Senior Bonds may provide that proceeds realized under any Credit Facility securing the payment of such Additional Senior Bonds shall not be available to pay the principal or Redemption Price of or interest on, or the Purchase Price (if any) of, the Series 2011 A Bonds or any other Series of Additional Senior Bonds.

If any Supplemental Indenture authorizing the issuance of Additional Senior Bonds provides for the establishment of separate funds and accounts for each Series of Additional Senior Bonds, then such Supplemental Indenture shall require (a) that the Revenues received by the Issuer or the Trustee for the account of the Issuer pursuant to the Loan Agreement shall be deposited pro rata as to time and amount among the Debt Service Funds and the Senior Debt Service Reserve Funds for each Series of Senior Bonds on the basis of the principal of or the Sinking Fund Installments for, and the interest on, each Series of Senior Bonds becoming due and the amounts required to be deposited in such Senior Debt Service Reserve Funds, respectively, during the period from November 16 of any year through November 15 of the following year, to the end that the Senior Bonds of each Series shall be equally and ratably

secured by the Receipts, the Revenues and the Mortgage and (b) that amounts on deposit in the Debt Service Fund, Construction Fund, Senior Debt Service Reserve Fund, and Redemption Fund created for each Series of Senior Bonds shall be applied solely to the payment of the principal or Redemption Price of and interest on, or the Purchase Price of, the Senior Bonds of such Series or to the reimbursement of the issuer of any Credit Facility securing such Senior Bonds and shall not be available to satisfy the claims of Holders of Senior Bonds of any other Series or of the issuer of any Credit Facility securing any other Series of Senior Bonds.

Any Supplemental Indenture authorizing the issuance of Additional Senior Bonds may provide that (a) any proceeds of such Additional Senior Bonds and investment earnings thereon remaining after the completion of the Facility or any Additional Facilities financed with the proceeds of such Additional Senior Bonds, as applicable, shall be deposited in the Redemption Fund created for such Series of Additional Senior Bonds, and (b) the amount of any increase in the Debt Service Reserve Fund Requirement resulting from the issuance of such Additional Senior Bonds shall be applied to the final payments of the principal or Redemption Price of and interest on such Additional Senior Bonds.

The Bonds of each Series of Additional Senior Bonds shall be executed by the Issuer and delivered to the Trustee, whereupon the Trustee shall authenticate such Additional Senior Bonds and, upon payment of the Purchase Price of such Additional Senior Bonds, deliver such Additional Senior Bonds to or upon the order of the Issuer, but only upon receipt by the Trustee of:

    (a)    a certified copy of the resolution of the Issuer authorizing the issuance of such Series of Additional Senior Bonds;

    (b)    a counterpart of the Supplemental Indenture authorizing such Series of Additional Senior Bonds;

    (c)    the written order of the Issuer directing the authentication and delivery of such Additional Senior Bonds, signed by an Authorized Officer of the Issuer;

    (d)    executed counterparts of Supplements to the Loan Agreement and the Mortgage, and evidence of the creation of a lien pursuant to the Mortgage and any supplement thereto, which shall require the Corporation to make equal monthly payments (as nearly as practicable) in such amount as shall be sufficient to provide for the timely payment of the principal or Redemption Price of and interest on such Additional Senior Bonds and otherwise provide for the security of such Additional Senior Bonds on a parity with the Series 2011 A Bonds and any other Outstanding Additional Senior Bonds to the extent provided in this Indenture, and shall be substantially in the same form and of the same content as the Loan Agreement and the Mortgage, except as shall be required in order to reflect the amount, maturities and other details of such Additional Senior Bonds or to further secure the Senior Bonds;

    (e)    all certificates, opinions, written statements and other documents required pursuant to Section 8.10 of the Loan Agreement to evidence compliance with such Section;

(f) a written statement of the underwriters of the Additional Senior Bonds to the Trustee setting forth a determination of the Debt Service Reserve Fund Requirement, taking into account the Additional Senior Bonds to be delivered and any Parity Debt to be refunded, together with moneys or securities authorized for the investment of the Senior Debt Service Reserve Fund (which may include, without limitation, a Debt Service Reserve Fund Credit Facility qualified to be credited to the Senior Debt Service Reserve Fund under Section 4.13 hereof), in an amount equal to the amount, if any, required to be paid to the Senior Debt Service Reserve Fund to make the amount on deposit therein equal the Debt Service Reserve Fund Requirement upon the issuance of such Additional Senior Bonds;

(g) a certified copy of an order, certificate or other formal action evidencing the final approval (or other enabling action), if any is then required by applicable law or regulation in the Commonwealth, of any Additional Facilities by any and all state and local agencies and an opinion of Independent Counsel, in form and substance satisfactory to the underwriters of the Additional Senior Bonds, to the effect that the Corporation has received all material consents and approvals of any and all state and local agencies required by applicable law or regulation for the construction or acquisition, or the financing or refinancing (as the case may be), of such Additional Facilities;

(h) an opinion of Bond Counsel to the effect that (i) the Supplemental Indenture and the Supplement to the Loan Agreement have been duly executed by the Issuer and constitute the valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their respective terms, (ii) the Additional Senior Bonds have been duly and validly authorized and issued by the Issuer and constitute the valid and binding limited obligations of the Issuer enforceable against the Issuer in accordance with their terms, (iii) the issuance of such Additional Senior Bonds will not adversely affect the excludability from gross income for federal income tax purposes of interest paid on any Tax-Exempt Bonds theretofore issued, and (iv) with respect to Additional Senior Bonds that are to be Tax-Exempt Bonds (based upon assumptions stated therein), the interest payable on such Additional Senior Bonds is not includable in the gross income of the Holders thereof for purposes of federal income taxation pursuant to Section 103 of the Code. The opinion of Bond Counsel may be qualified as to such matters as are acceptable to the Issuer, the underwriters of the Additional Bonds and the Trustee, and include, without limitation, customary exceptions as to bankruptcy, insolvency and other laws affecting creditor's rights generally and customary exceptions as to principles of equity;

(i) a certificate of the Authorized Officer of the Corporation to the effect that, as of the date of the issuance of such Additional Senior Bonds and after giving effect to the issuance of such Additional Senior Bonds, no event which upon the giving of notice or the passage of time or both would constitute an Event of Default, and no Event of Default shall have occurred and be continuing under this Indenture, the Loan Agreement or the Mortgage;

(j) a title insurance policy or such other documentation to evidence that the Corporation has obtained, and there is then in effect, a policy of insurance with respect to all real property conveyed by the Mortgage, including (without limitation) any real property conveyed by any Supplement to the Mortgage in connection with the issuance of such Additional Senior Bonds, issued by a company licensed to conduct a title insurance business in the Commonwealth

- 75 -

insuring against title losses in amounts aggregating not less than the aggregate principal amount of all Outstanding Senior Bonds (including the Additional Senior Bonds then to be delivered and taking into account any Senior Bonds to be refunded), less the amount on deposit in the Senior Debt Service Reserve Fund upon the issuance of such Additional Senior Bonds and any debt service reserve fund established in connection with the issuance of any Parity Obligation, all in form and substance satisfactory to the underwriters;

(k)  an assignment of the construction contract for such Additional Facilities or an agreement to complete such Additional Facilities duly executed by the construction manager or general contractor for such Additional Facilities, in form and substance satisfactory to the underwriters, or such other documentation as may be satisfactory to the underwriters to evidence that the construction manager or general contractor (as the case may be) for such Additional Facilities has agreed with the Trustee to complete such Additional Facilities in the event of any Event of Default under the Loan Agreement;

(l)  a schedule certified by an Authorized Officer of the Corporation and the Architect showing the anticipated monthly construction progress on any Additional Facilities to be financed with the proceeds of such Additional Senior Bonds and fixing an estimated date of completion of each part of such Additional Facilities;

(m)  a current survey of all real property and interests in real property conveyed by the Mortgage and any Supplement thereto, prepared by a registered surveyor, together with a surveyor's report, all in form and substance satisfactory to the underwriters and if required to enable a title insurance company to deliver a title insurance policy without any survey exceptions;

(n)  evidence of the creation of a security interest in favor of the Trustee in the Receipts, the Collateral and the goods and chattels of the Corporation located in or upon any part of the real property conveyed by the Mortgage and any Supplement thereto;

(o)  policies of insurance, certificates of insurance or such other documentation as may be satisfactory to the Trustee, including, without limitation, a certificate of an Independent Insurance Consultant to evidence that the Corporation has obtained, and there is then in effect, insurance of the types and in the amounts required by the Loan Agreement and any Supplement thereto; and

(p)  an opinion or opinions of Independent Counsel to the effect that the Supplemental Indenture, the Supplement to the Loan Agreement and the Supplement to the Mortgage have been duly executed and delivered by the parties thereto and constitute valid and binding obligations of such parties, enforceable against such parties in accordance with their respective terms (subject to customary exceptions as to bankruptcy, insolvency or other laws affecting creditors' rights generally, and customary exceptions as to principles of equity).

Additional Senior Bonds may be authenticated, delivered and paid for in installments of less than the total authorized principal amount of a Series of Additional Senior Bonds from time to time as the Issuer may direct in its written requests.

Section 2.14.   Authorization of Special Senior Bonds; Conditions Precedent to Delivery of Special Senior Bonds.   The Issuer may issue from time to time Special Senior Bonds under and secured by this Indenture, subject to the conditions hereinafter provided in this Section, solely for the purpose of financing and refinancing (provided such refinancing occurs at maturity of the Special Senior Bonds or results in a reduction in borrowing costs) the construction of Residential Building 2.5.   The costs to be incurred by the Corporation in connection with the issuance and sale of any such Special Senior Bonds, the establishment of necessary reserves and the payment of interest prior to and during construction and for a period of six months after the completion of Residential Building 2.5 shall be included within the foregoing authorized purpose.   The issuance of Special Senior Bonds shall be authorized by a Supplemental Indenture of the Issuer, which shall specify all matters required to be provided in this Section.

The Special Senior Bonds shall be secured by a senior lien on and pledge of the Revenues, which lien and pledge shall be senior to all Senior Parity Debt, but the Special Senior Bonds shall not be secured by amounts on deposit in the Senior Debt Service Reserve Funds or the Series 2011 Debt Service Fund.

Principal of the Special Senior Bonds shall be payable from Residential Building 2.5 Initial Entrance Fees, after the first $4,000,000 of such Residential Building 2.5 Initial Entrance Fees are deposited into the Operating Reserve Fund in accordance with the Loan Agreement, on the redemption dates determined by the Corporation in accordance with the Loan Agreement and shall mature on November 15 and the interest on the Special Senior Bonds shall be payable on May 15 and November 15 of each year, except Special Senior Bonds issued as Variable Rate Bonds shall mature on November 1 and interest shall be payable on the first Business Day of each month.

The Supplemental Indenture authorizing the issuance of any Series of Special Senior Bonds shall specify the maturities and redemption provisions of such Special Senior Bonds, the form, denominations, registration provisions and provisions for the exchange of such Special Senior Bonds and other details of such Special Senior Bonds, in each case.   Any Supplemental Indenture authorizing the issuance of Special Senior Bonds shall provide for the creation of a separate Debt Service Fund, Construction Fund, and Redemption Fund for such Special Senior Bonds and may provide for the creation of a debt service reserve fund securing such Special Senior Bonds.   If a debt service reserve fund is created for any Series of Special Senior Bonds, the Debt Service Reserve Fund Requirement and amounts payable under the Loan Agreement with respect to the Debt Service Reserve Fund Requirement shall be calculated separately for such Series of Special Senior Bonds for which such separate debt service reserve fund is maintained.

Any Supplemental Indenture authorizing the issuance of Special Senior Bonds may provide that (a) any proceeds of such Special Senior Bonds and investment earnings thereon remaining after the completion of Residential Building 2.5 shall be deposited in the Redemption Fund created for such Series of Special Senior Bonds, and (b) the amount of any Debt Service Reserve Fund Requirement resulting from the issuance of such Special Senior Bonds shall be applied to the final payments of the principal or Redemption Price of and interest on such Special Senior Bonds.

The Bonds of each Series of Special Senior Bonds shall be executed by the Issuer and delivered to the Trustee, whereupon the Trustee shall authenticate such Special Senior Bonds and, upon payment of the Purchase Price of such Special Senior Bonds, deliver such Additional Senior Bonds to or upon the order of the Issuer, but only upon receipt by the Trustee of:

(a)     each of the items (of similar tenor in respect of the Special Senior Bonds) described in Section 2.13 (a), (b), (c), (e), (f), (g), (h), (i), (k), (l), (o) and (p);

(b)     An executed counterpart of a Supplement to the Loan Agreement, which shall require the Corporation to make equal monthly payments (as nearly as practicable) in such amount as shall be sufficient to provide for the timely payment of interest on such Special Senior Bonds and otherwise provide for the security of such Special Senior Bonds on a senior basis to the extent provided in this Indenture, and shall be substantially in the same form and of the same content as the Loan Agreement, except as shall be required in order to reflect the amount, maturities and other details of such Special Senior Bonds;

(c)     An executed counterpart of a mortgage on the Facility, which mortgage shall be senior to the Mortgage, and evidence of the creation of a senior lien pursuant to such mortgage, which mortgage shall be substantially in the same form and of the same content as the Mortgage (except with respect to the lien status required hereby);

(d)     a title insurance policy or such other documentation to evidence that the Corporation has obtained, and there is then in effect, a policy of insurance with respect to all real property conveyed by the mortgage described in paragraph (c) above, issued by a company licensed to conduct a title insurance business in the Commonwealth insuring against title losses in amounts aggregating not less than the aggregate principal amount of the Special Senior Bonds, less the amount on deposit in any debt service reserve fund securing such Special Senior Bonds, all in form and substance satisfactory to the Trustee;

(e)     a current survey of all real property and interests in real property conveyed by the mortgage described in paragraph (c) above, prepared by a registered surveyor, together with a surveyor's report, all in form and substance satisfactory to the underwriters and if required to enable a title insurance company to deliver a title insurance policy without any survey exceptions;

(f)     a development agreement providing for the payment of a development fee not in excess of 5% of the hard construction costs; and

(g)     evidence of the creation of a senior security interest in favor of the Trustee in the Receipts, the Collateral and the goods and chattels of the Corporation located in or upon any part of the real property conveyed by the mortgage described in paragraph (c) above.

Section 2.15.  Execution and Authentication.  The Bonds shall be executed in the name and on behalf of the Issuer by an Authorized Officer of the Issuer.  In case any Authorized Officer whose manual or facsimile signature appears on the Bonds shall cease to be such Authorized Officer before delivery of such Bonds, such signature, nevertheless, shall be valid and sufficient for all purposes as if he had remained in office until such delivery, and the Issuer,

by resolution, may adopt and use for the execution of Bonds the manual or the facsimile signature of any person who shall have been at the time the proper officer to execute such Bonds, notwithstanding the fact that he may not have been such Authorized Officer on the date of such Bonds or that he may have ceased to be such Authorized Officer at the time when such Bonds shall be authenticated and delivered.

No Bonds shall be valid or obligatory for any purpose or entitled to any right or benefit hereunder unless there shall be endorsed on such Bonds a certificate of authentication substantially in the forms set forth in Appendices A, B, C, D and E hereto or in the Supplemental Indenture authorizing the issuance of such Bonds (as the case may be), duly executed by the Trustee, and such certificate of the Trustee upon any Bond executed on behalf of the Issuer shall be conclusive evidence and the only evidence required that the Bond so authenticated has been duly issued hereunder and that the holder thereof is entitled to the benefits of this Indenture. The certificate of the Trustee may be executed by any authorized signatory of the Trustee.

Section 2.16. <u>Registration and Exchange of Bonds</u>. The Bonds shall be negotiable instruments for all purposes and shall be transferable by delivery, subject only to the provisions for registration and registration of transfer endorsed on the Bonds.

The Issuer shall cause books for registration and the registration of transfer of the Bonds to be prepared. The registration books shall be maintained by the Registrar. The holder of any Bond may register such Bond only upon such books.

If any Bond is surrendered to the Trustee at its Designated Office for transfer or exchange in accordance with the provisions of such Bond, the Issuer shall execute and the Trustee shall authenticate and deliver in exchange for such Bond a new Bond or Bonds of the same Series, in Authorized Denominations, bearing interest at the same rate and having the same stated maturity date, in an aggregate principal amount equal to the principal amount of the Bond so surrendered, upon reimbursement to the Issuer or the Trustee of an amount equal to any tax or other governmental charge, shipping charges or insurance required to be paid with respect to such exchange.

Neither the Issuer nor the Trustee nor the Registrar shall be required to register the transfer of any Bond or make any such exchange of any Bond (i) after such Bond or any portion thereof has been selected for redemption or (ii) prior to the Resizing Tender Date after notice thereof has been given by the Trustee.

In addition, the Issuer and the Registrar shall not be required to issue, exchange or register the transfer of any Variable Rate Bond or any portion thereof:

(a) prior to the Optional Tender Date for such Variable Rate Bond or any portion thereof with respect to which an Optional Tender Notice has been received by the Trustee; or

(b) prior to a Mandatory Tender Date for such Variable Rate Bond with respect to which a Mandatory Tender Notice has been given;

unless, in each such case, the transferee of such Variable Rate Bond or portion thereof delivers to the Trustee and to the Registrar a written acknowledgement of such Tender Date and agrees in writing to be bound by such tender.

The Registrar shall not register the transfer of any Pledged Bond unless the Registrar shall have received written notice from the Letter of Credit Provider that the Principal Portion of the Letter of Credit has been reinstated in the amount of the principal portion of the drawing, the proceeds of which were used to purchase such Bond.

Section 2.17.  <u>Bonds Mutilated, Destroyed, Lost or Stolen</u>.  If any temporary or definitive Bond shall become mutilated or be destroyed, lost or stolen, the Issuer shall, upon request of the registered owner, execute, and thereupon the Trustee shall authenticate and deliver, a new Bond in exchange for the mutilated Bond or in lieu of and substitution for the Bond so destroyed, lost or stolen.  Every case of exchange and substitution for a mutilated Bond upon surrender and cancellation of such mutilated Bond, or in lieu of and substitution for the Bond destroyed, stolen or lost, shall be conditioned upon the Trustee certifying to the Issuer that the registered owner has (a) filed with the Trustee evidence satisfactory to the Trustee that such Bond has been destroyed, stolen or lost and proof of ownership thereof, (b) furnished the Trustee with indemnity satisfactory to the Trustee, (c) complied with such other reasonable regulations as the Trustee may prescribe and (d) agreed to pay such fees and expenses as the Issuer and the Trustee may require in connection therewith.  The Trustee may authenticate any Bond issued upon such exchange or substitution and deliver such Bond upon the written request or authorization of an Authorized Officer of the Issuer.  Upon the issuance of any Bond upon such exchange or substitution, the Issuer may require the payment of a sum sufficient to cover any tax or other governmental charge, shipping charges or insurance that may be imposed in relation thereto and any other expenses, including counsel fees, of the Issuer or the Trustee.

If any Bond that has matured or is about to mature shall become mutilated or be destroyed, lost or stolen, instead of issuing a Bond in exchange or substitution therefor, the Issuer may pay or authorize the payment of such Bond (without surrender thereof except in the case of a mutilated Bond) if the applicant for such payment shall furnish to the Issuer and to the Trustee evidence to the satisfaction of the Issuer and the Trustee of the mutilation, destruction, loss or theft of such Bond and of the ownership thereof and, in the case of any destroyed, lost or stolen Bond, such security or indemnity as they may require to save them harmless.

Every Bond issued pursuant to the provisions of this Section in exchange or substitution for any Bond that is mutilated, destroyed, lost or stolen shall constitute an additional contractual obligation of the Issuer, whether or not the destroyed, lost or stolen Bond shall be found at any time, or be enforceable by anyone, and shall be entitled to all the benefits hereof equally and proportionately with any and all other Bonds duly issued under this Indenture.  All Bonds shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement or payment of mutilated, destroyed, lost or stolen Bonds and shall preclude any and all other rights or remedies, notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment of negotiable instruments or other securities without their surrender.

\29695489.18

Section 2.18. <u>Cancellation and Disposition of Bonds</u>. All mutilated Bonds, all Bonds surrendered for exchange or transfer, all Bonds that have been paid at maturity or upon prior redemption and all Bonds surrendered to the Trustee by the Corporation for cancellation or purchased by the Trustee with amounts on deposit in the Sinking Fund Account or the Redemption Fund shall be cancelled by the Trustee and cremated or destroyed by other means. Upon written request from the Issuer, the Trustee shall deliver to the Issuer a certificate of any such cremation or other destruction of any Bond, identifying the Bond so canceled and cremated or otherwise destroyed.

Section 2.19. <u>Subordinated Bonds</u>. In addition to the Series 2011 Bonds, any Additional Senior Bonds issued in accordance with Section 2.13 hereof and any Special Senior Bonds issued pursuant to Section 2.14 hereof, the Issuer may, with the prior written consent of the Corporation, after the Resizing Tender Date and after the Series 2011 B Bonds are paid in full, issue from time to time other Bonds for the benefit of the Property in accordance with this Section 2.19 and such Bonds shall be Additional Subordinated Bonds for the purposes of this Indenture. Each Series of Additional Subordinated Bonds shall be issued pursuant to a Supplemental Indenture, which shall specify the interest rate or rates, maturity, redemption provisions, form, registration provisions and all other details of such Additional Subordinated Bonds. Prior to the issuance of any Additional Subordinated Bonds, there shall be delivered to the Trustee each of the items (of similar tenor in respect of the Additional Subordinated Bonds) described in Section 2.13(a) – (e), inclusive, and (g) – (p), inclusive. The Issuer may pledge the Revenues, the Receipts and the Collateral to the payment of any Additional Subordinated Bonds, but such pledge shall be junior and subordinate to the pledge of the Revenues, the Receipts and the Collateral to secure Special Senior Bonds and Senior Bonds. During the continuance of any Event of Default under this Indenture and while there is any Special Senior Parity Debt or Senior Parity Debt Outstanding, no payments shall be made with respect to the principal of or interest on any Subordinated Bonds, including, without limitation, the Series 2011 B Bonds unless, after the Special Senior Parity Debt is paid in full, the Holders of not less than a Majority of the Outstanding Senior Parity Debt permit the payment of Subordinated Bonds. Except with respect to the Series 2011 B Bonds, the principal of and interest on Additional Subordinated Bonds shall be payable on the same dates as the principal of and interest on Senior Bonds are paid, and then only after such principal of and interest on the Special Senior Bonds and the Senior Bonds have been paid.

Section 2.20. <u>Subordinated Indebtedness Authorized</u>. In addition to any Additional Senior Bonds issued in accordance with Section 2.13 hereof, any Special Senior Bonds issued in accordance with Section 2.14 hereof and any Additional Subordinated Bonds issued in accordance with Section 2.19 hereof, the Issuer may issue from time to time other Indebtedness for the benefit of the Corporation in accordance with the Act. Subordinated Indebtedness shall be issued pursuant to a Supplemental Indenture, which shall specify the interest rate or rates, maturity, redemption provisions, form, registration provisions and all other details of such Subordinated Indebtedness. Prior to the issuance of any Subordinated Indebtedness, there shall be delivered to the Trustee each of the items described in Section 2.13 hereof (except Section 2.13(f)) as if such Subordinated Indebtedness were Bonds, with such changes as are appropriate with respect to the issuance of Subordinated Indebtedness. The Issuer may pledge the Revenues, the Receipts and the Collateral to the payment of any Subordinated Indebtedness, but such

pledge shall be junior and subordinate to the pledge of the Revenues, the Receipts and the Collateral to secure Special Senior Bonds, Senior Bonds and Subordinated Bonds.

If (a) the Issuer pledges the Revenues, the Receipts and the Collateral to the payment of such Subordinated Indebtedness, (b) the Corporation notifies the Issuer and the Trustee that it intends to designate Indebtedness as Subordinated Indebtedness pursuant to this Section, and (c) the Trustee receives all of the items that must be delivered with respect to the Subordinated Indebtedness to evidence compliance with Section 8.10 of the Loan Agreement and this Section, together with an opinion of Independent Counsel to the effect that all conditions precedent to the issuance of such Subordinated Indebtedness under this Indenture and the Loan Agreement have been fulfilled, the Trustee will notify the Corporation that such items have been received. Upon receipt of such notice, such Indebtedness shall be Subordinated Indebtedness unless, after the payment in full of the Special Senior Parity Debt, the Holders of not less than a Majority of the Outstanding Senior Parity Debt permit the payment of such Subordinated Indebtedness.

So long as no Event of Default under this Indenture or the Loan Agreement shall have occurred and be continuing, the Issuer or the Corporation may pay or prepay the principal of and interest on any Subordinated Indebtedness, and no recourse shall be had by the holder of any Special Senior Bonds, Senior Bonds or Subordinated Bonds against the person to whom any such payment shall have been made unless such person shall have had, at the time of receipt of such payment, actual knowledge of the insolvency of the Corporation. During the continuance of any Event of Default under this Indenture or the Loan Agreement, no payments shall be made with respect to the principal of or interest on any Subordinated Indebtedness.

Section 2.21.  <u>Book-Entry Registration of Bonds</u>.  The provisions of this Section shall apply to any Series of the Bonds during any period of time in which such Series of the Bonds is maintained in Book-Entry Form with a Depository, any other provisions of this Indenture to the contrary notwithstanding.

A system for registration of the Bonds in Book-Entry Form with a Depository, which shall initially be The Depository Trust Company, New York, New York ("DTC"), shall be in effect on the date of the issuance and sale of the Bonds.

(a)  The principal, Purchase Price, or Redemption Price of and interest on the Bonds shall be payable to the Depository, or registered assigns, as the registered owner of the Bonds, in same day funds on each date on which the principal, Purchase Price, or Redemption Price of or interest on the Bonds is due as set forth in this Indenture and in the Bonds. Such payments shall be made to the offices of the Depository specified by the Depository to the Trustee in writing. Without notice to or the consent of the holders of the Bonds, the Issuer, the Trustee and the Depository may agree in writing to make payments of principal, Redemption Price, Purchase Price and interest in a manner different from that set out herein. Neither the Issuer nor the Trustee shall have any obligation with respect to the transfer or crediting of the appropriate principal and interest payments to the direct or indirect participants of the Depository (the "Participants") or the beneficial owners of the Bonds or their nominees.

(b)  The conveyance of notices, consenting or voting provisions and the procedure for selecting Bonds to be redeemed will be governed by the Depository's procedures

in effect from time to time.  SO LONG AS CEDE & CO. OR ANOTHER ENTITY NAMED BY DTC, AS NOMINEE FOR DTC, IS THE REGISTERED OWNER OF THE BONDS, THE TRUSTEE SHALL TREAT SUCH NOMINEE AS THE ONLY OWNER OF THE BONDS FOR ALL PURPOSES UNDER THIS INDENTURE, INCLUDING RECEIPT OF ALL PRINCIPAL, PURCHASE PRICE AND REDEMPTION PRICE OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS, RECEIPT OF NOTICES, VOTING AND REQUESTING OR DIRECTING THE TRUSTEE TO TAKE OR NOT TO TAKE, OR CONSENTING TO, CERTAIN ACTIONS UNDER THIS INDENTURE.

(c)　　The Issuer may replace any Depository as the Depository for any Series of the Bonds with another Depository or discontinue the maintenance of any Series of the Bonds with any Depository if (i) the Issuer, in its sole discretion, determines that (A) any such Depository is incapable of discharging its duties with respect to such Series of the Bonds, or (B) the interests of the beneficial owners of such Series of the Bonds might be adversely affected by the continuation of the Book-Entry System with such Depository, or (ii) such Depository determines not to continue to act as a securities depository for such Series of the Bonds or is no longer permitted to act as such Depository.  Notice of any determination pursuant to clause (i) shall be given to such Depository at least 30 days prior to any such determination (or such fewer number of days as shall be acceptable to such Depository).  Neither the Issuer nor the Trustee will have any obligation to make any investigation to determine the occurrence of any events that would permit the Issuer to make any determination described in this subsection.

(d)　　If, following a determination or event specified in subsection (c) above, the Issuer discontinues the maintenance of any Series of the Bonds in Book-Entry Form, the Issuer will issue Replacement Bonds for such Series directly to the Participants as shown on the records of the Depository or, to the extent requested by any Participant, to the beneficial owners of such Series of the Bonds as further described in this Section.  The Trustee shall make provisions to notify Participants and the beneficial owners of such Series of the Bonds, by mailing an appropriate notice to the Depository, or by other means deemed appropriate by the Trustee in its discretion, that the Issuer will issue Replacement Bonds for such Series directly to the Participants shown on the records of the Depository or, to the extent requested by any Participant, to beneficial owners of such Series of the Bonds shown on the records of such Participant, as of a date set forth in such notice, which shall be a date at least 10 days after receipt of such notice by the Depository (or such fewer number of days as shall be acceptable to the Depository).

(e)　　In the event that Replacement Bonds of a Series are to be issued to Participants or to beneficial owners of such Series of the Bonds, the Trustee shall promptly have prepared Replacement Bonds for such Series registered in the names of such Participants as shown on the records of the Depository or, if requested by such Participants, in the names of the beneficial owners of the Bonds of such Series, as shown on the records of such Participants as of the date set forth in the notice delivered in accordance with the immediately preceding paragraph.  Replacement Bonds of a Series issued to Participants or to beneficial owners shall be in the Authorized Denomination, be payable as to principal and interest on the same dates as the Series of the Bonds by check or draft mailed to each registered owner at the address of such owner as it appears on the bond register maintained by the Registrar and be in fully registered form.

(f)     Replacement Bonds of a Series issued to a Participant or the beneficial owners of the Bonds shall have the same terms, form and content as the Series of the Bonds initially registered in the name of the Depository to be replaced or its nominee except for the name of the record owner.

(g)     The Depository and its Participants and the beneficial owners of a Series of the Bonds, by their acceptance of such Series of the Bonds, agree that neither the Issuer nor the Trustee shall have any liability for the failure of such Depository to perform its obligations to the Participants and the beneficial owners of such Series of the Bonds, nor shall the Issuer or the Trustee be liable for the failure of any Participant or other nominee of the beneficial owners to perform any obligation the Participant may incur to a beneficial owner of such Series of the Bonds.

(h)     The Trustee is hereby authorized to make such modifications to the forms of the Bonds as may be appropriate to conform to any standard specifications for registered municipal securities that may be promulgated by any body generally recognized in the municipal securities industry (including, without limitation, the American National Standards Institute) in order to facilitate computer or other mechanical processing methods for registration of municipal bonds.  Notwithstanding the foregoing, the Trustee shall not promulgate any change in the forms of the Bonds, unless the Trustee shall have received an opinion of Bond Counsel to the effect that such change in the forms of the Bonds will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of such Series of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code.

(i)     Upon the written request of holders of 100% of the beneficial interests in a Series of the Bonds, the Trustee shall terminate any Book-Entry System then in effect with respect to such Series and Replacement Bonds for such Series shall be issued and delivered as provided above.  The Trustee shall promptly give notice of such request to the Issuer.

Section 2.22.   Independent Resizing Consultant; Rules for Resizing.

(a)     Upon the occurrence of a Resizing Event, the Corporation shall employ an Independent Consultant, who shall determine the principal amounts of the Series 2011 A-1 Bonds, Series 2007 B Bonds and Series 2011 A-2 Bonds to be exchanged for such Bonds tendered or deemed tendered in accordance with Sections 2.04(c), 2.05(r) and 2.06(c), the percentage of the resize, the amortization schedule of the Series 2011 A Bonds Outstanding after the resizing, and the Senior Debt Service Reserve Fund Requirement after the resizing.

(b)     The Independent Consultant shall calculate the principal amount of Series 2011 A Bonds to be exchanged for the Series 2011 A Bonds tendered or deemed tendered in accordance with Sections 2.04(c), 2.05(r) and 2.06(c) by calculating the aggregate principal amount of Series 2011 A Bonds that, assuming amortization on a level debt service basis over the remaining Series 2011 A Bond term and a 5.5% or 6.25% interest rate, as applicable, would result in a Debt Service Coverage Ratio of 1.25, based on the Resizing Financial Statements delivered to the Trustee pursuant to Section 8.07 of the Loan Agreement for the applicable Fiscal Year.  For purposes of this calculation, (i) there shall be excluded from Annual Debt

- 84 -

Service on all Outstanding Long-Term Indebtedness any interest and principal on the Construction Loan and any principal on the Series 2011 A-2 Bonds. Initial Entrance Fees shall be excluded from Funds Available for Debt Service, but net turnover Entrance Fees shall be included. If, as a result of the resizing, a surplus from the Senior Debt Service Reserve Fund is to be applied and taken into account in the resizing in accordance with Section 4.08 of this Indenture, any such surplus shall be applied to the payment of the principal amount of Series 2011 A Bonds otherwise to be reduced as a result of the calculation described herein. As an example of the application of the preceding sentence, if the Independent Consultant determines the total of Series 2011 A Bonds to be reduced as a result of the resizing equals $20,000,000 and the surplus to be applied in the resizing is $2,000,000, then the net resizing amount of Series 2011 A Bonds shall be $18,000,000 and the $2,000,000 shall be applied to the payment of the principal of Series 2011 A Bonds immediately prior to the resizing.

If the Independent Consultant determines a resizing is not necessary at such time, no Resizing Tender Date shall occur and the Corporation's right to resize the Series 2011 A Bonds shall be terminated.

(c)     If on the Resizing Tender Date, there is any accrued and unpaid principal or Purchase Price of or interest on the Series 2011 A Bonds, then (i) to the extent such principal or Purchase Price or interest was not paid pursuant to a Special Senior Parity Debt Standstill, a Calamity Standstill or a Good Cause Standstill, as each is defined in Section 7.01, such principal or Purchase Price or interest shall be taken into account by the Independent Consultant in calculating the principal amount of the Series 2011 A Bonds to be exchanged under paragraph (b) above, and if such deferred amounts could be included in the accreted value on the outstanding principal amount of the Series 2011 A Bonds and the resulting sum would not cause the Debt Service Coverage Ratio to exceed 1.25, such deferred amounts will be amortized over the remaining term of the Series 2011 A Bonds, and paid in monthly installments after payment of debt service on any Special Senior Parity Debt, and otherwise, such principal or Purchase Price or interest shall be treated on parity with the Series 2011 A Bonds as Additional Subordinated Parity Obligations under Section 8.22 of the Loan Agreement and Section 5.06 of this Indenture in principal amount equal to the amount of such principal or Purchase Price or interest and payable on the same terms as the Series 2011 B Bonds and (ii) to the extent such principal or Purchase Price or interest was not paid for any other reason, such principal or Purchase Price or interest would remain fully due and payable and will not be taken into account in the resizing. A copy of the Independent Consultant's report shall be delivered to the Trustee and Significant Holders prior to the Resizing Tender Date.

(d)     As a result of the resizing, the maturing principal of and any Sinking Fund Installments due on each Series of the Series 2011 A Bonds shall be ratably reduced to reflect the reduced principal amount of such Series Outstanding.

ARTICLE III
REDEMPTION OF BONDS

Section 3.01.  Selection of Bonds to Be Redeemed.  If fewer than all of a Series of Bonds shall be called for redemption, they shall be redeemed from such maturities as shall be selected by the Corporation.  If fewer than all of the Bonds of such maturities shall be called for

redemption, the Trustee shall select Bonds or portions thereof for redemption within such maturities by lot or in such other manner as the Trustee, in its discretion, may deem proper; provided, however, that the portion of any Bonds to be redeemed shall be in Authorized Denominations (except in the case of Variable Rate Bonds, the portion of any Bond remaining outstanding after any redemption shall be deemed to be an Authorized Denomination after the redemption date) and provided further, if fewer than all of the Series 2011 A-1 Bonds shall be called for optional redemption, the Trustee shall apply the funds for such optional redemption ratably between the Series 2011 A-1 Bonds and the Series 2007 B Bonds. Any redemption of Series 2011 B Bonds shall be subject to the option of the Holder of such Series 2011 B Bonds, by written notice to the Trustee at least 10 days prior to the redemption date, to direct that moneys available to redeem Series 2011 B Bonds held by such Holder shall instead be applied to the redemption of Series 2011 A-1 Bonds or Series 2007 B Bonds held by such Holder. The selection of Bonds to be redeemed shall be irrevocable.

Section 3.02. Notice of Redemption.

(a)    (i)    At the written direction of the Issuer (as directed by the Corporation) or the written direction of the Corporation (on behalf of the Issuer), as applicable, the Trustee shall redeem (A) Series 2011 A-1 Bonds and Series 2011 A-2 Bonds pursuant to Section 5(a) of the Series 2011 A-1 Bonds and Series 2011 A-2 Bonds, (B) Series 2007 B Bonds pursuant to Section 8(a)(iii), (iv) and (v) of the Series 2007 B Bonds and (C) Series 2011 B Bonds pursuant to Section 5(a) of the Series 2011 B Bonds. Such direction shall be given at least 60 days prior to the redemption date of such Bonds, or such fewer number of days as shall be acceptable to the Trustee and, in the case of the Variable Rate Bonds, the Letter of Credit Provider. Upon the transfer of any amount from the Insurance and Condemnation Award Fund to the Redemption Fund, the Trustee shall redeem Series 2011 Bonds pursuant to (A) Section 5(c) of the Series 2011 A-1 and Series 2011 A-2 Bonds, (B) Section 8(a)(i) of the Series 2007 B Bonds and (C) Section 5(c) of the Series 2011 B Bonds. Upon receipt of such direction or upon such transfer (as the case may be) the Trustee shall cause such Bonds to be redeemed as provided in this subsection (a).

(ii)    At least 45 days before each date on which a Sinking Fund Installment for the Series 2011 A-1 and Series 2007 B Bonds becomes due, the Trustee shall select the Series 2011 A-1 and Series 2007 B Bonds then subject to redemption from amounts on deposit in the Sinking Fund Account to be redeemed on such date in an aggregate principal amount equal to the Sinking Fund Installment due on such date (as such Sinking Fund Installment may be reduced in accordance with Section 4.07(c) hereof) and shall cause such Series 2011 A-1 and Series 2007 B Bonds to be redeemed pursuant to the mandatory sinking fund redemption provisions of such Series 2011 A-1 and Series 2007 B Bonds.

(iii)    At least 30 days before each date on which the Series 2011 A-2 Bonds shall be redeemed from Excess Liquidity in accordance with Section 3.09(b), the Trustee shall cause notice of such redemption to be sent with respect to such Series 2011 A-2 Bonds to be redeemed.

(iv)    At least 30 days before each date on which the Series 2011 B Bonds shall be redeemed from Excess Cash in accordance with Section 3.09(c), the Trustee shall

cause notice of such redemption to be sent with respect to such Series 2011 B Bonds to be redeemed. In addition to the information required to be included in such notice by paragraph (b) below, such notice shall state that the Holders of such Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(v)     At least 30 days before each date on which the Series 2011 B Bonds shall be redeemed in accordance with Section 3.09(d), the Trustee shall cause notice of such redemption to be sent with respect to such Series 2011 B Bonds to be redeemed. In addition to the information required to be included in such notice by paragraph (b) below, such notice shall state that the Holders of such Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(b)     Each notice of redemption of Bonds shall set forth (i) the maturities of the Bonds to be redeemed, (ii) the date fixed for redemption, (iii) the CUSIP numbers of the Bonds or portions thereof to be redeemed, (iv) the particular Series of Bonds to be redeemed, (v) the Redemption Price to be paid, (vi) that such Bonds will be redeemed at the Designated Office of the Trustee, (vii) if fewer than all of the Bonds of any one maturity then Outstanding shall be called for redemption, the distinctive numbers and letters, if any, of the Bonds to be redeemed, (viii) in the case of Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed, (ix) any conditions to such redemption, including the deposit of sufficient funds for the redemption of the Bonds made pursuant to the Bonds, and (x) that on the redemption date, there shall become due and payable upon all Bonds of a Series to be redeemed the Redemption Price thereof, together with interest accrued, if any, to the redemption date, and that, from and after such date, interest thereon shall cease to accrue. If any Bond is to be redeemed in part only, the notice of redemption that relates to such Bond shall state also that on or after the redemption date, upon surrender of such Bond to the Trustee at its Designated Office, a new Bond or Bonds of the same Series of Bonds and maturity, bearing interest at the same rate and of any Authorized Denomination will be issued in aggregate principal amount equal to the unredeemed portion of such Bond.

(c)     The Trustee shall mail notice of the call for any redemption at least 30 days (15 days in the case of Bonds bearing interest at a Variable Rate) before the redemption date to the registered owners of the Bonds to be redeemed; provided, however, that so long as the Bonds of a Series are maintained in Book-Entry Form, notice of the call for redemption required to be given to the registered owners shall be given only to the Depository or its nominee in whose name such Series of Bonds is registered. The failure to mail any such notice to any registered owner of Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Bonds. If for any reason it is impossible or impractical to mail such notice of redemption, then the Trustee shall give notice of the call for any redemption by publication at least once in an Authorized New York Newspaper, which notice shall be published at least 30 days (15 days in the case of the Bonds bearing

interest at a Variable Rate) before the redemption date. In the event notice is published as provided above, the mailing of notice to the registered owners of Bonds to be redeemed shall not be a condition precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of Bonds.

(d) The Trustee shall give notices of the redemption of Bonds in accordance with any regulation or release of the Municipal Securities Rulemaking Board or other governmental board or body from time to time applicable to such Bonds of which the Trustee shall have actual knowledge.

(e) In no event shall the Trustee give notice of any redemption of the Series 2007 B Bonds made pursuant to Section 8(a)(i), (ii) or (iii) of the Series 2007 B Bonds until (i) an amount of Available Moneys or Government Obligations, the principal of and earnings on which are, sufficient to pay the Redemption Price of all such Bonds to be redeemed, plus accrued interest to the date fixed for redemption, is on deposit in the Redemption Fund, or (ii) a Credit Facility is on deposit with or issued to the Trustee under which an amount of moneys sufficient to pay the Redemption Price of all such Bonds to be redeemed, plus accrued interest to the date fixed for redemption, may be drawn, on or before the date fixed for redemption and the provider of such Credit Facility has consented in writing to such redemption; provided, however, that no consent of the provider of the Credit Facility is required for scheduled optional redemption pursuant to the Letter of Credit Agreement; provided further, however, that the Trustee's notice shall not be deemed to be a representation by the Trustee that such Credit Facility funds will be available on the date fixed for redemption of Bonds, and the Trustee shall not be liable if such funds are not available.

Section 3.03. Redemption of Portion of Bond. In case part but not all of an Outstanding Bond shall be selected for redemption, upon the presentation and surrender of such Bond to the Paying Agent for payment of the principal amount thereof so called for redemption in accordance with such Bond, the Issuer shall execute and the Trustee shall authenticate and deliver to or upon the order of the registered owner of such Bond or his attorney or legal representative, without charge therefor, for the unredeemed portion of the principal amount of the Bond so surrendered, a Bond or Bonds of the same Series of Bonds and maturity, bearing interest at the same rate and of any Authorized Denomination, in aggregate principal amount equal to the unredeemed portion of such Bond.

Section 3.04. Effect of Call for Redemption. On the date designated for redemption, notice having been given as provided above, the Bonds or portions of Bonds so called for redemption shall become and be due and payable at the Redemption Price provided for redemption of such Bonds or such portions thereof on such date and, if moneys for the payment of the Redemption Price and accrued interest are held by the Trustee as provided herein, interest on such Bonds or such portions thereof so called for redemption shall cease to accrue, such Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under this Indenture, and the registered owners thereof shall have no rights in respect of such Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof and the accrued interest thereon so held by the Trustee.

Section 3.05.  No Partial Redemption After Default.  Anything in this Indenture to the contrary notwithstanding, if there shall have occurred and be continuing an Event of Default, there shall be no redemption of fewer than all of the Bonds at the time Outstanding except in accordance with the provisions of Section 7.04 herein, provided, however, that if all of the Bonds then Outstanding are term bonds of a single maturity, fewer than all of the Bonds may be redeemed from the Holders on a pro-rata basis.

Section 3.06.  Redemption of Parity Obligations.  Parity Obligations shall be subject to redemption as set forth therein.  Parity Obligations shall be selected for redemption and notice of the redemption of Parity Obligations shall be given in accordance with the provisions of such Parity Obligations.

Section 3.07.  Redemption in Accordance with Procedures of Depository.  Notwithstanding any provisions contained herein, during any period in which a Series of Bonds is maintained pursuant to a Book-Entry System, redemption of such Series of Bonds shall occur in accordance with the Depository's standard procedures for redemption of obligations such as the Bonds of such Series.

Section 3.08.  RESERVED.

Section 3.09.  Mandatory Redemption.

(a)    The Series 2007 B Bonds, and the Series 2011 A-1 Bonds are subject to mandatory sinking fund redemption pursuant to and in accordance with Section 2.10 of this Indenture.

(b)    The Series 2011 A-2 Bonds are subject to mandatory redemption in Authorized Denominations on any date occurring at least 45 days after the first to occur of (i) the Construction Commencement Date or (ii) the Resizing Tender Date, from the Corporation's Excess Liquidity as of the immediately preceding December 31, March 31, June 30 and September 30, respectively (as certified to the Trustee by the Corporation in writing at least 40 days prior to the applicable redemption date) from moneys deposited in the Redemption Fund from the Construction Account in accordance with Section 4.04 and from any other moneys deposited by the Corporation in the Redemption Fund with directions to use such moneys to redeem Series 2011 A-2 Bonds, at a price of 100% of the principal amount of the Series 2011 A-2 Bonds to be redeemed plus interest accrued to the redemption date.

(c)    On and after the Resizing Tender Date, the Series 2011 B Bonds are subject to mandatory redemption in Authorized Denominations on any date, in an amount equal to the Corporation's Excess Cash as certified to the Trustee by the Corporation in writing at least 40 days prior to the applicable redemption date and as deposited into the Redemption Fund pursuant to Section 4.06(a) herein, at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.

Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this

Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(d)     The Series 2011 B Bonds are subject to mandatory redemption in Authorized Denominations on the date which is 45 days after the date on which funds are transferred to the Redemption Fund in accordance with Section 4.08(a) and Section 4.08(b) hereof, in an amount equal to the surplus funds so transferred from the Senior Debt Service Reserve Fund, at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.

Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

Section 3.10.  Extraordinary Redemption.  The Bonds are also subject to extraordinary redemption in whole at any time or in part on any Interest Payment Date, at a Redemption Price equal to the principal amount thereof, plus accrued interest thereon to the date fixed for redemption, from, and to the extent of, funds deposited in the Redemption Fund from (i) proceeds received by the Corporation from title insurance with respect to the Property; (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.  Notwithstanding the foregoing, the Series 2007 B Bonds shall be redeemed solely from Available Moneys and proceeds allocable to the Series 2007 B Bonds will be used to reimburse the Letter of Credit Provider for any draw on the Letter of Credit in connection with such redemption.  Any extraordinary redemption of less than all of the Bonds shall be in accordance with the priorities established in Section 4.10 of this Indenture.

Section 3.11.  Optional Redemption and Tender.  The Bonds are also subject to optional redemption and optional tender as follows:

(a)     [Reserved].

(b)     Series 2011 A-1 Bonds.  The Series 2011 A-1 Bonds are subject to redemption prior to maturity on and after December 31, 2018 by the Issuer upon the written direction of the Corporation, as a whole or in part at any time, at a redemption price equal to a percentage of the principal amount of the Series 2011 A-1 Bonds to be redeemed as set forth in the following table, plus interest accrued to the redemption date:

| Redemption Period (both dates inclusive) | Redemption Price |
|---|---|
| December 31, 2018 to June 30, 2019 | 105% |
| July 1, 2019 to December 31, 2019 | 104 |

- 90 -

| January 1, 2020 to June 30, 2020 | 103 |
| July 1, 2020 to December 31, 2020 | 102 |
| January 1, 2021 to June 30, 2021 | 101 |
| July 1, 2021 and thereafter | 100 |

(c)     Series 2007 B Bonds.

(i)     Optional Redemption during Variable Rate Period.   During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, the Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of the Corporation to the Trustee with the written consent of the Letter of Credit Provider, upon notice to the Owners as set forth in Section 3.02, in whole or in part, on any Interest Payment Date, at a redemption price equal to the principal amount of the Series 2007 B Bonds to be redeemed plus accrued interest thereon to the redemption date.

(ii)     Optional Redemption on Mandatory Tender Dates.   The Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of the Corporation to the Trustee, upon notice to the Owners as set forth in Section 3.02, in whole or in part on any Mandatory Tender Date, at a redemption price equal to the principal amount of the Series 2007 B Bonds to be redeemed plus accrued interest thereon to the redemption date.

(iii)     Optional Redemption during Fixed Rate Period.   The Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of the Corporation to the Trustee, during any Fixed Rate Period that (A) extends to the maturity of the Series 2007 B Bonds, and (B) is 6 years or longer, on or after the Interest Payment Date immediately succeeding the date that is the later of (1) the sixth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (2) the earlier of (x) the tenth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (y) the anniversary of the Fixed Rate Date that approximates more closely than any other anniversary of the Fixed Rate Date, the date which occurs at the midpoint of such Fixed Rate Period, in whole at any time, or in part on any Interest Payment Date, upon notice to the Owners as set forth in Section 3.02, at a redemption price equal to the principal amount thereof, plus a premium (expressed as a percentage of the principal amount of the Series 2007 B Bonds redeemed) that for the first permissible redemption date is equal to the lesser of (I) three percent of the principal amount of the Series 2007 B Bonds to be redeemed and (II) one-half of one percent times the number of years between the calendar year of such first redemption date and the calendar year during which such Fixed Rate Period ends (including, for purposes of computation, the calendar year of such first redemption date but excluding the calendar year during which such Fixed Rate Period ends), and declining by one-half of one percent annually thereafter, such premium calculation to be made by the Trustee, upon consultation with the Remarketing Agent, prior to such redemption date plus accrued interest to the redemption date.

(iv)     Optional Tender during Fixed Rate Period.   On the Bank Tender Date, the Issuer will cause to be purchased (but solely from amounts provided by the Corporation pursuant to Section 3.02(d) of the Loan Agreement) any Series 2007 B Bond which was originally bearing interest at a Variable Rate on the Closing Date but which was converted to the Fixed Rate in accordance with Section 2.05(s) herein, at a purchase price equal to the principal

- 91 -

amount thereof, plus accrued interest to the Bank Tender Date, payable by check or wire transfer in immediately available funds. On the Bank Tender Date, the Owner shall deliver the Series 2007 B Bonds to be purchased as follows: (1) if the Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Series 2007 B Bonds to be purchased to the account of the Tender Agent maintained with the Depository, or (2) if physical bond certificates have been delivered to the Owners of the Series 2007 B Bonds pursuant to Section 2.21, delivery of the Series 2007 B Bonds to be purchased to the Trustee, at its Designated Office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank. On or before November 15, 2020, or if the Bank Tender Date has been extended past July 1, 2021, 220 days prior to the extended Bank Tender Date, the Corporation may request the Letter of Credit Provider to extend the Bank Tender Date by delivering to the Letter of Credit Provider a copy of the Corporation's interim financial statements and such other information as shall be reasonably requested by the Letter of Credit Provider. The Letter of Credit Provider shall provide written notice by 180 days prior to the Bank Tender Date (as may be extended) whether it has determined to extend the Bank Tender Date. The Letter of Credit Provider's decision to extend such Bank Tender Date shall be made in its sole discretion and no course of dealing or other circumstance shall be deemed to require the Letter of Credit Provider to extend the Bank Tender Date. The failure of the Letter of Credit Provider to deliver its notice to extend the Bank Tender Date shall be treated for all purposes hereunder as an election by the Letter of Credit Provider to not extend the Bank Tender Date. This clause (iv) shall have not force and effect if the Letter of Credit Provider does not, prior to the Closing Date, elect to deliver a Letter of Credit on the Closing Date.

(d)     Series 2011 A-2 Bonds.  The Series 2011 A-2 Bonds are subject to optional redemption prior to their maturity by the Issuer upon the written direction of the Corporation, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest thereon to the redemption date.

(e)     Series 2011 B Bonds.  The Series 2011 B Bonds are subject to redemption prior to maturity by the Issuer upon the written direction of the Corporation, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed.  Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

Section 3.12.  Notice of Redeemed Bonds.  The Trustee agrees to provide timely notice to the Issuer that some or all of the Bonds have been redeemed or paid.

ARTICLE IV
REVENUES AND FUNDS

Section 4.01.   Creation of Funds to Be Held for All Parity Debt.  The following funds are hereby created for the benefit of the holders of all Senior Parity Debt and Subordinated Bonds Outstanding, subject to the limitations set forth below, under the Loan Agreement and this Indenture and shall be held and maintained by the Trustee:

Revenue Fund

Insurance and Condemnation Award Fund

For the purposes of internal accounting, the funds created pursuant to this Section may contain one or more accounts and sub-accounts, as the Trustee, in its discretion, shall determine.

Pending the application of amounts on deposit in the funds created by this Section as provided in this Indenture, such amounts are hereby pledged to the payment of the principal of and interest on all Outstanding Senior Parity Debt and subordinate to such pledge, such amounts are also hereby pledged to the payment of the principal of and interest on the Series 2011 B Bonds and any Additional Subordinated Bonds.

Section 4.02.   Creation of Funds to Be Held for Bonds; Rebate Fund.

(a)      [Reserved].

(b)      The following funds and separate accounts within funds are hereby created for the benefit of the holders of all Series 2011 Bonds Outstanding under this Indenture and the Letter of Credit Provider and shall be held and maintained by the Trustee:

Construction Fund
Construction Account
Series 2011 Debt Service Fund
Series 2011 A-1 Interest Account
Series 2007 B Interest Account
Series 2011 A-2 Bonds Interest Account
Series 2011 A-1 Principal Account
Series 2007 B Principal Account
Series 2011 A-2 Bonds Principal Account
Series 2011 B Principal Account
Series 2011 Sinking Fund Account
Series 2007 B Purchase Account
Supplemental Reserve Fund
Supplemental Reserve Account
Redemption Fund
Letter of Credit Fund

(c)      A Senior Debt Service Reserve Fund is hereby created for and pledged to the benefit of the Holders of the Series 2011 A Bonds and to the extent provided in any

- 93 -

Supplemental Indenture authorizing the issuance of any Additional Senior Bonds, such Additional Senior Bonds.

(d)     An Operating Reserve Fund is hereby created for and pledged to the benefit of the Holders of the Series 2011 A Bonds, and, to the extent provided in any Supplemental Indenture authorizing the issuance of Additional Senior Bonds, such Additional Senior Bonds.

(e)     The Rebate Fund is hereby created to secure the obligations of the Corporation pursuant to Section 4.15 hereof and shall be held and maintained by the Trustee. The Rebate Fund is not pledged to the payment of any Parity Debt or Subordinated Bonds.

(f)     For the purposes of internal accounting, the funds and accounts created pursuant to this Section may contain one or more accounts and sub-accounts as the Trustee, in its discretion, shall determine and shall contain such sub-accounts with respect to each Series of Bonds.

(g)     Pending the application of amounts on deposit in the Construction Fund, the Series 2011 Debt Service Fund, the Letter of Credit Fund, the Redemption Fund, the Operating Reserve Fund and the Supplemental Reserve Fund, and the accounts and subaccounts therein, as provided in this Indenture, such amounts are hereby pledged to the payment of the principal of and interest on all Outstanding Senior Bonds and Senior Parity Obligations and subordinate to such pledge, amounts in the Construction Fund, the Series 2011 Debt Service Fund, the Redemption Fund, the Operating Reserve Fund and the Supplemental Reserve Fund are hereby pledged to the payment of the principal and interest on the Series 2011 B Bonds.

(h)     The Trustee shall keep and maintain accurate records pertaining to all the funds and accounts created pursuant to this Section and all deposits thereto and disbursements or withdrawals therefrom, and the Trustee shall, upon request, file a statement of debits and credits thereof with the Corporation.

(i)     The Trustee shall cause the Redemption Fund, the Series 2011 Debt Service Fund and the Letter of Credit Fund to be maintained as Eligible Accounts. In the event that a fund required hereby to be an "Eligible Account" no longer is such, the Trustee shall promptly (and, in any case, within not more than 30 calendar days) move such account to another financial institution such that the Eligible Account requirement will again be satisfied.

Section 4.03.  <u>Application of Moneys in Funds and Accounts Created Under the Original Indenture</u>.  Moneys in the funds and accounts on deposit under the Original Indenture and moneys constituting escrowed Initial Entrance Fees and other available cash of the Corporation shall be transferred into the funds and accounts created hereunder or otherwise applied as described herein.  In accordance with the First Supplemental Indenture, the Trustee shall make the following transfers or payments:

(a)     Moneys from the Tax-Exempt Debt Service Reserve Fund created under the Original Indenture shall be applied as follows and in the following order:

(i)    To the holders of the Series 2007 A Bonds and Original Series 2007 B Bonds, or the Letter of Credit Provider, as applicable, an amount equal to the unpaid interest on the Series 2007 A Bonds and Series 2007 B Bonds and unpaid letter of credit fees related thereto accruing from May 16, 2011 to the Closing Date, prorated for such period;

(ii)    To the Senior Debt Service Reserve Fund, an amount equal to the difference between (i) $4,670,000 and (ii) the excess of the amount transferred pursuant to Section 4.03(a)(i) and (b)(i) over $2,600,000;

(iii)    Any balance remaining therein shall be transferred to the Supplemental Reserve Account of the Supplemental Reserve Fund.

(b)    Moneys in the Taxable Debt Service Reserve Fund created under the Original Indenture shall be applied on the Closing Date as follows:

(i)    to the holders of the Series 2007 C Bonds or the Letter of Credit Provider, as applicable, an amount equal to the unpaid interest on the Series 2007 C Bonds and letter of credit fees related thereto accruing from May 16, 2011 to the Closing Date, prorated for such period;

(ii)    To the Senior Debt Service Reserve Fund, an amount necessary to make the amount on deposit therein equal the Initial Senior Debt Service Reserve Fund Requirement; and

(iii)    Any balance remaining therein shall be transferred to the Supplemental Reserve Fund.

(c)    Moneys held in the Operating Reserve Fund, the Development Fee Account, the Construction Fund, plus escrowed Initial Entrance Fees and all other available cash of the Corporation shall be deposited or applied as follows in such order:

(i)    To pay amounts due for administrative and restructuring expenses, real estate taxes and other current expenses due and payable on the Closing Date;

(ii)    To the Corporation for deposit in its Operating Account, $3,000,000;

(iii)    To the Operating Reserve Fund, $_____, which, when added to the amount described in (c)(v) above, equals 30 Days' Cash on Hand of the Corporation;

(iv)    To the Senior Debt Service Reserve Fund, an amount necessary to make the amount on deposit therein, after the transfer made pursuant to Section 4.03(a)(ii) and (b)(ii) above, equal to the Initial Senior Debt Service Reserve Fund Requirement; and

(v)    Any balance remaining after the application of moneys as described in clauses (i) through (iv) above will be deposited into the Supplemental Reserve Fund.

\29695489.18

Section 4.04.  Construction Fund; Conditions Precedent to Application of Moneys; Application of Moneys.

(a)    The Trustee shall deposit into the Construction Account Initial Entrance Fees received from time to time from the Corporation pursuant to Section 8.14 of the Loan Agreement.  Upon making such deposit, the Corporation shall deliver a certificate to the Trustee which shall (i) identify such amounts as Initial Entrance Fees, (ii) designate the building or buildings to which such Initial Entrance Fees relate as required in the Loan Agreement, (iii) identify the amount, if any, of deficiency in the Corporation's operating account below $3,000,000 and (iv) calculate the Corporation's Days' Cash on Hand.  Moneys in the Construction Account shall be disbursed:

(i)    FIRST, to the Senior Debt Service Reserve Fund to the extent the amount on deposit therein is less than the Initial Senior Debt Service Reserve Fund Requirement;

(ii)    SECOND, to the Corporation, an amount, if any, to replenish the Corporation's operating account to a balance of $3,000,000 in accordance with a certificate of the Corporation delivered to the Trustee when making a deposit of Initial Entrance Fees described above;

(iii)    THIRD, to fund the Operating Reserve Fund so that, together with the amount held in the Corporation's operating account after any deposit described in (ii) above, the Corporation has 45 Days' Cash on Hand;

(iv)    FOURTH, commencing on the earlier of the Construction Commencement Date and the Resizing Tender Date, on the first day of each February, May, August and November, promptly following receipt by the Trustee from the Corporation of a certificate identifying its Days Cash on Hand, and the amount, if any, of money that constitutes Excess Liquidity as of the immediately preceding calendar quarter, to the Redemption Fund, the amount, if any, which constitutes Excess Liquidity in accordance with such certificate, to be applied to redeem the Series 2011 A-2 Bonds;

(v)    FIFTH, if the Construction Commencement Date has occurred, to the Senior Debt Service Reserve Fund as necessary to bring the amount on deposit therein to the Senior Debt Service Reserve Fund Requirement;

(vi)    SIXTH, to the Operating Reserve Fund, as necessary to bring the amount on deposit therein to the Operating Reserve Fund Requirement; and

(vii)    SEVENTH, to the Corporation the remaining amount of such Initial Entrance Fees, to be applied in accordance with Section 8.14(b) of the Loan Agreement.

(b)    No disbursements from the Construction Fund shall be made if an Event of Default shall have occurred and be continuing.

Section 4.05.  Disbursements from Funds.  The Trustee shall deliver to the Issuer, upon its request, a record of disbursements from each Fund established under this Indenture.

Section 4.06. <u>Deposit of Revenues; Flow of Funds</u>. The Revenues and any other moneys that are required by the Loan Agreement or this Indenture to be deposited in the Revenue Fund shall be promptly deposited by the Trustee to the Revenue Fund, and the Revenues and any other moneys that are required by the Loan Agreement or this Indenture to be deposited in any other fund or account created hereunder shall be promptly deposited by the Trustee to such fund or account.

(a)     Except as otherwise expressly provided in this Indenture, the Trustee shall transfer moneys in the Revenue Fund upon deposit thereof as follows and in the following order of priority:

FIRST: ratably, (i) with respect to the Series 2011 A-1 Bonds, to the Series 2011 A-1 Interest Account, the amount, if any, necessary to make the amount on deposit therein equal to the amount of accrued and unpaid interest on the Series 2011 A-1 Bonds Outstanding as of the fifteenth day of the immediately succeeding month; (ii) with respect to Series 2007 B Bonds, to the Series 2007 B Interest Account, the amount, if any, necessary to make the amount on deposit therein equal to the amount of accrued and unpaid interest plus, prior to the Bank Tender Date, accrued and unpaid letter of credit fees and remarketing fees payable on Series 2007 B Bonds then bearing interest at a Variable Rate on the first day of the immediately succeeding month (in the case of the Series 2007 B Bonds then bearing interest at a Variable Rate, calculated on the basis of the actual interest rates borne by such 2007 B Bonds through the date of such transfer and assuming such Series 2007 B Bonds bear interest during any period after the date of such transfer of the moneys to the Series 2007 B Interest Account (for which period the interest rate borne by such Series 2007 B Bonds shall not have been established) at an annual rate (1) prior to the Bank Tender Date, and after taking into account the interest, letter of credit fees and remarketing fees, equal to 5.5% and (2) after the Bank Tender Date, equal to 110% of the interest rate borne by such Series 2007 B Bonds on the date of such transfer); and (iii) with respect to Series 2011 A-2 Bonds, to the Series 2011 A-2 Bonds Interest Account, the amount, if any, necessary to make the amount on deposit therein equal to the amount of accrued and unpaid interest payable on the Series 2011 A-2 Bonds Outstanding as of the fifteenth day of the immediately succeeding month.

SECOND: ratably, (i) to the Series 2011 A-1 Principal Account, the lesser of (A) one-twelfth (1/12) of the amount of any principal of the Series 2011 A-1 Bonds Outstanding, if any, becoming due on the immediately succeeding November 15 and (B) the amount required to make the amount on deposit in the Series 2011 A-1 Principal Account equal to the principal amount, if any, becoming due on the Series 2011 A-1 Bonds Outstanding on the immediately succeeding November 15; provided that transfers with respect to the principal of Bonds the first principal installment of which matures less than one year from the date of initial authentication and delivery of such Series 2011 A-1 Bonds shall commence in the first month after the delivery of such Series 2011 A-1 Bonds and, prior to the immediately succeeding November 15 the amount provided in clause (A) above with respect to such Series 2011 A-1 Bonds shall be equal to the quotient obtained by dividing the amount of such first principal installment by the number of calendar months between the date of authentication and delivery of such Series 2011 A-1 Bonds and the immediately succeeding November 15;

(ii)    to the Series 2011 Sinking Fund Account, the lesser of (A) one-twelfth (1/12) of the amount of any Sinking Fund Installment for the Series 2011 A-1 Bonds Outstanding, if any, becoming due on the immediately succeeding November 15, and (B) the amount required to make the amount credited to the Series 2011 Sinking Fund Account equal to the Sinking Fund Installment, if any, becoming due on the Series 2011 A-1 Bonds on the immediately succeeding November 15; provided that transfers with respect to Series 2011 A-1 Bonds the first payment of a Sinking Fund Installment for which is due less than one year from the date of initial authentication and delivery of such Series 2011 A-1 Bonds, shall commence in the month after the delivery of such Series 2011 A-1 Bonds and, prior to the immediately succeeding November 15, the amount provided in clause (A) above with respect to such Series 2011 A-1 Bonds shall be equal to the quotient obtained by dividing the amount of such first Sinking Fund Installment by the number of calendar months between the date of authentication and delivery of such Series 2011 A-1 Bonds and the immediately succeeding November 15;

(iii)    to the Series 2011 Sinking Fund Account, the lesser of (A) one-twelfth (1/12) of the amount of any Sinking Fund Installment for the Series 2007 B Bonds outstanding, if any, becoming due on the immediately succeeding November 1 and (B) the amount required to make the amount on deposit in the Series 2011 Sinking Fund Account equal to the Sinking Fund Installment, if any, becoming due on the Series 2007 B Bonds Outstanding on the immediately succeeding November 1 or to reimburse the Letter of Credit Provider for draws on the Letter of Credit to be applied to such purpose on the immediately succeeding November 1; that transfers with respect to Series 2007 B Bonds the first payment of a Sinking Fund Installment for which is due or to reimburse the Letter of Credit Provider for draws on the Letter of Credit applied to such purpose less than one year from the date of initial authentication and delivery of such Series 2007 B Bonds shall commence in the month after the delivery of such Series 2007 B Bonds and, prior to the immediately succeeding November 1, the amount provided in clause (A) above with respect to such Series 2007 B Bonds shall be equal to the quotient obtained by dividing the amount of such first Sinking Fund Installment by the number of calendar months between the date of authentication and delivery of such Series 2007 B Bonds and the immediately succeeding November 1; and

(iv)    on November 15, 2046, the amount required to make the amount on deposit in the Series 2011 A-2 Bonds Principal Account equal to the principal amount, if any, becoming due on the Series 2011 A-2 Bonds Outstanding on such date.

THIRD: on November 15, 2056, the amount required to make the amount on deposit in the Series 2011 B Principal Account equal to the principal amount, if any, becoming due on the Series 2011 B Bonds Outstanding on such date.

FOURTH: to the Redemption Fund, amounts constituting Excess Liquidity paid by the Corporation pursuant to Section 8.18(e) of the Loan Agreement, and together with moneys disbursed from the Construction Account pursuant to Section 4.04(a)(iv), to be applied to redeem Series 2011 A-2 Bonds.

FIFTH: to the Senior Debt Service Reserve Fund, beginning in the month immediately succeeding any month in which the Corporation receives notice of any deficiency in such Senior

Debt Service Reserve Fund pursuant to Section 4.08 hereof, until the amount credited to such Senior Debt Service Reserve Fund equals the Senior Debt Service Reserve Fund Requirement.

SIXTH: to the Redemption Fund, and after all Series 2011 A-2 Bonds have been paid in full, after the Resizing Tender Date, amounts constituting Excess Cash paid by the Corporation pursuant to Section 8.18(f) of the Loan Agreement, to be applied to redeem Series 2011 B Bonds, subject to the right of any Holder of a Series 2011 B Bond to direct the amount that would otherwise be applied to redeem the Holders' Series 2011 B Bond instead be applied to the payment of principal on the Series 2011 A-1 Bonds or Series 2007 B Bonds held by such Holder in accordance with Section 3.09(c).

After making the payments required above, any balance remaining in the Revenue Fund on the last day of any month shall be paid to the Corporation unless such amount constitutes the proceeds of Bonds or the investment earnings thereon, in which case such amount shall be transferred to such funds and accounts as Bond Counsel shall direct in writing.

(b)     The repayment of interest and principal on Bonds issued pursuant to Section 2.14 hereof shall occur first in priority from moneys in the Revenue Fund, in accordance with the Supplemental Indenture authorizing the issuance of such Bonds.

(c)     The Trustee shall deposit into the Revenue Fund any moneys paid by the Corporation or the Issuer pursuant to Section 6.04(c) of the Loan Agreement and transfer the same (i) ratably to the Series 2011 A-1 Interest Account and the Series 2007 B Interest Account, to the extent of the amount of such proceeds that represents interest accruing on such Bonds for the period covered by such payment, and (ii) ratably to the Series 2011 A-1 Principal Account or the Series 2011 Sinking Fund Account and the Series 2007 B Principal Account, to the extent of the amount of such proceeds that represents the amount, if any, payable by the Corporation during the period covered by such payment in respect of the principal of or Sinking Fund Installments for such Bonds.

(d)     Moneys deposited at any time in the Revenue Fund as the result of voluntary payments made by the Corporation to the Trustee in accordance with Section 10.01 of the Loan Agreement shall be paid to the applicable Redemption Fund immediately upon deposit thereof.

(e)     Moneys deposited at any time in the Revenue Fund pursuant to Section 9.03 of the Loan Agreement (upon foreclosure) or Section 7.04 hereof (upon default) shall be applied in accordance with Section 7.04 hereof.

(f)     Moneys deposited at any time in the Revenue Fund constituting payments made by the Corporation pursuant to the Loan Agreement and proceeds of remarketing and sale of the Variable Rate Bonds to pay the Purchase Price thereof shall be transferred to the Series 2007 B Purchase Account immediately upon deposit thereof to the Revenue Fund.

Section 4.07.  Series 2011 Debt Service Fund; Application of Moneys.  On each Interest Payment Date, the Trustee shall pay or cause to be paid, from the Series 2011 Interest Accounts, the interest due on the Outstanding Series 2011 Bonds.  The Trustee also shall pay from the Series 2011 Interest Accounts any amounts required for the payment of accrued interest upon

any purchase or redemption of Outstanding Series 2011 Bonds as provided in this Section 4.07. Prior to the Bank Tender Date, the Trustee also shall pay from the Series 2007 B Interest Account accrued and unpaid letter of credit fees and remarketing fees on Series 2007 B Bonds bearing interest at a Variable Rate.

With respect to the Series 2011 A-1 Bonds, on each November 15, the Trustee shall pay or cause to be paid from the Series 2011 A-1 Principal Account the principal amount due, if any, on the Outstanding Series 2011 A-1 Bonds, upon presentation and surrender of the requisite Bonds.

Subject to Sections 4.16 and 4.17, with respect to the Series 2007 B Bonds while bearing interest at the Variable Rate, on each November 1, and while bearing interest at a Fixed Rate, on each November 15, the Trustee shall pay or cause to be paid from the Series 2007 B Principal Account, the principal amount due, if any, on the Outstanding Series 2007 B Bonds, upon presentation and surrender of the requisite Series 2007 B Bonds.

With respect to the Series 2011 A-2 Bonds, on the maturity date thereof, the Trustee shall pay or cause to be paid from the Series 2011 A-2 Bonds Principal Account, the principal amount due, if any, on the Outstanding Series 2011 A-2 Bonds, respectively, upon presentation and surrender thereof.

The Trustee shall take all action required by Article III to effect the timely redemption of Outstanding Bonds from the Series 2011 Sinking Fund Account in accordance with the Sinking Fund Installments as set forth in the Series 2011 A-1 Bonds, the Series 2007 B Bonds and any Additional Bonds. Moneys in the Series 2011 Sinking Fund Account shall be applied to the purchase or redemption of Bonds as follows:

(a)     Subject to the provisions of subsection (b) of this Section, prior to each November 15 on which Outstanding Series 2011 Bonds are subject to redemption from any Sinking Fund Installment, the Trustee shall call for redemption from moneys in the Series 2011 Sinking Fund Account such principal amount of Outstanding Series 2011 Bonds subject to redemption from such Sinking Fund Installment on such November 15, at a price equal to the principal amount thereof (accrued interest on such Series 2011 Bonds being payable from the Series 2011 A-1 Interest Account or the Series 2007 B Interest Account, as applicable), as is equal to the Sinking Fund Installment due on such November 15 less the amount previously credited against such Sinking Fund Installment in accordance with subsection (c) of this Section. On such November 15, the Trustee shall pay or cause to be paid out of the Series 2011 Sinking Fund Account the principal amount of Series 2011 A-1 Bonds or Series 2007 B Bonds so called for redemption as provided in this subsection (a) upon the presentation and surrender of the requisite Series 2011 A-1 Bonds or Series 2007 B Bonds.

(b)     At the written direction of the Authorized Officer of the Corporation, the Trustee shall endeavor to purchase Outstanding Series 2011 Bonds subject to redemption from the Sinking Fund Installment due on the immediately succeeding November 15 at the most advantageous price then obtainable with reasonable diligence. The Trustee shall pay the interest accrued on such Bonds from the Series 2011 A-1 Interest Account or the Series 2007 B Interest Account, as applicable, and the Purchase Price from the Series 2011 Sinking Fund Account, but

no such purchase shall be made by the Trustee (i) within a period of 45 days immediately preceding any November 15 on which Bonds are subject to redemption from any Sinking Fund Installment, or (ii) at a price, including any brokerage and other charges, greater than the principal amount thereof and accrued interest thereon. The aggregate of the purchase prices of the Series 2011 Bonds of any Series so purchased in any Bond Year shall not exceed the amount deposited in the Series 2011 Sinking Fund Account on account of the Sinking Fund Installments for such Series of Series 2011 Bonds due on the immediately succeeding November 15; provided, however, that if in any Bond Year the amount credited against the Sinking Fund Installment for the Series 2011 Bonds of any Series in accordance with subsection (c) of this Section equals or exceeds the Sinking Fund Installment for such Series of Series 2011 Bonds due on the immediately succeeding November 15, any excess amount on deposit in the Series 2011 Sinking Fund Account shall be applied by the Trustee to the purchase of any Series 2011 Bonds of such Series then Outstanding as shall be directed by the Authorized Officer of the Corporation.

(c)     If (i) the Trustee purchases Series 2011 Bonds of any Series during any Bond Year as provided in subsection (b) above, (ii) the Corporation delivers to the Trustee for cancellation on or before the 45th day immediately preceding any November 15 on which a Sinking Fund Installment is due Series 2011 Bonds of such Series subject to redemption from moneys in the Series 2011 Sinking Fund Account on such November 15 (provided that the price paid by the Corporation to purchase any such Series 2011 Bonds, including any brokerage and other charges, shall not exceed the principal amount of such Series 2011 Bonds and accrued interest thereon), or (iii) Series 2011 Bonds of any Series subject to redemption from the Sinking Fund Installment due on the November 15 immediately succeeding any Bond Year are otherwise redeemed during such Bond Year, then an amount equal to 100% of the aggregate principal amount of such Series of Series 2011 Bonds so purchased and delivered to the Trustee for cancellation or redemption shall be credited against such Sinking Fund Installment for such Series of Series 2011 Bonds.

(d)     If the aggregate principal amount of Series 2011 Bonds of any Series purchased or redeemed in any Bond Year is in excess of the Sinking Fund Installment due on such Series of Series 2011 Bonds on the immediately succeeding November 15, the Trustee shall credit such excess against subsequent Sinking Fund Installments for such Series of Series 2011 Bonds as directed by an Authorized Officer of the Corporation in writing.

(e)     If the Corporation, on behalf of the Issuer, shall determine to provide for the payment of any Series 2011 A-1 Bonds as provided in Section 9.01 hereof, on the date on which such Bonds are deemed to be paid in accordance with such Section, amounts on deposit in the Series 2011 Debt Service Fund for the payment of the principal or Redemption Price of or interest on such Bonds shall be paid to the escrow agent for such Bonds upon the written direction of an Authorized Officer of the Corporation, on behalf of the Issuer.

(f)     If any moneys remain on deposit in the Series 2011 Principal Accounts, the Series 2011 Sinking Fund Account or the Series 2011 Interest Accounts of the Series 2011 Debt Service Fund immediately following the payment of the principal of the Series 2011 Bonds (whether by redemption or upon maturity), an amount of such moneys which is estimated by the Corporation in writing to the Trustee to be not greater than the sum of (i) one-twelfth (1/12) of

\29695489.18

the principal on the Series 2011 Bonds to become due during the succeeding Bond Year shall be deposited in the respective Series 2011 Principal Account or the Series 2011 Sinking Fund Account at the discretion of the Corporation and (ii) one-twelfth (1/12) of the interest to become due during the succeeding Bond Year shall be deposited in the respective Series 2011 Interest Account, and the balance of such moneys shall be paid to the Corporation; provided, however, that any moneys deposited into the Series 2011 Sinking Fund Account or the Series 2011 Principal Accounts that represent proceeds from the disposition of all or any portion of the Property pursuant to Section 7.04 of the Loan Agreement and not used within the time specified herein shall be invested, at the written direction of the Corporation, in such manner as required by the Tax Certificate.

(g)     As provided in Section 2.05(n), the Trustee shall pay from the Series 2007 B Purchase Account the Purchase Price of Series 2007 B Bonds then bearing a Variable Rate.

Section 4.08.   <u>Senior Debt Service Reserve Fund: Application of Moneys; Deficiencies and Surpluses</u>.  Moneys in the Senior Debt Service Reserve Fund shall be held solely for the Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds and the Series 2007 B Bonds.  If on any Interest Payment Date the amount in the applicable Interest Account for each Series of Series 2011 Bonds then secured by the Senior Debt Service Reserve Fund shall be less than the amount of interest then due on the Outstanding Bonds of such Series or if on any November 15 with respect to the Series 2011 A-1 Bonds,  the Series 2011 A-2 Bonds, and the Series 2007 B Bonds while bearing interest at a Fixed Rate, or on any November 1, with respect to the Series 2007 B Bonds while bearing interest at a Variable Rate, the amount credited to the Principal Account and the Sinking Fund Account for each Series of Series 2011 Bonds then secured by the Senior Debt Service Reserve Fund shall be less than the amount of the principal and the Sinking Fund Installment (either or both, as the case may be) then due on such Series of Series 2011 Bonds, and no other moneys of the Corporation are available to make such payment in accordance with the priority of payments set forth in Section 8.18 of the Loan Agreement, the Trustee forthwith shall transfer moneys from the Senior Debt Service Reserve Fund, first, to the Interest Accounts for each Series of Series 2011 A Bonds, and second, to the Principal Accounts for each Series of Series 2011 A Bonds and to the 2011 Sinking Fund Account, to the extent necessary to make good any deficiency.

Moneys in the Senior Debt Service Reserve Fund shall be applied as described above only after any moneys in the Operating Reserve Fund and the Supplemental Reserve Fund have been applied to the payment of debt service on the Senior Parity Debt in accordance with Section 4.11(b) and (e) hereof as directed by an Authorized Officer of the Corporation.

Interest earned and profits realized as a result of the investment of amounts on deposit in the Senior Debt Service Reserve Fund shall be applied as provided in Section 4.13 hereof.

For the purposes of this Indenture, in the case of the Senior Debt Service Reserve Fund:

(a)     a "deficiency" means that the value of the assets of a Senior Debt Service Reserve Fund, determined in accordance with Section 4.13 hereof, is less than the Senior Debt Service Reserve Fund Requirement; and

(b)     a "surplus" means that the value of the assets of a Senior Debt Service Reserve Fund, determined in accordance with Section 4.13 hereof, is in excess of the Senior Debt Service Reserve Fund Requirement; provided, however, that interest earned and profits realized as a result of the investment of amounts on deposit in the Senior Debt Service Reserve Fund and required by this Indenture to be transferred to another fund or account shall not create a surplus within the meaning of this Section even though such amounts shall not have been transferred from the Senior Debt Service Reserve Fund as provided in Section 4.13 hereof.

The Trustee shall determine the value of the assets of the Senior Debt Service Reserve Fund in the manner provided by Section 4.13 hereof as of the close of business (i) on November 15 in each Bond Year, (ii) on the date of any withdrawal from the Senior Debt Service Reserve Fund and on the last Business Day of each month thereafter until such determination discloses that a deficiency no longer exists in such Senior Debt Service Reserve Fund, (iii) on any date on which the Trustee obtains actual knowledge that any Debt Service Reserve Fund Credit Facility held to the credit of the Senior Debt Service Reserve Fund is no longer entitled to be credited against the Senior Debt Service Reserve Fund Requirement and (iv) on the date that is six months prior to the stated expiration date of any Senior Debt Service Reserve Fund Credit Facility.

As promptly as practicable after making such determination, the Trustee shall notify the Corporation of the result of such determination and of the amount of any deficiency or surplus determined to exist in the Senior Debt Service Reserve Fund.  In accordance with Section 3.02(i) of the Loan Agreement, (i) the Corporation is obligated to immediately replenish the Senior Debt Service Reserve Fund in the amount of any transfer from the Senior Debt Service Reserve Fund to pay debt service on Series 2011 A Bonds, and (ii) after all Series 2011 A-2 Bonds have been paid in full, the Corporation is obligated to apply moneys in excess of 90 Days' Cash on Hand for deposit into the Senior Debt Service Reserve Fund to the extent amounts on deposit therein are less than the Senior Debt Service Reserve Fund Requirement.

The Trustee shall transfer the amount of any surplus that exists in the Senior Debt Service Reserve Fund as follows:

(a)     Any surplus resulting from a reduction in the Senior Debt Service Reserve Fund Requirement following the Resizing Tender Date, as a result of a reduction of Maximum Annual Debt Service on the Series 2011 A-1 Bonds and Series 2007 B Bonds following the resizing, shall be applied as follows:

(i)     if the amount on deposit in the Operating Reserve Fund and the amount in the Corporation's operating account as of the resizing, is less than 30 Days' Cash on Hand, then the amount equal to the deficiency shall be transferred from the surplus to the Series 2011 Debt Service Fund and applied to pay principal of and interest on the Series 2011 A Bonds; and

(ii)     the amount of such surplus not applied as described in clause (i) above shall be used to redeem Series 2011 A Bonds on or prior to the Resizing Tender Date and shall be subtracted from the calculation of the principal amount of the Series 2011 A Bonds required to be resized  in accordance with Section 2.22 of this Indenture.

(b)    Any surplus resulting from a reduction in the Senior Debt Service Reserve Fund Requirement in accordance with clause (1)(ii) of the definition of Senior Debt Service Reserve Fund Requirement shall be transferred to the Redemption Fund and applied to redeem the Series 2011 B Bonds ratably based on the principal amount outstanding as of the redemption date, in accordance with Section 3.09(d) hereof; provided that any Holder of Series 2011 B Bonds to be redeemed may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to Section 3.09(d) applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(c)    With respect to any surplus other than as described in paragraphs (a) or (b) above:

FIRST:  unless the Supplemental Indenture authorizing the issuance of any Additional Bonds shall otherwise provide, to the construction fund established by such Supplemental Indenture during the period between the date of delivery of such Additional Bonds and the Completion Date of any Additional Facilities financed with the proceeds of such Additional Bonds; and

SECOND:  to the Series 2011 Debt Service Fund or the Redemption Fund, as specified in writing by the Corporation.

Section 4.09.  <u>Redemption Fund: Application of Moneys</u>.  On any date on which a determination of the value of the assets of any Senior Debt Service Reserve Fund discloses a deficiency therein, the Trustee shall transfer to such Senior Debt Service Reserve Fund from the Redemption Fund any amount on deposit in the Redemption Fund (other than moneys set aside to pay the Redemption Price of any Bonds theretofore called for redemption and moneys required for the purchase of Bonds theretofore contracted to be purchased) to the extent of such deficiency.  The Trustee shall notify the Corporation of such transfer and the amount thereof.

(a)    Subject to the provisions of subsections (a), (b), (c) and (d) of this Section and Sections 4.14, 4.16 and 4.17 hereof, moneys in the Redemption Fund shall be applied by the Trustee to the purchase or redemption of Bonds of such Series and maturities as the Authorized Officer of the Corporation, by written request on behalf of the Issuer, shall direct.  The Trustee shall use amounts on deposit in the Redemption Fund to redeem Bonds as provided in Article III hereof.  At the written direction of the Authorized Officer of the Corporation, the Trustee shall endeavor to purchase such Bonds at the most advantageous price obtainable with reasonable diligence, but no such purchase shall be made by the Trustee (i) within the period of 45 days immediately preceding any Interest Payment Date on which such Bonds are subject to call for redemption under the provisions of this Indenture or (ii) at a price, including any brokerage or other charges, greater than the Redemption Price of such Bonds on the next Interest Payment Date on which such Bonds are subject to redemption and accrued interest to the date of purchase of such Bonds.

(b)    Notwithstanding the foregoing provisions of this Section, to the extent provided in any Supplemental Indenture authorizing the issuance of any Series of Additional Bonds (i) moneys available for the redemption or purchase of Bonds on any date shall be allocated among all Series of Bonds in proportion (as nearly as practicable) to the aggregate

principal amount of Bonds of each such Series subject to redemption from such moneys on such date and (ii) the Bonds of such Series of Additional Bonds to be purchased or redeemed on any date shall be selected in accordance with the provisions of such Supplemental Indenture.

(c)     So long as no Event of Default has occurred and is continuing, the Trustee shall set aside any amount on deposit in the Redemption Fund for the redemption of particular Bonds upon receipt of irrevocable written instructions of the Corporation to the Trustee directing the Trustee to set aside such amount for such purpose, in which event all of the provisions of Sections 9.01 and 10.04 hereof shall be applicable to such Bonds and the amounts set aside for the payment of such Bonds. Amounts set aside for the redemption of Bonds and investment earnings on such amounts shall be applied to the payment of the interest due on such Bonds on or prior to the redemption date of such Bonds to the extent provided in such instructions.

(d)     Notwithstanding anything to the contrary herein contained, no moneys in the Redemption Fund shall be used to redeem or purchase Subordinated Bonds until all of the Special Senior Bonds and Senior Bonds are paid in full.

Section 4.10.   Insurance and Condemnation Award Fund: Application of Moneys.  The Trustee shall deposit into the Insurance and Condemnation Award Fund moneys paid by the Corporation or the Issuer pursuant to Section 6.04 of the Loan Agreement (other than the proceeds of any use and occupancy insurance policy, which are to be deposited by the Trustee into the Revenue Fund pursuant to Section 4.06(b) hereof) and apply the same in accordance with Section 6.04 of the Loan Agreement.

If such moneys are to be used to pay the costs of repair or replacement of lost, damaged, destroyed or taken property, such moneys shall be disbursed by the Trustee from time to time, upon requisitions in the form acceptable to the Trustee, signed by an Authorized Officer of the Corporation and in the case of payments under any construction contract relating to such property, signed by the Independent Architect (if any).

If such moneys are to be applied to the redemption of Bonds or Parity Obligations, such moneys shall be transferred by the Trustee to the Redemption Fund to be applied to the extraordinary redemption of first, Special Senior Bonds on the earliest practicable redemption date, second, after all Special Senior Bonds are paid in full, Senior Bonds and Senior Parity Obligations, ratably, on the earliest practicable redemption date, and third, after all Senior Bonds are paid in full, Subordinated Bonds on the earliest practicable redemption date.

Section 4.11.   Operating Reserve Fund; Supplemental Reserve Fund.

(a)     On the Closing Date, the Trustee shall deposit into the Operating Reserve Fund moneys transferred from accounts maintained under the Original Indenture for deposit into the Operating Reserve Fund in accordance with Section 4.03 above.  Moneys on deposit in the Operating Reserve Fund after the Closing Date shall come from Initial Entrance Fees as described in Section 4.04 above and from other moneys deposited with the Trustee and directed to be deposited into the Operating Reserve Fund, provided that the Corporation shall not be obligated to fund or replenish the Operating Reserve Fund.

\29695489.18

(b)     Moneys in the Operating Reserve Fund shall be disbursed by the Trustee to or for the account of the Corporation within 7 days of receipt by the Trustee of the written direction of an Authorized Officer of the Corporation to be applied to the payment of (i) subject to Section 8.18 of the Loan Agreement, Debt Service on the Senior Parity Debt and the Special Senior Parity Debt, (ii) operating expenses and the costs of needed repairs to the Facility, (iii) the costs of capital improvements to the Facility required by law or regulation, (iv) restructuring costs, (v) judgments against the Corporation, (vi) except as provided in the last sentence of this Subsection (b), amounts due on any Indebtedness of the Corporation, or (vii) the Purchase Price of tendered Variable Rate Bonds, in the case of clause (i) regarding the payment of Debt Service on the Senior Parity Debt upon written certification by an Authorized Officer of the Corporation to the Trustee that no moneys from Initial Entrance Fees (excluding Residential Building 2.5 Initial Entrance Fees while the Construction Loan is outstanding) are available to pay such expenses, and moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000, in the case of clause (i) regarding the payment of Debt Service on the Special Senior Parity Debt written certification by an Authorized Officer of the Corporation to the Trustee that no moneys from Residential Building 2.5 Initial Entrance Fees are available to pay such expenses, and moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000, and in all other cases, upon written certification that no other moneys are available to the Corporation for the payment of such expenses, costs or amounts from any other source.

(c)     On the later of the date the Series 2011 A Bonds are resized as provided in Sections 2.04(c), 2.05(r) and 2.06(c) hereof and the Operating Reserve Fund Requirement is met, all amounts then on deposit in the Operating Reserve Fund shall be paid directly to the Corporation.

(d)     Pending disbursement pursuant to subsection (b) or (c) above, amounts in the Operating Reserve Fund shall be held in trust by the Trustee for the benefit of the Holders of the Senior Parity Debt.

(e)     (i)     The Trustee shall deposit into the Supplemental Reserve Fund moneys transferred from accounts maintained under the Original Indenture as of the Closing Date for deposit into the Supplemental Reserve Fund as provided in Section 4.03 hereof, except that moneys transferred from the Debt Service Reserve Fund under the Original Indenture as of the Closing Date shall be deposited into the Supplemental Reserve Account as provided in Section 4.03 hereof.

(ii)     Moneys in the Supplemental Reserve Fund shall be disbursed by the Trustee to or for the account of the Corporation to pay operating expenses of the Facility, to the extent permitted, at the time and in the manner as moneys in the Operating Reserve Fund are disbursed under clause (i), (iii) and (iv) of subsection (b) of this Section 4.11, provided that no funds may be disbursed to pay such expenses unless the Corporation has certified that in the case of clause (i), moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000 and in all other cases, no moneys are available in the Operating Reserve Fund for the payment of such expenses. Moneys on deposit in the Supplemental Reserve Fund shall not be included in the calculation for purposes of

determining whether there are sufficient moneys on deposit in the Operating Reserve Fund to meet the Operating Reserve Fund Requirement.

(iii) On the date amounts on deposit in the Operating Reserve Fund are released to the Corporation pursuant to subsection (c) above, (i) all amounts then on deposit in the Supplemental Reserve Fund shall be paid directly to the Corporation, and (ii) all amounts then on deposit in the Supplemental Reserve Account shall be transferred to the Series 2011 Redemption Fund and applied to redeem Series 2011 A Bonds.

Section 4.12.   [Reserved].

Section 4.13.   Investment of Moneys; Application of Earnings.  Moneys in any of the funds and accounts established by this Indenture (except funds derived from draws on the Letter of Credit and funds held for the Purchase Price, which shall be held uninvested) may be invested.

Any moneys in any of such funds or accounts that are held by the Trustee shall be invested by the Trustee, as shall be directed in a written order signed by an Authorized Officer of the Corporation or its agent designated in a certificate of an Authorized Officer of the Corporation, but only as follows:

(a) moneys in the Revenue Fund, the Interest Accounts, the Principal Accounts, the Purchase Account, the Sinking Fund Account, the Redemption Fund and the Insurance and Condemnation Award Fund shall be invested only in Investment Obligations maturing in such amounts and on such dates as may be necessary to provide moneys to meet the payments from such funds and accounts;

(b) moneys in the Rebate Fund shall be invested in accordance with Section 4.15(d) hereof;

(c) moneys in each Senior Debt Service Reserve Fund shall be invested only in Investment Obligations maturing or redeemable at the option of the holder not later than the final maturity of the Bonds or Parity Obligations secured by such Senior Debt Service Reserve Fund; and

(d) moneys in the Construction Account and the Operating Reserve Fund shall be invested only in Investment Obligations.

Investments designated in any written order by the Corporation or its agent shall have maturities or redemption options consonant with the Corporation's and Trustee's need for funds.

Absent written orders from the Corporation or its agent, the Trustee may, but shall not be obligated to, invest moneys hereunder in Government Obligations or in any money market fund investing solely in or consisting solely of and secured by Government Obligations.

Subject to the further provisions of this Section, interest earned, profits realized and losses suffered by reason of any investment of the funds and accounts created by this Indenture shall be credited or charged, as the case may be, to the fund or account for which such investment shall have been made.

Upon the written request of an Authorized Officer of the Corporation, interest earned from the investment of all or any portion of any money in the Redemption Fund shall be paid from the Redemption Fund to the Interest Account during any period set forth in such request.

Interest earned, profits realized and losses suffered by reason of any investment of the Senior Debt Service Reserve Funds shall be determined by the Trustee on each date on which the Trustee is required to determine the value of the assets of the Senior Debt Service Reserve Funds in accordance with Section 4.08 hereof.  If the net investment result for a Senior Debt Service Reserve Fund for any such period is a gain (by virtue of either interest earned or profits realized), the amount of such investment gain shall be credited to such Senior Debt Service Reserve Fund, to the extent that there exists a deficiency therein, and the balance of such investment gain, if any, shall be paid by the Trustee from time to time as follows:  (i) unless the Supplemental Indenture authorizing the issuance of any Additional Bonds shall otherwise provide, to the construction fund established pursuant to such Supplemental Indenture during the period between the date of delivery of any Additional Bonds and the Completion Date of any Additional Facilities financed with the proceeds of such Additional Bonds and (ii) in any other case, to the Series 2011 Debt Service Fund for deposit first in the Interest Account to the extent necessary to pay interest on Parity Debt on the next succeeding Interest Payment Date and second to the Principal Account or the Sinking Fund Account to the extent necessary to pay principal of Parity Debt on the next succeeding date on which principal of such Parity Debt is due (whether at maturity or by redemption); provided that any investment gain on the Tax-Exempt Debt Service Reserve Fund shall be applied to pay debt service on Tax-Exempt Bonds only.

Investment earnings on moneys in the Operating Reserve Fund shall be deposited in the Operating Reserve Fund if the amount on deposit therein is less than the Operating Reserve Fund Requirement and otherwise shall be transferred semi-annually on May 15 and November 15 ratably to the Interest Accounts for the Series 2011 A Bonds.

The Trustee may sell or redeem any obligations in which moneys shall have been invested as in this Section provided to the extent necessary to provide cash in the respective funds or accounts to make any payments required to be made therefrom or to facilitate the transfer of moneys between various funds and accounts as may be required or permitted from time to time pursuant to the provisions of this Indenture.  The proceeds from the sale of any investment shall be paid into the fund or account for which the sale thereof was made.

In determining the value of the assets of the funds and accounts created by this Indenture, accrued interest thereon shall not be deemed a part thereof except as provided in this paragraph. Investments of the Revenue Fund, the Interest Accounts, the Principal Accounts, the Purchase Account, the Sinking Fund Account, the Supplemental Reserve Fund, the Supplemental Reserve Account, the Redemption Fund, the Rebate Fund, the Insurance and Condemnation Award Fund and the Construction Fund shall be valued at current market value. Investments of the Senior Debt Service Reserve Fund shall be valued at current market value plus accrued interest thereon.

In addition, in determining the value of the assets of the Senior Debt Service Reserve Fund, there shall be credited to the Senior Debt Service Reserve Fund the amount that can be realized by the Trustee under any Debt Service Reserve Fund Credit Facility if each of the

following conditions is met to the reasonable satisfaction of the Trustee: (a) on the date of delivery of such Debt Service Reserve Fund Credit Facility to the Trustee and throughout the period during which such Debt Service Reserve Fund Credit Facility is credited to the Senior Debt Service Reserve Fund, the unsecured long-term indebtedness or the claims-paying ability of the issuer of such Debt Service Reserve Fund Credit Facility or its parent holding company or other controlling entity is rated at least "A" by at least one of the Rating Agencies; (b) such Debt Service Reserve Fund Credit Facility is free and clear of all liens and encumbrances superior to this Indenture; (c) such Debt Service Reserve Fund Credit Facility permits the Trustee to realize amounts thereunder at such times as the Trustee is required to transfer any amount (other than any surplus) from the Senior Debt Service Reserve Fund in accordance with this Indenture; and (d) if amounts realized under such Debt Service Reserve Fund Credit Facility are, under any circumstances, payable from the Receipts or are secured by the Collateral or any other property of the Corporation (other than any property donated, granted or bequeathed to the Corporation for such purpose), such amounts shall be payable in no fewer than 12 equal monthly installments; provided, however, that the amount that can be realized by the Trustee under any Debt Service Reserve Fund Credit Facility shall not be credited to the Senior Debt Service Reserve Fund on any date that is within six months of the expiration date of such Debt Service Reserve Fund Credit Facility unless such expiration date occurs after the maturity date of the Bonds or Parity Obligations secured thereby.

Neither the Trustee nor the Issuer shall be liable for any depreciation in the value of any obligations in which moneys of the funds or accounts created by this Indenture shall be invested as set forth above or for any loss arising from any investment permitted herein. The investments authorized by this Section shall at all times be subject to the provisions of applicable law, as amended from time to time.

As long as no Event of Default shall have occurred and be continuing, the Corporation shall designate the investments to be sold and shall otherwise direct the Trustee in the sale or conversion to cash of the investments made with the moneys attributable to the Bonds in the funds and accounts established by Section 4.01; provided that the Trustee shall be entitled to conclusively assume the absence of any such Event of Default unless it has notice thereof within the meaning of Section 6.17. The Corporation shall not direct the investment of any funds which would violate the covenants set forth in Section 5.05 hereof.

The Trustee shall not be responsible for determining whether any investment made by it in accordance with this Section is authorized under any applicable law or complies with Section 5.05 hereof or the Tax Certificate.

The Trustee may make any and all investments permitted under this Section and Section 4.15 through its own bond or investment department including, without limitation, in any proprietary fund of the Trustee or an affiliate of the Trustee for which the Trustee or an affiliate of the Trustee serves as investment adviser or provides other services and receives reasonable compensation therefor).

All investments made under this Section shall be made strictly in accordance with this Indenture and the Tax Certificate.

Section 4.14.  Application of Moneys in Certain Funds for Retirement of Parity Debt. Notwithstanding any other provision of this Indenture, if at any time the Corporation shall determine to provide for the payment of all Outstanding Parity Debt in accordance with Article IX hereof, upon the written request of the Corporation, the Trustee shall apply any moneys on deposit in the funds and accounts created by this Indenture available for the payment of the principal or Redemption Price of and interest on the Parity Debt to the payment or redemption of such Parity Debt in the manner provided by such Article IX.

Section 4.15.  Rebate Fund; Rebate Amount.

(a)     The Trustee shall deposit into the Rebate Fund amounts paid by the Corporation pursuant to Section 3.02(k) of the Loan Agreement and the Tax Certificate.

(b)     The Corporation shall determine the Rebate Amount in accordance with the Tax Certificate and the Rebate Amount shall be paid at such times and in such installments as provided therein.  The Corporation shall direct the Trustee in writing with respect to the payment of the Rebate Amount.  As further provided in the Tax Certificate, the Corporation shall be responsible for paying the Rebate Amount.

(c)     Neither the Issuer nor the Trustee shall be obligated to pay any portion of the Rebate Amount (except from funds on deposit in the Rebate Fund).  In addition, neither the Issuer nor the Trustee shall have any responsibility with respect to the calculation of the Rebate Amount.

(d)     Any moneys held as part of the Rebate Fund and not immediately required to be paid to the United States pursuant to the Tax Certificate shall be invested or reinvested by the Trustee, at the written direction of the Corporation, in Government Obligations or in any money market or short-term investment fund investing in or consisting solely of and secured by Government Obligations, including any such fund maintained by the Trustee, having maturities consistent with the need for moneys as estimated by the Corporation.

(e)     To the extent that the amounts on deposit in the Rebate Fund are insufficient to meet the Rebate Amount, the Trustee shall so notify the Corporation in writing of the amount of the deficiency, and the amount of such deficiency shall be immediately paid by the Corporation to the Trustee for deposit into the Rebate Fund.  Notwithstanding anything in this Indenture to the contrary, neither the Issuer nor the Trustee shall be responsible or liable for any loss, liability or expense incurred to the extent incurred as a result of the failure of the Corporation to fulfill its obligations with respect to the calculation and payment of the Rebate Amount.  The Issuer and the Trustee shall be entitled to rely conclusively upon the calculations provided by the Corporation.

In connection with the investment of moneys held as part of the Rebate Fund, the provisions of Section 4.13 hereof regarding (i) the absence of any liability of the Trustee or the Issuer for any depreciation in the value of any obligations in which moneys shall be invested or for any loss arising from any investment permitted herein and (ii) the Corporation's right to designate investments shall apply.

(f)    As provided in the Tax Certificate, the Corporation is required to (i) perform every five years a rebate calculation with respect to the Rebate Amount and either (ii) (A) pay to the Trustee for deposit into the Rebate Fund an amount of money as determined by such calculation within 30 days of such calculation or (B) provide the Trustee with written notice (signed by the Corporation and the Rebate Expert) that no deposit is required.

Amounts in the Rebate Fund are not pledged to the payment of the principal, Purchase Price or Redemption Price of or interest on Parity Debt.

Section 4.16.   Letter of Credit Fund.  The Trustee shall deposit all proceeds from draws on the Letter of Credit to the Letter of Credit Fund and shall hold such amounts uninvested.  The Trustee shall pay when due from the Letter of Credit Fund the principal of, interest on and the Redemption Price of the Variable Rate Bonds then bearing a Variable Rate and, to the extent not paid from proceeds of remarketing of the Variable Rate Bonds then on deposit in the Purchase Account, the Purchase Price thereof.

To the extent that the Trustee has paid the principal of and/or interest on such Variable Rate Bonds from moneys on deposit in the Letter of Credit Fund, the Trustee shall reimburse the Letter of Credit Provider with moneys on deposit in the Principal Accounts, the Interest Accounts, the Purchase Account and/or the Redemption Fund, as applicable.

The Trustee shall create a separate account within the Letter of Credit Fund for each Series of Variable Rate Bonds that is secured by a Letter of Credit.

Section 4.17.   Payments on Variable Rate Bonds.   Notwithstanding anything to the contrary herein contained, the principal of, and premium (if any) and interest on, the Variable Rate Bonds then bearing a Variable Rate shall be paid solely from the following sources and in the order of priority listed:

(a)    Proceeds of Bonds issued to refund any other Series of Bonds, but so long as the Letter of Credit is in effect, only to the extent such proceeds are Available Moneys under clause (b) of that definition;

(b)    Moneys received from a drawing on the applicable Letter of Credit or Confirming Letter of Credit; and

(c)    Any moneys paid by the Corporation pursuant to the Loan Agreement or any moneys constituting the proceeds of such Bonds.

ARTICLE V
PARTICULAR COVENANTS

Section 5.01.   Covenant as to Payment; Faith and Credit of Commonwealth Not Pledged. The Issuer covenants that it will promptly pay or cause to be paid the principal of, interest, premium, if any, and other charges, if any, on the Bonds at the place, on the dates and in the manner provided herein and in the Bonds, provided, however, that the Bonds do not now and shall never constitute a general obligation of the Issuer or a debt or pledge of the faith and credit of the Commonwealth, and all covenants and undertakings by the Issuer hereunder and under the

Bonds to make payments are special obligations of the Issuer payable solely from the revenues and funds pledged hereunder.

Section 5.02. Due Organization and Authorization of the Bonds. The Issuer represents and warrants as follows:

(a) it is a body politic and corporate and a public instrumentality of the Commonwealth, established under Chapter 23G, with the power under and pursuant to the Act, to execute and deliver this Agreement and to perform its obligations hereunder, and to issue and sell the Bonds pursuant to this Indenture; and

(b) it has taken all necessary action and has complied with all provisions of the Constitution of the Commonwealth and the Act required to make this Indenture and the Bonds the valid obligations of the Issuer which they purport to be; and, when executed and delivered by the parties hereto, this Indenture will constitute a valid and binding agreement of the Issuer enforceable in accordance with its terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied; and

(c) when delivered to and paid for by the initial purchasers in accordance with the terms of this Indenture, or delivered in exchange for Bonds tendered in accordance with this Indenture, the Bonds will constitute valid and binding special obligations of the Issuer enforceable in accordance with their terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied, and will be entitled to the benefits of this Indenture; and

(d) the Issuer makes no other representations or warranties, either express or implied, of any nature or kind, including, without limitation, a representation or warranty that interest on the Bonds is or will continue to be exempt from federal or state income taxation.

Section 5.03. Rights and Duties of the Issuer.

(a) Remedies of the Issuer. Notwithstanding any contrary provision in this Indenture, the Issuer shall have the right to take any action not prohibited by law or make any decision not prohibited by law with respect to proceedings for indemnity against the liability of the Issuer and its officers, directors, employees and agents and for collection or reimbursement of moneys due to it under this Indenture for its own account. The Issuer may enforce its rights under this Indenture which have not been assigned to the Trustee by legal proceedings for the specific performance of any obligation contained herein or for the enforcement of any other legal or equitable remedy, and may recover damages caused by any breach by the Corporation of its obligations to the Issuer under this Indenture, including any Administrative Expenditures owed to the Issuer, court costs, reasonable attorney's fees and expenses and other costs and expenses incurred in enforcing such obligations.

(b)     <u>Limitations on Actions</u>.   Without limiting the generality of any other provision of this Indenture, the Issuer shall not be required to monitor the financial condition of the Corporation and shall not have any responsibility or other obligation with respect to reports, notices, certificates or other documents filed with it hereunder.

(c)     <u>Responsibility</u>.   The Issuer and its officers, directors, employees and agents shall be entitled to the advice of counsel (who may be counsel for any party) and shall not be liable for any action taken or omitted to be taken in good faith in reliance on such advice. They may rely conclusively on any communication or other document furnished to it under this Indenture and reasonably believed by it to be genuine. No such Person shall be liable for any action (i) taken by it in good faith and reasonably believed by it to be within the discretion or powers conferred upon it, or (ii) in good faith omitted to be taken by it because reasonably believed to be beyond the discretion or powers conferred upon it, (iii) taken by it pursuant to any direction or instruction by which it is governed under this Indenture or (iv) omitted to be taken by it by reason of the lack of direction or instruction required for such action, nor shall it be responsible for the consequences of any error of judgment reasonably made by it. The Issuer shall in no event be liable for the application or misapplication of funds, or for other acts or defaults by any Person except its own directors, officers and employees. When any consent or other action by the Issuer is called for by this Indenture, the Issuer may defer such action pending such investigation or inquiry or receipt of such evidence, if any, as it may require in support thereof. It shall not be required to take any remedial action (other than the giving of notice) unless reasonable indemnity is provided for any expense of liability to be incurred thereby. It shall be entitled to reimbursement for expenses reasonably incurred or advances reasonably made, with interest at the "base rate" or the "prime rate" of the Trustee, as announced from time to time (or, if none, the nearest equivalent), in the exercise of its rights or the performance of its obligations hereunder, to the extent that it acts without previously obtaining indemnity. No permissive right or power to act shall be construed as a requirement to act; and no delay in the exercise of any such right or power shall affect the subsequent exercise of that right or power. The Issuer shall not be required to take notice of any breach or default by the Corporation under this Indenture except when given notice thereof by the Trustee. No recourse shall be had by the Corporation, the Trustee or any Bondholder for any claim based on this Indenture, the Bonds or any agreement securing the same against any director, officer, agent or employee of the Issuer alleging personal liability on the part of such Person unless such claim is based upon the willful dishonesty of or intentional violation of law by such Person. No covenant, stipulation, obligation or agreement of the Issuer contained in this Indenture shall be deemed to be a covenant, stipulation, obligation or agreement of any present or future director, officer, employee or agent of the Issuer in his or her individual capacity, and no Person executing a Bond shall be liable personally thereon or be subject to any personal liability or accountability by reason of the issuance thereof.

(d)     <u>Financial Obligations</u>.   Nothing contained in this Indenture is intended to impose any pecuniary liability on the Issuer nor shall it in any way obligate the Issuer to pay any debt or meet any financial obligations to any Person at any time in relation to the Project except from moneys received under the provisions of this Indenture; provided, however, that nothing contained in this Indenture shall in any way obligate the Issuer to pay such debts or meet such financial obligations from moneys received for the Issuer's own purposes.

- 113 -

Section 5.04. <u>Rights Under Loan Agreement</u>. The Loan Agreement, a duly executed counterpart of which has been filed with the Trustee, sets forth the covenants and obligations of the Issuer and the Corporation, including provisions that, subsequent to the issuance of the Bonds and prior to the payment in full or provision for payment thereof in accordance with the provisions thereof, the Loan Agreement may not be amended, changed, modified, altered or terminated without the written consent of the Trustee, as provided in Article VIII hereof. Reference is hereby made to the Loan Agreement for a detailed statement of such covenants and obligations of the Corporation, and the Issuer agrees that, except with respect to the Reserved Rights of the Issuer, the Trustee, as assignee of the Issuer, but not in the name of the Issuer, shall enforce all rights of the Issuer and all obligations of the Corporation under and pursuant to the Loan Agreement for and on behalf of the Holders of Parity Debt, whether or not the Issuer is in default hereunder. The Issuer, at the expense of the Corporation, shall cooperate with the Trustee in enforcing the obligations of the Corporation to pay or cause to be paid all amounts payable by the Corporation under the Loan Agreement.

Section 5.05. <u>Arbitrage and Tax Covenants</u>. Pursuant to the Loan Agreement, the Corporation has covenanted to comply with the provisions of Sections 103 and 141 through 150 of the Code. The Issuer hereby covenants to comply with its obligations under the Tax Certificate.

Section 5.06. <u>Parity Obligations</u>. An Authorized Officer of the Corporation, from time to time, may apply to the Trustee in accordance with Section 8.11 or Section 8.22 of the Loan Agreement for the designation of any Indebtedness of the Corporation as a Parity Obligation. If the Trustee shall receive all of the items that must be received as conditions precedent to the issuance of Parity Obligations set forth in Section 8.11 or Section 8.22 of the Loan Agreement with respect to such Indebtedness, the Trustee shall notify the Corporation that the items have been received. Upon the receipt of that notice, such Indebtedness shall be a Parity Obligation and shall (i) constitute a Special Senior Parity Obligation in accordance with Section 8.11 of the Loan Agreement and rank senior to all other Parity Debt as to the security of the Receipts, the Revenues, the Collateral and the Mortgage, to the extent provided herein and in the Loan Agreement, (ii) constitute a Senior Parity Obligation in accordance with Section 8.11 of the Loan Agreement and rank equally and ratably with the Senior Bonds and any other Senior Parity Obligations as to the security of the Receipts, the Revenues, the Collateral and the Mortgage, to the extent provided herein and in the Loan Agreement or (iii) constitute a Subordinated Parity Obligation in accordance with Section 8.22 of the Loan Agreement and rank equally and ratably with the Subordinated Bonds and any other Subordinated Parity Obligations as to the security of the Receipts, the Revenues, the Collateral and the Mortgage, to the extent provided herein and in the Loan Agreement. Parity Obligations shall not, however, be secured by moneys and securities from time to time on deposit in the Debt Service Funds, the Operating Reserve Fund, the Senior Debt Service Reserve Fund, the Redemption Fund or the Construction Fund. The Bonds will not be secured by any debt service fund, debt service reserve fund, redemption fund or other similar fund created specifically for any other Parity Obligation or any amount on deposit in any fund or account securing any other Parity Obligation constituting proceeds of such Parity Obligation or investment earnings on such proceeds.

In connection with the designation of any Indebtedness as a Parity Obligation in accordance with this Indenture and the Loan Agreement, the Trustee shall take such actions and

execute such documents as the Trustee shall reasonably determine to be necessary or appropriate after consultation with the original purchaser of such Parity Obligation to confirm to the holder of such Parity Obligation the pledge and assignment made by this Indenture of the Receipts, the Revenues and the Collateral for the benefit, protection and security of the holders of Outstanding Bonds and Parity Obligations, to the extent and subject to the priorities provided in this Indenture and the Loan Agreement. Without limiting the generality of the foregoing, the Trustee is authorized to enter into an Intercreditor Agreement in form and substance satisfactory to the Trustee to further confirm to the holder of any Special Senior Parity Obligation the priority of such obligation as provided in this section and the standstill of remedies of the Senior Parity Obligations provided in Article VII hereof.

Section 5.07. <u>Issuer Entitled to Indemnity</u>.

(a) Pursuant to the Loan Agreement, the Corporation shall indemnify the Issuer, any person who "controls" the Issuer within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended, and any member, director, officer, official, agent, attorney and employee of the Issuer or the Commonwealth (herein the "Indemnified Parties").

(b) To secure the Corporation's indemnification payment obligation, the Indemnified Parties shall have a lien, prior to the lien created by this Indenture for the benefit of the owners of the Bonds, on all money or property held or collected by the Trustee other than money held for the payment of the principal of or Redemption Price of any Parity Debt (excluding the Bonds) and interest on any Parity Debt (excluding the Bonds) previously matured or called for redemption in accordance with this Indenture, which shall be held for the benefit of the registered owners of such Parity Debt (excluding the Bonds) only. Such obligations shall survive the satisfaction and discharge of this Indenture. Notwithstanding the foregoing provisions of this subsection, the Trustee's compensation lien created by Section 6.09 hereof is superior to the lien of the Indemnified Parties created by this subsection.

(c) When an Indemnified Party incurs expenses or renders services after an Event of Default, the expenses and compensation for the services are intended to constitute expenses of administration under any applicable bankruptcy law.

Section 5.08. <u>Issuer Not Responsible for Insurance, Taxes, Execution of Indenture, or Application of Moneys</u>.

(a) The Issuer is not under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Corporation, or to report, or make or file claims or proof of loss for, any loss or damage insured against or which may occur, or to keep itself informed or advised as to the payment of any taxes or assessments, or to require any such payment to be made. The Issuer shall have no responsibility in respect of the sufficiency of the security provided by this Indenture. The Issuer shall not be under any obligation to see that any duties herein imposed upon any party other than itself, or any covenants herein contained on the part of any party other than itself to be performed, shall be done or performed, and the Issuer shall not be under any liability for failure to see that any such duties or covenants are so done or performed.

- 115 -

(b)     The immunities and exemptions from liability of the Issuer hereunder shall extend to its officials, attorneys, officers, employees and agents.

ARTICLE VI
CONCERNING THE TRUSTEE AND THE REMARKETING AGENT

Section 6.01.     Appointment of Trustee, Registrar and Paying Agent; Acceptance of Appointment.  Wells Fargo Bank, National Association, a national banking association, is hereby appointed Trustee for the Bonds. Except as otherwise provided in any Supplemental Indenture authorizing the issuance of any Additional Bonds with respect to such Additional Bonds, the Trustee shall also be the Registrar and Paying Agent for the Bonds.  The Trustee's acceptance of the trusts and the duties of Trustee, by executing and delivering this Indenture, shall also constitute acceptance of the trusts and the duties of Registrar and Paying Agent for the Bonds.

Section 6.02.     Trustee Entitled to Indemnity.  The Trustee shall be under no obligation to institute any suit, or to undertake any proceeding under this Indenture, or to enter any appearance or in any way defend in any suit in which it may be made defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder, until it shall be indemnified to its satisfaction against any and all costs and expenses, outlays and counsel fees and other reasonable disbursements, and against all liability except as a consequence of its own negligence or willful misconduct.  Nevertheless, the Trustee may begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as the Trustee, without indemnity, and in such case the Trustee shall, to the extent not reimbursed by the Corporation, reimburse itself from the Revenues and any other moneys in its possession under the provisions of this Indenture for all costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith and the Trustee shall be entitled to a preference therefor over any Parity Debt Outstanding hereunder. Notwithstanding the foregoing, the Trustee shall not be entitled to indemnification prior to taking such steps as shall be necessary to make payments on the Bonds when due from money available to it, to giving notice to accelerate the Bonds as required pursuant to Section 7.02, or to make demands under the Letter of Credit in accordance with its terms.

Section 6.03.     Responsibilities of Trustee.  The recitals contained in this Indenture and in the Parity Debt shall be taken as the statements of the Issuer or the Corporation (as the case may be) and the Trustee assumes no responsibility for the correctness of the same.  The Trustee makes no representations as to the validity or sufficiency of this Indenture or the Parity Debt or with respect to the security afforded by this Indenture, and the Trustee shall incur no liability with respect thereto.  Except as otherwise expressly provided in this Indenture, the Trustee shall have no responsibility or duty with respect to: (a) the issuance of Parity Debt for value; (b) the application of the proceeds thereof, except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (c) the application of any moneys paid in accordance with this Indenture except as to the application of any moneys paid to it in its capacity as Trustee or Paying Agent.

The duties and obligations of the Trustee shall be determined by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and

\29695489.18

obligations as are specifically set forth in this Indenture and no implied covenants shall be read into this Indenture against the Trustee.

The Trustee shall not be liable for any action taken or omitted by it in the performance of its duties under this Indenture except for its own negligence or willful misconduct or if the Trustee is otherwise protected with respect to such act or omission under the provisions of this Indenture.

The Trustee shall not be liable for any debt contracted or for damages to persons or to personal property injured or damaged or for salaries or nonfulfillment of contracts during any period in which the Trustee may be in possession of or managing the Facility and the Facility Site pursuant to this Indenture, the Mortgage or the Collateral Documents, other than for its negligence or willful misconduct.

The Trustee shall not be responsible for any determination or calculation concerning arbitrage rebate with respect to the Bonds, for making any determination with respect to any insurance or insurance companies, for collecting any insurance monies or for determining whether the yield on any investments made hereunder would cause, or whether any other facts exist which would cause, Tax-Exempt Bonds to become arbitrage bonds under Section 148 of the Code.

Notwithstanding anything elsewhere herein contained, the Trustee shall have the right, but shall not be required, to demand, in respect of the authentication of any Bonds or any other action contemplated by this Indenture, the Loan Agreement or the Mortgage, any showings, certificates, opinions, appraisal or other information, or corporate action or evidence thereof, in addition to that required by the terms hereof or of the Loan Agreement or the Mortgage as a condition of such action by the Trustee, which the Trustee deems desirable for the purpose of establishing the right of the Issuer to the authentication of any Bonds, or the taking of any other action by the Trustee.

Section 6.04.  <u>Property Held in Trust</u>.  All moneys and securities held by the Trustee at any time pursuant to the terms of this Indenture shall be held by the Trustee in trust for the purposes and under the terms and conditions of this Indenture, but need not be segregated from other funds except to the extent required by this Indenture or by law.  The Trustee shall not be under any liability for interest on any monies received hereunder except as provided in Section 4.13 of this Indenture or as may have been otherwise agreed upon in writing.

Section 6.05.  <u>Trustee and Issuer Protected in Relying on Certain Documents</u>.  The Trustee and the Issuer shall be protected and may rely upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other document provided to the Trustee or the Issuer in accordance with the terms of this Indenture, the Loan Agreement, the Mortgage or the Collateral Documents that it shall in good faith reasonably believe to be genuine and to have been adopted or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture, or upon the written opinion of any counsel, architect, engineer, insurance consultant, management consultant or accountant believed by the Trustee or the Issuer to be qualified in relation to the subject matter, and the Trustee and the Issuer shall be under no duty to make any investigation or inquiry into any statements

contained or matters referred to in any such instrument. The Trustee and the Issuer may consult with counsel, who may or may not be Bond Counsel or counsel to the Corporation, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action under this Indenture, such matter may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Corporation, unless other evidence in respect thereof be hereby specifically prescribed. Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof, but in its discretion the Trustee may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it may deem reasonable. Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Issuer to the Trustee shall be sufficiently executed if executed in the name of the Issuer by an Authorized Officer.

The Trustee shall not be under any obligation to see to the recording or filing of this Indenture, or otherwise to the giving to any person of notice of the provisions hereof except as expressly required in connection with the Loan Agreement or the Mortgage.

Section 6.06. <u>Action by Trustee</u>. The Trustee shall be under no obligation to take any action in respect of any default or Event of Default hereunder or toward the execution or enforcement of any of the trusts hereby created, or to institute, appear in or defend any suit or other proceeding in connection therewith, unless requested so to do in writing, by Holders of a majority in aggregate principal amount of the Parity Debt then Outstanding and, if in its opinion such action may tend to involve it in expense or liability, unless furnished, from time to time as often as it may require, with security and indemnity satisfactory to it; provided, however, that the foregoing provisions are intended only for the protection of the Trustee, and shall not affect any discretion or power given by any provisions of this Indenture to the Trustee to take action in respect of any default or Event of Default without such notice or request from the Holders, or without such security or indemnity.

Section 6.07. <u>Standard of Care</u>.

(a) The Trustee shall have no obligation to, but may require of the Issuer or the Corporation full information and advice as to performance of the covenants, conditions and agreements contained herein or in the Loan Agreement.

(b) The permissive right of the Trustee to do things enumerated in this Indenture and the Loan Agreement shall not be construed as a duty. In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise under the circumstances in the conduct of his own affairs.

(c)     The Trustee shall be entitled to act on the opinion or advice of counsel concerning all matters of trust hereof and the duties hereunder, and may in all cases pay reasonable compensation to all attorneys, agents and receivers as may reasonably be employed in connection with the trust hereof.  The Trustee may act on an opinion of counsel and shall not be responsible for any loss or damage resulting from any action or nonaction by it taken or omitted to be taken in good faith in reliance on such opinion of counsel.

(d)     In the event it shall become necessary or desirable for the Trustee to make any investigation as to the existence or nonexistence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding preparatory to taking or not taking any action, or doing or not doing anything, as such Trustee, and in any case in which this Indenture provides for permitting or taking any action, it may rely on any certificate required or permitted to be filed with it under the provisions of this Indenture or the Loan Agreement, and any such certificate shall be sufficient evidence of such fact, or the sufficiency or validity of such instrument, paper or proceeding to protect it in any action that it may or may not take, or in respect of anything it may or may not do, in good faith, by reason of the supposed existence of such fact, instrument, paper or proceeding.

(e)     The Trustee shall be protected and shall incur no liability in acting or proceeding, or in not acting or not proceeding, in good faith, reasonably and in accordance with the terms of this Indenture, on any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other paper or document which it shall in good faith reasonably believe to be genuine and to have been adopted or signed by the proper board or person, or to have been prepared and furnished pursuant to any of the provisions of this Indenture, or on the written opinion of any attorney (who may be an attorney for the Issuer or the Corporation), engineer, appraiser or accountant.

Section 6.08.  Co-Trustees.  It is the purpose hereof that there shall be no violation of any law of any jurisdiction (including particularly the laws of the Commonwealth) denying or restricting the right of banking corporations or associations to transact business as trustee in such jurisdiction.  It is recognized that in case of litigation hereunder and in particular in case of the enforcement of this Indenture upon the occurrence of an Event of Default, it may be necessary that the Trustee and the Issuer enter into a supplemental indenture to appoint an additional individual or institution as a separate Trustee or Co-Trustee.  The following provisions of this Section are adapted to these ends.

Upon the incapacity or lack of authority of the Trustee, by reason of any present or future law of any jurisdiction, to exercise any of the rights, powers and trusts herein granted to the Trustee or to hold a security interest in the Trust Estate or to take any other action which may be necessary or desirable in connection therewith, each and every remedy, power, right, claim, demand, cause of action, immunity, estate, title, interest and lien expressed or intended to be exercised by or vested in or conveyed to the Trustee with respect thereto shall be exercisable by and vest in a separate Trustee or Co-Trustee appointed by the Trustee but only to the extent necessary to enable the separate Trustee or Co-Trustee to exercise such rights, powers and trusts, and every agreement and obligation necessary to the exercise thereof by such separate Trustee or Co-Trustee shall run to and be enforceable by either of them.

Should any deed, conveyance or instrument in writing from the Issuer be required by the separate Trustee or Co-Trustee so appointed by the Trustee in order to more fully and certainly vest in and confirm to him or it such properties, rights, powers, trusts, duties and obligations, any and all such deeds, conveyances and instruments shall, on request, be executed, acknowledged and delivered by the Issuer, at the expense of the Corporation.  In case any separate Trustee or Co-Trustee, or a successor to either, shall die, become incapable of acting, resign or be removed, all the estates, properties, rights, powers, trusts, duties and obligations of such separate Trustee or Co-Trustee, so far as permitted by law, shall vest in and be exercised by the Trustee until the appointment of a new Trustee or successor to such separate Trustee or Co-Trustee.

Section 6.09.  <u>Compensation</u>.  Unless otherwise provided by contract with the Trustee, the Trustee shall be entitled to reasonable compensation for all services rendered by it hereunder, including its services as Registrar and Paying Agent, together with all its reasonable expenses (including reasonable fees of its counsel), charges, advances and other disbursements and those of its counsel, agents and employees, incurred in and about the administration and execution of the trusts hereby created and the exercise of its powers and the performance of its duties hereunder, and the Trustee shall have a lien therefor on any and all funds at any time held by it hereunder (other than amounts drawn on the Letter of Credit) prior to any Parity Debt Outstanding.  The Corporation shall indemnify and save the Trustee harmless against any expenses and liabilities that the Trustee may incur in the exercise and performance of its powers and duties hereunder that are not due to its negligence or willful misconduct.  None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers.  If the Corporation shall fail to make any payment required by this Section, the Trustee may make such payment from any moneys in its possession under the provisions of this Indenture (except moneys drawn under the Letter of Credit) and shall be entitled to a preference therefor over any Parity Debt Outstanding hereunder.

Section 6.10.  <u>Permitted Acts</u>.  The Trustee and its directors, officers, employees or agents may become the owner of or may in good faith buy, sell, own, hold and deal in Parity Debt or Subordinated Indebtedness and may join in any action that any holder of Parity Debt or Subordinated Indebtedness may be entitled to take as fully and with the same rights as if it were not the Trustee.  The Trustee may act as depository, and permit any of its officers or directors to act as an official of, or in any other capacity with respect to, the Issuer or any committee formed to protect the rights of holders of Parity Debt or Subordinated Indebtedness or to effect or aid in any reorganization growing out of the enforcement of the Parity Debt, any Subordinated Indebtedness or this Indenture, whether or not such committee shall represent the holders of a majority of the Parity Debt or Subordinated Indebtedness (as the case may be).

Section 6.11.  <u>Resignation of the Trustee</u>.  The Trustee may at any time resign and be discharged of its duties and obligations hereunder by giving not fewer than 30 days' written notice, specifying the date when such resignation shall take effect, to the Issuer, the Corporation, the Letter of Credit Provider and each Holder of any Outstanding Parity Debt or Subordinated Indebtedness.  Such resignation shall take effect upon the appointment of a successor by the Issuer or the Holders of the Outstanding Special Senior Parity Debt, or if no Special Senior Parity Debt is Outstanding, by the Holders of the Outstanding Senior Parity Debt, as provided in Section 6.13 hereof and the acceptance of such appointment by such successor.  At any time the

- 120 -

Trustee resigns and no appointment of a successor Trustee is made pursuant to the foregoing provisions of this Article VI prior to the date specified in the notice of resignation as of the date when such resignation is to take effect, the resigning Trustee may apply to a court of competent jurisdiction for the appointment of a successor Trustee.

Section 6.12.  Removal of Trustee.  The Trustee may be removed at any time by the holders of a majority of the Outstanding Parity Debt, by an instrument or concurrent instruments in writing signed and acknowledged by such holders or by their attorneys-in-fact, duly authorized and delivered to the Issuer and the Trustee.  The Trustee may also be removed for cause at any time by the Corporation with the approval of the Issuer if the Corporation is not then in default.  The Trustee may also be removed for cause at any time by the Issuer.  The Trustee may also be removed at any time for any breach of trust or for acting or proceeding in violation of, or for failing to act or proceed in accordance with, any provision of this Indenture with respect to the duties and obligations of the Trustee by any court of competent jurisdiction upon the application of the Issuer or of the Holders of not less than ten percent (10%) of the Holders of the Outstanding Parity Debt.  Any removal shall take effect upon the appointment of a successor by the Issuer or the Holders of the Outstanding Parity Debt, as provided in Section 6.13 hereof and the acceptance of such appointment by such successor.

Section 6.13.  Successor Trustee.  If the Trustee shall resign, be removed, be dissolved or become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee or of its property or affairs, the position of the Trustee hereunder shall thereupon become vacant.

If the position of Trustee shall become vacant for any of the foregoing reasons or for any other reason, a successor Trustee may be appointed within one year after any such vacancy shall have occurred by the holders of a majority of the Outstanding Special Senior Parity Debt, or if no Special Senior Parity Debt is Outstanding, by the Holders of the Outstanding Senior Parity Debt, by an instrument or concurrent instruments in writing signed and acknowledged by such holders or their attorneys-in-fact, duly authorized and delivered to such successor Trustee, with notification thereof being given to the predecessor Trustee, the Issuer, the Letter of Credit Provider and the Corporation.

Until such successor Trustee shall have been appointed as described in the immediately preceding paragraph, the Corporation shall forthwith appoint a Trustee to act hereunder.  Copies of any instrument of the Corporation providing for any such appointment shall be delivered by the Corporation to the Trustee so appointed, the predecessor Trustee, the Letter of Credit Provider and the Issuer.  The successor Trustee shall mail notice of any such appointment to each Holder of any outstanding Parity Debt or Subordinated Indebtedness within 30 days after such appointment.  Any appointment of a successor Trustee made by the Corporation immediately and without further act shall be superseded and revoked by an appointment subsequently made by the holders of Parity Debt as described in the immediately preceding paragraph.

If in a proper case no appointment of a successor Trustee shall be made within 45 days after the giving by any Trustee of any written notice of resignation in accordance with Section 6.11 hereof or after the occurrence of any other event requiring or authorizing such appointment,

the Trustee or any holder of Outstanding Parity Debt or Subordinated Indebtedness may apply to any court of competent jurisdiction for the appointment of such a successor, and the court may thereupon, after such notice, if any, as the court may deem proper, appoint such successor.

Any successor Trustee appointed under the provisions of this Section shall be a commercial bank or trust company or national banking association (a) having a capital and surplus aggregating at least $50,000,000, or a subsidiary bank or trust company whose capital and surplus, together with that of its parent bank, trust company or bank holding company, as the case may be, is at least $50,000,000, if there be such a commercial bank or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms, and (b) authorized by law to perform all the duties of the Trustee required by this Indenture.

Section 6.14. <u>Transfer of Rights and Property to Successor Trustee</u>. Any successor Trustee appointed under the provisions of Section 6.13 hereof shall execute, acknowledge and deliver to its predecessor and the Issuer an instrument in writing accepting such appointment, and thereupon such successor shall become fully vested with all moneys, estates, properties, rights, immunities, powers, duties, obligations and trusts of its predecessor hereunder without any further act, deed or conveyance, with like effect as if originally appointed as Trustee.

However, the Trustee then ceasing to act shall nevertheless, on request of the Issuer or of such successor, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the rights, immunities, powers and trusts of such Trustee and all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any moneys or other properties subject to the trusts and conditions herein set forth.

Should any deed, conveyance or instrument in writing from the Issuer be required by such successor for more fully and certainly vesting in and confirming to it any such moneys, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing, on request and so far as may be authorized by law, shall be executed, acknowledged and delivered by the Issuer.

Section 6.15. <u>Merger, Conversion or Consolidation of Trustee</u>. Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business shall be the successor to such Trustee hereunder, without any further act, deed or conveyance, provided that such company shall be a commercial bank or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 6.13 hereof and reasonably acceptable to the Corporation.

Section 6.16. <u>Trustee to File Continuation Statements</u>. The Trustee shall cause to be filed such continuation statements as may be required by the Massachusetts Uniform Commercial Code, as from time to time in effect (the "UCC"), in order to continue perfection of the security interest of the Trustee in such items of tangible or intangible personal property and

any fixtures as may have been granted to the Trustee pursuant to this Indenture in the time, place and manner required by the UCC.

Section 6.17. <u>Notice of Events of Default</u>. The Trustee shall not be required to take notice or be deemed to have notice of any default or Event of Default under this Indenture, the Loan Agreement or the Mortgage other than an Event of Default under clause (a) or (b) of Section 7.01 hereof, unless an officer, agent or employee responsible for matters relating to the Bonds shall have actual knowledge of such default or Event of Default, or the Trustee shall have been specifically notified in writing of such default or Event of Default by holders of at least a majority of the Outstanding Special Senior Parity Debt, or if no Special Senior Parity Debt is Outstanding, by the Holders of the Outstanding Senior Parity Debt or by the Issuer.

Section 6.18. <u>Construction of Indenture</u>. The Trustee may construe any of the provisions of this Indenture insofar as the same may appear to be ambiguous or inconsistent with any other provision hereof, and any construction of any such provisions hereof by the Trustee in good faith shall be binding upon the holders of the Bonds.

Section 6.19. <u>Employment by Trustee of Management Consultant</u>. The Trustee agrees to the provisions of Sections 6.04(b)(iv) and 8.16 of the Loan Agreement, which require the Trustee to employ a Management Consultant at the expense of the Corporation under certain circumstances described therein.

In addition, if the Corporation fails to appoint a Management Consultant or deliver a report as required by Section 8.04, 8.16 and 8.20 of the Loan Agreement, the Trustee, upon notice to the Corporation, shall retain a Management Consultant for the account and at the expense of the Corporation.

Section 6.20. <u>Procurement of Insurance for Corporation; Other Advances</u>. If at any time the Corporation fails to procure or maintain any insurance required by Section 6.01 of the Loan Agreement or Section 3.03 of the Mortgage, the Trustee may, but shall not be required to, procure and maintain such insurance at the expense of the Corporation, and the Corporation shall reimburse the Trustee for all amounts expended in connection therewith with interest thereon at the Reimbursement Rate from the date the Trustee expends such amounts.

If the Issuer or the Corporation fails to perform any of the covenants or agreements contained in this Indenture or the Loan Agreement, other than the covenants or agreements in respect of the payment of the Bonds, the Trustee may, in its uncontrolled discretion and without notice to the Holders of any Parity Debt, at any time and from time to time, make advances to effect performance of the same on behalf of the Issuer or the Corporation, but the Trustee shall be under no obligation to do so; and any and all such advances shall bear interest at the Reimbursement Rate; but no such advance shall operate to relieve the Issuer or the Corporation from any default hereunder or under the Loan Agreement. Upon making such advance, the Trustee shall give notice to the Corporation of the amount of such advance and the date on which it was made and, in such case, the Trustee may, to the extent not reimbursed by the Corporation, reimburse itself from any moneys in its possession under the provisions of this Indenture (other than amounts drawn on the Letter of Credit) and shall be entitled to a preference therefor over any Parity Debt Outstanding hereunder.

Section 6.21. <u>Remarketing Agent</u>. Any Remarketing Agent and any successor Remarketing Agent shall accept the duties and obligations imposed on it under this Indenture by written instrument delivered to the Corporation, the Letter of Credit Provider and the Trustee. Any Remarketing Agent may resign at any time by written notice to the Trustee, the Letter of Credit Provider and the Corporation delivered not less than 30 days prior to the effective date of such resignation and may be removed at any time by the Corporation by written notice to the Trustee, the Letter of Credit Provider and the Remarketing Agent to be removed. Upon the resignation or removal of the Remarketing Agent, the Corporation shall appoint a substitute Remarketing Agent. Notwithstanding anything to the contrary herein contained, neither the resignation nor removal of any Remarketing Agent shall be effective until a successor Remarketing Agent has been appointed either by the Corporation or a court of competent jurisdiction and has accepted such appointment.

Section 6.22. <u>Information Provided to Others</u>. The Trustee shall provide a copy of any documents, certificates, notices, statements, opinions or other written material provided by the Corporation or any other Person pursuant to or in accordance with any Bond Document as shall be requested in writing by a then-current Holder of any Parity Debt.

ARTICLE VII
EVENTS OF DEFAULT AND REMEDIES

Section 7.01. <u>Events of Default</u>. Each of the following events is hereby declared to constitute an event of default hereunder (an "Event of Default"):

(a) payment of the principal or Redemption Price of any Bond shall not be made when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or payment of the Purchase Price of any Bond required by its terms to be purchased from the Holder thereof by the Trustee on any date prior to its stated maturity shall not be made in accordance with the terms thereof on such date; or

(b) payment of interest on any Bond shall not be made when the same shall become due and payable; or

(c) an order or decree shall be entered with the consent or acquiescence of the Issuer appointing a receiver of the Revenues, or such order or decree, having been entered without the consent or acquiescence of the Issuer, shall not have been vacated or discharged or stayed on appeal within 60 days after the entry thereof; or

(d) the Issuer shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions (other than as specified in clause (a) or (b) of this Section) contained in any Bond or in this Indenture on the part of the Issuer to be performed, which default shall continue for 30 days after written notice specifying such default and requiring the same to be remedied shall have been given to the Issuer by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of not less than a Majority (as defined in Section 7.06 hereto) of the Bondholders; or

(e) an "Event of Default" occurs under the Loan Agreement (as that term is defined in the Loan Agreement), or the Mortgage (as that term is defined in the Mortgage). A

- 124 -

default under this Indenture with respect to the Bonds shall not be or constitute a default under any other indenture entered into by the Issuer or with respect to any other indebtedness of the Issuer.

Notwithstanding the foregoing, in the event Special Senior Parity Debt is issued (whether as Special Senior Bonds described in Section 2.14 or as Special Senior Parity Obligations in accordance with Section 8.11 of the Loan Agreement), the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default hereunder (the "Special Senior Parity Debt Standstill") during the period commencing on the date such payment was due and ending on the date that is six months after all amounts due under the Special Senior Parity Debt are paid in full (the "Standstill Period"). All amounts that become due and payable and are not paid during the Standstill Period by reason of the Special Senior Parity Debt Standstill shall accrue interest at the per annum rate of 6.25% on amounts not paid on Series 2011 A-1 Bonds and at the per annum rate of 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Special Senior Parity Debt and the Senior Parity Debt due on such payment dates have been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date. On the Resizing Review Date any accrued and unpaid debt service during the Standstill Period will not be subject to resizing but instead will be satisfied in accordance with Section 2.22 herein.

Notwithstanding the foregoing in subsections (a) through (e) above, in the event of a Calamity Standstill (as defined in Section 6.04 of the Loan Agreement) the failure to pay the principal or Redemption Price of or interest on any Special Senior Parity Debt, or Senior Parity Debt or Subordinated Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default hereunder at anytime during the Calamity Standstill Period (as defined in Section 6.04 of the Loan Agreement), provided during the Calamity Standstill Period, the Corporation shall pay scheduled debt service due on any Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt to the extent the Corporation maintains 30 Days' Cash on Hand. All amounts that become due and payable and are not paid during the Calamity Standstill shall accrue interest at the per annum rate equal to (i) the interest rate on the Special Senior Parity Debt on the amounts not paid on the Special Senior Parity Debt, (ii) 6.25% on amounts not paid on Series 2011 A-1 Bonds and (iii) 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Special Senior Parity Debt, if any, and the Series 2011 A Bonds and Series 2007 B Bonds due on such payment dates have been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date. Any amounts accrued and unpaid as of the Resizing Review Date will not be subject to resizing but instead will be satisfied in accordance with Section 2.22 herein.

Notwithstanding the foregoing in subsections (a) through (e) above, in the event of a Good Cause Standstill (as defined in Section 4.05 of the Loan Agreement), the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt when the same shall become due and payable shall not, in and of itself, constitute an Event of Default hereunder at any time during the Good Cause Standstill Period (as defined in Section 4.05 of the Loan Agreement), provided during the Good Cause Standstill Period, the Corporation shall pay

scheduled debt service due on any Senior Parity Debt to the extent the Corporation maintains 30 Days' Cash on Hand. All amounts that become due and payable and are not paid during the Good Cause Standstill Period shall accrue interest at the per annum rate equal to (i) 6.25% on amounts not paid on Series 2011 A-1 Bonds and (ii) 5.5% on amounts not paid on all other Senior Parity Debt, and shall be payable in monthly installments of interest and quarterly installments of principal after all debt service on the Series 2011 A Bonds and Series 2007 B Bonds due on such payment dates have been paid until the earlier of the date all amounts due under this paragraph are paid in full and the Resizing Review Date. Any amounts accrued and unpaid as of the Resizing Review Date will not be subject to resizing but instead will be satisfied in accordance with Section 2.22 herein.

Section 7.02. <u>Acceleration of Maturity</u>. Upon the happening and continuance of any Event of Default specified in the Indenture, the Trustee may, and upon the written request of the owners of not less than 25% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) shall, unless the owners of not less than 50% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) direct the Trustee not to accelerate after the maturity of the Bonds, declare the principal of all of the Outstanding Bonds to be due and payable, whereupon such principal and accrued interest thereon shall be immediately due and payable. Notwithstanding the foregoing, the Trustee may not declare the principal of any Series of Bonds other than the Series 2011 Bonds to be due and payable without the prior written consent of any person whose consent shall be required for such declaration under the terms of the Supplemental Indenture authorizing the issuance of such Series of Bonds.

For all purposes of this Article VII, the Letter of Credit Provider shall be treated as the Holder of the Variable Rate Bonds so long as the Letter of Credit Provider is not in default of its obligations to honor proper drawings presented in strict compliance with the terms of the Letter of Credit. Interest on the Variable Rate Bonds shall cease to accrue immediately upon a declaration of acceleration.

Upon an Event of Default under the Loan Agreement, subject to the provisions of this Article and any Intercreditor Agreement, the Trustee may exercise its rights under the Collateral Documents, including the right to require payment of all amounts and performance of all obligations due under such Collateral Documents.

At any time after the principal of the Bonds shall have been so declared to be due and payable, and before the entry of final judgment or decree in any suit, action or proceeding instituted on account of such default, or before the completion of the enforcement of any other remedy under this Indenture, the Trustee may (but in the event that such declaration has been made upon the request of the holders of Special Senior Parity Debt, only with the written consent of the holders of not less than a majority of the Special Senior Parity Debt or in the event that such declaration has been made upon the request of the holders of Senior Parity Debt, only with the written consent of the holders of not less than a majority of the Senior Parity Debt), by written notice to the Corporation, annul such declaration and its consequences if: (a) moneys shall have accumulated in the Debt Service Funds sufficient to pay all arrears of interest, if any, upon all of the Outstanding Special Senior Parity Debt and Senior Parity Debt (except the interest accrued on such Parity Debt since the last interest payment date) and the principal of all

matured Special Senior Parity Debt and Senior Parity Debt (except the principal of any Parity Debt due only as a result of such declaration); (b) sufficient moneys shall have accumulated and be available to pay the charges, compensation, expenses, disbursements, advances and liabilities of the Trustee and the Issuer; and (c) every other default in the observance or performance of any covenant, condition or agreement contained in the Special Senior Parity Debt or the Senior Parity Debt or in this Indenture, the Loan Agreement and the Mortgage of which the Trustee has actual knowledge shall have been remedied to the satisfaction of the Trustee. No such annulment shall extend to or affect any subsequent default or impair any right consequent thereon.

Nothing in this Section shall be construed to prohibit the Corporation from taking any action, to the extent permitted by applicable law, to remedy any Event of Default specified in Section 7.01 hereof.

Section 7.03. <u>Enforcement</u>. Upon the happening and continuance of any Event of Default, then and in every such case the Trustee may proceed, and upon the written request of the holders of not less than 25% of the Outstanding principal amount of the Special Senior Parity Debt (or, if no Special Senior Parity Debt shall be Outstanding, the Senior Parity Debt), shall proceed, unless the holders of not less than 50% of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt shall be Outstanding, the Senior Parity Debt) object to such request, to protect and enforce its rights and the rights of the holders of Parity Debt under the laws of the Commonwealth and under this Indenture by such suits, actions or special proceedings in equity or at law, either for the specific performance of any covenant contained herein or therein, or in aid or execution of any power herein or therein granted, or for the enforcement of any documents executed and delivered in connection with the Parity Debt or any proper legal or equitable remedy as the Trustee shall deem most effectual to protect and enforce such rights.

In the enforcement of any remedy under this Indenture, the Trustee shall be entitled to sue for, enforce payment of and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal of or interest on Parity Debt, or otherwise under any of the provisions of this Indenture or of any Parity Debt, with interest on overdue payments of principal at the rate or rates of interest specified in the Parity Debt, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Parity Debt, without prejudice to any other right or remedy of the Trustee or of the holders of Parity Debt, and to recover and enforce judgment or decree against the Corporation, but solely as provided herein and in the Parity Debt and from the sources and moneys provided herein and in the Parity Debt, for any portion of such amounts remaining unpaid and to collect in any manner provided by law the moneys adjudged or decreed to be payable.

The Issuer may likewise enforce obligations owed to it hereunder that it has not assigned to the Trustee.

Section 7.04. <u>Priority of Payments following Default</u>. If at any time there shall have occurred and be continuing an Event of Default, after payment of all amounts owing to the Issuer and the Trustee under this Indenture, amounts held by the Trustee hereunder together with any moneys thereafter becoming available for such purpose, whether through exercise of the

- 127 -

remedies provided in this Article VII or otherwise, shall be deposited into the Revenue Fund and shall be applied as follows:

(a)　　First to the payment of the Outstanding Special Senior Parity Debt as follows:

(i)　　unless the principal of all Outstanding Special Senior Parity Debt shall have become or shall have been declared due and payable, all such moneys shall be applied:

(A)　　to the payment to the persons entitled thereto of all installments of interest then due on the Special Senior Parity Debt Outstanding, in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment of such installment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Special Senior Parity Debt;

(B)　　to the payment to the persons entitled thereto of the unpaid principal of any Outstanding Special Senior Parity Debt that shall have become due and payable, in the order of the due dates of such Special Senior Parity Debt, with interest upon the principal amount of such Special Senior Parity Debt from the respective dates upon which it shall have become due and payable and, if the amount available shall not be sufficient to pay in full the principal of such Special Senior Parity Debt due and payable on any particular date, together with such interest, then first to the payment of such interest, ratably, according to the amount of interest due on such date, and then to the payment of such principal, ratably, according to the amount of principal due on such date, to the persons entitled thereto, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Special Senior Parity Debt; and

(C)　　to the payment of the interest on and the principal of the Special Senior Parity Debt Outstanding as the same become due and payable; and

(ii)　　if the principal of all Outstanding Special Senior Parity Debt shall have become due by its terms or the principal of all Outstanding Special Senior Parity Debt subject to acceleration shall have become due and payable by a declaration of acceleration, all such moneys shall be applied to the payment of the principal and interest then due and unpaid upon such Special Senior Parity Debt, without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Special Senior Parity Debt over any other Special Senior Parity Debt, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Special Senior Parity Debt; and

(b)　　Second, after payment in full of all Outstanding Special Senior Parity Debt, to the payment of the Senior Parity Debt as follows:

(i) unless the principal of all Outstanding Senior Parity Debt shall have become or shall have been declared due and payable, all such moneys shall be applied:

(A) to the payment to the persons entitled thereto of all installments of interest then due on the Senior Parity Debt Outstanding, in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment of such installment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Special Senior Parity Debt;

(B) to the payment to the persons entitled thereto of the unpaid principal of any Outstanding Senior Parity Debt that shall have become due and payable, in the order of the due dates of such Senior Parity Debt, with interest upon the principal amount of such Senior Parity Debt from the respective dates upon which it shall have become due and payable and, if the amount available shall not be sufficient to pay in full the principal of such Senior Parity Debt due and payable on any particular date, together with such interest, then first to the payment of such interest, ratably, according to the amount of interest due on such date, and then to the payment of such principal, ratably, according to the amount of principal due on such date, to the persons entitled thereto, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Senior Parity Debt; and

(C) to the payment of the interest on and the principal of the Senior Parity Debt Outstanding as the same become due and payable; and

(ii) if the principal of all Outstanding Senior Parity Debt shall have become due by its terms or the principal of all Outstanding Senior Parity Debt subject to acceleration shall have become due and payable by a declaration of acceleration, all such moneys shall be applied to the payment of the principal and interest then due and unpaid upon such Senior Parity Debt, without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Senior Parity Debt over any other Senior Parity Debt, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Senior Parity Debt; provided, however, that, notwithstanding anything to the contrary stated above, moneys received from draws under the Letter of Credit securing the Variable Rate Bonds or any Credit Facility securing any Series of Additional Bonds shall only be applied to the payment of principal and interest on such Variable Rate Bonds or Series of Additional Bonds secured thereby; and

(c) Third, after payment in full of all Outstanding Senior Parity Debt, all such moneys shall be applied to the payment of the principal of and interest on the Subordinated Parity Debt in accordance with their respective terms and the terms of this Indenture and any applicable Supplemental Indenture.

Notwithstanding any other provision of this Section, amounts on deposit in the Construction Fund, the Debt Service Funds, the Senior Debt Service Reserve Fund, the Operating Reserve Fund, the Supplemental Reserve Fund and the Redemption Fund and the investment earnings on such amounts shall be applied, after payment of all amounts owing to the Issuer and the Trustee under this Indenture, first, to the payment of amounts due on the Special Senior Parity Debt, second, to the payment of amounts due on the Senior Parity Debt until paid in full and third, to the payment of amounts due on the Subordinated Parity Debt; and amounts on deposit in any debt service fund, debt service reserve fund, redemption fund or other similar fund created for any Senior Parity Obligation in accordance with the Supplemental Indenture approving the issuance thereof and any amount on deposit in any fund or account securing any Senior Parity Obligation constituting proceeds of such Senior Parity Obligation or investment earnings on such proceeds shall be applied solely to the payment of amounts due on such Senior Parity Obligation.

Notwithstanding anything in this Indenture to the contrary, (i) to the extent amounts have been deposited in the accounts of the Debt Service Funds on a ratable basis among the Series of Senior Parity Debt and amounts on deposit in certain of such accounts have been applied to payment on the respective Series of Senior Parity Debt prior to amounts deposited in other accounts being so applied, then amounts on deposit in such other accounts of the Debt Service Funds that have not been so applied shall be held solely for the benefit of the holders of the applicable Series of Senior Parity Debt and (ii) to the extent amounts have been deposited in the accounts of the Debt Service Funds on a ratable basis among the Series 2011 A-2 Bonds and amounts on deposit in certain of such accounts have been applied to payment on the Series 2011 A-2 Bonds prior to amounts deposited in other accounts being so applied, then amounts on deposit in such other accounts of the Debt Service Funds that have not been so applied shall be held solely for the benefit of the holders of the Series 2011 A-2 Bonds.

Whenever moneys are to be applied by the Trustee pursuant to the provisions of this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. The setting aside of such moneys in trust for the benefit of the holders of the applicable Parity Debt shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Issuer, to any holder of any Parity Debt or Subordinated Indebtedness or to any other person for any delay in applying any such moneys, so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions of this Indenture as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date for the applicable series of Parity Debt unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of principal of the Parity Debt to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate of the fixing of any such date; provided, however, that the provisions of this paragraph shall be subject in all respects to the provisions of the applicable Parity Debt with respect to the payment of defaulted interest on such Parity Debt. The Trustee shall not be required to make payment to the holder of any Bond or Parity Obligation unless such Bond or Parity Obligation shall be presented to the Trustee for appropriate endorsement.

Notwithstanding anything to the contrary herein contained, moneys in the Letter of Credit Fund shall be applied solely to payment of the principal or Purchase Price of, or interest on, the Variable Rate Bonds and the proceeds of any draws on the Letter of Credit shall be deposited in the Letter of Credit Fund before disbursement and not commingled with any other funds.

Section 7.05.  <u>Discontinuance of Proceedings</u>.  In case any proceedings taken by the Trustee or the holders of Special Senior Parity Debt or Senior Parity Debt on account of any default with respect to such Parity Debt shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or such holders, then and in every such case the Issuer, the Trustee and the holders of Parity Debt shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken.  In case any proceedings taken by the Trustee or the holders of the Subordinated Parity Debt on account of any Event of Default with respect to the Subordinated Parity Debt shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or such holders, then and in every case the Issuer, the Trustee and the holders of the Subordinated Parity Debt shall be restored to their former positions and rights hereunder and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken.

Section 7.06.  <u>Holders May Control Proceedings</u>.  Anything in this Indenture to the contrary notwithstanding, but subject to Section 6.06 and Section 7.02 hereof, the holders of not less than twenty five percent (25%) of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) may, by an instrument in writing executed and delivered to the Trustee, give instructions to the Trustee directing the method and place of conducting all remedial proceedings to be taken by the Trustee under this Indenture or any proceedings under Section 8.22 of the Loan Agreement, including, without limitation, the appointment of counsel to represent the interests of the Bondholders and the Trustee in the event of the occurrence of an Event of Default.  Upon receipt of such directions, the Trustee shall give written notice thereof immediately to the remaining holders of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) stating that the Trustee will act in accordance therewith unless within 10 days of the giving of notice the holders of not less than fifty percent (50%) of the Outstanding principal amount of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) object in writing to such directions.  The Trustee shall have the right to decline to follow any such direction that in the opinion of the Trustee would be unjustly prejudicial to holders of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) not parties to such direction.

Section 7.07.  <u>Restrictions upon Action by Individual Holders</u>.  No holder of any Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) shall have any right to institute any suit, action or proceeding in equity or at law on any Parity Debt for the execution of any trust hereunder or for any other remedy hereunder unless (a) such holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and (b) the holders of not less than a Majority of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have

\29695489.18

afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted by this Indenture or to institute such action, suit or proceeding in its or their name, and (c) there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this Indenture or to any other remedy hereunder; provided, however, that notwithstanding the foregoing provisions of this Section and without complying therewith, the holders of not less than a Majority of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) may institute any such suit, action or proceeding in their own names for the benefit of all holders of outstanding Parity Debt.

It is understood and intended that, except as otherwise provided above, no one or more holders of Parity Debt shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture or to enforce any right hereunder except in the manner herein provided, that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of Parity Debt and that any individual right of action or other right given by law to one or more of such holders is restricted by this Indenture to the rights and remedies herein provided.

Section 7.08.   Actions by Trustee.  All rights of action under this Indenture or under any Parity Debt may be enforced by the Trustee without the possession of any of such Parity Debt or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all holders of outstanding Parity Debt, all subject to the provisions of this Indenture.

Section 7.09.   No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Trustee or to the holders of Parity Debt is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

Section 7.10.   No Delay or Omission Construed as a Waiver; Waiver of Default.  No delay or omission of the Trustee or of any holder of Parity Debt to exercise any right or power accruing upon any default shall impair any such right or power, nor shall any such delay or omission be construed to be a waiver of any such default or an acquiescence therein.  Every power and remedy given by this Article VII to the Trustee and the holders of Parity Debt, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the holders of not less than a Majority of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) shall, waive any default with respect to Parity Debt which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions of this Indenture or before the completion of the enforcement of any other remedy under this Indenture; but no such waiver shall extend to or affect any other existing or any subsequent default or impair any rights or remedies consequent thereon.

Notwithstanding anything in this Indenture or in any of the other Bond Documents to the contrary, neither the Trustee nor the registered owners shall have the right to waive an Event of Default under any of the Bond Documents which arises out of a violation of a Reserved Right of the Issuer without the prior written consent of the Issuer, which it shall give in its sole and complete discretion. Notwithstanding anything herein or in any other Bond Document to the contrary, nothing herein shall affect the Issuer's unconditional right to enforce its Reserved Rights.

Section 7.11.  <u>Notice of Default</u>.  The Trustee shall mail to the Issuer and all holders of Parity Debt and Subordinated Indebtedness written notice of the occurrence of any Event of Default of which the Trustee shall have knowledge within 30 days after such Event of Default shall have occurred and be known to it. If in any Bond Year the total amount of deposits to the credit of the Debt Service Funds shall be less than the amount required to have been so deposited under the provisions of this Indenture, the Trustee, on or before the 30th day of the immediately succeeding Bond Year, shall mail to all holders of Parity Debt and Subordinated Indebtedness a written notice of the failure to make such deposits.  The Trustee shall not be subject to any liability to any holder of Parity Debt or Subordinated Indebtedness or to the Issuer by reason of its failure to mail any notice required by this Section.

<div align="center">

ARTICLE VIII
<u>MODIFICATION OR AMENDMENT OF
INDENTURE, LOAN AGREEMENT AND MORTGAGE</u>

</div>

Section 8.01.  <u>Modification or Amendment Without Consent</u>.  Without notice to or the consent of the holders of Parity Debt or Subordinated Indebtedness, the Issuer and the Trustee may, from time to time and at any time, enter into a Supplemental Indenture supplementing, modifying or amending this Indenture or any Supplemental Indenture for one or more of the following purposes:

(a)     to grant to or confer upon the Trustee for the benefit of the holders of Parity Debt any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Trustee for the benefit of such holders, not otherwise inconsistent with this Indenture and the Loan Agreement;

(b)     to add to the covenants and agreements of the Issuer contained in this Indenture other covenants and agreements thereafter to be observed relative to the acquisition, construction, equipping, operation, maintenance, development or administration of the Property, or relative to the application, custody, use or disposition of the proceeds of Bonds, Parity Obligations or Subordinated Indebtedness;

(c)     to surrender any right, power or privilege reserved to or conferred upon the Issuer by this Indenture;

(d)     to confirm, as further assurance, any pledge under, and the subjection to any lien on, or claim or pledge of (whether created or to be created by this Indenture), any property pledged hereunder;

<div align="center">- 133 -</div>

(e)     to cure any ambiguity or to cure or correct any defect or inconsistent provisions contained in this Indenture or to make such provisions in regard to matters or questions arising under this Indenture as may be necessary or desirable and not contrary to or inconsistent with this Indenture;

(f)     to authorize the issuance of Additional Senior Bonds or to approve the issuance of Senior Parity Obligations, including (without limitation) any modifications or amendments required to grant to or otherwise secure for the holders of such Additional Senior Bonds and Senior Parity Obligations a parity interest in the security granted to the holders of the Series 2011 A Bonds and any other then Outstanding Senior Parity Debt in accordance with Section 2.13 of this Indenture and Section 8.11 of the Loan Agreement, respectively;

(g)     to authorize or approve the issuance of Subordinated Bonds or to approve the issuance of Subordinated Parity Obligations, including (without limitation) any modifications or amendments required to grant to or otherwise secure for the holders of such Subordinated Bonds and Subordinated Parity Obligations a parity interest in the security granted to the holders of the Series 2011 B Bonds and any other then Outstanding Subordinated Parity Debt in accordance with Section 2.19 of this Indenture and Section 8.22 of the Loan Agreement, respectively;

(h)     to authorize or approve the issuance of Subordinated Indebtedness in accordance with Section 2.20 hereof;

(i)     to authorize or approve the issuance of Special Senior Bonds or to approve the issuance of Special Senior Parity Obligations in accordance with Section 2.14 of this Indenture and Section 8.11 of the Loan Agreement, respectively;

(j)     to permit the qualification of this Indenture or any Supplemental Indenture under any federal statute now or hereafter in effect or under any state blue sky law and, in connection therewith, to add to this Indenture or any Supplemental Indenture such other terms, conditions and provisions as may be permitted or required by such federal statute or state blue sky law, if any such Supplemental Indenture has no materially adverse effect upon Holders of the Bonds then Outstanding;

(k)     to obtain or to maintain any ratings on Special Senior Parity Debt or Senior Parity Debt from any nationally recognized securities rating agency, if any such Supplemental Indenture has no material adverse effect upon Holders of the Bonds then Outstanding;

(l)     to make any other change in this Indenture, including (without limitation) any change necessary in connection with the issuance of any Subordinated Indebtedness, which shall not prejudice in any material respect the rights of the holders of the Parity Debt Outstanding at the date as of which such change shall become effective;

(m)     to provide for the issuance of certificated Bonds in coupon form or registered form;

(n)     to preserve the excludability from gross income for federal income tax purposes of the interest paid on any Tax-Exempt Bonds theretofore issued, if any such Supplemental Indenture has no materially adverse effect upon Holders of the Bonds then Outstanding;

(o)     to comply with any secondary market disclosure requirements;

(p)     to provide for a Substitute Letter of Credit; or

(q)     in connection with any other change in this Indenture which, in the judgment of the Trustee (which may be in reliance upon an opinion of counsel), does not prejudice or materially adversely affect the Holders of the Special Senior Parity Debt or Senior Parity Debt.

Before the Issuer and the Trustee enter into any Supplemental Indenture pursuant to this Section 8.01, there shall have been delivered to the Trustee, the Issuer and the Corporation an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by this Indenture and the Act, complies with their respective terms, will, upon the execution and delivery thereof, be valid and binding upon the Issuer in accordance with its terms and will not adversely affect (i) the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and (ii) the exemption of the Bonds from taxation in the Commonwealth.

Any modification of this Indenture that adversely affects the Corporation shall not be made without the prior written consent of the Corporation.

Section 8.02.   Supplemental Indentures Requiring Consent of Holders of Parity Debt.  In addition to Supplemental Indentures permitted by Section 8.01 hereof, with the prior written consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing this Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by this Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of this Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which

is required for modification of this Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of this Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of this Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of this Indenture, if there is outstanding any Special Senior Parity Debt, no amendment under this Section 8.02 may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)     If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)     The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by this Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)     If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

Section 8.03.  <u>Notation on Bonds</u>.  Bonds authenticated and delivered after the effective date of any Supplemental Indenture may, and if the Trustee or the Issuer so determines, shall, bear a notation by endorsement or otherwise in form approved by the Issuer and the Trustee of such action.  If the Trustee or the Issuer shall so determines, new Bonds modified as necessary,

in the opinion of the Trustee and the Issuer, to conform to such Supplemental Indenture shall be prepared, authenticated and delivered and, upon demand of the Holder of any Outstanding Bond and surrender of such Bond to the Trustee, such Bond shall be exchanged, without cost to such Holder, for a new Bond so modified.

Section 8.04. <u>Amendment of Loan Agreement and Mortgage</u>.

(a)     Without notice to or the consent of the holders of Parity Debt or Subordinated Obligations, the Corporation (with regards to the Mortgage), the Trustee, the Corporation and the Issuer (with regards to the Loan Agreement) may, at any time and from time to time, enter into any amendment, change or modification of the Loan Agreement or the Mortgage that is (i) required or permitted by the provisions of the Loan Agreement or the Mortgage, or (ii) required to cure any ambiguity or formal defect or omission therein, or (iii) permitted by Section 4.05 of the Loan Agreement with respect to amendments of the Facility or any Additional Facilities, or (iv) required or permitted pursuant to the provisions of (A) Section 2.13 in connection with the issuance of any Additional Senior Bonds, (B) Section 2.14 in connection with the issuance of Special Senior Bonds, (C) Section 2.19 in connection with the issuance of Subordinated Bonds, (D) Section 2.20 in connection with the issuance of Subordinated Indebtedness or (E) Section 5.06 in connection with the issuance of Parity Obligations, or (v) not prejudicial in any material respect to the rights of the holders of Parity Debt Outstanding at the effective date of such amendment, charge or modification in the judgment of the Trustee.

(b)     Before the Trustee, the Corporation and the Issuer enter into any modification, alteration, amendment or supplement to the Loan Agreement or the Mortgage pursuant to this Section, there shall have been delivered to the Issuer, the Corporation and the Trustee an opinion of Bond Counsel stating that such modification, alteration, amendment or supplement is authorized or permitted by this Indenture and the Act, complies with their respective terms, will, upon the execution and delivery thereof, be valid and binding upon the Issuer and the Corporation in accordance with its terms and will not adversely affect (i) the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code or (ii) the exemption of the Bonds from taxation in the Commonwealth.

(c)     Except as provided in subsection (a) of this Section, neither the Issuer, the Corporation nor the Trustee shall enter into any amendment, change or modification of the Loan Agreement or the Mortgage without the prior written consent of the Holders of a Majority of the Special Senior Parity Debt Outstanding and a Majority of the Senior Parity Debt Outstanding at the effective date of such amendment, change or modification <u>provided</u>, the prior written consent of the Holders of 66 2/3% of the Special Senior Parity Debt Outstanding and 66 2/3% of the Senior Parity Debt Outstanding shall be required for any change in the percentage of Holders of Special Senior Parity Debt or Senior Parity Debt the consent of 66 2/3% of which is required to modify or amend particular provisions of the Loan Agreement.  Written notice of each amendment pursuant to subsection (a) of this Section shall be provided by the Trustee to the holders of Parity Debt.

## ARTICLE IX
## DEFEASANCE

Section 9.01. <u>Defeasance</u>. (a)        If the Issuer shall pay or cause to be paid the principal or Redemption Price of and interest on all Parity Debt and Subordinated Indebtedness at the times and in the manner stipulated therein, in this Indenture and in any Supplemental Indenture authorizing or approving the issuance of any Additional Bonds, Parity Obligations or Subordinated Indebtedness, and pays or causes to be paid all other sums payable hereunder and thereunder including, without limitation, all Administrative Expenditures, then the pledge of any Revenues and other property hereby pledged to the Parity Debt and Subordinated Indebtedness and all other rights granted hereby to the Parity Debt and Subordinated Indebtedness shall be discharged and satisfied.  In such event, upon the request of the Issuer or the Corporation, the Trustee shall execute and deliver to the Issuer or the Corporation all such instruments as may be desirable to evidence such discharge and satisfaction, and the Trustee shall pay or deliver to the Corporation all property held by it pursuant to this Indenture (other than any moneys and securities required for the payment or redemption of Bonds, Parity Obligations or Subordinated Indebtedness not theretofore surrendered for such payment or redemption).  Notwithstanding anything herein to the contrary, if any Bonds are then rated by any Rating Agency, no such Bonds shall be deemed to have been paid and discharged by reason of any deposit unless each such Rating Agency shall have confirmed in writing to the Trustee that its rating will not be withdrawn or lowered as the result of any such deposit.

(b)        A Bond shall be deemed to be paid within the meaning of this Article IX and for all purposes of this Indenture when:

(i)        payment of the principal of and Redemption Price (if any) on such Bond, plus interest thereon (in the case of Variable Rate Bonds, calculated at the Maximum Rate if such Bonds then bear a Variable Rate and otherwise at the Fixed Rate) to the due date thereof (whether such due date is by reason of maturity or upon redemption as provided herein) shall have been either:

(A)        made or caused to be made in accordance with the terms thereof, or

(B)        provided for by irrevocably depositing with the Trustee in trust and irrevocably setting aside exclusively for such payment the following:

(1)        moneys sufficient, without reinvestment, to make such payment, and/or

(2)        Defeasance Obligations maturing as to principal and interest in such amounts and at such times as will insure the availability of sufficient moneys to make such payment; and

(c)        all necessary and proper fees, compensation and expenses of the Issuer and all Administrative Expenditures with respect to which such deposit is made shall have been paid or the payment thereof provided for to the satisfaction of the Trustee in case of payments due the Trustee and in all other cases as evidenced by a certificate from the person to whom

- 138 -

payment is due. At such times as a Bond shall be deemed to be paid hereunder, as aforesaid, such Bond shall no longer be secured by or entitled to the benefits of this Indenture, except for the purposes of any such payment from such moneys or Defeasance Obligations, as the case may be.

Notwithstanding the foregoing paragraph, no deposit under clause (i)(B) of subsection (b) above shall be deemed a payment of such Bond as aforesaid until:

(x)　　(1) if such Bond is to be redeemed, proper notice of redemption of such Bond shall have been previously given in accordance with Section 3.02 hereof or provision satisfactory to the Trustee shall have been made for the giving of such notice, (2) there shall have been delivered to the Trustee a report of an Independent Public Accountant verifying that the money and the principal of, and interest on, the Defeasance Obligations so deposited are sufficient to pay the principal and Redemption Price of, and interest on, the Bond through the applicable redemption date or maturity date, as the case may be, and (3) in the event such Bond is not to be paid or redeemed within the next succeeding 60 days, until the Corporation shall have given the Trustee in form satisfactory to the Trustee, irrevocable instructions to notify, as soon as practicable, the Holder of such Bond in accordance with Section 3.02 hereof, that the deposit required by (i)(B) above has been made with the Trustee and that such Bond is deemed to have been paid in accordance with this Article IX and stating the maturity or redemption date upon which moneys are to be available for the payment of the principal of and the applicable redemption premium (if any) on such Bond, plus interest thereon to the due date thereof; or

(y)　　the maturity of such Bond.

Notwithstanding the foregoing provisions, if a Letter of Credit is in effect, in order for this Indenture to be discharged with respect to the Variable Rate Bonds, (i) any money deposited with the Trustee as described above shall be proceeds of a drawing under the Letter of Credit or other Available Moneys and any Defeasance Obligations deposited with the Trustee pursuant to this Section shall be purchased with proceeds of a drawing under the Letter of Credit or other Available Moneys, and (ii) adequate provision shall have been made for the payment of the Purchase Price with Available Moneys (to the extent not paid by remarketing proceeds).

(d)　　Anything in this Indenture to the contrary notwithstanding, so long as no Event of Default has occurred and is continuing, any moneys held by the Trustee in trust for the payment of any of the Parity Debt or Subordinated Indebtedness which remain unclaimed for the applicable escheat period after the later of the date at which such Parity Debt or Subordinated Indebtedness became due and payable and the date of deposit of such moneys shall be repaid by the Trustee to the Corporation or to such officer, board or body as may then be entitled by law to receive such money; provided, however, that before being so applied, the Trustee may, at the expense of the Corporation, cause to be published in an Authorized New York Newspaper a notice that such moneys remain unclaimed and that, after a date named in such notice, which

- 139 -

date shall be not fewer than 40 nor more than 90 days after the date of publication of such notice, the balance of such moneys shall be returned to the Corporation. The registered owner shall thereafter look only to the Corporation for any claim of whatever nature on his part under this Indenture or on, or with respect to, such Parity Debt or Subordinated Indebtedness.

(e)     In the case of Variable Rate Bonds then bearing interest at a Variable Rate, when such Variable Rate Bonds shall have been deemed paid within the meaning of this Article IX and the stated expiration date of the Letter of Credit coincides with the stated maturity date or redemption date of the defeased Variable Rate Bonds, the Termination Date shall mean the stated expiration date of the Letter of Credit.

(f)     An Additional Bond, Parity Obligation or Subordinated Indebtedness shall be deemed to have been paid within the meaning of and with the effect expressed in this Section if it is deemed to be paid in accordance with the provisions thereof or of the Supplemental Indenture authorizing or approving the issuance thereof.

(g)     The Corporation's Letter of Credit Obligations shall be deemed paid when the Corporation's obligations under the Letter of Credit Agreement have been paid in full and the Letter of Credit has been returned to the Letter of Credit Provider.

ARTICLE X
MISCELLANEOUS

Section 10.01. [Reserved].

Section 10.02. Consent of Holders; Evidence of Signatures of Holders and Ownership of Parity Debt; Letter of Credit Provider. Any request, direction, consent or other instrument which this Indenture may require or permit to be signed and executed by the holders of Parity Debt may be in one or more instruments of similar tenor, and shall be signed or executed by such holders in person, by their attorneys duly appointed in writing or by their legal representatives. Except as otherwise expressly provided herein, proof of the execution of any such instrument or of an instrument appointing any such attorney or the holding by any person of such Parity Debt shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee and the Issuer with regard to any action taken by either under such instrument if made in the following manner, but the Trustee may nevertheless in its discretion require further or other proof in any case in which it deems such further or other proof desirable:

(a)     the fact and date of the execution by any holder of Parity Debt or his attorney or legal representative of such instrument may be proved by the certificate (which need not be acknowledged or verified) of an officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act that the person signing such instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer; and the authority of any person executing any such instrument on behalf of a corporate holder may be established without further proof if such instrument is signed by a person purporting to be the president or a vice

president of such corporation with a corporate seal affixed and attested by a person purporting to be its secretary or an assistant secretary, its cashier or an assistant cashier;

(b)     the ownership of Bonds and the amount, numbers and other identification and date of holding the same shall be proved by the registration books established with respect to such Bonds; and

(c)     the ownership of Parity Obligations and the amount, numbers and other identification and date of holding the same shall be proved in accordance with the Supplemental Indenture approving the issuance thereof.

Notwithstanding the foregoing provisions of this Section, (1) for as long as a Letter of Credit secures a Series of the Variable Rate Bonds, the Letter of Credit Provider shall be deemed the Holder of all of the Variable Rate Bonds Outstanding of such Series for the purposes of making any request or giving or withholding any consent, vote or direction permitted or required to be made or given by any Holder of the Variable Rate Bonds under this Indenture and (2) a Supplemental Indenture authorizing or approving the issuance of any Additional Bonds or Parity Obligations may provide that the issuer of any Credit Facility securing such Additional Bonds or Parity Obligations shall be deemed the holder of such Additional Bonds or Parity Obligations, as the case may be, for the purposes of making any request or giving or withholding any consent, vote or direction permitted or required to be made or given by any holder of such Additional Bonds or Parity Obligations, as the case may be, under this Indenture or such Supplemental Indenture.

Notwithstanding anything to the contrary contained in this Indenture, the Letter of Credit Provider shall not be entitled to make any request or give or withhold any consent, vote or direction permitted or required to be made by the Letter of Credit Provider if the Letter of Credit Provider fails to honor a drawing under the Letter of Credit (which drawing strictly complies with and conforms to the terms and directions of the Letter of Credit).

Any request, direction, consent or vote of the owner of any Parity Debt given in accordance with this Indenture or any Supplemental Indenture shall bind all future owners of such Parity Debt with respect to anything done or suffered to be done or omitted to be done by the Issuer or the Trustee in accordance therewith.

Section 10.03. <u>Preservation by Trustee and Inspection of Documents</u>.  All documents received by the Trustee from the Issuer, the Corporation, the holders of Parity Debt or Subordinated Indebtedness or otherwise under the provisions of this Indenture shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Issuer, the Corporation, any holder of Parity Debt, any holder of Subordinated Indebtedness and their agents and representatives, any of whom may make copies thereof at their expense.  The Trustee shall retain Requisitions, Completion Certificates and all supporting materials for the term of the applicable Series of Bonds and any applicable periods of limitations under federal law.

Section 10.04. <u>Moneys and Funds Held for Particular Parity Debt or Subordinated Indebtedness</u>.  Amounts held by the Trustee for the payment of the principal, Redemption Price of and interest on Parity Debt or Subordinated Indebtedness due on any date shall, pending such

\29695489.18

payment, be set aside and held in trust by it (without liability for interest thereon) for the holders of such Parity Debt or Subordinated Indebtedness (as the case may be) and, for the purposes of this Indenture, such principal or Redemption Price of and interest on such Parity Debt or Subordinated Indebtedness, due after such date, shall no longer be considered to be unpaid.

Section 10.05. <u>No Recourse on Parity Debt or Subordinated Indebtedness</u>.  No recourse shall be had for the payment of the principal, Redemption Price of and interest on the Parity Debt or any Subordinated Indebtedness or for any claims based thereon or on this Indenture against any elected or appointed member, director, officer, attorney, agent, official or employee of the Issuer, all such liability, if any, being expressly waived and released by every Holder of Parity Debt and Subordinated Indebtedness by the acceptance of such Parity Debt and Subordinated Indebtedness.

Section 10.06. <u>Issuer Protected in Acting in Good Faith</u>.  In the exercise of the powers of the Issuer and its officials, officers, employees and agents under this Indenture or the Loan Agreement, and including, without limitation, the application of moneys, the investment of funds, the assignment or other disposition of the Trust Estate in the event of an Event of Default by the Corporation, neither the Issuer nor its members, directors, officials, officers, employees and agents shall be accountable to the Corporation, the Trustee or any holder of any Parity Debt or Subordinated Indebtedness for any action taken or omitted by it or its officials, officers, employees and agents in good faith and believed in good faith by it or them to be authorized or within the discretion or rights or powers conferred hereby or by the Loan Agreement.

No recourse shall be had by the Corporation, the Trustee or any holder of any Parity Debt or Subordinated Indebtedness for any claims based on this Indenture, the Loan Agreement or the Mortgage or on any Bond, Parity Obligation, Subordinated Indebtedness, or any Credit Facility (or any agreement pursuant to which any Credit Facility is issued) against any official, officer, employee or agent of the Issuer alleging personal liability on the part of such person unless such claims are based upon the bad faith, fraud or deceit of such person.

The Issuer and its members, directors, officials, officers, employees and agents shall be protected and shall incur no liability in acting or proceeding, or in not acting or not proceeding, in good faith, reasonably and in accordance with the terms of this Indenture, the Loan Agreement upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other document that it or they shall in good faith reasonably believe to be genuine and to have been adopted or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture or the Loan Agreement, or upon the written opinion of any counsel, architect, engineer, insurance consultant, management consultant or accountant believed by it or them to be qualified in relation to the subject matter, and it and they shall be under no duty to make any investigation or inquiry into any statements contained or matters referred to in any such instrument.  The Issuer and its members, directors, officials, officers, employees and agents may consult with counsel, who may or may not be Bond Counsel, counsel to the Issuer or counsel to the Corporation, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it or them in good faith and in accordance therewith.

\29695489.18

Whenever the Issuer or its members, directors, officials, officers, employees or agents shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action under this Indenture, the Loan Agreement or the Mortgage, such matter may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Corporation, unless other evidence with respect thereto is specifically required under this Indenture, the Loan Agreement or the Mortgage. Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof, but in its discretion the Issuer or its officers, officials, employees or agents may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it or they may deem reasonable. Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Issuer or the Corporation shall be sufficiently executed if executed in the name of such person by an Authorized Officer thereof.

Section 10.07. <u>Reserved</u>.

Section 10.08. <u>Actions to be Taken by Trustee</u>. Except for the Reserved Rights of the Issuer, all references in this Indenture or the Loan Agreement to actions taken or to be taken by the Issuer under or with respect to the Loan Agreement or the Mortgage shall be deemed to be references to the Trustee, and the Loan Agreement and this Indenture shall be deemed to constitute a trust agreement among the Issuer, the Corporation and the Trustee, solely for the benefit of the Holders of Parity Debt.

Section 10.09. <u>Severability of Invalid Provision</u>. If any covenant or agreement provided in this Indenture on the part of the Issuer or the Trustee to be performed should be contrary to law, then such covenant or agreement shall be null and void and shall in no way affect the validity of the other provisions of this Indenture or of the Parity Debt or any Subordinated Indebtedness.

Section 10.10. <u>Notices</u>. Except as otherwise provided in this Indenture, all notices, demands, requests, consents, approvals, certificates or other communications required under this Indenture shall be in writing and shall be sufficiently given and shall be deemed to have been properly given upon receipt after the same is faxed followed by first class mail, hand delivered or sent by overnight delivery or mailed by certified mail, postage prepaid, return receipt requested, addressed to the person to whom any such notice, demand, request, consent, approval, certificate or other communication is to be given, at the appropriate address for such person designated below:

| | |
|---|---|
| Issuer: | MASSACHUSETTS DEVELOPMENT FINANCE AGENCY |
| | 160 Federal Street, 7th Floor |
| | Boston, Massachusetts 02110 |
| | Attention: Executive Director |
| | Fax: 617-330-2001 |
| | |
| Corporation: | Linden Ponds, Inc. |
| | c/o Erickson Living Management, LLC |

701 Maiden Choice Lane
Baltimore, Maryland 21228
Attention:  General Counsel
Fax:  410-402-2350

with a copy to:

Herman B. Rosenthal, Esquire
Whiteford, Taylor & Preston L.L.P.
7 St. Paul Street, Suite 1500
Baltimore, Maryland 21202
Fax:  410-347-9414

Letter of Credit Provider: with a copy to:

[Bank]
[address]

Attn:
Fax:

Trustee, Registrar and Paying Agent: Wells Fargo Bank, National Association
[address]

Attention:
Fax:

Remarketing Agent: B.C. Ziegler and Company
[address]

Attention:
Fax:

Rating Agencies: Standard & Poor's Rating Services
Public Finance Department
55 Water Street, 40th Floor
New York, NY  10041-0003
Fax: 212-438-2128
Email:  nyloc@standardandpoors.com

Fitch Ratings Ltd.
One State Street Plaza
New York, NY  10004
Fax: 212-480-4435

 The parties listed above may from time to time, by giving written notice to the others, designate different addresses to which notices, demands, requests, consents, approvals, certificates or other communications and copies thereof shall be given.

In case, by reason of the suspension of publication of any Authorized New York Newspaper, or by reason of any other cause, it shall be impossible to make publication of any notice in an Authorized New York Newspaper as required by this Indenture, then the Trustee shall mail or deliver such notice to all holders of Parity Debt and such mailing or delivery shall constitute a sufficient publication of such notice.

Section 10.11. [Reserved].

Section 10.12. Business Days.  Except as otherwise expressly provided herein, if any date specified herein for the payment of any Bond or the performance of any act shall not be a Business Day, such payment or performance shall be made on the next succeeding Business Day with the same effect as if made on such date.

Section 10.13. Execution in Several Counterparts.  This Indenture may be executed in any number of counterparts, each of which shall be deemed to be an original for all purposes; and all such counterparts shall together constitute but one and the same instrument.

Section 10.14. Governing Law.  This Indenture shall be governed by and construed in accordance with the laws of the Commonwealth.

Section 10.15. Intention as to Contract.  It is intended that this Indenture, when signed on behalf of the Issuer and the Trustee and duly delivered between them, shall constitute a contractual obligation under the laws of the Commonwealth with force and effect as an agreement and indenture of trust.

Section 10.16. Effective Date.  This Indenture has been dated as of the date first above written solely for the purpose of convenience of reference and shall become effective upon its execution and delivery on the Closing Date by the parties hereto.  All representations and warranties set forth herein shall be deemed to have been made on the Closing Date.

Section 10.17. Certain Notices to Rating Agencies.  The Trustee hereby agrees to inform each of the Rating Agencies maintaining a rating on any Series of Bonds in writing of (a) any amendment, modification or supplement to the documents executed and delivered in connection with the Bonds to which it is a party or of which it has actual knowledge, (b) payment of the principal, interest and premium, if any, of all of the Bonds upon redemption, mandatory purchase or acceleration of all Outstanding Bonds pursuant to this Indenture, (c) expiration, termination, extension or substitution of the Letter of Credit, (d) any change in the identity of the Trustee or the Remarketing Agent, and (e) any conversion of the interest rate on any Series of Bonds. Notwithstanding the foregoing provisions of this Section 10.17, it is expressly understood and agreed that the Trustee agrees to give the notices described above and to forward to the Rating Agencies copies of such notices that the Trustee specifically agrees herein to forward as a matter of courtesy and accommodation, but shall not be liable or have any legal or contractual obligation to any of the Rating Agencies to provide the notices described above or in this Indenture.

Section 10.18. Certain References Ineffective Except During a Credit Facility Period. Except during a period in which a Letter of Credit is in effect and during the period immediately after a period in which a Letter of Credit is in effect, until receipt by the Trustee of a certificate

from the Letter of Credit Provider stating that all amounts payable to the Letter of Credit Provider under the Letter of Credit Documents, the Bond Documents and the Collateral Documents have been paid in full and that the Corporation has no further obligations to the Letter of Credit Provider thereunder, all references to the Letter of Credit Provider, the Letter of Credit Agreement or the Letter of Credit in the Loan Agreement, this Indenture and the Bonds shall be ineffective.

*[SIGNATURES APPEAR ON FOLLOWING PAGES.]*

**IN WITNESS WHEREOF**, the Issuer has caused this Indenture to be signed in its name as a sealed instrument by an Authorized Officer of the Issuer, and Wells Fargo Bank, National Association, as Trustee, has caused this Indenture to be signed in its corporate name by its authorized officers, all as of the day and year first above written.

<div align="center">

**MASSACHUSETTS DEVELOPMENT
FINANCE AGENCY**

</div>

By: _____

<div align="center">

*[SIGNATURE OF WELLS FARGO BANK, NATIONAL ASSOCIATION
APPEARS ON THE FOLLOWING PAGE.]*

</div>

<div align="center">

Signature Page to the Trust Indenture

</div>

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By: _____
　　　Authorized Representative

Signature Page to the Trust Indenture

**APPENDIX A**
**to Trust Indenture**

**[RESERVED]**

**FORM OF SERIES 2011 A-1 BOND**
[For Non-Bank Holders]

PRIOR TO THE RATING CONFIRMATION (HEREINAFTER DEFINED), THIS SERIES 2011 A-1 BOND IS ONLY TRANSFERABLE TO (1) A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION COMPLYING WITH RULE 144A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND (2) AN ACCREDITED INVESTOR WITHIN THE MEANING OF SECTION 2(15) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND IN THE CASE OF CLAUSE (2) ONLY, UPON EXECUTION AND DELIVERY OF AN INVESTOR LETTER.

REGISTERED                                                       REGISTERED
RA-1-___                                                         $_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BOND
(LINDEN PONDS, INC. FACILITY)
SERIES 2011 A-1 (TAX-EXEMPT)

| Interest Rate | Dated Date | Maturity Date | CUSIP |
|---|---|---|---|
| 6.25% | _____ , 2011 | November 15, 20__ | |

Registered Owner:      CEDE & CO.
Principal Sum:         _____DOLLARS
                       ($_____)

THIS BOND DOES NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF AND INTEREST AND PREMIUM, IF ANY, ON THIS BOND ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), for value received, hereby promises to pay, at the Designated Office (as hereinafter defined) of WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee, or its successor in trust (the "Trustee"), solely from the sources and as hereinafter provided, to the Registered Owner hereof, or registered assigns or legal representative, the Principal Sum stated above on the Maturity Date stated above, subject to prior redemption as hereinafter provided, and to pay interest on said sum at the rate set forth above and on the dates described below and, to the extent permitted by law,

interest on overdue installments of such interest at the same rate as provided herein. This Bond shall bear interest at the Interest Rate per annum shown above until said principal sum is paid, calculated on the basis of a year consisting of twelve 30-day months and payable commencing on November 15, 2011 and thereafter on May 15 and November 15 of each year and on the Resizing Tender Date (as hereinafter defined) (each, an "Interest Payment Date"). All Series 2011 A-1 Bonds (as hereinafter defined) shall bear interest (i) from their date of issuance, if authenticated prior to November 15, 2011, or (ii) otherwise from the May 15 or November 15 that is, or that immediately precedes, the date on which any such Series 2011 A-1 Bond is authenticated (unless payment of interest is in default, in which case such Series 2011 A-1 Bonds shall bear interest from the date to which interest has been paid).

The principal of, premium, if any, and interest on this Series 2011 A-1 Bond shall be payable in lawful money of the United States of America. Principal of and premium, if any, on this Series 2011 A-1 Bond shall be payable upon its presentation and surrender at the Designated Office of the Trustee. Interest on this Series 2011 A-1 Bond shall be payable to the Owner as of the Record Date by (a) check mailed to the address of the Owner as it appears on the registration books maintained by the Trustee or (b) by bank wire transfer to the Owner of $500,000 or more of Series 2011 A-1 Bonds who has provided the Trustee with written instructions on or before the Record Date.

1. <u>The Bonds; the Indenture</u>. This Bond is one of a duly authorized series of Bonds designated its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-1 Bonds"). Simultaneously with the issuance of the Series 2011 A-1 Bonds, the Issuer has issued its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-2 Bonds"), and its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 B Bonds") and has amended, restated and reissued its "Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand, Series 2007 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2007 B Bonds", and together with the Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds, and the Series 2011 B Bonds, the "Series 2011 Bonds"). The Series 2011 Bonds and any Additional Bonds (as defined in the Indenture) are, collectively, the "Bonds." The Series 2011 Bonds have been issued under Massachusetts General Laws, Chapters 23G and 40D, as amended (the "Act"), and the Amended and Restated Trust Indenture dated as of _____, 2011 (the "Indenture"), between the Issuer and the Trustee. The terms of the Series 2011 Bonds include those stated in the Indenture, and the Series 2011 Bonds are subject to all such terms. The Indenture describes the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Issuer, the Trustee and the Owners of the Series 2011 Bonds.

2. <u>Loan Agreement; Mortgage; Revenues</u>. The Issuer has entered into an Amended and Restated Loan Agreement dated as of _____, 2011 (the "Loan Agreement"), with Linden Ponds, Inc. (the "Corporation"), pursuant to which the Issuer is deemed to have made a loan to the Corporation by virtue of the issuance of the Series 2011 Bonds. Pursuant to the Loan

Agreement, the Corporation has agreed to pay the principal of and premium, if any, and interest on the Series 2011 Bonds and any Additional Bonds and Parity Obligations (as defined in the Indenture) as set forth therein. As security for the obligations of the Corporation under the Loan Agreement, (1) the Corporation has granted a lien and claim on and security interest in the Receipts (as defined in the Indenture) to the Issuer pursuant to the Loan Agreement, subject to certain Permitted Encumbrances (as defined in the Indenture), and (2) the Corporation has executed and delivered an amended and restated mortgage and security agreement dated as of _____ 1, 2011 (the "Mortgage"), to the Trustee and its assigns.

The Revenues (as hereinafter defined) are pledged under the Indenture for the equal and ratable benefit of the Owners from time to time of Parity Debt (as hereinafter defined), except to the extent set forth in the Indenture. As defined in the Indenture, the "Revenues" include (i) all payments to the Issuer or the Trustee pursuant to the Loan Agreement and the Mortgage, including without limitation payments from the Receipts and (ii) all other receipts of the Issuer or the Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 (each as defined in the Indenture) with the proceeds of Bonds (as defined in the Indenture); provided, however, that Revenues do not include Reserved Rights of the Issuer (as defined in the Indenture).

3. <u>Additional Parity Debt</u>. The Indenture provides that Additional Bonds and Parity Obligations may be issued within the limitations and provisions of the Indenture. The Bonds and any Parity Obligations are referred to, collectively, as "Parity Debt." All Parity Debt issued within the limitations and provisions of the Indenture shall be designated as Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt and shall be secured by the Revenues, the Property and other property pledged by the Corporation, as more particularly described in the Indenture.

4. <u>The Series 2011 A-1 Bonds</u>. All the Series 2011 A-1 Bonds are of like tenor except as to number, principal amount, maturity and redemption provisions. The Series 2011 A-1 Bonds are issuable only in registered form without coupons in denominations of $100,000 or any integral multiple of $1 in excess of $100,000 ("Authorized Denominations"), <u>provided</u> that if the Series 2011 A-1 Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Series 2011 A-1 Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and <u>provided further</u> that any Series 2011 Bonds issued in exchange for Series 2007 Bonds, including the exchange of Series 2011 Bonds for Series 2007 Bonds to Owners holding a beneficial interest of such Series 2007 Bonds on the Closing Date, and any transfer of such Series 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an Authorized Denomination.

5. <u>Redemption</u>. The Series 2011 A-1 Bonds at the time outstanding may be redeemed prior to their respective maturities as follows:

   (a) <u>Optional Redemption</u>. The Series 2011 A-1 Bonds are subject to redemption prior to maturity on and after December 31, 2018, by the Issuer upon the written direction of the Corporation as a whole or in part at any time, at a redemption price equal to a percentage of

<div align="center">B-3</div>

the principal amount of the Series 2011 A-1 Bonds to be redeemed, as set forth in the following table, plus accrued interest thereon to the redemption date:

| Redemption Period (both dates inclusive) | Redemption Price |
|---|---|
| December 31, 2018 to June 30, 2019 | 105% |
| July 1, 2019 to December 31, 2019 | 104 |
| January 1, 2020 to June 30, 2020 | 103 |
| July 1, 2020 to December 31, 2020 | 102 |
| January 1, 2021 to June 30, 2021 | 101 |
| July 1, 2021 and thereafter | 100 |

(b)     Mandatory Sinking Fund Redemption.

The Series 2011 A-1 Bonds are subject to redemption prior to maturity at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date from mandatory Sinking Fund Installments (defined in the Indenture) paid from the Sinking Fund Account (created by the Indenture) on November 15 of the following years in the following amounts:

SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2013

| Year | Principal Amount | Year | Principal Amount |
|---|---|---|---|
| 2012 | $[593,065] | 2013* | $[266,964] |

_____
*Final Maturity

SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2014

| Year | Principal Amount | Year | Principal Amount |
|---|---|---|---|
| 2013 | $[363,167] | 2014* | $[529,128] |

_____
*Final Maturity

SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2017

| Year | Principal Amount | Year | Principal Amount |
|---|---|---|---|
| 2014 | $[140,387] | 2016 | $[755,818] |
| 2015 | [711,359] | 2017* | [269,818] |

_____
*Final Maturity

B-4

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2018

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2017 | $[533,240] | 2018* | $[462,249] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2019

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2018 | $[390,999] | 2019* | $[649,211] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2020

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2019 | $[257,366] | 2020* | $[831,712] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2021

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2020 | $[131,526] | 2021* | $[1,010,477] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2026

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2021 | $[12,963] | 2024 | $[1,227,578] |
| 2022 | [1,087,405] | 2025 | [1,304,302] |
| 2023 | [1,155,368] | 2026* | [392,026] |

_____
*Final Maturity

\29695489.18

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2031

| Year | Principal Amount | Year | Principal Amount |
|------|------|------|------|
| 2026 | $[993,795] | 2029 | $[1,662,241] |
| 2027 | [1,472,435] | 2030 | [1,766,131] |
| 2028 | [1,564,462] | 2031* | [765,377] |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2039

| Year | Principal Amount | Year | Principal Amount |
|------|------|------|------|
| 2031 | $[1,111,137] | 2036 | $[2,540,952] |
| 2032 | [1,993,796] | 2037 | [2,699,762] |
| 2033 | [2,118,408] | 2038 | [2,868,497] |
| 2034 | [2,250,809] | 2039* | [951,809] |
| 2035 | [2,391,484] | | |

_____
*Final Maturity

## SERIES 2011 A-1 BONDS MATURING NOVEMBER 15, 2046

| Year | Principal Amount | Year | Principal Amount |
|------|------|------|------|
| 2039 | $[2,095,969] | 2043 | $[3,884,177] |
| 2040 | [3,238,264] | 2044 | [4,126,938] |
| 2041 | [3,440,655] | 2045 | [4,384,872] |
| 2042 | [3,655,696] | 2046* | [4,658,927] |

_____
*Final Maturity

(c)     Extraordinary Redemption.     The Series 2011 A-1 Bonds are subject to extraordinary redemption prior to maturity as a whole at any time or in part on any Interest Payment Date, at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date, from funds deposited in the Redemption Fund (created by the Indenture) from (i) proceeds received by the Corporation from title insurance with respect to the Property (defined in the Indenture); (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments received in connection with the loss, damage or destruction of the Property, in each case to the extent such

proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.

(d)  Selection of Bonds to Be Redeemed.  If fewer than all of the Series 2011 A-1 Bonds shall be called for redemption, the Trustee shall select the particular Series 2011 A-1 Bonds or portions of the Series 2011 A-1 Bonds to be redeemed by lot or in such other manner as the Trustee in its discretion may deem proper; provided, however, that the portion of any Series 2011 A-1 Bond to be redeemed shall be in Authorized Denominations; and provided further that, in selecting the Series 2011 A-1 Bonds for redemption, the Trustee shall treat each Bond as representing that number of Series 2011 A-1 Bonds which is obtained by dividing the principal amount of such Series 2011 A-1 Bond by $5,000.  Money available for the redemption of Parity Debt shall be allocated to the Series 2011 Bonds, the Series 2007 Bonds and to any Additional Bonds and Parity Obligations outstanding under the Indenture in the manner provided in the Indenture.

(e)  Notice of Redemption.  The Trustee shall mail notice of the call for any redemption by first-class mail at least 30 days before the redemption date to the registered owners of the Series 2011 A-1 Bonds; provided, however, that so long as the Series 2011 A-1 Bonds are maintained in book-entry form, notice of the call for redemption required to be given to the registered owners shall be given only to the securities depository or its nominee in whose name the Series 2011 A-1 Bonds are registered.  The failure to mail any such notice to any registered owner of the Series 2011 A-1 Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Series 2011 A-1 Bonds.  If for any reason it is impossible or impractical to mail such notice of redemption, the Trustee shall give notice of the call for any redemption by publication at least once in a daily newspaper of general circulation in the Borough of Manhattan, City and State of New York, or a financial journal published in such Borough, which notice shall be published at least 30 days before the redemption date.  In the event notice is published as provided above, the mailing of notice to the registered owners of the Series 2011 A-1 Bonds to be redeemed shall not be a condition precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of the Series 2011 A-1 Bonds.

(f)  Effect of Call for Redemption.  On the date designated for redemption, notice having been given as provided herein, the Series 2011 A-1 Bonds or portions of the Series 2011 A-1 Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Series 2011 A-1 Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price and accrued interest are held by the Trustee as provided in the Indenture, interest on such Series 2011 A-1 Bonds or such portions thereof so called for redemption shall cease to accrue, such Series 2011 A-1 Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under the Indenture, and the registered owners thereof shall have no rights in respect of such Series 2011 A-1 Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof and the accrued interest thereon so held by the Trustee.  If a portion of this Bond shall be called for redemption, a new Series 2011 A-1 Bond or Series 2011 A-1 Bonds in the aggregate principal amount equal to the unredeemed portion

hereof, of the same series and maturity and bearing interest at the same rate, shall be issued to the registered owner upon the surrender hereof.

(g)  Provisions Applicable to Book-Entry Bonds.  So long as all of the Series 2011 A-1 Bonds shall be maintained in Book-Entry Form with a Depository (as defined in the Indenture) in accordance with the Indenture, in the event that part, but not all, of this Bond shall be called for redemption, the holder of this Bond may elect not to surrender this Bond in exchange for a new Series 2011 A-1 Bond in accordance with subsection (f) above. For all purposes, the principal amount of this Bond outstanding at any time shall be equal to the lesser of (A) the Principal Sum shown on the face hereof and (B) such Principal Sum reduced by the principal amount of any partial redemption of this Bond following which the holder of this Bond has elected not to surrender this Bond in accordance with this subsection (g).  THEREFORE, IT CANNOT BE DETERMINED FROM THE FACE OF THIS BOND WHETHER A PART OF THE PRINCIPAL OF THIS BOND HAS BEEN PAID.

6.  Mandatory Tender and Exchange.  The Series 2011 A-1 Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  "Resizing Tender Date" means unless the Corporation's right to require a Resizing Event is terminated as provided in Section 4.05 of the Loan Agreement or the Independent Resizing Consultant determines upon a Resizing Event pursuant to the Indenture that no resizing of the Series 2011 A Bonds is necessary (in each such case, there shall be no Resizing Tender Date), the date which is 45 days after the later of (a) the date on which the Resizing Event occurs and (b) the date on which the Corporation has delivered the Certificate to the Trustee pursuant to Section 4.10 of the Loan Agreement, at which time the Series 2011 A Bonds shall be subject to mandatory tender and exchange in accordance with Section 2.04 of the Indenture.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Series 2011 A-1 Bonds.  Such notice shall state: (1) that a Resizing Event has occurred, the date that is the Resizing Tender Date and the percentage of the resize; (2) that the Series 2011 A-1 Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the Owners do not have a right to waive the mandatory tender of the Series 2011 A-1 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2011 A-1 Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Resizing Tender Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2011 A-1 Bonds pursuant to the Indenture, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2011 A-1 Bonds so tendered will be exchanged for new Series 2011 A-1 Bonds on the Resizing Tender Date; and (4) that, as of the Resizing Tender Date, the Series 2011 A-1 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2011 A-1 Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under the Indenture, except to receive new Series 2011 A-1 Bonds in exchange therefor as provided in the Indenture.

Any Series 2011 A-1 Bond to be exchanged on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for exchange and to have been exchanged

for new Series 2011 A-1 Bonds in accordance with the Indenture. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2011 A-1 Bond or Bonds in the aggregate principal amount set forth in the Indenture to the Owner of the Series 2011 A-1 Bond deemed to have been tendered and exchanged; (B) such Series 2011 A-1 Bond deemed to have been tendered and purchased shall no longer be Outstanding under the Indenture; (C) interest on such Series 2011 A-1 Bond deemed to have been tendered and purchased shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Series 2011 A-1 Bond shall cease to be entitled to the benefits and security of the Indenture as of the date on which such Series 2011 A-1 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2011 A-1 Bond by the Owner thereof.

On the Resizing Tender Date, the Series 2011 A-1 Bonds tendered or deemed tendered shall be exchanged for Series 2011 A-1 Bonds resized in principal amount determined by the Independent Consultant in accordance with the Indenture. Any accrued and unpaid interest on the Series 2011 A-1 Bonds as of the Resizing Tender Date shall be due and payable as set forth in the Indenture.

"Resizing Event" means the occurrence of any one of the following:

(a)     if the Corporation never satisfies the Commencement Test on or before February 29, 2016, the date of delivery of the Corporation's audited financial statements for Fiscal Year 2015;

(b)     if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements for the earlier of:

   (1)     the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and

   (2)     Fiscal Year 2017;

(c)     if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2020, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for the earlier of:

   (1)     the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and

   (2)     the Fiscal Year in which the Construction Loan is repaid;

(d)     if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and the Corporation is not in default of its obligation to proceed with construction of Residential Building 2.5 under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of:

     (1)     the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and

     (2)     Fiscal Year 2016; and

(e)     if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends.

(f)     Notwithstanding subsections (a) through (e) above, any pending Resizing Event may be extended due to a Good Cause Delay as provided in Section 6.04 of the Loan Agreement.

"Resizing Financial Statements" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if the Corporation's audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the August 31 immediately following such Fiscal Year and the Holders of the Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use the Corporation's unaudited financial statements from such Fiscal Year reviewed by the Corporation's auditor under an agreed upon procedures letter or some other arrangement approved by the Holders of a majority in aggregate principal amount of the Senior Parity Debt.

7.     <u>Acceleration; Defeasance</u>.  In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Series 2011 Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon.

The Indenture prescribes the manner in which it may be discharged and provides that the Series 2011 Bonds shall be deemed to be paid if moneys or Defeasance Obligations (as defined in the Indenture), the principal of and interest on which, when due, will be sufficient to pay the principal or redemption price of and interest on such Series 2011 Bonds to the date of maturity or redemption thereof, shall have been deposited with the Trustee.

8.     <u>Persons Deemed Owners; Restrictions upon Actions by Individual Holders</u>.  The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Issuer or the Trustee) for the purpose of receiving payment of or on account of the principal or redemption price of this Bond, and for all other purposes except as otherwise provided herein with respect to the payment of interest on this Bond, and neither the Issuer nor the Trustee shall be affected by any notice to the contrary.  All such payments so made to any such registered owner, or upon his

<div align="center">B-10</div>

order, shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable under this Bond.

The registered owner of this Bond shall have no right to enforce the provisions of the Indenture, or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect hereto, except as provided in the Indenture.

9.    Amendment.    Certain amendments to the Indenture are permitted without the consent of the Holders of Parity Debt, including this Bond.  In addition, with the prior written consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing the Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by the Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of the Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of the Indenture, if there is outstanding any Special Senior Parity Debt, no amendment under this Section may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)    If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the

proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)    The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by the Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)    If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

10.    <u>Transfer and Exchange</u>.  This Bond may be exchanged for an equal aggregate principal amount of the Series 2011 A-1 Bonds, of other authorized denominations, and the transfer of this Bond may be registered, upon presentation and surrender of this Bond at the designated corporate trust office of the Trustee in _____, together with an assignment duly executed by the registered owner hereof or such owner's attorney or legal representative.  Prior to the Rating Confirmation (as hereinafter defined), the Registered Owner of this Bond shall not be permitted to transfer or sell this Bond other than to (a) an Accredited Investor within the meaning of Section 2(15) of the Securities Act of 1933, as amended, upon the execution and delivery to the Trustee of an Investor Letter in the form attached to this Bond or (b) a Qualified Institutional Buyer within the meaning of Section 144 of the Securities Act of 1933, as amended.  "Rating Confirmation" shall mean confirmation that the Bonds are rated in a rating category not lower than "Ba" by Moody's Investors, Inc., "BB-" by Standard & Poor's Rating Services or "BB-" by Fitch Ratings.  The Issuer and the Trustee may require the person requesting any such exchange or transfer to reimburse them for any tax or other governmental charge, shipping charge or insurance payable in connection therewith.  Neither the Issuer nor the Trustee shall be required to register the transfer of this Bond or make any such exchange of this Bond after this Bond or any portion hereof has been selected for redemption.

11.    <u>Modifications</u>. Modifications or alterations of the Indenture, the Loan Agreement or the Mortgage may be made only to the extent and in the circumstances permitted by the Indenture, the Loan Agreement and the Mortgage.

12.     Negotiability.  As declared by the Act, this Bond shall be and be deemed to be for all purposes a negotiable instrument subject only to the provisions for registration and registration of transfer stated herein.

13.     Governing Law.  This Bond shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

14.     Notices.  Except as otherwise provided in the Indenture and this Bond, when the Trustee is required to give notice to the owner of this Bond, such notice shall be mailed by first-class mail to the registered owner of this Bond at such owner's address as it appears on the registration books maintained by the Trustee.  Any notice mailed as provided herein will be conclusively presumed to have been given, whether or not actually received by the addressees.

Neither the members of the Issuer nor any person executing this Bond are liable personally hereon or subject to any personal liability or accountability by reason of the issuance hereof.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]*

**IN WITNESS WHEREOF**, Massachusetts Development Finance Agency has caused this Bond to be executed in its name as a sealed instrument.

<div align="center">

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY**

</div>

By:_____
    Authorized Officer

\29695489.18

## CERTIFICATE OF AUTHENTICATION

Date of Authentication:

This Bond is one of the Bonds of the Series designated herein and issued under the provisions of the within-mentioned Indenture.

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By:_____
        Authorized Officer

(FORM OF ASSIGNMENT)


FOR VALUE RECEIVED, _____, the undersigned, hereby sells, assigns and transfers unto _____ (Tax Identification or Social Security No. _____) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.


Dated:_____          _____

                                     NOTICE: The signature
                                     to this assignment must
                                     correspond with the
                                     name as it appears upon
                                     the face of the within
                                     Bond in every particular,
                                     without alteration or
                                     enlargement or any
                                     change whatsoever.


SIGNATURE GUARANTEED:


_____
NOTICE:  Signature(s) must be guaranteed
by a member of The New York Stock
Exchange or a commercial bank or trust
company.


B-16

\29695489.18

**FORM OF INVESTOR LETTER**

[Letterhead of Investor]

[Date]

Massachusetts Development Financing Agency      Wells Fargo Bank, National
Association
160 Federal Street, 7th Floor                       [Address]
Boston, Massachusetts 02110
Attention: Executive Director

      Re:      Massachusetts Development Financing Agency Revenue Bond (Linden Ponds,
              Inc. Facility) Series 2011 (the "Bond")

Ladies and Gentlemen:

The undersigned (the "Investor") hereby represents and warrants to you as follows:

1.      The Investor proposes to purchase the Bond. The Investor understands that the Bond has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or the securities laws of any state, and will be sold to the Investor in reliance upon certain exemptions from registration and in reliance upon the representations and warranties of the Investor set forth herein. Capitalized terms used herein shall have the meaning given to them in the Bond.

2.      The Investor has sufficient knowledge and experience in business and financial matters in general, and investments such as the Bond in particular, and is capable of evaluating the merits and risks involved in an investment in the Bond. The Investor is able to bear the economic risk of, and an entire loss of, an investment in the Bond.

3.      The Investor is purchasing the Bond solely for its own account for investment purposes and has no intention to resell or distribute all or any portion of, or interest in, the Bond; provided that the Investor reserves the right to transfer or dispose of the Bond at any time, and from time to time, in its complete and sole discretion, subject, however, to the restrictions described in paragraphs 4, 5 and 6 of this letter.

4.      The Investor agrees that it will only offer, sell, pledge, transfer or exchange the Bond (or any legal or beneficial interest therein) in whole, and then only (i) in accordance with an available exemption from the registration requirements of Section 5 of the 1933 Act, (ii) in accordance with any applicable state securities laws, and (iii) in accordance with the provisions of the Bond.

5.      The Investor is an "accredited investor" as defined in Section 2(15) of the 1933 Act and understands that, prior to the Rating Confirmation, the Bond may be offered, resold, pledged or transferred only to a person who is a "qualified institutional buyer," within the meaning of Section 144 of the 1933 Act or to an "accredited investor" as defined in Section 2(15) of the 1933 Act and in compliance with the Bond and applicable state securities laws.

6.      If the Investor sells the Bond (or any legal or beneficial interest therein) prior to the Rating Confirmation to an accredited investor that is not a qualified institutional buyer as described in paragraph 5, the Investor or its agent will obtain for your benefit, and deliver to you, from such accredited investor an Investor Letter in the form of this letter or such other materials (including, but not limited to, an opinion of counsel) as are required by you to evidence compliance of such sale and purchase with the requirements of the 1933 Act effecting an exemption from registration. The Investor hereby indemnifies the Issuer and the Trustee against any failure by the Investor to transfer the Bond in accordance with the restrictions relating thereto set forth in the Bond.

Very truly yours,

**[Name of Investor]**

[Dated: _____]

By: _____

Name: _____

Title: _____

## FORM OF SERIES 2007 B BOND

**PRIOR TO THE RATING CONFIRMATION (HEREINAFTER DEFINED), THIS SERIES 2007 B BOND IS ONLY TRANSFERABLE TO (1) A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION COMPLYING WITH RULE 144A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND (2) AN ACCREDITED INVESTOR WITHIN THE MEANING OF SECTION 2(15) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND IN THE CASE OF CLAUSE (2) ONLY, UPON EXECUTION AND DELIVERY OF AN INVESTOR LETTER.**

REGISTERED                                                              REGISTERED
RB - I - 1                                                                  $_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
AMENDED AND RESTATED
REVENUE BONDS
(LINDEN PONDS, INC. FACILITY)
VARIABLE RATE DEMAND SERIES 2007 B (TAX-EXEMPT)

| Interest Rate | Dated Date | Maturity Date | CUSIP |
|---|---|---|---|
| VR | _____ , 2011 | November 1, 2046 | |

Registered Owner:                                    CEDE & CO.
Principal Sum:

THIS BOND DOES NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF AND INTEREST AND PREMIUM, IF ANY, ON THIS BOND ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), for value received, hereby promises to pay at the Designated Office (as hereinafter defined) of Wells Fargo Bank National Association, as trustee, or its successors in trust (the "Trustee"), solely from the Revenues (as defined herein) and other moneys pledged therefor, to the Registered Owner shown above or registered assigns or legal representative, on the Maturity Date (or earlier as hereinafter described), the Principal Sum shown above, and to pay (solely from the Revenues, and other moneys pledged therefor) interest on such Principal Sum from and including the most recent date to which interest shall have been paid hereon, or if no interest has been paid hereon, from the date of issuance of the Series 2007 B Bonds (as defined herein), until

payment of such Principal Sum has been made or duly provided for in accordance with the Indenture (as defined herein), which interest shall be payable at the Variable Rate (as defined in the Indenture and described herein) or at the Fixed Rate (as defined in the Indenture and described herein) and on the applicable Interest Payment Date (as defined in the Indenture and described herein).

Each Series 2007 B Bond shall bear interest from the Interest Payment Date immediately preceding the date on which such Series 2007 B Bond is authenticated; provided, however, (a) if any Series 2007 B Bond is authenticated on an Interest Payment Date, such Series 2007 B Bond shall bear interest from such Interest Payment Date, and (b) if any Series 2007 B Bond is authenticated prior to the first Interest Payment Date, such Series 2007 B Bond shall bear interest from the date of issuance of the Series 2007 B Bonds, and (c) if at the time of authentication of any Series 2007 B Bond, the Issuer is in default with respect to the payment of interest on such Series 2007 B Bond, such Series 2007 B Bond shall bear interest from the date to which interest shall have been paid. The certificate of authentication on each Series 2007 B Bond shall be dated the date on which such Series 2007 B Bond is authenticated by the Trustee.

The principal, Redemption Price and Purchase Price of this Bond are payable at the Designated Office of the Trustee upon presentation and surrender hereof. All interest due on this Bond shall be payable to its Owner as of the Record Date and shall be made by check mailed to the address of the Owner as it appears on the registration books maintained by the Trustee.

The principal or redemption price of, and interest on, and purchase price of, this Bond are payable in lawful money of the United States of America or by check payable in such money, but only from the Revenues and from any other moneys made available to the Issuer for such purpose. If any payment of the principal or redemption price of, or interest on, or purchase price of, this Bond shall be due on a day other than a Business Day (as defined herein), such payment shall be made on the next Business Day with like effect as if made on the originally scheduled date.

During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, at the option of any Owner of at least $500,000 in aggregate principal amount of the Series 2007 B Bonds Outstanding, any payment due on the Series 2007 B Bonds owned by such Owner may be transmitted by wire transfer to such Owner, at such Owner's written request, to the bank account number on file with the Trustee on the fifth day before the Record Date or, if any such day is not a Business Day, the Business Day immediately preceding such day. Such instructions shall remain in effect until revoked in writing by such Owner. Further, at the option of the Letter of Credit Provider (as defined herein), the principal of and interest on all Pledged Bonds (as defined in the Indenture) may be transmitted by wire transfer to the Letter of Credit Provider at the Letter of Credit Provider's written request, to the bank account number on file with the Trustee on the fifth day before the Record Date or, if any such day is not a Business Day, the Business Day immediately preceding such day.

IN CERTAIN CIRCUMSTANCES THIS BOND MAY BE DEEMED TO HAVE BEEN TENDERED AND PURCHASED OR PAID PRIOR TO THE MATURITY DATE HEREOF, AS DESCRIBED HEREIN.

C-2

This Bond shall not be entitled to any right or benefit under the Indenture, or be valid or become obligatory for any purpose, until this Bond shall have been authenticated by the Trustee or a duly authorized authenticating agent, by execution of the certificate of authentication inscribed hereon.

15.     The Bonds; the Indenture.  This Bond is one of a duly authorized series of bonds designated "Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand, Series 2007 B (Tax-Exempt) in aggregate principal amount of $_____ (the "Series 2007 B Bonds").  Simultaneously with the issuance of the Series 2007 B Bonds, the Issuer has issued its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-1 Bonds"), its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-2 Bonds"), and its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 B Bonds"). The Series 2007 B Bonds, the Series 2011 A-1 Bonds, the Series 2011 B Bonds, and the Series 2011 A-2 Bonds are collectively referred to as the "Series 2011 Bonds".  The Series 2011 Bonds and any Additional Bonds (as defined in the Indenture) are, collectively, the "Bonds."  The Series 2011 Bonds have been issued under Massachusetts General Laws, Chapters 23G and 40D, as amended (the "Act"), and the Amended and Restated Trust Indenture dated as of _____, 2011 (the "Indenture"), between the Issuer and the Trustee.  The terms of the Series 2011 Bonds include those stated in the Indenture, and the Series 2011 Bonds are subject to all such terms. The Indenture describes the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Issuer, the Trustee and the Owners of the Series 2011 Bonds.

16.     Loan Agreement; Mortgage; Revenues.  The Issuer has entered into an Amended and Restated Loan Agreement dated as of _____, 2011 (the "Loan Agreement"), with Linden Ponds, Inc. (the "Corporation"), pursuant to which the Issuer is deemed to have made a loan to the Corporation by virtue of the issuance of the Series 2011 Bonds.  Pursuant to the Loan Agreement, the Corporation has agreed to pay the principal of and premium, if any, and interest on the Series 2011 Bonds, the Series 2007 Bonds and any Additional Bonds and Parity Obligations (as defined in the Indenture) as set forth therein.  As security for the obligations of the Corporation under the Loan Agreement, (1) the Corporation has granted a lien and claim on and security interest in the Receipts (as defined in the Indenture) to the Issuer pursuant to the Loan Agreement, subject to certain Permitted Encumbrances (as defined in the Indenture), and (2) the Corporation has executed and delivered an amended and restated mortgage and security agreement dated as of _____ 1, 2011 (the "Mortgage"), to the Trustee and its assigns.

The Revenues are pledged under the Indenture for the equal and ratable benefit of the Owners from time to time of Parity Debt (as hereinafter defined), except to the extent set forth in the Indenture.  As defined in the Indenture, the "Revenues" include (i) all payments to the Trustee for the account of the Issuer or the Letter of Credit Provider pursuant to the Loan Agreement, the Letter of Credit Agreement and the Mortgage, including without limitation payments from the Receipts and (ii) all other receipts of the Issuer or the Trustee attributable to

C-3

the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 (each as defined in the Indenture) with the proceeds of Bonds (as defined in the Indenture); provided, however, that Revenues do not include Reserved Rights of the Issuer (as defined in the Indenture).

17. <u>Additional Parity Debt</u>. The Indenture provides that Additional Bonds and Parity Obligations may be issued within the limitations and provisions of the Indenture. The Bonds and any Parity Obligations are referred to, collectively, as "Parity Debt." All Parity Debt issued within the limitations and provisions of the Indenture shall be designated as Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt and shall be secured by the Revenues, the Property and other property pledged by the Corporation, as more particularly described in the Indenture.

18. <u>Letter of Credit</u>. Concurrently with the issuance of the Series 2007 B Bonds, to secure the timely payment of the principal of and interest on, and the Purchase Price of, the Series 2007 B Bonds, the Corporation has caused to be delivered to the Trustee an irrevocable direct pay letter of credit (the "Letter of Credit") issued by _____ (the "Letter of Credit Provider") pursuant to a Letter of Credit Agreement dated as of _____, 2011 (the "Letter of Credit Agreement"), between the Corporation and the Letter of Credit Provider. The Trustee shall be entitled under the Letter of Credit, subject to the terms and conditions thereof, to draw up to (a) an amount sufficient to pay (i) the principal of the Outstanding Series 2007 B Bonds when due, or (ii) the portion of the Purchase Price of outstanding Bonds Tendered or Deemed Tendered for Purchase (as defined herein), and not remarketed, corresponding to the principal amount of such Series 2007 B Bonds, plus (b) an amount equal to [51] days' accrued interest on the outstanding Series 2007 B Bonds, at the Maximum Rate (as defined herein) to pay (i) interest on the Outstanding Series 2007 B Bonds when due, or (ii) the portion of the Purchase Price of Outstanding Bonds Tendered or Deemed Tendered for Purchase, and not remarketed, corresponding to accrued interest on such Series 2007 B Bonds.

The Letter of Credit, unless it expires earlier as provided therein or is previously extended by the Letter of Credit Provider, will expire at the close of business on _____, 20___. The Letter of Credit Provider may, at its option, provide for one or more extensions of the Letter of Credit, but the Letter of Credit Provider is under no obligation to agree to any such extension. PRIOR TO THE EXPIRATION OF THE LETTER OF CREDIT THEN IN EFFECT, THE CORPORATION, UPON THE CONDITIONS SPECIFIED IN THE INDENTURE AND THE LOAN AGREEMENT, MAY, BUT IS NOT OBLIGATED TO, PROVIDE FOR THE DELIVERY TO THE TRUSTEE OF A SUBSTITUTE LETTER OF CREDIT (AS DEFINED IN THE INDENTURE), IN SUBSTITUTION FOR THE LETTER OF CREDIT THEN IN EFFECT. The effective date of any Substitute Letter of Credit constitutes a Termination Date (as defined herein) and a Mandatory Tender Date (as defined herein) on which the Series 2007 B Bonds are subject to mandatory tender and purchase.

19. <u>Definitions</u>. Each of the following terms, as used herein, shall have the meaning given to such term by the language employed in this paragraph defining such term, unless the context clearly indicates otherwise. Any other term used herein as a defined term, but which is

not defined in this paragraph or elsewhere herein, shall have the meaning given to such term by the Indenture, unless the context clearly indicates otherwise.

"Adjustment Date" means each of (i) the Wednesday of each week or if any such Wednesday is not a Business Day, the immediately succeeding Business Day, during any period in which the Series 2007 B Bonds bear interest at the Variable Rate, and (ii) the Business Day immediately preceding each Mandatory Tender Date after which the Series 2007 B Bonds will bear interest at the Variable Rate.

"Authorized Denomination" means (i) during any period in which the Series 2007 B Bonds bear interest at the Variable Rate, $100,000 or any integral multiple of $5,000 in excess of $100,000 and (ii) during any Fixed Rate Period, $100,000 or any integral multiple of $1 in excess of $100,000, provided that if the Series 2007 B Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Series 2007 B Bonds during any Fixed Rate Period shall be issuable in denominations of $5,000 and integral multiples thereof. In connection with (1) any partial redemption of Series 2007 B Bonds during any period in which the Series 2007 B Bonds bear interest at the Variable Rate or (2) any Optional Tender of a portion of such Bond, the term "Authorized Denomination" shall also mean $5,000 and any integral multiple of $5,000 to the extent that following such redemption or tender no such Bond Outstanding shall be of a denomination of less than $100,000.

"Available Moneys" means:

   (b)   moneys that have been on deposit with the Trustee for at least 91 days during and prior to which no Act of Bankruptcy has occurred with respect to the Corporation;

      (h)   proceeds of any Bonds that refund any other Series of Bonds, but only to the extent that (i) such refunding proceeds are paid directly to the Trustee for the benefit of the Holders and shall not have come into the possession or control of the Issuer, the Corporation or any Affiliate thereof, and (ii) with respect to the refunding of the Series 2007 B Bonds the Trustee shall have received an opinion of Independent Counsel acceptable to the Trustee and any of the Rating Agencies then maintaining a rating on such Series 2007 B Bonds, to the effect that distributions of payments of principal and premium (if any) and interest on such Series 2007 B Bonds made to the Holders from such refunding proceeds will not constitute preferential payments pursuant to the provisions of (A) Section 547(b) of the Bankruptcy Code in a bankruptcy proceeding by or against the Paying Agent, the Issuer, the Corporation or any Affiliate thereof, or (B) Chapter 9 of the Bankruptcy Code, if the Issuer should become a debtor under Chapter 9 of the Bankruptcy Code; and

   (i)   moneys received from a drawing under the Letter of Credit or any Confirming Letter of Credit.

For the purposes of this definition, moneys shall be deemed to be on deposit with the Trustee only when cash or its equivalent is so deposited or, in the case of checks or drafts, when final payment thereof has been made to the Trustee by the payor bank.

"Bank Conversion Date" means the third (3rd) Business Day after receipt by the Trustee of a Bank Conversion Date Notice.

"Bank Conversion Date Notice" means (A) a written notice from the Letter of Credit Provider to the Trustee stating that (i) all or a portion of the Series 2007 B Bonds bearing interest at a Variable Rate prior to the Bank Tender Date will be held by the Letter of Credit Provider after the Bank Conversion Date or (ii) all or a portion of the Series 2007 B Bonds bearing interest at a Fixed Rate prior to the Bank Tender Date will be converted to a Variable Rate after the Bank Conversion Date or (B) a written notice from the Corporation to the Trustee that the interest expense plus the remarketing fees and letter of credit fees on the Series 2007 B Bonds bearing interest at a Variable Rate, including any increased costs imposed by lawful request, law, regulation or directive under Section 5.4 of the Letter of Credit Agreement, equals or exceeds 5.5% and as a result all such Series 2007 B Bonds bearing interest at a Variable Rate will be held by the Letter of Credit Provider after the Bank Conversion Date.

"Bank Rate" shall have the meaning given such term in the Letter of Credit Agreement.

"Bank Tender Date" means July 1, 2021, as such date may be extended by the Owners of the Series 2007 B Bonds, being the (i) optional tender date of the Series 2007 B Bonds bearing interest at the Fixed Rate pursuant to Section 3.11(c)(iv) of the Indenture, which date shall be a Business Day not less than 180 days after the delivery of written notice to the Trustee and the Corporation in accordance with Section 3.11(c)(iv), and provided in no event shall the Bank Tender Date occur prior to the Resizing Tender Date and (ii) termination date of the Letter of Credit securing the Series 2007 B Bonds.

"Bonds Tendered or Deemed Tendered for Purchase" means the Series 2007 B Bonds tendered, or deemed to have been tendered, to the Trustee for purchase on an Optional Tender Date or on a Mandatory Tender Date, as provided in the Indenture.

"Business Day" or "business day" means any day other than a Saturday, Sunday or legal holiday observed in the Commonwealth as such or observed by the Designated Office of the Trustee or the office of the Letter of Credit Provider.

"Computation Date" means the date designated by the Corporation as the date on which a Fixed Rate for the Series 2007 B Bonds is to be determined by the Remarketing Agent in accordance with Section 2.05 of the Indenture, which date shall be at least 7 but not more than 15 days before the Fixed Rate Date; provided, however, that if the Corporation directs the Issuer to rescind its election to establish a Fixed Rate Period pursuant to Section 2.05(d) of the Indenture, and a Fixed Rate Period is then in effect, the term "Computation Date" means the Fixed Rate Date for the new Fixed Rate Period to be established in accordance with Sections 2.05(d) and (e) of the Indenture.

"Confirming Letter of Credit" means each Credit Facility issued from time to time to confirm the Letter of Credit.

"Conversion Date" means each Fixed Rate Date and each date on which the Variable Rate takes effect following a Fixed Rate Period.

"Fixed Rate" means the fixed rate or rates of interest borne by the Subseries I of Series 2007 B Bonds during each Fixed Rate Period.

"Fixed Rate Date" means the first day of each Fixed Rate Period.

"Fixed Rate Period" means a period established in accordance with Section 2.05 of the Indenture during which the rate of interest borne by the Series 2007 B Bonds is a Fixed Rate.

"Letter of Credit Mandatory Tender Event Date" means the second Business Day after receipt by the Trustee of a Letter of Credit Mandatory Tender Event Notice.

"Letter of Credit Mandatory Tender Event Notice" means a written notice from the Letter of Credit Provider to the Trustee stating that (i) an Event of Default has occurred and is continuing under the Letter of Credit Agreement, or (ii) that the Letter of Credit or the Confirming Letter of Credit will not be reinstated.

"Mandatory Tender Date" means (i) any Conversion Date, (ii) any Termination Date, (iii) any Letter of Credit Mandatory Tender Event Date, (iv) each Bank Conversion Date and (v) the Resizing Tender Date.

"Mandatory Tender Notice" means a notice of a Mandatory Tender Date given by the Trustee in accordance with the Indenture, which notice shall state the matters set forth in the Indenture and shall be given by the Trustee to the Owners as required by the Indenture.

"Maximum Rate" means 10% per annum, or such higher rate per annum to which the Maximum Rate may be increased in accordance with the Indenture.

"Optional Tender Date" means the date on which an Owner tenders its Series 2007 B Bonds for purchase pursuant to Section 2.05(k) of the Indenture.

"Optional Tender Notice" means an irrevocable written notice given to the Trustee by the Owner of any Series 2007 B Bond in accordance with Section 2.05(k)(i)(A) of the Indenture of such Owner's election to tender such Series 2007 B Bond or a portion thereof in an Authorized Denomination for purchase.

"Pledged Bonds" means Series 2007 B Bonds that have been purchased with proceeds of a drawing under the Letter of Credit in respect of which the Letter of Credit has not been reinstated.

"Record Date" means (a) during any period in which the Series 2007 B Bonds bear interest at the Variable Rate, the last day before each Interest Payment Date, (b) during any Fixed Rate Period, the first day of the calendar month of each Interest Payment Date, and (c) in the case of the payment of any defaulted interest, the fifth day before such payment; provided, however, that if any such day is not a Business Day, the Record Date shall be the Business Day immediately preceding such day.

"Remarketing Agent" means B.C. Ziegler and Company and any successor appointed by the Corporation to serve as remarketing agent for the Series 2007 B Bonds.

"Resizing Event" means the occurrence of any one of the following:

(a)     if the Corporation never satisfies the Commencement Test on or before February 29, 2016, the date of delivery of the Corporation's audited financial statements for Fiscal Year 2015;

(b)     if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and

(2)     Fiscal Year 2017;

(c)     if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2021, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and

(2)     the Fiscal Year in which the Construction Loan is repaid;

(d)     if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and the Corporation is not in default of its obligation to proceed with construction of Residential Building 2.5 under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of:

(1)     the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and

(2)     Fiscal Year 2016; and

(e)     if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends; and

(f)     Notwithstanding subsections (a) through (e) above, any pending Resizing Event may be extended due to a Good Cause Delay, as provided in Section 6.04 of the Loan Agreement.

"Resizing Financial Statements" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if the Corporation's audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the August 31 immediately following such Fiscal Year and the Holders of the Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use the Corporation's unaudited financial statements from such Fiscal Year reviewed by the Corporation's auditor under an agreed upon procedures letter or some other arrangement approved by the Holders of a majority in aggregate principal amount of the Senior Parity Debt.

"Resizing Tender Date" means unless the Corporation's right to require a Resizing Event is terminated as provided in Section 4.05 of the Loan Agreement or the Independent Resizing Consultant determines upon a Resizing Event pursuant to Section 2.22 of the Indenture that no resizing of the Series 2011 A Bonds is necessary (in each such case, there shall be no Resizing Tender Date), the date which is 45 days after the later of (a) the date on which the Resizing Event occurs and (b) the date on which the Corporation has delivered the Certificate to the Trustee pursuant to Section 4.10 of the Loan Agreement, at which time the Series 2007 B Bonds shall be subject to mandatory tender and purchase in accordance with Section 2.05 of the Indenture.

"Tender Date" means (a) an Optional Tender Date or (b) a Mandatory Tender Date.

"Termination Date" means the earliest of (a) the fifth Business Day before the expiration date of the Letter of Credit then in effect subject to Section 9.01(d) of the Indenture, (b) the fifth Business Day before the expiration date of the Confirming Letter of Credit then in effect, if one is in effect, and (c) the effective date of any Substitute Letter of Credit (including a substitute Confirming Letter of Credit) that replaces any Letter of Credit or Confirming Letter of Credit, if any, then in effect.

"Variable Rate" means the rate of interest borne by the Series 2007 B Bonds during any period other than a Fixed Rate Period.

20.     Reference to Documents.    Reference is made to the Indenture, the Loan Agreement, and the Mortgage, copies of which are on file with the Trustee, and the Letter of Credit, which is held by the Trustee, for the provisions, among others, with respect to (a) the nature and extent of the rights, duties and obligations of the Issuer, the Corporation, the Trustee, the Remarketing Agent and the Owners of the Series 2007 B Bonds, and certain rights of the Letter of Credit Provider, (b) the provisions under which the Series 2007 B Bonds Outstanding under the Indenture, and all accrued and unpaid interest thereon, may become or may be declared due and payable before the stated maturity thereof, (c) provisions under which the lien of the Indenture may be discharged, and (d) provisions relating to the modification and amendment of the Indenture and the Loan Agreement.  The Owner of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture, the Loan Agreement, the Mortgage, and the Letter of Credit, all of which are incorporated herein by reference.

21. <u>Interest Rate</u>. (a) The Series 2007 B Bonds shall initially bear interest at the Variable Rate set forth in the Indenture. The Series 2007 B Bonds shall bear interest at the initial Variable Rate from and including the date of their initial authentication and delivery to and including the first Adjustment Date.

(b) Thereafter, the Variable Rate shall be determined by the Remarketing Agent on each Adjustment Date and, subject to the Maximum Rate, shall be equal to the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Series 2007 B Bonds on the Adjustment Date at a price equal to the principal amount thereof, plus accrued interest, if any, thereon. The Variable Rate determined by the Remarketing Agent on each Adjustment Date shall be and remain in effect from and including the day immediately following such Adjustment Date through the earlier of (i) the immediately succeeding Adjustment Date and (ii) the immediately succeeding Mandatory Tender Date. During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, interest on the Series 2007 B Bonds shall be computed on the basis of a year of 365 days (366 days in leap years) for the actual number of days elapsed and shall be payable on each applicable Interest Payment Date commencing on _____, 2011.

(c) <u>Conversion of Interest Rate and Establishment of Fixed Rate Periods</u>. Subject to the terms of the Letter of Credit Agreement and except as provided in the last paragraph of this subsection (c), the Corporation, on behalf of the Issuer, may from time to time (i) establish one or more consecutive Fixed Rate Periods or (ii) at the expiration of any Fixed Rate Period (A) change the interest rate on the Series 2007 B Bonds from the Fixed Rate then in effect to the Variable Rate or (B) establish one or more additional consecutive Fixed Rate Periods, in any case by delivering to the Trustee, (iii) at least 45 but not more than 90 days before the proposed Conversion Date (or such fewer number of days as is acceptable to the Trustee), a written notice that specifies the proposed change, the Conversion Date and, if one or more Fixed Rate Periods will be established, the Computation Date for each such Fixed Rate Period and the last day of each such Fixed Rate Period, and (iv) on or before the proposed Conversion Date, the following: (1) an opinion of Bond Counsel to the effect that such change is permitted by the Indenture and will not adversely affect the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code and the exemption of the Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth; (2) if there is then a Letter of Credit in effect that will remain in effect following the establishment of one or more Fixed Rate Periods, (x) evidence satisfactory to the Trustee, including an amendment to the existing Letter of Credit if necessary, that the amount which can be realized under the Letter of Credit for the payment of interest on the Series 2007 B Bonds is equal to at least 204 days' interest on the Series 2007 B Bonds (or, if the Fixed Rate Period to be established will consist of less than 6 months, the number of days' interest on the Series 2007 B Bonds obtained by adding 20 days to the number of days in such Fixed Rate Period) calculated at the Maximum Rate (or, if the Fixed Rate Period extends to the maturity date of the Series 2007 B Bonds, the actual Fixed Rate on the Series 2007 B Bonds) and on the basis of a 360-day year of twelve 30-day months, and (y) written evidence from each of the Rating Agencies, if any, maintaining a rating on the Series 2007 B Bonds that the ratings, if any, borne by the Series 2007 B Bonds will not be reduced or withdrawn as a result of the establishment of the Fixed Rate Period; (3) either (x) evidence

C-10

satisfactory to the Trustee that the principal of, any premium on, and interest (at the Fixed Rate applicable to such Fixed Rate Period) on, the Series 2007 B Bonds during such Fixed Rate Period can be realized in full under the Letter of Credit then in effect, or (y) an opinion of Independent Counsel to the effect that the exemption of the Series 2007 B Bonds and any Letter of Credit then in effect from the registration requirements of the Securities Act of 1933, as amended, and the exemption of the Indenture from qualification under the Trust Indenture Act of 1939, as amended, will not be impaired as a result of the establishment of such Fixed Rate Period; (4) if such Fixed Rate Period does not extend to the maturity of the Series 2007 B Bonds, a new Letter of Credit or amendment to the existing Letter of Credit (if such Letter of Credit will remain in effect following such Conversion Date), which new Letter of Credit and the issuer thereof or amendment shall be satisfactory to the Trustee; and (5) in connection with the establishment of a Fixed Rate Period of more than one year following a period in which the Series 2007 B Bonds accrue interest at the Variable Rate or a Fixed Rate Period of one year or less, at the request of, and in form and content satisfactory to, the Remarketing Agent, additional disclosure on the Corporation, all facilities owned or operated from time to time by the Corporation and any other matter deemed appropriate by the Remarketing Agent for inclusion in an offering document for the Series 2007 B Bonds.

During any Fixed Rate Period after the Bank Tender Date, the Corporation shall be required either (a) to provide a Letter of Credit for the Series 2007 B Bonds, or (b) to pay to the Trustee for deposit into the Tax-Exempt Senior Debt Service Reserve Fund, cash or a Debt Service Reserve Fund Credit Facility in an amount necessary, if any, to bring the amount on deposit in the Tax-Exempt Senior Debt Service Reserve Fund equal to the Senior Debt Service Reserve Fund Requirement.

Fixed Rate Periods established in accordance with this subsection (c) may be of the same or different periods, but each such Fixed Rate Period shall commence on the first calendar day of a month or, if the Variable Rate is then in effect, the first Thursday of a month, or if such Thursday is not a Business Day, the immediately succeeding Business Day, and shall end on the last calendar day of a month or, if the Series 2007 B Bonds may bear interest at the Variable Rate following the expiration of any Fixed Rate Period, the day immediately preceding the first Thursday of a month, or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday. Any Fixed Rate Period (i) shall be for a period of at least 2 months in duration, and (ii) may extend to the maturity of the Series 2007 B Bonds. At least 35 days before each Conversion Date, the Trustee shall mail a Mandatory Tender Notice to each Owner of Series 2007 B Bonds.

Notwithstanding any other provision in this subsection (c), prior to the Bank Tender Date, the Letter of Credit Provider may convert all or a portion of the Series 2007 B Bonds bearing interest at a Variable Rate to a Fixed Rate or convert all or a portion of the Series 2007 B Bonds bearing interest at a Fixed Rate to a Variable Rate, each following a Bank Conversion Date in accordance with subsection (l) herein, and if a portion of the Series 2007 B Bonds are converted to a Fixed Rate, any Series 2007 B Bonds not converted to a Fixed Rate shall continue to bear interest at a Variable Rate. The last day of any Fixed Rate Period occurring prior to the Bank Tender Date shall be the Bank Tender Date.

(d)    Rescission of Election to Establish Fixed Rate Periods or to Convert Interest Rate to a Variable Rate.  Subject to the terms of the Letter of Credit Agreement, at any time prior to the Fixed Rate Date for any Fixed Rate Period, the Corporation, on behalf of the Issuer, may rescind its election to establish such Fixed Rate Period by written notice to the Trustee; provided, however, that if any such Fixed Rate Period shall be the second or any subsequent Fixed Rate Period in a succession of Fixed Rate Periods, there shall first be delivered to the Trustee an opinion of Bond Counsel to the effect that such rescission will not adversely affect (i) the exclusion of the interest payable on the Series 2007 B Bonds, from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and (ii) the excludability of interest on the Series 2007 B Bonds from gross income for purposes of state, county and municipal taxation in The Commonwealth of Massachusetts.  If the Corporation rescinds its election to establish a Fixed Rate Period, as provided in this subsection, or if a Fixed Rate has not been established as required  by subsection (c) above, the Series 2007 B Bonds will bear interest at the Variable Rate then in effect, as if such election had not been made or, if a Fixed Rate Period is then in effect, a new Fixed Rate Period shall be established as provided in subsection (e) below; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

Subject to the terms of the Letter of Credit Agreement, at any time prior to any Conversion Date on which the interest rate on the Series 2007 B Bonds is to be converted from a Fixed Rate to the Variable Rate, the Corporation, on behalf of the Issuer, may rescind its election to convert the interest rate thereon from a Fixed Rate to the Variable Rate by written notice to the Trustee, in which event a new Fixed Rate Period shall be established as provided in subsection (e) below; provided, however, that the proposed Conversion Date shall be a Mandatory Tender Date notwithstanding any such rescission.

(e)    Automatic Establishment of Fixed Rate Periods.  If 45 days before the last day of any Fixed Rate Period for which a succeeding Fixed Rate Period has not been established in accordance with subsection (c) above (or such fewer number of days as is acceptable to the Trustee), the Corporation, on behalf of the Issuer, shall not have elected to change the interest rate on the Series 2007 B Bonds to the Variable Rate or to establish a new Fixed Rate Period by delivery of the notice and opinion required by subsection (c) above, or if the Corporation rescinds any election to establish a new Fixed Rate Period at the end of any Fixed Rate Period or rescinds any election to convert the interest rate on the Series 2007 B Bonds from a Fixed Rate to the Variable Rate at the end of any Fixed Rate Period as provided in subsection (d) above, a new Fixed Rate Period shall be deemed to have been established having (i) if the Fixed Rate Period then ending consisted of twelve months or fewer than twelve months, the same number of days as the Fixed Rate Period then ending, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, the Series 2007 B Bonds may bear interest at the Variable Rate (provided, however, that such new Fixed Rate Period shall not exceed one year in length), (ii) if the Fixed Rate Period then ending consisted of more than twelve months, the same number of days as a Fixed Rate Period of twelve months, which number of days shall be adjusted to cause such Fixed Rate Period to end on the day immediately preceding the first Thursday of a month (or if such Thursday is not

a Business Day, the day immediately preceding the Business Day that immediately succeeds such Thursday) if, after the expiration of the new Fixed Rate Period, the Series 2007 B Bonds may bear interest at the Variable Rate, or (iii) such fewer number of days as shall remain until the maturity date thereof, and a new Fixed Rate shall be determined as provided in subsection (f) below, as if the Corporation had elected, on behalf of the Issuer to establish a new Fixed Rate Period, except that neither the notice nor the opinion of Bond Counsel referred to in subsection (c) above shall be provided.

(f)     Fixed Rate Determination.  During any Fixed Rate Period other than any Fixed Rate Period occurring prior to the Bank Tender Date, the Series 2007 B Bonds shall bear interest at the interest rate determined by the Remarketing Agent on the Computation Date to be the minimum rate that, in the judgment of the Remarketing Agent, taking into account prevailing market conditions, would enable the Remarketing Agent to sell all of the Series 2007 B Bonds on the Fixed Rate Date at a price equal to the principal amount thereof plus accrued interest, if any, thereon.  The Remarketing Agent shall determine the Fixed Rate for each Fixed Rate Period on the applicable Computation Date, and the Fixed Rate determined by the Remarketing Agent on each Computation Date shall constitute the Fixed Rate applicable to all Series 2007 B Bonds.  During any Fixed Rate Period occurring prior to the Bank Tender Date, the Series 2007 B Bonds converted to the Fixed Rate shall bear interest at 5.5% per annum.

Each Fixed Rate determined by the Remarketing Agent for any Fixed Rate Period shall be and remain in effect from and including the Fixed Rate Date on which such Fixed Rate Period commences to and including the last day of such Fixed Rate Period.  During any Fixed Rate Period, the interest payable on the Series 2007 B Bonds will be computed on the basis of a 360-day year of twelve 30-day months.

(g)     Interest Rate on Pledged Bonds.  Anything in this Bond or the Indenture to the contrary notwithstanding, all Pledged Bonds shall bear interest at the Bank Rate until remarketed or repaid, payable as provided in the Indenture  and the Letter of Credit Agreement.

(h)     Maximum Rate.  Notwithstanding the foregoing provisions of this section 7, so long as a Letter of Credit is in effect, the interest rate payable on the Series 2007 B Bonds (other than Pledged Bonds) may not exceed the Maximum Rate.  The Issuer may from time to time, upon the written request of the Corporation, increase the Maximum Rate upon the terms and conditions as provided in the Indenture.

(i)     Default Rate; Alternate Rates.  Notwithstanding the foregoing provisions of this section 7, (i) if any payment of the principal of or premium (if any) and interest on, or the Purchase Price of, any Series 2007 B Bond shall not be made when due, such Series 2007 B Bond shall continue to bear interest at the last interest rate borne by the Series 2007 B Bonds prior to the due date for such payment until such payment is made or provided for in accordance with the Indenture (except that interest on any Pledged Bond shall continue to accrue at the Bank Rate), and (ii) if the Remarketing Agent does not determine the Variable Rate on any Adjustment Date or the Fixed Rate on any Computation Date, or a court of competent jurisdiction holds that the rate so determined is invalid or unenforceable, (A) the Variable Rate for such Adjustment Date shall be equal to 85% of the per annum bond equivalent yield applicable to 13-week United States Treasury securities on such Adjustment Date and (B) the

<div align="center">C-13</div>

Fixed Rate for such Computation Date shall be equal to the same Fixed Rate in effect for the immediately preceding Fixed Rate Period. The Trustee shall not incur any liability for any errors in the computation of the rates required to be determined in accordance with this subsection (i).

(j) _Interest Rates Conclusive and Binding_. The determination by the Remarketing Agent of the Variable Rate and the Fixed Rate as provided in this section 7 and in the Indenture shall be conclusive and binding upon the Issuer, the Trustee, the Corporation, the Remarketing Agent, the Letter of Credit Provider, the Owners of the Series 2007 B Bonds, and all other Persons.

22. _Redemption_.

(d) _Redemption of the Series 2007 B Bonds Prior to Maturity_. The Series 2007 B Bonds are subject to redemption prior to maturity as follows:

(i) _Extraordinary Redemption_. The Series 2007 B Bonds are subject to extraordinary redemption in whole at any time or in part on any Interest Payment Date, at a Redemption Price equal to the principal amount thereof, plus accrued interest thereon to the date fixed for redemption, from, and to the extent of, funds deposited in the Redemption Fund from (i) proceeds received by the Corporation from title insurance with respect to the Property; (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property. Any extraordinary redemption of less than all of the Bonds shall be in such manner as the Corporation shall provide in writing to the Trustee.

(ii) _Mandatory Sinking Fund Redemption_. The Series 2007 B Bonds are subject to redemption prior to maturity at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date from mandatory Sinking Fund Installments (defined in the Indenture) paid from the Series 2011 Sinking Fund Account (created by the Indenture) on November 1 of the following years in the following amounts:

<div align="center">SERIES 2007 B BONDS</div>

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2012 | | 2030 | |
| 2013 | | 2031 | |
| 2014 | | 2032 | |
| 2015 | | 2033 | |
| 2016 | | 2034 | |
| 2017 | | 2035 | |
| 2018 | | 2036 | |
| 2019 | | 2037 | |
| 2020 | | 2038 | |
| 2021 | | 2039 | |

<div align="center">C-14</div>

| | |
|---|---|
| 2022 | 2040 |
| 2023 | 2041 |
| 2024 | 2042 |
| 2025 | 2043 |
| 2026 | 2044 |
| 2027 | 2045 |
| 2028 | 2046* |
| 2029 | |

_____
*Final Maturity

(iii)     Optional Redemption during Variable Rate Period.  During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, the Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of the Corporation to the Trustee with the written consent of the Letter of Credit Provider, upon notice to the Owners as set forth below, in whole or in part, on any Interest Payment Date, at a redemption price equal to the principal amount of the Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date.

(iv)     Optional Redemption on Mandatory Tender Dates. The Series 2007 B Bonds shall be subject to optional redemption by the Issuer at the written direction of the Corporation to the Trustee, upon notice to the Owners as set forth below, in whole or in part on any Mandatory Tender Date, at a redemption price equal to the principal amount of the Series 2007 B Bonds to be redeemed plus accrued interest to the redemption date.

(v)     Optional Redemption during Fixed Rate Period.  The Series 2007 B Bonds shall be subject to optional redemption by the Issuer, at the written direction of the Corporation to the Trustee, during any Fixed Rate Period that (A) extends to the maturity of the Series 2007 B Bonds, and (B) is 6 years or longer, on or after the Interest Payment Date immediately succeeding the date that is the later of (1) the sixth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (2) the earlier of (x) the tenth anniversary of the Fixed Rate Date for such Fixed Rate Period, and (y) the anniversary of the Fixed Rate Date that approximates more closely than any other anniversary of the Fixed Rate Date, the date which occurs at the midpoint of such Fixed Rate Period, in whole at any time, or in part on any Interest Payment Date, upon notice to the Owners as set forth below, at a redemption price equal to the principal amount thereof, plus a premium (expressed as a percentage of the principal amount of the Series 2007 B Bonds redeemed) that for the first permissible redemption date is equal to the lesser of (I) three percent of the principal amount of the Series 2007 B Bonds to be redeemed and (II) one-half of one percent times the number of years between the calendar year of such first redemption date and the calendar year during which such Fixed Rate Period ends (including, for purposes of computation, the calendar year of such first redemption date but excluding the calendar year during which such Fixed Rate Period ends), and declining by one-half of one percent annually thereafter, such premium calculation to be made by the Trustee, upon consultation with the Remarketing Agent, prior to such redemption date, plus accrued interest to the redemption date.

(vi)     Optional Tender during Fixed Rate Period.  On the Bank Tender Date, the Issuer will cause to be purchased (but solely from amounts provided by the Corporation pursuant

to Section 3.02(d) of the Loan Agreement) any Series 2007 B Bond bearing interest at the Fixed Rate at a purchase price equal to the principal amount thereof, plus accrued interest to the Bank Tender Date, payable by check or wire transfer in immediately available funds. On the Bank Tender Date, the Owner shall deliver the Series 2007 B Bonds to be purchased as follows: (1) if the Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Series 2007 B Bonds to be purchased to the account of the Tender Agent maintained with the Depository, or (2) if physical bond certificates have been delivered to the Owners of the Series 2007 B Bonds pursuant to Section 2.21 of the Indenture, delivery of the Series 2007 B Bonds to be purchased to the Trustee, at its Designated Office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank. On or before November 15, 2020, or if the Bank Tender Date has been extended past July 1, 2021, 220 days prior to the extended Bank Tender Date, the Corporation may request the Letter of Credit Provider to extend the Bank Tender Date by delivering to the Letter of Credit Provider a copy of the Corporation's interim financial statements and such other information as shall be reasonably requested by the Letter of Credit Provider. The Letter of Credit Provider shall provide written notice by 180 days prior to the Bank Tender Date (as may be extended) whether it has determined to extend the Bank Tender Date. The Letter of Credit Provider's decision to extend such Bank Tender Date shall be made in its sole discretion and no course of dealing or other circumstance shall be deemed to require the Letter of Credit Provider to extend the Bank Tender Date. The failure of the Letter of Credit Provider to deliver its notice to extend the Bank Tender Date shall be treated for all purposes as an election by the Letter of Credit Provider to not extend the Bank Tender Date.

(k)     Selection of the Series 2007 B Bonds to Be Redeemed.  If fewer than all the Series 2007 B Bonds are called for redemption, the particular Series 2007 B Bonds or portions thereof to be redeemed shall be selected by the Trustee, in such manner as the Trustee, in its discretion, may deem proper; provided, however, that the portion of any Series 2007 B Bond to be redeemed shall be in an Authorized Denomination; provided, however, the portion of any Series 2007 B Bonds remaining outstanding after any redemption shall be deemed to be an Authorized Denomination after the redemption date; and provided further that Pledged Bonds shall be selected for redemption prior to any other Series 2007 B Bonds.

(l)     Notice of Redemption. The Trustee shall mail notice of the call for any redemption at least 15 days (30 days in the case of the redemption of the Series 2007 B Bonds bearing interest at a Fixed Rate) before the redemption date to the Owners of the Series 2007 B Bonds to be redeemed; provided, however, that so long as the Series 2007 B Bonds are maintained in book-entry form, notice of the call for redemption required to be given to the registered Owners shall be given only to the securities depository or its nominee in whose name the Series 2007 B Bonds are registered. The failure to mail any such notice to any Owner of the Series 2007 B Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Series 2007 B Bonds. If for any reason it is impossible or impractical to mail such notice of redemption, the Trustee shall give notice of the call for any redemption by publication at least once in a daily newspaper of general circulation in the Borough of Manhattan, City and State of New York, or a financial journal published in such Borough, which notice shall be published at least 15 days (30 days in the case of the redemption of the Series 2007 B Bonds bearing interest at a Fixed Rate) before the redemption date. In the event notice is published as provided above, the mailing of notice to the Owners of the Series 2007 B Bonds to be redeemed shall not be a condition precedent to redemption and

the failure so to mail any such notice to any such Owners shall not affect the validity of the proceedings for the redemption of the Series 2007 B Bonds.

(m) <u>Effect of Call for Redemption</u>. On the date designated for redemption, notice having been given as provided herein, the Series 2007 B Bonds or portions of the Series 2007 B Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Series 2007 B Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price and accrued interest are held by the Trustee as provided in the Indenture, interest on such Series 2007 B Bonds or such portions thereof so called for redemption shall cease to accrue, such Series 2007 B Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under the Indenture, and the Owners thereof shall have no rights in respect of such Series 2007 B Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof and the accrued interest thereon so held by the Trustee. If a portion of this Bond shall be called for redemption, a new Series 2007 B Bond or Series 2007 B Bonds in the aggregate principal amount equal to the unredeemed portion hereof, of the same series and maturity and bearing interest at the same rate and of any Authorized Denomination, shall be issued to the Owner upon the surrender hereof.

(n) <u>Payment of Redemption Price</u>. The Redemption Price to be paid for the Series 2007 B Bonds redeemed pursuant to this section 8 and the Indenture shall be accompanied by all interest accrued on the Series 2007 B Bonds to be redeemed to the date fixed for redemption.

(o) <u>Provisions Applicable to Book-Entry Bonds</u>. So long as all of the Series 2007 B Bonds shall be maintained in Book-Entry Form (as defined in the Indenture) with a Depository (as defined in the Indenture) in accordance with the Indenture, in the event that part, but not all, of this Bond shall be called for redemption, the owner of this Bond may elect not to surrender this bond in exchange for a new Series 2007 B Bond in accordance with subsection (d) above. For all purposes, the principal amount of this Bond outstanding at any time shall be equal to the lesser of (A) the Principal Sum shown on the face hereof and (B) such Principal Sum reduced by the principal amount of any partial redemption of this Bond following which the owner of this Bond has elected not to surrender this Bond in accordance with this subsection (f). THEREFORE, IT CANNOT BE DETERMINED FROM THE FACE OF THIS BOND WHETHER A PART OF THE PRINCIPAL OF THIS BOND HAS BEEN PAID.

23. <u>Purchase of Series 2007 B Bonds on Tender Dates</u>.

(e) Purchase of Series 2007 B Bonds on Optional Tender Dates.

(i) During any period in which the Series 2007 B Bonds bear interest at the Variable Rate, the Issuer will cause to be purchased (but solely from the proceeds of the remarketing of such Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or, if one is in effect, the Confirming Letter of Credit) any Series 2007 B Bond (or portion thereof in a denomination of $5,000 or integral multiple thereof, provided such tender does not result in a Series 2007 B Bond in a denomination of less than $100,000, except with respect to Pledged Bonds) at the Purchase Price, payable by check or wire transfer in immediately available funds, upon:

(A)     delivery to the Trustee and the Remarketing Agent of a telephonic notice (the "Optional Tender Notice") not later than 4:00 p.m. prevailing Baltimore, Maryland time, on a Business Day not less than seven calendar days prior to the Optional Tender Date as defined below (such notice to be irrevocable and effective upon receipt) that states (1) the principal amount of Series 2007 B Bonds that are to be purchased (which amount shall be $5,000 or a multiple thereof) and the portion retained, if any (which must be $100,000 or any integral multiple of $5,000 in excess of $100,000), (2) the date on which such Series 2007 B Bonds are to be purchased (an "Optional Tender Date"), which date shall be a Business Day not less than seven calendar days after the delivery of the Optional Tender Notice to the Trustee and the Remarketing Agent, and (3) if fewer than all of the Owner's Series 2007 B Bonds are to be purchased, the CUSIP numbers and bond numbers of the Series 2007 B Bonds to be purchased; and

(B)     (1)     if the Series 2007 B Bonds are in Book-Entry Form, book-entry delivery of the Series 2007 B Bonds to be purchased to the account of the Remarketing Agent maintained with the Depository, or

(2)     if physical bond certificates have been delivered to the Owners of the Series 2007 B Bonds pursuant to the Indenture, delivery of the Subseries I of Series 2007 B Bonds to be purchased to the Trustee or the Remarketing Agent (which shall promptly deliver the same to the Trustee) at its Designated Office, together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank; and

(3)     in either case, at or prior to 10:00 a.m. prevailing Baltimore, Maryland time on the date designated for purchase in the Optional Tender Notice.

(ii)     Notwithstanding anything to the contrary herein contained, no optional tender of Series 2007 B Bonds made pursuant to this subsection shall result in a Series 2007 B Bond in a denomination of less than $100,000.

(iii)     Accrued interest payable on any Bond Tendered or Deemed Tendered for Purchase on any Interest Payment Date as provided in this subsection shall be paid to the Owner as of the Record Date immediately preceding such Interest Payment Date in the same manner as if such Series 2007 B Bond had not been purchased or deemed to have been purchased pursuant to this subsection.

(p)     Purchase of the Series 2007 B Bonds on Mandatory Tender Dates.  The Series 2007 B Bonds (other than any Pledged Bonds) are subject to mandatory tender and purchase, and the Issuer will cause to be purchased (but solely from the proceeds of the remarketing of the Series 2007 B Bonds by the Remarketing Agent and amounts realized from a drawing under the Letter of Credit or any Confirming Letter of Credit) the Series 2007 B Bonds (other than any Pledged Bonds), on each Mandatory Tender Date at the Purchase Price, payable by check or wire transfer in immediately available funds.

(q)     Agreement to Sell the Series 2007 B Bonds on Tender Dates.  The Owner of this Bond, by acceptance of this Bond, agrees (i) that this Bond may be sold on any Tender Date to any person obtained by the Remarketing Agent or otherwise, and (ii) to tender this Bond to the

Trustee for purchase (from any of the sources described in subsections (a) and (b) above) on each Tender Date at a price equal to the principal amount hereof plus accrued interest (if any) hereon to such Tender Date and to surrender this Bond to the Trustee on such Tender Date.

(r)   Bonds Deemed Tendered and Purchased on Tender Dates.  ANY OPTIONAL TENDER NOTICE GIVEN BY AN OWNER SHALL BE IRREVOCABLE.  ANY SERIES 2007 B BOND DESCRIBED IN AN OPTIONAL TENDER NOTICE AS A SERIES 2007 B BOND TO BE PURCHASED ON AN OPTIONAL TENDER DATE WHICH IS NOT TENDERED BY THE OWNER THEREOF TO THE TRUSTEE ON SUCH OPTIONAL TENDER DATE, AND ANY SERIES 2007 B BOND TO BE PURCHASED ON A MANDATORY TENDER DATE THAT IS NOT DELIVERED BY THE OWNER THEREOF TO THE TRUSTEE ON SUCH MANDATORY TENDER DATE, SHALL NONETHELESS BE DEEMED TO HAVE BEEN TENDERED BY THE OWNER THEREOF FOR PURCHASE AND TO HAVE BEEN PURCHASED, IF MONEYS FOR SUCH PURCHASE HAVE BEEN DEPOSITED WITH THE TRUSTEE ON OR BEFORE ANY SUCH TENDER DATE IN ACCORDANCE WITH THE INDENTURE.  THEREAFTER, (I) SUCH SERIES 2007 B BOND DEEMED TO HAVE BEEN TENDERED AND PURCHASED SHALL NO LONGER BE OUTSTANDING UNDER THE INDENTURE; (II) INTEREST ON SUCH SERIES 2007 B BOND DEEMED TO HAVE BEEN TENDERED AND PURCHASED SHALL CEASE TO ACCRUE TO THE FORMER OWNER THEREOF AS OF THE APPLICABLE TENDER DATE; (III) THE FORMER OWNER OF SUCH SERIES 2007 B BOND SHALL CEASE TO BE ENTITLED TO THE BENEFITS AND SECURITY OF THE INDENTURE AS OF THE DATE ON WHICH SUCH SERIES 2007 B BOND IS DEEMED TO HAVE BEEN TENDERED AND PURCHASED, EXCEPT TO RECEIVE THE MONEYS REPRESENTING THE PURCHASE PRICE OF SUCH SERIES 2007 B BOND AGAINST DELIVERY THEREOF AT THE DESIGNATED OFFICE OF THE TRUSTEE; AND (IV) THE TRUSTEE WILL NOT REGISTER, AND THE TRUSTEE WILL NOT RECOGNIZE, ANY FURTHER TRANSFERS BY THE FORMER OWNER OF SUCH SERIES 2007 B BOND DEEMED TO HAVE BEEN TENDERED AND PURCHASED.

24.   Mandatory Tender on Resizing Tender Date.  The Subseries I of Series 2007 B Bonds are subject to mandatory tender and purchase on the Resizing Tender Date.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Series 2007 B Bonds.  Such notice shall state: (1) that a Resizing Event has occurred and the date that  is the Resizing Tender Date; (2) that the Series 2007 B Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the Owners do not have a right to waive the mandatory tender of the Series 2007 B Bonds and that all of such Bonds must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Remarketing Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2007 B Bonds pursuant to the Indenture, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2007 B Bonds so tendered will be purchased for new Series 2007 B Bonds on the Resizing Tender Date at the Purchase Price; (4) that, as of the Resizing Tender Date, the Series 2007 B Bonds will be deemed, subject to the delivery of a new Series 2007 B Bond as described below, to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the

Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Series 2007 B Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under the Indenture, except to receive the moneys representing the Purchase Price of such Series 2007 B Bonds against delivery thereof at the Designated Office of the Trustee; and (5) to the extent not described above, the matters set forth in the definition of Mandatory Tender Notice in the Indenture.

Any Series 2007 B Bond to be purchased on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for purchase and to have been purchased from moneys in accordance with the Indenture or exchanged as described below. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2007 B Bond or Bonds in the aggregate principal amount determined by the Independent Consultant in accordance with the Indenture to the person to whom the Series 2007 B Bond deemed to have been tendered and purchased, subject to the delivery of a new Subseries of Series 2007 B Bond as described below, would have been delivered; (B) such Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under the Indenture; (C) interest on such Series 2007 B Bond deemed to have been tendered shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Series 2007 B Bond shall cease to be entitled to the benefits and security of the Indenture as of the date on which such Series 2007 B Bond is deemed to have been tendered; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2007 B Bond by the Owner thereof.

On the Resizing Tender Date, the Series 2007 B Bonds shall have been tendered or deemed tendered to the Letter of Credit Provider and the Letter of Credit Provider shall exchange such Series 2007 B Bonds for Series 2007 B Bonds resized in principal amount determined by the Independent Consultant in accordance with the Indenture. Any accrued and unpaid interest on the Series 2007 B Bonds as of the Resizing Tender Date shall be due and payable as set forth in the Indenture.

25. <u>Mandatory Tender on Bank Conversion Date</u>. During any time prior to the Bank Tender Date, the Letter of Credit Provider may set a Bank Conversion Date for the conversion of Series 2007 B Bonds from a Variable Rate to a Fixed Rate by delivering to the Trustee the Bank Conversion Date Notice at least 3 days prior to the Bank Conversion Date, which Bank Conversion Date Notice shall state: (1) the principal amount of Series 2007 B Bonds that are to be purchased (which amount shall be in a denomination of $5,000 or integral multiple thereof provided such tender does not result in a Series 2007 B Bond bearing interest at a Variable Rate in a denomination of less than $100,000, except with respect to Pledged Bonds), (2) the Bank Conversion Date, (3) the interest rate applicable to such Series 2007 B Bonds subject to Mandatory Tender on the Bank Conversion Date, in accordance with the Indenture and (4) the delivery instructions for such Series 2007 B Bonds subject to Mandatory Tender on the Bank Conversion Date, in accordance with the Indenture. All or a portion of the Series 2007 B Bonds bearing interest at a Variable Rate are subject to mandatory tender on the Bank Conversion Date. At least 1 day prior to the Bank Conversion Date, the Trustee shall mail a notice to the Owners of the portion of the Series 2007 B Bonds to be converted to a Fixed Rate as directed by the Letter of Credit Provider in accordance with the Indenture and as selected by the Trustee by lot or in such other manner as the Trustee, in its discretion, may deem proper. Such notice shall

state: (1) the date that is the Bank Conversion Date; (2) that the Series 2007 B Bonds so selected will be subject to mandatory tender on the Bank Conversion Date, (3) that the Owners do not have a right to waive the mandatory tender of the Series 2007 B Bonds and that all of such Bonds selected for mandatory tender must be tendered at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Bank Conversion Date (A) if such Series 2007 B Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Trustee maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Series 2007 B Bonds, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Series 2007 B Bonds so tendered will be delivered to or at the direction of the Letter of Credit Provider in accordance with the Indenture; and (4) that, as of the Bank Conversion Date, the Series 2007 B Bonds selected for mandatory tender will be deemed to have been tendered on such Bank Conversion Date, shall be deemed to be no longer Outstanding under the Indenture, and shall cease to bear interest as of such Bank Conversion Date, whether or not such Series 2007 B Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under the Indenture, except to receive the moneys representing the Purchase Price of such Series 2007 B Bonds against delivery thereof at the Designated Office of the Trustee.

Any Series 2007 B Bond to be purchased on a Bank Conversion Date that is not delivered by the Owner thereof to the Trustee on such Bank Conversion Date shall nonetheless be deemed to have been tendered by the Owner thereof for purchase and to have been purchased from the moneys described in the Indenture. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Series 2007 B Bond or Bonds in the aggregate principal amount of the Series 2007 B Bond deemed to have been tendered and purchased to the person whom would have received the Series 2007 B Bond as set forth in the Indenture; (B) such Series 2007 B Bond deemed to have been tendered and purchased shall no longer be Outstanding under the Indenture; (C) interest on such Series 2007 B Bond deemed to have been tendered and purchased shall cease to accrue to the Owner thereof as of the Bank Conversion Date; (D) such Series 2007 B Bond shall cease to be entitled to the benefits and security of the Indenture as of the date on which such Series 2007 B Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Series 2007 B Bond by the Owner thereof.

The Bank Conversion Date Notice shall provide that the Series 2007 B Bonds tendered or deemed tendered on the Bank Conversion Date shall be registered in the name of the Letter of Credit Provider as Pledged Bonds or shall be registered in the name of the Letter of Credit Provider or of the Holder designated by the Letter of Credit Provider as Series 2007 B Bonds bearing interest at a Fixed Rate of 5.5% per annum and containing such other terms as set forth in this Bond, and shall be accompanied by an opinion of Bond Counsel to the effect that such change is permitted by the Indenture and will not adversely affect the exclusion of the interest payable on the Series 2007 B Bonds from the gross income of the Owners thereof for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of the Series 2007 B Bonds from state, county and municipal taxation in the Commonwealth.

26.    Amendment.    Certain amendments to the Indenture are permitted without the consent of the Holders of Parity Debt, including this Bond. In addition, with the prior written

consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing the Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by the Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of the Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of the Indenture, if there is outstanding any Special Senior Parity Debt, no amendment under this Section may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)     If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)     The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by the Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the

C-22

interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)     If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

27.     <u>Persons Deemed Owners; Restrictions upon Actions by Individual Owners</u>.  The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Trustee) for the purpose of receiving payment of or on account of the principal, redemption price or purchase price of this Bond, and for all other purposes except as otherwise provided herein with respect to the payment of interest on this Bond, and neither the Issuer nor the Trustee shall be affected by any notice to the contrary.  All such payments so made to any such Owner, or upon his or its order, shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable under this Bond.

The Owner of this Bond shall have no right to enforce the provisions of the Indenture, or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect hereto, except as provided in the Indenture.

28.     <u>Transfer and Exchange</u>.  This Bond may be exchanged for an equal aggregate principal amount of Series 2007 B Bonds, of the same maturity and bearing interest at the same rate and of other Authorized Denominations, and the transfer of this Bond may be registered, upon presentation and surrender of this Bond at the designated corporate trust office of the Trustee, together with an assignment duly executed by the Owner hereof or such Owner's attorney or legal representative.  Prior to the Rating Confirmation, the Registered Owner of this Bond shall not be permitted to transfer or sell this Bond other than to (a) an Accredited Investor within the meaning of Section 2(15) of the Securities Act of 1933, as amended upon the execution and delivery to the Trustee of an Investor Letter in the form attached to this Bond or (b) a Qualified Institutional Buyer within the meaning of Section 144 of the Securities Act of 1933, as amended.  "Rating Confirmation" shall mean confirmation that the Bonds are rated in a rating category not lower than "Ba" by Moody's Investors, Inc., "BB-" by Standard & Poor's Rating Services or "BB-" by Fitch Ratings.  The Issuer and the Trustee may require the person requesting any such exchange or transfer to reimburse them for any tax or other governmental charge payable in connection therewith.  Neither the Issuer nor the Trustee shall be required to register the transfer of this bond or make any such exchange of this Bond after this Bond or any portion hereof has been selected for redemption.

<div align="center">C-23</div>

29. <u>Modifications</u>. Modifications or alterations of the Loan Agreement or the Mortgage may be made only to the extent and in the circumstances permitted by the Indenture and the Loan Agreement.

30. <u>Governing Law</u>. This Bond shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

31. <u>Notices</u>. Except as otherwise provided in the Indenture and this Bond, when the Trustee is required to give notice to the Owner of this bond, such notice shall be mailed by first-class mail to the Owner of this Bond at such Owner's address as it appears on the registration books maintained by the Trustee. Any notice mailed as provided herein will be conclusively presumed to have been given, whether or not actually received by the addressee.

Neither the members of the Issuer nor any person executing this Bond are liable personally hereon or subject to any personal liability or accountability by reason of the issuance hereof.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]*

**IN WITNESS WHEREOF**, Massachusetts Development Finance Agency has caused this Bond to be executed in its name as a sealed instrument.

**MASSACHUSETTS DEVELOPMENT**
**FINANCE AGENCY**


By:_____
        Authorized Officer

\29695489.18

CERTIFICATE OF AUTHENTICATION

Date of Authentication: _____

This Bond is one of the Bonds of the Series designated herein and issued under the provisions of the within-mentioned Indenture.

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**


By:_____
        Authorized Officer

\29695489.18

FOR VALUE RECEIVED, _____, the undersigned, hereby sells, assigns and transfers unto _____ (Tax Identification or Social Security No. _____) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____          _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever.

SIGNATURE GUARANTEED:

_____

NOTICE:  Signature(s) must be guaranteed by a member of The New York Stock Exchange or a commercial bank or trust company.

C-27

(FORM OF INVESTOR LETTER)

## FORM OF INVESTOR LETTER

[Letterhead of Investor]

[Date]

Massachusetts Development Financing Agency          Wells Fargo Bank, National Association
160 Federal Street, 7th Floor          [Address]
Boston, Massachusetts 02110
Attention: Executive Director

Re:     Massachusetts Development Financing Agency Revenue Bond (Linden Ponds, Inc. Facility) Series 2011, Subseries I (the "Bond")

Ladies and Gentlemen:

The undersigned (the "Investor") hereby represents and warrants to you as follows:

1.      The Investor proposes to purchase the Bond.  The Investor understands that the Bond has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or the securities laws of any state, and will be sold to the Investor in reliance upon certain exemptions from registration and in reliance upon the representations and warranties of the Investor set forth herein. Capitalized terms used herein shall have the meaning given to them in the Bond.

2.      The Investor has sufficient knowledge and experience in business and financial matters in general, and investments such as the Bond in particular, and is capable of evaluating the merits and risks involved in an investment in the Bond.  The Investor is able to bear the economic risk of, and an entire loss of, an investment in the Bond.

3.      The Investor is purchasing the Bond solely for its own account for investment purposes and has no intention to resell or distribute all or any portion of, or interest in, the Bond; provided that the Investor reserves the right to transfer or dispose of the Bond at any time, and from time to time, in its complete and sole discretion, subject, however, to the restrictions described in paragraphs 4, 5 and 6 of this letter.

4.      The Investor agrees that it will only offer, sell, pledge, transfer or exchange the Bond (or any legal or beneficial interest therein) in whole, and then only (i) in accordance with an available exemption from the registration requirements of Section 5 of the 1933 Act, (ii) in accordance with any applicable state securities laws, and (iii) in accordance with the provisions of the Bond.

C-28

5. The Investor is an "accredited investor" as defined in Section 2(15) of the 1933 Act and understands that, prior to the Rating Confirmation, the Bond may be offered, resold, pledged or transferred only to a person who is a "qualified institutional buyer," within the meaning of Section 144 of the 1933 Act or to an "accredited investor" as defined in Section 2(15) of the 1933 Act and in compliance with the Bond and applicable state securities laws.

6. If the Investor sells the Bond (or any legal or beneficial interest therein) prior to the Rating Confirmation to an accredited investor that is not a qualified institutional buyer as described in paragraph 5, the Investor or its agent will obtain for your benefit, and deliver to you, from such accredited investor an Investor Letter in the form of this letter or such other materials (including, but not limited to, an opinion of counsel) as are required by you to evidence compliance of such sale and purchase with the requirements of the 1933 Act effecting an exemption from registration. The Investor hereby indemnifies the Issuer and the Trustee against any failure by the Investor to transfer the Bond in accordance with the restrictions relating thereto set forth in the Bond.

Very truly yours,

**[Name of Investor]**

[Dated: _____]

By: _____

Name: _____

Title: _____

## FORM OF SUBSERIES I OF SERIES 2011 A-2 BOND

**PRIOR TO THE RATING CONFIRMATION (HEREINAFTER DEFINED), THIS SUBSERIES I OF SERIES 2011 A-2 BOND IS ONLY TRANSFERABLE TO (1) A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION COMPLYING WITH RULE 144A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND (2) AN ACCREDITED INVESTOR WITHIN THE MEANING OF SECTION 2(15) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND IN THE CASE OF CLAUSE (2) ONLY, UPON EXECUTION AND DELIVERY OF AN INVESTOR LETTER.**

REGISTERED                                                        REGISTERED
RA-2-___                                                          $_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BOND
(LINDEN PONDS, INC. FACILITY)
SERIES 2011 A-2, SUBSERIES I (TAX-EXEMPT)

| Interest Rate | Dated Date | Maturity Date | CUSIP |
|---|---|---|---|
| 5.5% | _____ , 2011 | November 15, 2046 | |

Registered Owner:    CEDE & CO.
Principal Sum:    _____DOLLARS
                              ($_____)

THIS BOND DOES NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF AND INTEREST AND PREMIUM, IF ANY, ON THIS BOND ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), for value received, hereby promises to pay, at the Designated Office (as hereinafter defined) of WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee, or its successor in trust (the "Trustee"), solely from the sources and as hereinafter provided, to the Registered Owner hereof, or registered assigns or legal representative, the Principal Sum stated above on the Maturity Date

\29695489.18

stated above, subject to prior redemption as hereinafter provided, and to pay interest on said sum at the rates set forth above and on the dates described below and, to the extent permitted by law, interest on overdue installments of such interest at the same rate as provided herein. This Bond shall bear interest at the Interest Rate per annum shown above until said principal sum is paid, calculated on the basis of a year consisting of twelve 30-day months and payable commencing on November 15, 2011 and thereafter on May 15 and November 15 of each year and on the Resizing Tender Date (as hereinafter defined) (each, an "Interest Payment Date"). All Subseries I of Series 2011 A-2 Bonds (as hereinafter defined) shall bear interest (i) from their date of issuance, if authenticated prior to November 15, 2011, or (ii) otherwise from the May 15 or November 15 that is, or that immediately precedes, the date on which any such Subseries I of Series 2011 A-2 Bond is authenticated (unless payment of interest is in default, in which case such Subseries I of Series 2011 A-2 Bonds shall bear interest from the date to which interest has been paid).

The principal of, premium, if any, and interest on this Subseries I of Series 2011 A-2 Bond shall be payable in lawful money of the United States of America. Principal of and premium, if any, on this Subseries I of Series 2011 A-2 Bond shall be payable upon its presentation and surrender at the Designated Office of the Trustee. Interest on this Subseries I of Series 2011 A-2 Bond shall be payable to the Owner as of the Record Date by (a) check mailed to the address of the Owner as it appears on the registration books maintained by the Trustee or (b) by bank wire transfer to the Owner of $500,000 or more of Subseries I of Series 2011 A-2 Bonds who has provided the Trustee with written instructions on or before the Record Date.

32. <u>The Bonds; the Indenture</u>. This Bond is one of a duly authorized series of Bonds designated its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2, Subseries I (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Subseries I of Series 2011 A-2 Bonds"). Simultaneously with the issuance of the Series 2011 A-2 Bonds, the Issuer has issued its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-1 Bonds") and its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 B Bonds") and amended, restated and reissued its "Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand, Series 2007 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2007 B Bonds", and together with the Subseries I of Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds, and the Series 2011 B Bonds, the "Series 2011 Bonds"). The Series 2011 Bonds and any Additional Bonds (as defined in the Indenture) are, collectively, the "Bonds." The Series 2011 Bonds have been issued under Massachusetts General Laws, Chapters 23G and 40D, as amended (the "Act"), and the Amended and Restated Trust Indenture dated as of _____, 2011 (the "Indenture"), between the Issuer and the Trustee. The terms of the Series 2011 Bonds include those stated in the Indenture, and the Series 2011 Bonds are subject to all such terms. The Indenture describes the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Issuer, the Trustee and the Owners of the Series 2011 Bonds.

\29695489.18

33.     Loan Agreement; Mortgage; Revenues.  The Issuer has entered into an Amended and Restated Loan Agreement dated as of _____, 2011 (the "Loan Agreement"), with Linden Ponds, Inc. (the "Corporation"), pursuant to which the Issuer is deemed to have made a loan to the Corporation by virtue of the issuance of the Series 2011 Bonds.  Pursuant to the Loan Agreement, the Corporation has agreed to pay the principal of and premium, if any, and interest on the Series 2011 Bonds, the Series 2007 Bonds and any Additional Bonds and Parity Obligations (as defined in the Indenture) as set forth therein.  As security for the obligations of the Corporation under the Loan Agreement, (1) the Corporation has granted a lien and claim on and security interest in the Receipts (as defined in the Indenture) to the Issuer pursuant to the Loan Agreement, subject to certain Permitted Encumbrances (as defined in the Indenture), and (2) the Corporation has executed and delivered an amended and restated mortgage and security agreement dated as of _____ 1, 2011 (the "Mortgage"), to the Trustee and its assigns.

The Revenues (as hereinafter defined) are pledged under the Indenture for the equal and ratable benefit of the Owners from time to time of Parity Debt (as hereinafter defined), except to the extent set forth in the Indenture.  As defined in the Indenture, the "Revenues" include (i) all payments to the Issuer or the Trustee pursuant to the Loan Agreement and the Mortgage, including without limitation payments from the Receipts and (ii) all other receipts of the Issuer or the Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 (each as defined in the Indenture) with the proceeds of Bonds (as defined in the Indenture); provided, however, that Revenues do not include Reserved Rights of the Issuer (as defined in the Indenture).

34.     Additional Parity Debt.  The Indenture provides that Additional Bonds and Parity Obligations may be issued within the limitations and provisions of the Indenture.  The Bonds and any Parity Obligations are referred to, collectively, as "Parity Debt."  All Parity Debt issued within the limitations and provisions of the Indenture shall be designated as Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt and shall be secured by the Revenues, the Property and other property pledged by the Corporation, as more particularly described in the Indenture.

35.     The Subseries I of Series 2011 A-2 Bonds.  All the Subseries I of Series 2011 A-2 Bonds are of like tenor except as to number and principal amount. The Subseries I of Series 2011 A-2 Bonds are issuable only in registered form without coupons in denominations of $100,000 or any integral multiple of $1 in excess of $100,000 ("Authorized Denominations"), provided that if the Subseries I of Series 2011 A-2 Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Subseries I of Series 2011 A-2 Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and provided further that any Subseries I of Series 2011 Bonds issued in exchange for Series 2007 Bonds, including the exchange of Subseries I of Series 2011 Bonds for Series 2007 Bonds to Owners holding a beneficial interest of such Series 2007 Bonds on the Closing Date, and any transfer of such Subseries I of Series 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an Authorized Denomination.

D-3

36.   <u>Redemption</u>.  The Subseries I of Series 2011 A-2 Bonds at the time outstanding may be redeemed prior to their respective maturities as follows:

(f)   <u>Optional Redemption</u>.  The Subseries I of Series 2011 A-2 Bonds are subject to optional redemption prior to their maturity by the Issuer upon the written direction of the Corporation, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest thereon to the redemption date.

(g)   <u>Mandatory Redemption</u>. The Subseries I of Series 2011 A-2 Bonds are subject to mandatory redemption in Authorized Denominations on any date occurring at least 45 days after the first to occur of (i) the Construction Commencement Date or (ii) the Resizing Tender Date, from the Corporation's Excess Liquidity as of the immediately preceding December 31, March 31, June 30 and September 30, respectively (as certified to the Trustee by the Corporation in writing at least 40 days prior to the applicable redemption date) from moneys deposited in the Redemption Fund from the Construction Account in accordance with the Indenture and from any other moneys deposited by the Corporation in the Redemption Fund with instructions to use such moneys to redeem the Subseries I of Series 2011 A-2 Bonds, at a price of 100% of the principal amount of the Subseries I of Series 2011 A-2 Bonds to be redeemed plus interest accrued to the redemption date.

(c)   <u>Extraordinary Redemption</u>.  The Subseries I of Series 2011 A-2 Bonds are subject to extraordinary redemption prior to maturity as a whole at any time or in part on any Interest Payment Date, at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date, from funds deposited in the Redemption Fund (created by the Indenture) from (i) proceeds received by the Corporation from title insurance with respect to the Property (defined in the Indenture); (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments received in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.

(d)   <u>Selection of Bonds to Be Redeemed</u>.  If fewer than all of the Subseries I of Series 2011 A-2 Bonds shall be called for redemption, the Trustee shall select the particular Subseries I of Series 2011 A-2 Bonds or portions of the Subseries I of Series 2011 A-2 Bonds to be redeemed by lot or in such other manner as the Trustee in its discretion may deem proper; provided, however, that the portion of any Subseries I of Series 2011 A-2 Bond to be redeemed shall be in Authorized Denominations; and provided further that, in selecting the Subseries I of Series 2011 A-2 Bonds for redemption, the Trustee shall treat each Bond as representing that number of Subseries I of Series 2011 A-2 Bonds which is obtained by dividing the principal amount of such Subseries I of Series 2011 A-2 Bond by $5,000.  Money available for the redemption of Parity Debt shall be allocated to the Subseries I of Series 2011 Bonds, the Subseries I of Series 2007 Bonds and to any Additional Bonds and Parity Obligations outstanding under the Indenture in the manner provided in the Indenture.

\29695489.18

(e)     Notice of Redemption.  The Trustee shall mail notice of the call for any redemption by first-class mail at least 30 days before the redemption date to the registered owners of the Subseries I of Series 2011 A-2 Bonds to be redeemed; provided, however, that so long as the Subseries I of Series 2011 A-2 Bonds are maintained in book-entry form, notice of the call for redemption required to be given to the registered owners shall be given only to the securities depository or its nominee in whose name the Subseries I of Series 2011 A-2 Bonds are registered.  The failure to mail any such notice to any registered owner of the Subseries I of Series 2011 A-2 Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Subseries I of Series 2011 A-2 Bonds.  If for any reason it is impossible or impractical to mail such notice of redemption, the Trustee shall give notice of the call for any redemption by publication at least once in a daily newspaper of general circulation in the Borough of Manhattan, City and State of New York, or a financial journal published in such Borough, which notice shall be published at least 30 days before the redemption date.  In the event notice is published as provided above, the mailing of notice to the registered owners of the Subseries I of Series 2011 A-2 Bonds to be redeemed shall not be a condition precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of the Subseries I of Series 2011 A-2 Bonds.

(f)     Effect of Call for Redemption.  On the date designated for redemption, notice having been given as provided herein, the Subseries I of Series 2011 A-2 Bonds or portions of the Subseries I of Series 2011 A-2 Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Subseries I of Series 2011 A-2 Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price and accrued interest are held by the Trustee as provided in the Indenture, interest on such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption shall cease to accrue, such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under the Indenture, and the registered owners thereof shall have no rights in respect of such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof and the accrued interest thereon so held by the Trustee.  If a portion of this Bond shall be called for redemption, a new Subseries I of Series 2011 A-2 Bond or Subseries I of Series 2011 A-2 Bonds in the aggregate principal amount equal to the unredeemed portion hereof, of the same series and maturity and bearing interest at the same rate, shall be issued to the registered owner upon the surrender hereof.

(g)     Provisions Applicable to Book-Entry Bonds.  So long as all of the Subseries I of Series 2011 A-2 Bonds shall be maintained in Book-Entry Form with a Depository (as defined in the Indenture) in accordance with the Indenture, in the event that part, but not all, of this Bond shall be called for redemption, the holder of this Bond may elect not to surrender this Bond in exchange for a new Subseries I of Series 2011 A-2 Bond in accordance with subsection (f) above. For all purposes, the principal amount of this Bond outstanding at any time shall be equal to the lesser of (A) the Principal Sum shown on the face hereof and (B) such Principal Sum reduced by the principal amount of any partial redemption of this Bond following which the holder of this Bond has elected not to surrender this Bond in accordance with this subsection (g). THEREFORE, IT CANNOT BE DETERMINED FROM THE FACE OF THIS BOND WHETHER A PART OF THE PRINCIPAL OF THIS BOND HAS BEEN PAID.

D-5

37.    <u>Mandatory Tender and Exchange</u>.  The Subseries I of Series 2011 A-2 Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  "Resizing Tender Date" means the date which is 45 days after the later of (a) the date on which the Resizing Event occurs and (b) the date on which the Corporation has complied with Section 4.05 of the Loan Agreement, at which time the Subseries I of Series 2011 A Bonds shall be subject to mandatory tender and exchange in accordance with Sections 2.04, 2.05 and 2.06 of the Indenture.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Subseries I of Series 2011 A-2 Bonds.  Such notice shall state:  (1) that a Resizing Event has occurred, the date that is the Resizing Tender Date and the percentage of the resize; (2) that the Subseries I of Series 2011 A-2 Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the Owners do not have a right to waive the mandatory tender of the Subseries I of Series 2011 A-2 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Subseries I of Series 2011 A-2 Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Resizing Tender Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Subseries I of Series 2011 A-2 Bonds pursuant to the Indenture, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Subseries I of Series 2011 A-2 Bonds so tendered will be exchanged for new Subseries I of Series 2011 A-2 Bonds on the Resizing Tender Date; and (4) that, as of the Resizing Tender Date, the Subseries I of Series 2011 A-2 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Subseries I of Series 2011 A-2 Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under the Indenture, except to receive new Subseries I of Series 2011 A-2 Bonds in exchange therefor as provided in the Indenture.

Any Subseries I of Series 2011 A-2 Bond to be exchanged on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for exchange and to have been exchanged for new Subseries I of Series 2011 A-2 Bonds in accordance with the Indenture. Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Subseries I of Series 2011 A-2 Bond or Bonds in the aggregate principal amount set forth in the Indenture to the Owner of the Subseries I of Series 2011 A-2 Bond deemed to have been tendered and exchanged; (B) such Subseries I of Series 2011 A-2 Bond deemed to have been tendered and purchased shall no longer be Outstanding under the Indenture; (C) interest on such Subseries I of Series 2011 A-2 Bond deemed to have been tendered and exchanged shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Subseries I of Series 2011 A-2 Bond shall cease to be entitled to the benefits and security of the Indenture as of the date on which such Subseries I of Series 2011 A-2 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Subseries I of Series 2011 A-2 Bond by the Owner thereof.

On the Resizing Tender Date, the Subseries I of Series 2011 A-2 Bonds tendered or deemed tendered shall be exchanged for Subseries I of Series 2011 A-2 Bonds resized in principal amount determined by the Independent Consultant in accordance with the Indenture.

\29695489.18

Any accrued and unpaid interest on the Subseries I of Series 2011 A-2 Bonds as of the Resizing Tender Date shall be due and payable as set forth in the Indenture.

"Resizing Event" means the occurrence of any one of the following:

(a)     if the Corporation never satisfies the Commencement Test on or before February 29, 2016, the date of delivery of the Corporation's audited financial statements for Fiscal Year 2015;

(b)     if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements for the earlier of:

     (1)     the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and

     (2)     Fiscal Year 2017;

(c)     if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2017, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for the earlier of:

     (1)     the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and

     (2)     the Fiscal Year in which the Construction Loan is repaid;

(d)     if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and the Corporation is not in default of its obligation to proceed with construction of Residential Building 2.5 under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of:

     (1)     the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and

     (2)     Fiscal Year 2016; and

(e)     if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends.

(f)     Notwithstanding subsections (a) through (e) above, any pending Resizing Event may be extended due to a Good Cause Delay, as provided in Section 6.04 of the Loan Agreement.

"Resizing Financial Statements" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if the Corporation's audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the August 31 immediately following such Fiscal Year and the Holders of the Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use the Corporation's unaudited financial statements from such Fiscal Year reviewed by the Corporation's auditor under an agreed upon procedures letter or some other arrangement approved by the Holders of a majority in aggregate principal amount of the Senior Parity Debt.

38.     Acceleration; Defeasance.  In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Series 2011 Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon.

The Indenture prescribes the manner in which it may be discharged and provides that the Series 2011 Bonds shall be deemed to be paid if moneys or Defeasance Obligations (as defined in the Indenture), the principal of and interest on which, when due, will be sufficient to pay the principal or redemption price of and interest on such Series 2011 Bonds to the date of maturity or redemption thereof, shall have been deposited with the Trustee.

39.     Persons Deemed Owners; Restrictions upon Actions by Individual Holders.  The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Issuer or the Trustee) for the purpose of receiving payment of or on account of the principal or redemption price of this Bond, and for all other purposes except as otherwise provided herein with respect to the payment of interest on this Bond, and neither the Issuer nor the Trustee shall be affected by any notice to the contrary.  All such payments so made to any such registered owner, or upon his order, shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable under this Bond.

The registered owner of this Bond shall have no right to enforce the provisions of the Indenture, or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect hereto, except as provided in the Indenture.

40.     Transfer and Exchange.  This Bond may be exchanged for an equal aggregate principal amount of the Subseries I of Series 2011 A-2 Bonds, of other authorized denominations, and the transfer of this Bond may be registered, upon presentation and surrender of this Bond at the designated corporate trust office of the Trustee in _____, together with an assignment duly executed by the registered owner hereof or such owner's attorney or legal representative.  Prior to the Rating Confirmation, the Registered Owner of this Bond shall

D-8

not be permitted to transfer or sell this Bond other than to (a) an Accredited Investor within the meaning of Section 2(15) of the Securities Act of 1933, as amended, upon the execution and delivery to the Trustee of an Investor Letter in the form attached to this Bond or (b) a Qualified Institutional Buyer within the meaning of Section 144 of the Securities Act of 1933, as amended. "Rating Confirmation" shall mean confirmation that the Bonds are rated in a rating category not lower than "Ba" by Moody's Investors, Inc., "BB-" by Standard & Poor's Rating Services or "BB-" by Fitch Ratings. The Issuer and the Trustee may require the person requesting any such exchange or transfer to reimburse them for any tax or other governmental charge, shipping charge or insurance payable in connection therewith. Neither the Issuer nor the Trustee shall be required to register the transfer of this Bond or make any such exchange of this Bond after this Bond or any portion hereof has been selected for redemption.

41.     <u>Amendment</u>. Certain amendments to the Indenture are permitted without the consent of the Holders of Parity Debt, including this Bond. In addition, with the prior written consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing the Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by the Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of the Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of the Indenture, if there is outstanding any Special Senior Parity Debt, no amendment may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)     If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)     The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by the Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)     If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

42.     Modifications.  Modifications or alterations of the Indenture, the Loan Agreement or the Mortgage may be made only to the extent and in the circumstances permitted by the Indenture, the Loan Agreement and the Mortgage.

43.     Negotiability.  As declared by the Act, this Bond shall be and be deemed to be for all purposes a negotiable instrument subject only to the provisions for registration and registration of transfer stated herein.

44.     Governing Law.  This Bond shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

45.     Notices.  Except as otherwise provided in the Indenture and this Bond, when the Trustee is required to give notice to the owner of this Bond, such notice shall be mailed by first-class mail to the registered owner of this Bond at such owner's address as it appears on the registration books maintained by the Trustee.  Any notice mailed as provided herein will be conclusively presumed to have been given, whether or not actually received by the addressees.

Neither the members of the Issuer nor any person executing this Bond are liable personally hereon or subject to any personal liability or accountability by reason of the issuance hereof.

D-10

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]*

**IN WITNESS WHEREOF**, Massachusetts Development Finance Agency has caused this Bond to be executed in its name as a sealed instrument.

<div align="right">

**MASSACHUSETTS DEVELOPMENT
FINANCE AGENCY**


By:_____
      Authorized Officer

</div>

\29695489.18

# CERTIFICATE OF AUTHENTICATION

Date of Authentication:

This Bond is one of the Bonds of the Series designated herein and issued under the provisions of the within-mentioned Indenture.

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By:_____
      Authorized Officer

\29695489.18

## (FORM OF ASSIGNMENT)

FOR VALUE RECEIVED, _____, the undersigned, hereby sells, assigns and transfers unto _____ (Tax Identification or Social Security No. _____) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.


Dated:_____

_____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever.


SIGNATURE GUARANTEED:


_____

NOTICE:  Signature(s) must be guaranteed by a member of The New York Stock Exchange or a commercial bank or trust company.

## FORM OF INVESTOR LETTER
[Letterhead of Investor]

[Date]

Massachusetts Development Financing Agency          Wells Fargo Bank, National Association
160 Federal Street, 7th Floor          [Address]
Boston, Massachusetts 02110
Attention: Executive Director

      Re:    Massachusetts Development Financing Agency Revenue Bond (Linden Ponds, Inc. Facility) Series 2011 (the "Bond")

Ladies and Gentlemen:

The undersigned (the "Investor") hereby represents and warrants to you as follows:

1.      The Investor proposes to purchase the Bond. The Investor understands that the Bond has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or the securities laws of any state, and will be sold to the Investor in reliance upon certain exemptions from registration and in reliance upon the representations and warranties of the Investor set forth herein. Capitalized terms used herein shall have the meaning given to them in the Bond.

2.      The Investor has sufficient knowledge and experience in business and financial matters in general, and investments such as the Bond in particular, and is capable of evaluating the merits and risks involved in an investment in the Bond. The Investor is able to bear the economic risk of, and an entire loss of, an investment in the Bond.

3.      The Investor is purchasing the Bond solely for its own account for investment purposes and has no intention to resell or distribute all or any portion of, or interest in, the Bond; provided that the Investor reserves the right to transfer or dispose of the Bond at any time, and from time to time, in its complete and sole discretion, subject, however, to the restrictions described in paragraphs 4, 5 and 6 of this letter.

4.      The Investor agrees that it will only offer, sell, pledge, transfer or exchange the Bond (or any legal or beneficial interest therein) in whole, and then only (i) in accordance with an available exemption from the registration requirements of Section 5 of the 1933 Act, (ii) in accordance with any applicable state securities laws, and (iii) in accordance with the provisions of the Bond.

5.      The Investor is an "accredited investor" as defined in Section 2(15) of the 1933 Act and understands that, prior to the Rating Confirmation, the Bond may be offered, resold, pledged or transferred only to a person who is a "qualified institutional buyer," within the

meaning of Section 144 of the 1933 Act or to an "accredited investor" as defined in Section 2(15) of the 1933 Act and in compliance with the Bond and applicable state securities laws.

      6.     If the Investor sells the Bond (or any legal or beneficial interest therein) prior to the Rating Confirmation to an accredited investor that is not a qualified institutional buyer as described in paragraph 5, the Investor or its agent will obtain for your benefit, and deliver to you, from such accredited investor an Investor Letter in the form of this letter or such other materials (including, but not limited to, an opinion of counsel) as are required by you to evidence compliance of such sale and purchase with the requirements of the 1933 Act effecting an exemption from registration. The Investor hereby indemnifies the Issuer and the Trustee against any failure by the Investor to transfer the Bond in accordance with the restrictions relating thereto set forth in the Bond.

Very truly yours,

**[Name of Investor]**

[Dated: _____]

By: _____
Name: _____
Title: _____

FORM OF SUBSERIES I OF SERIES 2011 A-2 BOND

**PRIOR TO THE RATING CONFIRMATION (HEREINAFTER DEFINED), THIS SUBSERIES I OF SERIES 2011 A-2 BOND IS ONLY TRANSFERABLE TO (1) A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION COMPLYING WITH RULE 144A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND (2) AN ACCREDITED INVESTOR WITHIN THE MEANING OF SECTION 2(15) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND IN THE CASE OF CLAUSE (2) ONLY, UPON EXECUTION AND DELIVERY OF AN INVESTOR LETTER.**

REGISTERED                                                           REGISTERED
RA-2-___                                                              $_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BOND
(LINDEN PONDS, INC. FACILITY)
SERIES 2011 A-2, SUBSERIES I (TAX-EXEMPT)

| Interest Rate | Dated Date | Maturity Date | CUSIP |
|---|---|---|---|
| 5.5% | _____ , 2011 | November 15, 2046 | |

Registered Owner:          CEDE & CO.
Principal Sum:             _____DOLLARS
                           ($_____)

THIS BOND DOES NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF AND INTEREST AND PREMIUM, IF ANY, ON THIS BOND ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), for value received, hereby promises to pay, at the Designated Office (as hereinafter defined) of WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee, or its successor in trust (the "Trustee"), solely from the sources and as hereinafter provided, to the Registered Owner hereof, or registered assigns or legal representative, the Principal Sum stated above on the Maturity Date

stated above, subject to prior redemption as hereinafter provided, and to pay interest on said sum at the rates set forth above and on the dates described below and, to the extent permitted by law, interest on overdue installments of such interest at the same rate as provided herein. This Bond shall bear interest at the Interest Rate per annum shown above until said principal sum is paid, calculated on the basis of a year consisting of twelve 30-day months and payable commencing on November 15, 2011 and thereafter on May 15 and November 15 of each year and on the Resizing Tender Date (as hereinafter defined) (each, an "Interest Payment Date"). All Subseries I of Series 2011 A-2 Bonds (as hereinafter defined) shall bear interest (i) from their date of issuance, if authenticated prior to November 15, 2011, or (ii) otherwise from the May 15 or November 15 that is, or that immediately precedes, the date on which any such Subseries I of Series 2011 A-2 Bond is authenticated (unless payment of interest is in default, in which case such Subseries I of Series 2011 A-2 Bonds shall bear interest from the date to which interest has been paid).

The principal of, premium, if any, and interest on this Subseries I of Series 2011 A-2 Bond shall be payable in lawful money of the United States of America. Principal of and premium, if any, on this Subseries I of Series 2011 A-2 Bond shall be payable upon its presentation and surrender at the Designated Office of the Trustee. Interest on this Subseries I of Series 2011 A-2 Bond shall be payable to the Owner as of the Record Date by (a) check mailed to the address of the Owner as it appears on the registration books maintained by the Trustee or (b) by bank wire transfer to the Owner of $500,000 or more of Subseries I of Series 2011 A-2 Bonds who has provided the Trustee with written instructions on or before the Record Date.

46. <u>The Bonds; the Indenture</u>. This Bond is one of a duly authorized series of Bonds designated its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2, Subseries I (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Subseries I of Series 2011 A-2 Bonds"). Simultaneously with the issuance of the Series 2011 A-2 Bonds, the Issuer has issued its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-1 Bonds") and its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 B Bonds") and amended, restated and reissued its "Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand, Series 2007 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2007 B Bonds", and together with the Subseries I of Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds, and the Series 2011 B Bonds, the "Series 2011 Bonds"). The Series 2011 Bonds and any Additional Bonds (as defined in the Indenture) are, collectively, the "Bonds." The Series 2011 Bonds have been issued under Massachusetts General Laws, Chapters 23G and 40D, as amended (the "Act"), and the Amended and Restated Trust Indenture dated as of _____, 2011 (the "Indenture"), between the Issuer and the Trustee. The terms of the Series 2011 Bonds include those stated in the Indenture, and the Series 2011 Bonds are subject to all such terms. The Indenture describes the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Issuer, the Trustee and the Owners of the Series 2011 Bonds.

47.     <u>Loan Agreement; Mortgage; Revenues</u>.  The Issuer has entered into an Amended and Restated Loan Agreement dated as of _____, 2011 (the "Loan Agreement"), with Linden Ponds, Inc. (the "Corporation"), pursuant to which the Issuer is deemed to have made a loan to the Corporation by virtue of the issuance of the Series 2011 Bonds.  Pursuant to the Loan Agreement, the Corporation has agreed to pay the principal of and premium, if any, and interest on the Series 2011 Bonds, the Series 2007 Bonds and any Additional Bonds and Parity Obligations (as defined in the Indenture) as set forth therein.  As security for the obligations of the Corporation under the Loan Agreement, (1) the Corporation has granted a lien and claim on and security interest in the Receipts (as defined in the Indenture) to the Issuer pursuant to the Loan Agreement, subject to certain Permitted Encumbrances (as defined in the Indenture), and (2) the Corporation has executed and delivered an amended and restated mortgage and security agreement dated as of _____ 1, 2011 (the "Mortgage"), to the Trustee and its assigns.

The Revenues (as hereinafter defined) are pledged under the Indenture for the equal and ratable benefit of the Owners from time to time of Parity Debt (as hereinafter defined), except to the extent set forth in the Indenture.  As defined in the Indenture, the "Revenues" include (i) all payments to the Issuer or the Trustee pursuant to the Loan Agreement and the Mortgage, including without limitation payments from the Receipts and (ii) all other receipts of the Issuer or the Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 (each as defined in the Indenture) with the proceeds of Bonds (as defined in the Indenture); provided, however, that Revenues do not include Reserved Rights of the Issuer (as defined in the Indenture).

48.     <u>Additional Parity Debt</u>.  The Indenture provides that Additional Bonds and Parity Obligations may be issued within the limitations and provisions of the Indenture.  The Bonds and any Parity Obligations are referred to, collectively, as "Parity Debt."  All Parity Debt issued within the limitations and provisions of the Indenture shall be designated as Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt and shall be secured by the Revenues, the Property and other property pledged by the Corporation, as more particularly described in the Indenture.

49.     <u>The Subseries I of Series 2011 A-2 Bonds</u>.  All the Subseries I of Series 2011 A-2 Bonds are of like tenor except as to number and principal amount. The Subseries I of Series 2011 A-2 Bonds are issuable only in registered form without coupons in denominations of $100,000 or any integral multiple of $1 in excess of $100,000 ("Authorized Denominations"), <u>provided</u> that if the Subseries I of Series 2011 A-2 Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Subseries I of Series 2011 A-2 Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and <u>provided further</u> that any Subseries I of Series 2011 Bonds issued in exchange for Series 2007 Bonds, including the exchange of Subseries I of Series 2011 Bonds for Series 2007 Bonds to Owners holding a beneficial interest of such Series 2007 Bonds on the Closing Date, and any transfer of such Subseries I of Series 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an Authorized Denomination.

50.  Redemption.  The Subseries I of Series 2011 A-2 Bonds at the time outstanding may be redeemed prior to their respective maturities as follows:

(e)  Optional Redemption.  The Subseries I of Series 2011 A-2 Bonds are subject to optional redemption prior to their maturity by the Issuer upon the written direction of the Corporation, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed, plus accrued interest thereon to the redemption date.

(f)  Mandatory Redemption. The Subseries I of Series 2011 A-2 Bonds are subject to mandatory redemption in Authorized Denominations on any date occurring at least 45 days after the first to occur of (i) the Construction Commencement Date or (ii) the Resizing Tender Date, from the Corporation's Excess Liquidity as of the immediately preceding December 31, March 31, June 30 and September 30, respectively (as certified to the Trustee by the Corporation in writing at least 40 days prior to the applicable redemption date) from moneys deposited in the Redemption Fund from the Construction Account in accordance with the Indenture and from any other moneys deposited by the Corporation in the Redemption Fund with instructions to use such moneys to redeem the Subseries I of Series 2011 A-2 Bonds, at a price of 100% of the principal amount of the Subseries I of Series 2011 A-2 Bonds to be redeemed plus interest accrued to the redemption date.

(h)  Extraordinary Redemption.  The Subseries I of Series 2011 A-2 Bonds are subject to extraordinary redemption prior to maturity as a whole at any time or in part on any Interest Payment Date, at a redemption price equal to the principal amount thereof plus accrued interest thereon to the redemption date, from funds deposited in the Redemption Fund (created by the Indenture) from (i) proceeds received by the Corporation from title insurance with respect to the Property (defined in the Indenture); (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments received in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.

(g)  Selection of Bonds to Be Redeemed.  If fewer than all of the Subseries I of Series 2011 A-2 Bonds shall be called for redemption, the Trustee shall select the particular Subseries I of Series 2011 A-2 Bonds or portions of the Subseries I of Series 2011 A-2 Bonds to be redeemed by lot or in such other manner as the Trustee in its discretion may deem proper; provided, however, that the portion of any Subseries I of Series 2011 A-2 Bond to be redeemed shall be in Authorized Denominations; and provided further that, in selecting the Subseries I of Series 2011 A-2 Bonds for redemption, the Trustee shall treat each Bond as representing that number of Subseries I of Series 2011 A-2 Bonds which is obtained by dividing the principal amount of such Subseries I of Series 2011 A-2 Bond by $5,000.  Money available for the redemption of Parity Debt shall be allocated to the Subseries I of Series 2011 Bonds, the Subseries I of Series 2007 Bonds and to any Additional Bonds and Parity Obligations outstanding under the Indenture in the manner provided in the Indenture.

(i)    Notice of Redemption.  The Trustee shall mail notice of the call for any redemption by first-class mail at least 30 days before the redemption date to the registered owners of the Subseries I of Series 2011 A-2 Bonds to be redeemed; provided, however, that so long as the Subseries I of Series 2011 A-2 Bonds are maintained in book-entry form, notice of the call for redemption required to be given to the registered owners shall be given only to the securities depository or its nominee in whose name the Subseries I of Series 2011 A-2 Bonds are registered.  The failure to mail any such notice to any registered owner of the Subseries I of Series 2011 A-2 Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Subseries I of Series 2011 A-2 Bonds.  If for any reason it is impossible or impractical to mail such notice of redemption, the Trustee shall give notice of the call for any redemption by publication at least once in a daily newspaper of general circulation in the Borough of Manhattan, City and State of New York, or a financial journal published in such Borough, which notice shall be published at least 30 days before the redemption date.  In the event notice is published as provided above, the mailing of notice to the registered owners of the Subseries I of Series 2011 A-2 Bonds to be redeemed shall not be a condition precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of the Subseries I of Series 2011 A-2 Bonds.

(j)    Effect of Call for Redemption.  On the date designated for redemption, notice having been given as provided herein, the Subseries I of Series 2011 A-2 Bonds or portions of the Subseries I of Series 2011 A-2 Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Subseries I of Series 2011 A-2 Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price and accrued interest are held by the Trustee as provided in the Indenture, interest on such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption shall cease to accrue, such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under the Indenture, and the registered owners thereof shall have no rights in respect of such Subseries I of Series 2011 A-2 Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof and the accrued interest thereon so held by the Trustee.  If a portion of this Bond shall be called for redemption, a new Subseries I of Series 2011 A-2 Bond or Subseries I of Series 2011 A-2 Bonds in the aggregate principal amount equal to the unredeemed portion hereof, of the same series and maturity and bearing interest at the same rate, shall be issued to the registered owner upon the surrender hereof.

(k)    Provisions Applicable to Book-Entry Bonds.  So long as all of the Subseries I of Series 2011 A-2 Bonds shall be maintained in Book-Entry Form with a Depository (as defined in the Indenture) in accordance with the Indenture, in the event that part, but not all, of this Bond shall be called for redemption, the holder of this Bond may elect not to surrender this Bond in exchange for a new Subseries I of Series 2011 A-2 Bond in accordance with subsection (f) above. For all purposes, the principal amount of this Bond outstanding at any time shall be equal to the lesser of (A) the Principal Sum shown on the face hereof and (B) such Principal Sum reduced by the principal amount of any partial redemption of this Bond following which the holder of this Bond has elected not to surrender this Bond in accordance with this subsection (g). THEREFORE, IT CANNOT BE DETERMINED FROM THE FACE OF THIS BOND WHETHER A PART OF THE PRINCIPAL OF THIS BOND HAS BEEN PAID.

51.     _Mandatory Tender and Exchange_.  The Subseries I of Series 2011 A-2 Bonds are subject to mandatory tender and exchange on the Resizing Tender Date.  "Resizing Tender Date" means the date which is 45 days after the later of (a) the date on which the Resizing Event occurs and (b) the date on which the Corporation has complied with Section 4.05 of the Loan Agreement, at which time the Subseries I of Series 2011 A Bonds shall be subject to mandatory tender and exchange in accordance with Sections 2.04, 2.05 and 2.06 of the Indenture.  At least 35 days prior to the Resizing Tender Date, the Trustee shall mail a notice to the Owners of the Subseries I of Series 2011 A-2 Bonds.  Such notice shall state:  (1) that a Resizing Event has occurred, the date that is the Resizing Tender Date and the percentage of the resize; (2) that the Subseries I of Series 2011 A-2 Bonds will be subject to mandatory tender on the Resizing Tender Date; (3) that the Owners do not have a right to waive the mandatory tender of the Subseries I of Series 2011 A-2 Bonds and that all of such Bonds must be tendered for exchange at or prior to 10:00 a.m. prevailing Baltimore, Maryland time, on the Resizing Tender Date (A) if such Subseries I of Series 2011 A-2 Bonds are in Book-Entry Form, by book-entry delivery thereof to the account of the Resizing Tender Agent maintained with the Depository or (B) if physical bond certificates have been delivered to the Owners of such Subseries I of Series 2011 A-2 Bonds pursuant to the Indenture, delivery thereof to the Trustee at its Designated Office (together with an appropriate endorsement for transfer or accompanied by a bond power endorsed in blank), and that such Subseries I of Series 2011 A-2 Bonds so tendered will be exchanged for new Subseries I of Series 2011 A-2 Bonds on the Resizing Tender Date; and (4) that, as of the Resizing Tender Date, the Subseries I of Series 2011 A-2 Bonds will be deemed to have been tendered on such Resizing Tender Date, shall be deemed to be no longer Outstanding under the Indenture, and shall cease to bear interest as of such Resizing Tender Date, whether or not such Subseries I of Series 2011 A-2 Bonds are tendered to the Trustee on such date, and that the Owners thereof shall have no rights with respect thereto or under the Indenture, except to receive new Subseries I of Series 2011 A-2 Bonds in exchange therefor as provided in the Indenture.

Any Subseries I of Series 2011 A-2 Bond to be exchanged on a Resizing Tender Date that is not delivered by the Owner thereof to the Trustee on such Resizing Tender Date shall nonetheless be deemed to have been tendered by the Owner thereof for exchange and to have been exchanged for new Subseries I of Series 2011 A-2 Bonds in accordance with the Indenture.  Thereafter, (A) the Issuer shall execute and the Trustee shall authenticate and deliver a new Subseries I of Series 2011 A-2 Bond or Bonds in the aggregate principal amount set forth in the Indenture to the Owner of the Subseries I of Series 2011 A-2 Bond deemed to have been tendered and exchanged; (B) such Subseries I of Series 2011 A-2 Bond deemed to have been tendered and purchased shall no longer be Outstanding under the Indenture; (C) interest on such Subseries I of Series 2011 A-2 Bond deemed to have been tendered and exchanged shall cease to accrue to the Owner thereof as of the Resizing Tender Date; (D) such Subseries I of Series 2011 A-2 Bond shall cease to be entitled to the benefits and security of the Indenture as of the date on which such Subseries I of Series 2011 A-2 Bond is deemed to have been tendered and exchanged; and (E) the Registrar will not register, and the Trustee will not recognize, any further transfers of such Subseries I of Series 2011 A-2 Bond by the Owner thereof.

On the Resizing Tender Date, the Subseries I of Series 2011 A-2 Bonds tendered or deemed tendered shall be exchanged for Subseries I of Series 2011 A-2 Bonds resized in principal amount determined by the Independent Consultant in accordance with the Indenture.

Any accrued and unpaid interest on the Subseries I of Series 2011 A-2 Bonds as of the Resizing Tender Date shall be due and payable as set forth in the Indenture.

"Resizing Event" means the occurrence of any one of the following:

(a)    if the Corporation never satisfies the Commencement Test on or before February 29, 2016, the date of delivery of the Corporation's audited financial statements for Fiscal Year 2015;

(b)    if Residential Building 2.5 is constructed and the Construction Loan is fully paid by December 31, 2016, the date of delivery of the Resizing Financial Statements for the earlier of:

(1)    the second Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two is at least 95%; and

(2)    Fiscal Year 2017;

(c)    if the Construction Loan is not fully repaid by December 31, 2016, then the date of delivery of the Resizing Financial Statements for the year in which the Construction Loan is repaid; except that (i) if the Bank Tender Date has not been extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for Fiscal Year 2017, whether or not the Construction Loan is fully repaid at such time, and (ii) if the Bank Tender Date is extended then the Resizing Event under this clause (c) will be the date of delivery of the Resizing Financial Statements for the earlier of:

(1)    the Fiscal Year immediately preceding the Fiscal Year to which the Bank Tender Date is extended (including subsequent extensions, if any); and

(2)    the Fiscal Year in which the Construction Loan is repaid;

(d)    if the Construction Loan is not funded in accordance with the Construction Loan Term Sheet and the Corporation is not in default of its obligation to proceed with construction of Residential Building 2.5 under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the earlier of:

(1)    the Fiscal Year following the first Fiscal Year during which the average annual occupancy of the Residential Units in Neighborhood One and Neighborhood Two (excluding Residential Building 2.5) is at least 95%; and

(2)    Fiscal Year 2016; and

(e)    if construction of Residential Building 2.5 was never started due to Good Cause as of the end of the Good Cause Period under Section 4.05 of the Loan Agreement, then the date of delivery of the Resizing Financial Statements for the Fiscal Year preceding the Fiscal Year in which the Good Cause Period ends.

(f)     Notwithstanding subsections (a) through (e) above, any pending Resizing Event may be extended due to a Good Cause Delay, as provided in Section 6.04 of the Loan Agreement.

"Resizing Financial Statements" means for any Fiscal Year the audited financial statements for such Fiscal Year, except that if the Corporation's audited financial statements for the applicable Fiscal Year to be used in calculating a resizing have not been delivered by the August 31 immediately following such Fiscal Year and the Holders of the Series 2007 B Bonds are entitled to tender such Bonds prior to December 31 of the year following such August 31, then instead of audited financial statements for such Fiscal Year, an Independent Consultant will use the Corporation's unaudited financial statements from such Fiscal Year reviewed by the Corporation's auditor under an agreed upon procedures letter or some other arrangement approved by the Holders of a majority in aggregate principal amount of the Senior Parity Debt.

52.     Acceleration; Defeasance.  In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Series 2011 Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon.

The Indenture prescribes the manner in which it may be discharged and provides that the Series 2011 Bonds shall be deemed to be paid if moneys or Defeasance Obligations (as defined in the Indenture), the principal of and interest on which, when due, will be sufficient to pay the principal or redemption price of and interest on such Series 2011 Bonds to the date of maturity or redemption thereof, shall have been deposited with the Trustee.

53.     Persons Deemed Owners; Restrictions upon Actions by Individual Holders.  The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Issuer or the Trustee) for the purpose of receiving payment of or on account of the principal or redemption price of this Bond, and for all other purposes except as otherwise provided herein with respect to the payment of interest on this Bond, and neither the Issuer nor the Trustee shall be affected by any notice to the contrary.  All such payments so made to any such registered owner, or upon his order, shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable under this Bond.

The registered owner of this Bond shall have no right to enforce the provisions of the Indenture, or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect hereto, except as provided in the Indenture.

54.     Transfer and Exchange.  This Bond may be exchanged for an equal aggregate principal amount of the Subseries I of Series 2011 A-2 Bonds, of other authorized denominations, and the transfer of this Bond may be registered, upon presentation and surrender of this Bond at the designated corporate trust office of the Trustee in _____, together with an assignment duly executed by the registered owner hereof or such owner's attorney or legal representative.  Prior to the Rating Confirmation, the Registered Owner of this Bond shall

not be permitted to transfer or sell this Bond other than to (a) an Accredited Investor within the meaning of Section 2(15) of the Securities Act of 1933, as amended, upon the execution and delivery to the Trustee of an Investor Letter in the form attached to this Bond or (b) a Qualified Institutional Buyer within the meaning of Section 144 of the Securities Act of 1933, as amended. "Rating Confirmation" shall mean confirmation that the Bonds are rated in a rating category not lower than "Ba" by Moody's Investors, Inc., "BB-" by Standard & Poor's Rating Services or "BB-" by Fitch Ratings. The Issuer and the Trustee may require the person requesting any such exchange or transfer to reimburse them for any tax or other governmental charge, shipping charge or insurance payable in connection therewith. Neither the Issuer nor the Trustee shall be required to register the transfer of this Bond or make any such exchange of this Bond after this Bond or any portion hereof has been selected for redemption.

     55.   <u>Amendment</u>. Certain amendments to the Indenture are permitted without the consent of the Holders of Parity Debt, including this Bond. In addition, with the prior written consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing the Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by the Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of the Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of the Indenture, if there is outstanding any Special Senior Parity Debt, no amendment may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)  If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)  The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by the Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)  If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

56.  Modifications.  Modifications or alterations of the Indenture, the Loan Agreement or the Mortgage may be made only to the extent and in the circumstances permitted by the Indenture, the Loan Agreement and the Mortgage.

57.  Negotiability.  As declared by the Act, this Bond shall be and be deemed to be for all purposes a negotiable instrument subject only to the provisions for registration and registration of transfer stated herein.

58.  Governing Law.  This Bond shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

59.  Notices.  Except as otherwise provided in the Indenture and this Bond, when the Trustee is required to give notice to the owner of this Bond, such notice shall be mailed by first-class mail to the registered owner of this Bond at such owner's address as it appears on the registration books maintained by the Trustee.  Any notice mailed as provided herein will be conclusively presumed to have been given, whether or not actually received by the addressees.

Neither the members of the Issuer nor any person executing this Bond are liable personally hereon or subject to any personal liability or accountability by reason of the issuance hereof.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]*

**IN WITNESS WHEREOF**, Massachusetts Development Finance Agency has caused this Bond to be executed in its name as a sealed instrument.

<div align="right">

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY**

By:_____
      Authorized Officer

</div>

\29695489.18

# CERTIFICATE OF AUTHENTICATION

Date of Authentication:

This Bond is one of the Bonds of the Series designated herein and issued under the provisions of the within-mentioned Indenture.

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By:_____
      Authorized Officer

\29695489.18

## (FORM OF ASSIGNMENT)

FOR VALUE RECEIVED, _____, the undersigned, hereby sells, assigns and transfers unto _____ (Tax Identification or Social Security No. _____) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.


Dated:_____          _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever.


SIGNATURE GUARANTEED:


_____

NOTICE:  Signature(s) must be guaranteed by a member of The New York Stock Exchange or a commercial bank or trust company.

\29695489.18

## FORM OF INVESTOR LETTER

[Letterhead of Investor]

[Date]

Massachusetts Development Financing Agency      Wells Fargo Bank, National Association

160 Federal Street, 7th Floor                  [Address]

Boston, Massachusetts 02110

Attention: Executive Director

> Re:      Massachusetts Development Financing Agency Revenue Bond (Linden Ponds, Inc. Facility) Series 2011 (the "Bond")

Ladies and Gentlemen:

The undersigned (the "Investor") hereby represents and warrants to you as follows:

1.      The Investor proposes to purchase the Bond. The Investor understands that the Bond has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or the securities laws of any state, and will be sold to the Investor in reliance upon certain exemptions from registration and in reliance upon the representations and warranties of the Investor set forth herein. Capitalized terms used herein shall have the meaning given to them in the Bond.

2.      The Investor has sufficient knowledge and experience in business and financial matters in general, and investments such as the Bond in particular, and is capable of evaluating the merits and risks involved in an investment in the Bond. The Investor is able to bear the economic risk of, and an entire loss of, an investment in the Bond.

3.      The Investor is purchasing the Bond solely for its own account for investment purposes and has no intention to resell or distribute all or any portion of, or interest in, the Bond; provided that the Investor reserves the right to transfer or dispose of the Bond at any time, and from time to time, in its complete and sole discretion, subject, however, to the restrictions described in paragraphs 4, 5 and 6 of this letter.

4.      The Investor agrees that it will only offer, sell, pledge, transfer or exchange the Bond (or any legal or beneficial interest therein) in whole, and then only (i) in accordance with an available exemption from the registration requirements of Section 5 of the 1933 Act, (ii) in accordance with any applicable state securities laws, and (iii) in accordance with the provisions of the Bond.

5.      The Investor is an "accredited investor" as defined in Section 2(15) of the 1933 Act and understands that, prior to the Rating Confirmation, the Bond may be offered, resold, pledged or transferred only to a person who is a "qualified institutional buyer," within the

meaning of Section 144 of the 1933 Act or to an "accredited investor" as defined in Section 2(15) of the 1933 Act and in compliance with the Bond and applicable state securities laws.

6.       If the Investor sells the Bond (or any legal or beneficial interest therein) prior to the Rating Confirmation to an accredited investor that is not a qualified institutional buyer as described in paragraph 5, the Investor or its agent will obtain for your benefit, and deliver to you, from such accredited investor an Investor Letter in the form of this letter or such other materials (including, but not limited to, an opinion of counsel) as are required by you to evidence compliance of such sale and purchase with the requirements of the 1933 Act effecting an exemption from registration.  The Investor hereby indemnifies the Issuer and the Trustee against any failure by the Investor to transfer the Bond in accordance with the restrictions relating thereto set forth in the Bond.

Very truly yours,

**[Name of Investor]**

[Dated: _____]

By: _____
Name: _____
Title: _____

# APPENDIX E

## FORM OF SERIES 2011 B BOND

**PRIOR TO THE RATING CONFIRMATION (HEREINAFTER DEFINED), THIS SERIES 2011 B BOND IS ONLY TRANSFERABLE TO (1) A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION COMPLYING WITH RULE 144A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND (2) AN ACCREDITED INVESTOR WITHIN THE MEANING OF SECTION 2(15) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND IN THE CASE OF CLAUSE (2) ONLY, UPON EXECUTION AND DELIVERY OF AN INVESTOR LETTER.**

REGISTERED                                                            REGISTERED
RB-___                                                                $_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BOND
(LINDEN PONDS, INC. FACILITY)
SERIES 2011 B (TAX-EXEMPT)

Dated Date                      Maturity Date                    CUSIP
_____ , 2011                 November 15, 2056

Registered Owner:          CEDE & CO.
Principal Sum:             _____DOLLARS
                           ($_____)

THIS BOND DOES NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF THIS BOND IS PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR ITS PAYMENT IN ACCORDANCE WITH THE INDENTURE. THE ISSUER HAS NO TAXING POWER UNDER THE ACT.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), for value received, hereby promises to pay, at the Designated Office (as hereinafter defined) of WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee, or its successor in trust (the "Trustee"), solely from the sources and as hereinafter provided, to the Registered Owner hereof, or registered assigns or legal representative, the Principal Sum stated above on the Maturity Date stated above, subject to prior redemption as hereinafter provided. This Bond shall not bear interest.

E-1

The principal of this Series 2011 B Bond shall be payable in lawful money of the United States of America. Principal of this Series 2011 B Bond shall be payable upon its presentation and surrender at the Designated Office of the Trustee.

60. <u>The Bonds; the Indenture</u>. This Bond is one of a duly authorized series of Bonds designated its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 B Bonds"). Simultaneously with the issuance of the Series 2011 B Bonds, the Issuer has issued its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-1 Bonds") and its "Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2 (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2011 A-2 Bonds") and amended, restated and reissued its "Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand, Series 2007 B (Tax-Exempt)" in the aggregate principal amount of $_____ (the "Series 2007 B Bonds" and together with the Series 2011 A-1 Bonds, the Series 2011 A-2 Bonds, and the Series 2011 B Bonds, the "Series 2011 Bonds"). The Series 2011 Bonds and any Additional Bonds (as defined in the Indenture) are, collectively, the "Bonds." The Series 2011 Bonds have been issued under Massachusetts General Laws, Chapters 23G and 40D, as amended (the "Act"), and the Amended and Restated Trust Indenture dated as of _____, 2011 (the "Indenture"), between the Issuer and the Trustee. The terms of the Series 2011 Bonds include those stated in the Indenture, and the Series 2011 Bonds are subject to all such terms. The Indenture describes the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Issuer, the Trustee and the Owners of the Series 2011 Bonds. The Series 2011 B Bonds constitute Subordinated Bonds under the Indenture, such that payment of the principal of the Series 2011 B Bonds shall be subordinate to the payment of the principal of, premium if any, and interest on any Special Senior Parity Debt and Senior Parity Debt issued or certified in accordance with the Indenture, including without limitation, the Series 2011 A Bonds and the Series 2011 A-2 Promissory Notes (defined below), and no principal payments shall be made with respect to the Series 2011 B Bonds (whether at maturity, upon redemption or acceleration of maturity or otherwise), until all current payments of principal of, premium, if any, and interest on all Special Senior Parity Debt and Senior Parity Debt, including the Series 2011 A Bonds and the Series 2011 A-2 Promissory Notes, have been paid in full. The Series 2011 B Bonds shall be payable from Excess Cash (as defined in the Indenture).

61. <u>Loan Agreement; Mortgage; Revenues</u>. The Issuer has entered into an Amended and Restated Loan Agreement dated as of _____, 2011 (the "Loan Agreement"), with Linden Ponds, Inc. (the "Corporation"), pursuant to which the Issuer is deemed to have made a loan to the Corporation by virtue of the issuance of the Series 2011 Bonds. Pursuant to the Loan Agreement, the Corporation has agreed to pay the principal of and premium, if any, and interest on the Series 2011 Bonds and any Additional Bonds and Parity Obligations (as defined in the Indenture) as set forth therein. As security for the obligations of the Corporation under the Loan Agreement, (1) the Corporation has granted a lien and claim on and security interest in the Receipts (as defined in the Indenture) to the Issuer pursuant to the Loan Agreement, subject to certain Permitted Encumbrances (as defined in the Indenture), and (2) the Corporation has

E-2

executed and delivered an amended and restated mortgage and security agreement dated as of
_____, 2011 (the "Mortgage"), to the Trustee and its assigns.

The Revenues (as hereinafter defined) are pledged under the Indenture for the equal and ratable benefit of the Owners from time to time of Parity Debt (as hereinafter defined), except to the extent set forth in the Indenture. As defined in the Indenture, the "Revenues" include (i) all payments to the Issuer or the Trustee pursuant to the Loan Agreement and the Mortgage, including without limitation payments from the Receipts and (ii) all other receipts of the Issuer or the Trustee attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 (each as defined in the Indenture) with the proceeds of Bonds (as defined in the Indenture); provided, however, that Revenues do not include Reserved Rights of the Issuer (as defined in the Indenture).

62. <u>Additional Parity Debt</u>. The Indenture provides that Additional Bonds and Parity Obligations may be issued within the limitations and provisions of the Indenture. Simultaneously with the issuance of the Bonds, the Corporation will issue $_____ aggregate principal amount of its promissory notes (the "Series 2011 A-2 Promissory Notes"), which have been certified as Senior Parity Obligations pursuant to the Indenture. The Bonds and any Parity Obligations (including the Series 2011 A-2 Promissory Notes) are referred to, collectively, as "Parity Debt." All Parity Debt issued within the limitations and provisions of the Indenture shall be designated as Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt and shall be secured by the Revenues, the Property and other property pledged by the Corporation, as more particularly described in the Indenture.

63. <u>The Series 2011 B Bonds</u>. All the Series 2011 B Bonds are of like tenor except as to number and principal amount. The Series 2011 B Bonds are issuable only in registered form without coupons in denominations of $100,000 or any integral multiple of $1 in excess of $100,000 ("Authorized Denominations"), <u>provided</u> that if the Series 2011 B Bonds are rated in a rating category not lower than "Baa3" by Moody's Investors, Inc., "BBB-" by Standard & Poor's Rating Services or "BBB-" by Fitch Ratings, the Series 2011 B Bonds shall be issuable in denominations of $5,000 and integral multiples of $1 in excess thereof, and <u>provided further</u> that any Series 2011 Bonds issued in exchange for Series 2007 Bonds and any transfer of such Series 2011 Bond in whole shall be issuable in any whole dollar amount and shall be deemed to be issued in an Authorized Denomination.

64. <u>Redemption</u>. The Series 2011 B Bonds at the time outstanding may be redeemed prior to their respective maturities as follows:

(h) <u>Optional Redemption</u>. The Series 2011 B Bonds are subject to redemption prior to maturity by the Issuer upon the written direction of the Corporation, as a whole or in part on any date, at a redemption price equal to 100% of the principal amount thereof to be redeemed. Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(l)    Mandatory Redemption.  (i)  On and after the Resizing Tender Date, the Series 2011 B Bonds are subject to mandatory redemption in Authorized Denominations on any date, in an amount equal to the Corporation's Excess Cash (as certified to the Trustee by the Corporation in writing at least 40 days prior to the applicable redemption date and as deposited into the Redemption Fund pursuant to the Indenture), at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.  Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(ii)    The Series 2011 B Bonds are subject to mandatory redemption in Authorized Denominations on the date which is 45 days after the date on which funds are transferred to the Redemption Fund in accordance with the Indenture, in an amount equal to the surplus funds so transferred from the Tax-Exempt Senior Debt Service Reserve Fund, at a price of 100% of the principal amount of the Series 2011 B Bonds to be redeemed.  Notwithstanding the foregoing, any Holder of Series 2011 B Bonds may elect, by written notice delivered to the Trustee at least 10 days prior to the redemption date, to have the amounts that would otherwise be applied to the redemption of such Series 2011 B Bonds pursuant to this Section applied to the redemption of the Series 2011 A-1 Bonds or Series 2007 B Bonds owned by such Holder.

(m)    Extraordinary Redemption.  The Series 2011 B Bonds are subject to extraordinary redemption prior to maturity as a whole at any time or in part on any Interest Payment Date for any other Series of the Series 2011 Bonds, at a redemption price equal to the principal amount thereof, from funds deposited in the Redemption Fund (created by the Indenture) from (i) proceeds received by the Corporation from title insurance with respect to the Property (defined in the Indenture); (ii) proceeds received by the Corporation from the condemnation of the Property or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Corporation from insurance and related payments received in connection with the loss, damage or destruction of the Property, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.

(i)    Selection of Bonds to Be Redeemed.  If fewer than all of the Series 2011 B Bonds shall be called for redemption, the Trustee shall select the particular Series 2011 B Bonds or portions of the Series 2011 B Bonds to be redeemed by lot or in such other manner as the Trustee in its discretion may deem proper; provided, however, that the portion of any Series 2011 B Bond to be redeemed shall be in Authorized Denominations; and provided further that, in selecting the Series 2011 B Bonds for redemption, the Trustee shall treat each Bond as representing that number of Series 2011 B Bonds which is obtained by dividing the principal amount of such Series 2011 B Bond by $5,000.  Money available for the redemption of Parity Debt shall be allocated to the Series 2011 Bonds, the Series 2007 Bonds and to any Additional Bonds and Parity Obligations outstanding under the Indenture in the manner provided in the Indenture.

(n)    Notice of Redemption.  The Trustee shall mail notice of the call for any redemption by first-class mail at least 30 days before the redemption date to the registered

E-4

owners of the Series 2011 B Bonds to be redeemed; provided, however, that so long as the Series 2011 B Bonds are maintained in book-entry form, notice of the call for redemption required to be given to the registered owners shall be given only to the securities depository or its nominee in whose name the Series 2011 B Bonds are registered.  The failure to mail any such notice to any registered owner of the Series 2011 B Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Series 2011 B Bonds.  If for any reason it is impossible or impractical to mail such notice of redemption, the Trustee shall give notice of the call for any redemption by publication at least once in a daily newspaper of general circulation in the Borough of Manhattan, City and State of New York, or a financial journal published in such Borough, which notice shall be published at least 30 days before the redemption date.  In the event notice is published as provided above, the mailing of notice to the registered owners of the Series 2011 B Bonds to be redeemed shall not be a condition precedent to redemption and the failure so to mail any such notice to any such registered owners shall not affect the validity of the proceedings for the redemption of the Series 2011 B Bonds.

(o)     Effect of Call for Redemption.  On the date designated for redemption, notice having been given as provided herein, the Series 2011 B Bonds or portions of the Series 2011 B Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Series 2011 B Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price are held by the Trustee as provided in the Indenture, such Series 2011 B Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under the Indenture, and the registered owners thereof shall have no rights in respect of such Series 2011 B Bonds or such portions thereof so called for redemption except to receive payment of the Redemption Price thereof so held by the Trustee.  If a portion of this Bond shall be called for redemption, a new Series 2011 B Bond or Series 2011 B Bonds in the aggregate principal amount equal to the unredeemed portion hereof, of the same series and maturity, shall be issued to the registered owner upon the surrender hereof.

(p)     Provisions Applicable to Book-Entry Bonds.  So long as all of the Series 2011 B Bonds shall be maintained in Book-Entry Form with a Depository (as defined in the Indenture) in accordance with the Indenture, in the event that part, but not all, of this Bond shall be called for redemption, the holder of this Bond may elect not to surrender this Bond in exchange for a new Series 2011 B Bond in accordance with subsection (c) above. For all purposes, the principal amount of this Bond outstanding at any time shall be equal to the lesser of (A) the Principal Sum shown on the face hereof and (B) such Principal Sum reduced by the principal amount of any partial redemption of this Bond following which the holder of this Bond has elected not to surrender this Bond in accordance with this subsection (d).  THEREFORE, IT CANNOT BE DETERMINED FROM THE FACE OF THIS BOND WHETHER A PART OF THE PRINCIPAL OF THIS BOND HAS BEEN PAID.

65.     Acceleration; Defeasance.  In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Series 2011 Bonds then outstanding under the Indenture may become or may be declared due and payable before the stated maturities thereof, together with the interest accrued thereon.

E-5

The Indenture prescribes the manner in which it may be discharged and provides that the Series 2011 Bonds shall be deemed to be paid if moneys or Defeasance Obligations (as defined in the Indenture), the principal of and interest on which, when due, will be sufficient to pay the principal or redemption price of and interest on such Series 2011 Bonds to the date of maturity or redemption thereof, shall have been deposited with the Trustee.

66. <u>Persons Deemed Owners; Restrictions upon Actions by Individual Holders</u>. The Issuer and the Trustee may deem and treat the person in whose name this Bond is registered as the absolute owner hereof (whether or not this Bond shall be overdue and notwithstanding any notation of ownership or other writing hereon made by anyone other than the Issuer or the Trustee) for the purpose of receiving payment of or on account of the principal or redemption price of this Bond, and for all other purposes, and neither the Issuer nor the Trustee shall be affected by any notice to the contrary. All such payments so made to any such registered owner, or upon his order, shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for moneys payable under this Bond.

The registered owner of this Bond shall have no right to enforce the provisions of the Indenture, or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Indenture, or to institute, appear in or defend any suit or other proceeding with respect hereto, except as provided in the Indenture.

67. <u>Transfer and Exchange</u>. This Bond may be exchanged for an equal aggregate principal amount of the Series 2011 B Bonds, of other authorized denominations, and the transfer of this Bond may be registered, upon presentation and surrender of this Bond at the designated corporate trust office of the Trustee in _____, together with an assignment duly executed by the registered owner hereof or such owner's attorney or legal representative. Prior to the Rating Confirmation, the Registered Owner of this Bond shall not be permitted to transfer or sell this Bond other than to (a) an Accredited Investor within the meaning of Section 2(15) of the Securities Act of 1933, as amended, upon the execution and delivery to the Trustee of an Investor Letter in the form attached to this Bond or (b) a Qualified Institutional Buyer within the meaning of Section 144 of the Securities Act of 1933, as amended. "Rating Confirmation" shall mean confirmation that the Bonds are rated in a rating category not lower than "Ba" by Moody's Investors, Inc., "BB-" by Standard & Poor's Rating Services or "BB-" by Fitch Ratings. The Issuer and the Trustee may require the person requesting any such exchange or transfer to reimburse them for any tax or other governmental charge, shipping charge or insurance payable in connection therewith. Neither the Issuer nor the Trustee shall be required to register the transfer of this Bond or make any such exchange of this Bond after this Bond or any portion hereof has been selected for redemption.

68. <u>Amendment</u>. Certain amendments to the Indenture are permitted without the consent of the Holders of Parity Debt, including this Bond. In addition, with the prior written consent of the Holders of a Majority in principal amount of the Parity Debt, but without the consent of the holders of Subordinated Indebtedness, the Issuer and the Trustee may, at any time and from time to time, enter into Supplemental Indentures amending or supplementing the Indenture, any Supplemental Indenture or any Bond to modify any of the provisions thereof or to release the Issuer from any of the obligations, covenants, agreements, limitations, conditions or restrictions therein contained; provided, however, that nothing contained herein shall permit (i) a

change in any terms of redemption or purchase of any Bond, the due date for the payment of the principal of or interest on any Bond or any reduction in the principal, Redemption Price or Purchase Price of or interest on any Bond without the consent of the Holder of such Bond or (ii) except as expressly permitted hereby, the creation of a claim or lien upon, or a pledge of, the Revenues ranking prior to or on a parity with the claim, lien and pledge created by the Indenture, a preference or priority of any Parity Debt over any other Parity Debt or a reduction in the percentage of Parity Debt the consent of the Holders of which is required for any modification of the Indenture, without the unanimous consent of the holders of all Outstanding Parity Debt so affected, except that during any period of time in which an Event of Default has occurred and is continuing, (x) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Special Senior Parity Debt, other than a change in the percentage of Special Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Special Senior Parity Debt, (y) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Senior Parity Debt, other than a change in the percentage of Senior Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Senior Parity Debt or (z) the Issuer and the Trustee may enter into Supplemental Indentures described in clauses (i) and (ii) that affect only the Subordinated Parity Debt, other than a change in the percentage of Subordinated Parity Debt the consent of the holders of which is required for modification of the Indenture, with the consent of the Holders of 66 2/3% in principal amount of all Outstanding Subordinated Parity Debt. Notwithstanding any other provision of the Indenture, if there is outstanding any Special Senior Parity Debt, no amendment may be made without the prior written consent of the holders of a majority in aggregate principal amount of the Special Senior Parity Debt outstanding.

(a)     If at any time the Issuer requests the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section, the Trustee shall cause notice of the proposed Supplemental Indenture to be given by mail to the Corporation and all Holders of Outstanding Parity Debt and Subordinated Indebtedness.  Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that a copy thereof is on file at the Designated Office of the Trustee for inspection by all Holders of Parity Debt and Subordinated Indebtedness.

(b)     The Issuer and the Trustee may enter into such Supplemental Indenture in substantially the form described in such notice, after receipt by the Trustee of (i) the required consents, in writing, of Holders of Special Senior Parity Debt, Senior Parity Debt, or Subordinated Parity Debt, as applicable, and (ii) an opinion of Bond Counsel stating that such Supplemental Indenture is authorized or permitted by the Indenture and the Act, complies with their respective terms and, upon the execution and delivery thereof, will be valid and binding upon the Issuer in accordance with its terms and will not adversely affect the exclusion of the interest payable on the Tax-Exempt Bonds from the gross income of the Holders of the Tax-Exempt Bonds for purposes of federal income taxation pursuant to Section 103 of the Code, and the exemption of such Bonds from taxation in the Commonwealth.

(c)     If Holders of not less than the percentage of the aggregate principal amount of Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt, as applicable, required by this Section shall have consented to and approved the execution and delivery thereof

as herein provided, no Holder of Parity Debt shall have any right to object to the execution and delivery of such Supplemental Indenture, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Issuer or the Trustee from executing and delivering the same or from taking any action pursuant to the provisions thereof.

69.     <u>Modifications</u>.     Modifications or alterations of the Loan Agreement or the Mortgage may be made only to the extent and in the circumstances permitted by the Indenture, the Loan Agreement and the Mortgage.

70.     <u>Negotiability</u>.    As declared by the Act, this Bond shall be and be deemed to be for all purposes a negotiable instrument subject only to the provisions for registration and registration of transfer stated herein.

71.     <u>Governing Law</u>.    This Bond shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

72.     <u>Notices</u>.    Except as otherwise provided in the Indenture and this Bond, when the Trustee is required to give notice to the owner of this Bond, such notice shall be mailed by first-class mail to the registered owner of this Bond at such owner's address as it appears on the registration books maintained by the Trustee.   Any notice mailed as provided herein will be conclusively presumed to have been given, whether or not actually received by the addresses.

Neither the members of the Issuer nor any person executing this Bond are liable personally hereon or subject to any personal liability or accountability by reason of the issuance hereof.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]*

\29695489.18

**IN WITNESS WHEREOF**, Massachusetts Development Finance Agency has caused this Bond to be executed in its name as a sealed instrument.

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY**

By: _____
       Authorized Officer

CERTIFICATE OF AUTHENTICATION

Date of Authentication:

This Bond is one of the Bonds of the Series designated herein and issued under the provisions of the within-mentioned Indenture.

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By:_____
       Authorized Officer

(FORM OF ASSIGNMENT)


FOR VALUE RECEIVED, _____, the undersigned, hereby sells, assigns and transfers unto _____ (Tax Identification or Social Security No. _____) the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within Bond on the books kept for registration thereof, with full power of substitution in the premises.


Dated:_____            _____

                                         NOTICE: The signature
                                         to this assignment must
                                         correspond with the
                                         name as it appears upon
                                         the face of the within
                                         Bond in every particular,
                                         without alteration or
                                         enlargement or any
                                         change whatsoever.


SIGNATURE GUARANTEED:


_____
NOTICE:  Signature(s) must be guaranteed
by a member of The New York Stock
Exchange or a commercial bank or trust
company.

\29695489.18

**FORM OF INVESTOR LETTER**

[Letterhead of Investor]

[Date]

Massachusetts Development Financing Agency Wells Fargo Bank, National
Association

160 Federal Street, 7th Floor [Address]
Boston, Massachusetts 02110
Attention: Executive Director

Re: Massachusetts Development Financing Agency Revenue Bond (Linden Ponds,
Inc. Facility) Series 2011 (the "Bond")

Ladies and Gentlemen:

The undersigned (the "Investor") hereby represents and warrants to you as follows:

1. The Investor proposes to purchase the Bond. The Investor understands that the
Bond has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), or
the securities laws of any state, and will be sold to the Investor in reliance upon certain
exemptions from registration and in reliance upon the representations and warranties of the
Investor set forth herein. Capitalized terms used herein shall have the meaning given to them in
the Bond.

2. The Investor has sufficient knowledge and experience in business and financial
matters in general, and investments such as the Bond in particular, and is capable of evaluating
the merits and risks involved in an investment in the Bond. The Investor is able to bear the
economic risk of, and an entire loss of, an investment in the Bond.

3. The Investor is purchasing the Bond solely for its own account for investment
purposes and has no intention to resell or distribute all or any portion of, or interest in, the Bond;
provided that the Investor reserves the right to transfer or dispose of the Bond at any time, and
from time to time, in its complete and sole discretion, subject, however, to the restrictions
described in paragraphs 4, 5 and 6 of this letter.

4. The Investor agrees that it will only offer, sell, pledge, transfer or exchange the
Bond (or any legal or beneficial interest therein) in whole, and then only (i) in accordance with
an available exemption from the registration requirements of Section 5 of the 1933 Act, (ii) in
accordance with any applicable state securities laws, and (iii) in accordance with the provisions
of the Bond.

5.	The Investor is an "accredited investor" as defined in Section 2(15) of the 1933 Act and understands that, prior to the Rating Confirmation, the Bond may be offered, resold, pledged or transferred only to a person who is a "qualified institutional buyer," within the meaning of Section 144 of the 1933 Act or to an "accredited investor" as defined in Section 2(15) of the 1933 Act and in compliance with the Bond and applicable state securities laws.

6.	If the Investor sells the Bond (or any legal or beneficial interest therein) prior to the Rating Confirmation to an accredited investor that is not a qualified institutional buyer as described in paragraph 5, the Investor or its agent will obtain for your benefit, and deliver to you, from such accredited investor an Investor Letter in the form of this letter or such other materials (including, but not limited to, an opinion of counsel) as are required by you to evidence compliance of such sale and purchase with the requirements of the 1933 Act effecting an exemption from registration.  The Investor hereby indemnifies the Issuer and the Trustee against any failure by the Investor to transfer the Bond in accordance with the restrictions relating thereto set forth in the Bond.

Very truly yours,

**[Name of Investor]**

[Dated: _____]

By: _____
Name: _____
Title: _____

\29695489.18

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY

and

LINDEN PONDS, INC.

_____

AMENDED AND RESTATED LOAN AGREEMENT

_____

$_____

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BONDS
(LINDEN PONDS, INC. FACILITY)
SERIES 2011 A-1, VARIABLE RATE DEMAND
SERIES 2007 B, SERIES 2011 A-2 AND
SERIES 2011 B

_____

Dated as of \_\_\_\_, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS AND CERTAIN RULES OF INTERPRETATION ..............1

    Section 1.01        Definitions ........................................................................1

    Section 1.02        Certain Rules of Interpretation ............................................1

ARTICLE 2        REPRESENTATIONS ........................................................................2

    Section 2.01        Representations by the Issuer .............................................2

    Section 2.02        Representations of the Corporation .....................................2

ARTICLE 3        GENERAL AGREEMENTS; AMOUNTS PAYABLE; TIMES AND
                        MANNER OF PAYMENT ...................................................................8

    Section 3.01        The Loan; Term of Loan Agreement...................................8

    Section 3.02        Amounts Payable ...............................................................8

    Section 3.03        Loan Agreement a General Obligation of Corporation .....................12

    Section 3.04        Obligation to Repay Loan Absolute ...................................12

    Section 3.05        Security Interest in Receipts and Collateral .......................13

ARTICLE 4        EXCHANGE OF SERIES 2007 BONDS FOR SERIES 2011 BONDS;
                        CONSTRUCTION AND ACQUISITION OF THE FACILITY AND
                        ADDITIONAL FACILITIES; RESIZING EVENT......................................16

    Section 4.01        Exchange of Series 2007 Bonds for Series 2011 Bonds ...................16

    Section 4.02        Limitation of Issuer's Liability.........................................16

    Section 4.03        Acquisition of Facility and Facility Site.............................16

    Section 4.04        Compliance with Applicable Governmental Standards and
                        Requirements.....................................................................16

    Section 4.05        Construction of Residential Building 2.5 ...........................17

    Section 4.06        Amendment of the Facility and Additional Facilities .......................19

    Section 4.07        No Warranty by Issuer.......................................................19

    Section 4.08        Completion Certificates.....................................................19

    Section 4.09        Contracts Assigned to Trustee............................................20

    Section 4.10        Resizing Event...................................................................20

ARTICLE 5        OPERATION OF PROPERTY .........................................................20

    Section 5.01        Operation and Maintenance of Property.............................20

    Section 5.02        Restrictions on Leases and Contracts ................................20

    Section 5.03        Preservation of Facility......................................................21

-i-

| | | |
|---|---|---|
| Section 5.04 | Expenses of Upkeep | 21 |
| Section 5.05 | Surrender in Proper Condition | 22 |
| Section 5.06 | Policies and Procedures | 22 |
| Section 5.07 | Restrictions on Use of Facility and Any Additional Facilities Financed with Bond Proceeds | 22 |
| Section 5.08 | Residence and Care Agreements | 22 |
| Section 5.09 | Trustee May Enter and Examine the Property | 23 |
| Section 5.10 | Management of the Facility | 23 |
| Section 5.11 | Use of the Facility | 24 |
| Section 5.12 | Covenant to Obtain Rating | 24 |
| Section 5.13 | Change in Fiscal Year | 25 |
| ARTICLE 6 | INSURANCE; EXTRAORDINARY REDEMPTION OF BONDS | 25 |
| Section 6.01 | Required Insurance; Independent Insurance Consultant; Self Insurance; Independent Actuary | 25 |
| Section 6.02 | Indemnification Agreement | 26 |
| Section 6.03 | Title Insurance | 28 |
| Section 6.04 | Application of Proceeds of Condemnation and Insurance; Extraordinary Redemption of Bonds | 29 |
| ARTICLE 7 | COLLATERAL SECURITY IN THE PROPERTY; RELEASE OF SECURITY | 33 |
| Section 7.01 | Conveyances upon Delivery of Series 2011 Bonds | 33 |
| Section 7.02 | Additions to Property | 34 |
| Section 7.03 | Sale, Lease or Other Disposition of Property | 34 |
| Section 7.04 | Partial Release of Liens | 35 |
| ARTICLE 8 | SPECIAL COVENANTS OF THE CORPORATION | 35 |
| Section 8.01 | Federal Tax Exemptions | 35 |
| Section 8.02 | Preservation of Qualifications | 36 |
| Section 8.03 | Payment of Obligations | 37 |
| Section 8.04 | Debt Service Coverage Ratio | 37 |
| Section 8.05 | Obligations Not to be Impaired | 39 |
| Section 8.06 | Corporation to Provide Information | 40 |

\29967894.13

# TABLE OF CONTENTS
Continued

| | | |
|---|---|---|
| Section 8.07 | Annual Audit of Corporation; Quarterly and Monthly Financial Reports | 40 |
| Section 8.08 | Corporation to Pay Impositions and Maintain Tax Exemptions | 41 |
| Section 8.09 | Limitations on Merger, Consolidation, Acquisition and Transfer of Assets | 41 |
| Section 8.10 | Additional Indebtedness of Corporation | 42 |
| Section 8.11 | Senior Parity Obligations; Special Senior Parity Obligations | 43 |
| Section 8.12 | Liens and Encumbrances; Further Assurances by Corporation | 45 |
| Section 8.13 | Corporation to Prepare Budget | 46 |
| Section 8.14 | Application of Entrance Fees | 46 |
| Section 8.15 | Operating Reserve Fund; Supplemental Reserve Fund | 47 |
| Section 8.16 | Management Consultant | 48 |
| Section 8.17 | ERISA Representations, Warranties and Covenants | 49 |
| Section 8.18 | Use of Funds to Pay Debt Service | 51 |
| Section 8.19 | Agreement to Provisions of Indenture | 54 |
| Section 8.20 | Management Reports and Plans | 54 |
| Section 8.21 | [Reserved] | 55 |
| Section 8.22 | Subordinated Parity Obligations | 55 |
| ARTICLE 9 | EVENTS OF DEFAULT AND REMEDIES; RIGHTS OF THE ISSUER | 56 |
| Section 9.01 | Events of Default | 56 |
| Section 9.02 | Remedies | 58 |
| Section 9.03 | Foreclosure of Mortgage and Sale | 58 |
| Section 9.04 | No Waiver of Rights | 59 |
| Section 9.05 | Waiver of Default | 59 |
| Section 9.06 | Right to Enter and Occupy Property for Specified Purposes | 59 |
| Section 9.07 | Attorneys' Fees and Expenses | 59 |
| Section 9.08 | Notice of Default | 59 |
| ARTICLE 10 | PREPAYMENT OF LOAN | 60 |
| Section 10.01 | Voluntary Payments | 60 |

\29967894.13

Section 10.02    Redemption of Bonds by Voluntary Payment ................................... 60

Section 10.03    Redemption of Bonds by Application of Funds ............................... 60

ARTICLE 11        MISCELLANEOUS ................................................................. 60

Section 11.01    Covenants for Benefit of Holders ..................................................... 60

Section 11.02    Compliance with Indenture ............................................................ 61

Section 11.03    Actions of Corporation and Issuer .................................................. 61

Section 11.04    Issuer's Liability Limited ............................................................... 61

Section 11.05    Applications of Provisions of the Original Loan Agreement ............. 63

Section 11.06    Notices ............................................................................................ 63

Section 11.07    Assignment by Issuer; Issuer's Rights to Approve Certain
Actions and Receive Notices and Information ................................. 64

Section 11.08    Amendment of Loan Agreement and Mortgage .............................. 64

Section 11.09    Payment Dates ................................................................................ 64

Section 11.10    Integration Clause .......................................................................... 64

Section 11.11    Counterparts ................................................................................... 64

Section 11.12    Severability ..................................................................................... 64

Section 11.13    Massachusetts Law ......................................................................... 65

Section 11.14    Effective Date .................................................................................. 65

Section 11.15    Payment of Attorneys' Fees ........................................................... 65

Exhibit A:      Term Sheet For Construction Financing

LOAN AGREEMENT

THIS AMENDED AND RESTATED LOAN AGREEMENT (the "Loan Agreement") dated as of _____ 1, 2011, is between MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (with its successors, the "Issuer"), and LINDEN PONDS, INC., a nonstock corporation organized and existing under the laws of the State of Maryland (with its successors, the "Corporation") and amends and restates a Loan Agreement dated as of July 1, 2007 (as amended by the First Supplemental Trust Indenture and Loan Agreement dated the date hereof by and among the Issuer, the Corporation and Wells Fargo Bank, National Association, as Trustee, the "Original Loan Agreement") between the Issuer and the Corporation. This Loan Agreement is a financing document under Massachusetts General Laws Chapters 23G and 40D, each as amended (the "Act").

W I T N E S S E T H:

That the parties hereto, intending to be legally bound hereby and for and in consideration of the mutual agreements herein contained, DO HEREBY AGREE, as follows:

ARTICLE 1

DEFINITIONS AND CERTAIN RULES OF INTERPRETATION

Section 1.01   Definitions.  In addition to the words and terms elsewhere defined herein, capitalized terms used herein shall have the meaning given to such terms in the Amended and Restated Trust Indenture dated as of _____ 1, 2011 by and between the Issuer and Wells Fargo Bank, National Association, as Trustee (the "Indenture"), unless the context or use clearly indicates another or different meaning or intent.

Section 1.02   Certain Rules of Interpretation.  The definitions set forth in Section 1.01 shall be equally applicable to both the singular and plural forms of the terms therein defined and shall cover all genders.

The words "herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter" and other equivalent words refer to this Loan Agreement and not solely to the particular Article, Section or subdivision hereof in which such word is used.

Reference herein to an Article number (e.g., Article 4) or a Section number (e.g., Section 6.02) shall be construed to be a reference to the designated Article number or Section number hereof unless the context or use clearly indicates another or different meaning or intent.

Any terms defined in Article I of the Indenture and not defined herein are hereby incorporated by reference.

## ARTICLE 2

## REPRESENTATIONS

Section 2.01    Representations by the Issuer.    The Issuer represents and warrants as follows:

(a)    it is a body politic and corporate and a public instrumentality of The Commonwealth, established under Chapter 23G of the Massachusetts General Laws, with the power under and pursuant to the Act, to execute and deliver this Loan Agreement, to perform its obligations hereunder and to issue the Bonds pursuant to this Loan Agreement and the Indenture; and

(b)    it has taken all necessary action and has complied with all provisions of the constitution of the Commonwealth and the Act, required to make this Loan Agreement and the Bonds the valid limited obligations they purport to be; and, when executed and delivered by the parties hereto, this Loan Agreement will constitute a valid and binding limited agreement of the Issuer enforceable in accordance with its terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied; and

(c)    when exchanged for the Series 2007 Bonds in accordance with the terms of this Loan Agreement and the Indenture, the Series 2011 Bonds will constitute valid and binding special obligations of the Issuer enforceable in accordance with their terms, except as enforceability may be subject to the exercise of judicial discretion in accordance with general equitable principles and to applicable bankruptcy, insolvency, reorganization, moratorium and other laws for the relief of debtors heretofore or hereafter enacted to the extent that the same may be constitutionally applied, and will be entitled to the benefits of this Loan Agreement; and

(d)    the Issuer makes no other representations or warranties, either express or implied, of any nature or kind, including, without limitation, a representation or warranty that interest on the Bonds is or will continue to be exempt from federal or state income taxation.

(e)    All agreements of the Issuer in this Section 2.01 are subject to the limitation described in Section 10.06 of the Indenture and Section 11.04 of this Agreement.

Section 2.02    Representations of the Corporation.    The Corporation makes the following affirmative representations as the basis for the undertakings on the Issuer's part herein contained:

(a)    Good Standing.    The Corporation (i) is a nonstock corporation duly organized and existing, and in good standing, under the laws of the State of Maryland and is qualified to do business in the Commonwealth and (ii) has the corporate power and all material governmental licenses, authorizations, consents and approvals to own its property and to carry on its business as now being conducted.

\29967894.13

(b)    501(c)(3) Status.

(i)    The Corporation is organized and operated exclusively for charitable, scientific and educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence  legislation (except as otherwise provided in Section 501(h) of the Code), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office, all within the meaning of Section 501(c)(3) of the Code.

(ii)    The Internal Revenue Service (the "Service") has determined, by letter dated March 3, 2005, that the Corporation is exempt from federal income tax under Section 501(c)(3) of the Code (the "Determination Letter").  The purposes, character, activities and methods of operation of the Corporation are not materially different from the purposes, character, activities and methods of operation at the time the Determination Letter became effective.  The Corporation has not received any indication or notice, written or verbal, from representatives of the Service to the effect that its exemption under Section 501(c)(3) of the Code has been modified, limited, revoked, or superseded, or that the Service is considering modifying, limiting, revoking, or superseding such exemption and the exemption of the Corporation under Section 501(c)(3) of the Code is still in full force and effect as of the date hereof.  The Corporation is in compliance with the terms, conditions and limitations of the Determination Letter.  There has been no change in the facts and circumstances which formed the basis on which the Service issued the Determination Letter relating to the Corporation's status (as an organization described in Section 501(c)(3) of the Code and as an organization which is not a "private foundation" as defined in Section 509 of the Code) of a nature or to a degree as would warrant any action by the Service to modify, limit, revoke or supersede the Determination Letter.

(iii)    No administrative or judicial proceedings are pending or, to the knowledge of the Corporation, threatened which in any way may adversely affect the classification of the Corporation as an organization (i) described in Section 501(c)(3) of the Code which is exempt from federal income taxation under Section 501(a) of the Code (except with respect to "unrelated business taxable income" within the meaning of Section 512(a) of the Code), and (ii) which is not a "private foundation" as defined in Section 509 of the Code.

(iv)    The Corporation has not taken any action, and knows of no action that any other person has taken, which would cause the Corporation to lose its status as an organization described in Section 501(c)(3) of the Code or which would cause interest on the Series 2011 Bonds that constitute Tax-Exempt Bonds to be includible in gross income for federal income tax purposes.

3

(v) The Corporation has not diverted a substantial part of the corpus of its assets or income for a purpose or purposes other than such purpose or purposes for which it is organized and operated as described in paragraph (i) above.

(vi) No director, trustee, member, officer or incorporator of the Corporation or any organization or corporation controlled by the Corporation or any other person or persons having a personal or private interest in the activities of the Corporation has acquired or received, directly or indirectly, any income or assets of the Corporation in the form of salary, rent, loans or otherwise, other than amounts included in the total amounts to be reported on Internal Revenue Service Form 990 for the appropriate fiscal year of the Corporation.

(vii) No substantial part of the activities of the Corporation consists of providing "commercial-type insurance," within the meaning of Section 501(m) of the Code.

(viii) The Corporation has not carried on its activities so as to be a "private foundation" as defined in Section 509 of the Code.

(ix) Except to the extent allowed under Section 145 of the Code, no portion of the proceeds of the Series 2011 Bonds that constitute Tax-Exempt Bonds (including any facilities financed or refinanced with the Series 2011 Bonds) will be used by the Corporation in any "unrelated trade or business" as such term is defined in Section 513(a) of the Code.

(x) The Corporation shall not (1) perform any act or enter into any agreement that shall cause any revocation or adverse modification of its federal income tax status represented in paragraph (i), or (2) carry on or permit to be carried on in the facilities of the Corporation or permit such facilities to be used in or for any trade or business the conduct of which is not substantially related to the exercise or performance by the Corporation of the purposes or functions constituting the basis for its exemption under Section 501(c)(3) of the Code if such use of such facilities would result in the loss of the Corporation's exempt status under Section 501(c)(3) of the Code.

(xi) The Corporation shall operate the Facility on a nonsectarian basis.

(xii) The representatives and officers of the Corporation who are responsible for the Corporation's participation in the financing are aware of the meaning of the terms (1) "commercial-type insurance" as used in Section 501(m) of the Code, (2) "private foundation" as used in Section 509 of the Code, and (3) "unrelated trade or business" as used in Section 513(a) of the Code.

(c) <u>Corporate Authority</u>. The Corporation has full corporate power and authority to enter into and execute and deliver each of this Loan Agreement, the Mortgage and the other Bond Documents to which it is a party and to incur and perform the obligations provided for therein (including the borrowing hereunder), all of which have been duly authorized by all proper and necessary corporate action. No consent or approval of any person or public

authority or regulatory body is required as a condition to the validity, enforceability or performance of any provision of this Loan Agreement or the other Bond Documents to which it is a party, or if required, the same has been duly obtained.

        (d)    <u>Binding Agreements</u>.   This Loan Agreement and the other Bond Documents to which it is a party have been duly and properly executed by the Corporation, constitute the valid and legally binding obligations of the Corporation and are fully enforceable against the Corporation in accordance with their terms, except to the extent that enforceability may be affected by any bankruptcy or insolvency proceeding filed by or against the Corporation and subject to the exercise of judicial discretion in accordance with general principles of equity.

        (e)    <u>Litigation</u>.  There is no litigation or proceeding pending or, so far as the Corporation knows, threatened before any court or administrative agency which, in the opinion of the Corporation, will materially adversely affect the financial condition or operations of the Corporation, or the authority of the Corporation to enter into, or the validity or enforceability of, this Loan Agreement, the Mortgage or the other Bond Documents to which it is a party.

        (f)    <u>No Conflicting Agreements, Laws, etc</u>.  There is (i) no charter or by-law provision of the Corporation and no provision of any existing mortgage, indenture, contract or agreement binding on the Corporation or affecting any of the Corporation's property and (ii) to the knowledge of the Corporation, no provision of law or order of court binding upon the Corporation or affecting any of the Corporation's property, which would conflict with or in any way prevent the execution, delivery, or performance of the terms of this Loan Agreement, the Mortgage or the other Bond Documents to which it is a party, or which would be in default or violated as a result of such execution, delivery or performance, or for which adequate consents or waivers have not been obtained.

        (g)    <u>Compliance with Law</u>.  The Corporation (i) is in compliance with all laws, ordinances and governmental rules and regulations to which it is subject, the failure to comply with which could materially adversely affect the ability of the Corporation to conduct its activities or the condition (financial or otherwise) of the Corporation, and (ii) except as provided in Section 2.02(o), has obtained and maintained all licenses, permits, franchises, certifications and other governmental authorizations necessary to the ownership of its property or to the conduct of its activities which, if not obtained or maintained, could materially adversely affect the ability of the Corporation to conduct its activities as contemplated herein or the condition (financial or otherwise) of the Corporation.

        (h)    <u>Full Disclosure</u>.  Neither this Loan Agreement nor the other Bond Documents to which the Corporation is a party, nor any certificate or statement furnished by the Corporation in connection therewith, contains any untrue statement of a material fact or, when this Loan Agreement or the other Bond Documents to which it is a party, statements, reports and certificates are taken in their entirety, omits to state a material fact necessary to make the statements contained therein or herein, relating to the Corporation, the Facility or its operations, not misleading as of the date hereof.  There is no fact of which the Corporation has actual knowledge which the Corporation has not disclosed to the Issuer prior to the date of this Loan Agreement with respect to the transactions contemplated by this Loan Agreement, the other

\29967894.13

Bond Documents to which it is a party or the Indenture which materially and adversely affects, or in the future could, in the reasonable opinion of the Corporation, materially adversely affect, the condition (financial or otherwise), results of operations, business or assets of the Corporation.

(i)        <u>Liens or Security Interests</u>.  Except for liens granted under the Original Indenture and Liens being granted hereunder in favor of the Issuer, the Trustee and the Letter of Credit Provider, (A) there exist no liens or security interests on or with respect to the Property (other than Permitted Encumbrances) and (B) the Corporation has made no contract or agreement of any kind, the performance of which by the other party thereto would give rise to any lien on the Property (other than Permitted Encumbrances).

(j)        <u>Purpose of the Series 2011 Bonds</u>.  The Corporation intends that the Series 2011 Bonds be issued solely to refinance a portion of the costs of the Project by effecting the exchange of the Series 2011 Bonds for the Series 2007 Bonds.  The Corporation intends that the interest payable on the Series 2011 Bonds shall be excludable from the gross income of the holders thereof for purposes of federal income taxation and shall be exempt from state, county and municipal taxation in the Commonwealth.

(k)        <u>Compliance with Tax Certificate</u>.  The Corporation hereby represents that all of its representations set forth in the Tax Certificate are true, complete and correct as of the date of delivery hereof.  The Corporation hereby agrees to comply with all of its covenants set forth in the Tax Certificate, and the Corporation's representations and covenants set forth in the Tax Certificate are herein incorporated by reference as if the same had been set forth herein in their entirety.

(l)        <u>Prohibition on Discrimination</u>.  The Corporation prohibits, in connection with the conduct of its activities at the Facility and the Facility Site, discrimination on the basis of (i) political or religious opinion or affiliation, race, color, creed and national origin, (ii) sex and age, except when sex or age constitutes a bona fide occupational or admissions qualification and (iii) the physical or mental handicap of a qualified handicapped individual.

(m)        <u>Utilities</u>.  All utility services necessary for the construction and operation of the Facility for its intended purposes are available or are under contract to be available at the boundaries of the Facility Site, including water, storm and sanitary sewer facilities of adequate capacities, gas, electric and telephone facilities.

(n)        <u>Zoning, etc</u>.  The Facility, and the use of the Facility for its intended uses, will not violate any zoning or other ordinance, regulation or law, restrictive covenant or agreement of the Corporation (either now in existence or known by the Corporation to be proposed) applicable to the Facility or its uses, and all requirements for such use have been satisfied.

(o)        <u>Licenses, Permits, Approvals, Consents, etc</u>.

(i)        The Corporation has obtained, and there are currently in full force and effect, all consents, permits, licenses, accreditations, certifications, orders and other approvals (governmental or otherwise) that (A) would constitute a condition precedent to,

or the absence of which would materially adversely affect, the performance by the Corporation of its obligations under this Loan Agreement, the Mortgage, the other Bond Documents to which it is a party and any other agreement or instrument to which the Corporation is a party and which is to be used or contemplated for use in the consummation of the transactions contemplated by such documents other than any consents, permits, licenses, accreditations, certifications, orders and other approvals (governmental or otherwise) that cannot be obtained until completion of construction of the Facility; or (B) are necessary for the acquisition, construction and equipping of the Facility, other than any permits that are normally and customarily obtained during the course of construction and at or after completion.

(ii)    With respect to any consents, permits, licenses, accreditations, certifications, orders and other approvals not yet obtained, the Corporation is not aware of any reason why such consents, permits, licenses, accreditations, certifications, orders and other approvals will not be issued at such times and in such manner that the performance by the Corporation of its obligations under this Loan Agreement will not be materially delayed.

(iii)    The Corporation will obtain or cause to be obtained, at such times and in such manner that the performance by the Corporation of its obligations under this Loan Agreement will not be materially delayed, all consents, permits, licenses, accreditations, certifications, orders and other approvals (governmental or otherwise) that are necessary for the operation of the Facility.

(iv)    The Corporation has not failed to receive, or to keep in full force and effect, any consent, permit, license, accreditation, certification, order or other approval (governmental or otherwise), which failure to receive or to keep in full force and effect would materially and adversely affect the ability of the Corporation to conduct its business as it is currently being conducted.

(p)    [Reserved].

(q)    <u>Place of Business of the Corporation</u>.    Since incorporation, the Corporation has a place of business in only one county in the Commonwealth, and such county is Plymouth County.

(r)    <u>Names of the Corporation</u>.  Linden Ponds, Inc. has been the name of the Corporation since its incorporation.  The Corporation has not changed its identity or corporate structure so as to make the use of the name Linden Ponds, Inc. in a filed financing statement materially misleading.  The Corporation does not do any business under any trade name.

(s)    <u>Taxes</u>.  The Corporation has filed all required federal, state and local tax returns and has paid all taxes (if any) as shown on such returns as they have become due, and no claims have been assessed and are unpaid with respect to such taxes.

(t)    Residence and Care Agreements.    The forms of Residence and Care Agreements on file as of the Closing Date in the Executive Office of Elder Affairs of the Commonwealth are the forms currently in use for the Facility.

(u)    The Project.    The Project is, and at all times while the Bonds are Outstanding will be, used in such a manner as to be included within the definition of a "project" in the Act, and the term of the Bonds will not exceed the useful life of the Project financed with the proceeds of the Bonds.  All of the proceeds of the Bonds shall be used solely for the payment of "costs of the project", as that term is defined in Section l(e) of Chapter 40D of the Massachusetts General Laws.  The Corporation agrees with the Issuer and the Trustee that the Project and Facility shall be used only as a "continuing care facility" within the meaning of Chapter 40D of the Massachusetts General Laws.

ARTICLE 3

GENERAL AGREEMENTS; AMOUNTS PAYABLE;
TIMES AND MANNER OF PAYMENT

Section 3.01    The Loan; Term of Loan Agreement.

(a)    Under the Original Loan Agreement, the Issuer loaned the proceeds of the Series 2007 Bonds to the Corporation.  The Corporation hereby confirms its obligation to repay the Series 2007 Loan under the terms and conditions set forth in the Original Loan Agreement, as amended and restated by this Loan Agreement.

(b)    The Issuer shall be deemed to have loaned the proceeds of the Series 2011 Bonds to the Corporation by exchanging the Series 2011 Bonds for the Series 2007 Bonds in accordance with the Indenture.  The Corporation shall have no legal or equitable interest in the proceeds of the Series 2011 Bonds or in any proceeds of any investment thereof except to require their application in the manner and on the terms and conditions set forth in the Indenture.

(c)    The Corporation shall repay the Loans in the manner required by this Loan Agreement.  The Loans are secured by this Loan Agreement and the Mortgage.

(d)    This Loan Agreement shall remain in full force and effect from the date of its execution and delivery until the date on which the Indenture shall be discharged and satisfied in accordance with Article IX thereof, at which time this Loan Agreement shall terminate and the Issuer shall release and cancel this Loan Agreement.

Section 3.02    Amounts Payable.

(a)    General.  The Corporation shall pay, FIRST, (i) the total interest becoming due on all Special Senior Parity Debt to the respective dates of payment thereof; (ii) the total principal amount of Special Senior Parity Debt; (iii) all redemption premiums (if any) payable on the redemption of Special Senior Parity Debt prior to stated payment dates, and (iv) the Purchase Price of Variable Rate Bonds constituting Special Senior Parity Debt required to be paid on any Tender Date, SECOND, (i) the total interest becoming due on all Senior Parity Debt to the

8

respective dates of payment thereof; (ii) the total principal amount of Senior Parity Debt; (iii) all redemption premiums (if any) payable on the redemption of Senior Parity Debt prior to stated payment dates, and (iv) the Purchase Price of Variable Rate Bonds constituting Senior Parity Debt required to be paid on any Tender Date, and THIRD, (i) the total interest becoming due on all Subordinated Parity Debt to the respective dates of payment thereof; (ii) the total principal amount of Subordinated Parity Debt and (iii) all redemption premiums (if any) payable on the redemption of Subordinated Parity Debt, in each case less any amount available for such payments from the funds and accounts established under the Indenture. The Corporation acknowledges that payments made for amounts due in each of the categories FIRST, SECOND and THIRD above shall be applied ratably among each Series of Parity Debt described in such category until all amounts due in such category are paid.

(b)  Administrative Expenditures.  In addition, the Corporation shall pay (i) to the Issuer and the Trustee (as the case may be) the Administrative Expenditures, and (ii) to the Trustee any amount required to maintain the Senior Debt Service Reserve Fund at the Senior Debt Service Reserve Fund Requirement in accordance with the Indenture.

(c)  Assignment of Payments.  All payments to the Issuer pursuant to this Loan Agreement have been assigned by the Issuer to the Trustee pursuant to the Indenture (other than payments to be deposited into the Rebate Fund and Administrative Expenditures) as security for the payment of the Bonds and the interest thereon and, to the extent provided in the Indenture, any Parity Obligations and the interest thereon and the performance of the obligations of the Issuer under the Indenture.  The Corporation assents to such assignment.  The Issuer hereby directs the Corporation, and the Corporation hereby agrees, to make all payments with respect to the principal of and interest on the Bonds, the Debt Service Funds, the Senior Debt Service Reserve Fund, the Redemption Fund, the Operating Reserve Fund, the Supplemental Reserve Fund, the Supplemental Reserve Account and the Construction Fund to the Trustee.  All payments with respect to the principal of and interest and premium on any Parity Obligation shall be paid in accordance with the Supplemental Indenture approving the issuance of such Parity Obligation.

(d)  Series 2011 A-1 Bonds.  To provide for the payment of the amounts due under paragraph (a) of this Section with respect to the Series 2011 A-1 Bonds, the Corporation shall pay for deposit into the Revenue Fund an amount equal to the sum of the following:

(i)  on _____ 15, 2011 and on the fifteenth day of each month thereafter, in approximately equal monthly installments, the amount, if any, necessary to make the amount on deposit in the Series 2011 A-1 Interest Account on each due date equal to the amount of accrued and unpaid interest on the Series 2011 A-1 Bonds due on November 15, 2011 and on each May 15 and November 15 thereafter;

(ii)  on _____ 15, 2011 and on the fifteenth day of each month thereafter, the lesser of (A) during the period from the Closing Date through October 15, 2011, one _____(1/__) and thereafter one-twelfth (1/12) of the amount of any Sinking Fund Installment for the Series 2011 A-1 Bonds Outstanding becoming due on the immediately succeeding November 15 and (B) the amount required to make the

9

amount on deposit in the Series 2011 A-1 Sinking Fund Account equal to the Sinking Fund Installment for the Series 2011 A-1 Bonds, if any, due on the immediately succeeding November 15;

   (iii) on or before any Tender Date, the amount required to make the amount on deposit in the Series 2011 A-1 Bond Fund equal the Purchase Price for the Series 2011 A-1 Bonds, if any, due on the applicable Tender Date; and

   (iv) on or before the date on which Series 2011 A-1 Bonds are to be redeemed pursuant to Section 5 in the Series 2011 A-1 Bonds, the amount necessary to make the amount on deposit in the Redemption Fund on the applicable redemption date and to be used for redemption equal to the minimum applicable Authorized Denomination.

   (e) <u>Series 2007 B Bonds</u>.  To provide for the payment of the amounts due under paragraph (a) of this Section with respect to the Series 2007 B Bonds, the Corporation shall pay for deposit into the Revenue Fund an amount equal to the sum of the following:

   (i) on _____, 2011 and on the first day of each month thereafter, the amount, if any, necessary to make the amount on deposit in the Series 2007 B Interest Account equal to the amount of accrued and unpaid interest on the Series 2007 B Bonds as of the first day of the immediately succeeding month <u>plus</u>, prior to the Bank Tender Date, any letter of credit fees and remarketing fees payable as of the first day of the immediately succeeding month;

   (ii) on _____, 2011 and the first day of each month thereafter, the lesser of (A) during the period from the Closing Date through October 15, 2011, one _____(1/__) and thereafter one-twelfth (1/12) of the amount of any Sinking Fund Installment for the Series 2007 B Bonds Outstanding becoming due on the immediately succeeding November 1 and (B) the amount required to make the amount on deposit in the Series 2007 B Sinking Fund Account equal to the Sinking Fund Installment for the Series 2007 B Bonds, if any, due on the immediately succeeding November 1; and

   (iii) on or before the date on which Series 2007 B Bonds are to be redeemed pursuant to Section (8)(a) in the Series 2007 B Bonds, the amount necessary to make the amount on deposit in the Redemption Fund on the applicable redemption date and to be used for redemption equal to the minimum applicable Authorized Denomination.

   (f) <u>Series 2011 A-2 Bonds</u>.  To provide for the payment of the amounts due under paragraph (a) of this Section with respect to the Series 2011 A-2 Bonds, the Corporation shall pay for deposit into the Revenue Fund an amount equal to the sum of the following:

   (i) on _____ 15, 2011 and on the fifteenth day of each month thereafter, in approximately equal monthly installments, the amount, if any, necessary to make the amount on deposit in the Series 2011 A-2 Bonds Interest Account on each due

date equal to the amount of accrued and unpaid interest on the Series 2011 A-2 Bonds due on November 15, 2011 and on each May 15 and November 15 thereafter;

(ii)     on or before the date on which Series 2011 A-2 Bonds are to be redeemed pursuant to Section 5 of the Series 2011 A-2 Bonds from Excess Liquidity, the amount necessary to make the amount on deposit in the Redemption Fund on the applicable redemption date and to be used for redemption equal to the minimum applicable Authorized Denomination; and

(iii)    on November 15, 2046, the amount required to make the amount on deposit in the Series 2011 A-2 Bonds Principal Account equal the principal amount, if any becoming due on the Series 2011 A-2 Bonds on such date.

(g)     [Reserved]

(h)     <u>Series 2011 B Bonds</u>.  To provide for the payment of the amounts due under paragraph (a) of this Section with respect to the Series 2011 B Bonds, the Corporation shall pay for deposit into the Revenue Fund an amount equal to, on or before the date on which Series 2011 B Bonds are to be redeemed pursuant to Section 5 in the Series 2011 B Bonds from Excess Cash, the amount necessary to make the amount on deposit in the Series 2011 B Principal Account on the applicable redemption date and to be used for redemption equal to the minimum applicable Authorized Denomination.

(i)     <u>Deficiency in Senior Debt Service Reserve Fund</u>.  On the first day of the month immediately succeeding any month in which the Corporation receives notice of any transfer from the Senior Debt Service Reserve Fund pursuant to Section 4.08 of the Indenture to pay debt service on Series 2011 A Bonds, the Corporation shall pay to the Trustee for deposit into the Revenue Fund the full amount necessary to restore the amounts so transferred from the Senior Debt Service Reserve Fund.  After all Series A-2 Bonds have been paid in full, the Corporation shall pay to the Trustee any moneys of the Corporation in excess of 90 Days' Cash on Hand for deposit into the Senior Debt Service Reserve Fund to the extent amounts on deposit therein are less than the Senior Debt Service Reserve Fund Requirement.

During any period in which there are sufficient moneys in the Senior Debt Service Reserve Fund to satisfy all remaining payments of the principal or Redemption Price of the Series of Senior Bonds secured by the Senior Debt Service Reserve Fund, the Corporation shall not be required to make payments to the Senior Debt Service Reserve Fund specified in the immediately preceding paragraph on account of any withdrawals from the Senior Debt Service Reserve Fund for transfer to the applicable Principal Account, the Sinking Fund Account or both (as the case may be) as required by Section 4.08 of the Indenture.

(j)     [Reserved]

(k)     <u>Rebate Amount</u>.  At the times required by the Tax Certificate, the Corporation shall pay to the Trustee for deposit in the Rebate Fund moneys sufficient to satisfy the requirements of the Tax Certificate with respect to the Rebate Amount.  If at any time the Rebate Amount is to be paid pursuant to the Tax Certificate and the moneys on deposit in the

11

Rebate Fund are not sufficient to pay the Rebate Amount, the Corporation, immediately upon notice from the Trustee, shall deposit into the Rebate Fund an amount of money sufficient to cause the amount of moneys on deposit in the Rebate Fund to be equal to the Rebate Amount.

(l)     Notwithstanding anything herein to the contrary, (i) to the extent amounts have been deposited in the accounts of the Debt Service Fund on a ratable basis among the Series of Senior Parity Debt pursuant to subsections (d) and (e) of this Section and amounts on deposit in certain of such accounts have been applied to payment on the respective Series of Senior Parity Debt prior to amounts deposited in other accounts being so applied, then amounts on deposit in such other accounts of the Debt Service Fund that have not been so applied shall be held solely for the benefit of the holders of the applicable Series of Senior Parity Debt and (ii) to the extent amounts have been deposited in the accounts of the Debt Service Fund on a ratable basis pursuant to subsection (f) of this Section and amounts on deposit in certain of such accounts have been applied to payment on the Series 2011 A-2 Bonds and Series 2011 A-2 Promissory Notes prior to amounts deposited in other accounts being so applied, then amounts on deposit in such other accounts of the Debt Service Fund that have not been so applied shall be held solely for the benefit of the holders of the Series 2011 A-2 Bonds.

Section 3.03     <u>Loan Agreement a General Obligation of Corporation</u>.     This Loan Agreement is a general obligation of the Corporation, and the full faith and credit of the Corporation is pledged to the payments required hereunder.

Section 3.04     <u>Obligation to Repay Loan Absolute</u>.  The obligation of the Corporation to pay or cause to be paid the amounts payable under this Loan Agreement shall be absolute, irrevocable, complete and unconditional and the amount, manner and time of payment of such amounts shall not be decreased, abated, rebated, setoff, reduced, abrogated, waived, diminished or otherwise modified in any manner or to any extent whatsoever regardless of any right of setoff, recoupment or counterclaim that the Corporation might otherwise have against the Issuer, the Trustee or any other party or person and regardless of any contingency, force majeure, event or cause whatsoever and notwithstanding any circumstance or occurrence that may arise or take place before, during or after the completion of the Facility or any Additional Facilities, including (without limitation):

(a)     any damage to or destruction of any part or all of the Property or the taking or damaging of any part or all of the Property by any public authority or agency in the exercise of the power of eminent domain or otherwise;

(b)     any assignment, novation, merger, consolidation, sale or transfer of assets, leasing or other similar transaction of or affecting the Corporation, except as otherwise expressly provided in this Loan Agreement;

(c)     the expiration of any term, covenant or condition of this Loan Agreement pursuant to any provisions hereof or operation of law, unless this Loan Agreement shall have been terminated by operation of the provisions of Section 3.01;

12

\29967894.13

(d) any failure of the Issuer to perform or observe any agreement or covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with this Loan Agreement, the Mortgage and the other Bond Documents to which it is a party;

(e) any change or delay in the time of availability of any Additional Facilities for use or delays in construction of any Additional Facilities or the failure to complete or to maintain satisfactory progress in the construction or provision of any Additional Facilities;

(f) any acts or circumstances that may constitute a foreclosure under the Mortgage;

(g) failure of consideration, failure of title, impossibility, impracticability or commercial frustration;

(h) any change in tax or other laws of the United States of America or other governmental authority;

(i) the failure of the Issuer or the Trustee to pursue any other person primarily or secondarily liable for any obligation under this Loan Agreement, the Mortgage or the other Bond Documents;

(j) the bankruptcy or insolvency of the Corporation;

(k) the granting of any indulgence, waiver or consent with respect to any obligation of the Corporation under this Loan Agreement, the Mortgage or the other Bond Documents to which it is a party; and

(l) the occurrence or taking of any other action similar or dissimilar to the foregoing.

The Corporation shall make the payments required by this Loan Agreement whether or not any resident, occupant, lessee or other user of the Facility or Facility Site is delinquent in the payment of his fees, rentals or other charges owed to the Corporation, whether or not any resident, occupant, lessee or other user receives either partial or total reimbursement in the form of a credit against such payment and whether or not the Corporation receives either partial or total reimbursement in the form of a credit against such payment.

Section 3.05 <u>Security Interest in Receipts and Collateral</u>. As security for all of its obligations under this Loan Agreement and the Mortgage, including without limitation its obligation to make timely payment of all amounts due under this Loan Agreement, the Corporation hereby pledges, assigns and grants to the Issuer, and reaffirms its pledge, assignment and grant to the Issuer under the Original Loan Agreement of, a lien and claim on and a security interest in the following, subject to no liens or encumbrances other than Permitted Encumbrances:

(a) <u>All of the Receipts</u>. Without limiting the generality of the foregoing, this lien, claim and security interest shall continuously apply for the entire term of this Loan

Agreement to all rights to receive Receipts (other than the right to receive Medicaid and Medicare payments).

        (b)    All of the assets of the Corporation of every kind whatsoever, including but not limited to each item of property of the Corporation described below, and in all cash and non-cash proceeds and products thereof and all funds at any time on deposit therein, and all proceeds of all insurance policies covering all or any party of such property (collectively, the "Collateral"):

        (i)    <u>Inventory</u>.  All of the Corporation's inventory (as such term is defined in the applicable Uniform Commercial Code), wherever located, both now owned and hereafter acquired, and as the same may now and hereafter from time to time be constituted, together with all cash and non-cash proceeds and products thereof.

        (ii)    <u>Accounts</u>.  All of the Corporation's accounts (as such term is defined in the applicable Uniform Commercial Code), and including, without limitation, all notes, notes receivable, amounts due to the Corporation under any leases, drafts, acceptances and similar instruments and documents both now owned and hereafter acquired (including all accounts receivable and notes receivable and related collateral or security interests arising from loans made, service agreements or leases entered into by or with the Corporation or with any of its affiliates or affiliates of the Issuer), together with (i) all cash and non-cash proceeds thereof, and (ii) all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to an account and all cash and non-cash proceeds and products of all such goods.

        (iii)    <u>Contract Rights</u>.  All of the Corporation's contract rights under each and every contract or agreement heretofore and hereafter entered into between the Corporation and any person or firm rendering services or supplying material in connection with the construction and operation of the Facility, including any and all third party payment contracts under which payment may be made for services rendered at the Facility, together with all additions to, modifications of and substitutions for any of the foregoing.

        (iv)    <u>General Intangibles</u>.  All of the Corporation's general intangibles (as such term is defined in the applicable Uniform Commercial Code), including, without limitation, all things in action, contractual rights, goodwill, literary rights, rights to performance, copyrights, trademarks, service marks, patents, judgments, awards, general and limited partnership interests, tax refunds and rights or claims with respect to taxes paid, both now owned and hereafter acquired, together with all cash and non-cash proceeds and products thereof.  The Corporation's general intangibles shall include all of the Corporation's rights under the Collateral Documents (collectively, as the same may from time to time be amended, restated, supplemented or otherwise modified, the "Documents").

        (v)    <u>Chattel Paper</u>.  All of the Corporation's chattel paper (as such term is defined in the applicable Uniform Commercial Code) both now owned and hereafter

<div align="center">14</div>

existing, acquired or created, together with (i) all moneys due and to become due thereunder, (ii) all cash and non-cash proceeds thereof, and (iii) all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to chattel paper and all cash and non-cash proceeds and products of all such goods. Additionally, the Corporation assigns and grants to the Issuer a security interest in all property and goods both now owned and hereafter acquired by the Corporation which are sold, leased, secured, serve as security for, are the subject of, or otherwise covered by, the Corporation's chattel paper, together with all rights incident to such property and goods and all cash and non-cash proceeds thereof.

(vi) <u>All Equipment, Fixtures and Furniture</u>. All of the Corporation's equipment (as such term is defined in the applicable Uniform Commercial Code), fixtures and furniture, both now owned and hereafter acquired, together with (i) all additions, parts, fittings, accessories, special tools, attachments and accessions now and hereafter affixed thereto and/or used in connection therewith; (ii) all replacements thereof and substitutions therefor; and (iii) all cash and non-cash proceeds and products thereof.

(vii) <u>Licenses</u>. To the fullest extent permitted under applicable law and by the terms of the Licenses (as hereinafter defined), all right, title and interest of the Corporation in, to and under the Licenses, together with all rights, privileges and entitlements thereunder; <u>provided</u>, however, that nothing contained herein shall impose upon the Issuer any of the obligations or liabilities of the Corporation under the Licenses, and <u>provided further</u> that the Issuer shall not exercise any rights under such Licenses unless and until an Event of Default has occurred. For the purposes hereof, "Licenses" shall mean and include any and all licenses, certificates of need, operating permits, franchises, and other governmental authorizations and approvals, now or hereafter existing with respect to the acquisition, construction, renovation, expansion, leasing, ownership and/or operation of the Facility, including all certificates of need, licenses and other authorizations of any kind in connection with any nursing home or other health care facilities which are a part of the Facility, and any and all licenses issued by any governmental authority relating to the operation of food and beverage facilities and/or amenities, and any and all third-party payment contracts under which payment may be made for services rendered at the Facility, including, but not limited to, Medicare and Medicaid provider agreements issued to the Corporation and the Facility, together with all additions to, modifications of and substitutions for any of the foregoing.

(viii) <u>Residence and Care Agreements</u>. All of the Corporation's right, title and interest in and to all Residence and Care Agreements (together with all annexes, schedules and ancillary agreements related thereto) with residents of the Facility, including any collateral rights of the Corporation therein, <u>provided</u>, that residents who have fully paid an Entrance Fee and have paid their monthly fees will retain an undisturbed right to occupy their Residential Unit, to receive full refunds from resales of their Residential Unit, as the market allows, and to receive all current programs and services, including on-site medical clinic services pursuant to their respective Resident and Care Agreements.

(ix)  Cash and Deposits.  All cash, cash equivalents, credits, securities, notes, and instruments, and all bank accounts, savings accounts, investment accounts, money market accounts and other such accounts of any nature and all funds, investments and securities on deposit therein, whether held by the Issuer, the Trustee or any other person or institution (collectively, "Funds").  All such Funds shall be deemed to be held for the benefit of the Issuer, or, if held by another party, by such party as agent for the Issuer for the purpose of perfecting the Issuer's pledge of and security interest therein.

(c)  In order to secure further the punctual payment of amounts due hereunder and without in any way limiting any other provision hereof, the Corporation agrees that, upon the written request of the Trustee following the occurrence of any Event of Default hereunder, and only for so long as such Event of Default continues, any Receipts that are then held by the Corporation shall immediately, and any Receipts thereafter received shall upon their receipt, be transferred to the Trustee, deposited in the Revenue Fund and applied pursuant to Section 7.04 of the Indenture.  Nothing contained in this Section shall be construed as precluding the Corporation from applying its Receipts to its own uses so long as no Event of Default shall have occurred and be continuing.

ARTICLE 4

EXCHANGE OF SERIES 2007 BONDS FOR SERIES 2011 BONDS; CONSTRUCTION AND ACQUISITION OF THE FACILITY AND ADDITIONAL FACILITIES; RESIZING EVENT

Section 4.01  Exchange of Series 2007 Bonds for Series 2011 Bonds.  The Corporation consents and agrees to the provisions of Section 2.02 of the Indenture relating to the exchange of the Series 2007 Bonds for the Series 2011 Bonds.

Section 4.02  Limitation of Issuer's Liability.  THE BONDS DO NOT CONSTITUTE A GENERAL OBLIGATION OF THE MASSACHUSETTS DEVELOPMENT FINANCE AGENCY OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS; THE PRINCIPAL OF AND INTEREST ON THE BONDS ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THIS LOAN AGREEMENT AND INDENTURE.

Section 4.03  Acquisition of Facility and Facility Site.  Concurrently with the issuance of the Series 2011 Bonds, the Corporation will acquire the fee simple interest in the Facility and the Facility Site.

Section 4.04  Compliance with Applicable Governmental Standards and Requirements. The Corporation and the Property shall at all times in all material respects comply with all governmental standards and requirements applicable to the Corporation and the Property, including (without limitation) standards, regulations and requirements (i) pertaining to the licensure or certification of continuing care retirement communities and assisted living residences and their constituent departments, fire and safety and food handling, (ii) pertaining to the Corporation regarding registration, certification and renewals of registration and certification

16

of continuing care retirement communities and assisted living residences, and (iii) of all departments and agencies of the Commonwealth and the United States of America and any political subdivision thereof having jurisdiction. To the extent the Corporation has consent or control rights with respect thereto, the Corporation shall not recommend, agree to or permit any changes, revisions or modifications to the Property or the operation thereof or to the Plans and Specifications relating to the Facility or any Additional Facilities that would in any way adversely affect compliance by the Corporation with such standards, regulations and requirements. The Corporation shall take any and all action necessary within a reasonable time of promulgation of any such standards, regulations or requirements hereafter imposed by the appropriate governmental body to ensure compliance with all such standards, regulations and requirements; provided, however, the Corporation shall have the right to contest the validity of such standards, regulations or requirements in good faith, so long as neither the security of the Issuer under the Mortgage nor the ability of the Corporation to comply with the provisions of this Loan Agreement and the Mortgage is adversely affected thereby.

Section 4.05 <u>Construction of Residential Building 2.5</u>. The Corporation will commence construction of Residential Building 2.5 as provided below:

(a) The Corporation agrees to begin construction of Residential Building 2.5 within nine (9) months after occupancy of the then-existing Residential Units has averaged at least 93% for three consecutive months (the "Commencement Test"). The Corporation acknowledges that the failure to commence construction within such nine-month period, except for Good Cause (as defined in subsection (c) below), and except as described in subsection (b) below, will result in the Corporation's forfeiture of its right to resize the Series 2011 A Bonds under Sections 2.04, 2.05 and 2.06 of the Indenture.

(b) Notwithstanding the foregoing, if the holders of the Series 2011 Bonds and any Letter of Credit Providers with respect thereto (or any subset thereof) do not provide financing to pay the costs of constructing Residential Building 2.5 (including all hard and soft costs incurred after the commencement of construction, but excluding marketing costs and the development fee, plus soft costs incurred by the Corporation prior to the commencement of construction but after the Closing Date, plus capitalized interest during the scheduled construction period and ending six months after Scheduled Completion, plus, at the election of the holders of the Series 2011 Bonds and the Letter of Credit Providers providing such financing, a debt service reserve fund securing such financing) on terms at least as favorable to the Corporation as the terms and conditions set forth in Exhibit A attached hereto, the Corporation shall have no obligation to begin construction of Residential Building 2.5, and the failure of the Corporation to begin construction shall not constitute an Event of Default hereunder. In the event the holders of the Series 2011 Bonds and the Letter of Credit Providers (or any subset thereof) fail to provide such financing, the Corporation shall deliver to the Trustee a Certificate of an Authorized Officer to such effect and requesting that the resizing of the Series 2011 A Bonds occur as soon as possible in accordance with Section 4.10 below.

Notwithstanding anything in this subsection (b) to the contrary, if the Corporation designs Residential Building 2.5 other than as permitted by 4.06 of the Loan Agreement or fails to competitively bid the construction contract for such building, failure of the holders of the

17

Series 2011 Bonds and any Letter of Credit Providers with respect thereto (or any subset thereof) to finance the costs of Residential Building 2.5 will not constitute a Resizing Event and the Corporation will have no right to resize by reason of clause (d) of the definition of "Resizing Event".

(c)     Notwithstanding the foregoing in (a) above, if Good Cause (as defined herein) exists, then the Corporation shall have no obligation to begin construction of Residential Building 2.5 and the failure of the Corporation to begin construction shall not constitute an Event of Default hereunder.  For purposes of this Section 4.05, "Good Cause" means (1) the failure of the Corporation to obtain any governmental approval necessary for the construction of Residential Building 2.5 despite the exercise of commercially reasonable diligent efforts to obtain such approval, (2) the inability of the Corporation to begin construction without violating any court order prohibiting the same despite the exercise of commercially reasonable diligent efforts to have such court order modified or set aside, or (3) the inability of the Corporation to begin construction as a result of a Force Majeure Event despite the exercise of commercially reasonable diligent efforts to overcome the impact of such Force Majeure Event; provided Good Cause described in any of clauses (1) through (3) above shall not constitute a Resizing Event unless the Corporation has, for a period commencing on the date the Commencement Test is satisfied and ending on February 29, 2016 (which may be extended as described below) (the "Good Cause Period") exercised commercially reasonable diligent efforts to cure or overcome the impediment to the commencement of construction as described in clauses (1) through (3) above.  If, on February 1, 2016, construction of Residential Building 2.5 has not commenced, then the Corporation shall deliver a certificate of an Authorized Officer to the Trustee to such effect and directing the Trustee to provide a notice to the holders of the Outstanding Senior Parity Debt and the Series 2011 B Bonds, to the effect that (a) Good Cause has impeded the Corporation's ability to commence construction of Residential Building 2.5 and (b) unless Good Cause has ceased to be in effect, a Resizing Event will occur on the date of delivery of the Resizing Financial Statements for the Fiscal Year ending December 31, 2015 unless within the later of (x) 28 days after the delivery of such notice to the Trustee and (y) February 29, 2016, the Holders of at least a Majority in principal amount of all Outstanding Senior Parity Debt, and the Holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds, consent to a Good Cause Standstill for the Good Cause Standstill Period (as each are hereinafter defined).  "Good Cause Standstill" means the failure to pay the principal or Redemption Price of or interest on any Senior Parity Debt or Subordinated Parity Debt when the same shall become due and payable, by reason of the Minimum Liquidity Condition shall not, in and of itself, constitute an Event of Default hereunder during the Good Cause Standstill Period. "Good Cause Standstill Period" shall mean the 12-month period ending on February 29, 2017. During the Good Cause Standstill Period, the Corporation shall pay scheduled debt service due on the Senior Parity Debt to the extent that immediately after such payment, the Corporation would have at least 30 Days' Cash on Hand (the "Minimum Liquidity Condition").  All amounts that become due and payable with respect to the principal of or interest on the Bonds that are not paid during the Good Cause Standstill Period shall accrue interest at the rate on the applicable Senior Parity Debt and shall be payable as described in Section 7.01 of the Indenture and shall not be subject to resizing pursuant to Section 2.22 of the Indenture. If the Holders' consent to a Good Cause Standstill Period as provided above, the end of the Good Cause Standstill Period (and

18

thereby any resizing of the Series 2011 A Bonds as provided in this Section 4.05(c)) will be extended to February 29, 2017.

Section 4.06    Amendment of the Facility and Additional Facilities.  The Facility and any Additional Facilities may be amended by the Corporation in order to increase or decrease the scope of the Facility or such Additional Facilities or to make changes within the Facility or such Additional Facilities as initially designed and planned; provided, however, that (i) in the case of the Facility or any Additional Facilities financed with Bond proceeds, any amendment does not adversely affect the qualification of the Facility or any Additional Facilities under the Act, (ii) neither the Facility nor any Additional Facilities will cease to be an economically feasible or functional facility as a result of any decrease in scope, (iii) all applicable governmental approvals are obtained, and (iv) if such amendment changes the scope or use of the Facility or any Additional Facilities, the Trustee receives an opinion of Bond Counsel to the effect that such amendment will not adversely affect the excludability from gross income, for federal income tax purposes, of interest paid on any Tax-Exempt Bonds theretofore issued.

Notwithstanding anything herein to the contrary, unless the Corporation has received the prior written consent of the holders of a Majority of the Senior Parity Debt, the plans and scope of Residential Building 2.5 as initially planned and designed at the time of issuance of the Series 2007 Bonds ("Original RB 2.5") may only be amended if the plans and scope of the building as modified have a design and workmanship of substantially similar quality to the Original RB 2.5 and the construction contract for Residential Building 2.5 has been subject to a competitive bid process; provided that the number of units in Residential Building 2.5 may be decreased to not less than 115 units.  The Corporation will deliver the plans for the Original RB 2.5 to the Trustee on the Closing Date.

Section 4.07    No Warranty by Issuer.  The Issuer makes no warranty, either express or implied, of the actual or designed capacity of the Facility or any Additional Facilities, of the suitability of the Facility or any Additional Facilities for the purposes specified in this Loan Agreement, of the condition of the Facility or any Additional Facilities, of the suitability of the Facility or any Additional Facilities for the purposes or needs of the Corporation or that the proceeds derived from any of the Loans will be sufficient for the purpose thereof.  Without limiting the generality of the foregoing provisions of this Section, the Corporation hereby acknowledges that THE ISSUER DOES NOT IN ANY WAY WARRANT THE MERCHANTABILITY OF ANY EQUIPMENT, AND THAT THERE ARE NO IMPLIED WARRANTIES OR WARRANTIES OF FITNESS MADE BY THE ISSUER.  By acceptance of each item of equipment, the Corporation is deemed to have acknowledged to the Issuer that such item of equipment is in acceptable condition and operating order.

Section 4.08    Completion Certificates.  Completion of any Additional Facilities shall be evidenced to the Trustee by a Completion Certificate signed by an Authorized Officer of the Corporation: (i) stating that such Additional Facilities have been completed in accordance with any applicable plans and specifications so as to permit efficient operation of such Additional Facilities, and all costs then due and payable in connection therewith have been paid, and that completion has been accomplished in such a manner as to conform with all applicable zoning, planning, building, environmental and other regulations of all governmental authorities having

jurisdiction; (ii) specifying the date by which the foregoing events have occurred; and (iii) stating that it is given without prejudice to any rights against third parties which then exist or may subsequently come into being.

Section 4.09    Contracts Assigned to Trustee.

The Corporation shall assign to the Trustee its rights and benefits under any contracts made by the Corporation to acquire, construct or equip any Additional Facilities to the extent such Additional Facilities are financed with proceeds of Additional Bonds.  Each such assignment shall permit the Trustee to enforce in its own name the rights and benefits thereunder; provided, however, that the Trustee shall not exercise its rights under any such assignment until the occurrence and continuance of an Event of Default.  The Trustee, as assignee, shall be obligated to make payments pursuant to any contract assigned hereunder only to the extent that moneys are available in the Construction Fund.

Section 4.10    Resizing Event.    Upon the occurrence of a Resizing Event, the Corporation shall deliver to the Trustee a Certificate of an Authorized Officer, which Certificate shall include (i) the Resizing Financial Statements, a calculation of the Corporation's Days' Cash on Hand and such other information required under the definition of Resizing Event, (ii) any certifications required under Section 4.05, (iii) a copy of the report of the Independent Consultant delivered to the Corporation pursuant to Section 2.22 of the Indenture, and (iv) a request that the resizing of the Series 2011 A Bonds occur as soon as possible.

ARTICLE 5

OPERATION OF PROPERTY

Section 5.01    Operation and Maintenance of Property.    The Corporation shall operate the Property in a sound and economical manner and shall maintain, preserve and keep the Property in good condition and repair.  The Corporation shall make all necessary and proper repairs, replacements and renewals so as to conduct the operation of the Property in accordance with all applicable governmental operating standards.    The Corporation shall operate the Property and any Additional Facilities financed with the proceeds of Bonds as facilities permitted to be financed and refinanced under the Act until the expiration or earlier termination of this Loan Agreement.

Section 5.02    Restrictions on Leases and Contracts.    Subject to the provisions of Sections 7.03 and 8.01 and the further provisions of this Section, the Corporation may enter into one or more leases, contracts and licenses with respect to the Facility.

If any such lease, license or contract requires the payment in any single Fiscal Year to the Corporation of an amount greater than five percent (5%) of the Operating Revenues of the Corporation for the most recent Fiscal Year for which audited financial statements have been filed with the Trustee as required by this Loan Agreement, then, before the Corporation enters into such lease, license or contract, (i) the Board of Directors of the Corporation shall have determined that the lessee, licensee or contracting party (as the case may be) has sufficient

financial responsibility and technical competency to render services meeting applicable nursing care or other standards relating to the portion of the Property to which such lease, license or contract relates, (ii) the Trustee shall have received a written opinion from Independent Counsel to the effect that such lease, license or contract does not violate any provision of the Indenture, this Loan Agreement (including without limitation Sections 8.01 and 8.09) or the other Bond Documents to which the Corporation is a party, (iii) the Trustee shall have received a copy of such lease, license or contract certified in writing by an Authorized Officer of the Corporation as a true, correct and complete copy, and (iv) the Trustee shall have received an opinion of Bond Counsel to the effect that such lease, license or contract will not adversely affect the excludability from gross income, for federal income tax purposes, of the interest paid on any Tax-Exempt Bonds theretofore issued.

Any such lease, license or contract (other than the Residence and Care Agreements meeting the requirements of Section 5.08 below) entered into with respect to any portion of the Property specifically by its terms shall be subordinate to the Mortgage and shall permit the Trustee upon the initiation of foreclosure of the Mortgage to terminate such lease, license or contract upon 30 days' notice at any time with or without cause, unless, at the effective date of such lease, license or contract, the portion of the Property subject to such lease, license or contract could be disposed of pursuant to Section 7.03. Each lease, license or contract shall be subject to the terms of this Loan Agreement and shall not relieve the Corporation of any of its obligations under this Loan Agreement.

Section 5.03    Preservation of Facility.

(a)    The Corporation will at all times preserve and protect the Facility in good repair, working order and safe condition, and from time to time will make, or will cause to be made, all needed and proper repairs, renewals, replacements, betterments and improvements thereto including those required after a casualty loss to the extent insurance proceeds are available therefor. The Issuer shall have no obligation and makes no warranties respecting the condition or operation of the Facility.

(b)    The Corporation will not use as a basis for contesting any assessment or levy of any tax the financing under this Loan Agreement or the issuance of the Bonds by the Issuer and, if any administrative body or court of competent jurisdiction shall hold for any reason that the Facility is exempt from taxation solely by reason of the financing under this Loan Agreement or issuance of the Bonds by the Issuer or other Issuer action in respect thereto, the Corporation covenants to make payments in lieu of all such taxes in an amount equal to such taxes and, if applicable, interest and penalties.

Section 5.04    Expenses of Upkeep. The Corporation shall pay all expenses, including without limitation, all extraordinary expenses, of maintaining, repairing and replacing the Property to the extent necessary to permit the Corporation to make the payments required by this Loan Agreement and to perform its obligations hereunder, except insofar as funds are available from insurance proceeds to pay such expenses in accordance with Section 6.04.

Section 5.05    Surrender in Proper Condition.   Upon the taking of possession of all or any portion of the Property by the Trustee pursuant to this Loan Agreement or the Mortgage upon the occurrence of any Event of Default, the Corporation shall give to the Trustee or an agent designated by the Trustee possession of the Property in proper condition, ordinary wear and tear excepted.  While the Trustee is in possession of the Property, to the extent that funds are available to the Trustee for such purpose, the Trustee shall maintain the Property in good condition, ordinary wear and tear excepted.

Section 5.06    Policies and Procedures.    The Corporation shall adopt and enforce reasonable policies and procedures for the care of the Property and the conduct of users thereof to effectuate the provisions of this Loan Agreement.

Section 5.07    Restrictions on Use of Facility and Any Additional Facilities Financed with Bond Proceeds.   The Corporation shall operate and maintain the Facility and any Additional Facilities financed with the proceeds of Bonds on a nonsectarian basis and shall not use any part of the Facility or such Additional Facilities for sectarian religious instruction or as a place of sectarian religious worship or in connection with any part of the program of a school or a department of divinity for any religious denomination.  The Corporation shall not make use of the Corporation's facilities or allow any use to be made of the Corporation's facilities that would cause the Corporation to be an institution devoted primarily to the inculcation of religious values and beliefs or to be "pervasively sectarian" as that term is construed by the Supreme Court of the United States.  Notwithstanding the foregoing provisions of this paragraph, if the Corporation receives an opinion of Bond Counsel to the effect that compliance with the foregoing restrictions is no longer necessary under applicable law, the Corporation shall no longer be required to comply with such restrictions.  The covenants contained in this Section are intended to be construed and applied so that the use of the Facility and such Additional Facilities financed by the Issuer will in all respects be consistent with law applicable from time to time, including decisions of state and federal courts regarding the use of facilities financed by the Issuer, or any similar entity, on substantially the same terms and under substantially the same circumstances as those under which the Issuer is financing the Facility and such Additional Facilities for the Corporation.  The covenants contained in this paragraph are not intended and shall not be construed to impose burdens, obligations or restrictions on the Corporation from time to time more onerous or restrictive than those that are required by such law and decisions from time to time. Nothing in this Section shall be construed to prevent the Corporation from (i) using its facilities or any part thereof for any purpose not prohibited by this Section, including (without limitation) the provision of pastoral care services and programs of the kind permitted or provided by continuing care retirement communities generally, or (ii) maintaining a nondenominational chapel for the use of residents, employees and visitors as a part of the Facility or any such Additional Facilities.

Section 5.08    Residence and Care Agreements.

(a)    The Corporation shall carry out all of its obligations under each and every Residence and Care Agreement.  The Corporation shall enter into with each resident of the Facility a Residence and Care Agreement in one of the forms previously delivered to the Massachusetts Executive Office of Elder Affairs as part of its annual disclosure statement filed

\29967894.13

with such office, as such forms may be amended in accordance with paragraph (b) of this Section.

(b)      (i)      Except as otherwise expressly provided herein, the Corporation may make such changes in the forms of Residence and Care Agreement as it deems appropriate in the exercise of its business judgment, to the extent permitted by law.

(ii)      Notwithstanding the foregoing, the rights, privileges and benefits of the residents under the Residence and Care Agreements (except the right to occupy the unit pursuant to the Residence and Care Agreement) shall at all times be subordinate to this Loan Agreement and the Mortgage, provided, however, that residents who have fully paid an Entrance Fee and have paid their monthly fees will retain an undisturbed right to occupy their Residential Unit, to receive full refunds from resales of their Residential Unit, as the market allows, and to receive all current programs and services, including on-site medical clinic services pursuant to their respective Resident and Care Agreements..

Section 5.09      Trustee May Enter and Examine the Property.  The Trustee shall have the right, upon reasonable notice to the Corporation, to enter upon, inspect and examine the Property at any time during regular business hours in such manner as not to interfere with the normal operations of the Corporation and not to disturb residents so far as practicable.  Representatives of the Corporation may accompany the employees or representatives of the Trustee on such inspections.

Section 5.10      Management of the Facility.

(a)      The Corporation shall not terminate the Management Agreement with the Initial Manager prior to the end of its term if an Event of Default has occurred and shall be continuing unless, prior to such termination, the Corporation shall have given notice thereof to the holders of the Outstanding Parity Debt and the Trustee and, unless such termination is required pursuant to Section 8.01 of this Loan Agreement, within 15 days of receipt thereof, the holders of the majority in principal amount of the Outstanding Special Senior Parity Debt and the Outstanding Senior Parity Debt, as a single class, have not disapproved in writing delivered to the Corporation and the Trustee such termination.

(b)      The Corporation shall not enter into a management agreement with any person for the management and operation of substantially all of the Facility if an Event of Default has occurred and shall be continuing unless the Corporation shall have given notice of the identity and qualifications of one or more proposed manager(s) of the Facility to the holders of the Outstanding Parity Debt and the Trustee and, within 15 days of receipt thereof, the holders of the majority in principal amount of the Outstanding Special Senior Parity Debt and the Outstanding Senior Parity Debt, as a single class, have not disapproved in writing delivered to the Corporation and the Trustee the Corporation's entering into a management agreement with such proposed manager(s).

(c)      The Corporation will not amend or modify the provisions of the Management Agreement described below without the consent of the Holders of a Majority in

23

principal amount of all Outstanding Senior Parity Debt and a Majority in principal amount of all Outstanding Series 2011 B Bonds:

>(i)     The subordination of up to 50% of the Manager's management fee to actual annual debt service on Parity Debt after the Resizing Review Date;

>(ii)     The sliding scale for the deferral of purchased services payments prior to the Resizing Review Date;

>(iii)     The waiver of deferred purchased services if, on the Resizing Tender Date, the resizing results in a reduction of the principal amount of Outstanding Series 2011 A Bonds; and

>(iv)     The rights to terminate the Management Agreement.

Section 5.11     <u>Use of the Facility</u>.

>(a)     <u>Compliance with Law</u>.   In the acquisition, construction, maintenance, improvement and operation of the Facility, the Corporation covenants that it has complied and will comply with all applicable building, zoning, land use, environmental protection, sanitary, safety laws, rules and regulations, and all applicable grant, reimbursement and insurance requirements, and will not permit a nuisance thereon; but it shall not be a breach of this subsection if the Corporation fails to comply with such laws, rules, regulations and requirements (other than Chapter 21E of the Massachusetts General Laws, as amended) during any period in which the Corporation is diligently and in good faith contesting the validity thereof, provided that the security created or intended to be created hereby is not, in the opinion of the Trustee, unreasonably jeopardized thereby.

>(b)     <u>Payment of Lawful Charges</u>.  The Corporation shall make timely payment of all taxes and assessments and other municipal or governmental charges and all claims and demands for work, labor, services, materials or other objects which, if unpaid, might by law become a lien on the Facility or any part thereof; but it shall not be a breach of this subsection if the Corporation fails to pay any such item during any period in which the Corporation is diligently and in good faith contesting the validity thereof, provided that the laws applicable to contesting its validity do not require payment thereof and proceedings for a refund and that the security created or intended to be created hereby is not, in the opinion of the Trustee, unreasonably jeopardized thereby.

>(c)     <u>Permitted Purposes</u>.  The Corporation agrees that the Facility shall be used only for the purposes described in the Act.   The Corporation acknowledges that it is fully familiar with the physical condition of the Facility and that it is not relying on any representation of any kind by the Issuer or the Trustee concerning the nature or condition thereof.  Neither the Issuer nor the Trustee shall be liable to the Corporation or any other person for any latent or patent defect in the Facility.

Section 5.12     <u>Covenant to Obtain Rating</u>.  The Corporation, not later than 180 days following the first full Fiscal Year after the Resizing Review Date and not later than 180 days

following the end of each Fiscal Year thereafter until the Series 2011 Bonds have received a rating of not less than "Ba" by Moody's, "BB-" by S&P or "BB-" by Fitch, shall review the Corporation's credit, taking into account rating medians published by Fitch, S&P and Moody's and discussions with representatives of one or more of such rating agencies. In the event that such review and discussions indicate a likelihood the Series 2011 Bonds would receive such a rating by any of such rating agencies, the Corporation shall, at its sole expense, solicit and make a good faith effort to obtain such rating. If the Corporation receives such rating, the foregoing requirements shall be of no further force and effect with respect to such Series of the Series 2011 Bonds so long as such rating is neither reduced below "Ba" by Moody's, "BB-" by S&P or "BB-" by Fitch nor withdrawn.

Section 5.13    Change in Fiscal Year.  The Corporation shall not change its Fiscal Year without the consent of the Holders of a Majority in principal amount of all Outstanding Senior Parity Debt and a Majority in principal amount of all Outstanding Series 2011 B Bonds.

ARTICLE 6

INSURANCE; EXTRAORDINARY REDEMPTION OF BONDS

Section 6.01    Required Insurance; Independent Insurance Consultant; Self Insurance; Independent Actuary.

(a)    The Corporation shall keep the Property adequately insured at all times and shall maintain, or cause to be maintained, with responsible insurers with respect to its facilities and operations insurance of such types, in such amounts and against such risks as are customarily maintained by persons in similar circumstances having facilities of a comparable type and size and offering comparable services as those of the Corporation, including without limitation the following insurance to the extent that such insurance is customarily maintained by such persons: (i) full fire and extended coverage insurance on the Property providing for not less than full recovery of the insurable value (less reasonable deductibles and exclusions) of any damaged property; (ii) public liability and property damage insurance, including without limitation business automobile liability insurance and medical and professional liability insurance in amounts estimated to fully indemnify (less reasonable deductibles and exclusions) the Corporation, the Issuer and the Trustee against the estimated loss or damage; and (iii) fidelity, comprehensive dishonesty, disappearance and destruction insurance.  In addition, the Corporation shall obtain and maintain "use and occupancy" insurance, "business interruption" insurance or "additional expenses" insurance covering the loss of revenues by reason of the total or partial suspension of or interruption in the operation of the Property caused by damage to or destruction of the Property and additional expenses incurred in complying with the Residence and Care Agreements in an amount not less than the amount required to meet Debt Service on Outstanding Long-Term Indebtedness and Operating Expenses for a period of not less than 24 months.

(b)    (i)    Biennially, within 60 days after the end of the applicable Fiscal Year, the first such report being due not later than March 1, 2013 with respect to Fiscal Year 2012, the Corporation shall employ an Independent Insurance Consultant to review the

insurance coverage of, and the insurance required by this Section for, the Corporation and shall furnish to the Trustee a summary of the report of such Independent Insurance Consultant.

(ii)    The Corporation shall furnish to the Trustee certificates of insurance reflecting all such policies.  The Corporation shall deliver to the Trustee certificates of renewal of any insurance at least 15 days prior to the expiration of any policy of insurance.

(c)    Policies of insurance with respect to the Property and the operation of the Property shall specifically name the Issuer and the Trustee as mortgagees and shall contain standard non-contributing mortgagee clauses.    Public liability insurance policies shall specifically name the Issuer and the Trustee as additional insureds.  All policies described in this subparagraph (c) shall provide that the insurer shall give at least 30 days' notice in writing to the Issuer and the Trustee of cancellation, termination or modification.

(d)    The Trustee shall have the sole right to receive the proceeds of any policies of insurance required to be maintained in accordance with this Loan Agreement other than as provided in Section 6.04 of this Loan Agreement and other than any public liability and property damage insurance, medical and professional liability insurance and workers' compensation or other employer's liability insurance, subject to the rights of the holders of any Permitted Encumbrances taking priority over the rights of the Trustee in the property which is subject to such Permitted Encumbrances.

(e)    If at any time the Corporation fails to procure or maintain any insurance required by this Section, the Trustee may, but shall not be required to, after 10 days' written notice to the Corporation and the Manager unless cured within such days, procure and maintain such insurance at the expense of the Corporation, and the Corporation shall reimburse the Trustee for all amounts expended in connection therewith with interest thereon at the Reimbursement Rate from the date the Trustee expends such amounts.

(f)    Except as expressly provided herein, neither the Issuer nor the Trustee shall have any responsibility with respect to any insurance required under this Section, except that the Trustee shall receive the letters and opinions required to be delivered in accordance with this Section and shall hold the same for inspection by any holder of Parity Debt.  The Trustee and the Issuer shall be entitled to rely upon any opinions, letters, certifications, recommendations and reports provided in accordance with this Section and shall have no responsibility or duty to conduct any independent inquiry or investigation as to the adequacy or enforceability of any insurance procured or maintained by the Corporation or as to whether the Corporation has in fact procured and maintained the insurance required under this Section.  No acceptance or approval of any insurance policy by the Trustee shall relieve or release the Corporation from any liability, duty or obligation under the provisions of this Loan Agreement.

Section 6.02  Indemnification Agreement.    The Corporation, regardless of any agreement to maintain insurance, shall fully defend and indemnify the Issuer, the Trustee, the Registrar and the Paying Agent, their respective officers, employees and agents and any person who controls the Issuer within the meaning of Section 15 of the Securities Act of 1933, as

26

provided in this Section. The Corporation shall protect, indemnify, and save harmless the Issuer, the Trustee, the Paying Agent and the Registrar and their respective officers, employees and agents against and from any and all liabilities, suits, actions, claims, demands, damages, losses, expenses and costs of every kind and nature incurred by, or asserted or imposed against, the Issuer, the Trustee, the Paying Agent and the Registrar and their respective officers, agents or employees, or any of them, related to the participation of the Issuer or the Trustee in the transactions contemplated by this Loan Agreement, including, without limitation, all claims or liability resulting from, arising out of or in connection with the offering, issuance, sale, tender solicitation, remarketing, reoffering, reissuance, restatement or any resale of the Series 2007 Bonds, the issuance of the Series 2011 Bonds, the exchange of Series 2007 Bonds for Series 2011 Bonds or the performance of duties under the Bond Documents or any breach by the Corporation of its obligations under this Loan Agreement or any act or omission of the Corporation or any of its agents, contractors, servants, employees or licensees or the failure of the interest on the Tax-Exempt Bonds to be excludable from the gross income of the holders thereof for purposes of federal income taxation pursuant to the Code or any accident, injury (including death) or damage to any person or property, however caused (other than the negligence or willful misconduct of the Trustee, the Paying Agent, and the Registrar, or any of their respective officers, agents or employees, which negligence or willful misconduct shall affect the indemnification rights of only the Trustee, Paying Agent or Registrar whose officer, agent or employee committed such negligence or willful misconduct), resulting from, connected with or growing out of any act of commission or omission of the Corporation, or any officers, employees, agents, assignees, contractors or subcontractors of the Corporation or any use, non-use, possession, occupation, condition, operation, service, design, construction, acquisition, maintenance or management of, or on, or in connection with, the Property, or any portion thereof, during the term of this Loan Agreement and regardless of whether such liabilities, suits, actions, claims, demands, damages, losses, expenses and costs be against or be suffered or sustained by the Issuer, the Trustee, the Paying Agent and the Registrar, or any of their respective officers, agents or employees, or be against or be suffered or sustained by legal entities, officers, agents, or other persons to whom the Issuer, the Trustee, the Paying Agent and the Registrar or any of their respective officers, agents or employees may become liable therefor. The Issuer (by reason of its role as issuer of the Series 2007 Bonds and the Series 2011 Bonds) shall not be liable for any damage or injury occurring during the term of the Loans to the persons or property of the Corporation or any of its officers, agents, including operating personnel, contractors and employees, or any other person or entity who or which may be upon the Property. The Corporation may, and if so requested by the Issuer, the Trustee, the Paying Agent or the Registrar shall, undertake to defend, at its sole cost and expense, any and all suits, actions and proceedings brought against the Issuer, the Trustee, the Paying Agent or the Registrar or any of their respective officers, agents or employees in connection with any of the matters indemnified against in this Section. The Issuer, the Trustee, the Paying Agent and the Registrar shall give the Corporation timely notice of and shall forward to the Corporation every demand, notice, summons or other process received with respect to any claim or legal proceedings within the purview hereof, but the failure of the Issuer, the Trustee, the Paying Agent and the Registrar to give such notice shall not affect its right to indemnification hereunder.

The Corporation agrees to indemnify the Trustee, the Paying Agent, and the Registrar and their respective officers, employees and agents for, and to hold them harmless against, any

loss, liability or expense incurred without negligence or willful misconduct on their part, arising out of or in connection with the acceptance or administration of the trust or trusts and duties hereunder and under the Indenture and the Mortgage, including the costs and expense of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties thereunder.

The Corporation agrees to indemnify and hold harmless the Issuer, the Trustee, the Registrar and the Paying Agent and their respective members, directors, officials, attorneys (other than Bond Counsel and Special Tax Counsel), officers, employees and agents and any person who controls the Issuer (within the meaning of Section 15 of the Securities Act of 1933, as amended) against any and all losses, claims, damages or liabilities (including all costs, expenses and reasonable counsel fees incurred in investigating or defending any such claim) suffered by any of the foregoing and caused by, relating to, arising out of, resulting from, or in any way connected to an examination, investigation or audit of the Bonds by the Internal Revenue Service. In the event of such examination, investigation or audit, the Issuer, the Trustee, the Registrar and the Paying Agent and their respective members, directors, officials, attorneys (other than Bond Counsel and Special Tax Counsel), officers, employees and agents and any person who controls the Issuer (within the meaning of Section 15 of the Securities Act of 1933, as amended) shall have the right to employ counsel at the Corporation's expense. Without limiting the generality of the foregoing, the Corporation acknowledges that in the event of an examination, inquiry or related action by the Internal Revenue Service with respect to the Bonds or the exclusion of interest thereon from the gross income of the holders thereof for federal income tax purposes, the Issuer may be treated as the responsible party, and the Corporation agrees to respond promptly and thoroughly to the satisfaction of the Issuer to such examination, inquiry or related action on behalf of and at the direction of the Issuer. The Corporation further agrees to pay all costs of counsel selected by the Issuer to represent the Issuer in connection with such examination, inquiry or related action. The Corporation shall indemnify and hold harmless the Issuer against any and all costs, losses, claims, penalties, damages or liability of or resulting from such examination, inquiry or related action by the Internal Revenue Service, including any settlement thereof by the Issuer.

The obligation of the Corporation under this Section shall survive the termination of this Loan Agreement, the Indenture and the other Bond Documents and the payment and performance of all other obligations of the Corporation.

Section 6.03   <u>Title Insurance</u>.   The Corporation, at its expense, shall deliver to the Trustee a mortgagee's title insurance policy or policies (or endorsement or other documentation of title insurance acceptable to the Trustee) insuring against title losses with respect to all of the Property which constitutes real property, in amounts not less than the total aggregate principal amount of the Outstanding Senior Parity Debt, less the sum of the amount of the Senior Debt Service Reserve Fund Requirement and any amount deposited in any debt service reserve fund for any Senior Parity Obligation on the date of issuance thereof, issued by a company or companies licensed to conduct a title insurance business in the Commonwealth (and any other jurisdiction in which any of the Property may be located) and in form and substance satisfactory to counsel to the Bondholders. The requirements of this Section may be satisfied with the

delivery of a mortgagee's title insurance policy or endorsement delivered concurrently with the Corporation's acquisition of the Facility and Facility Site pursuant to Section 4.03 herein.

Section 6.04    Application of Proceeds of Condemnation and Insurance; Extraordinary Redemption of Bonds.

(a)    The Issuer and the Corporation shall pay over to the Trustee for deposit in the Insurance and Condemnation Award Fund upon receipt thereof (i) all proceeds received by the Corporation under any title insurance policy relative to any Property ("title insurance proceeds"), (ii) the proceeds received by the Corporation of any Property taken in the exercise of the power of eminent domain, condemnation or through the exercise of any right or any obligation on the part of any public authority to purchase the same, or as a result of any agreement between the Corporation and the Issuer, the Commonwealth or the Federal government ("condemnation proceeds"), and (iii) any insurance proceeds received by the Corporation in connection with the loss, damage or destruction of any portion of the Property ("casualty insurance proceeds"); provided, however, that payments or awards of title insurance proceeds, casualty insurance proceeds or condemnation proceeds received in any Fiscal Year from a single casualty, loss or taking that are in an amount less than or equal to 3% of the Book Value of the Operating Assets of the Corporation as of the last day of the most recent Fiscal Year for which audited financial statements have been filed with the Trustee as required by this Loan Agreement shall be paid to the Corporation; provided, however, that any payments or awards of title insurance proceeds, casualty insurance proceeds or condemnation proceeds received in connection with any of the Property financed with proceeds of Tax-Exempt Bonds which are not paid over to the Trustee for deposit into the Redemption Fund or applied to the repair or replacement of the lost, damaged, destroyed or taken Property shall be applied as directed by the Corporation if such application is approved by an opinion of Bond Counsel to the effect that the tax-exempt status of the Tax-Exempt Bonds will not be impaired by the application of such proceeds.

(b)    Title insurance proceeds, casualty insurance proceeds or condemnation proceeds paid to the Trustee as provided in paragraph (a) (except any money paid to the Corporation as provided in paragraph (a) above or clause (v) of this paragraph (b)) shall be applied as set forth in this paragraph (b).

(i)    The Corporation may elect to apply such proceeds to the repair or replacement of the lost, damaged, destroyed or taken Property, if the Corporation's Board of Directors approves such repair or replacement and such action shall not result in an Event of Default under this Loan Agreement and the Corporation delivers to the Trustee an Independent Engineer's certificate to the effect that such proceeds, together with other available funds of the Corporation, will be sufficient to rebuild or restore the Facility (if applicable) and a certificate of an Authorized Officer of the Corporation to the effect that the Debt Service Coverage Ratio described in Section 8.04 will be maintained.

(ii)    The Corporation may elect to apply such proceeds to the redemption of, FIRST, Outstanding Special Senior Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Special Senior Parity Debt, SECOND, if

all Outstanding Special Senior Parity Debt has been paid in full, Outstanding Senior Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Senior Parity Debt, and THIRD, if all Outstanding Senior Parity Debt has been paid in full, Outstanding Subordinated Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Subordinated Parity Debt; and in any case such action shall not result in an Event of Default under this Loan Agreement.

(iii)   The Corporation may elect to apply a portion of such proceeds to the repair or replacement of the lost, damaged, destroyed or taken property if the Corporation meets the requirements of clause (b)(ii) with respect to such repair or replacement and to apply the remaining proceeds to the redemption of, FIRST, Outstanding Special Senior Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Special Senior Parity Debt, SECOND, if all Outstanding Special Senior Parity Debt has been paid in full, Outstanding Senior Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Senior Parity Debt, and THIRD, if all Outstanding Senior Parity Debt has been paid in full, Outstanding Subordinated Parity Debt if the Corporation's Board of Directors elects to redeem any Outstanding Subordinated Parity Debt.

(iv)   The Corporation shall elect to apply such proceeds in accordance with paragraph (i), (ii) or (iii) above within six months of such loss, damage, destruction or taking. If the Corporation does not make such election or is not entitled to apply such proceeds in accordance with paragraph (i), (ii) or (iii) above, the Trustee shall employ a Management Consultant at the expense of the Corporation, within 30 days after the six month period described in the previous sentence, to submit a written report and recommendations as to the use of such proceeds.  Such report shall include a financial projection for a period extending at least through the second full Fiscal Year after the date of completion of any repairs or replacements recommended by such Management Consultant.  Such proceeds shall be applied in accordance with the recommendations of such Management Consultant.

(v)   Notwithstanding anything to the contrary herein contained, with respect to title insurance proceeds, casualty insurance proceeds or condemnation proceeds of less than or equal to 3% of the Book Value of the Operating Assets of the Corporation as of the last day of the most recent Fiscal Year for which audited financial statements have been filed with the Trustee, the Corporation may, in its sole discretion, apply such proceeds to either the restoration, repair or replacement of the lost, damaged, destroyed or taken property or the redemption of, FIRST, the Outstanding Special Senior Parity Debt, SECOND, if all Outstanding Special Senior Parity Debt has been paid in full, the Outstanding Senior Parity Debt, and THIRD, if all Outstanding Senior Parity Debt has been paid in full, the Outstanding Subordinated Parity Debt.  Any such proceeds, if for restoration, repair or replacement, shall be paid to the Corporation.

(vi)   (A)   If the Corporation desires to apply insurance or condemnation proceeds to the repair or replacement of a lost, damaged, destroyed or taken Residential Building or any part of a Residential Building, but is unable to certify

that the Debt Service Coverage Ratio will be maintained, as required in paragraph (i) above, then the Corporation will deliver a certificate of an Authorized Officer to the Trustee to such effect and directing the Trustee to provide a notice to the holders of the Outstanding Special Senior Parity Debt, the Senior Parity Debt and the Subordinated Parity Debt, to the effect that (a) a Residential Building was lost, damaged, destroyed or taken, (b) the date on which Corporation expects the repair or replacement will be completed, (c) the Corporation desires to apply insurance proceeds to repair or replace such Residential Building but cannot certify that the Debt Service Coverage Ratio will be maintained, and (d) in accordance with the Indenture, such proceeds will be applied to redeem Parity Debt unless within 15 Business Days of the date of such notice, the Holders of at least a Majority in principal amount of all Outstanding Senior Parity Debt and the Holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds, consent to a Calamity Standstill for the Calamity Standstill Period with a potential Good Cause Delay (as each are hereinafter defined). The Holders shall have the right to propose an alternative to the Calamity Standstill Period but the Corporation shall have no obligation to accept such alternative.

(B)     All amounts that become due and payable with respect to the principal of or interest on the Special Senior Parity Debt or the Senior Parity Debt that are not paid during the Calamity Standstill Period shall accrue interest and shall be payable as described in Section 7.01 of the Indenture and shall not be subject to resizing pursuant to Section 2.22 of the Indenture.

(C)     If the Corporation fails to complete the repair or replacement within six months after the estimated completion date set forth above, the Calamity Standstill Period shall end, provided that if Good Cause (as defined in Section 4.05(c) above) exists with respect to such repair or replacement (a "Good Cause Delay"), within 30 days of the estimated completion date, the Corporation shall deliver a certificate of an Authorized Officer to the Trustee to such effect and directing the Trustee to provide a notice to the holders of the Outstanding Special Senior Parity Debt and Senior Parity Debt, to the effect that Good Cause has impeded the Corporation's ability to commence or complete the repair or replacement and unless Good Cause has ceased to be in effect, the Calamity Standstill Period will be extended to the Outside Resize Date unless within 15 Business Days of the date of such notice, the Holders of at least a Majority in principal amount of all Outstanding Special Senior Parity Debt and a Majority of all Outstanding Senior Parity Debt and the Holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds, direct the Corporation to apply the casualty proceeds to redeem Special Senior Parity Debt and, if all Special Senior Parity Debt is paid, to redeem Senior Parity Debt.

(D)     If the Calamity Standstill Period is extended as provided in (C) and the Corporation diligently pursues the completion of such repair or replacement, then such Calamity Standstill Period will be extended and any pending Resizing Event will be delayed and would be based on the Resizing Financial Statements for the earlier of the Outside Resize Date.

31

(E)     If the Corporation elects to repair or replace, instead of redeeming Parity Debt, and does not complete the repair or replacement then, subject only to a Good Cause Delay and availability of proceeds to complete such repair or replacement, the Corporation will forfeit its right to resize the Series 2011 A Bonds.  For the avoidance of doubt, if the Outside Resize Date occurs while the repair or replacement is still incomplete despite the Corporation's diligent efforts to complete (whether due to Good Cause or otherwise), then resizing will still occur. Any casualty proceeds not needed to pay the cost of the repair or replacement shall be applied to pay Senior Parity Debt on the Resizing Tender Date in a manner similar to the application of the surplus from the Senior Debt Service Reserve Fund, as described in Section 2.22 of the Indenture.

(F)     As used herein, the following terms have the meanings set forth below:

"Calamity Standstill" means the failure to pay the principal or Redemption Price of or interest on any Special Senior Parity Debt, Senior Parity Debt or Subordinated Parity Debt when the same shall become due and payable, by reason of the Minimum Liquidity Condition shall not, in and of itself, constitute an Event of Default hereunder during the Calamity Standstill Period.

"Calamity Standstill Period" shall mean the period of time after the occurrence of the calamity described above and ending on the date that is six months after such repair or replacement is completed, provided if the calamity occurs prior to the Resizing Review Date, the Calamity Standstill Period may be extended following a Good Cause Delay to the Outside Resize Date (as each are hereinafter defined).  During the Calamity Standstill Period, the Corporation shall pay scheduled debt service with respect to the principal of or interest on the Special Senior Parity Debt or Senior Parity Debt that on any Special Senior Parity Debt and Senior Parity Debt to the extent that immediately after such payment, the Corporation would have at least 30 Days' Cash on Hand (the "Minimum Liquidity Condition").

"Outside Resize Date" means the earliest of (i) two (2) years after the financial statements that would otherwise have been used for the resizing, (ii) the year ending at least one year before the Bank Tender Date and (iii) the full Fiscal Year following the substantial completion date of the repair or replacement.

(c)     Notwithstanding anything herein to the contrary, the proceeds of any use and occupancy or business interruption insurance policy representing the coverage of the Debt Service Requirements of any Bonds shall be paid to the Trustee for deposit in the Revenue Fund and applied in accordance with Section 4.06(a) of the Indenture.

(d)     As used in this Section, the terms "repair" and "replace" include (without limitation) the construction or acquisition of replacement or substitute property, structures, machinery, equipment or other improvements having a fair market value (but not necessarily the same function) at least equal to the fair market value, immediately prior to loss, damage, destruction or taking, of the property lost, damaged, destroyed or taken.  The election of the

Corporation to repair or replace any lost, damaged, destroyed or taken property shall be made by a written certification of an Authorized Officer of the Corporation to the effect that the Corporation has entered into substantial, binding commitments for such repair or replacement.

(e)     The Corporation shall adjust losses under property and business interruption insurance policies related to the Property, in conformity with this Loan Agreement, as promptly as practicable and with due regard to the interests of the Trustee, the Issuer and the holders of Parity Debt.  Any adjustment of any loss, damage or destruction in an amount in excess of $1,000,000 under any policy of casualty insurance and any settlement or payment of indemnity in an amount in excess of $1,000,000 under any such policy shall be evidenced by an appropriate certificate, filed with the Trustee, signed by an Authorized Officer of the Corporation.

(f)     If any public authority or other entity, in the exercise of its power of eminent domain or condemnation power or through the exercise of any right or obligation on the part of such entity, or as a result of any agreement between the Corporation and such entity made in lieu of condemnation proceedings, takes or damages the Property or any part thereof, the Corporation shall take prompt and appropriate measures to protect and enforce its rights and interests and those of the Trustee in connection with any condemnation proceeding.  Prompt written notice of any taking, loss, damage or destruction of any part of the Property or of any official notice thereof or of the institution of any proceeding therefor by any public instrumentality, body, agency or officer shall be given to the Trustee, the Letter of Credit Provider and to the other party to this Loan Agreement by the party first informed thereof.

(g)     The provisions of this Section, except for the provisions of (f) above, are subject to the rights (if any) of the holders of any Permitted Encumbrances that take priority over the rights of the Trustee in the Property that is subject to such Permitted Encumbrances.

ARTICLE 7

COLLATERAL SECURITY IN THE PROPERTY; RELEASE OF SECURITY

Section 7.01   Conveyances upon Delivery of Series 2011 Bonds.  Simultaneously with the delivery of the Series 2011 Bonds, (i) the Corporation shall acquire the Facility and the Facility Site in accordance with Section 4.03 herein, (ii) the Corporation shall execute and deliver the Mortgage, (iii) the Corporation shall assign (while expressly recognizing continuation of the Corporation's obligations) to the Issuer all of the Corporation's rights to payment of Fees and any other payments due under the Residence and Care Agreements theretofore and thereafter executed and (iv) the Corporation shall assign (while expressly recognizing continuation of the Corporation's obligations), pursuant to the Collateral Assignment, all of the Corporation's right, title and interest in and to, but not its obligations under, the Management Agreement, the Residence and Care Agreements and certain other agreements, contracts, approvals, certificates, licenses and permits relating to the operations of the Facility (to the extent the same may be lawfully assigned).

Section 7.02     Additions to Property.  Any additions, improvements and extensions to the Property and repairs, renewals and replacements thereof, including (without limitation) any Capital Improvements, shall upon their acquisition become part of the Property.

Section 7.03     Sale, Lease or Other Disposition of Property.  The Corporation shall not sell, lease or otherwise dispose of all or any portion of its Property except as follows:

(a)     transactions in the ordinary course of business upon fair and reasonable terms, including the use of units by residents pursuant to Residence and Care Agreements and the lease of retail and office space in the community buildings and care center for uses benefiting the residents, in the nature of convenience and gift shops, salons, bank branches, pharmacies and medical offices; or

(b)     in return for other Property of equal or greater value or usefulness; or

(c)     if the Corporation shall certify to the Trustee that, in the judgment of the Corporation, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary, provided the sale, lease, removal or other disposition thereof will not materially impair the structural soundness, efficiency or economic value of its remaining Property; or

(d)     the Property sold, leased or otherwise disposed of does not, for any consecutive 12-month period, exceed 3% of the total Book Value of all Property of the Corporation, and the Corporation is in compliance with the Debt Service Coverage Ratio and has at least 150 Days' Cash on Hand after giving effect to the transaction.  The foregoing percentage of total Book Value may be increased as follows under the following conditions, as evidenced by a certificate delivered to the Trustee by an Authorized Officer of the Corporation:

(i)     to 5% if (A) the Debt Service Coverage Ratio described in Section 8.04 would have been satisfied and (B) Days' Cash on Hand would not be less than 180 days, in each case after the effect of such sale, transfer or disposition of assets; or

(ii)     to 10% if (A) the Debt Service Coverage Ratio described in Section 8.04 would have been satisfied and (B) Days' Cash on Hand would not be less than 240 days, in each case after the effect of such sale, transfer or disposition of assets; or

(iii)     to 15% if (A) the Debt Service Coverage Ratio described in Section 8.04 would have been satisfied and (B) Days' Cash on Hand would not be less than 300 days, in each case after the effect of such sale, transfer or disposition of assets.

No sale, lease or disposal of Property under this subsection (d) shall be permitted prior to the later of the Resizing Review Date and the date on which all Series 2011 B Bonds have been paid in full without the consent of the Holders of at least a Majority in principal amount of all Outstanding Senior Parity Debt and the Holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds.

(e)     Supplements to the Mortgage, or a separate mortgage or other encumbrance as necessary or appropriate to affirm that the lien securing the Special Senior Parity Debt is senior and superior to the lien securing the Senior Parity Debt.

(f)     Parcel Three may be subject to a Neighborhood Three Loan Mortgage for the construction of Neighborhood Three only with the consent of the Holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds.

For purposes of this Section 7.03, "Property" shall include cash and investments of the Corporation, provided that the Corporation shall not be prohibited from disposing of cash for its charitable purposes involving subsidization of or assistance to existing residents of the Facility.

Section 7.04   Partial Release of Liens.  The Issuer and the Trustee, at the expense of the Corporation, shall execute and deliver any instrument necessary or appropriate (i) to confirm, grant or convey any property or interest therein transferred in accordance with Section 7.03 and to release such property or interest therein from the liens and security interests granted to the Issuer and the Trustee as security for outstanding Parity Debt and (ii) to grant or confirm the parity or priority of any lien or encumbrance described in clause (f), (l), (n), (o), (p), (q), (r) and (s) of the definition of Permitted Encumbrance over the liens and security interests granted to the Issuer and the Trustee as security for outstanding Parity Debt.

ARTICLE 8

SPECIAL COVENANTS OF THE CORPORATION

Section 8.01   Federal Tax Exemptions.

(a)     The Corporation shall not (i) perform any act or enter into any agreement that shall cause any revocation or adverse modification of the federal income tax status of the Corporation or (ii) carry on or permit to be carried on in the Property or permit the Property to be used in or for any trade or business, the conduct of which is not substantially related to the exercise or performance by the Corporation of the purposes or functions constituting the basis for its tax-exempt status under the Code, if such use of the Property would result in the loss by the Corporation of its tax-exempt status under the Code.  The Corporation shall immediately take all steps necessary to restore its tax-exempt status under the Code if the Corporation shall lose that status for any reason.

Notwithstanding the foregoing provisions of this Section, the Corporation shall not be obligated to maintain its tax-exempt status as provided herein if there shall be delivered to the Issuer and the Trustee a written opinion of Bond Counsel to the effect that the failure of the Corporation to maintain its tax-exempt status will not (A) adversely affect the excludability from gross income for federal income tax purposes of the interest paid on any Tax-Exempt Bonds theretofore issued, (B) result in a violation of the Act or (C) adversely affect any exemption of any Parity Debt from the registration requirements of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or the exemption of the Indenture, this Loan

Agreement and the Mortgage from qualification under the Trust Indenture Act of 1939, as amended.

(b)     It is the intention of the parties hereto that the interest on the Tax-Exempt Bonds be and remain excludable from gross income for federal income tax purposes and, to that end, the Corporation covenants with the Issuer, the Trustee and each of the Holders from time to time of any Tax-Exempt Bonds that (i) the Corporation shall take any and all action necessary to maintain the excludability from gross income for federal income tax purposes of the interest on all Tax-Exempt Bonds and (ii) the Corporation shall not perform any act or enter into any agreement, merger, consolidation or corporate reorganization, or use or permit the use of the Property or any portion thereof in a manner that shall have the effect of terminating the excludability from gross income for federal income tax purposes of the interest paid on any Tax-Exempt Bonds, including (without limitation) leasing all or any portion of the Facility or any Additional Facilities financed with the proceeds of Bonds, contracting with a third party for the use or operation of all or any portion of the Facility or such Additional Facilities, or entering into any merger, consolidation or corporate reorganization if entering into such lease, contract, merger, consolidation or corporate reorganization would have such effect.  Without limiting the generality of the foregoing, the Corporation specifically agrees to enter into such further agreements in order to ensure the continued excludability from gross income for federal income tax purposes of the interest paid on all Tax-Exempt Bonds as the Issuer, upon the advice of Bond Counsel, may reasonably deem necessary or desirable.

(c)     Without limiting the generality of the other covenants elsewhere set forth in this Loan Agreement, the Corporation covenants that there shall be paid from time to time all amounts required to be rebated to the United States of America pursuant to Section 148(f) of the Code in any temporary, proposed or final Treasury Regulations as may be applicable to the Parity Debt or Subordinated Indebtedness from time to time.  This covenant shall survive payment in full or defeasance of the Parity Debt or Subordinated Indebtedness.  The Corporation specifically covenants to pay or cause to be paid the Rebate Amount in accordance with the Tax Certificate.

(d)     The Corporation covenants that it will not make, or (to the extent that it exercises control or direction) permit to be made, any use of the proceeds of Parity Debt or Subordinated Indebtedness that would cause any Tax-Exempt Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Code.  The Corporation further covenants that it will comply with those provisions of Section 148 that are applicable to any Tax-Exempt Bonds on the date of issuance of such Parity Debt or Subordinated Indebtedness and with those provisions of Section 148 that may subsequently be lawfully made applicable to such Parity Debt or Subordinated Indebtedness.

Section 8.02  Preservation of Qualifications.  The Corporation shall not allow any permit, right, franchise or privilege so long as it is necessary for the ownership or operation of the Property as a continuing care retirement community to lapse or be forfeited.  The Corporation shall use its best efforts to become and remain fully qualified as a provider of services under and a participant in the Medicare program or any successor program thereto or any program by a federal, state or local government providing for payment or reimbursement for services rendered

for health care for which the Corporation is currently qualified; provided, however, that the Corporation shall not be required to maintain any such qualification if (i) the Board of Directors of the Corporation shall determine that the maintenance of such qualification is not in the best economic interest of the Corporation and (ii) at least 30 days prior to the discontinuance of such qualification, the Corporation shall notify the Trustee of such proposed discontinuance and shall provide the Trustee with a written explanation of the basis for such determination.

Section 8.03    Payment of Obligations.    The Corporation shall fix, charge and collect fees, rentals, rates or other charges for the use of the Facility and any other facilities of the Corporation and services provided by the Corporation that, together with the Corporation's general funds and any other moneys available to the Corporation (including without limitation, Initial Entrance Fees delivered to the Trustee pursuant to Section 8.14), shall provide moneys at least sufficient at all times (i) to pay all payments required by this Loan Agreement, and (ii) to pay all other obligations of the Corporation as they become due and payable.  The Corporation, from time to time as often as necessary, shall revise such fees, rentals, rates and other charges to the extent required to comply with the provisions of this Section.

Section 8.04    Debt Service Coverage Ratio.

(a)    The Corporation covenants and agrees that an Authorized Officer of the Corporation will calculate the Debt Service Coverage Ratio of the Corporation as of the end of each Fiscal Quarter for the prior 12-month period, commencing with the fourth Fiscal Quarter which occurs in the Fiscal Year ending December 31, 2011, and deliver a copy of such calculation to the Persons to whom quarterly financial statements are required to be delivered under Section 8.07 within 45 days following the end of each such Fiscal Quarter (the "Quarterly Evaluation Date").    If the Debt Service Coverage Ratio of the Corporation for any two consecutive Fiscal Years is greater than 1.50:1, then thereafter the Corporation shall calculate the Debt Service Coverage Ratio as part of its annual financial statements as of the end of each Fiscal Year for the prior 12 month period, commencing with the Fiscal Year after the second consecutive Fiscal Year in which the Corporation's Debt Service Coverage Ratio exceeded 1.50:1, and deliver such calculation to the Persons to whom such annual financial statements are required to be delivered under Section 8.07 within 120 days following the end of each such Fiscal Year (the "Annual Evaluation Date" and together with the Quarterly Evaluation Date, as the case may be, the "Evaluation Date").

(b)    The Corporation covenants and agrees to maintain a Debt Service Coverage Ratio of not less than 1.10:1 (the "Debt Service Coverage Ratio Covenant"), for the 12-month period ending on each Evaluation Date in accordance with subsection (a) above, commencing with the earlier to occur of (i) the Evaluation Date following the date on which the Series 2011 A Bonds are resized as described in Sections 2.04, 2.05 and 2.06 of the Indenture and (ii) December 31, 2018.

(i)    If, at any time after commencement of the Debt Service Coverage Ratio Covenant while reports are required in subsection (a) above to be delivered on Quarterly Evaluation Dates, the Debt Service Coverage Ratio of the Corporation, as calculated at the end of any Fiscal Quarter for the preceding 12-month period in

accordance with subsection (a) above, is less than the Debt Service Coverage Ratio Covenant, the Corporation shall, within 60 days after receipt of financial statements disclosing such deficiency, retain a Management Consultant to prepare a Consultant's Report (as hereinafter defined).

(ii)     If, at any time after commencement of the Debt Service Coverage Ratio Covenant while reports are required in subsection (a) above to be delivered on Annual Evaluation Dates, the Debt Service Coverage Ratio of the Corporation for any 12-month period is less than the Debt Service Coverage Ratio Covenant as disclosed in a report delivered in connection with subsection (a), the Corporation shall, at its own expense, submit an Authorized Officer's Certificate to the Trustee within 45 days of the applicable Annual Evaluation Date setting forth in detail the reasons therefor and the plan to increase the Debt Service Coverage Ratio to at least the required level in future periods including the 12-month period immediately following the Fiscal Year in which the deficiency occurred.  If the Debt Service Coverage Ratio of the Corporation for any two consecutive Fiscal Years after commencement of the Debt Service Coverage Ratio Covenant is less than the Debt Service Coverage Ratio Covenant, the Corporation shall retain a Management Consultant within 45 days following the second such applicable Annual Evaluation Date to prepare a Consultant's Report.

(iii)    As used herein, "Consultant's Report" shall mean a report making recommendations with respect to the rates, fees and charges of the Corporation, the Corporation's methods of operation and other factors affecting its financial condition in order to increase such Debt Service Coverage Ratio to meet the Debt Service Coverage Ratio Covenant.

(c)     A copy of the Consultant's Report and recommendations, if any, shall be filed with the Corporation and the Trustee within 75 days of the applicable Evaluation Date.  The Corporation shall follow each recommendation of the Management Consultant applicable to it; provided such actions need not be taken if they are not permitted by law or have been determined by the Governing Body of the Corporation by resolution to be unreasonable, impractical or not feasible or otherwise in accordance with Section 8.16.  This Section shall not be construed to prohibit the Corporation from serving indigent residents to the extent required for the Corporation to continue its qualification as a Tax-Exempt organization or from serving any other class or classes of residents without charge or at reduced rates so long as such service does not prevent the Corporation from satisfying the other requirements of this Section.

(d)     The provisions of subsection (c) above notwithstanding, if the Debt Service Coverage Ratio of the Corporation for any Fiscal Quarter (with respect to subsection (b)(i) above) or for any two consecutive Fiscal Years (with respect to subsection (b)(ii) above) is less than the Debt Service Coverage Ratio Covenant, the Corporation shall not be obligated to retain a Management Consultant to make such recommendations and deliver a Consultant's Report if:  (i) there is filed with the Trustee a written report addressed to it of a Management Consultant (which Management Consultant and report, including without limitation the scope, form, substance and other aspects of such report, are acceptable to the Trustee) which contains an opinion of such Management Consultant that applicable laws or regulations have prevented

38

the Corporation from generating Net Income Available for Debt Service during such 12-month periods sufficient to meet the requirements of this Section, and, if requested by the Trustee, such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including without limitation the scope, form, substance and other aspects thereof, are acceptable to the Trustee) as to any conclusions of law supporting the opinion of such Management Consultant; and (ii) the report of such Management Consultant indicates that the rates charged by the Corporation and the expenses incurred in connection therewith are such that, in the opinion of the Management Consultant, the Corporation has generated the maximum amount of Revenues reasonably practicable given such laws or regulations.

(e)     The Corporation shall not be required to cause the Consultant's Report to be prepared more frequently than once each Fiscal Year (with respect to subsection (b)(i) above) or once each two Fiscal Years (with respect to subsection (b)(ii) above) if at the end of the Fiscal Quarter (with respect to subsection (b)(i) above) or the end of the first of such two Fiscal Years (with respect to subsection (b)(ii) above) the Corporation provides to the Trustee an opinion of Independent Counsel (which Counsel and opinion, including without limitation the scope, form, substance and other aspects thereof, are acceptable to the Trustee) to the effect that the applicable laws and regulations underlying the Management Consultant's report delivered in respect of the previous 12-month period have not changed in any material way.

(f)     Notwithstanding any other provisions of this Loan Agreement, if the Corporation takes all action necessary to comply with the procedures set forth above for preparing a report and adopting a plan and follows each recommendation contained in such report to the extent required above:

(i)     the Corporation's failure to achieve a Debt Service Coverage Ratio of at least 1.00:1 for the most recent 12-month period shall not constitute an Event of Default under this Loan Agreement;

(ii)     the Corporation's failure to achieve a Debt Service Coverage Ratio of at least 1.00:1 for two consecutive 12-month periods shall not constitute an Event of Default under this Loan Agreement provided, as of the end of the second such 12-month period, Days' Cash on Hand is greater than 150; and

(iii)     the Corporation's failure to achieve a Debt Service Coverage Ratio, of at least 1.00:1 for three consecutive 12-month periods, regardless of the Corporation's Days Cash on Hand as of the end of such third 12-month period, shall constitute an Event of Default under this Loan Agreement.

Section 8.05     Obligations Not to be Impaired.  While the covenants of the Corporation set forth in Sections 8.03 and 8.04 are subject to applicable requirements imposed by law or lawfully imposed by federal, state or local regulatory authorities, nothing therein shall be construed or applied so as to permit any federal, state or local authority to impair the obligation of the Corporation to fix, charge and collect fees, rentals, rates and other charges in the amounts required by such Sections.

Section 8.06  Corporation to Provide Information.  Upon the written request of the Issuer or the Trustee, the Corporation shall provide and certify, at the Corporation's expense, such information concerning the Facility, the Property, the Corporation, its finances and other topics as the Issuer or the Trustee may reasonably request.  The Corporation is required to deliver to each Significant Holder any notice, document or information which the Corporation is required to deliver to the Trustee, simultaneously with its delivery to the Trustee.

Section 8.07  Annual Audit of Corporation; Quarterly and Monthly Financial Reports.  The Corporation shall furnish to the Trustee, each nationally recognized rating agency maintaining a rating on the Series 2011 A Bonds, EMMA (as such term is defined in Securities Exchange Commission Rule 15c2-12), and each Significant Holder the following financial statements and certificates:

(a)  Within 120 days of the end of each Fiscal Year, financial statements of the Corporation to be prepared with respect to such Fiscal Year in accordance with accounting principles generally accepted in the United States of America, consistently applied, which financial statements shall be audited by, and accompanied by a report of, an Independent Public Accountant.

(b)  Within 120 days after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2011, a certificate of an Authorized Officer of the Corporation and a certificate of an Independent Public Accountant (i) setting forth the Debt Service Coverage Ratio for the Corporation for such Fiscal Year, and (ii) setting forth the amount of Unrestricted Cash and Investments of the Corporation and the number of Days' Cash on Hand of the Corporation as of the end of such Fiscal Year.

(c)  Within 45 days after expiration of each Fiscal Quarter (including the expiration of the fourth Fiscal Quarter), (i) copies of the unaudited financial statements of the Corporation for such Fiscal Quarter, including income statements, cash flow and balance sheets, certified by the chief financial officer of the Corporation, and (ii) a certificate of the Authorized Officer of the Corporation setting forth the Debt Service Coverage Ratio for the Corporation for the preceding 12-month period, to the extent applicable.  In addition, within 15 days after the delivery of the information described in clauses (c)(i) and (ii) above, the Corporation shall conduct an investor call available for any current or prospective holders of Parity Debt, the access to such call to be provided with the information described above.

(d)  Within 30 days after the end of each calendar month, a written report indicating (i) the progress of construction of any Additional Facilities, (ii) the number of Residential Units that have been reserved, (iii) the number of prospective residents of the Facility whose names are on the Futures List and the Standby List, (iv) the number of Residential Units that are Settled Units, (v) the number of Nursing Care Beds actually occupied, (vi) the balances of the Funds and Accounts maintained under the Indenture, (vii) the number of Days' Cash on Hand of the Corporation, (viii) forecasted net operating income and variance to actual, (ix) the amount of allocated purchased services and (x) occupancy overall and on a three month rolling average, in each case, as of the last day of such calendar month, provided after the Resizing

\29967894.13

Review Date, such report shall be furnished within 45 days after expiration of each Fiscal Quarter.

(e)     Prior to the first day of each Fiscal Year beginning with Fiscal Year 2012, the Corporation's annual budget for the upcoming Fiscal Year, including assumptions.

The Trustee shall act only as a repository for, and shall have no obligation to review, any financial statements submitted by the Corporation pursuant to this Section 8.07.

Section 8.08    Corporation to Pay Impositions and Maintain Tax Exemptions.    The Corporation shall pay, prior to the accrual of any interest or penalties thereon, all governmental impositions (including, without limitation, taxes of every kind and nature whatsoever) and assessments, if any, lawfully levied or assessed upon or in respect of the Property, or upon any part thereof or upon any revenue therefrom, all ground rents, if any, on the Property and all costs of operating, maintaining, repairing and replacing the Property and its equipment. Except as provided in Section 8.01, the Corporation shall file any and all certificates or other documents required by law to obtain (to the extent it might be or become necessary) and maintain in full force and effect any and all available tax exemptions applicable to the Property (and any portion thereof), to the Corporation and to any income, receipts and other taxable item or event derived from or attributable to the Property. Nothing contained in this Section shall be construed to prevent the Corporation from contesting in good faith any governmental imposition or assessment with respect to the Property, provided that such contest shall not materially adversely affect the security for the Parity Debt or the effective use or operation of the Property.

Section 8.09    Limitations on Merger, Consolidation, Acquisition and Transfer of Assets. The Corporation shall not merge or consolidate with, transfer all or substantially all of its assets to or acquire all or substantially all of the assets of any other person, unless each of the following conditions is satisfied:

(a)     the surviving, resulting or transferee corporation (the "Surviving Corporation") (i) shall be a corporation organized under the laws of the United States or any state, district, or territory thereof and (ii) shall assume in writing all of the obligations of the Corporation under this Loan Agreement and the Mortgage;

(b)     the Debt Service Coverage Ratio and Days' Cash on Hand would improve as a result of the merger or consolidation;

(c)     at least 30 days (or such shorter period as shall be acceptable to the Trustee) prior to effecting such merger, consolidation, acquisition or transfer, there shall be filed with the Trustee (i) an opinion of Bond Counsel to the effect that the consummation of such merger, consolidation, acquisition or transfer will not adversely affect the excludability from gross income for federal income tax purposes of the interest paid on any Tax-Exempt Bonds theretofore issued, (ii) an opinion of Independent Counsel to the effect that each participant in such merger, consolidation, acquisition or transfer has obtained all necessary governmental, board and other consents and approvals for such consolidation, merger, acquisition or transfer, (iii) an opinion of Independent Counsel to the effect that the Surviving Corporation is a

41

corporation described under Section 501(c)(3) of the Code, and (iv) any other opinion, report, document, evidence, undertaking or other action that the Trustee reasonably may require;

(d) immediately following such merger, consolidation, acquisition or transfer, no Event of Default or event that, with notice or lapse of time or both, would constitute an Event of Default shall have occurred and be continuing; and

(e) if the merger, consolidation, acquisition or transfer is undertaken prior to the later of the Resizing Review Date and the date on which all Series 2011 B Bonds have been paid in full, the Corporation has obtained the consent of the Holders of at least a Majority in principal amount of all Outstanding Senior Parity Debt and the Holders of at least a Majority in principal amount of all Outstanding Series 2011 B Bonds.

Section 8.10    Additional Indebtedness of Corporation.  The Corporation shall not incur or permit to exist any Additional Indebtedness, except as follows:

(a) Refunding Indebtedness for either a current or advance refunding (including Cross-over Refunding Indebtedness), provided that the Corporation has delivered a certificate to the Trustee certifying that the refunding will result in debt savings in each Fiscal Year, provided further that no such certification shall be required with respect to refunding after the Resizing Review Date of the Series 2007 B Bonds.  With respect to any variable rate indebtedness, debt savings will be determined by assuming such variable rate indebtedness is accruing interest at the Maximum Rate then in effect.  For the avoidance of doubt, the Corporation may refinance the Series 2007 B Bonds at any time on or prior to the Bank Tender Date provided such refinancing is consummated after the Resizing Review Date.

(b) Current liabilities of the Corporation, arising in the ordinary course of business, other than for borrowed money or installment sales or similar contracts, without limit.

(c) Long Term Indebtedness to finance the construction of Residential Building 2.5.

(d) No Additional Indebtedness shall be deemed to arise when variable rate Indebtedness converts to fixed rate Indebtedness.

(e) Subordinated Parity Obligations, only as permitted in Section 8.22 herein.

(f) Subordinated Indebtedness shall not be permitted prior to the Resizing Review Date and shall be permitted after the Resizing Review Date without limit provided (A) on the Resizing Review Date, the Outstanding principal amount of the Series 2011 A Bonds is not reduced and (B) the Corporation's Days' Cash on Hand equals or exceeds 180 after any payment on such Subordinated Indebtedness and (C) the terms of such Subordinated Indebtedness state expressly that the repayment of such Subordinated Indebtedness (1) occurs not more frequently than annually, (2) is subordinate to the Series 2011 B Bonds and (3) cannot be accelerated.

(g)    Capital lease financings incurred in the ordinary course of the Corporation's operations of the Facility.

(h)    The Neighborhood Three Loan and the Neighborhood Three Loan Mortgage and any debt refinancing the Neighborhood Three Loan, but only with the consent of the Holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds.

(i)    The Renaissance Gardens Two Loan and any debt refinancing the Renaissance Garden Two Loan, but only with the consent of the Holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds.

Section 8.11    Senior Parity Obligations; Special Senior Parity Obligations.    The Corporation shall have the right to issue (i) its Senior Parity Obligations solely for the purpose of refunding existing Senior Parity Debt in accordance with Section 8.10(a) above, and (ii) its Special Senior Parity Obligations solely for the purpose of financing and refinancing the construction of Residential Building 2.5, each upon the following terms and conditions:

(a)    prior to the issuance of any Senior Parity Obligation or any Special Senior Parity Obligation, the Corporation shall provide evidence in form and substance satisfactory to the Trustee that the conditions set forth in paragraphs (c), (d), (e), (i) and (j) of Section 2.13 of the Indenture have been satisfied for the issuance of such Senior Parity Obligation or any Special Senior Parity Obligation as if such Senior Parity Obligation or any Special Senior Parity Obligation were an Additional Senior Bond;

(b)    in connection with the issuance of such Senior Parity Obligation, the Corporation shall establish and maintain a debt service reserve fund in an amount equal to the Debt Service Reserve Fund Requirement on such Senior Parity Obligation; provided that all or a portion of such debt service reserve fund may be financed by a financial guaranty bond from an insurance company or by letter of credit from a financial institution that would be entitled to be credited against the particular Debt Service Reserve Fund Requirement under the Indenture, determined as if such Senior Parity Obligation were a Senior Bond;

(c)    in connection with the issuance of a Special Senior Parity Obligation, and if required by the Holder of such Special Senior Parity Obligation, the Corporation shall establish and maintain a debt service reserve fund on such Special Senior Parity Obligation, provided that all or a portion of such debt service reserve fund may be financed by a financial guaranty bond from an insurance company or by a letter of credit from a financial institution;

(d)    any Senior Parity Obligation may be secured as to payment by pledges, liens, mortgages or other security interests with respect to any tangible property of the Corporation; provided, however, that the Corporation shall execute, deliver, file and record, or cause to be executed, delivered, filed and recorded, such documents as an opinion of Independent Counsel shall indicate are necessary or appropriate to grant to and otherwise secure to the Trustee an interest in any security granted to the holder of such Senior Parity Obligation

that is equivalent to the interest granted to such holder, to the end that all Senior Parity Debt shall be secured equally and ratably by the Receipts, the Mortgage and other property of the Corporation;

(e) any Special Senior Parity Obligation may be secured on a senior basis to all other Parity Obligations issued hereunder as to payment by pledges, liens, mortgages or other security interests with respect to any property of the Corporation. The Corporation shall execute, deliver, file and record, or cause to be executed, delivered, filed and recorded, such documents as an opinion of Independent Counsel shall indicate are necessary or appropriate to grant to and otherwise secure to the Trustee an interest in any security granted to the holder of such Special Senior Parity Obligation that is senior and superior to the interest granted to the holder of any other Parity Obligations, to the end that all Special Senior Parity Debt shall be secured senior and superior with respect to the Receipts, the Mortgage and all other property of the Corporation;

(f) except for the security of the Construction Fund, the Debt Service Fund, the Senior Debt Service Reserve Fund, the Redemption Fund, the Letter of Credit Fund, the Operating Reserve Fund, the Supplemental Reserve Fund and any debt service fund, debt service reserve fund, redemption fund or other similar fund created for such Senior Parity Obligation or Special Senior Parity Obligation and any amount on deposit in any fund or account securing any Senior Parity Obligation or Special Senior Parity Obligation constituting proceeds of such Senior Parity Obligation or Special Senior Parity Obligation or investment earnings on such proceeds, all Senior Parity Debt shall be secured equally and ratably and all Special Senior Parity Debt shall be secured on a senior basis to any other Parity Obligation by the Receipts, the Revenues and the Mortgage;

(g) any default under such Senior Parity Obligations or Special Senior Parity Obligation or under any agreement for the repayment of such Senior Parity Obligations or Special Senior Parity Obligation that shall not have been cured within any applicable grace period shall be a default hereunder and under the Mortgage if such Senior Parity Obligations or Special Senior Parity Obligation are secured by the Mortgage;

(h) the Corporation shall deliver to the Trustee (i) a copy of the applicable resolution of the Board of Directors of the Corporation authorizing the issuance of such Senior Parity Obligation or Special Senior Parity Obligation, certified by an Authorized Officer of the Corporation, and (ii) a certificate of an Authorized Officer of the Corporation to the effect that, as of the date of delivery of such Senior Parity Obligation or Special Senior Parity Obligation, (A) to the knowledge of such Authorized Officer of the Corporation, the Issuer is not in default in the performance or observance of any of the covenants, conditions, agreements or provisions of the Indenture, and (B) no event of default or event that, with notice or lapse of time or both, would constitute an Event of Default shall have occurred and be continuing, provided the certification described in (ii)(B) shall not be required for the issuance of any Special Senior Parity Obligations;

(i) the Trustee shall have received an opinion of Independent Counsel to the effect that: (i) the issuance of such Senior Parity Obligation or Special Senior Parity Obligation has been duly and validly authorized by the Board of Directors of the Corporation and all

conditions precedent to the delivery of such Parity Obligation have been fulfilled, (ii) such Parity Obligation is a valid and binding obligation of the Corporation in accordance with its terms, (iii) any instruments or other documents executed in connection with the issuance of such Parity Obligation have been recorded to the extent required by law and any financing and continuation statements required to be filed under the provisions of the Uniform Commercial Code under the Commonwealth of Massachusetts and the State of Maryland, as appropriate, have been duly filed in such manner and in such places as may be required by law in order to perfect any security interest purported to be granted thereby, (iv) all taxes, if any, payable in connection with the execution and issuance of such Parity Obligation have been paid, (v) no governmental orders, permits, approvals or authorizations not theretofore obtained are necessary in connection with the execution and issuance of such Parity Obligation, (vi) the issuance of such Parity Obligation is in accordance with law and the provisions of the Indenture, the Supplemental Indenture approving the issuance of such Parity Obligation and this Loan Agreement, and (vii) with respect to the issuance of Senior Parity Debt, all Senior Parity Debt then outstanding is equally and ratably secured by any security for such Parity Obligation and with respect to the issuance of Special Senior Parity Debt, such Special Senior Parity Debt then outstanding is secured on a senior and superior basis to any other Parity Debt; and

(j)     the Trustee shall have received an opinion of Bond Counsel to the effect that the issuance of such Parity Obligation will not adversely affect the excludability from gross income for federal income tax purposes of interest paid on any Tax-Exempt Bonds theretofore issued.

In connection with the issuance of any Senior Parity Obligation, the Issuer and the Trustee shall take such actions and shall execute, deliver, file and record such instruments of security as the Issuer (after consultation with the purchaser of such Senior Parity Obligation) shall reasonably determine to be necessary or appropriate to grant to and otherwise secure to the holders of such Senior Parity Obligation an equal and ratable interest in the Receipts, the Revenues and the Mortgage.  In connection with the issuance of any Special Senior Parity Obligation, the Issuer and the Trustee shall take such actions and shall execute, deliver, file and record such instruments of security as the Issuer (after consultation with the purchaser of such Special Senior Parity Obligation) shall reasonably determine to be necessary or appropriate to grant to and otherwise secure to the holders of such Special Senior Parity Obligation on a senior and superior basis to all other Parity Obligations an interest in the Receipts, the Revenues and the Mortgage.

Section 8.12   Liens and Encumbrances; Further Assurances by Corporation.  Except as otherwise specifically permitted by this Loan Agreement, the Corporation shall neither create any lien or encumbrance nor allow any lien to remain against any portion of the Property or the Receipts (except Permitted Encumbrances).

The Corporation shall execute, acknowledge and deliver such further resolutions, conveyances, transfers, assurances, financing statements and other instruments as may be necessary or desirable for better assuring, conveying, granting, assigning and confirming the Mortgage and any rights, security interests in Receipts and other moneys, securities, funds and

assets pledged or assigned to the Issuer or the Trustee, or intended to be, or that the Corporation may hereafter become bound to mortgage, pledge or assign.

Section 8.13    Corporation to Prepare Budget.    Annually, at least 30 days prior to the beginning of each of its Fiscal Years, the Corporation shall prepare and cause to be delivered to the Trustee a written Budget in connection with the operation of the Facility, which Budget shall contain an estimate for each such Fiscal Year of expenses, capital requirements and cash flow of the Corporation with respect to the Facility and its obligations with respect to outstanding indebtedness of the Corporation.  Such Budgets shall designate separately payments in respect of the Debt Service Requirements on all outstanding Parity Debt and all amounts due on any other indebtedness permitted under this Loan Agreement during such Fiscal Year.  The Corporation may amend the Budget from time to time by submitting such amendment to the Trustee at least 30 days prior to the date such amended Budget shall take effect.

Section 8.14    Application of Entrance Fees.

(a)    (i)    The Corporation agrees that, except as hereinafter provided, all Initial Entrance Fees received by the Corporation shall be designated in writing as such and delivered to the Trustee upon receipt thereof.    Such amounts shall be deposited into the Construction Account, together with a Certificate of an Authorized Officer of the Corporation which shall (i) identify such amounts as Initial Entrance Fees, (ii) designate the building or buildings to which such Initial Entrance Fees relate, (iii) identify the amount, if any, of deficiency in the Corporation's operating account below $3,000,000 and (iv) calculate the Corporation's Days' Cash on Hand, to be applied in accordance with the provisions of Section 4.04 of the Indenture.

(ii)    Notwithstanding paragraph (i) above, if the Corporation:

(A)    commences construction on Residential Building 2.5 using the proceeds of Special Senior Parity Debt, the Corporation may pledge and assign any or all Residential Building 2.5 Initial Entrance Fees to secure such Special Senior Parity Debt and may pay any and all of such Residential Building 2.5 Initial Entrance Fees to the Holder of the Special Senior Parity Debt to satisfy any reserve requirements or to pay debt service thereon, provided the Corporation shall cause the first $4,000,000 of Residential Building 2.5 Initial Entrance Fees to be delivered to the Trustee for deposit into the Operating Reserve Fund; and

(B)    with the consent of the Holders of (1) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (2) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds, commences construction on Neighborhood Three using the proceeds of the Neighborhood Three Loan and/or the second phase of the Care Center building containing assisted living and/or Nursing Care Beds    ("Renaissance Gardens Two") using the proceeds of Indebtedness (the "Renaissance Garden Two Loan"), the Corporation may pledge and assign any or all Initial Entrance Fees attributable to Neighborhood Three to secure such Neighborhood Three Loan and Initial Entrance Fees attributable to

46

Renaissance Gardens Two to secure such Renaissance Gardens Two Loan and may pay any or all of such Initial Entrance Fees to the Holder(s) of such Neighborhood Three Loan or Renaissance Gardens Two Loan, as the case may be, to satisfy any reserve requirements or to pay debt service thereon.

(b)     Pursuant to the Indenture, the Trustee shall pay all Initial Entrance Fees to the Corporation, to the extent such amounts are not required to be deposited or applied as set forth in this Section or in Section 4.04 of the Indenture.  The Corporation shall use such remaining balance of (i) any Initial Entrance Fees attributable to Residential Units in existence on the Closing Date to pay any amounts which are then currently due and payable by the Corporation under the Bond Documents, including Debt Service on the Bonds, (ii) any Residential Building 2.5 Initial Entrance Fees not applied in accordance with subsection (a)(ii)(A) above to the payment of accrued and unpaid interest on the Special Senior Parity Debt, to redeem the Special Senior Parity Debt or to the deposit of $4,000,000 to the Operating Reserve Fund shall, after all Special Senior Parity Debt is paid in full, be paid first, to the payment of a development fee for the development of Residential Building 2.5 and second, to the Trustee for deposit into the Construction Account and applied as set forth in Section 4.04 of the Indenture and Section 8.18 herein, and (iii) with the consent of the Holders of (1) 66 2/3% in principal amount of all Outstanding Senior Parity Debt and (2) 66 2/3% in principal amount of all Outstanding Series 2011B Bonds, any Initial Entrance Fees attributable to Neighborhood Three or Renaissance Gardens Two, to the payment of debt service on the Neighborhood Three Loan or the Renaissance Gardens Two Loan, as the case may be.  Any remaining Initial Entrance Fees shall be used, FIRST, to pay Total Operating Expenses currently due, to the extent Total Operating Expenses for the current month exceed estimated Total Operating Revenues for the current month, and SECOND, to redeem Series 2011 Bonds and any Special Senior Parity Debt in the manner provided in Section 8.18 herein.

Section 8.15     Operating Reserve Fund; Supplemental Reserve Fund.

(a)     In addition to the annual Budget submitted in accordance with Section 8.13, an Authorized Officer of the Corporation shall deliver to the Trustee, contemporaneously with each such Budget, a certificate establishing the Operating Reserve Fund Requirement for the upcoming Fiscal Year.

(b)     The Corporation consents and agrees to the provisions of Section 4.11 of the Indenture relating to the disbursement of moneys in the Operating Reserve Fund and the Supplemental Reserve Fund.

(c)     The Corporation acknowledges and agrees that:

(i)     moneys in the Operating Reserve Fund may be disbursed by the Trustee to or for the account of the Corporation in accordance with Section 4.11 of the Indenture and the written direction of an Authorized Officer of the Corporation, to pay (A) subject to Section 8.18 of this Loan Agreement, Debt Service on the Senior Parity Debt and the Special Senior Parity Debt, (B) operating expenses and the costs of needed repairs to the Facility, (C) the costs of capital improvements to the Facility

47

required by law or regulation, (D) restructuring costs, (E) judgments against the Corporation, (F) amounts due on any Indebtedness of the Corporation, or (G) the Purchase Price of tendered Variable Rate Bonds, provided (1) in the case of debt service on the Senior Parity Debt, upon written certification by an Authorized Officer of the Corporation to the Trustee that no moneys from Initial Entrance Fees and (Residential Building 2.5 Initial Entrance Fees are available to pay such expenses, and moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000, (2) in the case of debt service on the Special Senior Parity Debt, upon written certification by an Authorized Officer of the Corporation to the Trustee that no moneys from Residential Building 2.5 Initial Entrance Fees are available to pay such expenses, and moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000, and (3) in all other cases, upon written certification that no other moneys are available to the Corporation for the payment of such expenses, costs or amounts from any other source.

(ii) moneys in the Supplemental Reserve Fund may be disbursed by the Trustee to or for the account of the Corporation in accordance with Section 4.11 of the Indenture to pay operating expenses of the Facility, to the extent permitted, at the time and in the manner as moneys in the Operating Reserve Fund are disbursed under clause (A), (C) and (D) of clause (i) above, provided that no funds may be disbursed to pay such expenses unless the Corporation has certified that (1) in the case of clause (A), moneys available to the Corporation in the Corporation's operating account for the payment of such expenses have fallen below $3,000,000 and (2) in all other cases, no moneys are available in the Operating Reserve Fund for the payment of such expenses.

Section 8.16   Management Consultant.   For the purpose of performing the duties imposed on the Management Consultant by the Indenture and this Loan Agreement, the Corporation shall employ from time to time as required by the provisions of the Indenture or this Loan Agreement a Management Consultant.

Except as set forth in the immediately succeeding paragraph, the Corporation shall notify the Trustee and the Letter of Credit Provider of its intention to employ a consultant as Management Consultant pursuant to this Section and the name of such consultant at least 15 days prior to such employment.

Any agreement or contract between a Management Consultant and the Corporation pursuant to this Section shall include an acknowledgement by such Management Consultant, as appropriate, that the Trustee will rely upon the recommendations made by such Management Consultant.

If the Corporation fails to appoint a Management Consultant or deliver a Management Report as required by Sections 8.04 or 8.20, the Trustee, upon notice to the Corporation, shall retain a Management Consultant for the account and at the expense of the Corporation.

Notwithstanding anything to the contrary contained herein or in the Indenture, the Corporation shall not be required to concur with a recommendation contained in the report of a Management Consultant that conflicts with law or existing contracts (including the covenants of the Corporation set forth in the Tax Certificate), nor shall the Corporation be obliged to implement any such recommendation, if, in the reasonable judgment of the Management Consultant, such failure to concur with or to implement such recommendation will not prevent the implementation of other recommendations that are sufficient in the aggregate to enable the Corporation to rectify, within a reasonable period of time, the circumstance giving rise to employment of such Management Consultant.

Section 8.17    ERISA Representations, Warranties and Covenants.

(a)    Definitions.  For the purposes of this Section, "Plan" means any pension, profit sharing, deferred compensation, severance pay, bonus, stock option or stock purchase plan, or any other form of retirement or deferred benefit, or any health, accident or other welfare plan, or any other employee or retired employee benefit plan, program, contract, understanding or arrangement in which any employee, former employee, retired employee or beneficiary of any of them, of the Corporation, and any member of a group of trades or businesses that includes the Corporation and that is under common control, within the meaning of Section 414(b), (c) or (m) of the Code (a "Commonly Controlled Entity"), is entitled to participate.

(b)    Representations and Warranties.  The Corporation represents and warrants that:

(i)    each of the Plans is in full force and effect and at all times has been operated in accordance with its terms and, in all material respects, in accordance with all applicable laws including (without limitation) ERISA and the Code;

(ii)    there are no pending investigations, proceedings or other matters concerning the plans before the Internal Revenue Service ("IRS"), the Department of Labor, the Pension Benefit Guaranty Corporation (the "PBGC") or any other forum, other than determination letter applications filed with the IRS in the normal course of operating the Plans;

(iii)    neither the Corporation, any Commonly Controlled Entities, nor any director, officer, employee, agent or representative of the Corporation or any Commonly Controlled Entity nor any fiduciary of any Plan has engaged in a transaction in connection with any of the Plans that would be a prohibited transaction subject to a material civil penalty assessed pursuant to Section 502(i) of ERISA, or a tax imposed by Section 4975 of the Code, with respect to any Plan;

(iv)    with respect to each Plan that is a defined benefit pension plan, no accumulated funding deficiency (as defined in Section 412 of the Code or Section 302 of ERISA) has occurred, whether or not that accumulated funding deficiency has been waived;

49

(v)     with respect to each Plan which is a defined benefit pension plan, no reportable event (as defined in Section 4043(b) of ERISA) which is required to be reported to the PBGC within 30 days of its occurrence has occurred;

(vi)    with respect to each Plan that is a multiemployer plan (as defined in Section 3(37) of ERISA) neither the Corporation nor any Commonly Controlled Entity has any material current, contingent or potential liability of any kind, including (without limitation) withdrawal liability, except for contributions due in the ordinary course that are due but not yet payable;

(vii)   there are no pending or threatened claims by or disputes with any participants or beneficiaries of the Plans, except Plan benefit claims arising in the normal course of the operations of the Plans and as to which no dispute exists;

(viii)  the Corporation has no knowledge of any facts that could give rise to any material claims against any Plan or the fiduciaries of any Plan, except for Plan benefit claims arising in the normal course of the operations of the Plans;

(ix)    neither the Corporation nor any Commonly Controlled Entity, nor any fiduciary of any Plan has given notice to any fiduciary liability insurer of any claims or potential claims in connection with any of the Plans; and

(x)     no liens exist with respect to any of the Plans.

Within sixty (60) days after the end of its Fiscal Year, the Corporation will deliver to the Trustee a copy of the most recent actuarial report, financial statement and annual report completed with respect to any defined benefit pension plan of the Corporation or any Commonly Controlled Entity, as defined in Section 3(35) of ERISA.  The Trustee shall receive the financial statements and reports required to be delivered to it pursuant to this Section and shall hold the same for inspection by any holder of Parity Debt.  The Trustee shall have no other responsibility or duty with respect to such financial statements and reports.

(c)     <u>Covenants</u>.  The Corporation shall not:

(i)     fail to maintain such bonding with respect to any Plan as is required under Section 412 of ERISA;

(ii)    fail to notify the Trustee as soon as practicable and, in any event, within thirty (30) days after the Corporation or any Commonly Controlled Entity knows or has reason to know that a reportable event under Section 4043 of ERISA that is required to be reported to the PBGC within thirty (30) days of its occurrence has occurred and that would have a material adverse effect on the financial condition of the Corporation, which notice shall set forth the details of such reportable event;

(iii)   engage in or permit any prohibited transaction (as defined in Section 406 of ERISA and Section 4975 of the Code) to occur with respect to a Plan

which would subject a Commonly Controlled Entity to a material civil penalty assessed under Section 502(i) of ERISA or a material tax under Section 4975 of the Code;

(iv)    permit a Plan to incur any accumulated funding deficiency as defined in Section 302 of ERISA and Section 412 of the Code, whether or not waived;

(v)    take any action or omit to take any action with respect to any Plan that could result in a termination of any Plan in a manner which would result in the imposition of a lien on the property of the Corporation or any Commonly Controlled Entity;

(vi)    fail promptly to notify the Trustee that a notice has been received by the Corporation or any Commonly Controlled Entity of a termination of any multiemployer plan to which the Corporation or any Commonly Controlled Entity has an obligation to contribute in a manner that would have a material adverse effect on the financial condition of the Corporation;

(vii)    permit a complete or partial withdrawal with respect to any multiemployer plan within the meaning of Sections 4203 and 4205 of ERISA, if such withdrawal would result in a material withdrawal liability being imposed on the Corporation or any Commonly Controlled Entity; or

(viii)    fail to notify the Trustee within thirty (30) days after notice is received by the Corporation or any Commonly Controlled Entity that any Plan that is a multiemployer plan has been or will be placed in "reorganization" within the meaning of Section 4241 of ERISA in a manner that would have a material adverse effect on the financial condition of the Corporation.

Section 8.18    Use of Funds to Pay Debt Service.

(a)    For the period commencing on the Closing Date and ending on the date the Corporation delivers the Completion Certificate for Residential Building 2.5 to the Trustee, the Corporation shall pay the debt service on Senior Parity Debt from the following sources and in the following order:

(i)    First, from Initial Entrance Fees, as provided in Section 8.14(b)(i);

(ii)    Second, from the Corporation's operating account provided the balance in such account following such payment equals or exceeds $3,000,000;

(iii)    Third, from the Operating Reserve Fund, as provided in Section 4.11(b) of the Indenture;

(iv)    Fourth, from the Supplemental Reserve Fund and the Supplemental Reserve Account, as provided in Section 4.11(e) of the Indenture;

\29967894.13

(v)     Fifth, from any other funds of the Corporation available to pay amounts due hereunder; and

(vi)    Sixth, by application of amounts in the Senior Debt Service Reserve Fund, as provided in Section 4.08 of the Indenture.

(b)     For the period commencing on the date the Corporation delivers the Completion Certificate for Residential Building 2.5 and ending on the date all Special Senior Parity Debt is paid in full, the Corporation shall pay debt service on Senior Parity Debt from the following sources and in the following order:

(i)     First, from Initial Entrance Fees, as provided in Section 8.14(b)(i);

(ii)    Second, from the Corporation's operating account after payment of interest due and payable on any Special Senior Parity Debt and provided the balance in such account following such payment equals or exceeds $3,000,000;

(iii)   Third, from the Operating Reserve Fund following the application of moneys in the Operating Reserve Fund as necessary to pay interest due and payable on any Special Senior Parity Debt as provided in Section 4.11(b) of the Indenture;

(iv)    Fourth, from the Supplemental Reserve Fund and the Supplemental Reserve Account, as provided in Section 4.11(e) of the Indenture;

(v)     Fifth, from any other funds of the Corporation available to pay amounts due hereunder; and

(vi)    Sixth, by application of amounts in the Senior Debt Service Reserve Fund, as provided in Section 4.08 of the Indenture.

(c)     For the period commencing on the date the Special Senior Parity Debt is paid in full, the Corporation shall pay debt service on Senior Parity Debt from the following sources and in the following order:

(i)     First, from Initial Entrance Fees, as provided in Section 8.14(b)(i) and (ii);

(ii)    Second, from the Corporation's operating account provided the balance in such account following such payment equals or exceeds $3,000,000;

(iii)   Third, from the Operating Reserve Fund, as provided in Section 4.11(b) of the Indenture;

(iv)    Fourth, from the Supplemental Reserve Fund and the Supplemental Reserve Account, as provided in Section 4.11(e) of the Indenture;

(v)     Fifth, from any other funds of the Corporation available to pay amounts due hereunder; and

(vi)     Sixth, by application of amounts in the Senior Debt Service Reserve Fund, as provided in Section 4.08 of the Indenture.

(d)     Notwithstanding any of the foregoing in subsections (a)-(c) above, while Special Senior Parity Debt is outstanding, the Corporation shall pay debt service on such Special Senior Parity Debt from the following sources:

(i)     Interest on the Special Senior Parity Debt shall be paid by the Corporation from the following sources and in the following order:

(A)     First, unless interest was funded by the Special Senior Parity Debt, from Initial Entrance Fees, as provided in Section 8.14(b)(i) and (ii);

(B)     Second, from the Corporation's operating account prior to any debt service payments on Senior Parity Debt and provided the balance in such account following such payment equals or exceeds $3,000,000, as described in subsection (b)(ii) above;

(C)     Third, from the Operating Reserve Fund prior to any debt service payments on Senior Parity Debt as described in subsection (b)(iii) above; and

(D)     Fourth, from any other funds of the Corporation available to pay amounts due hereunder.

(ii)     The Corporation shall apply Initial Entrance Fees from Residential Building 2.5, after the first $4,000,000 are deposited into the Operating Reserve Fund, to the optional redemption of Special Senior Bonds as provided in Section 8.14(b)(ii), on the earliest practicable redemption date after which funds are available commencing on the third full calendar month following the receipt by the Corporation of funds derived from the first such Initial Entrance Fee.

(e)     The Corporation shall apply Excess Liquidity to the optional redemption of Series 2011 A-2 Bonds on the earliest practicable redemption date after which such funds are available.

(f)     After all Series 2011 A-2 Bonds have been paid in full and the Resizing Review Date, the Corporation shall apply Excess Cash to the optional redemption of Series 2011 B Bonds on the earliest practicable redemption date after which such funds are available, subject to the right of the Holders of Series 2011 B Bonds to apply such Excess Cash to the optional redemption of Series 2011 A-1 Bonds held by such Holders as provided in Section 3.09 of the Indenture.

\29967894.13

(g)     The Corporation shall pay deferred purchased services payable to the Manager under the Management Agreement, from moneys on deposit in its operating account, as follows:

(i)     Prior to the Resizing Review Date, any deferred purchased services will be paid on an annual basis from 50% of the excess of actual operating income (without regard to marketing expenses), as reflected in the Corporation's year-end financial statements, over operating income projected in the Corporation's Budget for such Fiscal Year (without regard to marketing expenses).

(ii)     After the Resizing Review Date and after (A) the Series 2011 A-2 Bonds are paid in full and (B) current debt service payments then due on the Special Senior Parity Debt, if any, and the Senior Parity Debt have been paid, deferred purchased services will be paid by the Corporation as an operating expense, provided that no such payment shall be made unless, at the time of payment, the Corporation demonstrates compliance with the Debt Service Coverage Ratio for the preceding Fiscal Year and the amount of such payment if made as of the last day of the preceding Fiscal Year would have left the Corporation with at least 45 Days Cash on Hand; provided further that (i) the payment of debt service on the Series 2011 B Bonds, if any such payment is then owing, shall be made simultaneously with the payment of purchased services and (ii) for purposes of the limitations on payment of deferred purchased services set forth in this paragraph, payment on the deferred purchased services shall be deemed to come before payment on the Series 2011 B Bonds.

Section 8.19     Agreement to Provisions of Indenture.     The Corporation agrees to the provisions of the Indenture and covenants to apply or direct the application of funds, if necessary, as set forth therein and to otherwise comply with the terms of the Indenture.

Section 8.20     Management Reports and Plans.     Whenever the Corporation is required pursuant to this Loan Agreement or the Indenture to prepare or obtain a report and plan for correcting a deficiency under such Section, the Board of Directors of the Corporation shall cause such report and plan to be prepared or obtained and shall adopt such plan within the applicable time limit prescribed by such Section.  If required by such Section, such report and plan shall be prepared by a Management Consultant employed by the Corporation in accordance with Section 8.16.  Each such report and plan, regardless of whether prepared by the Corporation or a Management Consultant, must be in writing and contain sufficient detail to support the conclusions made concerning the reasons for the deficiency and the steps to be taken for its correction.  Each report and plan prepared by a Management Consultant must be acknowledged in writing by the Corporation (although its concurrence in every conclusion or recommendation in the report and plan shall not be required).  Each such report and plan, regardless of whether prepared by the Corporation or a Management Consultant, shall be implemented immediately upon its adoption, except to the extent limited by law or existing contracts and except as provided in the last paragraph of Section 8.16.  Copies of each such report and plan shall be sent to the Trustee.  Any such report and plan shall be prepared or obtained at the expense of the Corporation.

\29967894.13

Section 8.21   [Reserved]

Section 8.22   Subordinated Parity Obligations.  The Corporation shall have the right to issue its Subordinated Parity Obligations solely for the purpose of paying accrued and unpaid Debt Service on the Series 2011 A Bonds during a Standstill Period a Calamity Standstill Period or a Good Cause Standstill Period, in accordance with Section 2.22(c) of the Indenture, each upon the following terms and conditions:

(a)    prior to the issuance of any Subordinated Parity Obligation, the Corporation shall provide evidence in form and substance satisfactory to the Trustee that the conditions set forth in paragraphs (e) and (i) of Section 2.13 of the Indenture have been satisfied for the issuance of such Subordinated Parity Obligation as if such Subordinated Parity Obligation were an Additional Senior Bond;

(b)    except for the security of any debt service fund, redemption fund or other similar fund created for such Subordinated Parity Obligation, all Subordinated Parity Obligations shall be secured equally and ratably and shall be subordinate to all Special Senior Parity Debt and all Senior Parity Debt to the Receipts, the Revenues and the Mortgage;

(c)    any default under such Subordinated Parity Obligations or under any agreement for the repayment of such Subordinated Parity Obligations that shall not have been cured within any applicable grace period shall be a default hereunder;

(d)    the Corporation shall deliver to the Trustee a copy of the applicable resolution of the Board of Directors of the Corporation authorizing the issuance of such Subordinated Parity Obligation, certified by an Authorized Officer of the Corporation; and

(e)    the Trustee shall have received an opinion of Independent Counsel to the effect that: (i) the issuance of such Subordinated Parity Obligation has been duly and validly authorized by the Board of Directors of the Corporation and all conditions precedent to the delivery of such Subordinated Parity Obligation have been fulfilled, (ii) such Subordinated Parity Obligation is a valid and binding obligation of the Corporation in accordance with its terms, (iii) any instruments or other documents executed in connection with the issuance of such Subordinated Parity Obligation have been recorded to the extent required by law and any financing and continuation statements required to be filed under the provisions of the Uniform Commercial Code under the Commonwealth of Massachusetts and the State of Maryland, as appropriate, have been duly filed in such manner and in such places as may be required by law in order to perfect any security interest purported to be granted thereby, (iv) all taxes, if any, payable in connection with the execution and issuance of such Subordinated Parity Obligation have been paid, (v) no governmental orders, permits, approvals or authorizations not theretofore obtained are necessary in connection with the execution and issuance of such Subordinated Parity Obligation, (vi) the issuance of such Subordinated Parity Obligation is in accordance with law and the provisions of the Indenture, the Supplemental Indenture approving the issuance of such Subordinated Parity Obligation and this Loan Agreement, and (vii) with respect to the issuance of Subordinated Parity Obligations, all Subordinated Parity Obligations then

outstanding is equally and ratably secured by any security for such Subordinated Parity Obligation.

In connection with the issuance of any Subordinated Parity Obligation, the Issuer and the Trustee shall take such actions and shall execute, deliver, file and record such instruments of security as the Issuer (after consultation with the purchaser of such Subordinated Parity Obligation) shall reasonably determine to be necessary or appropriate to affirm the grant to the holders of such Subordinated Parity Obligation is and shall be junior and subordinate to all other Special Senior Parity Debt and Senior Parity Debt in the Receipts, the Revenues and the Mortgage.

ARTICLE 9

EVENTS OF DEFAULT AND REMEDIES; RIGHTS OF THE ISSUER

Section 9.01    Events of Default.  The following shall be "Events of Default" under this Loan Agreement, and the terms "Event of Default" or "Default" shall mean, whenever they are used in this Loan Agreement, any one or more of the following events:

(a)    failure by the Corporation to pay when due (i) any payment required to be paid under Section 3.02(a) with respect to any Bond or (ii) prior to the Bank Tender Date, the letter of credit fee and remarketing agent fee required to be paid under the Letter of Credit Agreement;

(b)    failure by the Corporation to pay when due any other amount required to be paid under this Loan Agreement, which failure shall continue for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee;

(c)    failure by the Corporation in the due observance and performance of any covenant, condition or agreement contained in Sections 6.01, 7.03, 8.09, 8.10 and 8.12 which failure shall continue for a period of 30 days after written notice shall have been given to the Corporation by the Trustee;

(d)    failure by the Corporation to perform, observe or comply with any other of the terms, covenants, conditions or provisions contained in this Loan Agreement, which failure shall continue for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, shall have been given to the Corporation by the Trustee; provided, however, that if the Corporation shall proceed to make any repair, restoration or replacement or take any curative action that, if begun and prosecuted with due diligence, cannot be completed within a period of 30 days, then such period shall be increased to such extent as shall be necessary to enable the Corporation to complete such repair, restoration or replacement or other curative action through the exercise of due diligence, with an absolute limit of six (6) months;

(e)    abandonment by the Corporation of the Property, or any substantial part thereof, or the operations therein, which abandonment shall continue for a period of 30 days after written notice thereof shall have been given to the Corporation by the Trustee;

56

(f)     if the Corporation shall become insolvent or the subject of insolvency proceedings or shall file a petition or other pleading seeking an "order for relief" within the meaning of the United States Bankruptcy Code, or shall file any petition or other pleading seeking any reorganization, composition, readjustment, liquidation of assets or similar relief for itself under any present or future law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Corporation, or of substantially all of the assets of the Corporation, or shall make a general assignment for the benefit of creditors, or shall be unable or admit in writing its inability to pay its debts generally as they become due;

(g)     if a petition or other pleading shall be filed against the Corporation seeking an "order for relief" within the meaning of the United States Bankruptcy Code or any reorganization, composition, readjustment, liquidation of assets or similar relief under any present or future law or regulation, and shall remain undismissed or unstayed for a period of 90 days, or if, by an order or decree of a court of competent jurisdiction, the Corporation shall become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code or relief shall be granted under or pursuant to any such petition or other pleading, or if, by order or decree of such court, there shall be appointed, without the consent or acquiescence of the Corporation, a trustee in bankruptcy or reorganization or a receiver or liquidator of the Corporation or of all or any substantial part of the property of the Corporation, and any such order or decree shall have continued unvacated or unstayed, on appeal or otherwise, and in effect for a period of 90 days;

(h)     loss of excludability from gross income for federal income tax purposes of the interest on any Tax-Exempt Bonds theretofore issued as a result of any action by the Corporation;

(i)     default in the payment of the principal of or interest on any Outstanding Indebtedness of the Corporation (other than the Loan), or default under any indenture, agreement or other similar instrument under which any such Indebtedness may be issued, which default permits the acceleration of the maturity of such Indebtedness; provided, however, it shall not constitute an Event of Default if (x) the outstanding principal balance of such Indebtedness is not in excess of $500,000, or (y) the Corporation certifies to the Trustee that the default is being contested by the Corporation in good faith and by appropriate proceedings;

(j)     default under any Parity Obligation or under any agreement for the repayment of such Parity Obligation, which default shall not have been cured within any applicable grace period provided in such Parity Obligation or such agreement;

(k)     if any material representation or warranty made herein proves to be false or misleading in any material respect when made or affirmed;

(l)     an "Event of Default" occurs under the Mortgage (as that term is defined in the Mortgage); or

(m)     failure by the Corporation to comply with the provisions of Section 8.04.

The provisions of paragraph (d) of this Section are subject to the following limitations: if by reason of acts of God, strikes, lockouts or other industrial disturbances, acts of public enemies, orders of any kind of the government of the United States or of the Commonwealth, or any department, agency, political subdivision or official thereof, or any civil or military authority, insurrections, riots, infection, epidemics, landslides, lightning, earthquakes, fires, hurricanes, storms, floods, washouts, droughts, arrests, restraint of government and people, civil disturbances, explosions, breakage or accident to machinery, partial or entire failure of utilities, or any cause or event not reasonably within the control of the Corporation (each, a "Force Majeure Event"), the Corporation is unable in whole or in part to carry out its agreements referred to in paragraph (d) of this Section, the Corporation shall not be deemed in default during the continuance of such inability. The Corporation shall use its best efforts to remedy with all reasonable dispatch the cause or causes preventing it from carrying out its agreements; provided, that the settlement of strikes, lockouts and other industrial disturbances shall be entirely within the discretion of the Corporation, and the Corporation shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the Corporation, unfavorable to the Corporation. Any failure of the Corporation to perform its obligations under Article III or Sections 6.01, 7.03, 8.09, 8.10 or 8.12, upon any notice or lapse of time or both provided in this Section, shall constitute an Event of Default regardless of the reason for such failure to perform.

Section 9.02   Remedies.  Upon the occurrence of an Event of Default and upon written notice thereof to the Corporation, the Trustee (i) may, and upon the written request of not less than a Majority of the Holders of the Special Senior Parity Debt (or if no Special Senior Parity Debt is Outstanding, the Senior Parity Debt) shall, upon the declaration of acceleration of Outstanding Bonds under Section 7.02 of the Indenture, accelerate the payment of the Loans made with the proceeds of any Series of Senior Bonds upon notice to the Corporation, whereupon the entire unpaid principal of such Loans and all interest accrued thereon and all amounts to be paid under this Loan Agreement shall immediately become due and payable without further demand upon the Corporation, and (ii) may take any action at law or in equity to collect the payments due and thereafter to become due, or to enforce the performance and observance of any obligation, agreement or covenant of the Corporation under this Loan Agreement or under the Mortgage. If no Special Senior Parity Debt or Senior Parity Debt is then outstanding, the Trustee, upon the written request of the Holders of a Majority of the Subordinated Parity Debt, shall, upon the declaration of acceleration of Outstanding Bonds under Section 7.02 of the Indenture, accelerate the payment of the Loans with respect to payments due under any Series of Subordinated Bonds upon notice to the Corporation, whereupon the entire unpaid principal of such Loans and all interest accrued thereon and all amounts to be paid under this Loan Agreement shall immediately become due and payable without further demand upon the Corporation, and (ii) may take any action at law or in equity to collect the payments due and thereafter to become due, or to enforce the performance and observance of any obligation, agreement or covenant of the Corporation under this Loan Agreement or under the Mortgage.

Section 9.03   Foreclosure of Mortgage and Sale.  Upon the occurrence of an Event of Default, the Trustee shall have the right to foreclose on the Property subject to the Mortgage. Upon foreclosure, the Trustee shall sell the Property upon such terms as shall be satisfactory to the Trustee and receive the proceeds of the sale thereof, and the Corporation shall thereupon

have no right to repossess the Property. For the purpose of sale, the Trustee shall be authorized to make such repairs or alterations in or to the Property as may be necessary to place the same in good order and condition. The Corporation shall be liable to the Trustee for the cost of such repairs or alterations and all expenses of any sale. If the sum realized from the sale is insufficient to satisfy the payments provided in this Loan Agreement, the Trustee, at its option, may require the Corporation to pay such deficiency month by month, or may require the Corporation to pay the entire amount of such deficiency in a single payment.

Moneys realized upon any such sale shall be delivered to the Trustee for deposit in the Revenue Fund for payment as provided in the Indenture.

Such foreclosure and sale by the Trustee shall not operate to release the Corporation from any payments to be made or covenants to be performed under this Loan Agreement during the full term of this Loan Agreement.

Section 9.04    No Waiver of Rights.  No failure or delay by the Issuer or the Trustee in exercising any right, remedy, power or privilege hereunder or under the Mortgage, nor any single or partial exercise thereof nor the exercise of any other right, remedy, power or privilege shall affect the rights, remedies, powers or privileges of the Issuer or the Trustee hereunder and under the Mortgage or shall operate as a waiver hereof or thereof. The rights, remedies, powers and privileges of the Issuer and the Trustee hereunder are cumulative and not exclusive of any other rights, remedies, powers or privileges now or hereafter existing at law or in equity.

Section 9.05    Waiver of Default.  In the event that any agreement contained herein shall be breached by either party and such breach shall thereafter be waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

Section 9.06    Right to Enter and Occupy Property for Specified Purposes.  At such time and as long as an Event of Default under this Loan Agreement has occurred and is continuing, the Trustee shall have the right to enter upon and occupy the Property for the purpose of constructing, equipping and operating the Property, or any part thereof.

Section 9.07    Attorneys' Fees and Expenses.  The Corporation shall pay all fees and expenses, including the attorneys' fees and expenses, which the Issuer or the Trustee may incur as a result or in consequence of the happening of an Event of Default, even if the Event of Default is cured and any Loan is placed in good standing.

Section 9.08    Notice of Default.  Except as otherwise expressly provided in this Loan Agreement or the Mortgage, the Trustee shall not have any duty or obligation to provide the Corporation with a notice of the existence of an Event of Default upon the occurrence of an Event of Default or before exercising the rights and remedies of the Trustee in consequence of the happening of any Event of Default, nor, except as provided in this Loan Agreement or the Mortgage, shall the Trustee be required to give any period of time for the Corporation to cure an Event of Default. The Trustee may, however, in the sole and absolute discretion of the Trustee, give such a notice to evidence the existence of an Event of Default.

\29967894.13

## ARTICLE 10

## PREPAYMENT OF LOAN

Section 10.01 <u>Voluntary Payments</u>.  The Corporation shall have the right to make voluntary payments in any amount to the Trustee for the account of the Issuer, which voluntary payments shall be deposited in the Revenue Fund for immediate payment to the Redemption Fund.  Upon deposit of such moneys, the Trustee shall purchase or redeem Bonds in accordance with Article III of the Indenture.

Section 10.02 <u>Redemption of Bonds by Voluntary Payment</u>.  Upon written notice to the Trustee by the Corporation at least 60 days prior to redemption or such fewer number of days as may be acceptable to the Trustee, and upon the payment by the Corporation to the Trustee for the account of the Issuer of an amount equal to the difference between (a) the sum of (i) the aggregate principal amount of Bonds Outstanding on the date of such notice, (ii) accrued interest thereon to the date that the Bonds are next redeemable, (iii) redemption premiums, if any, due thereon to the next applicable redemption date in accordance with the provisions of the Bonds and the Indenture, and (iv) the Administrative Expenditures, and (b) the sum of the amounts on deposit in the Revenue Fund, the Debt Service Fund, the Senior Debt Service Reserve Funds, the Redemption Fund, the Operating Reserve Fund, the Supplemental Reserve Fund and the Supplemental Reserve Account, the Corporation shall direct the Trustee, on behalf of the Issuer, to redeem all of the Bonds Outstanding in sufficient time for the Trustee to provide notice of redemption pursuant to the Indenture and the Bonds.

Section 10.03 <u>Redemption of Bonds by Application of Funds</u>.  If at any time the moneys on deposit in the Revenue Fund, the Debt Service Fund, the Senior Debt Service Reserve Fund, the Redemption Fund, the Operating Reserve Fund, and the Supplemental Reserve Fund are at least equal to the sum of (i) the aggregate principal amount of Bonds then Outstanding, (ii) accrued interest thereon to the date that the Bonds are next redeemable, and (iii) redemption premiums, if any, due thereon to the next applicable redemption date, all in accordance with the provisions of the Bonds and the Indenture, the Corporation, on behalf of the Issuer, shall give notice to the Trustee of its election to redeem all of the Bonds Outstanding.

## ARTICLE 11

## MISCELLANEOUS

Section 11.01 <u>Covenants for Benefit of Holders</u>.  This Loan Agreement is executed in part to induce the purchase by others of Parity Debt, and accordingly, all covenants and agreements on the part of the Corporation and the Issuer in this Loan Agreement are hereby declared to be for the benefit of the Holders from time to time of the Parity Debt.  The Trustee holds this Loan Agreement and the Mortgage and the liens and security interests created hereby and thereby, including (without limitation) the security interest in the Receipts and the lien on the Property, for the benefit of the Holders of the Parity Debt, and such liens and security interests and the proceeds thereof shall not be available to satisfy claims of holders of other issues of the Issuer's bonds or any other creditors of the Issuer.

\29967894.13

Section 11.02  Compliance with Indenture.   The parties shall provide any Additional Facilities, pay the costs incurred therefor and administer the funds available therefor in the manner provided in the Indenture.  The Corporation shall do all things within its power in order to enable the Issuer to comply with all requirements and to fulfill all covenants of the Indenture to the extent that compliance with such requirements and fulfillment of such covenants are dependent upon any observance or performance required of the Corporation by the Indenture or this Loan Agreement.

Section 11.03  Actions of Corporation and Issuer.  The Corporation agrees that all actions heretofore or hereafter taken by it to carry out the financing and refinancing of the Facility or any Additional Facilities, including the making of contracts, and all actions hereafter taken by the Issuer to carry out the financing and refinancing of the Facility or any Additional Facilities upon the recommendation or request of any officer of the Corporation have been and will be in full compliance with the Indenture and this Loan Agreement.  The Corporation acknowledges that any review of any such actions heretofore or hereafter taken by the Issuer or its members, officers, employees or agents has been or will be solely for the protection of the Issuer.  Neither such review nor any action taken by the Issuer or its members, officers, employees or agents to carry out the financing and refinancing of the Facility or any Additional Facilities shall estop or otherwise preclude the Issuer from enforcing this Loan Agreement and the Mortgage.

Section 11.04  Issuer's Liability Limited.

(a)     The acquisition of the Facility and any Additional Facilities shall not impose any liability on the officials, officers, employees or agents of the Issuer.  No recourse shall be had by the Corporation for any claims based on the Indenture, this Loan Agreement or the Mortgage against any official, officer, employee or agent of the Issuer, all such liability, if any, being expressly waived by the Corporation by its execution and delivery of this Loan Agreement.

(b)     In the exercise of the powers of the Issuer and its officials, officers, employees and agents under the Indenture, this Loan Agreement or the Mortgage, including (without limitation) the application of moneys, the investment of funds and the disposition of the Property upon the occurrence of an Event of Default, the Issuer shall not be accountable to any person for any action taken or omitted by it or its officials, officers, employees or agents in good faith and believed by it or them to be authorized or within the discretion or rights or powers conferred.

(c)     The Issuer and its officials, officers, employees and agents shall be protected and shall incur no liability in acting or proceeding, or in not acting or not proceeding, in good faith, reasonably and in accordance with the terms of this Loan Agreement, the Indenture or the Mortgage upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other document that it or they shall in good faith reasonably believe to be genuine and to have been adopted or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of the Indenture, the Mortgage or this Loan Agreement, or upon the written opinion of any counsel, architect, engineer, insurance consultant, management consultant or accountant believed by it or them to

be qualified in relation to the subject matter, and it and they shall be under no duty to make any investigation or inquiry into any statements contained or matters referred to in any such instrument, and it or they may conclusively rely upon advice of counsel and may (but need not) require further evidence of any fact or matter before taking action.  The Issuer and its officials, officers, employees and agents may consult with counsel, who may or may not be Bond Counsel, counsel to the Issuer or counsel to the Corporation, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it or them in good faith and in accordance therewith.

(d)     Whenever the Issuer or its officials, officers, employees or agents shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action under the Indenture, this Loan Agreement or the Mortgage, such matter may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Corporation, unless other evidence in respect thereof is specifically required under the Indenture, this Loan Agreement or the Mortgage.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof, but in its discretion the Issuer or its officials, officers, employees or agents may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it or they may deem reasonable.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Issuer or the Corporation shall be sufficiently executed if executed in the name of such person by an Authorized Officer thereof.

(e)     The Corporation shall indemnify the Issuer and each of its officials, officers, employees and agents and save them harmless against any liability precluded by this Section.  The Corporation agrees to pay the Issuer (or, if the Issuer so elects, to pay directly to the person entitled to payment) for the Administrative Expenditures, if any, incurred by the Issuer in the administration of the Bonds, the Loan or any of the documents executed and delivered in connection therewith, including all attorneys' fees.  The obligation of the Corporation under this Section shall survive the termination of this Loan Agreement, the Indenture and the Mortgage and the payment and performance of all of the obligations of the Corporation under this Loan Agreement and the Mortgage.

(f)     Except as otherwise expressly permitted by this Loan Agreement, the Corporation shall not enter into any contracts or agreements or perform any acts or require the Issuer to enter into any contracts or agreements or perform any acts that may adversely affect any of the assurances or rights of the Issuer hereunder or under the Mortgage.

(g)     No covenant or agreement contained in the Series 2011 Bonds or in the other Bond Documents shall be deemed to be the covenant or agreement of any official, officer, agent, or employee of the Issuer in his or her individual capacity, and neither any member of the Board of Directors of the Issuer nor any official or officer executing the Series 2011 Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.

Section 11.05 <u>Applications of Provisions of the Original Loan Agreement</u>. The provisions of this Loan Agreement are intended to amend and restate those of the Original Loan Agreement as in effect immediately prior to the execution and delivery hereof. As amended and restated by this Loan Agreement, the Original Loan Agreement shall remain in full force and effect. The Issuer and the Corporation agree that this Loan Agreement shall not be construed as an agreement to extinguish the Corporation's obligations under the Original Loan Agreement and shall not constitute a novation as to the obligations of the Corporation under the Original Loan Agreement.

Section 11.06 <u>Notices</u>. All notices required to be given or authorized to be given pursuant to this Loan Agreement shall be in writing and shall be faxed followed by first class mail or by hand delivery or sent by overnight delivery or mailed by certified mail, postage prepaid, addressed as follows (or to such other address as may be designated by written notice hereunder):

In the case of the Issuer:

> MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
> 160 Federal Street, 7th Floor
> Boston, Massachusetts 02110
> Attention: Executive Director
> Fax: 617-330-2001

In the case of the Corporation:

> LINDEN PONDS, INC.
> c/o Erickson Living Management, LLC
> 701 Maiden Choice Lane
> Baltimore, Maryland 21228
> Attention: General Counsel
> Fax: 410-402-2350

> with a copy to:

> Herman B. Rosenthal, Esquire
> Whiteford, Taylor & Preston L.L.P.
> 7 St. Paul Street, Suite 1500
> Baltimore, Maryland 21202
> Fax: 410-347-9414

In the case of the Trustee:

> WELLS FARGO BANK, NATIONAL ASSOCIATION
> [Address]
> Fax: 410-___-___

Section 11.07 <u>Assignment by Issuer; Issuer's Rights to Approve Certain Actions and Receive Notices and Information</u>.

(a)     The Issuer, simultaneously with the delivery of this Loan Agreement, has assigned to the Trustee, pursuant to the Indenture, as security for the Issuer's obligations thereunder (among other things) all of the Issuer's right, title and interest in and to and remedies under this Loan Agreement and the Mortgage, including the Revenues, and including (without limitation) any and all security referred to herein, excepting only the Reserved Rights of the Issuer; provided, however, that the Issuer's right, title and interest in and to the Rebate Fund has been assigned solely as security for performance of the obligations described in Section 4.15 of the Indenture.  The Corporation consents to such assignment and the Corporation agrees that it will make or cause to be made payment directly to the Trustee of all Revenues.

(b)     Notwithstanding the grant made by the Issuer to the Trustee in the Indenture, the Issuer reserves to itself and shall retain the right to grant any and all approvals which the Issuer is specifically entitled to grant under the terms of this Loan Agreement, the Indenture and the Mortgage and the right to receive from time to time reports, notices and other information from the Corporation or any other person pursuant to this Loan Agreement, the Indenture and the Mortgage.

Section 11.08 <u>Amendment of Loan Agreement and Mortgage</u>.  This Loan Agreement and the Mortgage may only be amended by written agreement of the parties thereto in accordance with the Indenture.

Section 11.09 <u>Payment Dates</u>.  If the date for any payment hereunder is a day which is not a Business Day, then for all purposes of this Loan Agreement the payment then due shall be made on the next following Business Day, and such extension of time shall in each case be included in any computation of payments of interest.

Section 11.10 <u>Integration Clause</u>.  This Loan Agreement supersedes any other prior agreements or understandings, written or oral, between the parties with respect to the Facility.

Section 11.11 <u>Counterparts</u>.  This Loan Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original; but such counterparts together shall constitute but one and the same Loan Agreement.

Section 11.12 <u>Severability</u>.  If any clause, provision or section of this Loan Agreement is held illegal or invalid by any court, the invalidity of such clause, provision or section shall not affect any of the remaining clauses, provisions or sections hereof, and this Loan Agreement shall be construed and enforced as if such illegal or invalid clause, provision or section had not been contained herein.  In case any agreement or obligation contained in this Loan Agreement is held to be in violation of law, such agreement or obligation shall nevertheless be determined to be the agreement or obligation of the Issuer or the Corporation, as the case may be, to the full extent permitted by law.

Section 11.13 <u>Massachusetts Law</u>.  This Loan Agreement shall be governed by and construed in accordance with the laws of the Commonwealth (including without limitation the Act).

Section 11.14 <u>Effective Date</u>.  This Loan Agreement has been dated as of the date first above written solely for the purpose of convenience of reference and shall become effective upon its execution and delivery on the Closing Date by the parties hereto.  All representations and warranties set forth herein shall be deemed to have been made on the Closing Date.

Section 11.15 <u>Payment of Attorneys' Fees</u>.  Notwithstanding anything to the contrary herein contained, wherever the Corporation shall be obligated herein to pay attorneys' fees, the Corporation shall be obligated to pay only reasonable attorneys' fees; provided, however, that (i) from and after the occurrence of an event which, with notice or lapse of time or both, would constitute an Event of Default, (ii) during the continuance of any Event of Default or (iii) in connection with the enforcement of any rights or remedies hereunder, the Corporation shall be obligated to pay actual attorneys' fees; provided, however, that the Corporation shall be obligated at all times to pay the actual attorneys' fees incurred by counsel to the Issuer, the Trustee and the holders of the Parity Debt in connection herewith.

\29967894.13

IN WITNESS WHEREOF, the Issuer and the Corporation have caused this Loan Agreement to be executed under seal in their respective corporate names by their duly authorized officers, all as of the date first above written.

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY

By: _____

*[Signature of Linden Ponds, Inc. appears on following page.]*

\29967894.13

LINDEN PONDS, INC.

By: _____

## Term Sheet for Construction Financing

| | |
|---|---|
| **Construction Financing** | Participating bondholders and banks ("Lenders") would have the right to invest (or commit to invest) moneys (the "New Debt") to finance all hard and soft construction costs of RB 2.5, including capitalized interest, as provided in the attached Restructuring Term Sheet, all on terms and conditions acceptable to such Lenders and as agreed to by Linden.    The form of the New Debt may be tax-exempt bonds, a revolving construction loan, a line of credit, a letter of credit, some other debt instrument and/or a combination of the foregoing, as determined by the parties. |
| **Maturity** | 5 years from issue date – payable in full at maturity, subject to quarterly payments of principal discussed below. |
| **Interest** | Conventional Loan:  LIBOR + 350 basis points<br><br>Tax exempt loan:  5 year MMD + 350 basis points.<br><br>Following the capitalized interest period, interest would be payable monthly from operating cash flow (including net resales) and IED's from existing inventory and RB 2.5. |
| **Principal Paydown** | Principal of the New Debt would be payable prior to maturity from IED's from RB 2.5 on a quarterly basis, subject to using the first RB 2.5 IED's up to $4 million to fund a liquidity reserve. |
| **Security** | The New Debt would secured by a senior lien on the Linden Ponds facility and all assets except for the DSF and the DSRF held by the Trustee.  At the election of the holders of the New Debt, the funding may include a debt service reserve fund that would be available solely to pay interest or principal on the New Debt |
| **Conditions to advance and construction commencement** | The construction loan agreement would contain Lenders' standard terms and conditions to advance.  In addition, the Lenders will not advance funds until the average month end occupancy of all independent living units in completed buildings is at least 90% for a period of three consecutive months.   Linden Ponds would be required to commence construction of RB 2.5 within nine months after the existing residential units have experienced three consecutive months of average month end occupancy of 93%, except as described in the Restructuring Term Sheet. |
| **Subordination and Standstill of Series A and B Bonds** | The holders of the Series 2011 A Bonds and the Series 2011 B Bonds would be required to stand still in the exercise of remedies so long as the New Debt is outstanding, though the holders of Series 2011A Bonds may receive payments from available funds.  (Though not a condition to New Debt, it is understood that the standstill might extend to after the full payment of the New Debt as agreed between Linden Ponds and its 2011 bondholders.)  The holders of the 2011 Bonds would also be fully subordinated to the New Debt (except as to the DSF and DSRF held by the Trustee) on terms satisfactory to the New Debt. |

| | |
|---|---|
| **Requirements relating to construction** | Guaranteed maximum price contract with firm independent of the manager and the developer awarded through a competitive bidding process; 10% retainage released upon final completion; liquidated damages for delay in the amount of per diem interest on New Debt; independent construction monitor retained by Linden for the benefit of the Trustee and Lenders; collateral assignment of all construction documents; 100% payment, performance and lien bonds with dual obligee rider in favor of the Trustee; Lenders' standard construction loan documentation; and such additional protections as may be required by Lenders, all of the foregoing in form and substance satisfactory to Lenders. |
| **Marketing and Occupancy targets; Required management consultant:** | None required. |
| **Marketing Plan and Budget** | Linden Ponds and the manager to prepare a marketing plan and budget pre-closing and then annually thereafter. The management agreement would include a market based fee that would compensate the manager for achieving certain total levels of occupancy for completed buildings, to provide a balanced incentive to sell new and turnover units. |
| **Development Agreement** | Development fee not to exceed 5% of hard construction costs, payable from IED's of RB 2.5 as follows upon repayment in full of the New Debt. |

After Recording, please deliver to:

**AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT,
ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING**

LINDEN PONDS, INC.
as Mortgagor

and

WELLS FARGO BANK, NATIONAL ASSOCIATION, Trustee
as Mortgagee

Relating to:

MASSACHUSETTS DEVELOPMENT FINANCE AGENCY
REVENUE BONDS
(LINDEN PONDS, INC. FACILITY)

$_____                    $_____

SERIES 2011 A-1                      SERIES 2007 B
[Fixed Rate]                         [Variable Rate]

$_____                    $_____

SERIES 2011 A-2                      SERIES 2011 B
[Fixed Rate]                         [Zero Coupon]

Dated as of _____ 1, 2011

# AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

THIS **AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING** ("Mortgage") is made as of the 1st day of _____, 2011, by and between LINDEN PONDS, INC., a nonstock corporation with an address of 701 Maiden Choice Lane, Baltimore, Maryland 21228, organized and existing under the laws of the State of Maryland (the "Mortgagor"), and WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, as Trustee, and its successors and assigns (the "Mortgagee") and amends and restates in its entirety the Fee and Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of July 1, 2007 (the "Original Mortgage"), which is recorded in the Registry of Deeds of Plymouth County, Massachusetts at Book 34922, pp. 28-77, as Document Number 626166.

## RECITALS

Pursuant to, and in accordance with, the Act (defined herein), Massachusetts Development Finance Agency, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the "Issuer"), previously issued its Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2007 A (Tax-Exempt) in the original aggregate principal amount of $101,365,000 (the "Fixed Rate Bonds") and its Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand Series 2007 B (Tax-Exempt) and its Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Variable Rate Demand Series 2007 C (Taxable) in the original aggregate principal amount of $55,000,000 (collectively, the "Variable Rate Bonds," and together with the Fixed Rate Bonds, the "Series 2007 Bonds"), and loaned the proceeds thereof to the Mortgagor (the "Series 2007 Loan"), upon the terms and conditions of the Loan Agreement dated as of July 1, 2007, between the Mortgagor and the Issuer (as amended, the "Original Loan Agreement") for the purpose of financing the payment of a portion of the purchase price of the Facility (as hereinafter defined) and to pay certain costs of issuing the Series 2007 Bonds and to fund a debt service reserve fund and to pay capitalized interest on the Series 2007 Bonds.

The Series 2007 Bonds were issued pursuant to a Trust Indenture dated as of July 1, 2007 (as amended, the "Original Indenture") between the Issuer and Wells Fargo Bank, N.A., as successor trustee (in such capacity, the "Trustee"). To secure the holders from time to time of the Parity Debt (defined herein) the Mortgagor and Hingham Campus, LLC ("Hingham"), delivered the Original Mortgage, constituting a first lien on and security interest in the Property (defined herein), subject to Permitted Encumbrances (defined herein).

On June ___, 2011, the Mortgagor and Hingham filed voluntary bankruptcy actions under Chapter 11 of Title 11 of the United States Code, and pursuant to such actions and the plan of reorganization confirmed by the bankruptcy court, the amendment and restatement of the Original Indenture, the Original Loan Agreement and the Original Mortgage has been approved.

By resolution adopted by the Issuer on April 14, 2011, the Issuer will (A) issue its (i) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-1, (ii) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 A-2, (collectively, the "Series 2011 A Bonds"), and (iii) $_____ Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility), Series 2011 B (the "Series 2011 B Bonds") and (B) will reissue its $_____ Massachusetts Development Finance Agency Amended and Restated Revenue Bonds (Linden Ponds, Inc. Facility), Series 2007 B (the "Amended Series 2007 B Bonds" and collectively with the Series 2011 A Bonds and the Series 2011 B Bonds, the "Series 2011 Bonds") which Series 2011 Bonds will be exchanged for the Series 2007 Bonds in accordance with the terms of an Amended and Restated Trust Indenture dated the date hereof by and between the Issuer and the Trustee (the "Indenture").

The Mortgagor has acquired the Facility and the Property from Hingham. As of the date hereof, the Mortgagor is the sole owner of the Property.

The Mortgagor wishes and intends, by the execution and delivery of this Mortgage, and in accordance with the Act, to continue to secure the full and punctual payment and performance of (A) with respect to the Existing Facility Site (defined herein), FIRST, the Mortgagor's obligations to pay the principal of and interest on the Series 2011 Bonds and SECOND, the Mortgagor's obligations to pay the principal of and interest on the Series 2011 B Bonds, and (B) with respect to Parcel Three (defined herein), the Mortgagor's obligations to pay the principal of and interest on the Series 2011 Bonds.

The aggregate principal amount secured hereby is _____ Dollars ($_____) representing the principal amount of the Loans.

## GRANT

NOW, THEREFORE, in consideration of the Issuer's entering into the Loan Agreement and amending and restating the Loans to the Mortgagor in the principal amount of _____ Dollars ($_____),and of other good and valuable consideration, the receipt and legal sufficiency of which the Mortgagor hereby acknowledges, and continue to secure the repayment of such principal sum with interest, and other indebtedness, and performance of the Mortgagor's Parity Obligations, including its obligations under the Loan Agreement, the Original Mortgage is amended and restated in its entirety as follows: the Mortgagor does hereby mortgage, warrant, grant, convey, bargain, sell and assign unto the Mortgagee and its successor or successors, and hereby grants to the Mortgagee a lien on and security interest, to the extent permitted under the Uniform Commercial Code of The Commonwealth of Massachusetts in effect from time to time, in its fee simple and equitable interests, both now owned or held and hereafter acquired, in the following:

(a) all estates, interests, rights, titles, benefits, privileges, and other leasehold or equitable interests of the Mortgagor in and to all that real property located in Plymouth County, Massachusetts, consisting of the tract of land more particularly described in Exhibit A attached hereto and made a part hereof (such property consisting generally of the site on which the existing Facility is located (the "Existing Facility Site") and Parcel Three, the site on which

Neighborhood Three will be constructed) (the "Land"), together with, (i) all right, title and interest of the Mortgagor, including any after-acquired title or reversion in and to the beds of the ways, streets, avenues and alleys adjoining the Land and (ii) all and singular the tenements, hereditaments, easements, appurtenances, passages, waters, water rights, water courses, riparian rights, other rights, liberties and privileges thereof or in any way now or thereafter appertaining to the Property or any part thereof, including, but not limited to, any homestead or other claim at law or in equity, as well as any after-acquired title, franchise or license and reversion and reversions and remainder and remainders thereof and also all the estate, property, claim, right, title or interest now-owned or hereafter acquired by the Mortgagor in or to the Property or any part thereof.

(b)     all buildings and improvements of every kind and description now or hereafter erected and placed thereon (collectively, the "Improvements").

(c)     all building materials, fixtures, machinery, equipment and tangible personal property of every kind and nature whatsoever (but not including consumable goods or trade fixtures or other personal property owned by any third parties occupying all or any portion of the Improvements), now or hereafter located or contained in or upon or attached to the Land or the Improvements or any part thereof, and used or usable in connection with any present or future use or operations of the Land or the Improvements or any part thereof, whether now owned or hereafter acquired by the Mortgagor, together with all Additions (defined herein) thereto (all of the foregoing being hereinafter sometimes referred to collectively as the "Equipment Collateral"). All of the Equipment Collateral, so far as permitted by law, shall be deemed to be fixtures and part of the Land and of the Improvements, and as to any part of the Equipment Collateral not deemed or permitted by law to be fixtures, this Mortgage shall also constitute a security agreement under and pursuant to the Massachusetts Uniform Commercial Code, and in order to secure the repayment of the Mortgage Indebtedness (defined herein) and the performance of the obligations to be secured by this Mortgage, the Mortgagor hereby grant to the Mortgagee a continuing security interest under the Massachusetts Uniform Commercial Code in and to such part of the Equipment Collateral not deemed or permitted by law to be fixtures, and the proceeds thereof, including the proceeds of any and all insurance policies in connection therewith. With respect to such Equipment Collateral, the Mortgagee, shall have all the rights and remedies of a secured party under the Massachusetts Uniform Commercial Code.

(d)     all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any Residence and Care Agreements, lease or agreement pertaining thereto (including, without limitation, all fees charged to each and every resident of the Property pursuant to a Residence and Care Agreement, including, without limitation, all fees paid on a daily or monthly basis and all fees paid upon entering any part of the Property and any other fees payable by or on behalf of residents of the Property) and all right, title and interest of the Mortgagor in and to, and remedies under, any and all Residence and Care Agreements, and any and all leases and subleases of the Property, or any part thereof, both now in existence or hereafter entered into, and all accounts, general intangibles and other rights growing out of or in connection with such Residence and Care Agreements, leases and subleases, together with all proceeds thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the residents or lessees of their obligations thereunder whether such cash or securities are to be held

until the expiration of the terms of such Residence and Care Agreements, leases and subleases or are to be applied to one or more of the purposes under such Residence and Care Agreements or to one or more of the installments of rent coming due immediately pursuant to such leases or subleases prior to the expiration of such terms; and reserving in the Mortgagor a license terminable upon the occurrence of an Event of Default (defined herein) to collect and receive the same; provided, however, there shall be excluded from the property described in this paragraph (i) any moneys received by the Mortgagor from prospective residents or commercial tenants in order to pay for customized improvements to those Residential Units or other areas of the Facility to be occupied by such residents or leased to such tenants, (ii) all deposits made by residents pursuant to Residence and Care Agreements and required by law to be held in escrow until construction of a resident's Residential Unit is completed, a certificate of occupancy has been issued and appropriate licenses have been issued by the Commonwealth and (iii) all deposits and/or advance payments made in connection with the occupancy of the Residential Units and received prior to the date of receipt of such certificate and licenses.

(e) any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof under the power of eminent domain, either temporarily or permanently, (ii) any change or alteration of the grade of any street, and (iii) any other injury or damage to, or decrease in value of, the Property or any part thereof (all of the foregoing being hereinafter sometimes referred to, collectively, as the "Condemnation Awards", or singularly a "Condemnation Award"), to the extent of all Mortgage Indebtedness which may be secured by this Mortgage at the date of receipt of any such Condemnation Award by the Mortgagee, and of the reasonable counsel fees, costs and disbursements, if any, incurred by the Mortgagee in connection with the collection of such Condemnation Award.

(f) any and all payments, proceeds, settlements or other compensation heretofore made (but not yet received by the Mortgagor) or hereafter made, including any interest thereon, and the right to receive the same, from any and all insurance policies covering the Property or any portion thereof.

(g) all of the Mortgagor's rights, options, powers and privileges in and to (but not the Mortgagor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operation and maintenance of, or provision of services to, the Property.

(h) all receipts, revenues, rentals, income, insurance proceeds (including, without limitation, all Medicaid, Medicare and other third-party payments), Condemnation Awards and other moneys received by or on behalf of the Mortgagor, including (without limitation) revenues derived from (i) ownership, operation or leasing of any portion of the Facility and the Facility Site (including, without limitation, Fees (as defined in the Indenture) and any other fees payable by or on behalf of residents of the Property) and all rights to receive the same (other than the right to receive Medicaid and Medicare payments), whether in the form of accounts, general intangibles or other rights, and the proceeds of such accounts, general intangibles and other rights, whether now existing or hereafter coming into existence or whether now owned or held or

hereafter acquired, and (ii) gifts, grants, bequests, donations and contributions heretofore or hereafter made that are legally available to meet any of the obligations of the Mortgagor incurred in the financing, operation, maintenance or repair of any portion of the Property (collectively "Receipts"); provided, however, there shall be excluded from Receipts (i) any moneys received by the Mortgagor from prospective residents or commercial tenants in order to pay for customized improvements to those Residential Units or other areas of the Facility to be occupied by such residents or leased to such tenants, (ii) all deposits made by residents pursuant to the Residence and Care Agreements and required by law to be held in escrow until construction of a resident's Residential Unit is completed, a certificate of occupancy has been issued and appropriate licenses have been issued by the Commonwealth and (iii) all deposits and/or advance payments made in connection with the occupancy of the Residential Units and received prior to receipt of such certificate and licenses.

(i)      all of the Mortgagor's respective rights, title and interests in and to any and all rights that the Mortgagor may own, possess, use, enforce, and have a license to use, or from which it shall otherwise benefit, with respect to the Property, including without limitation any and all permits, approvals, licenses, title insurance binders or policies, insurance policies, letters of credit, performance and payment bonds, easements, restrictive covenants, utility connection agreements, surveys, site plans, plans and specifications, environmental reports and studies and appraisals, and including all amendments, modifications, supplements, or addenda now or hereafter made.

(j)      all cash and non-cash proceeds of the collateral identified in subparts (a), (b), (c), (d), (e), (f), (g), (h) and (i) identified above.

Unless specifically designated otherwise, the Land, the Facility, the Improvements, the Equipment Collateral, and all other items and property described in the preceding paragraphs hereof, together with all Additions thereto, shall be herein collectively referred to as the "Property".

TO HAVE AND TO HOLD, the Premises, unto Mortgagee, its successors and assigns, forever, for the purposes and upon the uses herein set forth together with all right to possession of the Property after the occurrence of any Event of Default.

THE FOREGOING MORTGAGE AND GRANT OF SECURITY INTEREST is intended to continue to secure the prompt payment and performance of the Mortgagor's Senior Parity Obligations and the Subordinated Bonds which include (without limitation) the following: (a) the prompt payment of all sums of money secured hereby (collectively, the "Mortgage Indebtedness"), which Mortgage Indebtedness shall include, but not be limited to, (i) all moneys and all sums of principal, interest and premium (if any) due or to become due under the Loan Agreement (A) with respect to the Existing Facility Site, FIRST, ratably between the Series 2011 A Bonds and the Amended Series 2007 B Bonds and SECOND, the Series 2011 B Bonds, and (B) with respect to Parcel Three, the Mortgagor's obligations to pay the principal of and interest on the Series 2011 Bonds, (ii) all other moneys now or hereafter advanced or expended by the Mortgagee as provided for herein or in any other of the Bond Documents (as defined herein) or by applicable law, and (iii) all costs, expenses, charges, liabilities, commissions, half-commissions and attorneys' fees now or hereafter chargeable to the Mortgagor, or incurred by, or

disbursed by, the Mortgagee on behalf of the Mortgagor as provided for herein or in any of the other Bond Documents, including by applicable law, and (b) the prompt performance of, observance of and compliance with, by the Mortgagor, all of the terms, covenants, conditions, stipulations and agreements, express or implied, contained herein, or in any of the Bond Documents.

PROVIDED HOWEVER, that until the occurrence of an Event of Default hereunder, and subject to any provisions hereof to the contrary, the Mortgagor shall have the right to remain in quiet and peaceful possession of the Property, and to collect, receive and retain the rents, revenues, profits, proceeds, income and royalties therefrom.

PROVIDED FURTHER, that if the Mortgagor pays, causes to be paid or provides for the payment of the Mortgage Indebtedness in full at the time and in the manner stated in the Loan Agreement, this Mortgage, and the other Bond Documents at any time before the sale hereinafter provided for, and the Mortgagor pays, causes to be paid or provides for the payment of each and all of the Series 2011 A Bonds, the Amended Series 2007 B Bonds, the Mortgagor's other Senior Parity Obligations, the Series 2011 B Bonds and upon the expiration or termination of the Loan Agreement in accordance with their respective terms, then these presents and the lien granted hereby shall cease, determine and become void, and upon proof given to the satisfaction of the Mortgagee that (a) the Mortgage Indebtedness has been so paid, satisfied or provided for in full, (b) the Series 2011 A Bonds, the Amended Series 2007 B Bonds, the Mortgagor's other Senior Parity Obligations, and the Series 2011 B Bonds have been so paid, satisfied or provided for in full, and (c) the Loan Agreement has expired, the Mortgagee shall (upon the receipt of the written request of, and at the expense of, the Mortgagor) release and discharge the lien and security interest of this Mortgage.

## AGREEMENTS

The Mortgagor hereby represents, warrants, covenants and agrees as follows, and stipulates that a breach of any of the following representations, warranties, covenants and agreements shall be deemed a breach of a material condition of this Mortgage and of the Loan Agreement:

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION

SECTION 1.01    Definitions.    The terms defined in this Section shall have the meanings stated in this Section for all purposes of this Mortgage, except as otherwise expressly provided or unless the context otherwise requires.  In the event of any inconsistencies between the terms used herein and in the Loan Agreement, the Loan Agreement shall control.

"Acquisition" or "acquisition" means, when used in regard to the Facility and Additional Facilities, and shall include, where applicable, and without limitation, the acquisition, construction, rehabilitation, remodeling, extension, equipping and permanent improvement of the Facility and Additional Facilities, and paying the necessary costs of preparing, printing and selling the Bonds and the tender and exchange of the Bonds as set forth in Section 2.02(c) of the Indenture, and such other costs as may be permitted by the Act and the Code.

"Act" means, together, Chapters 23G and 40D of the General Laws of The Commonwealth of Massachusetts, and all future acts supplemental thereto or amendatory thereof.

"Additional Bonds" means, collectively, any Additional Senior Bonds, Additional Subordinated Bonds and Special Senior Bonds.

"Additional Facilities" means any project undertaken by the Mortgagor that is financed or refinanced (i) pursuant to the Act and the Indenture by the Issuer by the issuance of Additional Bonds or (ii) pursuant to the Loan Agreement by the Mortgagor by the issuance of Parity Obligations, including (without limitation) land, easements, rights-of-way and other interests in real property and any improvement, addition or betterment to, or any construction, replacement, remodeling or equipping of, the Property. Additional Facilities includes Residential Building 2.5, Neighborhood Three and Renaissance Gardens Two.

"Additional Indebtedness" means any Indebtedness incurred or assumed by the Mortgagor subsequent to the date of issuance of the Series 2011 Bonds.

"Additional Senior Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.19 of the Indenture.

"Additional Subordinated Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.19 of the Indenture.

"Additions" means any and all alterations, additions, accessions, extensions, betterments and improvements to the Property (or any portion thereof), substitutions therefor, and renewals and replacements thereof.

"Administrative Expenditures" means any fees and expenses of the Trustee (whether as Trustee, Paying Agent or Registrar for the Bonds), fees and expenses of the Mortgagee, fees and expenses of the Issuer, and all expenditures incurred by the Issuer or the Mortgagee by reason of its issuance of any Bonds and any Subordinated Indebtedness, including (without limitation) the Issuer's Annual Administrative Fee (as defined in the Indenture), legal, accounting, consulting, financing and administrative expenses and expenses incurred by the Mortgagee to compel full and punctual performance of the provisions of the Loan Agreement, this Mortgage, the Indenture and the Collateral Documents in accordance with the terms thereof.

"Authorized Officer" means (i) when used with reference to the Mortgagee, an officer designated as such by the Mortgagee, (ii) when used with reference to the Mortgagor, the President, any Vice President or any Executive Vice President, Secretary, Treasurer or Assistant Treasurer of the Mortgagor and, when used with reference to any act or document, also means any other person authorized by resolution of the Board of Directors of the Mortgagor to perform such act or execute such document, and (iii) when used with reference to the Issuer, the person designated to act on behalf of the Issuer by resolution adopted by the Issuer or any person at the time designated to act on behalf of the Issuer by a certificate signed by any such person.

"Bond" or "Bonds" means the Series 2011 Bonds and any Additional Bonds, collectively.

"Bond Documents" means and includes (without limitation) the Bonds, the Indenture, the Loan Agreement, this Mortgage and, with respect to each Series of Variable Rate Bonds, the Letter of Credit, and any and all other documents that the Issuer, Mortgagee, the Mortgagor, or any other party or parties or their representatives, have executed and delivered, or may hereafter execute and deliver, to evidence or secure the Series 2011 Bonds, together with any and all Supplements thereto.

"Bondholder" means the registered owner of any Bond.

"Book Value" when used with respect to any property or interest therein, means, at the option of the Authorized Officer of the Mortgagor, either (a) the value of such property or interest, net of accumulated depreciation, as it is carried on the books of the Mortgagor in conformity with generally accepted accounting principles, or (b) the current market value of such property as of the time a ratio is to be calculated or value determined, in either case evidenced by a certificate of such Authorized Officer. In preparation of such certificate pursuant to (a) above, Book Value shall be the value set forth in the most recent financial statements of the Mortgagor. In preparation of such certificate pursuant to (b) above, current market value shall be assigned to property or any portion thereof only on the basis of an appraisal completed within three years of the date of such certificate by an independent party qualified by reputation and experience or, with respect to property other than real property and fixed assets on the basis of a certificate of an Authorized Officer of the Mortgagor if such certificate is accompanied by appropriate documentation indicating the basis of such valuation.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the Commonwealth observed as such or observed by the Designated Office of the Trustee or the office of the Letter of Credit Provider.

"Closing Date" means the date of initial issuance and delivery of fully executed and authenticated Series 2011 Bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor federal income tax statute or code, and the applicable regulations thereunder.

"Collateral Assignment" means the Collateral Assignment dated the date hereof by the Mortgagor to the Trustee.

"Collateral Documents" means those documents, instruments and items, a continuing security interest in which have been assigned, transferred and conveyed to the Trustee pursuant to the Collateral Assignment, including, but not limited to, the Management Agreement, each Residence and Care Agreement, and certain agreements, contracts, approvals, certificates, licenses and permits relating to the operations of the Facility (to the extent the same may be lawfully assigned).

"Commonwealth" means The Commonwealth of Massachusetts.

"Condemnation Award" has the meaning given to that term in the granting clauses of this Mortgage.

"Development Plan" means Exhibit C of the Linden Ponds Amended and Restated Development Agreement dated as of August 21, 2006, by and between Hingham and Erickson Retirement Communities, as amended from time to time.

"Encumbrance" means any mortgage, pledge, lien, security interest, charge or other encumbrance.

"Environmental Report" has the meaning given to that term in the Letter of Credit Agreement.

"Equipment Collateral" has the meaning given to that term in the granting clauses of this Mortgage.

"Existing Facility Site" means that portion of the Land on which Neighborhood One and Neighborhood Two and any other Facilities in existence on the Closing Date are located.

"Facility" means (a) approximately 988 Residential Units, (b) two community buildings, (c) a skilled nursing facility with approximately 132 private nursing care beds (the "Nursing Care Beds"), and (d) dining rooms, convenience stores, banks, beauty salons/barber shops, game rooms, an aquatic center, a music room, classrooms, a woodwork and hobby shop, a computer lab, a library, an in- house cable television station, a non-denominational chapel, walking paths and a health club, which shall be expanded to include Neighborhood Three, together with any amendments to the scope of the Facility or additions to or Expansions or replacements of the Facility made by the Mortgagor pursuant to the Loan Agreement, including any Additional Facilities.

"Facility Site" or "Land" means the parcel of land containing approximately 108 acres located in Plymouth County, Massachusetts, consisting of the Existing Facility Site and Parcel Three, and more particularly described in Exhibit A.

"Guaranty" means, as applied to any Indebtedness for borrowed money, (i) a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such Indebtedness or (ii) an agreement, direct or indirect, contingent or otherwise, providing assurance of the payment or performance (or payment of damages in the event of non-performance) of any part or all of such Indebtedness, including, without limiting the foregoing, the payment of amounts drawn down by letters of credit. Notwithstanding anything herein to the contrary, a guarantee shall not include any agreement solely because such agreement creates a lien on the assets of any Person or any agreement providing for indemnification. The amount of a guarantee shall be deemed to be the maximum principal amount of the Indebtedness guaranteed for which the guarantor could be held liable under such guarantee.

"Hazardous Materials" means any radioactive materials, hazardous waste, toxic substances or related materials, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehydes, radon and any substance defined as or included in the definition of (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6901 et seq.), as amended from time to time, and the regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 (42 U.S.C. 9601 et seq.), as amended from time to time, and the regulations promulgated thereunder; (c) any substance the presence of which on the Property is prohibited by any law similar to those set forth in this definition; (d) any hazardous or infectious medical waste including, but not limited to, cultures and stocks of infectious agents and associated biologicals, pathological wastes, human and animal blood specimens and blood products, anatomical materials, blood, blood-soiled articles, contaminated materials, microbiological laboratory wastes, sharps, chemical wastes, infectious wastes, chemotherapeutic wastes, and radioactive wastes; and (e) any other substance which by law requires special handling in its collection, storage, treatment or disposal.

"Hazardous Materials Contamination" means the contamination in violation of any applicable federal, state, or local laws, statutes, ordinances and regulations (whether presently existing or occurring after the date of this Mortgage) of the Improvements, facilities, soil, ground water, air or other elements on, or of, the Property by Hazardous Materials, or the contamination in violation of any applicable federal, state, or local laws, statutes, ordinances and regulations of the buildings, facilities, soil, ground water, air or other elements on, or of, any other property as a result of Hazardous Materials at any time (whether before or after the date of this Mortgage) emanating from the Property.

"Hingham" means Hingham Campus, LLC, a Maryland limited liability company.

"Holder" or "holder" or "Owner" or "owner" or any similar term means (i) when used with reference to a Bond, a Bondholder and (ii) when used with reference to any other Parity Obligation or Subordinated Indebtedness, the owner of such other Parity Obligation or Subordinated Indebtedness, determined in accordance with the Indenture or the Supplemental Indenture authorizing or approving the issuance thereof.

"Improvements" has the meaning given to that term in the granting clauses of this Mortgage.

"Indebtedness" has the meaning given to that term in the Indenture.

"Indenture" means the Amended and Restated Trust Indenture of even date herewith, between the Issuer and the Trustee, as amended, modified or supplemented from time to time by Supplemental Indentures.

"Independent Architect" means an Independent Person (i) authorized to engage in the practice of architecture by the laws of the Commonwealth and (ii) employed by the Mortgagor from time to time to pass upon those matters required by the Indenture, the Loan Agreement or this Mortgage to be passed upon by an Independent Architect, provided that the Mortgagor will mail a statement to the Trustee, naming the Independent Architect.

"Independent Engineer" means an Independent Person (i) authorized to engage in the profession of engineering by the Commonwealth and (ii) employed by the Mortgagor from time to time to pass upon those matters required by the Indenture, the Loan Agreement or this Mortgage to be passed upon by an Independent Engineer, provided that the Mortgagor will mail a statement to the Trustee naming any Independent Engineer.

"Independent Person" means a Person designated by the Mortgagor and not an employee, director or officer of the Mortgagor.

"Initial Manager" means Erickson Living Management, LLC.

"Leasehold Improvements" means the leasehold improvements to the Property.

"Leases" means any and all leases and subleases which may have been heretofore executed or which may be hereafter executed in connection with, or for, the use and occupation of the Property (or any part thereof), together with any and all Supplements thereto.

"Letter of Credit" means, with respect to the Series 2007 B Bonds, the direct pay letter of credit issued on the Closing Date and, upon its effective date, any Substitute Letter of Credit.

"Letter of Credit Agreement" means, with respect to the Series 2007 B Bonds initially, the Amended and Restated Letter of Credit Agreement dated as of the date hereof, between the Mortgagor and the Letter of Credit Provider pursuant to which the Letter of Credit securing such Series 2007 B Bonds is issued, together with any and all Supplements thereto, and if the Letter of Credit has been replaced by a Substitute Letter of Credit, any similar reimbursement agreement relating to such substitute Letter of Credit.

"Letter of Credit Documents" means the Letter of Credit, any Confirming Letter of Credit (as defined in the Indenture), the Letter of Credit Agreement and any and all other documents which the Mortgagor or any other party or parties or their representatives have executed and delivered, or may hereafter execute and deliver, to evidence or secure the Mortgagor's Letter of Credit Obligations, or any part thereof, or in connection therewith, together with any and all Supplements thereto.

"Letter of Credit Provider" means the issuer of any Letter of Credit then in effect.

"Loan Agreement" means the Amended and Restated Loan Agreement dated as of the date hereof, between the Issuer and the Mortgagor, together with any and all Supplements thereto.

"Loans" means the Series 2011 Loan and any other loans made by the Issuer to the Mortgagor of the proceeds of sale of any Additional Bonds, Parity Obligations or Subordinated Indebtedness.

"Management Agreement" means (i) the Management and Marketing Agreement dated as of _____, 2011, between the Mortgagor and the Manager, together with any Supplements thereto and (ii) any other management agreement entered into with a Manager.

"Manager" means the Initial Manager and thereafter any successor manager engaged by the Mortgagor to manage the Facility.

"Mortgage" means this Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing pertaining to the Property executed and delivered by the Mortgagor to the Mortgagee and any other mortgage amendatory hereof or

supplemental hereto, including (without limitation) any Supplement or amendment hereto and any separate or additional instrument executed and delivered by the Mortgagor in order to effect, record or perfect the interest of the Mortgagee in any portion of the Property.

"Mortgage Indebtedness" means all sums of money secured by this Mortgage and has the meaning given such term in the granting clauses of this Mortgage.

"Mortgagee" means Wells Fargo Bank, National Association, a national banking association, as Trustee, and its successors and assigns.

"Mortgagor" means the nonstock corporation, duly organized and existing under the laws of the State of Maryland and qualified to do business in the Commonwealth, having its principal facilities in Hingham, Plymouth County, Massachusetts, the corporate name of which is LINDEN PONDS, INC., and its successors and assigns.

"Mortgagor's Letter of Credit Obligations" means the obligations of the Mortgagor under the Letter of Credit Documents to pay all payments required by the Letter of Credit Documents, when and as the same become due and payable, and timely perform, observe and comply with all of the terms, covenants, conditions, stipulations and agreements, express or implied, which the Mortgagor is required by the Letter of Credit Documents to observe or perform, including without limitation, the Mortgagor's obligation thereunder to reimburse the Letter of Credit Provider, with interest, for all amounts drawn under the Letter of Credit and to pay certain fees to the Letter of Credit Provider.

"Neighborhood One" means that group of Residential Buildings identified as R.B. 1.1, R.B. 1.2, R.B. 1.3, R.B. 1.4 and R.B. 1.5, and community building 1.0 (each as described in the Development Plan), which as been constructed as part of the Facility.

"Neighborhood Three" means that group of Residential Buildings identified as R.B. 3.1, R.B. 3.2, R.B. 3.3, R.B. 3.4 and R.B. 3.5, and community building 3.0 (each as described in the Development Plan), which has been constructed as part of the Facility.

"Neighborhood Three Loan" means the construction loan(s) to the Mortgagor in connection with the construction of Neighborhood Three and any refinancing(s) thereof.

"Neighborhood Three Loan Mortgage" means any mortgage, security agreement or other agreement encumbering assets of the Mortgagor located on or derived from Parcel Three for the benefit of any construction lender entered into to secure the Neighborhood Three Loan.

"Neighborhood Two" means that group of Residential Buildings identified as R.B. 2.1, R.B. 2.2, R.B. 2.3, R.B. 2.4, and R.B. 2.5 and community building 2.0 (each as described in the Development Plan), which has been or will be constructed as part of the Facility.

"Net Plant, Property and Equipment" means, with respect to the Mortgagor, the entire complex of tangible long-lived assets used by the Mortgagor as shown on the balance sheet of the Mortgagor, determined in accordance with generally accepted accounting principles.

"Nursing Care Beds" shall mean the Nursing Care Beds described in the definition of Facility.

"Operating Revenues" means the sum of gross resident and patient service revenues less contractual allowances and provisions for uncollectible accounts, free care and discounted care, plus other operating revenues and non-operating revenues.

"Outstanding" means, as of any particular date, (a) when used with reference to Bonds, all Bonds authenticated and delivered under the Indenture except (i) any Bond cancelled by the Trustee (or delivered to the Trustee for cancellation) at or before such date, (ii) any Bond for the payment of the principal or Redemption Price of and interest on which provision shall have been made as provided in Section 9.01 of the Indenture, and (iii) any Bond in lieu of or in substitution for which a new Bond shall have been authenticated and delivered pursuant to Article II or Section 8.03 of the Indenture; and (b) when used with reference to any other Indebtedness, except as otherwise provided in any Supplemental Indenture authorizing or approving the issuance of any Parity Obligation or Subordinated Indebtedness, all Indebtedness theretofore issued or incurred other than any such Indebtedness that is deemed to have been paid or discharged under generally accepted accounting principles.

"Parcel Three" means that portion of the Land on which Neighborhood Three, if constructed, is to be located.

"Parity Debt" means all Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt, collectively.

"Parity Obligation" means any bond, note or other Indebtedness issued by or on behalf of the Mortgagor as permitted by Section 8.11 or Section 8.22 of the Loan Agreement and with respect to which the Trustee, pursuant to Section 5.06 of the Indenture, has notified the Mortgagor in writing that all items that are conditions precedent to the issuance of Parity Obligations have been received.

"Permitted Encumbrance" means:

(a)     any lien arising by reason of any good faith deposit with the Mortgagor in connection with any lease of real estate, bid or contract (other than any contract for the payment of money), any deposit by the Mortgagor to secure any public or statutory obligation, or to secure, or in lieu of, any surety, stay or appeal bond, and any deposit as security for the payment of taxes or assessments or other similar charges;

(b)     any lien arising by reason of any deposit with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license or to enable the Mortgagor to maintain self-insurance or to participate in any funds established to cover any insurance risk or in connection with workers' compensation, unemployment insurance, any pension or profit-sharing plan or other social security, or to share in the privileges or benefits required for the participation of the Mortgagor in such arrangements;

(c)     any judgment lien against the Mortgagor, so long as such judgment is being contested in good faith and is fully bonded, fully covered by a letter of credit or other surety, or covered by insurance;

(d)     any right reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law affecting any property of the Mortgagor; any lien on any property of the Mortgagor for taxes, assessments, levies, fees, water and sewer rents or charges and other governmental and similar charges and any lien of any mechanic, materialman, laborer, supplier or vendor for work or services performed or materials furnished in connection with such property that is not due and payable or that is not delinquent or the amount or validity of which is being contested and execution thereon stayed;

(e)     the Indenture, the Loan Agreement, the Letter of Credit Agreement, the Collateral Agreement, and this Mortgage; and any lien or encumbrance disclosed in the title insurance policy delivered in connection with the issuance of the Series 2007 Bonds or the bring down endorsement to such policy delivered in connection with the issuance of the Series 2011 Bonds, provided that such lien or encumbrance is not extended, renewed or modified to apply to any property of the Mortgagor not subject to such lien or encumbrance on the date such policy is delivered, unless the lien or encumbrance, as so extended, renewed or modified, otherwise qualifies as a Permitted Encumbrance without reference to this clause;

(f)     any lien or encumbrance on the Property or the Receipts securing any Indebtedness permitted by Section 8.10(c) of the Loan Agreement to finance or refinance Residential Building 2.5 which shall be senior to the lien arising hereunder and under the Indenture to secure the Senior Bonds and the Subordinated Bonds;

(g)     any lien with respect to moneys deposited by residents or others with the Mortgagor as security for, or as prepayment of, the cost of resident or other client care and any lien arising under law or by contract with respect to any deposit made by a prospective resident under a Residence and Care Agreement prior to occupancy;

(h)     any lien on property received by the Mortgagor through any gift, grant or bequest constituting a restriction imposed by the donor, grantor or testator on such gift, grant or bequest or the income therefrom;

(i)     any lien (other than a lien on the Property) of any third-party payor for recoupment of amounts paid to the Mortgagor for resident care;

(j)     any lien on property acquired with the proceeds of Indebtedness permitted by Section 8.10(f) of the Loan Agreement;

(k)     [RESERVED];

(l)     any lien granted for the benefit of all holders of Parity Debt in accordance with the Indenture and the Loan Agreement;

(m)     any lease whereunder the Mortgagor is lessor which relates to property that is of a type that is customarily the subject of such leases, including without limitation, the lease of

individual living units, office space for physicians and educational institutions, food service facilities, parking facilities, barber shops, beauty shops, flower shops, gift shops, radiology, pathology or other specialty services and pharmacy and similar departments, and leases of or licenses to use buildings or portions thereof located on the Facility Site, which leases or licenses do not impair the operations being conducted in connection with the Facility (or, if no operations are being conducted therein, the operations for which the Facility was designed or last modified);

(n)     any lien placed upon any real or personal property being acquired by the Mortgagor to secure all or a portion of the purchase price thereof and any landlord's lien under any lease permitted under the Loan Agreement;

(o)     any lien or encumbrance on any property existing on the date on which such property was acquired by the Mortgagor, including (without limitation) any acquisition as a result of a merger or consolidation permitted by Section 8.09 of the Loan Agreement, involving the owner of such property, provided that such lien is not extended or modified to apply to other property, no Additional Indebtedness is incurred which is secured by such lien, and such lien is not extended, renewed or replaced with another lien or mortgage, unless the lien, as so extended, renewed or modified, otherwise qualifies as a Permitted Encumbrance without reference to this clause;

(p)     with respect to property acquired after the effective date of the Indenture, liens securing the purchase price of such property, or existing liens, provided that Indebtedness secured by liens under this subsection (p)(i) is not incurred prior to the Resizing Tender Date, and (ii) does not exceed 10% of Book Value or Market Value at the option of the Mortgagor, of Net Plant, Property and Equipment of the Mortgagor, provided any property that is encumbered by a lien other than this Mortgage securing the Indenture shall be excluded from the determination of Book Value or Market Value of Net Plant, Property and Equipment;

(q)     such easements, rights-of-way, servitudes, restrictions and other defects, liens and encumbrances which shall not materially impair the use of the Property for its intended purposes or the value of the Property;

(r)     such easements, servitudes, restrictions, licenses, restrictive covenants and rights-of-way (including the dedication of public highways or public or private utility easements) as may be required by governmental authorities or utility providers in connection with the construction of, or the furnishing of utilities to, the Facility;

(s)     with the consent of the Holders of (i) 66 2/3% in principal amount of all Outstanding Senior Parity Debt, and (ii) 66 2/3% in principal amount of all Outstanding Series 2011 B Bonds, with respect to Parcel Three only, the Neighborhood Three Loan, the Neighborhood Three Loan Mortgage and any other documents or instruments entered into with respect to the Neighborhood Three Loan; and

(t)     any banker's lien arising in connection with the establishment and maintenance of depository bank accounts in the ordinary course of business.

"Person" or "person" means any natural person, firm, association, corporation, company, trust, partnership, public body or other entity.

"Prime Rate" means, with respect to the Series 2011 Bonds, the prime rate of interest established and declared from time to time by the Trustee as a commercial lending institution or, if the Trustee is not a commercial lending institution, by a commercial lending affiliate of the Trustee, and with respect to the Variable Rate Bonds, the "Prime Rate" as such term is defined in any Letter of Credit Agreement.

"Property" means the Land, the Facility, the Improvements, the Equipment Collateral and all other items of property listed in the granting clauses of this Mortgage.

"Receipts" has the meaning given to that term in the granting clauses of this Mortgage.

"Redemption Price" means, when used with respect to any Bond or Parity Obligation or portion thereof, the principal amount of such Bond or such Parity Obligation or such portion thereof plus the applicable premium, if any, payable upon redemption thereof pursuant to the Indenture.

"Reimbursement Rate" means the fluctuating rate of interest that is at all times equal to the Prime Rate plus one percent (1.0%) per annum.

"Reserved Rights of the Issuer" means (a) all rights of the Issuer as set forth in Sections 5.07, 6.02, 8.01, 8.04, 8.06, 8.08, 9.07, 11.04, 11.07 and 11.15 of the Loan Agreement; (b) the right of the Issuer to receive notices, reports or other information hereunder and under the Indenture and the Loan Agreement; (c) all rights of the Issuer to enforce (other than the declaration of a default under the Loan Agreement) the representations, warranties, covenants and agreements of the Mortgagor pertaining in any manner or way, directly or indirectly, to the tax-exempt status of interest on any Tax-Exempt Bonds set forth in the Loan Agreement or in the Tax Certificate or in any other certificate or agreement executed by the Mortgagor; (d) all rights of the Issuer in connection with any amendment to or modification of the Indenture and the Loan Agreement; and (e) all enforcement remedies with respect to the foregoing. The Reserved Rights of the Issuer have been assigned to the Mortgagee under the Indenture but are also held and retained by the Issuer concurrently with the Trustee.

"Reserved Units" means those Residential Units with respect to which a prospective Resident has committed to occupy upon the availability thereof and in respect of which such prospective Resident has made one or more deposits required by the application for such Residential Unit.

"Residence and Care Agreement" means each and every Residence and Care Agreement as amended from time to time, between the Mortgagor and a resident of the Facility giving the resident certain rights of occupancy in the Facility, including, without limitation, the Residential Units and the Nursing Care Beds, and providing for certain services to such resident, which contract shall be in one of the forms previously delivered to the Department of Elder Affairs of the Commonwealth and the Letter of Credit Provider, as such forms may from time to time be amended, modified or supplemented in accordance with Section 5.08 of the Loan Agreement.

"Residential Building" means a building located within the Facility that contains Residential Units.

"Residential Building 2.5" means the Residential Building identified as such in the Development Plan which is intended to be constructed as part of the Facility.

"Residential Units" means an Independent Living Unit (as defined in the Residence and Care Agreements) within the Facility, and, for the avoidance of doubt, does not include Nursing Care Beds.

"Revenues" means (i) all payments to the Mortgagee for the account of the Issuer or the Letter of Credit Provider pursuant to the Loan Agreement, the Letter of Credit Agreement and this Mortgage, including (without limitation) payments from the Receipts, and (ii) all other receipts of the Mortgagee or the Issuer attributable to the ownership, leasing or operation of any portion of the Property and the financing and refinancing of the Facility, the Facility Site, any Additional Facilities and Residential Building 2.5 with the proceeds of Bonds; provided, however, that the term "Revenues" does not include the Reserved Rights of the Issuer.

"Senior Bonds" means the Series 2011 A Bonds (including the Amended Series 2007 B Bonds) and any Additional Senior Bonds.

"Senior Parity Debt" means the Senior Bonds and the Senior Parity Obligations.

"Senior Parity Obligations" means any Parity Obligation which is designated as a Senior Parity Obligation in accordance with Section 5.06 of the Indenture and in compliance with Section 8.11 of the Loan Agreement.

"Series 2011 Bonds" shall have the meaning assigned such term in the Recitals.

"Settled Units" means Residential Units that, as of any date, are currently subject to an executed and currently effective Residence and Care Agreement.

"Special Senior Bonds" means Indebtedness of the Issuer issued pursuant to Section 2.14 of the Indenture.

"Subordinated Bonds" means the Series 2011 B Bonds and any Additional Subordinated Bonds.

"Subordinated Indebtedness" means Indebtedness, the terms of the documents providing for the issuance of which expressly provide that all payments on such Subordinated Indebtedness shall be subordinated to the timely payment of all Special Senior Parity Debt, Senior Parity Debt and Subordinated Parity Debt, whether currently Outstanding or subsequently issued.

"Subordinated Parity Debt" means the Subordinated Bonds and the Subordinated Parity Obligations.

"Subordinated Parity Obligation" means any Parity Obligation which is designated as a Subordinated Parity Obligation in accordance with Section 5.06 of the Indenture and in compliance with Section 8.22 of the Loan Agreement.

"Supplement" or "Supplements" means any and all extensions, renewals, modifications, amendments, supplements, and substitutions.

"Supplemental Indenture" means any indenture of the Issuer amending, modifying or supplementing the Indenture, any Supplemental Indenture, the Loan Agreement, this Mortgage or any Bond, adopted and becoming effective in accordance with the terms of the Indenture.

"Tax Certificate" means the Tax Certificate and Covenants executed and delivered by the Mortgagor upon the issuance and delivery of the Series 2011 Bonds and any other similar certificates executed and delivered by the Mortgagor upon the issuance and sale of any other Series of Tax-Exempt Bonds.

"Tax-Exempt Bonds" has the meaning set forth in the Indenture.

"Taxes" means all taxes, water rents, sewer rents, assessments and other governmental or municipal or public or private dues, charges and levies and any prior liens (including federal tax liens) for the Taxes which are or may be levied, imposed or assessed upon the Property or any part thereof, or any leases pertaining thereto, or upon the rents, issues, income or profits thereof, whether any or all of the aforementioned be levied directly or indirectly or as excise taxes or as income taxes.

"Trustee" means initially, Wells Fargo Bank, National Association, a national banking association, appointed pursuant to Section 6.01 of the Indenture as trustee for the Bonds, or any substitute or successor bank, trust company or national banking association that may at any time be substituted in its place pursuant to the Indenture, and their successors.

## ACCOUNTING TERMS

Unless specifically provided otherwise, all accounting terms have the definitions given them in accordance with generally accepted accounting principles as applied to the applicable person on a consistent basis by its accountants in the preparation of its previous annual financial statements.

SECTION 1.02    Rules of Construction. The words "hereof," "herein," "hereunder," "hereto," and other words of similar import refer to this Mortgage in its entirety.

The terms "agree" and "agreements" contained herein are intended to include and mean "covenant" and "covenants."

References to Articles, Sections, and other subdivisions of this Mortgage are to the designated Articles, Sections, and other subdivision of this Mortgage.

The headings of this Mortgage are for convenience only and shall not define or limit the provisions hereof.

All references made (a) in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, and (b) in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

Any reference to particular sections or subsections of the Code and applicable Income Tax Regulations shall include any successor provisions of law or regulations, to the extent the same shall apply to the Bonds.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

SECTION 2.01    General.    The Mortgagor reaffirms the representations and warranties made by the Mortgagor in the Loan Agreement.

SECTION 2.02    Warranty of Title.    The Mortgagor warrants that it is the owner of a fee simple interest in the Facility and the Facility Site.  The Mortgagor has the right and authority to convey the Facility Site and does hereby warrant, and agree to defend, the Facility Site and the title thereto, whether now owned or hereafter required, against all lawful claims and demands by any person claiming by, through, or under the Mortgagor, subject to Permitted Encumbrances.

SECTION 2.03    Purpose of Loan.    The Mortgagor represents and warrants that the Loans evidenced by the Loan Agreement and secured by this Mortgage are each a "commercial loan" as defined in the Massachusetts Uniform Commercial Code.

SECTION 2.04    Tax Assessments.    The Land and the Improvements covered by this Mortgage are assessed for purposes of Taxes as separate and distinct parcels from any other real property so that the Land and Improvements shall never become subject to the lien of any Taxes levied or assessed against any real property other than the Land and Improvements described in this Mortgage.

SECTION 2.05    Hazardous Materials.    Except for matters disclosed in the Environmental Report, a copy of which have been previously provided to the Issuer, no Hazardous Materials are located on the Property, or if so located thereon, are stored and used in accordance with all applicable federal, state, and local laws.  Except for matters disclosed in the Environmental Report, Hingham has never, and to the Mortgagor's knowledge, no other Person has ever, used the Property as a manufacturing, storage or dump site for Hazardous Materials nor, to the best of the Mortgagor's knowledge, is the Property affected by any Hazardous Materials Contamination.  Except for matters disclosed in the Environmental Report, to the best of the Mortgagor's knowledge, no property adjoining the Property has ever been used as a manufacturing, storage or dump site for Hazardous Materials nor, to the Mortgagor's knowledge, is any such adjacent property affected by any Hazardous Materials Contamination.

## ARTICLE III
## COVENANTS AND AGREEMENTS

SECTION 3.01    Payment and Performance of Mortgagor's Obligations.    The Mortgagor will: (a) punctually pay the principal of and interest on the Loans according to the terms of the Loan Agreement, together with all other Mortgage Indebtedness secured hereby, as and when the same become due and payable; and (b) punctually keep and perform each and all other of the Mortgagor's obligations under the Loan Agreement and this Mortgage and any other contracts, agreements and instruments executed in connection with the issuance and sale of the Bonds.

SECTION 3.02      Further Assurances.  At any time, and from time to time, upon request by the Mortgagee, the Mortgagor, at the sole expense of the Mortgagor, will make, execute, deliver and record or cause to be made, executed, delivered and recorded, any and all further instruments, certificates, and other documents as may, in the reasonable opinion of the Mortgagee, be necessary or desirable in order to effectuate, complete, perfect or continue and preserve the obligations of the Mortgagor under the Loan Agreement and this Mortgage, and the lien of this Mortgage, and all modifications, extensions and other amendments of the same.  Upon any failure by the Mortgagor so to do, the Mortgagee may make, execute and record any and all such instruments, certificates and documents for and in the name of the Mortgagor, and at the sole expense of the Mortgagor, and the Mortgagor hereby irrevocably appoints the Mortgagee the agent and attorney-in-fact of the Mortgagor to do so, this appointment being coupled with an interest.  The Mortgagee may, at its option, advance the expenses incurred in making, executing and recording any and all such instruments, certificates and documents, and such sums advanced, with interest at the Reimbursement Rate, will be repaid to the Mortgagee by the Mortgagor as provided in Section 3.11 hereof.

SECTION 3.03      Insurance.  The Mortgagor shall maintain insurance of the kinds and amounts required by the Loan Agreement with respect to the Property.  The proceeds of all property insurance policies shall be applied as required by the Loan Agreement and the Indenture.  In the event of a sale of all or any part of the Property pursuant to the provisions of this Mortgage, the Mortgagee shall succeed to all the rights and interest of the Mortgagor, including any right of the Mortgagor to unearned premiums, in and to all such policies of insurance.

SECTION 3.04      Taxes.

(a)      The Mortgagor will promptly pay, prior to the accrual of any penalties thereon, all Taxes and any other governmental impositions and assessments lawfully levied or assessed upon or in respect of the Property.  If the Mortgagor fails to pay, or cause to be paid, the Taxes at the time or in the manner provided in this Section, the Mortgagee may, at its option (but without being under any obligation to do so), pay such Taxes, and the Mortgagor shall pay to the Mortgagee the amount of any Taxes so paid, with interest thereon, as provided in Section 3.11 hereof.

(b)      In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of mortgages or debts secured by mortgages or the manner of collecting any such taxes so as to adversely affect the Mortgagee (including, without limitation, a requirement that internal revenue stamps be affixed to this Mortgage), the Mortgagor will promptly pay any such tax.  If the Mortgagor fails to make such prompt payment, or if any such law prohibits the Mortgagor from making such payment or would penalize the Mortgagee if the Mortgagor makes such payment, then an "Event of Default" shall be deemed to have occurred hereunder.  In no event, however, shall any income taxes or franchise taxes of the Mortgagee, the Issuer, or any Holder, measured by income, or taxes in lieu of such income taxes or franchise taxes, be required to be paid by the Mortgagor.

(c)     The fact that the Issuer is assisting in the financing of the acquisition of the Facility shall not imply that the Mortgagor is or shall be eligible for any decrease in or immunity from any applicable tax, assessment, charge or levy ordinarily imposed by the Issuer or any other governmental entity.

(d)     The Mortgagor shall not claim or demand or be entitled to receive any credit or credits on the Mortgage Indebtedness, or on the interest payable thereon, for so much of the Taxes assessed against the Property as is equal to the tax rate applied to the principal indebtedness due on this Mortgage or any part thereof and agrees that no deduction shall be made or claimed from the taxable value of the Property by reason of this Mortgage.

SECTION 3.05     Condemnation.   So long as an Event of Default shall not have occurred and be continuing, the Mortgagor is hereby authorized, at its option upon notice thereof to the Trustee, to commence, appear in and prosecute, any action or proceeding relating to any condemnation of all or any part of the Property, or sale in lieu of condemnation, and to settle or compromise any claim in connection therewith with due regard to the interests of the Trustee, the Mortgagee and the holders of the Senior Parity Debt.  If an Event of Default shall have occurred and be continuing, the Mortgagee is hereby authorized, at its option, to commence, appear in and prosecute, in its own or in the Mortgagor's name, any action or proceeding relating to any condemnation of all or any part of the Property or any part thereof, or sale in lieu of condemnation, and to settle or compromise any claim in connection therewith.  Notwithstanding any taking by eminent domain, sale in lieu of condemnation, alteration of the grade of any street or other injury to or decrease in the value of the Property by any public or quasi-public authority or corporation, the Mortgagor will continue to pay the Mortgage Indebtedness as and when the same shall become due and payable, and any reduction in the Mortgagor's obligations under the Loan Agreement or this Mortgage resulting from the application of the Condemnation Awards shall be deemed to take effect only on the date of such receipt.  Any Condemnation Awards so received shall be deposited with the Mortgagee and applied as set forth in the Loan Agreement and the Indenture.  If, prior to the receipt by the Mortgagee of such Condemnation Award, the Property or any part thereof shall have been sold pursuant to the provisions of Section 4.02 of this Mortgage, the Mortgagee shall have the right to receive such Condemnation Award to the extent of any deficiency found to be due upon such sale, with legal interest thereon, whether or not a deficiency judgment on this Mortgage shall have been sought or recovered or denied, and of the reasonable attorneys' fees, costs and disbursements incurred by the Mortgagee in connection with the collection of such Condemnation Award.  The Mortgagor agrees to execute and deliver, from time to time, upon the request of the Mortgagee, such further instruments or documents as may be requested by the Mortgagee to confirm the grant and assignment to the Mortgagee of any such Condemnation Award.

SECTION 3.06     Damage and Destruction; Condemnation, Application of Proceeds. If, at any time prior to the repayment in full of all of the Mortgage Indebtedness, (a) the Property or any part thereof is damaged by fire or other casualty or is destroyed (in whole or in part) by fire or other casualty, or (b) title to, or the use of, the Property or any part thereof, or the interest of the Mortgagor in the Property or any part thereof, is taken under the exercise of the power of eminent domain by any governmental body, or by any person acting under governmental authority or otherwise, either temporarily or permanently, the amounts resulting from any event

described in this Section (including all proceeds received under any title insurance policy relative to the Property) will be applied as required by the Loan Agreement and the Indenture.

The Mortgagor expressly waives, to the extent permitted by law, for the benefit of the Mortgagee, any right or privilege now granted or created under the provisions of any of the real property laws of the Commonwealth or any similar law, rule or regulation now or hereafter in effect relating to the disposition of Condemnation Awards of the Property or the damage or destruction of the Property from any cause and agree that the provisions of the Loan Agreement and the Indenture shall govern in lieu thereof.

SECTION 3.07      Additions to Security.  All right, title and interest of the Mortgagor in and to all Additions to the Property, hereafter acquired by or released to the Mortgagor, or constructed, assembled or placed by the Mortgagor on the Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by the Mortgagor, shall become subject to the lien and security interest of this Mortgage as fully and completely, and with the same effect, as though now owned by the Mortgagor and specifically described in the granting clauses hereof, but at any and all times the Mortgagor will execute and deliver to the Trustee any and all such further assurances, mortgages, conveyances or assignments thereof as the Mortgagee may require for the purpose of expressly and specifically subjecting the same to the lien and security interest of this Mortgage.

SECTION 3.08      Subrogation of Mortgagee.  To the extent permitted by law, the Mortgagee shall be subrogated, notwithstanding their release of record, to any Encumbrances heretofore or hereafter existing on the Property to the extent that the same are paid or discharged by the Mortgagee, whether or not from the proceeds of the Loan; provided, however, that this Section shall not be deemed or construed to obligate the Mortgagee to pay or discharge the same.

SECTION 3.09      Security Agreement; Filing.  This Mortgage constitutes a security agreement pursuant to Massachusetts General Laws, Chapter 106, Section 9-101 et seq., is intended to be recorded with the Plymouth County Registry of Deeds as a Financing Statement pursuant to said General Laws, Chapter 106, Section 9-502, and shall constitute a Security Agreement within the meaning of the Massachusetts Uniform Commercial Code.  The Mortgagor hereby agrees to execute and deliver on demand, and hereby irrevocably constitutes and appoints the Mortgagee as the attorney-in-fact of the Mortgagor, to deliver and, if appropriate, to file with the appropriate filing office or offices such financing statements or other instruments as may be requested or required in order to perfect the security interest granted hereby or continue the effectiveness of the same.

With respect to the Equipment Collateral, the Mortgagee shall have all of the rights and remedies of a secured party under the Massachusetts Uniform Commercial Code.  The Mortgagee shall not be liable for any loss to any Equipment Collateral in the Mortgagee's possession, nor shall such loss diminish the amount of the Mortgage Indebtedness.

The Mortgagor intends that the security interest created hereby shall be perfected in such manner as is permitted or required pursuant to the Massachusetts Uniform Commercial Code.

The parties agree that all necessary continuation statements shall be filed by the Trustee within the time prescribed by the Massachusetts Uniform Commercial Code Secured Transactions in order to continue the security interest created by this Mortgage. This Mortgage shall be recorded in the Registry of Deeds in and for Plymouth County, Massachusetts, to the end that the rights of the Mortgagee shall be fully preserved as against creditors of, or purchasers for value from, the Mortgagee or the Mortgagor.

If, at any time, any of the information contained in any financing statement filed in connection with the security interests created by the Indenture or this Mortgage, including, without limitation, the description of the collateral, shall change in such manner as to cause such financing statement to become misleading in any material respect or as may impair the perfection of the security interests intended to be created by the Indenture and this Mortgage, then the Mortgagor shall promptly prepare an amendment to such financing statement as may be necessary to continue the perfection of the security interest intended to be created by the Indenture and this Mortgage, as applicable, and file the same in any office where such amendment is required to be filed to continue the perfection of the security interest intended to be created thereby. The Mortgagor shall pay all costs and expenses incurred in connection with the performance of its obligations set forth in this Section.

SECTION 3.10    Right to Perform. If the Mortgagor fails to make any payment or perform, observe, or comply with any of the conditions and covenants contained herein, the Mortgagee, without notice to or demand upon the Mortgagor, and without waiving or releasing any obligation or default, and without in any way assuming any of the Mortgagor's obligations under the Loan Agreement or the Mortgagor's obligation under this Mortgage, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of the Mortgagor, and may enter upon the Property or any part thereof for that purpose and take all such action thereon as the Mortgagee may consider necessary or appropriate for such purpose. All such sums so paid or advanced by the Mortgagee and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred, together with interest thereon, shall be repaid by the Mortgagor to the Mortgagee as provided in Section 3.11 hereof.

SECTION 3.11    Expenses. If the Mortgagee incurs or expends any sums, including (without limitation) reasonable attorneys' fees and expenses, whether or not in connection with any action or proceeding, to sustain the lien and/or protect or enforce any of its rights hereunder, or to recover any of the Mortgage Indebtedness hereby secured, or for any title examination or title insurance policy relating to the title to the Property or any part thereof, or for any other purposes set forth in any Section of this Mortgage or in the Loan Agreement or the Indenture, all such sums shall on notice and demand be paid by the Mortgagor, together with interest thereon at the Reimbursement Rate, and shall be a part of the Mortgage Indebtedness secured by this Mortgage; provided, however, that in any action or proceeding to foreclose this Mortgage or to recover or collect the Mortgage Indebtedness secured hereby, the provisions of law respecting the recovery of costs, disbursements and allowances shall prevail unaffected by this covenant.

SECTION 3.12    Other Liens.

(a)     Except for Permitted Encumbrances, the Mortgagor will not, except as provided by the Loan Agreement and except as described in (b) below, permit any lien, mortgage, security interest, encumbrance or claim to accrue or remain on such party's interest in the Property or any part thereof which may be superior to or on a parity with the lien or security interest of this Mortgage or which may be inferior or junior to the lien or security interest of this Mortgage.

(b)     In the event Parcel Three is legally subdivided, the Mortgagor may, but shall be under no obligation to, take the following actions:

(i)     cause to be executed, delivered and recorded in the Registry of Deeds of Plymouth County, Massachusetts, an amendment to this Mortgage, replacing the existing Property description with the Property description that excludes Parcel Three; and

(ii)     cause to be executed, delivered and recorded in the Registry of Deeds of Plymouth County, Massachusetts, a Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing against Parcel Three with substantially the same terms as this Mortgage, creating a first lien security interest in favor of and securing the Series 2011 B Bonds and creating a second lien security interest in favor of the Senior Bonds.

SECTION 3.13     Inspection of Property.   The Mortgagor will permit the Mortgagee, or any person or persons authorized by the Mortgagee, to enter and make inspections of the Property or any part thereof as provided in the Loan Agreement and to make, or cause to be made, any tests, including (without limitation) environmental tests, of the Property.

SECTION 3.14     Transfer of Property.   Except for Permitted Encumbrances and except as provided in Section 3.12(b), the Mortgagor will not encumber, transfer, sell, assign, lease, dispose of, or contract to transfer all or any part of its interest in the Property except as provided by the Loan Agreement.

SECTION 3.15     Easements, Restrictive Covenants, Zoning.   The Mortgagor will promptly perform and observe, or cause to be performed and observed, all of the terms, covenants and conditions of all instruments of record affecting such parties' interest in the Property, non-compliance with which may adversely affect the security of this Mortgage, and the Mortgagor shall do or cause to be done all things necessary to preserve intact and unimpaired any and all easements, appurtenances and other interests and rights in favor of, or benefiting any portion of, the Property.

Except for Permitted Encumbrances referred to in clauses (q) and (r) of the definition of Permitted Encumbrances, the Mortgagor shall not initiate, grant, join in, release or consent to any change in any restrictive covenant, easement, license, right-of-way (including the dedication of public highways) or any other public or private restriction limiting or defining the uses which may be made of the Property or any part thereof (other than Permitted Encumbrances) unless the Mortgagor shall furnish to the Trustee:

(a)     a certificate executed by the Authorized Officer of the Mortgagor, stating that (i) any such grant, consent, release or change will not cause or result in an Event of Default under the Loan Agreement or this Mortgage, (ii) as of the date of such request, no Event of Default under the Loan Agreement or this Mortgage or any event which, with the lapse of time or the giving of notice, or both, would constitute an Event of Default under the Loan Agreement or this Mortgage has occurred and is continuing, and (iii) such grant, release, consent or change will not adversely affect the revenue producing capability of the Property or deprive the Property of any real or personal property needed for the operation thereof; and

(b)     a certificate dated within 30 days preceding the date of such request of an Independent Architect or Independent Engineer to the effect that any such grant, consent, release, or change (i) will not destroy or materially impair the means of ingress to or egress from the Property, (ii) will not materially impair the use of the Property for its intended purposes, (iii) will not materially impair the value of the Property, and (iv) will not materially interfere with or impair the efficiency of operations then being conducted on the Property by the Mortgagor or any occupant of the Property.

Upon receipt of the foregoing, or upon receipt of documentation required in connection with any Permitted Encumbrance, the Trustee shall promptly execute and deliver any and all instruments necessary or appropriate in connection with the foregoing and as may be necessary to release the same from the lien of this Mortgage. All expenses in connection therewith shall be borne solely by the Mortgagor.

SECTION 3.16     Estoppel Certificate.  Within 10 days after any request by the Mortgagee, or any other proposed assignee of the Loan Agreement, the Mortgagor shall certify by a written statement to the requesting party signed by the Authorized Officer of the Mortgagor the then unpaid balance of the Mortgage Indebtedness and the existence of any offsets or defenses of which the Mortgagor has knowledge against the Mortgage Indebtedness secured hereby, and stating that, to its best knowledge as of the date of such certificate, no event or condition has happened or existed, or is happening or existing, which constitutes, or which, with notice or lapse of time, or both, would constitute, an Event of Default under the Loan Agreement or this Mortgage, or if any such event or condition has happened or existed, or is happening or existing, specifying the nature and period of such event or condition and what action the Mortgagor has taken, is taking, or proposes to take with respect thereto.

SECTION 3.17     Hazardous Materials; Contamination.  The Mortgagor agrees to (a) give notice to the Mortgagee immediately upon the Mortgagor acquiring knowledge of the presence of any Hazardous Materials on the Property in material violation of law or of any Hazardous Materials Contamination with a full description thereof; (b) promptly comply with any laws requiring the removal, treatment or disposal of such Hazardous Materials or Hazardous Materials Contamination and provide the Mortgagee with satisfactory evidence of such compliance; (c) provide the Mortgagee, within thirty (30) days after a demand by the Mortgagee, with a bond, letter of credit or similar financial assurance evidencing to the Mortgagee's satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of such Hazardous Materials or Hazardous Materials Contamination and discharging any Encumbrance which may be imposed on the Property as a result thereof; and (d) indemnify and hold harmless the Mortgagee from any and all claims, damages, suits, liability, orders for

cleanup or other matters, and all expenses, fees and other costs incurred in connection therewith, which may now or in the future (whether before or after the release of this Mortgage) be asserted as a result of the presence of any Hazardous Materials on the Property or any Hazardous Materials Contamination. The provisions of this Section 3.17 shall survive the release of this Mortgage.

SECTION 3.18    Prohibition on Hazardous Materials.    The Mortgagor shall not produce, create or dispose of, or permit to be produced, created or disposed of, on the Property any Hazardous Materials other than Hazardous Materials produced, created or disposed of by the Mortgagor in accordance with law in the ordinary course of operation of the Facility. The Mortgagor may place or store Hazardous Materials on the Property in the ordinary course of operation of the Facility only if such Hazardous Materials are placed or stored in accordance with all applicable federal, state, and local laws.

## ARTICLE IV
## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

SECTION 4.01    Events of Default.    Any of the following events shall be an "Event of Default" under this Mortgage:

(a)    an Event of Default occurs under the Loan Agreement or under any of the other Bond Documents; or

(b)    the Mortgagor fails to fully and promptly perform, comply with or observe any of the terms, covenants or agreements contained in Sections 3.03, 3.04 or 3.14 hereof; or

(c)    the Mortgagor fails to fully and promptly perform, comply with or observe any other term, covenant or agreement herein contained, and such failure remains unremedied for 30 days after written notice thereof shall have been given to the Mortgagor by the Mortgagee; provided, however, that if such failure is such that it cannot be corrected within 30 days, it shall not be an Event of Default hereunder if the Mortgagor is taking appropriate corrective action to cure such failure and if such failure will not impair the security for the Mortgagor's obligations under the Loan Agreement and this Mortgage.

SECTION 4.02    Remedies.    Upon the occurrence of an Event of Default, the Mortgagee may at any time thereafter exercise any of the following powers, privileges, discretions, rights and remedies, in addition to the powers, privileges, discretions, rights and remedies available to the Mortgagee (including, without limitation, acceleration of maturity) under the Loan Agreement or the Indenture:

(a)    Foreclosure.    The Mortgagee may recover judgment against the Mortgagor for the entire unpaid principal balance, accrued interest, and all other sums secured by this Mortgage; and neither recovery or judgment nor the levy of execution thereof on any property, including the Property, shall affect the Mortgagee's rights hereunder or the lien hereof. The Mortgagee may take possession of and sell the Property, or any part thereof requested by the Mortgagee to be sold, and proceed to sell the same at a foreclosure sale. In connection with any sale under this Mortgage, the Mortgagee may procure such title reports, surveys, tax histories and appraisals as they deem necessary, and all costs and expenses incurred in connection

therewith shall be payable by the Mortgagor or from the proceeds of sale. In case of any sale under this Mortgage, the Property may be sold as an entirety or in parcels, by one sale or by several sales, as may be deemed by the Mortgagee to be appropriate and without regard to any right of the Mortgagor or any other person to the marshalling of assets. In the event that the Property or any part thereof is advertised for sale as herein provided, but not sold pursuant to such advertisement, the Mortgagee shall be paid by the Mortgagor its actual expenses incurred. If, prior to or at the time of the sale, the Mortgagee shall deem it proper for any reason to postpone or continue the sale, it may do so from time to time, in which event advertisement of the postponed sale shall be in the manner as required by law. Upon the terms of such sale being complied with, the Mortgagee shall convey to the purchaser or purchasers (at their expense) the interest of the Mortgagor in the Property so sold, free and discharged of and from all estate, title or interest of the Mortgagor, at law or in equity, such purchaser or purchasers being hereby discharged from all liability to see to the application of the purchase money. The proceeds of such sale or sales under this Mortgage shall be held by the Mortgagee and applied as follows:

        (i)     First, to pay all costs, charges and expenses attending the execution of this trust or any sale made as aforesaid;

        (ii)     Second, to discharge all taxes, levies, and assessments on the Property, with costs and interest if they have priority over the lien of this Mortgage, including the pro rata amount thereof due for the current year;

        (iii)     Third, to discharge in the order of their priority, if any, (A) if Parcel Three has been subdivided and is sold separately from the Existing Facility Site, then the proceeds from the sale of the Existing Facility Site shall be applied FIRST, to Senior Parity Debt secured by this Mortgage, SECOND to the Series 2011 B Bonds and THIRD, to any other remaining debts and obligations secured by this Mortgage, and any liens of record inferior to this Mortgage with lawful interest, and the proceeds from the sale of Parcel Three shall be applied FIRST, on a parity basis to the Senior Parity Debt secured by this Mortgage, and the Series 2011 B Bonds, and SECOND, to any other remaining debts and obligations secured by this Mortgage, and any liens of record inferior to this Mortgage with lawful interest, and (B) if Parcel Three has not been subdivided FIRST, the Senior Parity Debt secured by this Mortgage, SECOND, the Series 2011 B Bonds secured by this Mortgage and THIRD any Subordinated Parity Debt and any other remaining debts and obligations secured by this Mortgage, and any liens of record inferior to this Mortgage with lawful interest; and

        (iv)     Last, to pay over to the Mortgagor or its assigns any residue of said proceeds provided, however, that the Mortgagee as to such residue shall not be bound by any inheritance, devise, conveyance, assignment or lien of or upon the Mortgagor's equity, without actual notice thereof prior to distribution.

Notwithstanding anything contained in this Section 4.02(a) to the contrary, any foreclosure shall be held in accordance with Massachusetts law.

(b) **STATUTORY POWER OF SALE**. Notwithstanding anything contained in this Mortgage to the contrary, this Mortgage is granted by the Mortgagor **WITH MORTGAGE COVENANTS**, and upon the **STATUTORY CONDITION**, and upon the further condition that all covenants and agreements of, and conditions imposed upon, the Mortgagor contained herein and in the Bond Documents and the other instruments and agreements evidencing or securing the Indebtedness and other obligations secured hereby shall be kept and fully performed, for any breach of which, Mortgagee or its successors or assigns shall have the **STATUTORY POWER OF SALE** in addition to any other remedy or remedies provided herein or at law or in equity. Upon any Event of Default in the performance or observance of the requirements of this Mortgage, Mortgagee or its successors or assigns, with or without entry, personally or by its agents or attorneys, may exercise the **STATUTORY POWER OF SALE** and sell the Premises or such portion thereof as may remain subject to this Mortgage in case of any partial release thereof, and all estate, right, title and interest, claim and demand therein at one or more sales as an entirety or in parcels, together with all improvements that may be thereon, and at such time and place upon such terms and after such notice thereof as may be required or permitted by law.

(c) <u>Receiver</u>. As a matter of right and to the extent permitted by law, without notice to the Mortgagor, and without regard to the adequacy of the security, and upon application to a court of competent jurisdiction, the Mortgagee shall be entitled to the immediate appointment of a receiver for all or any part of the Property, and of the rents, income, profits, issues and proceeds thereof and therefrom, whether such receivership be incidental to a proposed sale of the Property or otherwise, and the Mortgagor hereby consents to the appointment of such a receiver. Any amounts so received shall be applied (i) first, to pay all costs and expenses of so entering upon, taking possession of, holding, operating, maintaining, preserving and managing the Property or any part thereof including, but not in limitation of the foregoing, reasonable compensation to the attorneys, employees or agents of the Mortgagee or the Mortgagee or any receiver engaged or employed with regard thereto, (ii) second, to pay the cost and expense of all repairs, renewals, replacements, alterations, additions, betterments and improvements to or upon the Property or any part thereof, (iii) third, to pay any unpaid Administrative Expenditures, (iv) fourth, to pay all of the Mortgage Indebtedness and the Mortgagor's obligations under the Loan Agreement and this Mortgage in such order and manner as set forth in Section 7.04 of the Indenture, and (v) last, to pay the surplus, if any, to the Mortgagor or any person entitled thereto upon surrender and delivery to the purchaser or purchasers of the Property, and less the costs, if any, of obtaining possession. The Mortgagor will pay to the Mortgagee, upon demand, all expenses, including receiver's fees, reasonable attorneys' fees, court costs, agent's compensation, management fees and costs incurred in the repair, maintenance and operation of, or taking possession of, or selling, the Property, advanced by the Mortgagee and incurred pursuant to the provisions contained in this Section; and all such expenses shall be (A) a lien against the Property, (B) added to the Mortgage Indebtedness secured by this Mortgage, and (C) payable on demand with interest at the Reimbursement Rate from and including the date each such advance is made.

(d)　　Entry and Operation.　To the extent permitted by law, and with or without the appointment of a receiver, or an application therefor, the Mortgagee may enter upon, and take possession of (and the Mortgagor shall surrender actual possession of), the Property or any part thereof, without notice to the Mortgagor and without bringing any legal action or proceeding, or, if necessary by force, legal proceedings, ejectment or otherwise, and may remove and exclude the Mortgagor and its agents and employees and all other persons therefrom, and having and holding the same may make all necessary or proper repairs, replacements and useful or required alterations, additions, betterments or improvements to or upon the same, and operate, maintain, control, make secure, and preserve the same and receive all earnings, income, rents (including rents accrued and unpaid), and proceeds accruing with respect thereto or any part thereof, such earnings, income, profits, rents and proceeds being hereby assigned to the Mortgagee as additional security for the, repayment of the Mortgage Indebtedness.　In so doing, the Mortgagee shall have the right to manage the Property and to carry on the business of the Mortgagor and may exercise all of the rights and powers of the Mortgagor, either in the name of the Mortgagor or otherwise, including, but without limiting the generality of the foregoing, the right to lease the Property or any part thereof, to cancel, modify, renew or extend any lease or sublease of the Property or any part thereof and to complete the construction of any unfinished improvements. The Mortgagee shall not be liable for or by reason of any such taking of possession, entry, holding, removal, maintaining, operation, making secure or management, except for willful misconduct.　Any amounts so received by the Mortgagee shall be applied (i) first, to pay all costs and expenses of so entering upon, taking possession of, holding, operating, maintaining, preserving and managing the Property or any part thereof including, but not in limitation of the foregoing, reasonable compensation to the attorneys, employees or agents of the receiver engaged or employed with regard thereto, (ii) second, to pay the cost and expense of all repairs, renewals, replacements, alterations, additions, betterments and improvements to or upon the Property or any part thereof, (iii) third, to pay any unpaid Administrative Expenditures, (iv) fourth, to pay all of the Mortgage Indebtedness and the Mortgagor's obligations under the Loan Agreement and this Mortgage in such order and manner as set forth in the Indenture, and (v) last, to pay the surplus, if any, to the Mortgagor or any person entitled thereto upon surrender and delivery to the purchaser or purchasers of the Property, and less the costs, if any, of obtaining possession.　The Mortgagor shall pay on demand to the Mortgagee the amount of any deficiency between (A) the amounts so received by the Mortgagee and (B) all moneys paid or advanced and all costs and expenses incurred (including, without limitation, reasonable attorneys' fees and expenses) by the Mortgagee in exercising the rights provided in this paragraph, and the same shall bear interest at the Reimbursement Rate and shall be a part of the Mortgage Indebtedness secured hereby.　The exercise of the remedies provided in this subsection shall not cure or waive any Event of Default or notice of an Event of Default hereunder or invalidate any act done pursuant to such notice, and the enforcement of such remedies, once commenced, shall continue for as long as the Mortgagee shall elect, notwithstanding the fact that the exercise of such remedies may have, for a time, cured the original Event of Default.

(e)　　Uniform Commercial Code.　The Mortgagee may proceed under the Massachusetts Uniform Commercial Code as to all or any part of the Equipment Collateral and any other security granted hereunder and in conjunction therewith, to exercise all of the rights, remedies and powers of a secured party under the Massachusetts Uniform Commercial Code, including, without limitation, taking possession of the Equipment Collateral and other security without judicial process pursuant to Section 9-609 of the Massachusetts Uniform Commercial

Code to the extent permitted by such Massachusetts Uniform Commercial Code. Upon the occurrence of any Event of Default hereunder, the Mortgagor shall assemble all of the Equipment Collateral and such other security and make the same available within the Property or at any other location designated by the Mortgagee and reasonably convenient to the Mortgagee and the Mortgagor. Any notification required by Section 9-611 of the Massachusetts Uniform Commercial Code shall be deemed reasonable and properly given if mailed certified mail, return receipt requested, postage prepaid, by the Mortgagee to the Mortgagor at the address specified in Section 5.02 hereof at least 10 days before any sale or other disposition of the Equipment Collateral (or any of the other security granted hereunder), or any portion thereof. Disposition of the Equipment Collateral (or any of the other security granted hereunder), or any portion thereof, shall be deemed commercially reasonable if made pursuant to a public offering advertised at least twice in a newspaper generally circulating in the community where the Property is located.

(f)     [Reserved].

(g)     Other Remedies. The Mortgagee shall have the right from time to time to enforce any legal or equitable remedy against the Mortgagor and to sue the Mortgagor for any sums (whether interest, damages for failure to pay principal or any installments thereof, Taxes, or any other sums required to be paid under the terms of this Mortgage, as the same become due), without regard to whether or not the Mortgage Indebtedness or any other of the Mortgagor's obligations secured by this Mortgage shall be due, and without prejudice to the right of the Mortgagee thereafter to enforce any appropriate remedy against the Mortgagor, including any action of foreclosure, or any other action, including an action for specific performance, for a default or defaults by the Mortgagor existing at the time such earlier action was commenced. Nothing contained in this Mortgage shall preclude the Mortgagee from exercising or enforcing any rights it may now or hereafter have under or pursuant to any separate instrument of guaranty or any other document, instrument or agreement, or against any collateral or other property then held by the Mortgagee as security for the Mortgagor's obligations under the Loan Agreement or this Mortgage.

No action taken pursuant to this Section shall relieve the Mortgagor from any of the Mortgage Indebtedness for which it is responsible or any of the Mortgagor's obligations under the Loan Agreement or this Mortgage, all of which shall survive any such action, and the Mortgagee may take whatever action at law or in equity as may appear necessary and desirable to collect the payments and other amounts then due and thereafter to become due or to enforce the performance and observance of the Mortgagor's obligations under the Loan Agreement or this Mortgage.

Any amounts collected pursuant to action taken under this Section shall be paid over to the Mortgagee and applied to the Mortgage Indebtedness and the Mortgagor's obligations under the Loan Agreement and this Mortgage, as set forth in the Indenture.

SECTION 4.03     Remedies, etc. Cumulative. Each right, power and remedy of the Mortgagee as provided for in this Mortgage, or the Issuer as provided in the Loan Agreement or the Indenture, shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Mortgage or in any of the other Bond Documents, and the exercise or beginning of the exercise by the Mortgagee or the Issuer of any one or more of such

rights, powers or remedies shall not preclude the simultaneous or later exercise by the Mortgagee or the Issuer of any or all such other rights, powers or remedies.

SECTION 4.04      No Waiver, etc.  No failure or delay by the Mortgagee to insist upon the strict performance of any term, condition, covenant or agreement of this Mortgage or of any of the other Bond Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach, or preclude the Mortgagee from exercising any such right, power or remedy at any later time or times.  By accepting payment after the due date of any amount payable under this Mortgage or the Loan Agreement, the Mortgagee shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Mortgage or under the Loan Agreement, or to declare a default for failure to effect such prompt payment of any such other amount.  Neither the Mortgagor nor any other person now or hereafter obligated for the payment of the whole or any part of the Mortgage Indebtedness now or hereafter secured by this Mortgage shall be relieved of such obligation by reason of the failure of the Mortgagee to comply with any request of the Mortgagor or of any other person so obligated to take action to foreclose this Mortgage or otherwise enforce any of the provisions of this Mortgage or of any obligations secured by this Mortgage, or by reason of any agreement or stipulation between any subsequent owner or owners of the Property or any part thereof, or by the Mortgagee extending the time of payment or modifying the terms of this Mortgage, the Loan Agreement or the Indenture without first having obtained the consent of the Mortgagor or such other person, and in the latter event, the Mortgagor and all such other persons shall continue to be liable to make such payments according to the terms of any such agreement of extension or modification unless expressly released and discharged in writing by the Mortgagee.  Regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien on the Property, the Mortgagee may release the obligation of any person at any time liable for any of the Mortgage Indebtedness secured by this Mortgage or any part of the security held for the Mortgage Indebtedness and may extend the time of payment or otherwise modify the terms of this Mortgage, the Loan Agreement and the Indenture (upon compliance with any terms and conditions pertaining to such modifications which may be contained in any of such documents) without, as to the security or the remainder thereof, in any way impairing or affecting the lien or security interest of this Mortgage or the priority of such lien or security interest as security for the payment of the Mortgage Indebtedness as it may be so extended or modified over any subordinate lien.  The holder of any subordinate lien shall have no right to terminate any lease affecting the Property whether or not such lease be subordinate to this Mortgage.  The Mortgagee may resort for the payment of the Mortgage Indebtedness secured hereby to the Property or to any other security or collateral therefor held by the Mortgagee in such order and manner as the Mortgagee may elect.

## ARTICLE V
## MISCELLANEOUS

SECTION 5.01      Payment by Others.  Any payment of the Mortgage Indebtedness or any part thereof made in accordance with the terms of this Mortgage or of the Loan Agreement, by any subsequent owner of the Property or by any other person whose interest in the Property might be prejudiced in the event of a failure to make such payment, or by any stockholder, officer or director of a corporation which at any time may be liable for such

payment or may own or have such an interest in the Property, shall be deemed as between the Mortgagee for the benefit of the Issuer and all persons who at any time may be liable as aforesaid or may own or have an interest in the Property to have been made on behalf of such persons. Nothing herein contained shall be construed to give any such person any right of subrogation in and to this Mortgage or the Loan Agreement or the Indenture or all or any part of the Mortgagee's interest herein or therein, until all of the Mortgage Indebtedness shall have been paid in full.

SECTION 5.02     Notices. All notices, demands, requests, consents, approvals, certificates or other communications required under this Mortgage to be in writing shall be sufficiently given and shall be deemed given when personally delivered or mailed by registered or certified mail, postage prepaid, return receipt requested, or when sent by telegram or telex, addressed as follows:

| | |
|---|---|
| Mortgagee and Trustee: | WELLS FARGO BANK, NATIONAL ASSOCIATION<br>[Address] |
| Mortgagor: | LINDEN PONDS, INC.<br>c/o Erickson Living Management, LLC<br>701 Maiden Choice Lane<br>Baltimore, Maryland  21228<br>Attention:  General Counsel |
| *With a copy to:* | Herman B. Rosenthal, Esquire<br>Whiteford, Taylor & Preston L.L.P.<br>7 St. Paul Street<br>Baltimore, MD  21202-1636 |
| Issuer: | MASSACHUSETTS DEVELOPMENT FINANCE AGENCY<br>160 Federal Street<br>Boston, MA 02110<br>Attn.: Executive Director |

Any of the foregoing may, by notice given hereunder to each of the others, designate any further or different addresses to which subsequent notices, demands, requests, consents, approvals, certificates or other communications shall be sent hereunder.

SECTION 5.03     Successors and Assigns.   All of the grants, covenants, terms, provisions and conditions herein shall run with the Property and shall apply to, bind and inure to the benefit of the Mortgagor (including any permitted subsequent owner of the Property, or any portion thereof), and inure to the benefit of the Mortgagee, its successors and assigns, and to the successors in trust of the Mortgagee.

SECTION 5.04     Amendments. This Mortgage may be amended to the same extent and upon the same conditions that the Loan Agreement may be amended, as provided in Section 8.04 of the Indenture.

SECTION 5.05    Illegality.  If fulfillment of any provision hereof or any transaction related hereto or to the Loan Agreement or the Indenture, at the time performance of such provisions shall be due, shall involve transcending the limit of validity prescribed by law, then the obligation to be fulfilled shall be reduced to the limit of such validity; and if any clause or provision herein contained operates or would prospectively operate to invalidate this Mortgage in whole or in part, then such clause or provision only shall be void, as though not herein contained, and the remainder of this Mortgage shall remain operative and in full force and effect.

SECTION 5.06    Governing Law.  This Mortgage is being executed and delivered in the Commonwealth and shall be construed, governed and enforced in accordance with the laws in effect from time to time in the Commonwealth.

SECTION 5.07    Effective Date.  This Mortgage has been dated as of the date first above written solely for the purpose of convenience of reference and shall become effective upon the Closing Date.  All representations and warranties set forth herein shall be deemed to have been made on the Closing Date.

SECTION 5.08    Waiver of Jury Trial.  THE MORTGAGOR HEREBY VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR OTHERWISE RELATING TO THIS MORTGAGE.

SECTION 5.09    Amendment and Restatement.  This Mortgage is an amendment and restatement of a previously recorded mortgage securing obligations in the amount of $157,133,494.00.  The instant document reduces the maximum principal indebtedness secured to $_____.  The lien of this Mortgage is intended to relate back to the date of the Original Mortgage as to the real property secured thereby.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Mortgagor has executed, sealed and delivered this Mortgage and Security Agreement as of the Closing Date.


[SEAL]

ATTEST:                                          LINDEN PONDS, INC.


_____          By:    _____


STATE OF _____          )
                                                 ) ss.
_____ OF _____   )


    BE IT REMEMBERED, that on this ____ day of _____, 2011, before me, the subscriber, a Notary Public of the State of Maryland, personally appeared _____, who acknowledged himself to be the _____ of LINDEN PONDS, INC., a Maryland corporation, and that he, as such officer, being authorized to do so, executed the foregoing instrument for the purposes contained therein, by signing the name of the corporation by himself as the _____.


                                          _____
                                          Notary Public

EXHIBIT A

Property Description


AN ERICKSON RETIREMENT COMMUNITY
TOWNSHIP OF HINGHAM
PLYMOUTH COUNTY, MASSACHUSETTS


**PARCEL 1: (formerly South River, LLC and Gordon)**

Assessor's Parcel 166-1

That certain parcel of land with the buildings thereon located on Old Ward Street, in the Town of Hingham, County of Plymouth, Commonwealth of Massachusetts, shown as lot marked N/ F James Gordon Assessor's Map 166 Parcel 1 on a plan entitled "Subdivision Plan of Land in Hingham, MA", dated October 25, 1988, recorded with said Deeds in Plan Book 33, Page 223.

**PARCEL 2: (formerly South River, LLC and Estate of Margetts)**

Those certain parcels of land located off Whiting Street, in the Town of Hingham, County of Plymouth, Commonwealth of Massachusetts, being more particularly described follows:

Assessor's Parcel 154-6

SOUTHERLY AND WESTERLY: by land now or formerly of the heirs of Samuel French;

NORTHERLY: by land now or formerly of Abigail Cobb, and

EASTERLY: by land formerly of the heirs of David B. Lovell.

Said parcel includes therein all of Assessor Parcel 165-1 and contains 7 acres, more or less.

Parcels 165-3,165-4, and 165-6

Three parcels situated to the north of Whiting Street in Hingham, consisting approximately of 5.44 acres, 5.82 acres and 8.71 acres respectively, and designated on the Hingham Assessor's Plan as Parcels 165.3, 165.4 and 165.6 respectively; also being designated on the records of the Hingham Collector of Taxes as Parcels 165-003, 165-004, and 165-006 respectively. Being a portion of the real estate devised to John H. Rooney by will of John A. Rooney, Suffolk Probate No. 300777.

Parcel 165-11

A certain parcel of woodland situated in Hingham, in the County of Plymouth and Commonwealth of Massachusetts, containing eight (8) acres more or less, bounded Westerly by land of Richard Hulman as the fence now stands, as far as there is a fence thence in a straight line over a ledge of rock, which has been substituted for a fence to the fence standing near the Northwesterly end of said ledge, thence Northerly by land quitclaimed in 1845 by deed, recorded at Norfolk Registry, by line of Janice Humphrey, late of Weymouth deceased, to her daughter Mary Bates, by a straight line as the same is marked by monuments, stake or fence, thence Easterly by land now or late of Josiah E. Rice deceased and by land now or late of Josiah Lane deceased, thence Southerly by land quitclaimed by deed in 1845 recorded as aforesaid, by heirs of Janice Humphrey aforesaid to her daughter Anna Vinins as the same is marked by fence, monuments or stakes.

Parcel 165-12

The land in Hingham, Plymouth County, Massachusetts being located northerly of Whiting Street, containing approximately 6.35 acres and being bounded by lands of owners unknown and shown on Hingham Assessor's records as Lot 165-12.

**PARCEL 3: (formerly South River, LLC and Hall)**

All those certain parcels of unregistered land with the buildings thereon situated off the westerly side of Old Ward Street, in the Town of Hingham, County of Plymouth, State of Massachusetts, and is more particularly described as follows:

Assessor's Parcel 154-5

WESTERLY: by land now or formerly of Arthur B. Maynard and the Weymouth/ Hingham town boundary line;

NORTHERLY: by Plymouth River and land of Arthur B. Maynard;

EASTERLY: by land now or formerly of Frank W. and Marie P. Weaver;

SOUTHERLY: by a stone wall and land of owner unknown.

Containing 8.19 acres, more or less.

**PARCEL 4: (formerly Hingham Land, LLC and Skye)**

Parcels 165-5 and 165-13

All those certain parcels of land with the buildings thereon situated off Whiting Street (Route 53), in the Town of Hingham, County of Plymouth, State of Massachusetts, and is

more particularly described as Parcels 165-5 and 165-13 on the Hingham Assessor's Map and consisting approximately of 5.99 acres and 4.72 acres.

**PARCEL 5:   (formerly Hingham Land, LLC and Heirs of Loring Pratt/ Victor H. King)**

Assessor's parcel 165-2 on the Town of Hingham Assessor's Map and containing approximately 7.15 acres.

**PARCEL 6: (formerly Hingham Campus, LLC and Jancaterino)**

Parcel 165-7

A certain parcel of unregistered land with all buildings and improvements thereon, situated in Hingham, Plymouth County, Massachusetts shown as "Lot B" (6.59 acres) on a plan entitled "Plan of Land Whiting Street Hingham, Massachusetts" prepared for Thomas A. Welch, dated April 4, 1986, prepared by Perkins Engineering Inc., recorded with Plymouth County Registry of Deeds as Plan Number 535 of 1986 in Plan Book 27, Page 177.

Together with another certain parcel of unregistered land with all buildings and improvements thereon, situated in Hingham, Plymouth County, Massachusetts shown as "Lot A 1" (14,690 SF) on a plan entitled "Plan of Land Whiting Street Hingham, Massachusetts" prepared for Thomas A. Welch, dated April 4, 1986, prepared by Perkins Engineering Inc., recorded with Plymouth County Registry of Deeds as Plan Number 535 of 1986 in Plan Book 27, Page 177.

Parcels 165-16 and 165-17

Two (2) certain parcels of registered land with all buildings and improvements thereon, situated in Hingham, Plymouth County, Massachusetts shown as Lot "7" and Lot "8" on a plan entitled "Subdivision Plan of Land in Hingham" prepared by Perkins Engineering, Inc., dated September 25, 1979, on file with the Plymouth County Registry District of the Land Court as Plan 32564D.

**PARCEL 7: (formerly Hingham Land, LLC and Cashman)**

PARCEL A

Parcels 165-18 and 165-19

Two (2) certain parcels of registered land with all buildings and improvements thereon, situated in Hingham, Plymouth County, Massachusetts shown as Lot "9" and Lot 10" on a plan entitled "Subdivision Plan of Land in Hingham" prepared by Neponset Valley

Survey Assoc., Inc., dated April 18, 1995, on file with the Plymouth County Registry District of the Land Court as Plan 32564E filed with Certificate No. 44775.

PARCEL B

Parcel 165-8

A certain parcel of recorded land with all buildings and improvements thereon, situated in Hingham, Plymouth County, Massachusetts shown as "Lot A" (43,560 S.F. or 1.00 AC) on a plan entitled "Subdivision Plan of Land in Hingham, MA" prepared for Jay M. Cashman, dated October 25, 1988, prepared by Neponset Valley Survey Assoc. Inc., recorded with the Plymouth County Registry of Deeds at Plan Book 33, Page 223.

**EASEMENT PARCEL:**

Together with the rights and appurtenant easements granted in Easement Agreement for Recharge System and Appurtenances by and between Hillshire Realty Corp., Maxx LLC and Hingham Campus, LLC dated July 21, 2003, and recorded with said Deeds on July 31, 2003 as Instrument No. 165348 in Book 26019, Page 29.

Together with the rights and appurtenant easements granted in Hingham Municipal Light Plan Electrical Distribution System Grant of Easement by E.L. Margetts & Sons, Inc., to the Town of Hingham and to CNL Retirement ER4, LP dated December 6, 2005 and recorded in Book 32206, Page 272.

**PERIMETER DESCRIPTION:**

All of the above land is further described by ALTA/ ACSM SURVEY entitled "Land Title Survey Plan of Lots at Whiting Street and Old Ward Street in Hingham, MA" dated July 29, 2003 scale 1" = 100' as follows:

That certain of land located in the Town of Hingham, County of Plymouth, State of Massachusetts, shown on a plan entitled "Plan of Lots at Whiting Street and Old Ward Street in Hingham, MA, and being more fully described as follows:

BEGINNING AT A POINT, said point being the Northerly Sideline of Whiting Street and the centerline of Old Ward Street said point being the southeast corner of said lot

Thence, along Whiting Street N 39° 24'23" W for a distance of 543.40 feet to a point;

Thence, along Whiting Street along a curve to the left having a radius of 1262.28 feet, for an arc length of 306.54 feet to a point;

Thence, along Whiting Street N 53° 19'03" W for a distance of 293.67 feet to a point;

Thence, along Whiting Street N 50° 38'58" W for a distance of 418.70 feet to a point;

Thence, N 12° 36'49" E for a distance of 140.60 feet to a point;

Thence, N 12° 53'39" E for a distance of 114.41 feet to a point;

Thence, N 29° 19'49" E for a distance of 133.41 feet to a point;

Thence, N 26° 38'05" W for a distance of 59.70 feet to a point;

Thence, N 27° 27'36" W for a distance of 262.33 feet to a point on a stone wall;

Thence, along a stone wall N 72° 54'25" W for a distance of 12.36 feet to a point;

Thence, along a stone wall N 81 ° 56'31" W for a distance of 22.23 feet to a point;

Thence, Westerly by a stone wall for a distance of 689 feet more or less to a point on the Hingham - Weymouth town line;

The last eight courses bounded westerly and southerly by land now or formerly owned by Joseph Crugnale;

Thence, along the Hingham - Weymouth town line N 05° 57'35" E for a distance of 1446 feet more or less to a point on the centerline of the Plymouth River;

Thence, Easterly by the centerline of the Plymouth River for a distance of 2,206 feet more or less to a point;

Thence, Easterly by land now or formerly of Robert D. Margetts for a distance of 1,125 feet more or less to a point on the centerline of Old Ward Street;

Thence, Southwesterly by the centerline of Old Ward Street for a distance of 890 feet more or less to a point;

Thence, S 31 ° 33'14" W for a distance of 233.01 feet to a point;

Thence, S 37° 29'26" W for a distance of 166.64 feet to a point;

Thence, S 25° 12'15" W for a distance of 306.47 feet to a point;

Thence, S 64° 39'01" W for a distance of 234.77 feet to a point;

Thence, S 26 ° 39'08" W for a distance of 243.44 feet to the POINT OF BEGINNING.

CONTAINING: 108.5 acres of land, more or less.

**TABLE OF CONTENTS**

**Page**

Section

ARTICLE I        DEFINITIONS AND CONSTRUCTION ..........................................7

    Section 1.01        Definitions ...............................................................7

    Section 1.02        Rules of Construction ............................................19

ARTICLE II        REPRESENTATIONS AND WARRANTIES ................................19

    Section 2.01        General..................................................................20

    Section 2.02        Warranty of Title ..................................................20

    Section 2.03        Purpose of Loan....................................................20

    Section 2.04        Tax Assessments ..................................................20

    Section 2.05        Hazardous Materials .............................................20

ARTICLE III        COVENANTS AND AGREEMENTS ...........................................20

    Section 3.01        Payment and Performance of Mortgagor's Obligations.........20

    Section 3.02        Further Assurances ...............................................20

    Section 3.03        Insurance...............................................................21

    Section 3.04        Taxes.....................................................................21

    Section 3.05        Condemnation........................................................22

    Section 3.06        Damage and Destruction; Condemnation, Application of Proceeds ...........................................................22

    Section 3.07        Additions to Security ............................................23

    Section 3.08        Subrogation of Mortgagee .....................................23

    Section 3.09        Security Agreement; Filing ...................................23

    Section 3.10        Right to Perform ...................................................24

    Section 3.11        Expenses ...............................................................24

    Section 3.12        Other Liens ...........................................................24

    Section 3.13        Inspection of Property ..........................................25

    Section 3.14        Transfer of Property..............................................25

    Section 3.15        Easements, Restrictive Covenants, Zoning ...........25

    Section 3.16        Estoppel Certificate ..............................................26

    Section 3.17        Hazardous Materials; Contamination ...................26

    Section 3.18        Prohibition on Hazardous Materials ......................27

# TABLE OF CONTENTS

Cont'd.

**Page**

ARTICLE IV      EVENTS OF DEFAULT; RIGHTS AND REMEDIES ...................27

    Section 4.01      Events of Default ....................................................27

    Section 4.02      Remedies ...............................................................27

    Section 4.03      Remedies, etc..........................................................31

    Section 4.04      No Waiver, etc ........................................................31

ARTICLE V      MISCELLANEOUS ................................................32

    Section 5.01      Payment by Others ..................................................32

    Section 5.02      Notices ...................................................................33

    Section 5.03      Successors and Assigns ...........................................33

    Section 5.04      Amendments...........................................................33

    Section 5.05      Illegality.................................................................33

    Section 5.06      Governing Law .......................................................34

    Section 5.07      Effective Date.........................................................34

    Section 5.08      Waiver of Jury Trial ...............................................34

    Section 5.09      Amendment and Restatement...................................34

EXHIBIT A - Property Description

SCHEDULE 1 - Approved Independent Construction Consultants

\30093580.6