Vincent P. Slusher, State Bar No. 00785480
vince.slusher@dlapiper.com
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano, NY Bar No. 2286144
thomas.califano@dlapiper.com
George B. South, NY Bar No. 2446771
george.south@dlapiper.com
Jeremy R. Johnson, NY Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

J. Mark Chevallier, State Bar No. 04189170
mchevallier@mcslaw.com
James G. Rea, State Bar No. 24051234
jrea@mcslaw.com
McGUIRE, CRADDOCK & STROTHER, P.C.
3550 Lincoln Plaza
500 N. Akard St.
Dallas, Texas 75201
Telephone: (214) 954-6800
Facsimile: (214) 954-6850

Martin T. Fletcher, MD Bar No. 07608
mfletcher@wtplaw.com
Stephen F. Fruin, MD Bar No. 08456
sfruin@wtplaw.com
Thomas J. Francella, Jr., DE Bar No 3835
tfrancella@wtplaw.com
WHITEFORD, TAYLOR AND PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
Telephone: (410) 347-8700
Facsimile: (410) 752-7092

Proposed Attorneys for Hingham Campus, LLC,
Debtor and Debtor in Possession

Proposed Attorneys for Linden Ponds, Inc.,
Debtor and Debtor in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case Nos. 11-33913 and 11-33912** |
| | § | |
| **LINDEN PONDS, INC. and** | § | **Chapter 11** |
| **HINGHAM CAMPUS, LLC** | § | |
| | § | **Joint Administration Pending** |
| **Debtors.** | § | |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c); AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors"), by their proposed attorneys, hereby move (the "Motion") this Court for entry of an interim order (the "Interim Order") and a final order (the "Final Order", collectively with the Interim Order, the "DIP Orders"): (i) authorizing the Debtors to obtain postpetition financing on a senior secured

superpriority basis pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"); (ii) scheduling a final hearing pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## Summary of Relief Requested

1.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs. In addition, the Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize. Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs. Absent postpetition financing and the use of cash collateral, the Debtors will be forced to cease operations of their business, thereby jeopardizing their ability to maximize the value of their estates. Such an abrupt cessation of the business would have devastating effects on the residents of the communities, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRC (defined below) in a complete state of disarray. Due to the nature of the Debtors' business and the impact that prolonged chapter 11 cases would have on the Debtors' residents, it is imperative that the Debtors have the necessary cash on hand to successfully reorganize as quickly as possible.

2.     To obtain postpetition financing, the Debtors engaged in good faith and arms-length negotiations with Redwood Capital Investments, LLC or its designee (the "DIP Lender"), as well as with Wells Fargo Bank, N.A., as successor trustee to Manufacturers and Traders Trust Co. (the "Bond Trustee") pursuant to that certain Trust Indenture dated as of July 1, 2007 (the "Indenture") between Massachusetts Development Finance Agency (the "Issuer") and the Bond

Trustee and certain holders of the outstanding bonds (the "2007 Bonds") issued pursuant the Indenture (the "Consenting Holders").  On June 8, 2011, the Debtors and the Consenting Holders entered into a Restructuring, Lockup, Plan Support and Forbearance Agreement (the "Lockup Agreement") pursuant to which, among other things, the Bond Trustee and the Consenting Holders consented to the DIP Facility as well as to the Debtors' use of the Bond Trustee's cash collateral.  The Consenting Holders were provided with the opportunity to provide the Debtors with debtor-in-possession financing but declined to do so.

3.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, below are the essential terms of the Facility.[1]  The Debtors submit that these terms are customary and reasonable for financing of this type.[2]

**Borrowers:**  Linden Ponds, Inc. ("Linden") and Hingham Campus, LLC ("Hingham"), as debtors and debtors in possession under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code").

**Lender:**  The DIP Lender or its designee.

**DIP Facility:**  A revolving credit facility made available to the Linden Ponds in a principal amount of up to $6,000,000 (the "DIP Facility") of which up to $1,000,000 (the "Interim DIP Amount") shall be available during the period from the Closing Date (as defined below) through the entry of the final order approved on a final basis (the "Final Order", with the interim order being referred to herein as the "Interim Order" and the Final Order and the Interim Order being referred to herein collectively as the "DIP Orders") by this Court approving the Facility.  The DIP Facility amount in excess of the Interim DIP Amount shall not be available unless and until the Final Order is in full force and effect, final, non-appealable and not subject to a stay.  All loans outstanding under the Facility (the "Loans"), and unless provided otherwise in the loan documentation, other obligations under the Facility, shall become due and payable on the Maturity Date (as defined below).  On a business day and on two (2) business days written notice, and not more

---

[1] All capitalized terms herein, but not otherwise defined, shall have the meanings ascribed to them in the DIP Loan Agreement.

[2] To the extent the following summaries and descriptions in this Motion conflict with the express provisions of the DIP Loan Agreement and Interim Order, as applicable, the express provisions of the DIP Loan Agreement and Interim Order shall control.

frequently than twice per calendar week, Linden Ponds shall be permitted to request a borrowing under the DIP Facility.

**Maturity Date:** The maturity date ("<u>Maturity Date</u>") shall be the earlier to occur of (i) November 8, 2011; or (ii) the effective date of a plan of reorganization under chapter 11 of the Bankruptcy Code in these chapter 11 cases, unless converted to a new post-bankruptcy exit facility at the request of the Borrowers, in the sole and absolute discretion of the DIP Lender and with consent of at least 40% of the principal amount of the 2007 Bonds outstanding; or (iii) the occurrence of an event of default under the DIP Loan Agreement (including, without limitation, failure to meet a Milestone (defined below) within the time required).

Any conversion, dismissal or confirmation order entered in these Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrowers to the DIP Lender under the DIP Facility and any loan documents, other than after the payment in full and in cash on or before the effective date of a plan of reorganization.

**Purpose/Use of Proceeds:** Proceeds of the Loans under the DIP Facility will be used solely in accordance with the cash flow projections of Linden Ponds showing anticipated cash receipts and disbursements on a weekly basis for the periods as required under the loan documentation and in form and substance satisfactory to the DIP Lender (the "<u>Budget</u>"), which will consist of the following payments: (i) to pay interest, fees and expenses in respect of the DIP Facility to the DIP Lender in accordance with the DIP Facility loan documentation; (ii) to fund the postpetition operating expenses of Linden Ponds incurred in the ordinary course of business; and (iii) to pay certain other costs and expenses of administration of these chapter 11 cases including, without limitation, adequate protection payments, if any, required by any cash collateral order entered in these cases. A copy of the initial Budget is attached hereto as <u>Exhibit B</u>.

**Rate:** The Loans will bear interest at the Applicable Margin plus the LIBOR Rate, payable at the end of the relevant interest period.

"<u>LIBOR Rate</u>" means the greater of (i) 2.5%; or (ii) the then current LIBOR Rate for interest periods of one month.

"<u>Applicable Margin</u>" means 2.5% per annum.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

**Default Rate:** Effective immediately upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Agreement), Loans

will bear interest at an additional 3% per annum.

**Unused Line Fee:** From and after the Closing Date, a non-refundable unused commitment fee of .5% per annum will accrue as a percentage of the daily average unused portion of the DIP Facility (whether or not then available), payable monthly in arrears and on the Maturity Date.

**Upfront Commitment Fee:** On the Closing Date, Linden Ponds shall pay a fee of $50,000.

**Optional Commitment Reductions:** Linden Ponds may permanently and irrevocably reduce the commitments under the DIP Facility upon at least five business days' notice; provided that each such reduction shall be in an amount of $250,000 or multiples of $250,000 in excess thereof and any mandatory prepayment resulting from such reduction shall have been made.

**Mandatory Repayments:** Mandatory repayments of the Loans under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales (including, without limitation, a sale of all or substantially all of the Borrowers' assets), (ii) 100% of extraordinary receipt proceeds, (iii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business and (iv) 100% of insurance and condemnation proceeds, in each case received by the Borrowers. Mandatory repayments shall result in a permanent reduction of the DIP Facility and in no event shall such mandatory repayments exceed the obligations owing under the DIP Facility.

**Voluntary Prepayments:** Upon three (3) business days written notice and not more frequently than once per calendar week, permitted in whole or in part, with prior written notice but without premium or penalty, subject to limitations as to minimum amounts of prepayments and customary indemnification. Such repayments shall only be in increments of $250,000.

**Repayment at Maturity** The DIP Facility will be repaid in full at the Maturity Date.

**Priority:** Subject to the Carve Out (as defined below), all amounts owing by the Borrowers under the DIP Facility shall be joint and several as to each Borrower and (a) will be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing the 2007 Bonds and all other existing secured credit facilities, bonds and other indebtedness of the Borrowers (the "Existing Facility")

pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Borrowers, whether consisting of real, personal, tangible or intangible property (including, without limitation, property held by others, all of the outstanding shares of capital stock of the Borrowers' subsidiaries, all Initial Entrance Deposits and all other entrance deposits (whether existing or new) (collectively, the "IEDs"), and all other accounts of the Borrowers (which for avoidance of doubt shall not include any account held or controlled by the Bond Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account), and all proceeds and products of all of the foregoing (collectively, the "Collateral," described more fully below). The relative priority of all amounts owed under the DIP Facility will be subject only to a carve-out for (i) the Borrowers' professional fees incurred in these chapter 11 cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the DIP Facility was received plus $250,000, (ii) other professional fees and expenses incurred in the Chapter 11 Cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the Facility was received plus $150,000, (iii) the payment of fees pursuant to 28 U.S.C. § 1930 and (iv) costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of these chapter 11 cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $100,000 (collectively, the "Carve-Out"). Nothing in the DIP Loan Agreement shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in these chapter 11 cases.

No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of the DIP Lender's liens or in any way that is materially adverse to the DIP Lender's rights under the DIP Facility.

All of the liens described herein shall be effective and perfected as of the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Separate Cash Accounts:**

The proceeds of the DIP Facility and all other cash from operation of the Borrowers during the period in which the Facility is in place shall be maintained in one or more segregated accounts over which the DIP Lender shall have a Lien as described above.

The IEDs currently held in a separate account (the "Segregated IED

Account") at JPMorgan Chase Bank, N.A., which IEDs are expected to be transferred into a separate escrow account following the commencement of these chapter 11 cases and approval by this Court (the "IED Escrow Account") shall continue to be maintained in one of such accounts.  The DIP Lender shall maintain a security interest and first priority lien in the proceeds of the Segregated IED Account or the IED Escrow Account, as applicable, subject only to the Carve-Out and rights of the residents pursuant to any agreement or order requiring the Borrowers to escrow or segregate such IEDs for the benefit of the residents.

The Borrowers shall also enter into an account control agreement immediately with respect to any account as and when directed by the DIP Lender.

**Collateral:**  All amounts owing by the Borrowers under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, subject only to the Carve-Out and all other prepetition perfected and unavoidable security interests. The DIP Lender shall have a first priority lien as described in the "Priority" section above on all Collateral. For avoidance of doubt Collateral shall not include any account held or controlled by the Bond Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account.

Collateral shall not include avoidance actions first arising on the Petition Date, but shall include avoidance actions to the extent such avoidance actions could be commenced pursuant to Section 549 of the Bankruptcy Code or a similar claim relating to property that had been Collateral or proceeds or product of Collateral at any time during these chapter 11 cases.

The DIP Facility shall be joint and several obligations of each Borrower and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise.  The Borrowers shall waive and the DIP Order shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory.  In the event of foreclosure, all lenders will be subrogated to the rights of the DIP Lender.

In the event the Debtors have ceased to prosecute the confirmation of the Plan (substantially in the form attached to the Lockup Agreement or as filed in the first day pleadings), in good faith, the DIP Lender shall reserve the right, in consultation with the Borrowers, to retain expert consultants and financial advisors at the expense of the Borrowers, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Borrowers and the value of the Collateral.

**Adequate Protection:** The Consenting Holders have consented to the DIP Facility pursuant to the Lockup Agreement subject to entry of that certain Cash Collateral Order attached thereto granting the Bond Trustee on behalf of the holders of the 2007 Bonds adequate protection in respect of the DIP Facility and for the use of cash collateral (the "Cash Collateral Order").

**Cross-collateralization Protections** The Interim Order and Final Order will contain provisions allowing for joint and several liability between the Borrowers and the ability to seek collection from any and all Collateral.

**Conditions Precedent to the Closing:** The DIP Loan Agreement contains conditions to the closing of the DIP Facility customarily found in loan agreements for similar debtor in possession financings, including, without limitation, the following conditions:

- All fees and expenses (including reasonable fees and expenses of counsel) required to be paid to the DIP Lender on or before the Closing Date shall have been paid and the Borrowers shall fund a $150,000 deposit to cover such fees and expenses as described in the Section entitled "Expenses" below.

- All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the DIP Lender.

- The DIP Lender shall have received and approved the Budget, which shall include the items set forth in "Use of Proceeds" and any changes or amendments to the Budget.

- Linden Ponds shall have entered into an amendment of that certain Management Agreement and Marketing Agreement dated January 31, 2009 by and between Linden Ponds and Erickson Retirement Communities, LLC ("ERC") as previously amended (the "Existing Management Agreement") and/or the Transitional Subcontract effective April 30, 2010 among ERC, Erickson Living Management, LLC ("Erickson"), Linden Ponds and the Trustee, as previously amended (the "Transitional Subcontract") as applicable

that: (a) provides that such amendment will be effective only in the event the Borrowers commence the Chapter 11 Cases, enter into the Facility and obtain approval from this Court to do so on a final basis; (b) provides for an amendment of the term of the Existing Management Agreement from month-to-month to a term coterminous with the Facility, and (c) provides for a termination fee not to exceed $900,000 (the "Termination Fee") as liquidated damages and not as a penalty, if (i) Linden Ponds executes an agreement with any entity other than Erickson, under which such entity is engaged by Linden Ponds to provide management services to Linden Ponds; or (ii) the Existing Management Agreement terminates for any reason and, at the effective time of such termination, a replacement management agreement in substantially the form of the Management and Marketing Agreement attached to the Lockup Agreement (the "New Management Agreement") has not been fully executed. Notwithstanding the foregoing, the Termination Fee shall not be paid to Erickson if: (A) at the time the Termination Fee would otherwise be payable pursuant to the preceding sentence, Erickson has materially breached any provision of (x) the Transitional Subcontract or the Existing Management Agreement, or (y) any agreement related to the DIP Facility, and has in either case received written notice from Linden Ponds specifying such material breach, *provided, however*, that Linden Ponds shall subsequently pay any Termination Fee to Erickson that would otherwise have been due but for this subsection (A) if Erickson cures such breach in accordance with any applicable cure provisions in the Transitional Subcontract, the Existing Management Agreement or the applicable document relating to the DIP Facility (as the case may be); or (B) at the time the Termination Fee would otherwise be payable pursuant to clause (ii) of the preceding sentence, Linden Ponds has executed, but Erickson refuses to execute the New Management Agreement.

- On or prior to entry of a Final Order, Linden Ponds shall have obtained an order from the Bankruptcy Court approving Linden Ponds' assumption of the Existing Management Agreement, as amended.

**Conditions Precedent to Each Loan:** On the Closing Date and the funding date of each Loan, the following conditions precedent shall have been satisfied:

- Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to the DIP Lender in its sole and absolute discretion;

- The Interim Order or Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified,

amended, stayed for a period of five business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender;

- The Borrowers use of the proceeds is consistent with the Budget;

- There shall exist no default under the DIP Loan Agreement; and

- The representations and warranties of the Borrowers shall be true and correct immediately prior to, and after giving effect to, funding.

**Representations and Warranties:**

The DIP Loan Agreement contains representations and warranties customarily found in loan agreements for similar debtor in possession financings, including, without limitation, with respect to: valid existence, requisite power, due authorization, no conflict with agreements or applicable law, enforceability of loan documentation, accuracy of financial statements and all other information provided, compliance with law, absence of material adverse change, no default under the loan documentation (except as specified), absence of material litigation, absence of liens on assets (except as specified), ownership of properties and necessary rights to intellectual property, no burdensome restrictions, inapplicability of Investment Company Act, compliance and continued effectiveness of the applicable Order.

**Affirmative, Negative and Financial Covenants:**

The DIP Loan Agreement contains affirmative, negative and financial covenants appropriate to the transaction, including, without limitation, the following:

- The DIP Orders shall prohibit and the Borrowers shall waive the claims arising under Bankruptcy Code section 506(c) against the DIP Lender or the DIP Facility or the commencement of other actions adverse to the DIP Lender or its rights and remedies under the DIP Facility.

- Compliance with total net cash flow of the Budget, reported weekly and tested every second week on a rolling four week basis (subject to certain variances).

- Certain additional financial covenants.

- Delivery to DIP Lender each month of the Borrower's rolling 13-week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior monthly period) in

form and substance reasonably satisfactory to the DIP Lender.

- Unless superseded by the New Management Agreement, Borrowers shall not be in default under, or, except for the amendments described above, seek to reject or terminate, or seek to renegotiate materially or otherwise repudiate (i) the Existing Management Agreement, or (ii) the Transitional Subcontract Agreement.

- The Borrowers shall not take any action which is inconsistent with consummation of the Plan.

Certain Affirmative Covenants – The Borrowers shall:

- Deliver weekly updates of the cash flow forecast and weekly variance reports;

- Deliver monthly updates by the Borrowers with respect to asset sales, cost savings, construction progress, and other matters reasonably requested by the DIP Lender;

- Deliver to the DIP Lender as soon as practicable the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Lender), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

- Obtain, prior to entry of the Final Order, Bankruptcy Court approval of Linden Ponds' assumption of the Existing Management Agreement (as amended as described above);

- Comply with Milestones set forth below with respect to these chapter 11 cases;

- Comply with additional reporting requirements reasonably requested by the DIP Lender; and

- Provide access to the DIP Lender for information (including historical information) and personnel, including, without limitation, regularly scheduled meetings with the Borrowers and their advisors.

Certain Negative Covenants – the Borrowers shall be barred from:

- Creating or permitting to exist any liens or encumbrances on any

assets, other than liens securing the DIP Facility and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date and liens described in the Cash Collateral Order) and other liens described in "Priority" above;

- Creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lender under the DIP Facility, except for the Carve-Out and liens of the DIP Lender;

- Disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363 or otherwise) out of the ordinary course of business or in excess of $250,000;

- Modifying or altering (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code;

- Asserting any right of subrogation or contribution against any of the Borrowers until all borrowings under the DIP Facility are paid in full and the commitments thereunder are terminated;

- Paying amounts not within the Budget (subject to the variances allowed) without the DIP Lender's consent;

- Making any material investment in excess of $50,000 (subject to the variances allowed above) not approved in the Budget without the DIP Lender's consent; and

- Revise or otherwise amend the Plan (unless such Plan amendment is permitted under the Lockup Agreement) without the DIP Lender's consent, or pursue a plan of reorganization materially different than the Plan (unless such plan is permitted under the Lockup Agreement).

**Milestones:**   Within one business day of the Petition Date, the Borrowers shall have filed the Plan (or a plan modified as permitted under the Lockup Agreement) and accompanying Disclosure Statement (each of which shall have been approved by the DIP Lender provided that the form of Plan and Disclosure Statement attached to the Lockup Agreement shall be deemed approved by the DIP Lender);

An Interim Order acceptable to the DIP Lender must have been entered by Bankruptcy Court within ten days of the Petition Date, or

such later date as may be agreed upon;

A Final Order acceptable to the DIP Lender must have been entered by the Bankruptcy Court and not stayed pending appeal, within thirty days of the Petition Date, and such order shall become a final order no longer subject to any appeal that may have a material adverse impact on the rights or interests of the DIP Lender, within forty-five days of the Petition Date;

The joint hearing on the Disclosure Statement and Confirmation shall have been set within one hundred twenty (120) days of the Petition Date; and

The Borrowers shall otherwise comply with the provisions of the Lockup Agreement and within the time prescribed in the Lockup Agreement .

**Events of Default:** The DIP Loan Agreement contains events of default customarily found in loan agreements for similar debtor in possession financings, including, without limitation, failure to make payments when due; termination of, or any act to assign, sell or terminate, the Borrowers' management contracts, unless for the purpose of implementing a New Management Agreement with Erickson or except for actions necessary to implement the amendments described above; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; impairment of loan documentation or security; change of ownership or control; dismissal of either of these chapter 11 cases or conversion of either case to a chapter 7 case; appointment of a chapter 11 trustee; judgment against the Borrowers or an affiliate in an amount to be determined by the DIP Lender; appointment of a responsible officer or examiner with enlarged powers beyond those set forth in Section 1106(3) and (4) of the Bankruptcy Code; granting of relief from the automatic stay to permit foreclosure on assets of the Borrowers (other than "<u>friendly foreclosures</u>" agreed to by the Borrowers and the applicable lender, as agreed to by the DIP Lender) or that would otherwise have a material adverse affect on the Borrowers or their businesses; entry of an order granting any super-priority claim which is senior or pari passu with the DIP Lender's claims under the DIP Facility; entry of an order without the prior consent of the DIP Lender, or the Borrowers otherwise agreeing to incur indebtedness, other than trade debt in the ordinary course of the Borrowers' businesses or under the DIP Facility; entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying either of the DIP Orders; reversal, vacation or stay of the effectiveness of either of the DIP Orders; non-entry of the Final Order within 30 days of commencement of these chapter 11 cases; any plan is confirmed

without repayment of the DIP Facility in full in cash without consent of the DIP Lender; reversing, amending, supplementing, vacating, appealing or otherwise modifying any of the DIP Orders without consent of the DIP Lender; the Borrowers or an affiliate shall take any action in support of any person who contests the DIP Order or the Borrowers fail to contest in good faith the foregoing; the filing of any motion, pleading or proceeding by any of the Borrowers that could reasonably be expected to result in a material impairment of the rights or interest of the DIP Lender; cross-default of any material indebtedness or material commitment of the Borrowers; payment of or granting adequate protection with respect to pre-petition debt (other than as set forth above, as provided in the Cash Collateral Order, or as provided in the Budget or the DIP Order); cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

**Taxes**

The DIP Loan Agreement includes customary provisions, as to the DIP Facility, to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever.

**Assignments and Participations**

The DIP Lender may assign all or any part of the DIP Facility to one or more affiliates, banks, financial institutions or other entities. Upon such assignment, such affiliate, bank, financial institution or entity will become a DIP Lender for all purposes under the Loan Documents.

**Indemnification**

Pursuant to the DIP Loan Agreement, the Borrowers provide certain joint and several indemnifications for the DIP Lender and its representatives.

**Expenses**

The Borrowers are required to pay all customary and reasonable costs and expenses of the DIP Lender and shall fund a deposit of $150,000 (the "Deposit") to cover actual costs and expenses to be paid as follows:

- After providing five (5) days notice to the Prepetition Lenders and the DIP Lenders to commence drafting and negotiation of definitive documentation, the Borrowers shall pay the DIP Lender $75,000; provided such payment shall be (i) credited against the Deposit, if made, and (ii) refundable in the event the DIP Lender doesn't provide the DIP Facility and to the extent the DIP Lender does not utilize such amounts to pay its fees and expenses in connection with the DIP Facility (whether or not the DIP Lender actually provides the DIP Facility); and

- The unpaid portion of the Deposit shall be paid upon entry of the

Interim Order.

## **Jurisdiction**

4.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364.

## **Background**

### Chapter 11 Cases

6.     On June 14, 2011 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.     The Debtors remain in possession of their assets and continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

8.     No trustee, examiner or committee of creditors has been appointed in these cases.

9.     The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the Affidavit of Paul B. Rundell in Support of First Day Motions (the "Rundell Affidavit"), and is incorporated herein by reference.  Capitalized terms not specifically defined in this Motion have the meanings set forth in the Rundell Affidavit.

### Linden Ponds

10.     Linden Ponds, Inc. ("Linden Ponds") is a Maryland non-stock corporation organized in 2002 to operate the continuing care retirement community located at 300 Linden

Ponds Way in Hingham, Massachusetts (the "CCRC"). The Internal Revenue Service issued a letter dated March 3, 2005, setting forth its determination that Linden Ponds is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code. Pursuant to the Master Lease, Linden Ponds currently leases the CCRC, to the extent it is already constructed, and the property upon which the CCRC is built from Hingham Campus, LLC ("Hingham"), a Maryland limited liability company. Hingham is the owner of the CCRC and owns the fee simple interest in the property upon which the CCRC is built. Senior Living Retirement Communities, LLC ("Senior Living"), formerly known as Erickson Retirement Communities, LLC, currently owns, directly or indirectly, 100% of the membership interests in Hingham.

11.     As of March 31, 2011, the CCRC had (a) 988 completed independent living units, 5 of which are units utilized for guest rooms and services, 869 of which are occupied units, resulting in an 87.9% occupancy rate of independent living units; and (b) 132 skilled nursing beds, of which 90 are occupied by residents, resulting in a 68% occupancy rate. Upon completion of construction of the CCRC, including Residential Building 2.5 and Neighborhood 3, it is anticipated that the CCRC's facilities will include up to 1,705 independent living units and 228 skilled nursing beds.

12.     The primary liabilities of Linden Ponds are: (a) the bonds issued for the benefit of Linden Ponds by the Massachusetts Development Finance Agency in a total amount of $156,365,000 (the "2007 Bonds") and (b) the Master Lease entered into between Hingham and Linden Ponds.

13.     The primary assets of Linden Ponds are (a) the Community Loan entered into between Hingham and Linden Ponds in the maximum amount of $519,619,000, of which

$177,170,023 was owed to Linden Ponds as of the Petition Date; (b) cash and cash equivalents in the amount of approximately $1,059,719; and (c) the fully paid right to purchase the CCRC or have the $145,000,000 Purchase Option Deposit returned and the Community Loan repaid by Hingham. Based on its current circumstances, Hingham would not be able to refund the Purchase Option Deposit or repay the Community Loan.

Hingham

14. Hingham's primary liabilities are: (a) the Community Loan entered into between Hingham and Linden Ponds in the maximum amount of $519,619,000, of which $177,170,023 was owed to Linden Ponds as of the Petition Date and (b) the obligation to refund of the $145,000,000 Purchase Option Deposit. Hingham is also indirectly liable to the holders of the 2007 Bonds (the "Bondholders") by virtue of its obligations under the Fee and Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of July 1, 2007, by and between Linden Ponds, Hingham and Wells Fargo Bank, National Association, as successor indenture trustee ("Bond Trustee") with respect to the 2007 Bonds.

15. Hingham's primary assets are: (a) the improved land located in Hingham, Massachusetts upon which the CCRC is located; (b) cash and cash equivalents in the amount of approximately $23,865; and (c) the Master Lease entered into between Hingham and Linden Ponds.

Events Leading to Restructuring

16. During the past few years, senior living facilities, including the CCRC, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital and declining real estate values, among other things.

Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the financial market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities. As a result of these challenging market conditions, Linden Ponds has suffered a substantial loss of revenue and lower than anticipated absorption rates.

17.     Substantial losses of revenue at certain senior living facilities in turn forced Senior Living, previously known as Erickson Retirement Communities, the prior manager and developer of Linden Ponds and Hingham's direct parent company, and certain other of its related entities to seek chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 09-37010) (the "Senior Living Cases") on October 19, 2009. Senior Living's Fourth Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on April 16, 2010. The Senior Living Cases are still pending before this Court.

18.     Subsequently, two of Senior Living's other direct subsidiaries, Lincolnshire Campus, LLC and Naperville Campus, LLC, along with the not-for-profit operators of their respective Sedgebrook and Monarch Landing campuses, Sedgebrook, Inc. and Monarch Landing, Inc. (collectively, the "Illinois Debtors"), also sought chapter 11 protection by filing for bankruptcy in this Court (Main Case No. 10-34176) (the "Illinois Cases"). The Illinois Debtors' Third Amended Joint Plan Under Chapter 11 of the Bankruptcy Code was confirmed on November 16, 2010. The Illinois Cases are still pending before this Court.

19.     The Bond Trustee has indicated that events of default under the 2007 Bonds have occurred including (i) the failure of Linden Ponds to make the principal and interest payments due to the Bond Trustee on March 15, 2011; (ii) failure to reimburse Sovereign Bank (the "Bank") under the letter of credit agreement for the principal component of a draw made on

March 1, 2011; and (iii) the failure of Linden Ponds to deposit initial entrance deposits with the Bond Trustee, commencing December 2010, when Linden Ponds began escrowing such IEDs to provide further assurance to prospective residents. Prior to these defaults, the Debtors entered into negotiations with the Bond Trustee, the Bank and certain holders of the outstanding 2007 Bonds (the "Consenting Holders").

20.     On April 5, 2011, the Debtors, the Bond Trustee, the Bank and the Consenting Holders executed that certain Restructuring Term Sheet (the "Restructuring Term Sheet"). The Restructuring Term Sheet was a non-binding agreement among the signatories to, among other things, (i) conduct an out-of-court exchange offer whereby the 2007 Bonds would be exchanged for new bonds to be issued by the Massachusetts Development Finance Agency and/or amended 2007 Bonds (the "2011 Bonds") and (ii) simultaneously solicit votes for a prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code on substantially the same terms as the exchange offer and provide substantially all of the Debtors' other creditors with payment in full. The Restructuring Term Sheet conditioned consummation of the exchange offer on the tender of 98% of the 2007 Bonds and contemplated that a prepackaged plan of reorganization would be filed if a lesser amount of 2007 Bonds were tendered. The Bank and the Consenting Holders collectively held or had voting authority with respect to approximately 75% of the outstanding 2007 Bonds. After several months of extensive negotiations and the drafting of substantially all of the documents required to commence solicitation related to the exchange offer and the prepackaged plan of reorganization, the Bank demanded a term in the deal that neither the Debtors nor the Consenting Holders could accept which was inconsistent with the Restructuring Term Sheet. As a result, on or about May 26, 2011, the Bank indicated that it no longer wished

to participate in the exchange offer or a prepackaged plan on the terms outlined in the Restructuring Term Sheet as further negotiated between the parties.

21. In light of the 98% consent threshold required to effectuate the out-of-court exchange and the fact that the Debtors' cash position no longer afforded them the ability to continue negotiating terms with the Bank without any certainty of the outcome, the Debtors were left with no alternative other than to commence these chapter 11 cases in order to effectuate the restructuring.

22. Consequently, on June 8, 2011, the Debtors and the Consenting Holders entered into the Restructuring, Lockup, Plan Support and Forbearance Agreement (the "Lockup Agreement"). Pursuant to the Lockup Agreement, the Consenting Holders agreed to, among other things, support the Debtors' use of cash collateral and its efforts to obtain debtor-in-possession financing in connection with these chapter 11 cases. Additionally, the Consenting Holders, which entities hold approximately 62% of the Series 2007 A Bonds and approximately 40% of all of the 2007 Bonds, have agreed to support and vote in favor of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"), filed contemporaneously herewith.

23. Pursuant to the Plan, the only three classes of Claims entitled to vote thereon are the Class 2 Series 2007 A Bond Claims, the Class 3 Series 2007 B/C Bond Claims (which also includes certain claims held by the Bank pursuant to a letter of credit agreement) and the Class 6 Manager Claims. All of the Debtors' other known creditors will be paid in full.[3] The Consenting Holders, as noted above, hold 62% of the Class 2 Series 2007 A Bond Claims and support the Plan. The Bank, which has ultimate beneficial interest in and authority to vote the Class 3 Series

---

[3] Additionally, under the Plan, all interests in Hingham will either be transferred to Linden Ponds or extinguished (with Hingham's assets transferred to Linden Ponds).

2007 B/C Bond Claims, has advised the Debtors that it will not support the Plan. If the Bank does not vote in favor of the Plan, the Debtors intend to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to the Class 3 Series 2007 B/C Claims. The holder of the Class 6 Manager Claims has consented to the treatment of such Claims under, and is expected to vote in favor of, the Plan. Accordingly, the Debtors are all but certain to have at least two of the three impaired classes entitled to vote under the Plan accept the Plan.

The Debtors' Need for Postpetition Financing

24.     Prior to the Petition Date, the Debtors financed their operations with cash from operating activities and a variety of financing arrangements. Because of the substantial decline in the housing market, the Debtors are unable to generate sufficient cash to operate its business or satisfy its obligation under the various binding agreements described above.

25.     Concurrently herewith and with the consent of the Bond Trustee and Consenting Holders pursuant to the Lockup Agreement, the Debtors filed a motion for entry of an interim and final order authorizing the Debtors to use the Bond Trustee's cash collateral (the "Cash Collateral Motion"). The Debtors require both the use of cash collateral and the financing proposed herein to continue to operate their business until consummation of the Plan.

26.     If the Debtors are unable, on a consistent basis, to maintain their businesses and demonstrate financial stability to existing and future residents, the CCRC will lose existing residents, employees, and vendors, will be unable to attract new residents and will be forced to cease operations. This will not only cause harm to the Debtors, but it will also cause harm to the residents, who will not receive proper care and may be forced to move. Therefore, postpetition financing and the use of cash collateral is essential to the Debtors' continued ability to operate, to maintaining the value of their assets, and to the Debtors' successful reorganization.

27.     The DIP Facility provides that the Debtors may draw on funds immediately (on an interim basis) to meet their administrative and operational obligations in the period leading up to confirmation of the Plan and resolution of these chapter 11 cases. The DIP Facility will instill confidence in existing and future residents, employees, and vendors, and it will help relieve any uncertainty that people may have concerning the Debtors' reorganization. In order to stabilize and continue to operate their business, the Debtors have determined, in the exercise of their sound business judgment, that the DIP Facility is necessary and appropriate. Additionally, the Bond Trustee has consented to the DIP Facility and the use of cash collateral.

## Relief Requested

28.     By this Motion, the Debtors requests the entry of the Interim Order and Final Order (i) authorizing the Debtors to obtain the DIP Facility from the DIP Lender on a senior secured superpriority basis, pursuant to Bankruptcy Code sections 105, 361, 362, 363, and 364; and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c).

## Basis For Expedited Relief

### A.     Applicable Authority for Obtaining DIP Financing

29.     Bankruptcy Code section 364(c) and (d) provides:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1)   The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

> (A)      the trustee is unable to obtain such credit otherwise; and

> (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)      In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

30.      Debtors who exercise sound business judgment, within the confines of the policies underlying the Bankruptcy Code, in obtaining postpetition financing are afforded deference by courts.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

31.      Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

32.       The Debtors seek entry of the Interim Order in order to avoid immediate and irreparable harm to their estates.  Accordingly, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Court is authorized to grant the relief requested herein.

**B.      The DIP Lenders Are Entitled to Priming Liens as Set Forth in the DIP Facility**

33.      Pursuant to Bankruptcy Code section 364(c), if a debtor is unable to obtain postpetition credit on an unsecured basis, a court may authorize the debtor to obtain postpetition credit or incur postpetition debt which entitles the postpetition lender to priming liens, a first-priority lien on unencumbered property of the debtor, and superpriority administrative expense status.  11 U.S.C. § 364(c)(1), (2), and (3).  A debtor seeking postpetition financing must make

reasonable efforts to seek credit on an unsecured basis, but the debtor is granted deference by the court if the court finds the debtor acted within its business judgment when seeking out alternative sources of financing. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085 (4th Cir. 1986). Moreover, a debtor is not required to exhaustively seek out every potential source of postpetition financing. See id.; see also In re Mid-State Raceway, Inc., 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); In re Baxco Corp., 148 B.R. 855, 860 (Bankr. N.D. Ill. 1992).

34.     The Debtors have negotiated in good faith and at arms-length with the Bond Trustee, the Consenting Holders and the Bank and provided them with an opportunity to provide the debtor in possession financing. The Consenting Holders and the Bank declined to provide the DIP Facility. However, the Bond Trustee and the Consenting Holders have consented to the postpetition financing in the form of the DIP Facility. The Debtors also negotiated in good faith and at arms-length with the DIP Lender. The DIP Lender was the only lender that offered sufficient postpetition financing to the Debtors during these chapter 11 proceedings. Accordingly, the Debtors efforts to obtain necessary postpetition financing satisfy the requirements of Bankruptcy Code section 364(c).

## C.     The Debtors Could Not Obtain Alternative Financing and the Bond Trustee's Interests Are Adequately Protected

35.     Bankruptcy Code section 364(d) allows postpetition financing that provides a postpetition lender a senior or equal lien on a debtor's encumbered property (a "priming" lien) if (i) the debtor could not obtain alternative financing and (ii) the interests of the secured parties whose security interests are being primed are adequately protected. See 11 U.S.C. § 364(d)(1).

36.     Substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors and their financial advisors, the Debtors have been unable to procure the

required funding absent the proposed super priority claims and priming lines. The Debtors have negotiated the best possible terms to obtain the funding they need to maintain sufficient liquidity to preserve their assets over the course of their chapter 11 cases, and the DIP Lender is unwilling to provide the DIP Facility without the priming liens. Accordingly, the first requirement of Bankruptcy Code section 364(d)(1) is satisfied.

37.     Additionally, pursuant to and upon entry of an order approving the Cash Collateral Motion, which the Bond Trustee and the Consenting Holders support, the Bond Trustee's security interests will be adequately protected. Although the Bankruptcy Code does not define what constitutes adequate protection, Bankruptcy Code section 361, lists three (3) nonexclusive examples: to the extent of any decrease in value if an entity's interest in property resulting from the grant of a priming lien (i) a cash payment or periodic cash payments; (ii) an additional or replacement lien; or (iii) "granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." Whether the protection offered by a debtor is adequate protection is determined on a case-by-case basis. See MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); Martin v. United States (In re Martin), 761 F.2d 472 (8th Cir. 1995). Further, the adequate protection requirement is designed to protect a lienholder from the diminution of the value of its interest due to use of priming. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

38. The Bond Trustee has consented to and is entitled, pursuant to Bankruptcy Code sections 361, 363(c)(2) and 363(e), to adequate protection of their interest in the prepetition collateral, in accordance with the Cash Collateral Motion, which includes (i) replacement liens to the extent of any diminution in value of the Bond Trustee's prepetition collateral and (ii) payment of the Bond Trustee's reasonable fees and expenses.

39. Furthermore, the Bond Trustee will receive adequate protection in the form of the preservation of the enterprise value of the Debtors, jointly and severally. These protections are fair and reasonable and will protect the Bond Trustee from diminution in value of the Bond Trustee's interests in the Collateral. Finally, the Bond Trustee has consented to the DIP Facility and the use of cash collateral. Accordingly, the requirements for priming existing liens are duly satisfied.

**D.  The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

40. Given the nature of the Debtors' business, the residents', the employees' and the trade creditors' confidence in the viability of the enterprise is key to the Debtors' ability to continue operations without interruption. Therefore, having the DIP Facility in place will assure the above-listed parties that the Debtors remain vital and have the working capital necessary to continue operations, including payroll and capital expenditures, during these chapter 11 cases with the ultimate goal of preserving and maximizing the going concern value of the Debtors' businesses which will inure to the benefit of all creditor constituencies.

**E.  The DIP Facility Should Be Authorized as Fair and Reasonable and a Sound Exercise of the Debtors' Business Judgment**

41. The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the Debtors and DIP Lender at arms-length and in good faith. Additionally, the Carve-Out for professional fees is reasonable and necessary to ensure any statutory committee

and the Debtors' estate may retain the assistance of outside counsel.  See Ames Dep't Stores, 115 B.R. at 38.

42.      Moreover, approval of the DIP Facility, along with the use of cash collateral, will provide the Debtors with immediate and ongoing access to funds to pay their current and ongoing operating expenses, including postpetition wages and salaries and vendor costs.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would result in irreparable harm to the business, deplete going concern value, and jeopardize the Debtors' ability to reorganize.  Because cash collateral is insufficient to fund such expenditures, the credit provided under the DIP Facility is necessary to preserve and enhance the value of the estates for the benefit of all stakeholders.  Additionally, the availability of credit under the DIP Facility will provide confidence to the residents, employees, and trade vendors, thereby promoting a successful reorganization and the party holding a security interest in substantially all of the Debtors' assets, the Bond Trustee, has consented to the DIP Facility and the use of cash collateral.  Accordingly, the timely approval of the relief requested herein is imperative.

43.      The Debtors submit that the circumstances of this case require the Debtors to obtain financing under Bankruptcy Code sections 364(c) and (d), and accordingly, the DIP Facility reflects the exercise of sound business judgment.

**F.      Section 364(e) Protections Should Apply to the DIP Financing**

44.      The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms-length. Accordingly, the DIP Lender and all obligations incurred under the DIP Facility should be accorded the benefits of Bankruptcy Code section 364(e).

**G.    The Automatic Stay Should Be Modified on a Limited Basis**

45.    The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default and, with respect to set off and other remedies in respect of the Collateral, after five (5) business days' notice thereof, all rights and remedies under the DIP Facility.  This kind of modification is an ordinary and standard feature of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, is reasonable and fair under the present circumstances.

**H.    Interim Approval and Scheduling of Final Hearing**

46.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

47.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to borrow up to $1,000,000 under the DIP Facility on an interim basis, pending entry of a Final Order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule the Final Hearing.

48.    The Debtors need cash to maintain proper liquidity levels and continue to operate. Without postpetition financing the Debtors will not have sufficient funds with which to operate

their businesses on an ongoing basis during these chapter 11 cases. Absent authorization from the Court to obtain secured credit and use cash collateral, as requested, on an interim basis pending the Final Hearing the Debtors will be immediately and irreparably harmed. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

**I.     Waiver of Bankruptcy Rules 6004(a) and (h)**

49.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interests. Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 10-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

50.     Notice of this Motion has been provided to (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Debtors' thirty largest unsecured creditors on a consolidated basis; (c) the DIP Lender; (d) the Bank and (e) the Bond Trustee. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form submitted attached hereto as <u>Exhibit C</u>, granting the relief requested herein and such other relief as is just and proper.

Dated: June 14, 2011
      Dallas, Texas

**DLA PIPER LLP (US)**

By: /s/ Vincent P. Slusher
Vincent P. Slusher, State Bar No. 00785480
vince.slusher@dlapiper.com
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano, NY Bar No. 2286144
thomas.califano@dlapiper.com
George B. South, NY Bar No. 2446771
george.south@dlapiper.com
Jeremy R. Johnson, NY Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Proposed Attorneys for Hingham Campus, LLC, Debtor and Debtor in Possession

**McGUIRE, CRADDOCK & STROTHER, P.C.**

By: /s/ J. Mark Chevallier
J. Mark Chevallier, State Bar No. 04189170
mchevallier@mcslaw.com
James G. Rea, State Bar No. 24051234
jrea@mcslaw.com
McGUIRE, CRADDOCK & STROTHER, P.C.
3550 Lincoln Plaza
500 N. Akard St.
Dallas, TX 75201
Telephone: (214) 954-6800
Facsimile: (214) 954-6850

Martin T. Fletcher, MD Bar No. 07608
mfletcher@wtplaw.com
Stephen F. Fruin, MD Bar No. 08456
sfruin@wtplaw.com
Thomas J. Francella, Jr., DE Bar No 3835
tfrancella@wtplaw.com
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, MD 21202
Telephone: (410) 347-8700
Facsimile: (410) 752-7092

Proposed Attorneys for Linden Ponds, Inc., Debtor and Debtor in Possession