**Exhibit A**
**Proposed Senior Secured Super-Priority Debtor-in-Possession Loan Agreement**

**SENIOR SECURED**
**SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**LOAN AGREEMENT**

dated June \_\_\_, 2011

by and among

**LINDEN PONDS, INC. and HINGHAM CAMPUS, LLC**, as Co-Borrowers, Debtors and
Debtors-in-Possession under Chapter 11 of the Bankruptcy Code

and

**REDWOOD CAPITAL INVESTMENTS, LLC**, as Lender

# TABLE OF CONTENTS

**ARTICLE**                                                                                                              **PAGE**

ARTICLE 1      INCORPORATION AND DEFINITIONS ..................................................... 2

   1.1    Incorporation and Definitions ................................................................. 2

ARTICLE 2      REPRESENTATIONS AND WARRANTIES............................................ 12

   2.1    Representations and Warranties.............................................................. 12
   2.2    Continuation of Representations and Warranties ................................... 13

ARTICLE 3      AMOUNT AND TERMS OF COMMITMENTS ........................................ 14

   3.1    Agreement to Lend and to Borrow; Note ............................................... 14
   3.2    Use of Loan Proceeds ............................................................................ 14
   3.3    Prepayments and Reduction of Aggregate Commitment........................ 14
   3.4    Super-Priority Nature of Obligations and Status of Lender's Liens.................. 16
   3.5    No Discharge; Survival of Liens and Claims; Waiver of Priming Rights.......... 17
   3.6    Payment of Obligations.......................................................................... 18
   3.7    Escrow of Initial Entrance Deposits ...................................................... 18
   3.8    Joint and Several Obligations ................................................................ 18
   3.9    No Marshalling ...................................................................................... 18

ARTICLE 4      PRINCIPAL, INTEREST; SPECIAL PROVISIONS ................................. 18

   4.1    Interest Rate ........................................................................................... 18
   4.2    Payment of Principal and Interest.......................................................... 18
   4.3    Computation of Interest and Fee; Default Rate ..................................... 19
   4.4    Inability to Determine Interest Rate....................................................... 19
   4.5    Illegality ................................................................................................ 19
   4.6    Legal Requirements ............................................................................... 20
   4.7    Taxes ...................................................................................................... 20
   4.8    Loan Indemnification............................................................................. 22
   4.9    Fees and Expenses ................................................................................. 22

ARTICLE 5      CONDITIONS PRECEDENT TO EACH ADVANCE ............................... 23

   5.1    Conditions Precedent to Each Advance ................................................. 23

ARTICLE 6      CONDITIONS TO CLOSING ................................................................. 24

   6.1    Conditions to Closing ............................................................................ 24

ARTICLE 7      FUNDING CONDITIONS AND MECHANICS ........................................ 26

   7.1    Funding Conditions and Mechanics....................................................... 26

ARTICLE 8      FURTHER AGREEMENTS OF BORROWER............................................ 27

   8.1    Furnishing Information ........................................................................... 27
   8.2    Affirmative Covenants............................................................................ 28
   8.3    Negative Covenants ............................................................................... 31

ARTICLE 9        ASSIGNMENTS; CONFIDENTIALITY ..................................................... 34

    9.1    Successors and Assigns.................................................................................. 34
    9.2    Confidentiality ............................................................................................... 34
    9.3    Dissemination of Information ......................................................................... 34

ARTICLE 10       EVENTS OF DEFAULT BY BORROWER.................................................. 35

    10.1   Event of Default Defined ............................................................................... 35

ARTICLE 11       LENDER'S REMEDIES UPON EVENT OF DEFAULT ........................... 37

    11.1   Remedies ........................................................................................................ 37
    11.2   Setoff Rights .................................................................................................. 38
    11.3   Right of Lender to Make Advances to Cure Event of Defaults;
           Obligatory Advances ..................................................................................... 38
    11.4   Attorneys' Fees .............................................................................................. 38
    11.5   No Waiver ....................................................................................................... 38
    11.6   Application of Proceeds .................................................................................. 39

ARTICLE 12       MISCELLANEOUS ....................................................................................... 39

    12.1   Time is of the Essence .................................................................................... 39
    12.2   Amendments, Etc ........................................................................................... 39
    12.3   Determination of Facts................................................................................... 39
    12.4   Prior Agreements ........................................................................................... 39
    12.5   Disclaimer by Lender..................................................................................... 39
    12.6   Borrower Indemnification .............................................................................. 40
    12.7   Captions .......................................................................................................... 40
    12.8   Inconsistent Terms and Partial Invalidity ..................................................... 40
    12.9   Subsidiaries .................................................................................................... 40
    12.10  Approvals........................................................................................................ 40
    12.11  Gender and Number ....................................................................................... 40
    12.12  Notices ............................................................................................................ 40
    12.13  Effect of Agreement........................................................................................ 42
    12.14  Governing Law ............................................................................................... 42
    12.15  Waiver of Defenses......................................................................................... 42
    12.16  Consent to Jurisdiction................................................................................... 43
    12.17  Waiver of Jury Trial....................................................................................... 43
    12.18  Usury Savings Clauses................................................................................... 43
    12.19  Counterparts; Facsimile Signatures .............................................................. 43

**<u>EXHIBITS</u>**

EXHIBIT A     -     BUDGET
EXHIBIT B     -     FORM OF PROMISSORY NOTE
EXHIBIT C     -     FORM OF LOAN NOTICE

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION LOAN AGREEMENT

**THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** ("**Agreement**"), is made and entered into as of June ___, 2011, by and among **LINDEN PONDS, INC.**, a Maryland nonstock corporation and **HINGHAM CAMPUS, LLC**, a Maryland limited liability company, as Co-Borrowers, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code (individually and collectively, as appropriate, "**Borrower**"), and **REDWOOD CAPITAL INVESTMENTS, LLC**, a Maryland limited liability company and its successors and assigns ("**Lender**").

## R E C I T A L S:

A.      On June 14, 2011 ("**Filing Date**"), Borrower commenced a case ("**Chapter 11 Case**") under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas ("**Bankruptcy Court**"), and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession.

B.      On June ___, 2011, the Bankruptcy Court entered an Interim Order (i) authorizing Borrower to obtain postpetition financing on a senior secured superpriority basis pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and (ii) granting related relief ("**Interim Order**").

C.      Borrower has requested that Lender provide a revolving credit debtor-in-possession facility to Borrower in a principal amount not to exceed Six Million Dollars ($6,000,000.00) ("**Loan**"), the proceeds of which shall be used as provided in Sections 3.2 and 8.2(d) of this Agreement.

D.      Lender has indicated its willingness to extend the Loan to Borrower, all on the terms and conditions set forth herein and in the other Loan Documents and in accordance with the Bankruptcy Code, so long as, inter alia, such postpetition credit obligations are (i) secured by Liens on all of the property and interests, real and personal, tangible and intangible, of Borrower whether now owned or hereafter acquired, as set forth herein, and subject in priority only to the Carve Out and certain rights of residents solely as hereinafter provided, and (ii) given super-priority status as provided in the Orders.

E.      Lender has agreed to provide the Loan made pursuant to this Agreement with the express understanding that Borrower has agreed to the super-priority status and priming liens subject to approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties hereto represent and agree as follows:

# ARTICLE 1

## INCORPORATION AND DEFINITIONS

1.1     **Incorporation and Definitions**.  The foregoing recitals and all exhibits hereto are hereby made a part of this Agreement.  The following terms shall have the following meanings in this Agreement:

**Advance**:  An advance of Loan Proceeds made by Lender to Borrower hereunder.

**Affiliate**:  Any Person which, directly or indirectly, controls or is controlled by or is under common control with Borrower.  A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of ten percent (10%) or more of any class of voting securities (or other voting interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of Capital Stock, any other Equity Interest, by contract or otherwise.  In no event shall Lender be considered an Affiliate of Borrower.

**Aggregate Commitment**:  The aggregate of the Commitment, as reduced from time to time pursuant to the terms hereof.  The Aggregate Commitment as of the Closing Date is Six Million Dollars ($6,000,000.00).

**Agreement**:  As defined in the Preamble.

**Applicable Commitment Fee Percentage**:  As at any date of determination, a non-refundable unused commitment fee of 0.50% *per annum* of the daily average unused portion of the Aggregate Commitment (whether or not then available), payable monthly in arrears and on the Maturity Date; however, during the Interim Period, the percentage shall be based on the Interim Availability Amount instead of the Aggregate Commitment.

**Applicable Margin**:  Two and one-half percent (2.5%) *per annum*.

**Asset Sale**:  With respect to any Person, the sale, lease, conveyance, disposition or other transfer by such Person of any of its assets (including by way of a sale-leaseback transaction and including the sale or other transfer of any of the Equity Interests of any Subsidiary of such Person).

**Available Commitment**:  After the Final Order Entry Date, the difference at any time, and from time to time, between (a) the amount of the Aggregate Commitment and (b) the aggregate principal amount of all Advances outstanding hereunder.

**Availability Period**:  The period commencing on the Closing Date and ending on the Maturity Date.

**Avoidance Actions**:  means claims and causes of action that arise on or subsequent to the Filing Date under Chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

**Bankruptcy Code**:  Title 11 of the United States Code.

**Bankruptcy Court**:   The United States Bankruptcy Court for the Northern District of Texas, Dallas Division or any other court having jurisdiction over the Chapter 11 Cases from time to time.

**Borrower**:  As defined in the Preamble, each of who shall be jointly and severally liable for payment of the Obligations and performance of the covenants set forth herein and in the Loan Documents.

**Borrowing Date**:  Any date on which an Advance hereunder is made.

**Budget**:  The cash flow projections prepared by Borrower and attached hereto as **Exhibit A** showing anticipated cash receipts and disbursements on a weekly basis for the term of the Loan, together with any amendments, modifications or updates to such projections, but only to the extent the same have been approved by Lender in its sole but reasonable discretion.

**Business Day**:  Any day other than a Saturday, Sunday or other day on which lenders in the State of Maryland are required or permitted to close, or any day on which lenders are not open for dealings in dollar deposits on the London interbank market.

**Capitalized Lease**:  Means, with respect to any Person, any lease of property by such Person (as lessee) which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

**Capital Stock**:  Means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership, ownership or other equity interests, and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

**Carve Out**:  means (a) the Borrowers' professional fees and expenses incurred in the Chapter 11 Cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the Facility was received plus $250,000, (b) other professional fees and expenses incurred in the Chapter 11 Cases in the amount not to exceed those fees and expenses incurred through the date that notice of the default under the Facility was received plus $150,000, (c) the payment of fees pursuant to 28 U.S.C. § 1930, and (d) costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed One Hundred Thousand Dollars ($100,000.00).

**Cash Collateral Order**:  Initially means the interim order dated June __, 2011, and subsequently the final order, of the Bankruptcy Court entered in the Chapter 11 Case (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Bond Trustee, and (III) Scheduling a Final Hearing Thereon.

**Chapter 11 Case**:  As defined in the Recitals.

**Closing Date**:  With respect to the Interim Availability Amount, the date on which (i) the Interim Order is granted and (ii) all conditions precedent to the first Advance are satisfied or waived.  With respect to the Aggregate Commitment, the date on which (i) the Final Order is granted, and (ii) all conditions precedent to the first Advance after the Final Order Entry Date are satisfied or waived.

**Collateral**:  All property and interests in property (whether tangible or intangible, real property or personal property), whether now owned or hereafter acquired by Borrower in or upon which a security interest, lien or mortgage is granted to Lender, whether under this Agreement, under any of the other Loan Documents, or under the Orders or any other order of the Bankruptcy Court.  The definition of Collateral shall be deemed to include, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in Subsidiaries of Borrower, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof.  For the avoidance of doubt, the Collateral shall also include (i) all Initial Entrance Deposits (whether existing or new) and (ii) and all other accounts of the Borrowers, and all proceeds and products of all of the foregoing. Notwithstanding the foregoing or any other provision of this Agreement, any Loan Document or the Orders, Collateral shall not include any account held or controlled by the Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account, as such terms are defined in the Lock-Up Agreement.  Collateral shall not include Avoidance Actions, except that (1) actions under section 549 of the Bankruptcy Code (and the proceeds thereof) shall be included in the Collateral, and (2) any lien or security interest avoided pursuant to sections, 550, 551 and/or 552 of the Bankruptcy Code shall have the same priority as such avoided lien.

**Commitment**:  Lender's commitment to make the Loan under this Agreement.

**Contingent Obligation**:  As applied to any Person, (i) any Contractual Obligation, contingent or otherwise, of that Person with respect to any Indebtedness of another or other obligation or liability of another, including, without limitation, any such Indebtedness, obligation or liability of another directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, including Contractual Obligations (contingent or otherwise) arising through any agreement to purchase, repurchase, or otherwise acquire such Indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, or other financial condition, or to make payment other than for value received, and (ii) any other contingent obligation or liability of such Person, whether or not reflected in financial statements of such Person as a liability.

**Contractual Obligation**:  As applied to any Person, any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any

case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

**Customary Permitted Liens**:

(a)    Liens with respect to the payment of taxes, assessments or governmental charges in all cases which are not yet due or (if foreclosure, distraint, sale or other similar proceedings shall not have been commenced) which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and, in each case, with respect to which adequate reserves or other appropriate provisions are being maintained;

(b)    Statutory Liens of landlords and Liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens imposed by law created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained;

(c)    Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money), surety, appeal and performance bonds; provided that (i) all such Liens do not in the aggregate materially detract from the value of Borrower's assets or property taken as a whole or materially impair the use thereof in the operation of the businesses taken as a whole, and (ii) all Liens securing bonds to stay judgments or in connection with appeals do not secure at any time an aggregate amount exceeding Two Hundred Fifty Thousand Dollars ($250,000.00);

(d)    Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of Borrower;

(e)    Normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(f)    Liens of a collection bank arising on items in the course of collection; and

(g)    Any interest or title of the lessor in the property subject to any operating lease entered into by Borrower in the ordinary course of business.

**Debt Issuance**:    The incurrence by Borrower or any Subsidiary of any Indebtedness after the Closing Date.

**Default**:    A condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

**Default Rate**.  Has the meaning set forth in Section 4.3 of this Agreement.

**ELM**.  Has the meaning set forth in Section 6.1(h) of this Agreement.

**ERC**.  Has the meaning set forth in Section 6.1(h) of this Agreement.

**Equity Interests**:  Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

**Equity Issuance**:  The issuance by Borrower or any Subsidiary of any Capital Stock after the Closing Date.

**Event of Default**:  One or more of the events or occurrences referred to in Article 10 of this Agreement.

**Exchange Act**:  The Securities Exchange Act of 1934, and regulations promulgated thereunder.

**Existing Management Agreement**.  Has the meaning set forth in Section 6.1(h) of this Agreement.

**Filing Date**:  As set forth in the Recitals.

**Final Order**:  A final order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) granting final approval of this Agreement and the other Loan Documents and granting the priming liens and super priority claims and other benefits and protections with respect to Borrower described herein and in the Loan Documents (including the Interim Order) in favor of the Lender, substantially on the terms provided in the Interim Order, with such changes thereto as may be satisfactory Lender.

**Final Order Entry Date**:  The date the Final Order is entered in the Chapter 11 Case.

**GAAP**:  Generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**Governmental Authority**:  Any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**Highest Lawful Rate**:  The maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**Hingham**: means Hingham Campus, LLC, one of the Borrowers.

**Indebtedness**:  As to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)    capital leases and synthetic lease obligations;

(f)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)    all guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

**Initial Entrance Deposits**.  (a) all initial entrance deposits from each first occupant of a "living unit" pursuant to the Residence and Care Agreements for the Project received by the NFP Borrower after the Filing Date and the initial entrance deposits held in a separate account (including any separate escrow account) at JPMorgan Chase Bank, N.A.

**Interest Period**:  The period commencing on the date of the initial Advance hereunder and ending on the date that is one month thereafter; provided that:

(a)    each Interest Period occurring after the initial Interest Period shall commence on the day on which the preceding Interest Period expires;

(b)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the following Business Day, unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day;

(c)     any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(d)     no Interest Period shall extend beyond the scheduled Maturity Date.

**Interest Rate**:  For each Interest Period, the amount that is the <u>greater</u> of: (i) two hundred fifty (250) basis points <u>plus</u> the Applicable Margin, or (ii) the then-current LIBOR Rate for interest periods of one month <u>plus</u> the Applicable Margin.

**Interim Availability Amount**:  One Million Dollars ($1,000,000.00).

**Interim Availability Period**:  The period commencing on the date of entry of the Interim Order and ending on the Final Order Entry Date.

**Interim Order**:  As set forth in the Recitals.

**Land**:  All real estate in which Borrower held an interest on the Filing Date.

**Legal Requirements**:  As to any person or party, the certificate of incorporation and by-laws or other organizational or governing documents of such person or party, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or party or any of its property or to which such person or party or any of its property is subject.

**Lender**:  As identified in the Preamble.

**LIBOR Rate**:  For any Interest Period, the per annum rate of interest at which United States dollar deposits in an amount comparable to the amount of such Loan and for a one month period are offered in the London Interbank Eurodollar market at 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period (or three Business Days prior to the commencement of such Interest Period if banks in London, England were not open and dealing in offshore United States dollars on such second preceding Business Day), as displayed in the *Bloomberg Financial Markets* system (or other authoritative source selected by Lender in its sole discretion).

**Lien**:  With respect to any property or assets, any right or interest therein of a creditor to secure liabilities owed to it or any other arrangement with such creditor which provides for the payment of such liabilities out of such property or assets or which allows such creditor to have such liabilities satisfied out of such property or assets prior to the general creditors of any owner thereof, including any lien, mortgage, security interest, pledge, deposit, production payment, rights of a vendor under any title retention or conditional sale agreement or lease substantially equivalent thereto, tax lien, mechanic's or materialman's lien, or any other charge or encumbrance for security purposes, whether arising by law or agreement or otherwise, but excluding any right of offset which arises without agreement in the ordinary course of business with trade creditors.

**Loan**:  As set forth in the Recitals.

**Loan Documents**:  This Agreement, all agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect, or evidence Liens to secure the Obligations, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether heretofore, now, or hereafter executed by or on behalf of Borrower and delivered to Lender, together with all agreements and documents referred to therein or contemplated thereby.

**Loan Notice**:  A request for an Advance made by Borrower in accordance with this Agreement and substantially in the form of Exhibit D hereto.

**Loan Proceeds**:  All amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

**Lock-Up Agreement**.  That certain Restructuring, Lockup, Plan Support and Forbearance Agreement, dated June 8, 2011, entered into by and among the Borrower and the parties signatory thereto who are the beneficial owners of approximately 40% of the aggregate principal amount of the Series 2007 Bonds outstanding.

**Material Adverse Effect**:  Any event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which:

(a)  has or reasonably could be expected to have a material adverse effect upon or change in (i) the legality, validity or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to Lender under any of the Loan Documents;

(b)  has or reasonably could be expected to have a material and adverse effect upon the value of any of the Collateral or the business, operations, prospects, properties, assets, liabilities or condition (financial or otherwise) of Borrower; or

(c)  materially impairs or reasonably could be expected to materially impair the ability of Borrower to perform any of the Obligations or its obligations, or to consummate the transactions, under the Loan Documents;

provided, for the avoidance of doubt, any changes attributable to the commencement of the Chapter 11 Case or any defaults under the Prepetition Indebtedness which have been disclosed to Lender relating to the Chapter 11 Case shall not constitute a Material Adverse Effect.

**Maturity Date**:  The earlier of:

(a)  November 8, 2011;

(b)  the effective date of a plan of reorganization in the Chapter 11 Case, unless converted to a new post-bankruptcy exit facility at the request of the Borrower, in the sole and absolute discretion of Lender and with consent of at least 40% of the principal amount of the Series 2007 Bonds outstanding; or

(c)     the occurrence of an Event of Default under this Agreement.

**Net Cash Proceeds**:  Cash or cash equivalents (including securities) received by any Person from any Asset Sale by any Person (including cash received as consideration for the assumption or incurrence of liabilities incurred in connection with or in anticipation of such Asset Sale), after (i) in connection with any Asset Sale, provision for all income or other taxes actually paid with respect to such Asset Sale in the taxable year thereof or in the following taxable year, (ii) payment of all reasonable brokerage and underwriting commissions and other fees and expenses related to such Asset Sale, including, without limitation, transaction fees payable to Borrower's professional advisors, financial advisors and restructuring advisors, (iii) in connection with any Asset Sale, all amounts used to repay Indebtedness secured by a prior Lien on any asset disposed of in such Asset Sale or which is or may be required (by the express terms of a post-petition instrument governing such Indebtedness or an order of the Bankruptcy Court) to be repaid in connection with such Asset Sale (including payments made to obtain or avoid the need for the consent of any holder of such Indebtedness), and (iv) in connection with any Asset Sale, deduction of appropriate amounts to be provided by such Person as a reserve, in accordance with GAAP, against any liabilities associated with the assets sold or disposed of in such Asset Sale and retained by such Person after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with the assets sold or disposed of in such Asset Sale.

**New Management Agreement**:  Has the meaning set forth in Section 6.1(h) of this Agreement.

**NFP Borrower**: means Linden Ponds, Inc., one of the Borrowers.

**NFP Cash**:  All cash, cash equivalents or securities which are held in segregated accounts, securities accounts or the principal deposit accounts of Borrowers, and any proceeds thereof or interest earned thereon (excluding any cash in accounts held or controlled by the Trustee pursuant to the terms of the Bond Documents with the exception of the Operating Reserve Fund and the Development Fee Account).

**Non-Excluded Taxes:  Has the meaning set forth in Section 4.7**

**Note**:  Collectively, the promissory note or notes made by Borrower and payable to Lender in the form of **Exhibit B** hereto.

**Obligations**:  All obligations of every nature of Borrower from time to time owed to Lender, or any indemnitee under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Borrower, would have accrued on any Obligation, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

**Orders**:  The Interim Order and the Final Order.

**Permitted Existing Liens**:  The Liens on assets of Borrower existing on the date hereof with respect to the Series 2007 Bonds.

**Permitted Lien**:  Any Lien of the type identified in Section 8.3(c)(i)-(v) of this Agreement that is found by the Bankruptcy Court to be legal, valid, enforceable, perfected and non-avoidable.

**Permitted Purchase Money Indebtedness**:  As defined in Section 8.3(a)(vi).

**Person**:  Natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

**Plan**:  The plan of reorganization in the form attached as an exhibit to the Lock-up Agreement (as may be amended as permitted under the Lock-up Agreement) and approved by the Lender in its reasonable discretion.

**Prepetition Collateral**:  All collateral securing the Prepetition Indebtedness.

**Prepetition Indebtedness**:  All Indebtedness and any other obligations of Borrower outstanding on the Filing Date.

**Project**:  The continuing care retirement community known as Linden Ponds located at 300 Linden Ponds Way in Hingham, Massachusetts, and managed by ELM.

**Regulatory Change**:  As to Lender, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any Governmental Authority or any central bank or other fiscal, monetary or other authority having jurisdiction over the Lender or its lending offices.

**Revolving Credit Maximum Amount**:  At any particular time, the Aggregate Commitment; provided, that in no event shall the Revolving Credit Maximum Amount exceed the maximum principal amount of the Loan approved by the Bankruptcy Court pursuant to the then-effective Order.

**Revolving Credit Obligations**:  At any particular time, the outstanding principal amount of the Loan.

**Series 2007 Bonds**:  The $156,365,000 Massachusetts Development Finance Agency Revenue Bonds (Linden Ponds, Inc. Facility) Series 2007 A (Tax Exempt), Variable Rate Demand Series 2007 B (Tax Exempt) and Variable Rate Demand Series 2007 C (Taxable), issued for the benefit of Linden Ponds, Inc., pursuant to a certain Trust Indenture, dated as of July 1, 2007, between Massachusetts Development Finance Agency and the Trustee.

**Subsidiary**:  As to any Person, (i) any corporation more than fifty percent (50%) of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (ii) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the ownership interests of which shall at the time be so owned or controlled.  For purposes of this Agreement, a Person or Persons

shall be deemed to have a majority ownership interest in a partnership, association, joint venture or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar business organization.

**Termination Fee**:  The amount of Nine Hundred Thousand Dollars ($900,000.00), payable by Borrowers to Lender in accordance with and pursuant to the terms and conditions of the Existing Management Agreement.

**Transitional Subcontract**:  Has the meaning set forth in Section 6.1(h) of this Agreement.

**Trustee**:  Wells Fargo Bank, N.A., as successor trustee to Manufacturers and Traders Trust Co, under a certain Trust Indenture, dated as of July 1, 2007, respecting the Series 2007 Bonds.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1  **Representations and Warranties**.  To induce Lender to execute and perform this Agreement, Borrower hereby represents, covenants and warrants to Lender as follows:

(a)  At the Closing and at all times thereafter until the Loan is paid in full, Borrower will have good and indefeasible fee simple title to the Land and good title to the personal property, that serves as Collateral hereunder subject only to the Permitted Liens, and to any and all intellectual property necessary to the conduct of Borrower's business and represented as owned by the Borrower.

(b)  Hingham is a duly formed limited liability company.  NFP Borrower is a duly formed nonstock corporation.  Each is formed under the laws of the State of Maryland and is duly qualified to do business under the laws of each jurisdiction in which failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

(c)  Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and the Loan Documents have been duly authorized by all necessary action on the part of Borrower, and no consent of any other party is required for the performance by Borrower of its obligations hereunder and under the Loan Documents.

(d)  The Loan Documents and any other documents and instruments required to be executed and delivered by Borrower in connection with this Loan, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and will be enforceable strictly in accordance with their respective terms.

(e)  The execution, delivery and performance of the Loan Documents and any other documents or instruments to be executed and delivered by Borrower pursuant to this

Agreement or in connection with the Loan and the construction, occupancy and use of the Collateral will not: (i) violate any Legal Requirements, or (ii) upon entry of the Orders and Cash Collateral Order as final orders, conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower is a party or by which it may be bound.

(f)     To the best of Borrower's knowledge, except for the defaults under the Prepetition Indebtedness which have been disclosed to Lender, Borrower is not in default under any contract or agreement entered into on or after the Filing Date to which it is a party, the effect of which default will have a Material Adverse Effect on the performance by Borrower of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement or the other Loan Documents.

(g)     To the best of Borrower's knowledge, no condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the knowledge of Borrower, litigation threatened in writing) exists which could (i) adversely affect the validity or priority of the Liens and security interests granted Lender under the Loan Documents; (ii) could reasonably be expected to have a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents; or (iii) constitute an Event of Default under any of the Loan Documents or an event which, with the giving of notice, the passage of time or both, would constitute such an Event of Default.

(h)     To the best of Borrower's knowledge, all governmental permits and licenses required by applicable law to conduct Borrower's business are validly issued and in full force and effect.

(i)     To the best of Borrower's knowledge, the financial reports and other information provided by Borrower to Lender is true, correct and accurate in all material respects.

(j)     To the best of Borrower's knowledge, there is no claim, action, litigation, arbitration or other proceeding pending against Borrower which relates to the Collateral or which could result in the imposition of a lien against the Collateral, which lien is either pari passu or senior to the Liens granted to Lender. To the best of Borrower's knowledge, there is no action threatened against Borrower or the Collateral which, if adversely determined, could give rise to an event, condition, liability or circumstance that would constitute a Material Adverse Effect.

(k)     To the best of Borrower's knowledge, it is in full and complete compliance with the Interim Order during the Interim Period, and the Final Order after the Final Order Entry Date.

(l)     Borrower (individually or in the aggregate) or, after giving effect to the transactions contemplated by the Loan Documents, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.2     **Continuation of Representations and Warranties**.  Borrower represents and warrants to Lender that each of the foregoing statements is, to the best of Borrower's knowledge, true and correct on the date hereof, and, subject to Section 7.1 will, to the best of Borrower's

knowledge, be true and correct and at all times thereafter so long as any part of the Loan shall remain outstanding.

# ARTICLE 3

## AMOUNT AND TERMS OF COMMITMENTS

3.1 **Agreement to Lend and to Borrow; Note**.

(a) Subject to the terms and conditions set forth herein, Lender agrees to make Advances under the Loan to Borrower from time to time. At no time shall Lender have any obligation to make any Advance hereunder which would cause the Revolving Credit Obligations to exceed the Revolving Credit Maximum Amount. During the Interim Period, Lender shall not have any Obligation to make any Advance hereunder that would cause the Revolving Credit obligations to exceed the Interim Availability Amount. Subject to the terms of this Agreement, Borrower may borrow, repay and re-borrow the Loan Proceeds at any time prior to the Maturity Date. On the Maturity Date, Borrower shall repay in full in cash the Revolving Credit Obligations, together with all accrued and unpaid interest thereon.

(b) The Loan and all Advances made in connection therewith shall be evidenced by a Note executed by Borrower, substantially in the form of **Exhibit B** hereto and payable to the order of Lender. The date and amount of each Advance, the payment or prepayment of principal and/or interest with respect thereto, and the length of each Interest Period with respect thereto shall be recorded by Lender on its books. Each such recordation shall constitute prima facie evidence of the accuracy of the information so recorded in the absence of manifest error. The Note shall (i) be dated the date hereof or, if a Lender's interest is hereafter assigned, the effective date of such assignment, (ii) be stated to mature on the Maturity Date, and (iii) provide for the payment of interest in accordance with Article 4 hereof.

3.2 **Use of Loan Proceeds**. Loan Proceeds may be used solely in accordance with the Budget, and as required under the Loan Documents. Loan Proceeds shall be used for the following purposes:

(a) to pay interest, fees and expenses in connection with the Loan to Lender in accordance with the Loan Documents;

(b) to fund the post-petition operating expenses incurred by Borrower in the ordinary course of business;

(c) to pay certain other costs and expenses in connection with the administration of the Chapter 11 Case, including, without limitation, adequate protection payments, if any, required by the Cash Collateral Order.

3.3 **Prepayments and Reduction of Aggregate Commitment**.

(a) Borrower may, upon notice to Lender, at any time or from time to time (but not more frequently than once per calendar week) voluntarily prepay all or part of the Revolving Credit Obligations, without premium or penalty; provided that (i) such notice must be

received by Lender not later than 11:00 a.m. on the date that is three (3) Business Days prior to any date of prepayment; (ii) any prepayment shall be in a principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) or a whole multiple of Two Hundred Fifty Thousand Dollars ($250,000.00) in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment, and Borrower shall make such prepayment in the amount and on the date specified in such notice.  Any prepayment shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required hereunder.

(b)     Borrower may, upon notice to Lender, at any time or from time to time reduce the Aggregate Commitment; provided that (i) such notice must be received by Lender not later than 11:00 a.m. on the date that is five (5) Business Days prior to the date of such reduction; (ii) any such reduction shall be in a principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) or a whole multiple of Two Hundred Fifty Thousand Dollars ($250,000.00) in excess thereof; and (iii) any mandatory prepayment resulting from such reduction shall have been made.  Any reduction of the Aggregate Commitment shall be permanent and irrevocable.

(c)     **Mandatory Prepayments**.  Each of the following shall require that Borrower make a mandatory prepayment of the Revolving Credit Obligations.  Once such prepayments are made, the Aggregate Commitment shall thereafter be permanently reduced.  The mandatory prepayments shall not exceed the Obligations owing under this Agreement.

(i)     Asset Sale Prepayments.  Upon the consummation of any Asset Sale by Borrower, other than those Asset Sales permitted pursuant to Section 8.3(b), Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of Net Cash Proceeds.

(ii)     Extraordinary Receipt Proceeds.  Upon receipt of any proceeds not customarily received in the Borrower's ordinary course of business, including, without limitation, proceeds arising from insurance, condemnation, eminent domain, tax refunds, deposit refunds, pension plan reversions, indemnity payments or any purchase price adjustments related to a sale or disposition of any or all of its assets, Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of the proceeds so received.

(iii)     Proceeds of Any Indebtedness or Equity Issuance.  Upon receipt of any proceeds arising from any Equity Issuance or the incurrence of any indebtedness (other than a trade indebtedness incurred in the ordinary course of business), including any Debt Issuance, Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of the proceeds so received.

(d)     Unless an Event of Default shall have occurred and is continuing, each mandatory prepayment required by clauses (c)(i) through (iii) of this Section 3.3 shall be applied:

First, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest), including fees, charges and disbursements of counsel to Lender and amounts payable under Section 4.9;

**Second**, to payment of accrued and unpaid interest on the Loan and the other Obligations; and

**Third**, to payment of unpaid principal on the Loan and the other Obligations.

(e)     If for any reason the Revolving Credit Obligations at any time exceed the Revolving Credit Maximum Amount, Borrower shall immediately prepay the Revolving Credit Obligations in an amount equal to such excess.

3.4     **Super-Priority Nature of Obligations and Status of Lender's Liens**.

(a)     On and after the Closing Date, subject to Section 3.4(b) below, the provisions of the Loan Documents and the Orders (as applicable) shall be effective to create in favor of Lender, legal, valid and perfected Liens on and security interests in all right, title and interest of Borrower in the Collateral, enforceable against Borrower:

(i)     Pursuant to section 364(c)(2) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected first priority senior Lien on all Collateral that is not otherwise subject to valid, perfected and non-avoidable Liens as of the Filing Date;

(ii)     Pursuant to section 364(c)(3) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected second priority junior Lien on all Collateral that is otherwise subject to (1) valid, perfected and non-avoidable Liens as of the Filing Date or (2) valid Liens in existence at the Filing Date that are perfected subsequent to the Filing Date as permitted by section 546(b) of the Bankruptcy Code and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (other than with respect to the Liens described in clause (iii) below, which Liens shall be primed by the Liens described in such clause); and

(iii)     Pursuant to section 364(d)(1) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected first priority senior priming Lien on the Prepetition Collateral.

Subject to the Orders, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)     Notwithstanding anything in this Agreement to the contrary, the Lender's Liens shall be subject to the Carve Out, but, for the avoidance of doubt, payment of the Carve Out shall not reduce the amounts payable to the Lender hereunder or under the Loan Documents or affect the rights of Lender to receive such payment.

(c)     Pursuant to section 364(c)(1) of the Bankruptcy Code and Orders (as applicable), all Obligations at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all allowed administrative expenses, subject only to the Carve Out and rights of the residents pursuant to any agreement or order

requiring the Borrowers to escrow or segregate certain Initial Entrance Deposits for the benefit of the residents.

(d)     Except for the Carve Out and rights of the residents pursuant to any agreement or order requiring the Borrowers to escrow or segregate certain Initial Entrance Deposits for the benefit of the residents, no costs or expenses of administration shall be imposed against the Lender or any of the Collateral under section 105 or 506(c) of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under section 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender or the Collateral.

(e)     Subject to the priorities set forth in subsection (a) above and to the Carve Out, as to all Land, Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Lender or such trustees as are designated by Lender all of the right, title and interest of Borrower in all of such Land, together in each case with all of the right, title and interest of Borrower in and to all buildings, improvements, and fixtures related thereto, any leases or subleases thereof, all general intangibles relating thereto and all proceeds thereof.  Borrower acknowledges that, pursuant to the Orders, the Liens in favor of Lender in all of such Land shall be perfected without the recordation of any instruments of mortgage or assignment.  Borrower acknowledges that, pursuant to the Orders, the Liens in favor of Lender on all of Borrower's right, title and interest in all Collateral, including all such real property and leasehold interests, shall be perfected without the filing or recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment and without the necessity of any party delivering, filing, registering or recording any other financing statements, filings, notices, recordings or other instruments or otherwise taking any other action to perfect such security interests or Liens.  Borrower further agrees that, upon the request of Lender and its counsel, it shall enter into and execute separate mortgages, deeds of trust or similar instruments in recordable form with respect to its owned and leased real properties on terms reasonably satisfactory to Lender and Lender's counsel.

### 3.5     <u>No Discharge; Survival of Liens and Claims; Waiver of Priming Rights</u>.

(a)     Borrower agrees that the Obligations hereunder shall not be discharged by (i) the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case (and Borrower pursuant to section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge), (ii) the conversion of the Chapter 11 Case to a chapter 7 case, or (iii) the dismissal of the Chapter 11 Case.

(b)     Borrower agrees that the Liens and super-priority administrative expense claim granted to Lender pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case.

(c)     Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien on the Collateral that is of equal or greater priority than the Liens securing the Obligations, or to

approve a claim of equal or greater priority than the super-priority administrative expense claim granted to the Obligations

3.6 **Payment of Obligations**. On the Maturity Date, Borrower shall pay to Lender in cash all of the Obligations owed by Borrower to Lender hereunder or under any of the Loan Documents. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations in cash without further application to or order of the Bankruptcy Court.

3.7 **Escrow of Initial Entrance Deposits**. Subject to applicable state regulatory requirements, Hingham and the NFP Borrower shall cause all Initial Entrance Deposits to be deposited into an escrow account with a third party financial institution acceptable to applicable state regulators, which escrow account will be subject to a first priority Lien in favor of Lender.

3.8 **Joint and Several Obligations**. Subject to Section 11.6, payment of the Obligations set forth herein and in the Loan Documents shall be joint and several obligations of the Persons comprising Borrower. Performance of the covenants set forth herein and in the Loan Documents shall be joint and several obligations of the Persons comprising Borrower.

3.9 **No Marshalling**. Borrower agrees that in no event shall Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or otherwise, and no Borrower will assert any such theory of law or equity as it relates to the Collateral or collection under the Loan.

## ARTICLE 4

## PRINCIPAL, INTEREST; SPECIAL PROVISIONS

4.1 **Interest Rate**. Borrower promises to pay interest on the Revolving Credit Obligations for the period commencing on the date of each Advance until such Advance is paid in full at a rate per annum equal to the Interest Rate.

4.2 **Payment of Principal and Interest**.

(a) Through and including the Maturity Date, accrued interest on each Advance shall be payable in arrears on the first Business Day of each calendar month and on the Maturity Date. The Revolving Credit Obligations shall be due and payable in full on the Maturity Date.

(b) Payments shall be applied as required under applicable law and in the absence of any such requirements, payments may be applied to amounts owed hereunder and under the Loan Documents in such order as Lender shall determine, in its sole discretion.

(c)     All payments of principal (including prepayments) and accrued interest shall be paid by wire transfer in United States Dollars, to Lender, at such place as Lender may from time to time direct.

(d)     All payments (including prepayments) to be made by Borrower hereunder and under the Note, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 P.M., Eastern Standard Time, on the due date thereof.

(e)     If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable Interest Rate during such extension.

(f)     Prepayments of the Revolving Credit Obligations shall be made in accordance with Article 3.

4.3     **Computation of Interest and Fees; Default Rate**.

(a)     Fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed in any portion of a month in which interest is due.  In no event shall the Interest Rate hereunder exceed the Highest Lawful Rate.

(b)     After the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased by three hundred (300) basis points above the rate otherwise applicable thereto ("**Default Rate**").

(c)     Each determination of the Interest Rate for any Interest Period made by Lender pursuant to any provision of this Agreement shall be conclusive and binding upon the parties hereto in the absence of manifest error.

4.4     **Inability to Determine Interest Rate**.  If Lender determines for any reason that (i) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period, (ii) adequate and reasonable means do not exist for determining the LIBOR Rate for any Interest Period, or (iii) the LIBOR Rate for any Interest Period does not adequately and fairly reflect the cost to Lender of funding the Loan, Lender will promptly so notify Borrower, and thereafter, the obligation of Lender to make additional Advances shall be suspended until Lender revokes such notice.

4.5     **Illegality**.  Notwithstanding any other provision herein, if Lender shall reasonably determine that any Regulatory Change shall make it unlawful for Lender to make or maintain the Loan as contemplated by this Agreement, Lender shall give notice of such determination to Borrower.  Upon receipt of such notice, the right of Borrower to request further Advances and the obligation of Lender to make further Advances shall immediately cease, and the Revolving Credit Obligations shall immediately become due and payable.

4.6    **Legal Requirements**.

      (a)      If any Regulatory Change made subsequent to the date hereof shall:

            (i)      subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note, or the Loan, or change the basis of taxation of payments to Lender in respect thereof (except for Non-Excluded Taxes covered by subsection 4.7 and changes in the rate of tax on the overall net income of such Lender); or

            (ii)      impose on Lender any other condition regarding the Loan or Lender's funding thereof;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender in good faith deems to be material, then, in any such case, Borrower shall promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for such increased cost or reduced amount receivable.

      (b)      If Lender shall have reasonably determined that any Regulatory Change regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in any such case made subsequent to the date hereof, does or shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which Lender or such corporation could have achieved but for such change or compliance (taking into consideration Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time to time, after submission by Lender to Borrower of a written request therefor, Borrower shall pay to Lender such additional amount as will compensate Lender for such reduction.

      (c)      If Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify Borrower of the event by reason of which it has become so entitled.    A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Note and all other amounts payable hereunder.

      (d)      Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from Lender's gross negligence or willful misconduct as found in a final non-appealable judgment by a court of competent jurisdiction.

4.7    **Taxes**.

      (a)      All payments made by Borrower under this Agreement and the Note shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net

income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or the Note).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") are required to be withheld from any amounts payable to Lender hereunder or under the Note, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that Borrower shall not be required to increase any such amounts payable to Lender that is not organized under the laws of the United States of America or a state thereof if Lender fails to comply with the requirements of paragraph (b) of this subsection.  Whenever any Non-Excluded Taxes are payable by Borrower, as promptly as possible thereafter, Borrower shall send to Lender a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failures.  The agreements in this subsection shall survive the termination of this Agreement and the payment of the Obligations, as set forth in the Loan Documents.  Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from such Lender's negligence.

(b)     If Lender is not incorporated under the laws of the United States of America or a state thereof it shall:

(i)     deliver to Borrower two duly completed copies of United States Internal Revenue Service Form 1001 or 4224, or successor applicable form, as the case may be, and an Internal Revenue Service Form W-8 or W-9, or successor applicable form, as the case may be;

(ii)     deliver to Borrower two further copies of any such form or certification on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower; and

(iii)     obtain such extensions of time for filing and complete such forms or certifications as may reasonably be requested by Borrower; unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise by required which renders all such forms inapplicable or which would prevent Lender from duly completing and delivering any such form with respect to it and Lender so advises Borrower.  Lender shall certify (i) in the case of a Form 1001 or 4224, that it is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes, and (ii) in the case of a Form W-8 or W-9, that it is entitled to an exemption from United States backup withholding tax.  Each party that shall become a transferee pursuant to Section 9.1 shall, upon the effectiveness of

the related transfer, be required to provide all of the forms and statements required pursuant to this Section, provided that in the case of a participant such participant shall furnish all such required forms and statements to the Lender from which the related participation shall have been purchased.

4.8 **Loan Indemnification**. Borrower shall indemnify and hold harmless Lender and its Affiliates, officers, directors, employees, agents, advisors, attorneys and representatives (each, "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to this Agreement, the Loan Documents or the transactions contemplated hereby, or any use made or proposed to be made with the proceeds of the Loan, whether or not such investigation, litigation or proceeding is brought by Borrower, any of its shareholders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Borrower or any of its shareholders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

4.9 **Fees and Expenses**.

(a) Borrower shall pay to Lender an unused commitment fee equal to the Applicable Commitment Fee Percentage. The unused commitment fee shall accrue at all times during the period from the date of entry of the Interim Order to the Maturity Date and shall be due and payable monthly in arrears on the first Business Day of each calendar month (for the prior calendar month), commencing with the first such date to occur after the date of entry of the Interim Order. Any portion of the unused commitment fee which has not been paid in accordance with the immediately preceding sentence shall be due and payable on the Maturity Date.

(b) Borrower shall pay to Lender a commitment fee on the Closing Date with respect to the Initial Availability Amount in the amount of $50,000 or such other amount as shall be approved by the Bankruptcy Court.

(c) Pursuant to the Interim Order, Borrower shall immediately deposit into an account established by Lender the sum of One Hundred Fifty Thousand Dollars ($150,000.00) to pay the fees and expenses that may become due and owing to Lender from time to time; provided, however, that the Seventy Five Thousand Dollars ($75,000) paid by Borrower to Lender on June 13, 2011, shall be credited against such deposit requirement) and refundable in

the event the Lender does not provide the Facility and to the extent the Lender does not utilize such amounts to pay its reasonable fees and expenses in connection with the Facility (whether or not the Lender actually provides the Facility).  Upon demand, Borrower shall reimburse Lender for all fees (including legal fees), costs, charges and reasonable out-of-pocket expenses (including reasonable fees, costs, charges and expenses in excess of One  Hundred Fifty Thousand Dollars ($150,000.00)) associated with (i) the preparation and negotiation of this Agreement and the Loan Documents, (ii) the consummation of the transactions described in this Agreement and the Loan Documents, (iii) administration of the Loan, and (iv) the enforcement of rights and remedies set forth in this Agreement and the Loan Documents, that have been billed to or incurred by Lender.  Such reimbursements shall commence with the first such demand to occur after the Closing Date, but the obligation of Borrower to make any final reimbursement shall survive the Maturity Date.

# ARTICLE 5

## CONDITIONS PRECEDENT TO EACH ADVANCE

5.1  **Conditions Precedent to Each Advance**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)  Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to Lender in its sole and absolute discretion.

(b)  There exists no Default or Event of Default under any Loan Document.

(c)  The representations and warranties contained in this Agreement and each of the other Loan Documents are true and correct in all material respects as of such Borrowing Date except for changes reflecting events, conditions or transactions permitted or not prohibited by this Agreement; provided, that the words "in all material respects" in this subsection (c) shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard.

(d)  During the Interim Availability Period, (i) the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed for a period of five business days or longer, vacated or subject to a stay pending appeal, in the case of any modification,  amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the Lender, without the prior written consent of Lender, and (ii) the Revolving Credit Obligations shall not exceed the Interim Availability Amount.

(e)  Following the Final Order Entry Date and during the Availability Period, (i) the Final Order shall be in full force and shall not have been reversed, modified, amended, stayed for a period of five business days or longer, vacated or subject to a stay pending appeal, in the case of any modification,  amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the Lender, without the prior written consent of Lender, and (ii) the Revolving Credit obligations shall not exceed the Revolving Credit Maximum Amount.

(f)     Before and after giving effect to the requested Advance and the application of the proceeds thereof, the Revolving Credit Obligations shall not exceed the Revolving Credit Maximum Amount.

(g)     Before and after giving effect to the requested Advance and the application of the proceeds thereof, Borrower shall be in compliance in all material respects with the Budget, and the proposed use of the proceeds is consistent with the Budget.

(h)     There has been no event, condition, obligation, liability, or circumstance that would constitute a Material Adverse Effect; provided that, any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect.

(i)     Borrower shall have executed such Loan Documents as Lender shall reasonably require to secure the performance of Borrower's obligations and to perfect Lender's interest in the Collateral.

(j)     Lender shall have received such other information and materials relating to the Collateral as Lender shall reasonably require, including, without limitation, mortgagee title insurance policies, casualty and liability insurance policies, surveys and environmental site assessments.

(k)     Borrower shall have complied with the funding conditions and procedures described in Section 7.1.

Each request for an Advance shall constitute a representation and warranty by Borrower that the conditions contained in this Section 5.1 have been satisfied or waived in writing by Lender.

## ARTICLE 6

## CONDITIONS TO CLOSING

6.1     **Conditions to Closing**.  The obligation of Lender to close and make the initial Advance on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 12.2, of the following conditions on or before the Closing Date:

(a)     **Delivery of Documents**.  Borrower shall have furnished to Lender each of the following, all in form and substance satisfactory to Lender:

(i)     Executed copies of this Agreement and each of the other Loan Documents required to be executed and delivered by Borrower on or prior to the Closing Date;

(ii)     A copy of the certificates of incorporation or formation for each Person constituting Borrower, as amended, certified as of a recent date by the Secretary of State of the state of their incorporation or formation;

(iii)     A certificate of the Secretary of State in the state of Borrowers' incorporation or formation, dated as of a recent date, as to the good standing of and payment of taxes by Borrower;

(iv)     A certificate of the Secretary or an Assistant Secretary of Borrower dated the Closing Date and certifying on behalf of Borrower (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of Borrower as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the board of directors, managers, or sole member, as the case may be, of Borrower authorizing the filing of its bankruptcy petition and authorizing the execution, delivery and performance in accordance with the terms of this Agreement, each of the Loan Documents, and any other documents required or contemplated hereunder or thereunder, the granting of the security interests contemplated by the Loan Documents, and the other transactions contemplated by this Agreement, (C) that the certificate of incorporation or formation of Borrower has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to clause (iii) above, and (D) as to the incumbency and specimen signature of each officer or manager of that entity executing this Agreement and the other Loan Documents or any other document delivered by it in connection herewith or therewith; and

(v)     Copies of the Budget.

(b)     **Fees and Expenses**.  All costs, charges, fees, expenses (including, without limitation, legal fees and expenses and the commitment fee) and other compensation payable to Lender shall have been paid to the extent due, including, without limitation, Borrower shall have funded a $150,000 deposit to cover such fees and expenses in accordance with Section 4.9(c).

(c)     **Entry of the Orders**.  Lender shall have obtained a copy (to be followed by a certified copy when available) of the Interim Order and subsequently Final Order, as applicable, granting approval of the Loan Documents and granting the super-priority claim status and first-priority priming lien described in this Agreement, which Order, as applicable, (i) shall be in form and substance satisfactory to Lender, (ii) shall authorize extensions of credit in amounts satisfactory to Lender, (iii) shall approve the payment by Borrower of all of the fees contemplated under this Agreement and the fees of professionals of Lender, (iv) shall be in full force and effect, and (v) shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender.

(d)     **Objections to Lender's Liens and Security**.  No timely objection shall have been filed challenging (i) the amount, validity, enforceability or non-avoidability of the Lender's Liens, or (ii) the validity, enforceability, perfection, non-avoidability or seniority of the Obligations.

(e)     **First Day Orders**.  Lender shall be satisfied in its reasonable discretion that all orders approving all necessary motions filed by the Borrower on the Filing Date ("**First Day Orders**") shall have been entered by the Bankruptcy Court at the commencement of the Chapter 11 Case, and they shall be substantially similar in form and substance to those reviewed and approved by Lender immediately prior to the commencement of the Chapter 11 Case.  In

addition, the Borrower shall have filed the Plan (or a plan modified as permitted under the Lock-Up Agreement) and accompanying Disclosure Statement (each of which shall have been approved by the DIP Lender provided that the form of Plan and Disclosure Statement attached to the Lock-up Agreement shall be deemed approved by the DIP Lender).

(f)     **Motions and Other Documents**.  Borrower shall have provided lender with a copy of all motions and other documents to be filed by the Borrower with and submitted to the Bankruptcy Court in connection with the Loan which motions and other documents shall be in form and substance reasonably satisfactory to the Lender.  Borrower shall not have filed any motion or pleading which has or may have an affect on the rights granted to Lender hereunder or under the Orders without first providing Lender with sufficient and reasonable notice of such a motion or pleading.

(g)     **No Material Adverse Effect**.  No change shall have occurred that results in a Material Adverse Effect; provided that, any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect.

(h)     **Assumption of Existing Management Agreement**.  On or prior to the Final Entry Order Date, the Bankruptcy Court shall have entered an order approving the assumption of, and the Borrower shall have assumed, that certain Management Agreement and Marketing Agreement dated January 31, 2009 by and between Linden Ponds and Erickson Retirement Communities, LLC ("ERC") as amended on June 12, 2011 (the "Existing Management Agreement") and the Transitional Subcontract effective April 30, 2010 among ERC, Erickson Living Management, LLC ("ELM"), NFP Borrower and the Trustee, as previously amended (the "Transitional Subcontract").

(i)     **Additional Documents**.  Lender shall have received such other papers, reports and documents regarding Borrower or the Collateral as Lender or its counsel may reasonably require.

## ARTICLE 7

## FUNDING CONDITIONS AND MECHANICS

7.1     **Funding Conditions and Mechanics**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)     Each request for an Advance shall be made by Borrower in an irrevocable Loan Notice to Lender, which notice may initially be given verbally by telephone.  Each such Loan Notice (or such verbal notice) must be received by Lender not later than 11:00 a.m. two (2) Business Days prior to the requested date of any Advance.  Each telephonic notice by Borrower pursuant to this Section 7.1(a) must be confirmed promptly by delivery to Lender of a written Loan Notice, appropriately completed and signed by a responsible officer of Borrower.  Each Advance shall be in a principal amount of at least Fifty Thousand Dollars ($50,000.00).  Each Loan Notice (whether telephonic or written) shall specify:

(i)     the requested date of the Advance (which shall be a Business Day);

(ii)     the principal amount of the Advance requested to be borrowed;

(iii)    the recipient of each portion of the Loan Proceeds requested; and

(iv)    the specific use of the Loan Proceeds requested.

(b)     Borrower shall have no right to request, and Lender shall have no obligation to honor, more than two requests for Advances in any calendar week.

(c)     Following receipt of a Loan Notice, and upon satisfaction of the applicable conditions set forth in Section 5.1 (and, if such borrowing is the initial Advance, Section 6.1), Lender shall make the amount of the requested Advance available to Borrower by wire transfer not later than 1:00 p.m. on the Business Day specified in the Loan Notice.  Lender shall make the Advance in accordance with instructions provided by Borrower to (and reasonably acceptable to) Lender.

(d)     After the occurrence of a Default, Lender shall have no obligation to honor any Borrower request for an Advance.

(e)     At Borrower's request, Lender shall promptly notify Borrower of the Interest Rate applicable to any Interest Period upon determination by Lender of such Interest Rate.

## ARTICLE 8

## FURTHER AGREEMENTS OF BORROWER

8.1     **Furnishing Information**.  Borrower will:

(a)     deliver to Lender weekly updates of the cash flow results and weekly variance reports;

(b)     deliver to Lender monthly updates certified by the Chief Restructuring Officer with respect to Asset Sales, cost savings, construction progress, and other matters reasonably requested by Lender;

(c)     deliver to Lender reports demonstrating compliance within 10% of the total net cash flow as shown in the Budget, reported weekly and tested weekly on a rolling four week basis;

(d)     deliver to Lender, as soon as practicable, and in advance of filing with the Bankruptcy Court: (i) the proposed Final Order, (ii) all other proposed orders and pleadings related to the Collateral or the Loan, (iii) any plan of reorganization or liquidation, and/or (iv) any disclosure statement related to such plan.  All of the forgoing must be in form and substance reasonably satisfactory to Lender;

(e)     not later than the 15th Business Day of each month after the date of this Agreement, deliver to Lender, (i) an updated rolling cash flow forecast setting forth on a

line-item basis anticipated cash receipts and expenditures for Borrower for the succeeding 13-week period (together with a comparison of actual payments to budgeted line items for the immediately preceding monthly period).

(f)      promptly supply Lender with such information concerning Borrower's assets, liabilities and affairs, as Lender may reasonably request from time to time hereafter; which shall include, without necessity of any request by Lender, as soon as available and in no event later than ninety (90) days after the close of each fiscal year, and within thirty (30) days of the end of each fiscal quarter, unaudited financial statements of Borrower showing the results of operations and consisting of a balance sheet, cash flow statement, and statement of income and expense prepared in accordance with GAAP and signed by an officer of Borrower;

(g)      promptly notify Lender of any condition or event which constitutes (or which, with the giving of notice or lapse of time, or both, would constitute) an Event of Default;

(h)      promptly notify Lender of any circumstance or condition that would constitute a Material Adverse Effect, and of any material adverse change in the financial condition of Borrower or the value of the Collateral;

(i)      promptly after the same is available (to the extent not otherwise previously delivered), furnish to Lender's counsel all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case, or distributed by or on behalf of Borrower to the Committee, if any (other than confidential information provided to Borrower by any other bidder for Borrower's assets); and

(j)      promptly upon receiving a request therefor from Lender, prepare and deliver to Lender such other information with respect to Borrower or the Collateral, including, without limitation, schedules identifying and describing the Collateral and any dispositions thereof or any Asset Sale (other than those Asset Sales permitted pursuant to Section 8.3(b) (and the use of the Net Cash Proceeds thereof), as from time to time may be reasonably requested by Lender.

8.2      **Affirmative Covenants**.

(a)      **Existence, Etc**.  Borrower shall at all times maintain its organizational existence and preserve and keep, or cause to be preserved and kept, in full force and effect its rights and franchises material to its businesses.

(b)      **Powers; Conduct of Business**.  Borrower shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified and where the failure to be so qualified will have or could reasonably be expected to have a Material Adverse Effect.  Borrower shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

(c)      **Compliance with Laws, Etc.**  Borrower shall (i) comply with all Legal Requirements and all restrictive covenants affecting such Person or the business, properties,

assets or operations of such Person, and (ii) obtain, as needed, all permits necessary for its operations and maintain such permits in good standing unless failure to comply or obtain could not reasonably be expected to have a Material Adverse Effect.

(d)     **Use of Proceeds**.  Borrower will solely and exclusively use the Loan Proceeds in the manner specified in this Agreement, the Loan Notice, the Budget and the Orders, as applicable.  No portion of the Loan Proceeds shall be used in any manner that causes or might cause the Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

(e)     **Payment of Taxes**.  To the extent provided for in the Budget, Borrower shall pay all post-petition taxes, assessments and other governmental charges imposed upon it or on any of its properties or assets or in respect of any of its franchises, business, income or property before any penalty or interest accrues thereon; provided, however, that no such taxes, assessments and governmental charges (and interest, penalties or fines relating thereto) need be paid if being contested in good faith by appropriate proceedings diligently instituted and conducted.

(f)     **Insurance**.  Borrower shall maintain in full force and effect insurance policies and programs or other policies and programs as reflect coverage that is reasonably consistent with prudent industry practice.  Not later than ten (10) Business Days following the Closing Date, Borrower shall deliver to Lender endorsements in form and substance acceptable to Lender (i) to all "All Risk" physical damage insurance policies on all of such Borrower's tangible real and personal property and assets and business interruption insurance policies naming Lender as loss payee, and (ii) to all general liability and other liability policies naming Lender as an additional insured.  In the event Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligations or resulting Event of Default hereunder and without obligation to do so, may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which Lender deems advisable.  All sums so disbursed by Lender shall constitute part of the Obligations, payable as provided in this Agreement.

(g)     **Inspection of Property; Books and Records; Discussions**.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect any of the properties of Borrower to examine, audit, check and make copies of its financial and accounting records, books, journals, orders, receipts and any correspondence and other data relating to their respective businesses or the transactions contemplated hereby (including, without limitation, in connection with environmental compliance, hazard or liability), and to discuss their affairs, finances and accounts with their officers and independent certified public accountants, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.  Without limiting the foregoing, Borrower shall permit any authorized representatives designated by Lender to complete each such audit, collateral analysis, appraisal, field examination, environmental survey, or other business analysis with respect to Borrower as Lender shall request, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.

(h) **Insurance and Condemnation Proceeds**.  Borrower hereby directs all insurers under policies of property damage, boiler and machinery and business interruption insurance and payors of any condemnation claim or award relating to the property to pay all proceeds payable under such policies or with respect to such claim or award for any loss with respect to the Collateral directly to Lender.

(i) **Maintenance of Property**.  Borrower shall cause all property used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the applicable Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing contained herein shall prevent Borrower from discontinuing the operation or maintenance of any of such property if such discontinuance is, in the judgment of Borrower, desirable in the conduct of its business and not disadvantageous in any material respect to the interests of Lender.

(j) **Waiver of Claims**.  Borrower shall waive any claims arising under Bankruptcy Code section 506(c) against Lender or the Loan, and shall not commence any actions adverse to Lender or its rights and remedies under the Loan.

(k) **Further Assurance**.  At Lender's reasonable request, Borrower will execute and deliver such documents as may be necessary to perfect and maintain perfected and valid Liens upon the Collateral and the personal property located thereon, the Liens granted to Lender pursuant to this Agreement or any of the other Loan Documents, and to fully consummate the transactions contemplated by this Agreement.

(l) **Cash Reports**.  Each month Borrower shall deliver to Lender the Borrower's 13-week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior month period and in form and substance reasonable satisfactory to Lender.  Weekly, Borrower shall deliver to Lender the cash flow forecast and weekly variance reports.

(m) **Budget**.  Borrower shall only incur and make expenditures, and shall only advance funds to other Persons (i) as provided for in the Budget, tested every second week on a rolling four (4) week basis (other than the first testing period at the end of week two, which shall be based on the immediately preceding two (2) weeks) with regards to aggregate cash receipts and aggregate cash disbursements, each subject to a ten percent (10%) negative variance to the Budget over the four week period, or (ii) with the prior written approval of, and subject to any conditions as set forth by, Lender in its reasonable discretion.

(n) **Management Agreement**.  Unless superseded by the New Management Agreement, Borrowers shall not be in default under, or seek to reject or terminate, or seek to renegotiate materially or otherwise repudiate (i) the Existing Management Agreement or (ii) the Transitional Subcontract.

(o)    **Other Monthly Reports**.  Borrower shall deliver to Lender monthly updates with respect to asset sales, cost savings, construction progress, and other matters reasonably requested by the Lender.

(p)    **Final Order**.  Borrower shall cause the Final Order Entry Date to occur no later than July 15, 2011.

8.3    **Negative Covenants**.

(a)    **Indebtedness**.  Neither Borrower nor its Subsidiaries (if any) shall directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(i)    the Obligations;

(ii)    the    Prepetition    Indebtedness    (including    intercompany Indebtedness);

(iii)    Indebtedness constituting Contingent Obligations permitted by Section 8.3(d);

(iv)    secured or unsecured purchase money Indebtedness (including Capitalized Leases) incurred subsequent to the Filing Date to finance the acquisition of assets used in the business, if (1) at the time of such incurrence, no Default or Event of Default has occurred and is continuing or would result from such incurrence, (2) such Indebtedness has a scheduled maturity and is not due on demand, (3) such Indebtedness does not exceed the lower of the fair market value or the cost of the applicable fixed assets on the date acquired, (4) such Indebtedness does not exceed One Hundred Thousand Dollars ($100,000.00) in the aggregate outstanding at any time, and (5) any Lien securing such Indebtedness is permitted under Section 8.3(c) (such Indebtedness being referred to herein as "**Permitted Purchase Money Indebtedness**"); and

(v)    unsecured Indebtedness with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(b)    **Sales of Assets**.  Borrower will not sell, transfer, lease, exchange, alienate or dispose of any or all Collateral, other than (i) in the ordinary course of Borrower's business, and then only to the extent such transfers are limited to Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate, and (ii) in accordance (or not inconsistent) with the Orders.

(c)    **Liens**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets except:

(i)    Liens created by the Loan Documents or otherwise securing the Obligations;

(ii)    Permitted Existing Liens;

(iii)     Customary Permitted Liens;

(iv)     Replacement and additional Liens in favor of the Trustee as adequate protection granted pursuant to the Cash Collateral Order, which Liens are junior to the Liens contemplated hereby in favor of Lender, <u>provided</u> that the Orders provide that the holders of such junior Liens shall not be permitted to take any action to foreclose with respect to such junior Liens so long as any amounts shall remain outstanding hereunder or any Commitment shall be in effect.  Notwithstanding the preceding sentence or any other provision of this Agreement, in the event that (a) the Lender is not pursuing its remedies against the Collateral or is pursuing remedies in bad faith or for an improper purpose and (b) there is no order of the Court (other than the Interim Order or any order approving this Agreement on a final basis) prohibiting the Lender from pursuing its remedies against the Collateral, then on 10 days' written notice from the Trustee to the Lender upon the occurrence of a Termination Event (as defined in any Cash Collateral Order), the Trustee shall be permitted to exercise remedies against Collateral in a manner that is otherwise permitted by and consistent with the Cash Collateral Order, absent an order of this Court to the contrary.  Nothing herein shall affect any rights of the Trustee to seek relief from the automatic stay, relief from this order, or to seek to enforce the Cash Collateral Order.  For avoidance of doubt, any amounts recovered by the Trustee from Collateral shall be paid to the Lender until all outstanding Obligations under the Facility have been indefeasibly paid in full.

(v)     purchase money Liens (including the interest of a lessor under a Capitalized Lease and Liens to which any property is subject at the time of the applicable Borrower's acquisition thereof) securing Permitted Purchase Money Indebtedness; <u>provided</u> that such Liens shall not apply to any property of Borrower other than that purchased or subject to such Capitalized Lease.

(d)     **Contingent Obligations**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create or become or be liable with respect to any Contingent Obligation, except:  (i) recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business; (ii) Prepetition Contingent Obligations; (iii) obligations, warranties, and indemnities, not relating to Indebtedness of any Person, which have been or are undertaken or made in the ordinary course of business and not for the benefit of or in favor of an Affiliate of Borrower; (iv) Contingent Obligations entered into in connection with any Indebtedness of Borrower permitted by Section 8.3(a)(iii); and (v) Contingent Obligations with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(e)     **Sales and Leasebacks**.  Borrower shall not become liable, directly, by assumption or by Contingent Obligation, with respect to any lease, whether an operating lease or a Capitalized Lease, of any property (whether real or personal or mixed) (i) which it or one of its Subsidiaries sold or transferred or is to sell or transfer to any other Person, or (ii) which it or one of its Subsidiaries intends to use for substantially the same purposes as any other property which has been or is to be sold or transferred by it or one of its Subsidiaries to any other Person in connection with such lease.

(f)    **Distributions**.  Borrower shall not make any distributions to its members, partners or shareholders.

(g)    **Material Investments**.  Borrower shall not make any material investment in excess of Fifty Thousand Dollars ($50,000.00) unless set forth in the Budget and authorized by Lender or otherwise in accordance with the United States Trustee's Guidelines for Debtors-in-Possession.

(h)    **Restriction on Fundamental Changes**.  Borrower shall not enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), or convey, lease, sell, transfer or otherwise dispose of, in one transaction or series of transactions, all or substantially all of Borrower's business or property, whether now or hereafter acquired.

(i)    **Subrogation Rights**.  Borrower shall not assert any right of subrogation or contribution against any other Borrower until all Obligations are paid in full and the Commitment is terminated.

(j)    **Corporate Documents**.  Borrower shall not amend, modify or otherwise change (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code, without the prior written consent of Lender.

(k)    **Prohibition Against Additional Recordings**.  Borrower will not record or permit to be recorded any document, instrument, agreement or other writing against the Collateral without the prior written consent of Lender.

(l)    **Chapter 11 Claims; Adequate Protection**.  Borrower shall not incur, create, assume, suffer to exist or permit any (i) administrative expense, unsecured claim, or other super-priority claim or Lien on the Collateral that is pari passu with or senior to the claims of Lender against Borrower hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out and Permitted Liens, or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than with respect to the Obligations, the Prepetition Indebtedness, as set forth in the Cash Collateral Order or otherwise as approved by Lender.

(m)    **Limitation on Prepayments of Prepetition Indebtedness**.  Except as otherwise permitted by the Orders or agreed to by Lender, including with respect to the Prepetition Indebtedness, Borrower shall not (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Indebtedness, (ii) pay any interest on any Prepetition Indebtedness (whether in cash, in kind securities or otherwise), (iii) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or (iv) apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, that (x) Borrower shall make payments required to be made by the Bankruptcy Code, including under section 365 of the Bankruptcy Code and

adequate protection payments set forth in the Cash Collateral Order or as otherwise approved by the Bankruptcy Court and consented to by Lender, and (y) Borrower may make payments permitted by any of the "first day" orders consented to by Lender and any other orders of the Bankruptcy Court consented to by Lender.

(n) **Orders**.  Borrower shall not make or permit to be made any change, amendment or modification, or make any application or motion for any change, amendment or modification, to the Orders other than as approved in writing by Lender.

(o) **Plan**.  Borrower shall not revise or otherwise amend the Plan (unless such amendment is permitted under the Lock-Up Agreement), without Lender's consent, or take any action which is inconsistent with consummation of the Plan, including, without limitation, pursuing a plan materially different than the Plan (unless such amendment is permitted under the Lock-Up Agreement).

## ARTICLE 9

## ASSIGNMENTS; CONFIDENTIALITY

9.1  **Successors and Assigns**.  The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or obligations under the Loan Documents.  Lender may at any time, and from time to time, assign or transfer the Loan without the consent of Borrower; provided, however, that no such assignment shall release Lender from its obligations hereunder.  Any assignee or transferee agrees by acceptance thereof to be bound by all the terms and provisions of the Loan Documents.  Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the holder of the Note, shall be conclusive and binding on any subsequent holder, transferee or assignee of the Note or of any instruments issued in exchange therefore.

9.2  **Confidentiality**.   Subject to Section 9.3, Lender and its representatives, consultants and advisors shall hold all nonpublic information obtained pursuant to the requirements of this Agreement and identified as such by Borrower in accordance with such Person's customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices; provided, however, such Persons may make disclosure (i) to Affiliates of Lender, (ii) to prospective transferees or participants in connection with the contemplated participation or assignment, or (iii) as required or requested by any Governmental Authority or representative thereof or pursuant to legal process and shall require any such Affiliate or transferee to agree (and require any of its transferees to agree in writing) to comply with this Section 9.2.  In no event shall Lender or any of its Affiliates be obligated or required to return any materials furnished by any Borrower; provided, however, each prospective transferee shall be required to agree that if it does not become a participant or assignee, it shall return all materials furnished to it by or on behalf of Borrower in connection with this Agreement.

9.3  **Dissemination of Information**.  Borrower authorizes Lender and its Affiliates to disclose to any prospective participant or transferee any and all information in Lender's or

Affiliate's possession concerning each of Borrower and its Subsidiaries and the Collateral; provided that prior to any such disclosure, such prospective participant or transferee shall agree in writing to preserve, in accordance with Section 9.2, the confidentiality of any confidential information described therein

## ARTICLE 10

## EVENTS OF DEFAULT BY BORROWER

10.1 **Event of Default Defined**. The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a) Borrower shall fail to pay when due hereunder or under the other Loan Documents any of the Obligations, including without limitation, any interest or other charges required to be paid;

(b) Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under this Agreement or under the other Loan Documents;

(c) The existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Agreement or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower;

(d) The dissolution, termination or merger of Borrower;

(e) The occurrence of an "Event of Default" under the Note or any of the other Loan Documents;

(f) The Bankruptcy Court shall dismiss the Chapter 11 Case or shall convert the Chapter 11 Case to a Chapter 7 Case;

(g) Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case (in each case other than the incumbent Chief Restructuring Officer of Borrower or the appointment by Borrower or its Affiliates of a successor);

(h) Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case (i) approving additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Liens expressly permitted in the Orders or Cash Collateral Orders) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Lender, (iii) granting any

claim priority senior to or pari passu with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, other than the Carve-Out, or (iv) granting any other relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or their interest in the Collateral;

(i)     Borrower shall fail to comply with the terms of the Orders or any other Bankruptcy Court Order in any material respect;

(j)     The Orders shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender;

(k)     Borrower, or any of its Affiliates, shall file a motion for reconsideration or other motion which seeks to materially and adversely affect Lender's rights;

(l)     The right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court;

(m)     Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower), any other Person's motion to, disallow in whole or in part the Lender's claim in respect of the Obligations or to challenge the validity, perfection, non-avoidability or enforceability of the Liens in favor of Lender;

(n)     Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness, other than in accordance with the Cash Collateral Order;

(o)     Unless in connection with a duly confirmed plan of reorganization, the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower which have an aggregate value in excess of Fifty Thousand Dollars ($50,000.00) or (ii) to permit other actions that would have a Material Adverse Effect on Borrower or the Chapter 11 estates;

(p)     Any judgments which, to the extent not covered by insurance, are in the aggregate in excess of Fifty Thousand Dollars ($50,000.00) as to any postpetition obligation shall be rendered against Borrower and the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrower a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents;

(q)     Absent the written consent of Lender and unless in connection with a duly confirmed plan of reorganization, entry by the Bankruptcy Court of an order under section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of any of Borrower's assets, or procedures in respect thereof, or Borrower shall seek, support, or fail to contest in good faith, the entry of such an order in the Chapter 11 Case;

(r)     A Chapter 11 plan of reorganization or liquidation with respect to Borrower is filed and (i) the treatment of the claims of Lender in such plan is not approved by Lender, or (ii) such plan does not provide for the payment in full, in cash, of the Obligations on or prior to the effective date of such plan;

(s)     Borrower, or any of its Affiliates, shall be in default under any material commitment or Indebtedness (other than in connection with any Prepetition Indebtedness) affecting such Persons or the Collateral;

(t)     Borrower's failure to substantially comply with the Budget, tested weekly on a rolling four (4) week basis with regards to total cash flow (after giving effect to the cumulative ten percent (10%) variance permitted hereunder;

(u)     The failure by any Borrower Subsidiary to perform or satisfy, as applicable, the covenants set forth in Sections 8.2 and 8.3 of this Agreement applicable to such Borrower Subsidiary; or

(v)     The Final Order Entry Date shall not have occurred by July 15, 2011 or the Final Order is not a final non-appealable order no longer subject to any appeal that may have a material adverse impact on the rights or interests of the Lender within 45 days after the Filing Date.

(w)     The joint hearing on the Disclosure Statement and confirmation of the Plan shall not have occurred within one hundred twenty (120) days of the Filing Date.

(x)     The Lock-up Agreement terminates.

(y)     Borrower fails to pay the Termination Fee as and when due and payable.

(z)     Borrower fails to obtain an order of the Bankruptcy Court authorizing the assumption of the Existing Management Agreement.

(aa)     The Existing Management Agreement is terminated or expires and the New Management Agreement has not become effective.

## ARTICLE 11

## LENDER'S REMEDIES UPON EVENT OF DEFAULT

11.1     **Remedies**.  Upon the occurrence of any Event of Default, at the request of (or with the consent of) Lender, and upon notice to Borrower:

(a)     the Commitment shall immediately terminate;

(b)     all Obligations, including the unpaid principal amount of and accrued interest on the Loan, shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower;

(c)     Lender may enforce any and all Liens and security interests created pursuant to the Loan Documents and subject to the Orders; and

(d)     Lender may enforce its other rights and remedies under the Loan Documents or applicable Law and subject to the Orders.

11.2   **Setoff Rights**.  In addition to any rights of setoff that Lender may have under applicable law, Lender, without notice of any kind to Borrower, may appropriate and apply to the payment of the Note or of any sums due under this Agreement or the other Loan Documents, any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender.

11.3   **Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances**.  If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing, and any amounts advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed.  Loan Proceeds advanced by Lender to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand and evidenced and secured by the Loan Documents.

11.4   **Attorneys' Fees**.  Borrower will pay Lender's reasonable attorneys' fees and costs in connection with the negotiation, preparation, administration and enforcement of this Agreement and will pay Lender's reasonable attorneys' fees and costs in connection with the administration and enforcement of this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, if at any time or times hereafter Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Collateral or the Loan Documents (including any bankruptcy proceeding) or if Lender employs one or more counsel to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral, or to attempt to enforce or protect any security interest or Lien or other right in any of the Collateral or under any of the Loan Documents, or to enforce any rights of Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents.

11.5   **No Waiver**.  No failure by Lender to exercise, and no delay by Lender in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.6 **Application of Procceds**. The repayment of the Loan and other Obligations pursuant to this Agreement shall be applied in the following order of priority:

(a) **First**, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to Lender, including fees, charges and disbursements of counsel to Lender and other amounts payable under Section 4.9;

(b) **Second**, to payment of accrued and unpaid interest on the Loan and the other Obligations; and

(c) **Third**, to payment of unpaid principal on the Loan and the other Obligations.

# ARTICLE 12

# MISCELLANEOUS

12.1 **Time is of the Essence**. Borrower agrees that time is of the essence with respect to all of its covenants and obligations under this Agreement.

12.2 **Amendments, Etc**. No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be effective unless in writing and signed by Lender and Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.3 **Determination of Facts**. Lender shall be free at all times to establish independently to its satisfaction and in its sole and absolute discretion the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

12.4 **Prior Agreements**. This Agreement and the other Loan Documents, and any other documents or instruments executed pursuant thereto or contemplated thereby, shall represent the entire, integrated agreement between the parties hereto with respect to the transactions contemplated hereby, and shall supersede all prior negotiations, representations or agreements pertaining thereto, either oral or written. This Agreement and any provision hereof shall not be modified, amended, waived or discharged in any manner other than by a written amendment executed by all parties to this Agreement.

12.5 **Disclaimer by Lender**. Lender shall not be liable to any subcontractor, supplier, laborer, architect, engineer or any other party for services performed or materials supplied, nor shall Lender be liable for any debts or claims accruing in favor of any such parties against Borrower or against the Collateral. Borrower is not and shall not be an agent of Lender for any purposes, nor shall it be venture partners with Lender in any manner whatsoever. Lender shall not be deemed to be in privity of contract with any subcontractor, or provider of services on or to any Collateral, nor shall any payment of funds directly to a subcontractor, or provider of services be deemed to create any third party beneficiary status or recognition of same by Lender unless and until Lender expressly assumes such status in writing. No subcontractor, supplier, laborer,

architect, engineer or other party shall be deemed to be a third party beneficiary of this Agreement or any of the Loan Documents. Approvals granted by Lender for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any written approval or, if not in writing, such approvals shall be solely for the benefit of Borrower.

12.6 **Borrower Indemnification**. To the fullest extent permitted by law, Borrower hereby agrees to protect, indemnify, defend and save harmless Lender and its directors, officers, Agents and employees from and against any and all liability, expense or damage of any kind or nature and from any suits, claims or demands, including legal fees and expenses on account of any matter or thing or action or failure to act by Lender, whether or not in litigation, arising out of this Agreement or in connection herewith unless such suit, claim or damage is caused solely by any act, omission or willful malfeasance of Lender, its directors, officers, Agents and authorized employees. This indemnity is not intended to excuse Lender from performing hereunder. This obligation on the part of Borrower shall survive the repayment of the Loan and any cancellation of this Agreement. Borrower shall pay, and hold Lender harmless from, any and all claims of any brokers, finders or Agents claiming a right to any fees in connection with arranging the financing contemplated hereby.

12.7 **Captions**. The captions and headings of various Articles and Sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

12.8 **Inconsistent Terms and Partial Invalidity**. In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, Lender may elect which terms shall govern and prevail. If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

12.9 **Subsidiaries**. Borrower and Lender acknowledge that Borrowers currently have no Subsidiaries. In the event the Borrower has a Subsidiary in the future, provisions herein pertaining to Subsidiaries shall apply to such Subsidiary or Subsidiaries of Borrower.

12.10 **Approvals**. All consents and approvals required in this Agreement shall be in writing, unless Borrower and Lender agree in writing to waive such requirement.

12.11 **Gender and Number**. Any word herein which is expressed in the masculine or neuter gender shall be deemed to include the masculine, feminine and neuter genders. Any word herein which is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and the plural.

12.12 **Notices**. Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iii) by overnight express carrier, addressed in each case as follows:

| To Lender: | Redwood Capital Investments, LLC |
| | 7301 Parkway Drive |
| | Hanover, MD  21076 |
| | Attn:  General Counsel |

| With copy to: | Redwood Capital Investments, LLC |
| | 7301 Parkway Drive |
| | Hanover, MD  21076 |
| | Attn:  Randall D. Sones |

To Borrower:

Alvarez & Marsal
55 West Monroe, Suite 4000
Chicago, IL 60603
Attn:  Paul Rundell

And

North Shores Consulting
11365 Heathertoe Lane
Columbia, MD  21044
Attn:  Thomas L. Brod

And

Houlihan Lokey
123 N Wacker Dr, 4th Fl
Chicago, IL  60606
Attn:  Scott Jackson

| With copy to: | Erickson Living Management LLC |
| | 701 Maiden Choice Lane |
| | Baltimore, MD 21228 |
| | Attn: Gerald Doherty |

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY  10020
Attn:  Thomas R. Califano
           George B. South

Whiteford Taylor & Preston LLP
Seven St. Paul Street
Baltimore, MD 21228
Attn:  Deborah H. Diehl

To Trustee:

Wells Fargo Corporate Trust
MAC N9303-120
Sixth and Marquette
Minneapolis, MN 55479
Attn:  Virginia A. Housum

With copy to:

Mintz Levin
One Financial Center
Boston, MA 02111
Attn:  Richard H. Moche
           William W. Kannel

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto.  All notices sent pursuant to the terms of this Section 12.12 shall be deemed received (a) if personally delivered, then on the date of delivery, (b) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (c) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

12.13  **Effect of Agreement**.  The submission of this Agreement and the Loan Documents to Borrower for examination does not constitute a commitment or an offer by Lender to lend money to Borrower.  This Agreement shall become effective only upon execution and delivery hereof by Lender to Borrower.

12.14  **Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland, without reference to the choice of law or conflicts of law principles of such State.

12.15  **Waiver of Defenses**.  OTHER THAN CLAIMS BASED UPON THE FAILURE OF LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, BORROWER HEREBY WAIVES EVERY PRESENT AND FUTURE DEFENSE

(OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT. PROVIDED THAT LENDER ACTS IN GOOD FAITH, BORROWER RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.**

12.16  **Consent to Jurisdiction**. **TO INDUCE LENDER TO ACCEPT THE NOTE, BORROWER IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THE LOAN DOCUMENTS WILL BE LITIGATED IN COURTS HAVING SITUS IN MARYLAND. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN MARYLAND, WAIVES PERSONAL SERVICE OF PROCESS UPON BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.**

12.17  **Waiver of Jury Trial**. **BORROWER AND LENDER, HAVING BEEN REPRESENTED BY COUNSEL EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

12.18  **Usury Savings Clause.**  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loan made hereunder shall bear interest at the Highest Lawful Rate.

12.19  **Counterparts; Facsimile Signatures**.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic

records of executed Loan Documents maintained by Lender shall be deemed to be originals thereof.

12.20 **THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**IN WITNESS WHEREOF**, Lender and Borrower have caused these presents to be executed the day and year first above written.

**Borrower:**
**HINGHAM CAMPUS, LLC**

By: _____
    Name:
    Title:

**LINDEN PONDS, INC.**

By: _____
    Name:
    Title:

**Lender:**
**REDWOOD CAPITAL INVESTMENTS, LLC**

By: _____
    Name:
    Title: